UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -:
MASTR ADJUSTABLE RATE MORTGAGES    : 12 Civ. 7322 (HB) (JCF)
TRUST 2006-OA2, MASTR ADJUSTABLE   :
RATE MORTGAGES TRUST 2007-1, MASTR :    MEMORANDUM
ADJUSTABLE RATE MORTGAGES TRUST    :    <u>AND   ORDER</u>
2007-3,                            :
                                   :
              Plaintiffs,          :
                                   :
     - against -                   :
                                   :
UBS REAL ESTATE SECURITIES INC.,   :
                                   :
              Defendant.           :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     The spoliation motion now before the Court raises significant
issues about when the duty to preserve evidence arises, what
constitutes an adequate litigation hold, and what degree of
culpability warrants spoliation sanctions.  Determination of the
motion ultimately turns, however, on whether relevant information
has been lost.

     The defendant, UBS Real Estate Securities, Inc. ("UBS"),
contends that U.S. Bank, N.A. ("U.S. Bank"), the trustee for the
trusts that are the nominal plaintiffs in this action, failed to
implement any litigation hold when it should have reasonably
anticipated litigation.  Further, UBS maintains that when U.S.
Bank belatedly sought to preserve documents, the hold that it did
impose was inadequate.  As a consequence, information was

1

destroyed, and UBS now moves for an order dismissing the claims asserted by U.S. Bank or, at a minimum, an order directing the jury to draw an adverse inference against U.S. Bank. For the reasons that follow, the motion is denied.

<u>Background</u>

    A. <u>Residential Mortgage-Backed Securities</u>

Asset-backed securities distribute risk and return to investors by pooling cash-producing financial assets and issuing securities backed by the pool of underlying assets. (Complaint ("Compl."), ¶ 14). One form of asset-based securities comprises Residential Mortgage-Backed Securities ("RMBS"), where the underlying assets consist of residential mortgage loans. (Compl., ¶¶ 14-15). Generally, a sponsor will create a portfolio of mortgage loans, which it will transfer to a trust, sometimes through an intermediary known as the depositor. (Compl., ¶ 15). Once the trust receives the portfolio of mortgage loans, it issues RMBS, using the pool of loans as collateral. (Compl., ¶ 16). Investors purchase the securities, which are known as Certificates, and acquire the rights to the cash generated by the borrowers' payment of principal and interest on the mortgage loans held by the trust. (Compl., ¶ 16). In some instances, the return on investment for the Certificateholders is guaranteed by a financial guaranty insurer in return for a premium; the presence of such

insurance increases the value and rating of RMBS. (Compl., ¶¶ 17-18).  Sponsors of securitizations frequently make representations and warranties concerning the quality of the underlying mortgage loans and covenant in the applicable contracts that, if the loans fail to conform to the representations and warranties, the sponsor will replace the defective loans, cure the defects, or repurchase the loans within a specified time period.  (Compl., ¶ 18).

B. <u>The Transactions</u>

Three transactions are at issue in this case.  The first closed on November 15, 2006, and created the Mastr Adjustable Rate Mortgages Trust 2006-OA2 ("MARM 2006-OA2").  (Compl., 20).  The Trust issued 21 classes of certificates with a total face value of $1.99 billion, backed by residential mortgages with an aggregate principal balance of approximately $2.01 billion at closing. (Compl., ¶ 20).  The second transaction closed on January 16, 2007, and established the Mastr Adjustable Rate Mortgages Trust 2007-1 ("MARM 2007-1").  (Compl., ¶ 21).  MARM 2007-1 issued 40 classes of certificates with a total face value of approximately $2.09 billion, backed by mortgages with an aggregate principal balance of approximately $645 million.  (Compl., ¶ 21).  Finally, the third transaction closed on May 15, 2007, creating the Mastr 2007-3 Adjustable Rate Mortgages Trust ("MARM 2007-3").  (Compl., ¶ 22).  MARM 2007-3 issued 28 classes of certificates with a total face

value of approximately $2.57 billion, backed by mortgages with an aggregate principal balance of approximately $2.58 billion. (Compl., ¶ 22). In each instance, UBS served as the sponsor, assembling the portfolio of residential mortgages, which it transferred to its affiliated depositor, Mortgage Asset Securitization Transactions, Inc. ("MAST"); MAST, in turn, conveyed the loans to the respective trusts. (Compl., ¶¶ 11, 23, 25). In each transaction, Assured Guaranty Municipal Corp. ("Assured") provided financial guaranty insurance on certain classes of the certificates that the trusts ultimately issued. (Compl., ¶¶ 9, 20-22).

Each of the transactions was governed by a pooling and servicing agreement ("PSA"), the terms of which were substantially the same. (Compl., ¶¶ 25-30). In each of the PSAs, UBS made representations and warranties concerning the quality of the underlying residential mortgages, including that they were underwritten in accordance with the originator's guidelines and that information about such items as the loan-to-value ratio of the mortgage and the borrower's debt-to-income ratio was true and correct. (Compl., ¶¶ 27-28). Under the PSAs, if Assured, as Certificate Insurer, determined that any mortgage loan failed to conform to the representations in a material way, it was entitled to give notice to UBS, which was then obligated to cure the breach,

substitute a conforming loan, or repurchase the defective loan.
(Compl., ¶ 29).  If UBS did not cure or repurchase the loan within
90 days, U.S. Bank, as Trustee, was required to enforce UBS's
obligations.  (Compl., ¶ 30).

C. <u>The Litigation</u>

On February 2, 2012, Assured filed an action against UBS in
New York State Supreme Court, which UBS removed to this court on
March 5, 2012 (the "<u>Assured</u> Litigation").  Assured asserted three
claims for breach of contract and two claims for declaratory
judgment.  The first contract claim asserted that UBS breached its
representations and warranties with respect to the quality of the
underlying mortgages.  <u>Assured Guaranty Municipal Corp. v. UBS Real</u>
<u>Estate Securities, Inc.</u>, No. 12 Civ. 1579, 2012 WL 3525613, at *1
(S.D.N.Y. Aug. 15, 2012).  The second alleged that UBS breached the
PSAs by failing to repurchase defective loans after receiving
demands from Assured.  <u>Id.</u>  In the third claim, Assured maintained
that UBS breached its obligation, contained in certain commitment
letters, to confirm that the loans had received certain ratings.
<u>Id.</u>  The fourth cause of action sought a declaration of UBS's
continuing obligation to cure pervasive breaches, and the fifth
sought a declaration that UBS was required to reimburse Assured.
<u>Id.</u>

UBS moved to dismiss the complaint, and on August 15, 2012,

the Honorable Harold Baer, U.S.D.J., issued a decision granting the motion in part and denying it in part.  He denied the motion to dismiss the contract claims contained in the first and third causes of action but dismissed the demands for declaratory judgment in the fourth and fifth causes of action.  Id. at *3-7.  Most importantly for present purposes, he dismissed Assured's repurchase claims, holding that under the PSAs, Assured was not an entity that could enforce the repurchase obligation; it could only direct the Trustee to do so.  Id. at *4.

Accordingly, U.S. Bank filed the instant action as a related case on September 28, 2013.[1]  It alleges that as a consequence of alarmingly high delinquency rates among the mortgage loans underlying the RMBS, Assured conducted a review of a sample of the loans and determined that they did not conform to the representations and warranties in the PSAs.  (Compl., ¶¶ 31-36).  On August 9, 2010, Assured sent the first breach notice to UBS, requesting that it cure or repurchase 270 allegedly defective loans from the MARM 2007-1 Trust.  (Compl., ¶ 37).  From that time until

---

[1] UBS moved to dismiss the complaint on the basis, among others, that the Trusts, which are the named plaintiffs, lack the capacity to sue.  Judge Baer rejected that argument, finding that the pleadings made clear that the rights of the Trusts were being enforced by U.S. Bank as Trustee.  Mastr Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc., No. 12 Civ. 7322, 2013 WL 4399210, at *2 (S.D.N.Y. Aug. 15, 2013).

June 28, 2012, Assured issued another sixteen repurchase requests with respect to loans in all three trusts, several of which were followed by identical requests from U.S. Bank. (Compl., ¶ 37). In total these breach notices demanded that UBS cure or repurchase 3,616 mortgage loans with an original unpaid balance of approximately 1.642 billion. (Compl., ¶ 37). UBS declined to repurchase all but a small fraction of those loans. (Compl., ¶ 37). In August and September of 2012, Assured issued another four repurchase demands for which the 90-day cure period had not expired when it filed its complaint in this action. (Compl., ¶ 38). Those demands encompassed an additional 1,026 mortgage loans with an original unpaid balance of approximately $383 million. (Compl., ¶ 38).

During the course of discovery, UBS raised a number of questions about U.S. Bank's efforts to preserve electronically stored information. Pursuant to U.S. Bank's standard policy, e-mail messages are automatically deleted from the system after 90 days and then remain on backup media for another five days. (USBank Messaging Standard Detail, attached as Exh. 2 to Declaration of Scott D. Musoff dated June 19, 2013 ("Musoff Decl."), at 1; Tr. at 20).[2] In this matter, U.S. Bank instituted

---

[2] "Tr." refers to the transcript of the evidentiary hearing held on August 21, 2013.

a litigation hold on October 24, 2012. (Letter of Michael A. Collyard dated May 2, 2013 ("Collyard 5/2/13 Letter"), attached as Exh. 46 to Musoff Decl., at 1; Tr. at 20). Initially, eight persons were identified as custodians of potentially discoverable information and were directed to preserve documents. (Collyard 5/2/13 Letter at 2; Letter of Michael A. Collyard dated April 22, 2013 ("Collyard 4/22/13 Letter"), attached as Exh. 51 to Musoff Decl., at 3). Subsequently, four additional employees were added to the legal hold between January and March of 2013. (Collyard 4/22/13 Letter at 3).

In order to implement the litigation hold, each custodian met first with a business person and later with a business person, in-house counsel, and outside counsel. (Collyard 4/22/13 Letter at 4). The custodians were instructed to preserve relevant e-mails by gathering and forwarding them to a legal hold folder that was not subject to autodelete. (Collyard 4/22/13 Letter at 4). Other documents were preserved because they were not subject to deletion at all. For example, when a U.S. Bank employee printed out an e-mail and sent in to a central file, it would remain there indefinitely. (Collyard 4/22/13 Letter at 4). Similarly, documents pertaining to the individual deals were retained in the central file and in a shared drive. (Collyard 4/22/13 Letter at 4).

8

Discussion

    A.   Legal Standard

"Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Orbit One Communications, Inc. v. Numerex Corp., 271 F.R.D. 429, 435 (S.D.N.Y. 2010) (quoting Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 107 (2d Cir. 2001)); accord Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010); Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 288-89 (S.D.N.Y. 2009).  Where spoliation violates a court order, Rule 37(b) of the Federal Rules of Civil Procedure empowers the court to impose various sanctions, including dismissing the complaint or entering judgment by default, precluding the introduction of certain evidence, imposing an adverse inference, or assessing attorneys' fees and costs. Fed. R. Civ. P. 37(b); see Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 106-07 (2d Cir. 2002); Orbit One, 271 F.R.D. at 435; Richard Green (Fine Paintings), 262 F.R.D. at 288; Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union, 212 F.R.D. 178, 219 (S.D.N.Y. 2003).  A court may impose discovery sanctions even absent the violation of a court

order, pursuant to "its inherent power to manage its own affairs."
Residential Funding, 306 F.3d at 107; accord Richard Green (Fine
Paintings), 262 F.R.D. at 288; In re NTL, Inc. Securities
Litigation, 244 F.R.D. 179, 191 (S.D.N.Y. 2007); Metropolitan
Opera, 212 F.R.D. at 220.  "'The determination of an appropriate
sanction for spoliation, if any, is confined to the sound
discretion of the trial judge, and is assessed on a case-by-case
basis.'"  Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430
(S.D.N.Y. 2004) ("Zubulake V") (quoting Fujitsu Ltd. v. Federal
Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)); see also Harkabi
v. SanDisk Corp., 275 F.R.D. 414, 418 (S.D.N.Y. 2010).

Where a party seeks sanctions based on the spoliation of
evidence, it must establish:

> (1) that the party having control over the evidence had
> an obligation to preserve it at the time it was
> destroyed; (2) that the records were destroyed with a
> culpable state of mind; and (3) that the destroyed
> evidence was relevant to the party's claim or defense
> such that a reasonable trier of fact could find that it
> would support that claim or defense.

Residential Funding, 306 F.3d at 107 (internal quotation marks
omitted); accord Sekisui American Corp. v. Hart, __ F. Supp. 2d __,
__, 2013 WL 4116322, at *4 (S.D.N.Y. 2013); Richard Green (Fine
Paintings), 262 F.R.D. at 289; Treppel v. Biovail Corp., 249 F.R.D.
111, 120 (S.D.N.Y. 2008); Zubulake V, 229 F.R.D. at 430.

10

2.   <u>Obligation to Preserve</u>

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation," including instances where suit has not been filed but the party "should have known that the evidence may be relevant to future litigation." <u>Kronisch v. United States</u>, 150 F.3d 112, 126 (2d Cir. 1998); <u>accord</u> <u>Fujitsu Ltd.</u>, 247 F.3d at 436. "Thus, the preservation requirement arises when a party 'reasonably anticipates litigation.'" <u>Orbit One</u>, 271 F.R.D. at 436 (quoting <u>Pension Committee</u>, 685 F. Supp. 2d at 466); <u>accord</u> <u>Treppel</u>, 249 F.R.D. at 118; <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("<u>Zubulake IV</u>"). "'This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation.'" <u>Apple Inc. v. Samsung Electronics Co.</u>, 888 F. Supp. 2d 976, 990-91 (N.D. Cal. 2012) (quoting <u>Micron Technology, Inc. v. Rambus, Inc.</u>, 645 F.3d 1311, 1320 (Fed. Cir. 2011)).

UBS presents a litany of occurrences that it asserts should have caused U.S. Bank to reasonably anticipate litigation. These began in early 2010, after Assured requested loan files from Wells Fargo, the Master Servicer, in order to "investigate compliance with representations and warranties . . . and to enforce the Mortgage Loan Repurchase remedy, where warranted." (UBS Real

Estate Securities Inc.'s Memorandum of Law in Support of its Motion

for Imposition of Sanctions for Spoliation of Evidence ("Def.

Memo.") at 4; Letter of Stephen Buteau dated Feb. 4, 2009, attached

as Exh. 5 to Musoff Decl., at 1).  According to UBS, the following

events also triggered U.S. Bank's obligation to preserve evidence:

1.   Assured's allegations of breaches of the representations and warranties on hundreds of loans and subsequent repurchase demands between August and December 2010.  (Def. Memo. at 4-5);

2.   Certain certificateholders' threats of litigation in August and September 2010.  (Def. Memo. at 5-6);

3.   Amendment of a complaint in December 2010 in a class action lawsuit pending in the District of New Jersey, which named the MARM 2007-3 Trust as a defendant, alleging that it issued documents containing "material misstatements of fact." (Def. Memo. at 6);

4.   U.S. Bank's agreement in April 2011 to cooperate with Assured's pre-litigation investigation into "enforcing put back rights on behalf of certificate holders" and Assured's later inquiry requesting a discussion with U.S. Bank's counsel on "how [] a lawsuit could be brought." (Def. Memo. at 6-8; E-mail of Linda Kobrin dated March 29, 2011, attached as Exh. 15 to Musoff Decl., at 1; E-mail of Linda Kobrin dated Oct. 20, 2011, attached as Exh. 34 to Musoff Decl., at 1);

5.   U.S. Bank's recognition in November 2011 that Assured might request it "to send [] breach notices and repurchase demands" and Assured's subsequent filing of the Assured Litigation in February 2012. (E-mail of Laura Cawley dated Nov. 18, 2011 ("Cawley 11/18/11 E-mail"), attached as Exh. 35 to Musoff Decl.; Def. Memo. at 8-9);

6.   A certificateholder's requests in July 2012 that

U.S. Bank investigate the strength of Assured's allegations and intervene in the Assured litigation. (Def. Memo. at 9-10);

7.  Judge Baer's August 19, 2012, ruling in the <u>Assured</u> Litigation that only U.S. Bank could enforce repurchase provisions of the PSAs. (Def. Memo. at 10-11); <u>Assured Guaranty</u>, 2012 WL 3525613, at *4;

8.  The filing of this action in September 2012. (Def. Memo. at 11).

U.S. Bank contends that there was no "'credible probability'" of litigation until September 28, 2012, when it filed this suit and promptly instituted a litigation hold.[3] (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Imposition of Sanctions for Spoliation of Evidence ("Pl. Memo.") at 11 (quoting The Sedona Conference Commentary on Legal Holds: The Trigger and the Process, 11 Sedona Conf. J. 265, 269) (emphasis omitted)).

The duty to preserve arose, at the latest, when the <u>Assured</u> Litigation was filed in February 2012. Indeed, it may have arisen prior to that date, for example, in December 2011, when Assured had demanded the repurchase of thousands of loans. (Def. Memo. at 4; Complaint, <u>Assured Guaranty Municipal Corp. v. UBS Real Esatate Securities Inc.</u>, Index No. 650327/2012, New York County Supreme Court ("State Court Compl."), attached as Exh. 8 to Musoff Decl.,

---

[3] As noted, the defendant insists both that the litigation hold was not instituted promptly and that, when instituted, it was inadequate. (Def. Memo. at 13, 16-17). I address these arguments below.

¶ 52).  While U.S. Bank contends that the mere investigation of certain loans, or even demands to repurchase, did not, in this case, indicate a sufficient probability that the trustee would be directed to institute litigation (Pl. Memo. at 12), it is clear that by the end of 2011, the volume of those demands had exploded. Indeed, the principal value of those loans totaled almost $1 billion, but by February 2012, UBS had only agreed to repurchase less than $50 million worth of loans.  (Pl. Memo. at 12; Letter of Nicholas Joseph dated June 24, 2011 ("Joseph 6/24/11 Letter"), attached as Exh. 22 to Musoff Decl., at 3).  Even given U.S. Bank's hands-off approach to these repurchase demands (Pl. Memo. at 13; Joseph 6/24/11 Letter; Cawley 11/10/11 E-mail; Tr. at 58-62, 80-81), their scale, as well as the discrepancy between the number of demands and the number of loans that UBS agreed to repurchase might well have indicated a likelihood of litigation.

However, it is unnecessary to decide if the repurchase demands alone triggered the obligation to preserve, because it is clear that when Assured sued UBS in connection with them, U.S. Bank should have expected that it would be required to participate in litigation.  As Judge Baer held, the PSAs are clear: The trustee is the entity responsible for enforcing repurchase obligations, and Assured's status as a third-party beneficiary of the agreements did not absolve the trustee of that responsibility.  Assured Guaranty,

14

2012 WL 3525613, at *4; (Pooling and Servicing Agreement dated Oct. 1, 2006 ("10/1/06 PSA"), excerpts attached as Exh. 3 to Musoff Decl., § 2.03). The contrary interpretation, under which Assured and U.S. Bank apparently operated, is not a reasonable reading of the contracts -- indeed, Judge Baer disposed of it in short order, devoting a mere two paragraphs to the issue. <u>Assured Guaranty</u>, 2012 WL 3525613, at *4. When Assured filed its suit to enforce those obligations, U.S. Bank should have recognized that Assured did not have that right and that U.S. Bank would likely be called upon to perform its enforcement duty under the PSAs. Therefore, there was a creditable probability of litigation at the filing of the <u>Assured</u> Litigation.[4] U.S. Bank did not institute a litigation hold, however, until eight months later, after it had filed this action.

   3. <u>Culpability</u>

   "This circuit follows a 'case-by-case approach to the failure to produce relevant evidence' because 'such failures occur along a continuum of fault -- ranging from innocence through the degrees of negligence to intentionality.'" <u>Sekisui</u>, ___ F. Supp. 2d at ___, 2013 WL 4116322, at *4 (quoting <u>Residential Funding</u>, 306 F.3d at

---

   [4] U.S. Bank's subjective belief that it would not be litigating does not excuse the failure to preserve. <u>See</u> <u>Apple Inc.</u>, 888 F. Supp. 2d at 990-91; <u>Zubulake IV</u>, 220 F.R.D. at 216.

108).   In order to "protect[] the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an 'empty head, pure heart' defense," one who fails to preserve evidence will be sufficiently culpable even when acting with ordinary negligence.   <u>Orbit One</u>, 271 F.R.D. at 438.

### a.   <u>Bad Faith</u>

UBS contends that U.S. Bank's failure to preserve evidence constitutes bad faith for two primary reasons: (1) U.S. Bank allegedly ignored a warning in an order issued in <u>Verona v. U.S. Bancorp</u>, a case in the Eastern District of North Carolina, stating that "because of the extremely short retention time for certain documents and the absence of back-up tapes, [] U.S. Bank [] and [its] counsel must be particularly vigilant in promptly implementing legal holds so as to preserve evidence that may be relevant to future litigation" (Order dated April 19, 2010 ("<u>Verona</u> Order"), attached as Exh. 1 to Musoff Decl., at 9; Def. Memo. at 18); and (2) the litigation hold U.S. Bank implemented "was woefully insufficient," because it did not suspend the auto-delete function for relevant custodians, omitted certain custodians, and "relied on each custodian's self-selection of e-mails to send to a 'litigation hold' folder" (Def. Memo. at 19).   But neither the <u>Verona</u> order nor U.S. Bank's implementation of its litigation hold indicate bad faith.

16

First, while encouraging U.S. Bank to be vigilant in instituting legal holds, the Verona order actually approved of the company's document retention policy, finding it a reasonable, "neutral policy aimed at managing the presumably large volumes of email generated by a sizable company." (Verona Order at 6). There is no showing that U.S. Bank "ignored" the court's advice; indeed, I fail to see how the admonition to be "vigilant" adds anything to this discussion. Vigilance is, of course, to be encouraged. But a failure of vigilance does not necessarily indicate bad faith.

Moreover, the litigation hold that U.S. Bank finally imposed was reasonable. UBS cites a number of cases that purportedly stand for the proposition that, once there is reasonable anticipation of litigation, routine document destruction policies must be suspended. (Def. Memo. at 19). However, those cases teach merely that a litigation hold is not, alone, sufficient; instead compliance must be monitored. See, e.g., Apple, Inc. v. Samsung Electronics Co., 881 F. Supp. 2d 1132, 1147 (C.D. Cal. 2012) (faulting Samsung failing to follow-up with employees and check compliance); VOOM HD Holdings LLC v. EchoStar Satellite L.L.C., 93 A.D.3d 33, 39-40, 939 N.Y.S.2d 321, 327 (1st Dep't 2012) (faulting defendant for failing to provide guidance to employees or monitor compliance). Here, however, the employees subject to the litigation hold were guided by both business people and counsel as

17

to what to retain, and counsel monitored compliance, gathering and reviewing relevant e-mails in the legal hold folders. (Collyard 5/2/13 Letter at 4-5). Substantive e-mails and attachments were printed out and retained separately, and were not subject to the autodeletion policy. (Tr. at 51-52, 73). Communications from Assured regarding its repurchase demands were similarly not subject to autodeletion, but rather collected and retained separately in a central location. (Tr. at 64-65).

Nor was U.S. Bank's identification of the key players subject to the litigation hold inadequate. UBS complains that Laura Cawley, the "main contact between Assured and U.S. Bank," was not included in the original litigation hold but was added at the beginning of 2013. (Def. Memo. at 19; UBS Real Estate Securities Inc.'s Reply Memorandum of Law in Further Support of Its Motion for Imposition of Sanctions for Spoliation of Evidence ("Reply") at 7). However, as U.S. Bank explains, by March 2012, Ms. Cawley was no longer in a position pertinent to this litigation and all relevant documents had been handed off to her successor, who was included in the original litigation hold. (Pl. Memo. at 19-20; Collyard 5/2/13 Letter at 4-5). Nor did the other employees added to the litigation hold have anything to do with the relevant loans at the inception of this action, and their files, too, were transferred to their successors. (Tr. at 91).

Finally, the fact that custodians self-selected e-mails for retention is not evidence of bad faith in these circumstances. As noted above, the subject custodians were guided by both business people and counsel and thereafter monitored by counsel. Additionally, this is not a case where potential personal liability of the custodians might create an incentive not to act diligently to preserve information. The means by which the litigation hold was implemented therefore provides no evidence of bad faith.[5]

Indeed, there is positive evidence of good faith. It is clear that U.S. Bank subjectively believed that it would not be required to participate in litigation because Assured could litigate the repurchase demands. While, as noted above, this mistaken belief does not excuse the failure to preserve, it does undermine UBS' claim of bad faith.

   b.   <u>Negligence and Gross Negligence</u>

That U.S. Bank acted in good faith does not mean, however, that it lacks the requisite culpability. Its failure to begin retaining documents in anticipation of litigation at the inception of the <u>Assured</u> litigation was at least negligent. Worse, U.S. Bank failed to institute a litigation hold even after Judge Baer ruled

---

[5] To be sure, a failure to implement a litigation hold properly could be significant beyond being probative of bad faith and could constitute sanctionable conduct on its own. However, for the reasons discussed, that is not the case here.

that it was the only entity that could to enforce the repurchase provisions of the PSAs.  At that point, U.S. Bank could no longer rely on its (mistaken) interpretation of the relevant agreements, and its failure to preserve documents ripened into gross negligence.  See, e.g., Sekisui, __ F. Supp. 2d at __, 2013 WL 4116322, at *6 (finding gross negligence where, among other things, no litigation hold was imposed until months after plaintiff "had full knowledge of the possibility of future litigation").

    4.  <u>Relevance and Prejudice</u>

There are two types of relevance that must be analyzed in deciding a motion for sanctions based on spoliation of evidence. First, a court must look to the standard articulated in Rule 26(b)(1) of the Federal Rules of Civil Procedure and ask whether destroyed evidence could reasonably have led to the discovery of admissible evidence.  <u>See</u> <u>Orbit One</u>, 271 F.R.D. at 440-41.  "'[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed.'"  <u>Id.</u> at 441 (alteration in original) (emphasis omitted) (quoting <u>Farella v. City of New York</u>, Nos. 05 Civ. 5711, 05 Civ. 8264, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)).  The party seeking sanctions must demonstrate the loss of discovery-

relevant information.[6]  Orbit One, 271 F.R.D. at 441.  However, this is not a difficult burden to meet.  Id.

Second, a court must determine whether the destroyed evidence would have been favorable to the moving party.  See id. at 438 (citing Residential Funding, 306 F.3d at 108-09, and Zubulake V, 229 F.R.D. at 431).  The moving party generally must "affirmatively demonstrate that a reasonable trier of fact could find that the missing evidence would support [its] claims."  Orbit One, 271 F.R.D. at 439 (internal quotation marks and brackets omitted). Again, this burden is not an onerous one, "lest the spoliator be permitted to profit from its destruction."  Id. at 440 (internal

---

[6] Neither Residential Funding nor Sekisui clearly states which party must demonstrate discovery relevance; however, both make clear that so-called "assistive relevance," which I discuss below, must be demonstrated by the party who seeks sanctions, unless a presumption of relevance arises based on the culpability of the alleged spoliator.  See Residential Funding, 306 F.3d at 108-09 ("[T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." (internal quotation marks omitted)); Sekisui, __ F. Supp. 2d at __, 2013 WL 4116322, at *5 (quoting Residential Funding, 306 F.3d at 108-09). I see no reason that the allocation should be different for the foundational showing of discovery relevance.  Indeed, the burden of establishing relevance generally lies with the party seeking discovery, see, e.g., Nunez v. City of New York, No. 11 Civ. 5845, 2013 WL 2149869, at *2 (S.D.N.Y. May 17, 2013), even though that party, like the party charging spoliation, has limited knowledge of the universe of potentially relevant materials.  Balance is achieved by the fact that the burden of demonstrating relevance is not a demanding one.

quotation marks omitted).  However, the destruction of evidence in bad faith will support an inference that the information would have been of assistive relevance and its loss therefore prejudicial. Id. at 438-40; see also Residential Funding, 306 F.3d at 109; Sekisui, __ F. Supp. 2d at __, 2013 WL 4116322, at *5. In addition, "under certain circumstances 'a showing of gross negligence . . . ' will support the same inference." Orbit One, 271 F.R.D. at 439 (quoting Residential Funding, 306 F.3d at 109); see also Field Day, LLC v. County of Suffolk, No. 04 CV 2202, 2010 WL 1286622, at *3 (E.D.N.Y. March 25, 2010) ("Relevance and prejudice may, but need not be, presumed when the spoliating party acted in bad faith or in a grossly negligent manner."). This presumption is, however, rebuttable. See GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 357-58 (S.D.N.Y. 2012) (noting presumption of relevance for purposes of spoliation sanctions is rebuttable); E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc., 803 F. Supp. 2d 469, 499 (E.D. Va. 2011) ("[I]n order to rebut the presumption of relevance, the alleged spoliator must present clear and convincing evidence demonstrating that the spoliated material or documents were of minimal or little import."); Sekisui, __ F. Supp. 2d at __, 2013 WL 4116322, at *7.

Based on documents produced by U.S. Bank and Assured, UBS contends that two types of relevant documents have been destroyed:

(1) notice of alleged breaches served by Assured to UBS, which are relevant because prompt notice is a prerequisite to a purchase demand and (2) communications regarding forensic reviews of relevant loans. (Def. Memo. at 20-22; Reply at 7-9). This is sufficient to meet UBS' light burden of showing both discovery relevance and assistive relevance.[7]

However, U.S. Bank has presented persuasive evidence showing that no relevant documents were destroyed. First, as noted above, the rights and responsibilities of U.S. Bank are substantially limited -- it is able to "perform such duties and only such duties as are specifically set forth in [the PSAs]." (10/1/06 PSA, § 8.01). More specifically, the PSAs do not impose on the trustee a duty to assess repurchase demands or investigate possible breaches of representations and warranties in the relevant loans, nor is it U.S. Bank's normal practice to do so. (10/1/06 PSA, § 2.03; Pl. Memo. at 2; Declaration of Laura Cawley dated July 12, 2013 ("Cawley Decl."), ¶ 3; Declaration of Diane Reynolds dated July 12, 2013 ("Reynolds Decl."), ¶ 3; Declaration of Nicolas Valaperta dated July 12, 2013 ("Valaperta Decl."), ¶ 3; Declaration of Toby Robillard dated July 12, 2013 ("Robillard Decl."), ¶ 3). While

---

[7] Because UBS has met this burden through positive evidence, it is unnecessary to determine whether UBS would be entitled to a presumption of relevance based on U.S. Bank's gross negligence.

U.S. Bank requested loan files from servicers and arranged for their delivery to third-party file review vendors, it did not analyze them substantively, such as by re-underwriting the loans; indeed, it never actually possessed the files. (Cawley Decl., ¶¶ 2, 5; Reynolds Decl., ¶ 5; Valaperta Decl., ¶ 5; Robillard Decl., ¶ 5; Tr. at 37-38, 39, 78).

Diane Reynolds, a Senior Vice-President of U.S. Bank who oversaw the account manager for the three trusts at issue here, testified that U.S. Bank did not perform any assessments of Assured's repurchase demands and did not have any communications regarding those demands. (Tr. at 14-15, 55-56, 57-58, 62, 85). Indeed, U.S. Bank learned which loans were subject to repurchase demands only when Assured copied the trustee on those demands or sent U.S. Bank a breach notice.[8] (Tr. at 61-64, 65-66, 96). Other than these two categories of documents, which were collected and retained in a central file that was not subject to the autodeletion policy (Tr. at 64-65, 124), there were no communications regarding repurchase demands or breach notices, either internally or with Assured (Tr. at 58, 67-68, 89, 94-95).

---

[8] According to Ms. Reynolds, a breach notice is "a notice provided by the entity within a PSA that has the ability to provide notice of a breach to the trustee." (Tr. at 27). This document is different from a repurchase demand, which is subsequently sent to the entity with the obligation to repurchase a non-conforming loan. (Tr. at 28-29).

This case is thus different from the situation in <u>Sekisui</u>. In that case, e-mails from two relevant custodians, one of whom had a cognitive disorder and therefore could not testify or be deposed, were destroyed. <u>Sekisui</u>, ___ F. Supp. 2d at ___, 2013 WL 4116322, at *2-3. The court held that the plaintiff was "unable to rebut the presumption of prejudice because an unknowable amount of [e-mails] . . . was permanently destroyed and remains irretrievable." <u>Id.</u> at *7. Here, however, U.S. Bank has shown, through competent evidence, that the documents about which UBS speculates either never existed or were not destroyed. There is no basis, therefore, for sanctions.

<u>Conclusion</u>

For these reasons, UBS' motion for sanctions for spoliation of evidence (Docket no. 79) is denied.


SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       October 23, 2013

25

Copies mailed this date:

Michael A. Collyard, Esq.
Robins, Kaplan, Miller & Ciresi LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015

Sean P. Baldwin, Esq.
Adam M. Abensohn, Esq.
Nicholas F. Joseph, Esq.
Philippe Z. Selendy, Esq.
Paul Riley, Esq.
Quinn Emanuel Urquhart & Sullivan
51 Madison Avenue
New York, NY 10010

Scott D. Musoff, Esq.
Jay B. Kasner, Esq.
Alexander C. Drylewski, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
42nd floor
New York, NY 10036