UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MASTR ADJUSTABLE RATE MORTGAGES  :
TRUST 2006-OA2, MASTR ADJUSTABLE :
RATE MORTGAGES TRUST 2007-1, AND : 12-cv-7322 (HB)(JCF)
MASTR ADJUSTABLE RATE MORTGAGES  :
TRUST 2007-3,                    : **ECF Case**
                                 :
               Plaintiffs,  : **Electronically Filed**
                                 :
    - against -              :
                                 :
UBS REAL ESTATE SECURITIES INC., :
                                 :
               Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF UBS REAL ESTATE SECURITIES INC.'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

            SKADDEN, ARPS, SLATE,
             MEAGHER & FLOM LLP

            Jay B. Kasner
            Scott D. Musoff
            Robert A. Fumerton
            Alexander C. Drylewski
            Four Times Square
            New York, New York 10036
            Phone: (212) 735-3000

            Thomas J. Nolan
            300 South Grand Avenue
            Los Angeles, California 90071
            Phone: (213) 687-5000

            Paul J. Lockwood
            One Rodney Square
            P.O. Box 636
            Wilmington, Delaware 19899-0636
            Phone: (302) 651-3000

            *Attorneys for Defendant*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, defendant UBS Real Estate Securities Inc. ("UBS RESI"), in connection with its Motion for Partial Summary Judgment, sets forth the following statement of material facts as to which no genuine issue exists.

**A.   The Parties**

1.   Plaintiffs MASTR Adjustable Rate Mortgages Trust 2006-OA2 ("MARM 2006-OA2"), MASTR Adjustable Rate Mortgages Trust 2007-1 ("MARM 2007-1") and MASTR Adjustable Rate Mortgages Trust 2007-3 ("MARM 2007-3") (together, "Plaintiffs" or the "Trusts") are three RMBS trusts.  (Ex. A ¶ 7.)  A true and correct copy of Plaintiff's complaint ("Complaint") is attached as **Exhibit A** to the Declaration of Robert A. Fumerton, dated April __, 2014 ("Fumerton Declaration").

2.   The Trusts are purportedly acting through their Trustee, U.S. Bank National Association ("U.S. Bank").  (Ex. A ¶ 7.)

3.   Defendant UBS RESI acted as the "sponsor" of three RMBS securitization transactions (the "Transactions") and "acquired the underlying mortgage loans, which it subsequently conveyed to [the Trusts]."  (*Id.* ¶ 2.)

4.   The Trusts in turn issued certificates, which entitle investors to a portion of the principal and interest payments made by homeowners on the mortgage loans held in the Trusts.  (*Id.*)

5.   As publicly disclosed in prospectus supplements for the three transactions, UBS RESI did not originate the loans held in the Trusts that back the certificates but rather acquired them from unaffiliated third-party originators.  (Ex. B at 9; Ex. C at 14; Ex D at 12.)  True and

correct copies of the prospectus supplements are attached as **Exhibits B through D** to the Fumerton Declaration.

6.  As publicly disclosed in the prospectus supplements, a large number of the loans underlying the Trusts were non-prime loans that "were originated without regard to whether such loans would be acceptable for purchase by Fannie Mae or Freddie Mac." (Ex. B at 26; Ex. C at 43; Ex. D at 40.)

7.  Many of these loans provided borrowers with a variety of payment options, including "negative amortization," where the loan payment by the borrower is less than the accrued interest and the difference is added to the loan balance, resulting in an increase in the loan's principal balance over time. (Ex. B at 27-28; Ex. C at 45; Ex. D at 30, 42-43.)

8.  The prospectus supplements disclosed that "delinquencies and liquidation proceeds are more likely with these loans than with loans that are originated in a more traditional manner." (Ex. B at 26; Ex. C at 43; Ex D. at 40.)

**B.   The PSAs**

9.  Each of the Transactions is governed by a separate PSA. True and correct excerpted copies of each of the PSAs are attached as **Exhibits E through G** to the Fumerton Declaration.

10. The PSAs are governed by New York law. (*See* Ex. E at 141.)

11. The PSAs were entered into by UBS RESI, the Depositor, the Master Servicer, the Custodian, the Trust Administrator, the Credit Risk Manager and the Trustee (as those terms are defined in the PSAs). (*See* Ex. E at 1.)

12. Assured Guaranty Municipal Corp. ("Assured"), as the insurer for certain of the certificates issued by the Trusts, is identified as a third-party beneficiary of the PSAs. (*Id.* at 144.)


13. In the PSAs, UBS RESI made certain representations and warranties ("R&Ws") regarding the characteristics of the mortgage loans held in each Trust. (Ex. E at 154-161.)

14. Section 2.03 of the MARM 2006-OA2 PSA provides in part:

Remedies for Breaches of Representations and Warranties.

The Transferor hereby makes the representations and warranties set forth in Schedule II hereto, and by this reference incorporated herein, to the Depositor, the Certificate Insurer and the Trustee, as of the Closing Date, or if so specified therein, as of the Cut-off Date. With respect to any representation and warranties set forth on Schedule II hereto which are made to the best of the Transferor's knowledge if it is discovered by any of the Depositor, the Certificate Insurer, the Master Servicer, the Transferor, any Servicer, the Trustee or the Trust Administrator that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders or the Certificate Insurer therein, notwithstanding the Transferor's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable representation or warranty.

Upon discovery by any of the Depositor, the Certificate Insurer, the Transferor, the Master Servicer, the Trust Administrator or the Custodian of a breach of a representation or warranty made by the Transferor pursuant to this Section 2.03 that materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties and the Trustee. Notwithstanding the foregoing, (i) a breach which causes a Mortgage Loan not to constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, or (ii) a breach of any of the representations and warranties set forth in clauses (xiii), (xiv), (xv) and (xxxv) through (l) of Schedule II, in each case, will be deemed automatically to materially and adversely affect the interests of the Certificateholders in such Mortgage Loan. Upon receiving notice of a breach, the Trustee shall in turn notify the Transferor of such breach. The Trustee shall enforce the obligations of the Transferor in accordance with this Section 2.03 to correct or cure any such breach of a representation or warranty made herein, and if the Transferor fails to correct or cure the defect within such period, and such defect materially and adversely affects the interests of the Certificateholders and the Certificate Insurer in the related Mortgage Loan, the Trustee shall enforce the Transferor's obligations hereunder to (i) purchase such Mortgage Loan at the Purchase Price or (ii) substitute for the related Mortgage Loan an Eligible Substitute Mortgage Loan. In each case, such Deleted Mortgage Loan will be removed from the Trust Fund.

The Transferor hereby covenants that within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to this Section 2.03 which materially and adversely affects the interest of the Certificateholders or the Certificate Insurer in any Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such ninety (90) day

period expires prior to the second anniversary of the Closing Date, remove such Deleted Mortgage Loan from the Trust Fund and substitute in its place an Eligible Substitute Mortgage Loan or Mortgage Loans into the Trust Fund, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below.

\* \* \* \*

It is understood and agreed that the obligation under this Agreement of the Transferor to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedies against the Transferor respecting such matters available to Certificateholders, the Master Servicer, the NIMS Insurer, the Depositor, the Trust Administrator or the Trustee on their behalf.

(Ex. E at 61-62.)

15. The MARM 2007-1 and MARM 2007-3 PSAs contain provisions that are materially identical to Section 2.03 of the MARM 2006-OA2 PSA. (Ex. F at 89-91; Ex. G at 73-75.)

16. The MARM 2006-OA2 PSA defines "Mortgage Loans" as:

Such of the mortgage loans and cooperative loans transferred and assigned to the Trustee pursuant to the provisions hereof as from time to time are held as a part of the Trust Fund (including any REO Property), the mortgage loans so held being identified in the Mortgage Loan Schedule, notwithstanding foreclosure or other acquisition of title of the related Mortgaged Property. With respect to each Mortgage Loan that is a Cooperative Mortgage Loan, if any, 'Mortgage Loan' shall include, but not be limited to, the related Mortgage Note, Security Agreement, Assignment of Proprietary Lease, Recognition Agreement, Cooperative Shares and Proprietary Lease and, with respect to each Mortgage Loan other than a Cooperative Mortgage Loan, 'Mortgage Loan' shall include, but not be limited to the related Mortgage and the related Mortgage Note.

(Ex. E at 37.)

17. The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Mortgage Loans. (Ex. F at 50; Ex. G at 47.)

18. The MARM 2006-OA2 PSA defines "Purchase Price" as:

With respect to any Mortgage Loan that is purchased by the transferor pursuant to Section 2.02 or 2.03 hereof, a price equal to the outstanding Principal Balance of such Mortgage Loan as of the date of purchase, plus all accrued and unpaid interest thereon, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected,

4

plus any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law.

(Ex. E at 47.)

19. The MARM 2007-1 and MARM 2007-3 PSAs contain a materially identical definition of Purchase Price.  (Ex. F at 61; Ex G at 56.)

20. The MARM 2006-OA2 PSA defines "Principal Balance" as:

As to any Mortgage Loan and any Distribution Date, the unpaid principal balance of such Mortgage Loan as of the Due Date in the month preceding the month in which such Distribution Date occurs, as specified in the amortization schedule at the time relating thereto (before any adjustment to such amortization schedule by reason of any moratorium or similar waiver or grace period) after giving effect to any previous partial Principal Prepayments and Liquidation Proceeds allocable to principal received during the Prepayment Period for the prior Distribution Date (other than with respect to any Liquidated Loan), and to the payment of principal due on such Due Date and irrespective of any delinquency in payment by the related Mortgagor. The Principal Balance of any Mortgage Loan that has been prepaid in full or has become a Liquidated Loan during the related Prepayment Period shall be zero.

(Ex. E at 45-46.)

21. The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Principal Balance.  (Ex. F at 61; Ex G at 55.)

22. The MARM 2006-OA2 PSA defines "Liquidated Mortgage Loan" as:

 With respect to any Distribution Date, (i) a defaulted Mortgage Loan (including any REO Property) which was liquidated in the calendar month preceding the month of such Distribution Date and as to which the applicable Servicer or the Master Servicer, as the case may be, has determined (in accordance with the applicable Servicing Agreement and this Agreement) that it has received all amounts it expects to receive in connection with the liquidation of such Mortgage Loan, including the final disposition of an REO Property or (ii) any Mortgage Loan that becomes 180 days or more delinquent in the calendar month preceding the month of such Distribution Date.

(Ex. E at 34.)

23. The MARM 2007-1 and 2007-3 PSAs contain materially identical definitions of "Liquidated Mortgage Loan."  (Ex. F at 48; Ex. G at 45.)

5

24. The MARM 2006-OA2 PSA defines "Mortgage" as: "The mortgage, deed of trust or other instrument creating a second lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note." (Ex. E at 36.)

25. The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Mortgage. (Ex. F at 49; Ex. G at 46.)

26. The MARM 2006-OA2 PSA defines "Mortgage Note" as: "The original executed note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan." (Ex. E at 37.)

27. The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Mortgage Note. (Ex. F at 50; Ex. G at 47.)

28. The MARM 2006-OA2 PSA defines "Mortgage File" as: "The mortgage documents listed in Section 2.01 hereof pertaining to a particular Mortgage Loan and any additional documents delivered to the Custodian to be added to the Mortgage File pursuant to this Agreement." (Ex. E at 36.)

29. The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Mortgage File. (Ex. F. at 49; Ex. G at 46.)

30. The MARM 2006-OA2 PSA defines "REO Property" as: "A Mortgaged Property acquired by the Trust Fund through foreclosure, deed-in-lieu of foreclosure, repossession or otherwise in connection with a defaulted Mortgage Loan." (Ex. E at 48.)

31. The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of REO Property. (Ex. F at 64; Ex. G at 58.)

32. The MARM 2006-OA2 PSA defines "Amount Held for Future Distribution" as:

> As to any related Distribution Date and any Mortgage Loan, the aggregate amount held in the Collection Account at the close of business on the related Servicer Remittance Date with

6

respect to such Mortgage Loan at the close of business on the related Servicer Remittance Date on account of (i) Principal Prepayments received after the related Prepayment Period and Liquidation Proceeds and Insurance Proceeds received in the month of such Distribution Date and (ii) all Scheduled Payments due after the related Due Date.

(Ex. E at 17.)

33.     The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Amount Held for Future Distribution.  (Ex. F at 31; Ex. G at 22.)

34.     The MARM 2006-OA2 PSA defines "Liquidation Proceeds" as:

Amounts, including Insurance Proceeds, received in connection with the partial or complete liquidation of defaulted Mortgage Loans, whether through trustee's sale, foreclosure sale or otherwise or amounts received in connection with any condemnation or partial release of a Mortgaged Property and any other proceeds received in connection with an REO Property, less the sum of related unreimbursed Servicing Fees and Servicing Advances.

(Ex. E at 34.)

35.     The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Liquidation Proceeds.  (Ex. F at 48; Ex. G at 45.)

36.     The MARM 2006-OA2 PSA defines "Prepayment Period" as "the period from and including the 16th day of the month preceding the month in which such Distribution Date occurs and to and including the 15th day of the month in which such Distribution Date occurs, and with respect to any other Mortgage Loan and any Distribution Date, the calendar month preceding the month in which such Distribution Date occurs."  (Ex. E at 45.)

37.     The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Prepayment Period.  (Ex. F at 60; Ex. G at 55.)

38.     The MARM 2006-OA2 PSA defines "Distribution Date," in part, as "the 25th day of each calendar month after the initial issuance of the Certificates, or if such 25th day is not a Business Day, the next succeeding Business Day."  (Ex. E at 27.)

39. The MARM 2007-1 and MARM 2007-3 PSAs contain materially identical definitions of Distribution Date.  (Ex. F at 39; Ex. G at 31.)

C. **Plaintiffs' Breach Notices**

40. Beginning in August 2010, Assured sent UBS RESI a series of written notices identifying defective mortgage loans in each Transaction and demanding that UBS RESI either cure the defects or repurchase those mortgage loans within 90 days of the notice.  (Ex. A ¶ 37.)

41. UBS RESI received seventeen breach notices which "demanded that [UBS RESI] cure or repurchase a total of 3,616 mortgage loans with an original unpaid principal balance of approximately $1,642,318,795."  (*Id.*)

42. The Complaint defines these seventeen breach notices as the "Breach Notices."  (*Id.*)

43. UBS RESI received four additional breach notices demanding cure or repurchase of an additional 1,026 mortgage loans with an original unpaid principal balance of approximately $382,919,764.83.  (*Id.* ¶ 38.)

44. The Complaint defines these four additional breach notices as the "Additional Breach Notices."  (*Id.*)

45. At the time the Complaint was filed, "the 90-day cure period ha[d] yet to expire" with respect to the Additional Breach Notices.  (*Id.*)

46. In total, the Complaint identifies twenty-one total breach notices that were sent to UBS RESI concerning the Transactions.  (*Id.*)

47. U.S. Bank reiterated to UBS RESI seven of the twenty-one breach notices pled in the Complaint.  (*Id.* ¶¶ 37-38.)

48. The breach notices pled in the Complaint identified specific mortgage loans which were alleged to be in breach of R&Ws.  (Ex. H.)

8

49.     For example, on August 13, 2010, Assured sent to UBS RESI a breach notice relating to the MARM 2007-3 Trust which stated:

> [Assured ] hereby gives notice that each of the Mortgage Loans referenced on <u>Appendix A</u> hereto (the 'Subject Loans') breaches one or more of the representations and warranties regarding the Mortgage Loans set forth in <u>Schedule II</u> of the PSA (which representations and warranties are incorporated by reference into the PSA, pursuant to Section 2.03 thereof), and each such breach materially and adversely affects the interests of the Certificateholders and the Insurer in the Subject Loans.

(*Id.*)

50.     The breach notices described in paragraphs 37-38 contain similar language.  True and correct copies of these breach notices are attached as **Exhibit H** to the Fumerton Declaration.

51.     At the time UBS RESI received the Breach Notices, 3,342 of the loans identified in the Breach Notices (as defined in Paragraph 37 of the Complaint) were 180 days or more delinquent (representing 92% of the loans identified in the Breach Notices by loan count and 93% by original principal balance).  (Declaration of John Lantz ¶ 8.)

52.     At the time UBS RESI received the Breach Notices, 1,938 loans were liquidated because the underlying properties had been foreclosed upon and sold or the loan was paid in full as of the time UBS RESI received the Breach Notices (representing 54% by loan count and 53% by original principal balance).  (*Id.* ¶ 9.)

53.     Of the total number of loans included in the Trusts, 12,429 loans were 180 days or more delinquent, liquidated or paid in full as of September 28, 2012, the date of the Complaint (representing 73% by loan count and 74% by original principal balance).  (*Id.* ¶ 10.)

54.     Of the total number of loans included in the Trusts, 6,054 loans were liquidated because the underlying properties had been foreclosed upon and sold as of September 28, 2012 (representing 35% by loan count and 36% by original principal balance).  (*Id.* ¶ 11.)

55. The first breach notice was sent to UBS RESI in August 2010, and demanded that within 90 days, UBS RESI cure alleged breaches of R&Ws for 762 loans or repurchase the loans from the Trust. (*Id.* ¶ 5.)

56. In total, Assured alleged 2,755 breaches in connection with the 762 loans, each of which required review in order to respond to the Breach Notices. (*Id.*)

57. UBS RESI reviewed each of the 2,755 allegations of breach over the next 90 days. At the end of the 90 days, UBS RESI responded to Assured, and while reserving all rights, UBS RESI agreed to repurchase 105 of the 762 loans identified in Assured's breach notices in a good faith effort to resolve Assured's purported claims. (*Id.* ¶ 6.)

58. UBS RESI also offered to place into escrow funds representing the estimated repurchase costs or losses associated with another 51 loans identified in Assured's breach notices. UBS RESI offered to release the escrowed funds to Assured if Assured could provide UBS RESI with a complete loan file for these 51 loans so that UBS RESI could complete its review of Assured's breach allegations. (*Id.*)

**D.    The Assured Action**

59. On February 2, 2012, Assured filed a lawsuit against UBS RESI. A true and correct copy of the complaint filed by Assured is attached as **Exhibit I** to the Fumerton Declaration.

60. On May 6, 2013, UBS RESI and Assured executed a Settlement Agreement and Release whereby UBS RESI paid to Assured $358 million in exchange for Assured's voluntary dismissal of its claims. 12-cv-1579 (HB) (S.D.N.Y. May 10, 2013), ECF No. 92-1.

**E.    The Trustee Action**

61. On September 28, 2012, Plaintiffs filed the Complaint. (Ex. A.)

62. The Complaint contains a single cause of action for UBS RESI's alleged "Breach of Repurchase Obligations." (*Id.* at 19.)

63. The Complaint alleges that the Breach Notices "identified the specific mortgage loans that contained one or more breaches of the [R&Ws]." (*Id.* ¶ 46.)

64. The Complaint alleges that the Breach Notices and the Additional Breach Notices "demanded that [UBS RESI] cure or repurchase a total of 4,642 mortgage loans with an original principal balance of approximately $2,025,238,559.83." (*Id.* ¶ 38.)

65. The Complaint alleges that UBS RESI "was required to cure the breaches identified in the Breach Notices, or repurchase the defective mortgage loans identified therein." (*Id.* ¶ 47.)

66. Plaintiffs allege that "the 90-day cure period has yet to expire" as of the date the Complaint for the Additional Breach Notices. (*Id.* ¶ 38.)

67. The deadline for Plaintiffs to add new claims expired on December 15, 2013, following two extensions. 12-cv-1579 (HB), ECF Nos. 30, 43.

68. Fact discovery in this action was completed on February 7, 2014. 12-cv-7322 (HB), ECF No. 158.

69. The deadline for expert discovery is May 30, 2014. 12-cv-7322 (HB), ECF No. 183.

F. **Plaintiffs' Expert Reports**

70. On February 21, 2014, Plaintiffs served UBS RESI with four expert reports in connection with this action. (Fumerton Decl. ¶ 2.)

71. On March 19, 2014, Plaintiffs served UBS RESI with "Corrected and Supplemental" versions of all four expert reports. (*Id.* ¶ 3.)

72. On April 21, 2014, Magistrate Judge Francis permitted Plaintiffs to serve another round of supplemental expert reports by April 25, 2014 but limited those reports to only addressing certain loan files produced after the close of fact discovery.  ECF No. 183, 190.

73. The expert reports include analyses as to mortgage loans that were not identified in Plaintiffs' Breach Notices or identified in the Complaint.  (Fumerton Decl. ¶¶ 5-7.)

74. The expert reports include analyses as to mortgage loans that are Liquidated Loans as defined by the PSAs and loans for which the underlying properties have been foreclosed upon and sold.  (*Id.*)

Dated:   New York, New York
            April 25, 2014

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

 /s/ Jay B. Kasner
Jay B. Kasner
Scott D. Musoff
Robert A. Fumerton
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

Thomas J. Nolan
300 South Grand Avenue
Los Angeles, California 90071
Phone:  (213) 687-5000

Paul J. Lockwood
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Phone:  (302) 651-3000

*Attorneys for Defendant*