UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
MASTR ADJUSTABLE RATE MORTGAGES
TRUST 2006-OA2, MASTR ADJUSTABLE
RATE MORTGAGES TRUST 2007-1 and
MASTR ADJUSTABLE RATE MORTGAGES
TRUST 2007-3,

|  |  |
|---|---|
| Plaintiffs, | 12-cv-7322 (PKC) |
| -against- | MEMORANDUM AND ORDER |

UBS REAL ESTATE SECURITIES INC.,

Defendant.
---------------------------------------------------------x
CASTEL, U.S.D.J.

Plaintiffs are three trusts (the "Trusts") that purchased pools of residential

mortgage-backed securities ("RMBS") assembled by defendant UBS Real Estate Securities Inc.

("UBS"). The RMBS pools contained first-lien, adjustable-rate residential mortgage loans. As

the sponsor of these transactions, UBS acquired more than 17,000 mortgage-secured loans from

various originators, then assembled them into pools and sold them to the Trusts. Three Pooling

and Servicing Agreements ("PSAs") govern these transactions, and each is identical in material

respects. The Trusts, in turn, issued securities backed by the loans. These securities entitled

investors to cash flows on the mortgage loan repayments. The Trusts' securities offerings were

insured by non-party Assured Guaranty Municipal Corp. ("Assured").

According to the Trusts, the RMBS pools included thousands of loans that were in

breach of the PSAs' representations and warranties concerning quality and underwriting

standards. In the PSAs, UBS promised to cure or repurchase any mortgage loans that failed to

satisfy the representations and warranties. The Complaint, invoking diversity jurisdiction,

asserts one claim, which alleges that UBS breached its obligation to repurchase mortgage loans

that it knew violated the representations and warranties.  It seeks money damages flowing from

the failure to repurchase the purportedly defective loans.

Discovery in this case is closed, and both sides move for partial summary

judgment.  For the reasons explained, the motions are, for the most part, denied.

BACKGROUND.

The three plaintiff Trusts are: (1) MASTR Adjustable Rate Mortgages Trust

2006-OA2 ("MARM 2006-OA2"); (2) MASTR Adjustable Rate Mortgages Trust 2007-1

("MARM 2007-1"); and (3) MASTR Adjustable Rate Mortgages Trust 2007-3 ("MARM 2007-

3").  (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.)  Each is a residential mortgage-backed securities trust,

and the Court will occasionally refer to them collectively as the "Trusts."  (Def. 56.1 ¶ 1, 3; Pl.

56.1 Resp. ¶ 1, 3.)  The Trusts bring this action through their trustee, the U.S. Bank National

Association ("U.S. Bank," or the "Trustee").  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2; Pl. 56.1 ¶ 4; Def.

56.1 Resp. ¶ 4.)

UBS was the sponsor of three RMBS securitization transactions with the Trusts.

(Def. 56.1 ¶ 3; Pl. 56.1 Resp. ¶ 3.)  As sponsor, UBS acquired mortgage loans from various

originators, and then conveyed them to the Trusts, which, in turn, issued securities (referred to as

"Certificates") that entitled investors to returns on the principal and interest that homeowners

paid on the loans.[1]  (Def. 56.1 ¶¶ 3-4; Pl. 56.1 Opp. ¶¶ 3-4; Pl. 56.1 ¶ 2; Def. 56.1 Resp. ¶ 2.)

UBS did not itself originate the loans.  (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  Rather, it acquired the

mortgage loans from other originators, having represented to the Trusts that it conducted due

---

[1] "Mortgage Loans" is a defined term in the PSAs.  (See, e.g., Fumerton Dec. Ex. E § 1.01.)  The PSAs define a
"Mortgage Loan" to include "the related Mortgage and the related Mortgage Note," except as to a "Cooperative
Mortgage Loan," which applies to co-op properties, and is defined to include additional categories of materials.
(Id.)

diligence on the loans, and that the loans complied with quality standards and underwriting guidelines.  (Def. 56.1 ¶¶ 9-14; Pl. 56.1 Resp. ¶¶ 9-14.)

A separate PSA governs each of the three transactions that conveyed the mortgage pools to the Trusts.  (Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  The PSAs are dated October 1, 2006 (for MARM 2006-OA2), December 1, 2006 (for MARM 2007-1) and April 1, 2007 (for MARM 2007-3), and all three are governed by New York law.  (Pl. 56.1 ¶¶ 5-8; Def. 56.1 Resp. ¶¶ 5-8.) For the purposes of this motion, the PSAs' relevant terms are largely identical, and no party contends that any variation between the PSAs affects the outcome of these motions.  (See, e.g., Pl. 56.1 ¶¶ 13-20; Def. 56.1 Resp. ¶¶ 13-20.)  UBS and the Trustee were two of several parties to the PSAs.  (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.)  The Trusts themselves were not parties to the PSAs, and, as discussed below, are acting here through their Trustee, U.S. Bank.  Assured was the insurer for certain certificates issued by the Trusts, and the PSAs identify Assured as a third-party beneficiary.  (Def. 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12.)

In each of the PSAs, UBS made representations and warranties about the quality and underwriting process of the mortgages assembled into the pools.  These representations and warranties are set forth at Schedule II attached to each PSA.  The following three are at issue in this motion:

> (i) The information set forth in the Mortgage Loan Schedule was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the Mortgage Loan Schedule; . . .
>
> (xxx) The Mortgage Loan was underwritten in accordance with the underwriting guidelines of the related Loan Seller in effect at the time of origination with exceptions thereto exercised in a reasonable manner; . . .
>
> (xlv) The methodology used in underwriting the extension of credit for each Group 1 Loan did not rely solely on the extent of the

- 3 -

borrower's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria such as the borrower's income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Mortgage Loan; . . . .

(Fumerton Dec. Ex. E. Schedule II; Pl. 56.1 ¶¶ 10-12; Def. 56.1 Resp. ¶¶ 10-12.)

The relationship between these representations and warranties and the PSAs' remedial provisions is central to this action. Section 2.03 sets forth UBS's obligations to cure or repurchase in the event that a representation and warranty has been breached. Section 2.03 states that UBS "covenants that within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to this Section 2.03 which materially and adversely affects the interest of the Certificateholders . . . in any Mortgage Loan, it shall cure such breach in all material respects . . . ." (Fumerton Dec. Ex. E; Pl. 56.1 ¶¶ 18-20; Def. 56.1 Resp. ¶¶ 18-20.) Section 2.03 requires that if the breach is not cured within 90 days, then UBS must repurchase the affected loan at the original purchase price, or substitute the defective loan with an eligible loan. (Pl. 56.1 ¶ 18-20; Def. 56.1 Resp. ¶ 18-20.) Under Section 2.03, if UBS fails to cure or repurchase the defective loan within 90 days, the Trustee, U.S. Bank, "shall enforce" UBS's obligations. (Fumerton Dec. Ex. E § 2.03.) Section 2.03 provides the "sole remedies" in the event of a breach. (Fumerton Dec. Ex. E § 2.03.)

Beginning on August 9, 2010, non-party Assured, the insurer of the Trusts' securities offerings, sent UBS seventeen letters demanding that, within 90 days, UBS cure or repurchase certain allegedly defective loans contained in the Trusts' three pools. (Pl. 56.1 ¶¶ 3, 23; Def. 56.1 Resp. ¶¶ 3, 23; Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 40.) Assured's letters identified the individual loans and set forth the particularities as to the loans' purported defects. For example,

in its letter of August 9, 2010, Assured identified 270 loans that it claimed were defective, and

set forth information as to the nature of the breaches therein.  (Baldwin Dec. Ex. 8.)  Those loans

carried an original principal balance of $137,009,951.  (Baldwin Dec. Ex. 8.)  As of June 28,

2012, Assured had identified 3,616 allegedly defective loans, with an unpaid principal balance of

$1,642,318,795.  (Def. 56.1 ¶ 41; Pl. 56.1 Resp. ¶ 41.)

           In a series of letters dated between October 29, 2010 and April 5, 2011, UBS

agreed to repurchase 105 loans.  By way of example, in a letter dated October 29, 2010, UBS

stated that "[o]ur loan review team has timely investigated the alleged breaches set forth in the

repurchase requests" of Assured's letters of August 9 and 13, 2010.  (Baldwin Dec. Ex. 41.)  The

letter identified 56 loans by borrower name, originator number and UBS loan number.  (Baldwin

Dec. Ex. 41.)  It stated that it was repurchasing the loans without prejudice to future defenses,

and that "UBS has no obligation to repurchase many if not all of the loans . . . ."  (Baldwin Dec.

Ex. 41.)  UBS ultimately repurchased only 70 of these 105 loans.  (Pl. 56.1 ¶ 72; Def. 56.1 Resp.

¶ 72.)

           Between August 17, 2012 and September 27, 2012, Assured sent four additional

breach notices to UBS.  The present action was commenced on September 28, 2012, one day

after the last of these notices.  (Docket # 1.)  UBS's summary judgment motion turns in part on

the timing of these letters, which demanded the cure or repurchase of an additional 1,026

mortgage loans that carried a total, unpaid principal balance of $382,919,764.83.  (Def. 56.1 ¶

43; Pl. 56.1 Resp. ¶ 43.)  The Complaint identifies these four notices in the separate category of

"Additional Breach Notices," and there is no dispute that the 90-day cure or repurchase period

set forth in the PSAs had not expired between the time that Assured sent these breach notices and

the Trusts' filing of the Complaint.  (Def. 56.1 ¶¶ 44-45; Pl. 56.1 Resp. ¶¶ 44-45.)  According to

UBS, the Trusts cannot seek relief as to these 1,026 loans, because at the time the Complaint was filed, the 90-day cure or repurchase period had not yet passed.

The three Trusts held a combined total of 17,082 loans.  (Pl. 56.1 Resp. ¶ 53.)  By the time that UBS received the breach notices from Assured, between 3,288 and 3,342 of the loans were delinquent by 180 days or more.  (Def. 56.1 ¶ 51; Pl. 56.1 Resp. ¶ 51.)  Of these, between 1,938 and 2,126 loans had been liquidated because the underlying properties had been subject to foreclosure and sold, or else because the mortgage had been paid in full.  (Def. 56.1 ¶ 52; Pl. 56.1 Resp. ¶ 52.)  At the time that the Complaint was filed, between 12,429 and 12,766 of all loans in the Trusts were delinquent by 180 days or more, liquidated or paid in full; between 5,541 and 6,054 of those loans were liquidated because the underlying properties had been foreclosed and sold.  (Def. 56.1 ¶¶ 53-54; Pl. 56.1 Resp. ¶¶ 53-54.)

The Trusts argue that they are entitled to relief as to all materially defective loans contained in the pools, and not just the loans that Assured identified as being in material breach.  They propose a theory of "pervasive breach," whereby Assured's letters gave UBS notice of widespread breaches throughout the pools.  Before the limitations period expired, they argue, UBS had loan-by-loan notice that "at least 21%" of the mortgage loans breached the PSAs' representations and warranties.  (Trusts' Opp. Mem. at 12.)  According to the Trusts, notice of these defects was sufficient to require UBS to investigate all loans for breaches of the representations and warranties and to repurchase those found to be in breach.

Further, the Trusts argue that they should be permitted to prove their "pervasive breach" theory through statistical sampling performed by their retained experts.  They assert that the Trusts' underwriting expert concluded that, from a randomly drawn sample of 1,092 loans, 71.9% were materially defective.  (Pl. 56.1 ¶ 152; Def. 56.1 Resp. ¶ 152.)  The Trusts contend

that UBS's receipt of the Trusts' expert analysis of "pervasive breach" provided sufficient notice

to trigger an obligation to cure or repurchase all loans that were, in fact, defective.  (Trusts Opp.

Mem. at 12-13.)

PROCEDURAL HISTORY.

      Prior to the commencement of this action, Assured commenced its own action

against UBS in the Supreme Court of the State of New York, which UBS subsequently removed

to this Court.  Assured Guaranty Municipal Corp. v. UBS Real Estate Secs. Inc., 12 Civ. 1579

(HB) (Docket # 1.). (Def. 56.1 ¶ 59; Pl. 56.1 Resp. ¶ 59.)  The Trusts commenced this action on

September 28, 2012.  (Docket # 1.)  On May 6, 2013, Assured and UBS executed a settlement

agreement, in which UBS agreed to pay Assured $358 million and 85% of Assured's future

losses, and the action was dismissed.  (Def. 56.1 ¶ 60; Pl. 56.1 Resp. ¶ 60.)

      The Trusts' Complaint brings a single claim for "Breach of Repurchase

Obligations."  (Docket # 1.)  It alleges that UBS "was required to cure the breaches identified in

the Breach Notices, or repurchase the defective mortgage loans identified therein."  (Compl't ¶

47.)

      On August 15, 2013, the late Judge Harold Baer, to whom this case was then

assigned, denied UBS's motion to dismiss.  MASTR Adjustable Rate Mortgs. Trust 2006-OA2

v. UBS Real Estate Securities Inc., 2013 WL 4399210 (S.D.N.Y. Aug. 15, 2013).  Several of

Judge Baer's conclusions are relevant to this motion.  Under the PSAs, the Trustee may sue for

enforcement of the agreement, but the PSAs do not give the Trusts themselves the capacity to

sue.  Id. at *2.  Judge Baer concluded that, although U.S. Bank, the Trustee, is not named in the

caption, the Complaint stated that the Trusts were acting through U.S. Bank, which was

sufficient to allege that the Trusts were acting through the Trustee.  Id.  Second, Judge Baer

concluded that the PSAs' "sole remedies" provision, which limits relief for the breach of representations and warranties to the cure or repurchase of defective mortgages, did not preclude the Trusts from seeking money damages for the breach of the repurchase obligation.  Id. at *2-4. He concluded that money damages may be the only feasible remedy to make the Trusts whole, provided that damages were limited to an amount commensurate to what would be available under the sole-remedies clause.  Id. at *2-4.  Third, Judge Baer concluded that, at the Rule 12(b)(6) stage, he could not determine whether UBS received "prompt notice" of allegedly defective mortgages, or whether the PSAs required UBS to repurchase loans that were liquidated or in default for more than 180 days.  Id. at *5.  Finally, he concluded that Assured's settlement with UBS did not preclude the Trusts' action, and that UBS's obligations to Assured were distinct from its obligations to the Trusts and investors.  Id. at *5-6.

Fact discovery closed on February 7, 2014, and expert discovery closed on May 30, 2014.  (Def. 56.1 ¶¶ 68-69; Pl. 56.1 Resp. ¶¶ 68-69.)

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  It is the movant's initial burden to come forward with evidence on each material element of its claim or defense, sufficient to demonstrate its entitlement to relief as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine

issue for trial.'" <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir. 2004) (quoting <u>Aslanidis v. U.S. Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)).

   A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby. Inc.</u>, 477 U.S. 242, 248 (1986).  The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, granting summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party.  <u>Costello v. City of Burlington</u>, 632 F.3d 41, 45 (2d Cir. 2011); <u>accord</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-88 (1986). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants.  Rule 56(c)(3), Fed. R. Civ. P.  In the absence of any disputed material fact, summary judgment is appropriate.  Rule 56(a), Fed. R. Civ. P.

    "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." <u>Major League Baseball Properties, Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); <u>see also</u> <u>Anderson</u>, 477 U.S. at 249-50 (summary judgment "may be granted" if the opposing evidence is "merely colorable" or "not significantly probative") (citations omitted).  An opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." <u>Contemporary Mission. Inc. v. U.S. Postal Serv.</u>, 648 F.2d 97, 107 n.14 (2d Cir. 1981) (internal quotation marks and citation omitted).

THE PARTIES' MOTIONS ARE GRANTED IN PART AND DENIED IN PART.

        I.         With the Exception of the 180 Loans Set Forth in the August 30, 2012 Breach Notice, the Trusts May Seek Relief as to the Mortgage Loans Listed in the "Additional Breach Notices."

UBS argues that the Trusts may not recover for any breaches for which it did not receive more than 90 days' notice before this action commenced on September 28, 2012. According to UBS, the Trusts may not recover for any breach that UBS independently discovered, or for any defective loans identified in four breach notices sent between August 17 and September 27, 2012.

Section 2.03 of the PSAs states that UBS must cure any breach of representation or warranty or repurchase the defective loan "within ninety (90) days of the earlier of its discovery or its receipt of written notice" of the breach. (Pl. 56.1 ¶ 18-20; Def. 56.1 Resp. ¶ 18-20.) If that 90-day period passes, the repurchase obligation is triggered and the Trustee "shall enforce" the cure-or-repurchase requirement. (Fumerton Dec. Ex. E. § 2.03.) Thus, UBS argues, if the 90-day period has not yet passed, UBS cannot have breached its obligation.

The Complaint alleges two categories of breach notices, and distinguishes them according to whether the 90-day period had yet expired. Paragraph 37 details the "Breach Notices" that Assured and the Trustee set forth in letters dated between August 9, 2010 and June 28, 2012. Separately, paragraph 38 identifies the "Additional Breach Notices," "for which the 90-day cure period has yet to expire." (emphasis added) These "Additional Breach Notices" covered 1,026 allegedly defective mortgages, with an original unpaid principal balance totaling $382,919,764.83. (Compl't ¶ 38.)

The "Additional Breach Notices" consist of four notices that Assured sent to UBS. (Compl't ¶ 38.) On August 17, 2012, Assured identified 264 allegedly defective loans in

the 2006-OA2 transaction.  (Compl't ¶ 38.)  Also on August 17, 2012, it separately identified

354 allegedly defective loans in the 2007-3 transaction.  (Compl't ¶ 38.)  On August 30, 2012, it

identified 180 allegedly defective loans in the 2006-OA2 transaction.  (Compl't ¶ 38.)  Finally, in

a letter dated September 27, 2012, Assured identified 228 allegedly defective loans in the 2007-3

transaction.  (Compl't ¶ 38.)  For reasons that will be explained, the Trusts' claim arising from

the breach notice of August 30 is barred by New York's six-year limitations period, and is

analyzed separately from the other "Additional Breach Notices."

       The Complaint acknowledges that, at the time that the action was commenced, the

90-day period had not yet expired for the "Additional Breach Notices."  (Compl't ¶ 38.)  Because

the 90-day period had not expired, UBS could not have breached its obligation to cure or

repurchase.  This contrasts with the 3,616 mortgage loans described in the Complaint's summary

of the "Breach Notices," which had already passed the deadline to cure or repurchase.  (Compl't

¶ 37.)

       However, in the early weeks of this litigation, all loans described in the

"Additional Breach Notices" reached the PSAs' 90-day deadline.  There is no dispute that UBS

received notice of these allegedly defective loans via the "Additional Breach Notices."  The text

of the Complaint expressly asserted that those loans had breached the PSAs' representations and

warranties, but had not yet passed the deadline.

       From the Trusts' perspective, the prudent course of action would have been to

amend or seek leave to amend the Complaint after the 90-day period expired, in order to

expressly assert that UBS was in breach as to the loans included in the Additional Breach

Notices.  At the same time, there can be no dispute that the Complaint placed UBS on notice that

it would be in breach of the representations and warranties of the 1,026 loans described in

Assured's "Additional Breach Notices" upon expiration of the 90-day period.  UBS's argument that the Trusts are only now, and belatedly, seeking relief as to these loans is without merit.

UBS does not argue that this litigation would have proceeded differently had the Trusts re-pleaded their claims as to the "Additional Breach Notices."  UBS also does not contend that it requires additional discovery as to those loans.  It makes no claim of prejudice as a result of the Trusts' failure to amend.

UBS also relies on certain decisions applying New York law that have characterized the expiration of a cure period as a condition precedent for bringing suit.  But those decisions arose in a very different timing posture, where the expiration of the cure period was in conflict with New York's six-year limitations period set forth at CPLR 213(2).  In each of those cases, the cure period expired after the CPLR's limitations period had run.  With the exception of the 180 loans identified in Assured's breach notice of August 30, 2012, there is no such tension between the cure period and the limitations period in this case.  A review of these decisions shows why they do not bar the Trusts' claims as to the loans contained in the other three Additional Breach Notices.

In <u>ACE Sec. Corp. v. DB Structured Prods., Inc.</u>, 112 A.D.3d 522, 522-23 (1st Dep't 2013), the plaintiffs commenced their action on the final day of New York's six-year limitations period for a breach of contract claim, even though the PSA's cure period had not yet expired.  The First Department held that the expiration of the cure period functioned as a "condition precedent to commencing suit," and that the plaintiffs' premature filing of the complaint "rendered their summons with notice a nullity."  <u>Id.</u> at 523.

Similarly, in <u>Lehman XS Trust, Series 2006-4N v. GreenPoint Mortg. Funding, Inc.</u>, 991 F. Supp. 2d 472, 477 (S.D.N.Y. 2014), another decision cited by UBS, Judge

Scheindlin relied upon <u>ACE</u>, and stated that expiration of the cure period was a necessary precondition to suit.  But again, this issue arose in the context of a claim that was barred by New York's six-year limitations period for contract claims.  <u>Id.</u> at 477-78.  <u>Lehman</u> concluded that the cure period, and the defendant's failure to cure, did not extend New York's limitations period. <u>Id.</u>; <u>see also</u> <u>Home Equity Asset Trust 2006-5 v. DLJ Mortg. Capital, Inc.</u>, 984 N.Y.S.2d 632, at *3 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 3, 2014) (six-year limitations period bars action when plaintiffs had not yet submitted breach notices to defendants).

Only the August 30, 2012 breach notice raises a conflict between the limitations period and the 90-day cure period.  Any claim that was based on this breach notice, and which was initiated after the expiration of the cure period, would have been met with a meritorious statute of limitations defense.  The final closing date of the MARM 2006-OA2 transaction was November 15, 2006.  (See Fumerton Dec. Ex. E at 23 of 216.)  Under New York law, a claim for breach of the representations and warranties would have accrued at the time that the transaction closed, and not at the discovery of the breach.  <u>See</u> <u>ACE</u>, 112 A.D.3d at 522-23.  The six-year limitations period for claims directed to that transaction therefore expired on November 15, 2012.  However, the 90-day cure period for the August 30 breach notice expired on November 17, 2012, two days after the limitations period concluded.  (See UBS Mem. at 20.)  The Trusts could not have brought a timely claim as to the loans described in the August 30, 2012 breach notice because it would have been time-barred by New York's six-year limitations period. Under the PSA, UBS is entitled to notice, and summary judgment is granted in its favor as to the loans identified in the August 30 notice.  The Trusts do not dispute that the 90-day period ended after the limitations period expired, but they argue that this is "immaterial" because UBS "indisputably" was on notice "of pervasive breaches" throughout the pools.  (Trusts Opp. Mem.

at 12 n.6.)  For reasons later explained, the Court concludes that the Trusts' "pervasive breach" theory is without merit.

As to the remaining breach notices, there is no tension between the expiration of the 90-day cure-or-repurchase period and the six-year limitations period.  UBS received the Additional Breach Notices prior to the commencement of this action, and the Complaint alleged that the underlying loans failed to comply with UBS's representations and warranties while also expressly acknowledging that the cure period had not yet expired.  However, the 90-day periods expired shortly thereafter, and did so within the six-year limitations period.

The Trusts therefore may seek relief as to the breach notices dated August 17, 2012 and September 27, 2012.

II.     The Trusts May Recover as to Mortgages that UBS Independently
        Discovered to Be Defective.

UBS argues that the Trusts' recovery should be limited to loans specifically identified in Assured's breach notices.  The Trusts, however, argue that UBS was also on notice of – and that the Trusts may recover for – loans that UBS itself discovered to be in breach, even if they were not included in the Assured breach notices.

This Court concludes that the Trusts may recover for any loans that UBS independently discovered to be in breach of the representations and warranties.

Under New York law, "[c]ourts will not rewrite contracts that have been negotiated between sophisticated, counseled commercial entities . . . ."  Flag Wharf, Inc. v. Merrill Lynch Capital Corp., 40 A.D.3d 506, 507 (1st Dep't 2007).  "Courts will give effect to the contract's language and the parties must live with the consequences of their agreement." Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC, 22 N.Y.3d 413, 424 (2013).  "'The best evidence of what parties to a written agreement intend is what they say in their writing.'"

Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc., 117 A.D.3d 450, 450 (1st Dep't 2014)

(quoting Slamow v. Del Col, 79 N.Y.2d 1016, 1018 (1992)).

    Because the PSAs require UBS to cure any breaches that it independently

discovered, the Trusts may recover for mortgages that UBS knew to be defective, regardless of

whether UBS was placed on notice of the defect by Assured or U.S. Bank.  Section 2.03 of the

PSAs provides that UBS must cure any defective mortgages within ninety days "of the earlier of

its discovery or its receipt of written notice" that a mortgage has breached representations and

warranties.  (Pl. 56.1 ¶ 18-20; Def. 56.1 Resp. ¶ 18-20; emphasis added.)  Courts interpreting

similar provisions have held that the servicer is obligated to cure if it independently discovered a

breach, regardless of whether it was provided separate notice under the terms of the relevant

agreement.  See ACE Sec. Corp. v. DB Structured Prods., Inc., 2014 N.Y. Slip Op. 32451(U), at

5 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 28, 2014) (trial order) (breach notice is not a condition

precedent to commencing litigation when defendant independently discovered breaches); ACE

Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Prods., Inc., 5 F. Supp.

3d 543, 560 (S.D.N.Y. 2014) (Nathan, J.) (permitting plaintiff to pursue non-noticed claims for

breaches that defendant independently discovered, but noting that denial of motion to dismiss

"does not relieve Plaintiff of its burden of proving loan-by-loan breaches at later stages of

litigation."); Citigroup Mortg. Loan Trust 2007-AMC3 v. Citigroup Global Markets Realty

Corp., 2014 WL 1329165, at *5-6 (S.D.N.Y. Mar. 31, 2014) (Daniels, J.) (acknowledging

defendant's obligation to cure loans it discovered independently but dismissing as conclusory

and speculative plaintiff's allegations that defendant discovered breaches in non-noticed loans);

Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc., 958 F.

Supp. 2d 488, 497 (S.D.N.Y 2013) (Sweet, J.) (observing in motion to dismiss that the servicer's

"obligation to repurchase would have been triggered upon its own discovery and does not require notice by Plaintiff.").

The Trusts have come forward with some evidence that UBS independently discovered defects in the mortgage pools, separate from the contents of Assured's breach notices. This evidence includes the following:

- In an e-mail dated July 16, 2007, a UBS trader stated as follows concerning the MARM 2007-3 transaction: "If you remember, we had a huge due dili issue with this deal with Countrywide. . . . and now it's the worst performing neg am deal to date based on the first mos delinquencies! Can you comb thru that deal and look into the deal for breaches of reps and warrants?" (Baldwin Dec. Ex. 134.)

- An e-mail written by a different UBS trader, dated January 26, 2007, referred to "all these dd issues" concerning MARM 2007-1. (Baldwin Dec. Ex. 138.)

- An internal UBS e-mail dated October 30, 2007 noted an investor's observation that "it does not look like due diligence was done" on the collateral. (Baldwin Dec. Ex. 137.)

UBS disputes the weight and relevance that should be afforded to these statements, and argues that the Trusts have taken the e-mails out of context. (Def. 56.1 Resp. ¶¶ 176-180, 183.) A post-closing default on a loan does not prove a breach of representation or warranty at the time of closing. Hindsight is not the standard. However, the Trusts may endeavor to prove at trial that UBS discovered breaches of the PSAs' representations and warranties as to specific loans beyond those in the breach notices. The Court stands ready to grant judgment as a matter of law if they fail in this attempt.

UBS also argues that the Complaint did not adequately allege that UBS internally discovered defects in the loan pools. However, the Complaint asserted that section 2.03 required UBS to cure any defective loans that it independently discovered. (Compl't ¶¶ 29-30.) Under the heading "First Cause of Action," the Complaint specifically notes UBS's obligation to cure a

breach "within 90 days of the earlier of its discovery or its receipt of written notice" of the

breach.  (Compl't ¶ 45.)  Again, UBS does not assert that additional discovery is needed as to

these loans, or that the course of this litigation would have proceeded differently had the Trusts

more explicitly pleaded claims as to its contractual obligation to cure any loans that it knew to be

defective.

The Trusts may therefore pursue claims that are premised on UBS's discovery

that it had breached a representation and warranty as to a specific defect in a specific mortgage

loan.

III.     The Trusts May Not Recover Under a Theory of Pervasive Breach.

The Trusts urge that the breach notices had the cumulative effect of placing UBS

on notice that a significant number of loans, beyond those specifically identified, were also in

breach.  They refer to this as the "pervasive breach" theory.  The Trusts propose to offer

testimony from their experts, who did not review the entire pool of loans but engaged in

statistical sampling of the pool.  The experts will testify that 71.9% of the 1,092 sampled loans

were not in compliance with the representations and warranties at the time of closing.  (Pl. 56.1¶

152; Def. Resp. ¶ 152.)  The Trusts contend that evidence of this so-called "pervasive breach"

imposes an obligation upon UBS to cure or repurchase all defective loans in the pool.  This Court

concludes that the terms of the PSAs foreclose such a broad and improvised remedy.

First, the PSAs provide that not all breaches trigger a cure or repurchase

obligation.  The breach must "materially and adversely affect the interests of the

Certificateholders in such Mortgage Loan."  (Fumerton Dec. Ex. E § 2.03)  Notably, under

section 2.03, a breach of a large subcategory of the 50 representations and warranties (clauses

xiii, xiv and xxxv through *l* of Schedule II) are "deemed automatically" to be material and

adverse.  But the three representations and warranties at issue on this motion (clauses i, xxx and

xlv of Schedule II) are not in the category of breaches "automatically" deemed material and

adverse, and therefore are not exempt from the requirement of proof of material adversity.

While a breach of the representation and warranty is determined solely by reference to facts

extant at the time of the "Closing Date" or the "Cut-Off Date," the determination of whether the

breach "materially and adversely affect the interests of the Certificateholders . . ." is assessed as

of the cure-repurchase period.[2]  As will be later discussed, this Court adopts a construction of the

"materially and adversely" provision that requires proof of a significant increase in the risk of a

loan's default but not an actual loss or default.   Despite the Trusts' claims to the contrary, the

proposed statistical sampling does not adequately distinguish between breaches that are material

and adverse as to a particular loan and those that are not.  For example, a failure to follow

internal underwriting standards – which is a breach of a representation and warranty at issue –

may or may not significantly increase the risk of a loss in a particular borrower's loan, i.e., "such

Mortgage Loan."  At this juncture, the Court need not determine the contours of how materiality

may be proven.  It suffices that the Trusts, as summary judgment movants, have not come

forward with evidence that, if believed and not disputed, would entitle them to judgment in their

favor.

        Second, the repurchase remedy negotiated by the parties is loan specific, i.e., an

obligation to "purchase such Mortgage Loan. . . . ."  Further, upon triggering the repurchase

---

[2] "The Trustee shall enforce the obligations of the Transferor in accordance with Section 2.03 to correct or cure any such breach of a representation or warranty made herein, and if the Transferor fails to correct or cure the defect within such period, and such defect materially and adversely affects the interests of the Certificateholders and the Certificate Insurer in the related Mortgage Loan, the Trustee shall enforce the Transferor's obligations hereunder. . . ." (Section 2.03.)

obligation, section 2.03 requires UBS to repurchase at the "Purchase Price," which is defined as follows:

> With respect to any Mortgage Loan that is purchased by the transferor pursuant to Section . . . 2.03 hereof, a price equal to the outstanding Principal Balance of such Mortgage Loan as of the date of purchase, plus all accrued and unpaid interest thereon, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected, plus any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law.

Inherently, the "Mortgage Rate" (a defined term) is specific to a particular loan, as is the outstanding "Principal Balance" (also a defined term). Also, whether and to what extent a "Mortgage Loan" has any "accrued and unpaid interest" is loan specific. Thus, the repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans.

Third, and most significant, the PSAs expressly provides that cure or repurchase are the "sole remedies," and, thus, they foreclose the "pervasive breach" theory.[3] Other sophisticated parties have bargained for a broader obligation to repurchase the entire pool of loans under specified circumstances. These parties did not. Nor did these parties, unlike others, bargain for a broad remedy provision making the obligation to cure or repurchase a non-exclusive remedy.

---

[3] Section 2.03 provides that UBS's obligation "to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedies . . . respecting such matters available to . . . the Trustee . . . ." (Fumerton Dec. Ex. E § 2.03.) Judge Baer held that, upon breach of the obligation to cure or repurchase, the Trusts may seek specific performance, but "also decline[d] to foreclose the possibility of awarding damages in lieu of specific performance." 2013 WL 4399210, at *3. This was a reasonable interpretation of the "sole remedies" provision, and not the creation of a new, improvised remedy ungrounded in the parties' agreement. Indeed, Judge Baer wrote as follows: "I disagree with the Trusts to the extent that they argue that breach of the repurchase obligation somehow entitles them to damages that are greater than those that are commensurate with the sole remedy clause." Id. at *4.

For instance, U.S. Bank National Association v. Countrywide Home Loans, Inc., 2014 WL 617548 (N.Y. Sup. Ct. N.Y. Cnty., Nov. 1, 2013) (trial order), dismissed a "pervasive breach" claim that alleged an obligation to repurchase all loans contained in a trust.  It concluded that the "pervasive breach" rationale would render superfluous the agreement's loan-by-loan repurchase remedy, and instead impose "a different and broader remedy unsupported by the plain language" of the agreement.  Id.  At the same time, the agreement contained a separate provision that required the repurchase of all loans, in the event that certain specified representations and warranties were breached.  Id.  Plaintiffs in this state case did not seek pool-wide relief under this provision, and the court viewed their attempt to graft a pervasive breach remedy to the loan-by-loan breach provisions as an attempt to rewrite the agreement.  Id.

Similarly, in U.S. Bank, N.A. v. GreenPoint Mortgage Funding, Inc., 907 N.Y.S.2d 441, at *7 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 3, 2010) (trial order), the underlying sales agreement provided that if the defendant breached certain representations and warranties, it was obligated to repurchase "all of the" loans, whereas certain other breaches were subject to "narrow constraints" requiring the repurchase of individual loans.  Acting Justice Bernard J. Fried concluded that, at the pleading stage, the court could not determine which breach provision applied, and, therefore whether the defendant was obligated to repurchase the entire body of loans or to repurchase on a loan-by-loan basis.  Id. at *8.  The plaintiff's claim for pool-wide relief therefore survived the pleading stage.  Id.

Lastly, in Syncora Guarantee Inc. v. EMC Mortgage Corp., 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011) (Crotty, J.), the financial-guaranty insurer alleged a breach of representations and warranties pursuant to an agreement with the transaction's sponsor.  That agreement included a provision that stated, "[u]nless otherwise expressly provided, no remedy

herein conferred or reserved is intended to be exclusive of any other available remedy . . . ." Id. at *2. At summary judgment, Judge Crotty held that because the parties negotiated a broad remedial provision, the plaintiff insurer could seek poolwide relief, and was not limited to the narrower repurchase procedures set forth in other agreements between the sponsor and other parties to the transactions. Id. at *5-6; see also Assured Guar. Mun. Corp. v. Flagstar Bank, FSB, 2011 WL 5335566, at *7 (S.D.N.Y. Oct. 31, 2011) (Rakoff, J.) (plaintiff not limited to loan-by-loan cure and notice requirements when agreement allowed defendant to "take whatever action at law or in equity that may appear necessary or desirable in its judgment to enforce performance . . . .").

Here, the PSAs' cure-or-repurchase remedy is addressed to "such Mortgage Loan" and the Purchase Price mechanism is loan specific. There is no broad carve-out providing that the enumerated remedies are not exclusive of others available to the parties. Rather, section 2.03 describes the "sole remedies." Moreover, the breach notices sent by Assured and U.S. Bank did not assert a pervasive breach across the three trusts, and the Trusts have not cited evidence to indicate that, prior to the filing of the Complaint, Assured, U.S. Bank or the Trusts placed UBS on notice of a claim that all loans should be repurchased because of a pervasive breach, or that the notice requirement was dispensed with because of a pervasive breach. That is not to say that such notice would have permitted it to assert a "pervasive breach," but without such notice, the Trusts' claims certainly fail.[4]

---

[4] In Nomura Asset Acceptance Corp. Alternative Loan Trust v. Nomura Credit & Capital, Inc., 2014 N.Y. Slip. Op. 31671(U) (N.Y. Sup. Ct. N.Y. Cnty. June 26, 2014) (trial order), the trustee sent a repurchase demand that identified specific loans that it claimed to be in breach, but also sought repurchase of "any loans that did not comply with the representations and warranties made by" the defendant. Nomura observed: "In interpreting similar repurchase protocols, the Courts have generally held that the contractual notice requirement that trigger's the seller's purchase obligation is satisfied by a plaintiff's breach notice that refers to specific allegedly defective loans identified by a statistical sampling of the loan pool, or other loan-level investigation, at least where the notice also demands repurchase of all other defective loans." Id. (collecting cases); see also Home Equity Asset Trust 2007-2 v. DLJ

IV.   The PSAs Do Not Prevent the Trusts from Recovering for Losses Incurred on Liquidated Loans or Foreclosed Properties.

UBS seeks summary judgment in its favor to the extent that the Trusts seek relief as to any liquidated or defaulted loans.  In their own motion, the Trusts argue that they should be permitted to recover for any breaches of "Liquidated Loans," as defined in the PSAs, and to loans made to foreclosed properties.  The Court concludes that, contrary to UBS's argument, the PSAs' remedial scheme does not exempt "Liquidated Loans" or loans to now-defaulted properties.

UBS's motion turns on the application of the PSAs' definitional section to a passage of Judge Baer's opinion that denied the motion to dismiss.  At the motion to dismiss stage, UBS argued that the PSAs' remedy provision precluded an award of money damages.  MASTR Adjustable Rate Mortgages Trust 2006-OA2, 2013 WL 4399210, at *2-4.  Judge Baer concluded that the Trusts could seek money damages, but that damages were "limited to 'the Purchase Price' under the PSAs."  Id. at *4.

UBS argues that under the definitional sections of the PSAs, the "Purchase Price" for "Liquidated Loans" is zero, and that the Trusts therefore may not recover any loss arising from such loans.  This argument turns on the PSAs' definitions of "Purchase Price," "Principal Balance" and "Liquidated Mortgage Loan."  First, the PSAs define "Purchase Price" as "a price equal to the outstanding Principal Balance" of a "Mortgage Loan as of the date of purchase . . . ." (Def. 56.1 ¶¶ 18-19; Pl. 56.1 Resp. ¶¶ 18-19; Fumerton Dec. Ex. E § 1.01.)  As to the definition of "Principal Balance," the PSAs state that "[t]he Principal Balance of any Mortgage Loan that

---

Mortg. Capital, Inc., 2014 N.Y. Slip Op. 32568(U) (N.Y. Sup. Ct. N.Y. Cnty. Oct. 1, 2014) (defendant placed on notice of widespread breaches when notice claimed defects in the entire pool and a federal agency commenced securities law action against defendant).  Assuming arguendo that Nomura could apply to the notice and cure provisions of the PSAs, because Assured did not claim "pervasive breach" in its notices, there is no basis for the Trusts to argue that UBS failed to cure any "pervasive breach."

has . . . become a Liquidated Loan during the related Prepayment Period shall be zero." (Def. 56.1 ¶¶ 20-21; Pl. 56.1 Resp. ¶¶ 20-21; Fumerton Dec. Ex. E § 1.01.) The PSAs' definition of "Liquidated Mortgage Loan" states in part:

> With respect to any Distribution Date, (i) a defaulted Mortgage Loan . . . which was liquidated in the calendar month preceding the month of such Distribution Date and as to which the applicable Servicer or the Master Servicer, as the case may be, has determined (in accordance with the applicable Servicing Agreement and this Agreement) that it has received all amounts it expects to receive in connection with the liquidation of such Mortgage Loan, including the final disposition of an REO Property or (ii) any Mortgage Loan that becomes 180 days or more delinquent in the calendar month preceding the month of such Distribution Date.

(Fumerton Dec. Ex. E § 1.01.) UBS contends that, on the face of the PSAs, the Trusts cannot recover for any Liquidated Mortgage Loan, because under the definition of "Principal Balance," if a "Liquidated Mortgage Loan" has a "Principal Balance" of zero, the "Purchase Price" is also valued at zero.

UBS's argument would require the Court to overlook the limitations and qualifications in the PSAs' definitions. First, "Purchase Price" is defined as "a price equal to the outstanding Principal Balance of such Mortgage Loan as of the date of purchase" by UBS. (Fumerton Dec. Ex. E § 1.01; emphasis added.) If, at some point after "the date of purchase," a Mortgage Loan were to become a Liquidated Mortgage Loan with a Principal Value of zero, it does not follow that the Principal Balance "as of the date of purchase" was also zero. Nothing in the language that UBS cites moves the Purchase Price to a point after "the date of purchase." Thus, if a loan were eventually to be liquidated subsequent to purchase, that Liquidated Loan would not automatically render the Purchase Price as zero.

Moreover, as the Trusts note, the Principal Balance on a Liquidated Mortgage Loan is set at zero "during the related Prepayment Period." The PSAs define the "Prepayment

- 23 -

Period" as either "the period from and including the 16th day of the month preceding the month in which such Distribution Date occurs and to and including the 15th day of the month in which such Distribution Date occurs," or "the calendar month preceding the month in which such Distribution Date occurs." (Fumerton Dec. Ex. E § 1.01.) The Distribution Date is defined as "the 25th day of each calendar month after the initial issuance of the Certificates, or if such 25th day is not a Business Day, the next succeeding Business Day." (Fumerton Dec. Ex. E § 1.01.)[5]

The Prepayment Period and Distribution Date govern the Trusts' payments to the certificateholders. They are not part of the PSAs' remedial scheme. The entire definition of "Liquidated Mortgage Loan" is conditioned on the language, "With respect to any Distribution Date . . . ." (Fumerton Dec. Ex. E § 1.01.) Under the PSAs, then, with respect to any Distribution Date, if a loan becomes a Liquidated Mortgage Loan during the relevant Prepayment Period, it has zero value for the purposes of calculating distribution to the shareholders. For the purposes of the current dispute, these definitional sections do not alter the remedies available under section 2.03 of the PSAs.

UBS's motion for summary judgment as to Liquidated Loans is therefore denied.

UBS's motion also is denied to the extent that it seeks summary judgment as to any foreclosed properties contained in the pools. It argues that any such properties have already been sold, and that the loans for those properties no longer exist in the Trusts' assets and therefore have no Purchase Price under the PSAs. UBS contends that the remedial provision of section 2.03 requires UBS only to repurchase "Mortgage Loans," and that, pursuant to dictionary definition, a mortgage loan must be secured by a mortgage or deed on real property. (UBS Mem.

---

[5] In each PSA, the Prepayment Period is measured from the sixteenth of the month and the Distribution Date is set at the twenty-fifth day. (Fumerton Dec. Exs. E-G.)

at 23-24.)  Thus, it argues that the foreclosure of the property extinguishes the underlying mortgage loan as a matter of law.  (Id. at 24.)

The PSAs' definition of "Mortgage Loans" differs from the dictionary definition supplied by UBS, however.  The relevant portion of the PSAs defines "Mortgage Loans" as follows: "Such of the mortgage loans and cooperative loans transferred and assigned to the Trustee pursuant to the provisions hereof as from time to time are held as a part of the Trust Fund (including any REO Property), the mortgage loans so held being identified in the Mortgage Loan Schedule, notwithstanding foreclosure or other acquisitions of title of the related Mortgaged Property."  (Fumerton Dec. Ex. E § 1.01; emphasis added.)  Thus, foreclosure does not alter a loan's status as a "Mortgage Loan" within the meaning of the agreement.  UBS does not revisit this argument in its reply, and appears to abandon its position.

To the extent that UBS seeks summary judgment in its favor as to any foreclosed mortgage loans, its motion is denied.

V.    The PSAs Do Not Require a Default In Order for a Mortgage Loan to Experience a Material Adverse Effect.

The Trusts argue that they should be permitted to show that UBS breached its representations and warranties with evidence that any breaches have increased the risk that the individual mortgage loans might default, as opposed to evidence that borrowers have actually defaulted.

The PSAs state that a representation and warranty is breached when an inaccuracy "materially and adversely affects" the value of a mortgage loan.  Specifically, Section 2.03 provides that if the content of a "representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders or the Certificate Insurer therein . . . such inaccuracy shall be deemed a breach

- 25 -

of the applicable representation or warranty."  (Fumerton Dec. Ex. E. § 2.03.)  According to the

Trusts, in order to obtain relief, they are not required to show that a loan had actually defaulted,

but only that the breach of representation and warranty materially and adversely affected the

mortgage loan's value.

   Interpreting similar language, MBIA Insurance Corp. v. Countrywide Home

Loans, Inc., 105 A.D.3d 412, 413 (1st Dep't 2013), stated that the "plaintiff is entitled to a

finding that the loan need not be in default to trigger defendants' obligation to repurchase it."  It

noted that the agreement "requires only that 'the inaccuracy [underlying the repurchase request]

materially and adversely affect[ ] the interest of' plaintiff.  Thus, to the extent plaintiff can prove

that a loan which continues to perform 'materially and adversely affect[ed]' its interest, it is

entitled to have defendants repurchase that loan."  Id. (alterations in original).  MBIA noted the

parties' sophistication, and observed that if they intended only non-performance or default to

trigger a repurchase obligation, they could have included such language in the contract.  Id.

   Other courts applying New York law to similar provisions have concluded that a

material, adverse effect may arise when a breach of representation and warranty increases the

risk of loss, and that the loan need not be in default.  See Wells Fargo Bank, N.A. v. JPMorgan

Chase Bank, N.A., 2014 WL 1259630, at *4 (S.D.N.Y. Mar. 27, 2014) (Cedarbaum, J.) ("A

growing consensus among New York courts holds that MAE repurchase conditions are triggered

when the plaintiff's risk of loss increases and not just when that risk actualizes.") (in dictum);

Homeward Residential, Inc. v. Sand Canyon Corp., 298 F.R.D. 116, 131 (S.D.N.Y. 2014)

(Torres, J.) ("material and adverse effect" requires only decrease in mortgage value through

increased credit risk, not actual default); Wells Fargo Bank, N.A. v. Bank of Am., N.A., 2013

WL 1285289, at *10 (S.D.N.Y. Mar. 28, 2013) (Oetken, J.) ("While the terms of the PSA do

- 26 -

indeed reflect a causal requirement, the breach need only cause harm, though not necessarily default."); <u>Assured Guar. Mun. Corp. v. Flagstar Bank, FSB</u>, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) (Rakoff, J.) (a breach that "materially increased" plaintiff's risk was adverse under the contract and therefore subject to repurchase or cure); <u>Syncora Guar. Inc. v. EMC Mortg. Corp.</u>, 874 F. Supp. 2d 328, 335 (S.D.N.Y. 2012) (Crotty, J.) (because text of the contract does not require a default in order to constitute a breach of representation and warranty, "any increased risk to [plaintiff] as a result of the alleged breaches" falls within the repurchase or cure provision).

The PSAs do not require the default of a mortgage loan, and do not specify any other limitations on which events constitute a material and adverse effect arising from an inaccuracy in the representations and warranties. This Court therefore concludes that the Trusts need not prove that a default has occurred in order to establish a breach of the representations and warranties. The Trusts may rely upon proof that as to a specific loan, there is a material or significant increase in the risk of loss.

VI.   <u>The Trusts' Motion as to UBS's Liability for 37% of the Pools Is Denied.</u>

The Trusts seek a ruling that 37% of the mortgage loans in the Trusts' three pools are materially defective, and seek summary judgment in their favor as to UBS's liability for these loans. This portion of the Trusts' motion is denied.

First, the Trusts argue that, as a matter of law, incomplete loan files breached the PSAs' representations and warranties, because those incomplete loan files do not satisfy applicable underwriting guidelines. They cite to the opinions of an expert on the underwriting process, who concluded that 394 loan files that he reviewed were materially incomplete, including 393 loan files that included no loan approvals. (Pl. 56.1 ¶¶ 158-63.) The Trusts

emphasizes that, for 376 of these loans, there is no indication that any loan approval ever existed. (Pl. 56.1 ¶ 163.)  Their expert concluded that, among borrowers with incomplete loan files, 21.4% filed for bankruptcy, and that many materially misrepresented their incomes.  (Pl. 56.1 ¶¶ 165, 168.)  The Trusts cite to UBS's witness, who testified in his deposition that the absence of documents could be evidence of a breach and that certain loan files were "thin."  (Pl. 56.1 ¶¶ 169, 171.)  The Trusts argue that, as a matter of law, the Court should grant them summary judgment that the 376 mortgage loans for which there is no evidence of a loan approval have breached the PSA's representations and warranties.

But UBS notes that these loans were originated seven to nine years ago, and the representations and warranties reflect their conditions at the time of origination, not the ongoing completeness of the loan files.  UBS states that loan files remained in the custody of originators, not UBS, and that many originators have since dissolved.  (UBS Opp. Mem. at 4-5.)  UBS notes statements by servicers concerning original loan files that were found to be in "disarray," or else "corrupted and lost."  (Id. at 5.)  It also notes the testimony of the Trusts' expert that he had no basis to conclude whether loan approvals had been removed, or whether, alternatively, they never existed.  (Id. at 6-7.)  UBS also argues that its own expert has opined that any incomplete loan files should be attributed to the passage of time and the number of times that a file changed hands.  (Id. at 8-9.)

These issues must be determined by a trier of fact.  While the parties do not dispute that the loan files are, in their present state, incomplete, the Court is not in a position to determine whether the loan files were incomplete at the time of origination, whether loan approvals existed for certain loans and were subsequently misplaced, or the extent to which the

composition of loan files changed as they were transferred over time.  On this record, the issues may not be resolved at the summary judgment stage.

Second, the Trusts argue that any loans procured by fraud or misrepresentation are materially defective, and necessarily failed to satisfy underwriting guidelines.  They assert that 21 loans, constituting 1.9% of the sample drawn by their expert, contain indicia of borrower fraud or misrepresentation.  (Pl. 56.1 ¶ 167.)  However, unlike other sponsors in RMBS transactions, UBS did not warrant against borrower fraud and misrepresentation in the loans' origination.  See Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB, 920 F. Supp. 2d 475, 509 (S.D.N.Y. 2013) (enforcing representation and warranty that no "misrepresentation, negligence, fraud or similar occurrence" was made with respect to mortgage loans).  UBS states that the PSAs were so drafted because the loans in these pools were higher-risk "stated income/stated asset" loans, which were more susceptible to borrower misrepresentations.  (UBS Opp. Mem. at 9.)  In his deposition, the Trusts' expert stated that he determined fraud based on the contents of PSAs in other transactions, and not from the PSAs in this case.  (UBS Opp. Mem. at 9-10.)  At the same time, underwriting guidelines required originators to identify any "red flags" that indicated borrower misrepresentations.  (UBS Opp. Mem. at 10.)  UBS notes that in concluding that 21 loans were fraudulent, the Trusts' expert relied heavily on borrowers' post-closing bankruptcy documents, and not on information available to the originators and to UBS at the time they reviewed borrowers' applications.  (UBS Opp. Mem. at 10-11.)

As with the completeness of the loan files, a trier of fact must consider the parties' conflicting evidence of whether, at the time of origination, these loans failed to meet applicable quality standards.  The Trusts have not met their summary judgment burden of establishing that, as a matter of law, these loans breached the PSAs' representations and warranties.  Issues include

whether information contained in post-closing bankruptcy documents go toward misrepresentations at the time the loans were issued, and whether these applications contained any purported "red flags" that should have been recognized by UBS.  Moreover, no party has articulated a clear approach to reconciling the PSAs' omission of a representation and warranty against fraud with its inclusion of a representation and warranty that loans are in compliance with underwriting standards.  As noted, the Trusts' expert apparently based his determinations of fraud on agreements that are not at issue here.  Summary judgment is therefore denied as to mortgage loans allegedly obtained by fraud.

Third, the Trusts argue that because UBS agreed to repurchase 105 loans, it has conceded that those loans materially breached the PSAs' representations and warranties.  However, at the time that UBS agreed to repurchase those loans, it did so "without prejudice to, and strictly without waiver of, defenses UBS otherwise may have asserted with respect to these loans or may assert with respect to other loans proffered for repurchase."  (Baldwin Dec. Ex. 41 at 3.)  UBS's agreement to purchase these loans was not an admission of liability, and UBS expressly reserved its defenses as to these loans.  The Trusts' motion for summary judgment is therefore denied as to any loans that UBS agreed to repurchase.

VII.   The Trusts May Recover Money Damages, but Have Not Established that They Are Entitled to Rescissory Damages.

The Trusts argue that they are entitled to money damages, and are not limited to seeking specific performance.  As noted, Judge Baer concluded at the motion to dismiss stage that the Trusts were not foreclosed from seeking money damages for a breach of the repurchase obligation.  See 2013 WL 4392210, at *3-4.  This approach is consistent with the reasoning of New York courts.  See, e.g., U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc., 2014 WL 1621046, at *5 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 21, 2014) (trial order) ("a remedy of damages is

available with respect to breach of the cure and repurchase obligation relating to Loans for which notice has been given.").  UBS does not dispute that the Trusts may pursue money damages, and argues only that damages may not exceed actual loss.  (UBS Opp. at 20-21.)

       The Trusts separately seek a ruling that, if they come forward with certain evidence at trial, they may be entitled to rescissory damages as an alternative remedy to compensatory damages.  (Trusts Mem. at 22-25.)  They argue that they are entitled to rescissory damages in the event that they can prove breaches "with respect to a high proportion of the Loans," and prove that the breaches arose as a result of willful misconduct or gross negligence. (Id. at 22.)

       Under New York law, rescissory damages may be available when a plaintiff is otherwise entitled to rescission, but rescission itself is not practicable.  Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., 935 N.Y.S.2d 858, 869-70 (N.Y. Sup. Ct. N.Y. Cnty. 2012); accord U.S. Bank, 2014 WL 1621046, at *5 ("An award of rescissory damages is an alternative remedy in cases where rescission itself is not viable.").  Rescissory damages are a "very rarely used equitable tool."  MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 105 A.D.3d 412, 413 (1st Dep't 2013).  They are available only when there is no adequate remedy at law.  U.S. Bank, 2014 WL 1621046, at *4.

       The Trusts have not articulated how an award of rescissory damages would apply to this case, what those damages would entail or how rescissory damages would differ from compensatory damages.  To the extent that the Trusts seek rescissory damages as a remedy for their "pervasive breach" theory, that theory is foreclosed as explained herein.  If the Trusts intend some other meaning, it is premature to rule on the type of relief that may be available to them without an understanding of the trial evidence.

The Trusts' summary judgment motion is denied to the extent that it seeks a determination of their ability to recover rescissory damages.

CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment are granted in part and denied in part.

The Clerk is directed to terminate the motions.  (Docket # 192, 203.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
January 9, 2015