UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

MASTR ADJUSTABLE RATE MORTGAGES
TRUST 2006-OA2, MASTR ADJUSTABLE
RATE MORTGAGES TRUST 2007-1 and
MASTR ADJUSTABLE RATE MORTGAGES
TRUST 2007-3,

Plaintiffs,

-against-

UBS REAL ESTATE SECURITIES INC.,

Defendant.

-------------------------------------------------------x

```
┌─────────────────────────────────────┐
│ USDS SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____                │
│ DATE FILED: 2-25-15                  │
└─────────────────────────────────────┘
```

12-cv-7322 (PKC)

MEMORANDUM AND ORDER
ON RECONSIDERATION

CASTEL, U.S.D.J.

> Plaintiffs move for reconsideration of this Court's Memorandum and Order of January 9, 2015, which granted in part and denied in part the parties' motions for summary judgment (the "Summary Judgment Opinion"). (Docket # 249.) Familiarity with the Summary Judgment Opinion and the standards on a motion to reconsider is assumed.[1]

> Plaintiff Trusts argue that this Court overlooked an April 1, 2013 memorandum endorsement of the late Judge Harold Baer on the use of sampling and should have permitted them to proceed with a theory of notice by "pervasive breach." In the event that the Court denies reconsideration, the Trusts seek to re-open expert discovery and postpone the May 11, 2015 trial. For reasons to be explained, the motions are denied.

---

[1] All abbreviated or terms with initial capitalization are as defined in either the Summary Judgment Opinion or the the Pooling and Service Agreements ("PSAs") .

A Brief Recap of the Case and the Court's Summary Judgment Opinion

        To place matters in context, the Court begins with a review of certain basic principles governing the original disposition of the summary judgment motions and, hence, this motion for reconsideration. The Complaint in this action helpfully contains only one claim for relief styled: "Breach of Repurchase Obligations." It sounds in contract. The PSAs at issue are 62-pages of single-space text. They were negotiated by sophisticated parties and incorporate New York law. They are integrated agreements. Insofar as the summary judgment motions were concerned, neither side claimed ambiguity in the contractual provisions at issue. "It is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself. Consequently, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms'." MHR Capital Partners LP v. Presstek, Inc., 12 N.Y.3d 640, 645 (2009) (citation omitted).

        For convenience, the Court repeats two key provisions of the PSAs. Section 2.03 of the PSA unambiguously provides as follows:

> It is understood and agreed that the obligation under this Agreement to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedies against the Transferor respecting such matters available to Ceritficateholders, the Master Servicer, the NIMs Insurer, the Depositor, the Trust Administrator or the Trustee on their behalf.

Section 2.03 also provides that:

> Upon discovery by any Depositor, the Certificate Insurer, the Transferor the Master Servicer, the Trust Administrator of the Custodian of a breach of a representation or warranty made by the Transferor pursuant to this Section 2.03 that materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan, the party discovering such

breach shall give prompt notice thereof to the other parties and the
Trustee.

Notably, not all breaches that have been "discover[ed]" trigger the obligation to cure or repurchase.[2] The breach must "materially and adversely affect[ ] the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan. . . ."[3] "[I]f the Transferor fails" to cure or repurchase, the "Trustee[s] shall enforce the obligations of the Transferor in accordance with this Section 2.03 to correct or cure any such breach . . . ."

All breaches of a representation as to which UBS was placed on notice (4,462 loans) and any other loans which were discovered by UBS to be in breach will be at issue at the trial commencing on May 11, 2015.  In addition to "discovery" and breach, the plaintiffs must prove that the breach "materially and adversely affect[ed] the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan. . . ."

Statistical Sampling

The Court first addresses the Trusts' arguments concerning expert sampling and its use in this case.  To date, this Court has not ruled on the admissibility of any form of evidence at trial and no motion to do so is presently before the Court.  The Trusts, in effect, urge that Judge Baer's memorandum endorsement, docketed in Assured Guaranty Municipal Corp. v. UBS Real Estate Securities Inc., 12 Civ. 1579 (HB), dictates how the summary judgment motion should have been decided.

---

[2] In its Summary Judgment Opinion, the Court held that "discovery" is not limited to receipt of notice by the Trust Administrator or the Certificate Insurer but that at trial the plaintiffs may endeavor to prove that that UBS discovered breaches that materially and adversely affected the Certificateholders. (Summary Judgment Opinion 14-17.)

[3] Breaches of certain representations not at issue are "deemed automatically" to satisfy "materially and adversely affects the interests" requirement. (Summary Judgment Opinion 17-18.)

In March 2013, the parties traded letter briefs on the use of sampling in both the
Assured action and this action on certain issues, including the existence of breaches in the loans
held by the Trusts. (Baldwin Dec. Exs. 5-7.) The Trusts argued that sampling would streamline
the case while accurately identifying the extent of breach. On April 1, 2013, Judge Baer issued a
handwritten memorandum endorsement that stated, in relevant part, "I will allow sampling."
(Baldwin Dec. Ex. 7.)

The Trusts now "seek clarification that the Order [i.e. the Summary Judgment
Opinion] was not intended to reverse Judge Baer's April 1, 2013 order allowing the Trusts to use
statistical sampling to prove their claims — specifically, to use a statistically significant sample
of loans to determine the percentage of such loans that materially breached UBS' representations
and warranties and to calculate damages for UBS's failure to repurchase those loans." (P. Mem.
1).[4]

Statistical sampling evidence that meets the standards of Rule 703, Fed. R. Evid.,
and the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and
Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), is potentially admissible evidence in this
and other actions. But to be admissible, the evidence, even if found to be reliable, must meet the
standard of relevance. Rule 301, Fed. R. Evid. This Court's Summary Judgment Opinion
granted summary judgment dismissing the plaintiffs' "pervasive breach" theory of liability. Had
such a theory survived, statistical sampling may have been a valid method of proving it. But for
reasons explained in the Summary Judgment Opinion, the Court concluded that the language of
the agreements at issue, which varies in material respects from the language of other agreements

---

[4] In deciding the summary judgment motion, the Court was well aware of Judge Baer's memorandum endorsement,
which the briefing discussed at length.

- 4 -

in other RMBS actions, foreclosed the use of a "pervasive breach" theory to prove liability at trial.

Specifically, in their summary judgment motion, the plaintiffs argued that their underwriting experts examined 1,092 loans.  Their experts found that 37% of the sampled loans were "materially defective."  Plaintiffs sought partial summary judgment that the repurchase obligation (or its money damage equivalent) was triggered as to 37% of the 4,462 loans covered by the notice as well as 37% of 12,620 loans not covered by the written breach notices but of which plaintiffs argued UBS had constructive notice.[5]  In terms of the summary judgment motion, the Court interprets this to mean that, based upon statistical sampling, the Court should have concluded that the repurchase obligation was established as to 6,320 loans, or 37% of 17,082 loans.  (P. Mem. In Support at 25.)  In neither the motion for partial summary judgment nor the motion to reconsider do the plaintiffs identify which 6,320 loans should have been repurchased.  Presumably, that would have come later.

Summary judgment was denied because plaintiffs' theories and expert sampling data did not align with the materiality requirement of the parties' agreements.  For example, one of the representations and warranties alleged to have been breached is as follows: "The Mortgage Loan was underwritten in accordance with the underwriting guidelines of the related Loan Seller in effect at the time of origination with exceptions thereto exercised in a reasonable manner." (Schedule II at xxx.)  But the cure or repurchase obligation is not triggered unless a breach of that representation "materially and adversely affects the interests of the Certificateholders . . . ." (Fumerton Dec. Ex. E § 2.03; Pl. 56.1 ¶¶ 18-20; Def. 56.1 Resp. ¶¶ 18-20.)  Materiality is determined not by the degree of deviation from the internal underwriting standards, but by how

---

[5] The plaintiffs contend that 71.9% of all loans are defective but only sought summary judgment as to 37% of all loans.

the deviation affects the Certificateholders in relation to "such Mortgage Loan." (Fumerton Dec. Ex. E § 2.03.) Thus, for example, the failure to obtain written verification of the salary and employment of a borrower may be a material deviation from underwriting standards, but if the borrower, in fact, was paid the exact salary and had the exact employment that he claimed, the material deviation would not have "materially and adversely affect the interests of the Certificateholders . . . ." While the Summary Judgment Opinion rejects the notion that the plaintiffs must prove an actual loss or default, it does require proof of a significant increase in the risk of a loan's default.   (Summary Judgment Opinion 25-27.)

Thus, summary judgment was denied because plaintiffs failed to come forward with evidence, which, if believed, would entitle them to judgment in their favor on the issue. The Court expressly disclaimed ruling on the manner of proof of materiality:

> At this juncture, the Court need not determine the contours of how materiality may be proven.  It suffices that the Trusts, as summary judgment movants, have not come forward with evidence that, if believed and not disputed, would entitle them to judgment in their favor.

(Summary Judgment Opinion 18.)  No valid basis has been tendered to vary this conclusion.

Pervasive Breach

The Trusts also seek to reargue its "pervasive breach" theory which was considered and rejected in the Summary Judgment Opinion.  It argues that written notice of a breach of a representation as to 4,462 loans placed UBS on constructive notice that such loans that were, in fact, materially defective were materially defective.  In other words, it urged that, once UBS received notice that many loans were defective, the PSAs imposed an affirmative duty on the part of UBS, to examine the universe of 17,082 loans and determine which of them

breached a representation in a manner that materially and adversely affected the interests of the

Certificateholders:

> "To be clear, the Trusts do not argue—and have never have
> argued—that notice of UBS's pervasive breaches of representations
> and warranties triggered an obligation to repurchase *all* loans, nor
> even all *defective* loans. Rather, the Trusts argue that, based on the
> complaints' allegations of pervasively defective loans, UBS was put
> on *constructive notice* of all *materially defective* loans in the Trusts,
> which triggered UBS's obligation to repurchase all such loans." (P.
> Mem. at 1.)

While the Court appreciates the clarification, it does not alter the result or the

reasoning of the Summary Judgment Opinion.  The parties could have, but did not, bargain for

an inquiry notice standard.  The parties could have, but did not, bargain for an obligation that if

the aggregate number of loans in breach exceeded a certain threshold, a duty to reexamine all

loans would be triggered.   Instead, the specified remedies are the "sole remedies."  Unlike the

agreements in other RMBS litigations, the "sole remedies" provision of the PSAs is not offset by

another contractual provision permitting the parties to pursue available remedies under law.  In

this respect the case is notably different from in <u>Assured Guar. Mun. Corp. v. Flagstar Bank,</u>

<u>FSB</u>, 2011 WL 5335566, at *7 (S.D.N.Y. Oct. 31, 2011), in which the agreement permitted the

party to "take whatever action at law or in equity that may appear necessary or desirable in its

judgment to enforce performance . . . ."  In any event, plaintiffs cite no controlling authority

contrary to the central holdings of this Court Summary Judgment Opinion.

It is a core function of a district court to manage cases.  But that function does not

give the judge the prerogative of overriding the parties' agreements in order to provide an

efficient and economical remedy in the name of a just and fair resolution.  When it comes to

written, integrated contracts among sophisticated parties, predictable outcomes in accordance

with the expressed intentions of the contracting parties is justice and fairness.  The parties have

powerful tools available to them to streamline the presentation of large volumes of data to the fact finder.  See, e.g., Rule 1006, Fed. R. Evid.

Reopening of Expert Discovery

Alternatively, the Trusts seek to reopen expert discovery which they acknowledge would require the postponement of the trial.  The Court concludes that the description of the proposed revised expert testimony is inadequate to grant the relief.  The application is denied without prejudice to renewal by the submission of a letter brief by March 4 identifying the expert(s), describing the central points of the proposed revised expert report and the methodology for developing same, and proposing a revised schedule. The Court will hear the parties on any renewed application by plaintiffs on March 9, 2015 at 2 p.m.

CONCLUSION

Having considered all of the arguments in the motion for clarification and reconsideration or, alternatively, to reopen expert discovery, the motion (Doc 252) is DENIED. In the event that a renewed application for the reopening of expert discovery is made as outline above, the Court will hear the parties on March 9, 2015 at 2 p.m.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
February 25, 2015