# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3,<br><br>Plaintiffs,<br><br>-against-<br><br>UBS REAL ESTATE SECURITIES INC.,<br><br>Defendant. | 12 Civ. 7322 (HB)<br><br>ECF Case<br>Electronically Filed<br><br>**DECLARATION OF IRA H. HOLT, JR., IN SUPPORT OF PLAINTIFFS' LETTER-BRIEF REGARDING THE REOPENING OF EXPERT DISCOVERY** |

I, IRA H. HOLT, JR., declare pursuant to 28 U.S.C. § 1746 as follows:

1. I respectfully submit this declaration in support of the letter-brief of Plaintiffs MASTR Adjustable Rate Mortgages Trust 2006-OA2, MASTR Adjustable Rate Mortgages Trust 2007-1, and MASTR Adjustable Rate Mortgages Trust 2007-3 (together the "Trusts"), acting through U.S. Bank National Association, solely in its capacity as trustee of the Trusts, regarding the reopening of expert discovery.

2. I am a director with Analytic Focus LLC ("Analytic Focus"). I have worked in the mortgage industry in various capacities for 25 years and have been underwriting mortgage loans and supervising underwriters throughout my entire career. I am an expert in mortgage loan re-underwriting. The facts set forth herein are based on my personal knowledge and/or information obtained in consultation with others at Analytic Focus that I believe to be true and correct.

3. I have been retained by the Trusts to re-underwrite loans in the Trusts in order to determine whether they have material defects in violation of specific contractual representations and warranties that UBS Real Estate Securities Inc. ("UBS") made to, among others, the Trusts.

4. In my initial report, I reported the results of my re-underwriting of three random samples of 400 loans (one from each of the Trusts). In reviewing these loans, I made several assessments. First, I determined whether each of the loans had one or more defects. Specifically, I determined whether each loan was underwritten in accordance with the originator's underwriting guidelines, whether there otherwise was a failure to follow reasonable underwriting standards, or whether the information in the borrower's loan application or elsewhere in the loan file, or in the Mortgage Loan Schedule for the relevant Trust, was verifiably false. Second, I evaluated whether the defects I identified were material and would adversely affect the value of the loan or the interest of a party holding the risk of the loan. Specifically, I determined whether the defects I identified significantly increased the risk of loss with respect to the loan (all such defects being "Material Defects"). Only if my review of a loan fulfilled both conditions—*i.e.*, breach and materiality—did I deem the loan materially defective. In residential mortgage lending generally, and the loans in the Trusts specifically, such risk of loss includes (a) the risk that the borrower will default on the loan, (b) the risk that the property securing the loan will not constitute adequate collateral in the event of default, and (c) the risk that the loan and/or collateral documentation will not be fully enforceable against the borrower, in whole or in part.

5. By way of example, for loan 158312151, I determined that the underwriter failed to assess the reasonableness of the borrower's stated income, as required under the applicable underwriting guidelines. The borrower represented that he/she was employed as a lab technician

2

and earned a monthly salary of $9,250. Bureau of Labor statistics indicate that the 90% percentile salary for someone in the borrower's position was $5,132. The underwriter also failed to verify the borrower's prior mortgage payment history. Each of these defects significantly increased the risk of loss with respect to the loan. A borrower who misrepresents their income is significantly less likely to make their mortgage payments. Similarly, a borrower with a poor payment history presents a higher risk of non-payment in the future. For loan 159077994, the borrower misrepresented that he/she earned a monthly income of $9,000 as the owner of a sports and recreation company. A subsequent bankruptcy filing by the borrower disclosed that he/she in fact earned a monthly income of $1,000 at the time of origination. When the borrower's actual income is taken into account, the true debt-to-income ("DTI") ratio for the loan is 401%, which exceeds the maximum of 45% imposed by the applicable underwriting guidelines. Again, this defect significantly increased the risk of loss with respect to the loan. Where the DTI ratio exceeds the permitted maximum, there is a substantial risk that the borrower will be unable to make their loan payments. For loan 149376704, the borrower misrepresented that the mortgaged property would be owner-occupied. In fact, the borrower resided at a different property. This defect significantly increased the risk of loss with respect to the loan. Borrowers who occupy mortgaged properties are less likely to "walk away" from those properties and default on their mortgage obligations than are borrowers who buy residential properties as investments or as vacation homes. For loan 158969180, the applicable underwriting guidelines imposed a maximum combined loan-to-value ("CLTV") ratio of 75%. The actual CLTV ratio for the loan was 90%. Again, this defect significantly increased the risk of loss with respect to the loan. The mortgaged property on a loan with a CLTV ratio in excess of the permitted maximum is less likely to constitute adequate collateral in the event of a default.

6. To perform my analysis, I personally reviewed each of the loans in the random samples, with assistance from a team of underwriters who aggregated and reported on data. My team performed first-level re-underwriting on each loan under my supervision. I personally carried out second-level review on virtually all the loans that were re-underwritten, and on each of the loans that was determined to be defective in the first-level review. For each loan I reached my own conclusion, based on my own judgment and experience, as to whether the loan contained Material Defects.

7. Following the Court's January 9, 2015 Order, counsel for the Trusts instructed me to calculate how much time would be required for me to re-underwrite an additional 1,004 loans from the Trusts, using the same methodology as I used previously. I calculated that it would take approximately four months—*i.e.*, until July 15, 2015.

8. I was also instructed to calculate how much time would be required for me to re-underwrite an additional 3,132 loans from the Trusts (for a total of 4,136 additional loans), again using the same methodology as I used previously. I calculated that it would take approximately five additional months—*i.e.*, until December 15, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 4, 2015, in Birmingham, Alabama.

_____
Ira H. Holt, Jr.

4