UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MASTR ADJUSTABLE RATE MORTGAGES
TRUST 2006-OA2, MASTR ADJUSTABLE
RATE MORTGAGES TRUST 2007-1, AND
MASTR ADJUSTABLE RATE MORTGAGES
TRUST 2007-3,

               Plaintiffs,

        -against-

UBS REAL ESTATE SECURITIES INC.,

              Defendant.

12 Civ. 7322 (PKC)

---

**PLAINTIFFS' CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

David L. Elsberg
Sean P. Baldwin
Andrew R. Dunlap
Steven M. Edwards
Nicholas F. Joseph
Paul P. Hughes
Marlo A. Pecora
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Facsimile: 212-849-7100

Paul A. Riley
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel: 213-443-3000
Facsimile: 213-443-3100

*Attorneys for Plaintiffs*

June 13, 2016

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY .....................................................................................2

BACKGROUND ....................................................................................................9

I.     RESIDENTIAL MORTGAGE-BACKED SECURITIES ..........................9

    A.     Originating A Residential Mortgage Loan ......................................10

        1.     Assessing Credit Risk ..........................................................11

        2.     Assessing Collateral Risk ....................................................12

        3.     Requiring Critical Documents ..............................................13

    B.     Pricing A Residential Mortgage Loan ............................................13

    C.     Creating An RMBS..........................................................................17

II.     THE TRUSTS ........................................................................................20

    A.     The PSAs .........................................................................................20

    B.     The Loans ........................................................................................21

III.     UBS'S PRE-CLOSING DUE DILIGENCE ..........................................22

IV.     UBS'S POST-CLOSING MONITORING ............................................26

V.     UBS'S RESPONSES TO REPURCHASE DEMANDS..........................29

VI.     THE PARTIES' EXPERT ANALYSES ................................................30

    A.     Re-underwriting ...............................................................................30

        1.     Holt's Testimony .................................................................30

        2.     Grissom's Response To Holt's Testimony ...........................32

        3.     UBS's Cross-Examination Of Holt.....................................34

    B.     Appraisals .......................................................................................38

        1.     Cowan's Testimony .............................................................38

        2.     Barnett's Response To Cowan's Testimony..........................40

        3.     UBS's Cross-Examination of Cowan ..................................41

    C.     Sampling And Extrapolation............................................................42

        1.     Lipshutz's Testimony ..........................................................42

        2.     Barnett's Response To Lipshutz's Testimony .....................44

        3.     UBS's Cross-Examination of Lipshutz................................45

    D.     Remedies .........................................................................................46

        1.     Snow's Testimony ...............................................................46

        2.      Carron's Response To Snow's Testimony ...................................................48

        3.      UBS's Cross-Examination of Snow ...........................................................48

DISCUSSION ..............................................................................................................49

I.      BURDENS OF PROOF ....................................................................................51

II.     EVIDENTIARY STANDARDS .......................................................................52

III.    THE CONTRACTS' REPURCHASE PROVISION .........................................56

    A.     The "Material And Adverse Effects" Requirement .........................................57

        1.      UBS's False Warranties Materially And Adversely Affect The Interests Of The Certificateholders, And Those MAEs Persisted ............57

        2.      The Material And Adverse Effects Of UBS's False Warranties Are Measured As Of The Effective Dates Of Those Warranties.....................66

    B.     The "Written Notice" Requirement ................................................................69

    C.     The "Discovery" Requirement.........................................................................70

        1.      UBS Had Actual Knowledge Of Many Breaches...................................70

        2.      UBS Was Willfully Blind To All Breaches.............................................73

        3.      UBS Had Constructive Knowledge Of Most Breaches ...........................77

IV.    THE MORTGAGE LOAN SCHEDULE WARRANTY .................................80

    A.     Construction Of The MLS Warranty ..............................................................80

    B.     The MLS Warranty Regarding Loan Purpose .................................................84

        1.      UBS Breached The MLS Warranty Regarding Loan Purpose .................84

        2.      UBS's Breaches Caused MAEs ...............................................................86

        3.      UBS Discovered Its Breaches On The Closing Dates .............................88

    C.     The MLS Warranty Regarding Property Type .................................................89

        1.      UBS Breached The MLS Warranty Regarding Property Type ................89

        2.      UBS's Breaches Caused MAEs ...............................................................90

        3.      UBS Discovered Its Breaches On The Closing Dates .............................93

    D.     The MLS Warranty Regarding Documentation Type ...........................................93

        1.      UBS Breached The MLS Warranty Regarding Documentation Type ......................................................................................................94

        2.      UBS's Breaches Caused MAEs ...............................................................95

        3.      UBS Discovered Its Breaches On The Closing Dates .............................98

    E.     The MLS Warranty Regarding Credit Score ...................................................99

        1.      UBS Breached The MLS Warranty Regarding Credit Score ..................99

2.      UBS's Breaches Caused MAEs .................................................100

3.      UBS Discovered Its Breaches On The Closing Dates ...........................103

F.      The MLS Warranty Regarding Owner Occupancy ...........................................103

1.      UBS Breached The MLS Warranty Regarding Owner Occupancy.........103

2.      UBS's Breaches Caused MAEs .................................................107

3.      UBS Discovered Its Breaches On The Closing Dates ...........................110

G.      The MLS Warranty Regarding Debt-To-Income Ratios ...................................111

1.      UBS Breached The MLS Warranty Regarding DTI Ratios...................111

2.      Evidence Regarding Debts.......................................................114

        a.      Mortgage Electronic Research Systems....................................114

        b.      Other Commercial Data ....................................................116

        c.      Multiple Credit Inquiries....................................................117

        d.      Credit Reports ...............................................................117

        e.      Additional Misrepresentations ...................................................118

3.      Evidence Regarding Income ....................................................118

        a.      Social Security Administration and Pension Custodian
                Statements of Income................................................119

        b.      Employer Statements Of Income .................................120

        c.      Bureau of Labor Statistics....................................................121

        d.      Salary.com ...............................................................123

        e.      Work Number ...............................................................125

        f.      Borrowers' Tax Returns.......................................................125

        g.      Borrower Bankruptcy Filings .....................................126

        h.      Borrower Hardship Letters ...........................................127

        i.      Red Flags ...............................................................128

        j.      Additional Misrepresentations And Confirmatory Data
                from BLS or Salary.com......................................131

4.      UBS's Breaches Caused MAEs .................................................133

5.      UBS Discovered Its Breaches On The Closing Dates ...........................137

H.      The MLS Warranty Regarding Loan-To-Value Ratios ....................................137

1.      UBS Breached The MLS Warranty Regarding LTV Ratios .................139

2.      UBS's Breaches Caused MAEs .................................................144

3.      UBS Discovered Its Breaches On The Closing Dates ...........................145

V.      THE MAXIMUM LOAN-TO-VALUE RATIO WARRANTY ....................................145

    A.      Construction Of The Maximum LTV Ratio Warranty .......................................145

    B.      UBS Breached The Maximum LTV Ratio Warranty .........................................146

    C.      UBS's Breaches Caused MAEs ..........................................................................147

    D.      UBS Discovered Its Breaches On The Closing Dates ........................................147

VI.     THE MORTGAGE FILE WARRANTY .....................................................................147

    A.      Construction Of The Mortgage File Warranty...................................................147

    B.      UBS Breached The Mortgage File Warranty .....................................................148

    C.      UBS's Breaches Caused MAEs ..........................................................................150

    D.      UBS Discovered Its Breaches On The Closing Dates ........................................153

VII.    THE TITLE INSURANCE WARRANTY ...................................................................153

    A.      Construction Of The Title Insurance Warranty .................................................153

    B.      UBS Breached The Title Insurance Warranty ....................................................154

    C.      UBS's Breaches Caused MAEs ..........................................................................155

    D.      UBS Discovered Its Breaches On The Closing Dates ........................................155

VIII.   THE HAZARD INSURANCE WARRANTY ..............................................................155

    A.      Construction Of The Hazard Insurance Warranty .............................................155

    B.      UBS Breached The Hazard Insurance Warranty ...............................................156

    C.      UBS's Breaches Caused MAEs ..........................................................................157

    D.      UBS Discovered Its Breaches On The Closing Dates ........................................158

IX.     THE GUIDELINE WARRANTY ...............................................................................159

    A.      Construction Of The Guideline Warranty..........................................................159

    B.      Loans Without Critical Documents ....................................................................160

        1.      UBS Breached The Guideline Warranty For Loans Without
            Critical Documents ................................................................................163

        2.      UBS's Breaches Caused MAEs...............................................................166

        3.      UBS Discovered Its Breaches On The Closing Dates ............................167

    C.      Loans With Unreasonable Stated Incomes .........................................................168

        1.      UBS Breached The Guideline Warranty For Loans With
            Unreasonable Stated Incomes .................................................................169

        2.      UBS's Breaches Caused MAEs...............................................................171

        3.      UBS Discovered Its Breaches On The Closing Dates ............................173

    D.      Loans Violating Guidelines With Unreasonable Exceptions.............................173

|        |     | 1.  | UBS Breached The Guideline Warranty For Loans Violating Guidelines With Unreasonable Exceptions | 173 |
|        |     | 2.  | UBS's Breaches Caused MAEs | 174 |
|        |     | 3.  | UBS's Discovered Its Breaches On The Closing Dates | 175 |
|        | E.  |     | Loans Violating Guidelines With No Exceptions | 175 |
|        |     | 1.  | UBS Breached The Guideline Warranty For Loans Violating Guidelines With No Exceptions | 177 |
|        |     | 2.  | UBS's Breaches Caused MAEs | 177 |
|        |     | 3.  | UBS Discovered Its Breaches On The Closing Dates | 178 |
|        | F.  |     | Loans Violating Guidelines As A Result Of Other Defects | 179 |
| X.     |     |     | MULTIPLE MATERIAL BREACHES | 179 |
| XI.    |     |     | THE TRUSTS' EQUITABLE REMEDIES | 181 |
|        | A.  |     | Specific Performance | 182 |
|        | B.  |     | Equitable Damages Plus Prejudgment Interest | 182 |
|        | C.  |     | No Offset For Assured's Payments To Certificateholders | 185 |
| XII.   |     |     | THE MARGINAL INDYMAC LOANS | 187 |
|        | A.  |     | Liquidated Marginal IndyMac Loans | 187 |
|        | B.  |     | Non-Liquidated Marginal IndyMac Loans | 189 |
|        | C.  |     | Liability And Remedies For The Marginal IndyMac Loans | 190 |
| XIII.  |     |     | UBS'S DEFENSES | 191 |
|        | A.  |     | "Prompt Written Notice" | 192 |
|        | B.  |     | Statute Of Limitations | 194 |
|        |     |     | CONCLUSION | 195 |

The Trusts[1] respectfully submit the following proposed findings of fact and conclusions of law ("FOFs") for the bench trial in this case that began on April 18, 2016 and concluded on May 13, 2016.

## INTRODUCTION

1.      In the Pooling and Servicing Agreements governing the three plaintiff Trusts (the "PSAs"), defendant UBS Real Estate Securities Inc. ("UBS RESI" or "UBS") made a series of express warranties regarding the 17,082 residential mortgage loans backing those Trusts (the "Loans"), and it agreed that 90 days after it discovered or received written notice of a breach of a warranty that materially and adversely affects the interests of the Trusts' investors (the "Certificateholders") in any Loan, it would cure the breach or repurchase the affected Loan.  In this breach-of-contract action, the primary questions are:  (i) whether UBS breached its warranties; and (ii) whether those breaches caused material and adverse effects ("MAEs") to the interests of the Certificateholders in the Loans.

2.      The answers are clear:  UBS breached its warranties as to 9,342 of these Loans, 5,991 of which have liquidated, another 960 of which have been modified with a loss, and another 8,013  of which have been delinquent for 60 days or more.  Those breaches caused MAEs.  UBS discovered those breaches no later than January 31, 2008, and received additional written notice of those breaches between August 2010 and August 2015.  Accordingly, judgment shall be entered for the Trusts.[2]

---

[1]   MASTR Adjustable Rate Mortgages Trust 2006-OA2, MASTR Adjustable Rate Mortgages Trust 2007 1, and MASTR Adjustable Rate Mortgages Trust 2007-3 (collectively, the "Trusts"), acting through U.S. Bank National Association, solely in its capacity as trustee for the Trusts (the "Trustee").  The Trustee is the real party in interest.  As Judge Baer held at the motion-to-dismiss stage, "the Complaint leaves no doubt that the Trusts' rights are being enforced by the Trustee" and it is "[t]he substance of the pleadings, not the caption, that determines the identity of the parties."  *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 7322 (HB), 2013 WL 4399210, at *2 (S.D.N.Y. Aug. 15, 2013) (citing Dkt. 1 at 1 and *Mateo v. JetBlue Airways Corp.*, 847 F. Supp. 2d 383, 384 (E.D.N.Y. 2012)).  The Trusts have separately asked that the Court either (i) grant the Trusts leave to move to amend the caption or (ii) deem that motion to have been made and granted as part of the Court's provisional grant of the Trusts' motion to conform the pleadings to the evidence.  Dkt. 428 at 7 (citing Tr. 1978:15-1979:3).

[2]   Pursuant to the Court's guidance, Tr. 611:6-612:4, after discussing certain preliminary issues, these FOFs address of each type of breach, including the proper construction of the relevant Warranty, the evidence that UBS breached that Warranty for specific Loans, evidence of the MAEs caused by those breaches for those Loans, and evidence of

3.     Below, the Court begins by reviewing the procedural history and background of this dispute, and then summarizing the expert testimony it received regarding the Loans.  In Parts I and II of its Discussion, the Court explains the burdens of proof and evidentiary standards governing its analysis.  In Part III, the Court explains the PSAs' repurchase provision, which governs the Trusts' request for relief, and discusses the standards for proving MAEs and for determining when UBS discovered its breaches. In Parts IV, V, VI, VII, VIII and IX the Court discusses, respectively, the Trusts' claims for breaches of the MLS Warranty; Maximum Loan-To-Value Ratio Warranty; Mortgage File Warranty; Title Insurance Warranty; Hazard Insurance Warranty; and Guideline Warranty (all as defined below; "each a Warranty").  For each type of breach of each Warranty, the Court addresses:  (i) the construction of the Warranty; (ii) UBS's breaches; (iii) how UBS's breaches caused MAEs; and (iv) when UBS discovered the breaches.  In Part X, the Court discusses the impact of UBS's multiple material breaches.  In Part XI, the Court discusses the Trusts' entitlement to equitable remedies.  In Part XII, the Court discusses UBS's liability, and the Trusts' entitlement to relief, for certain IndyMac Loans.  Finally, in Part XIII, the Court concludes that UBS failed to prove any of its asserted defenses.

## PROCEDURAL HISTORY

4.     On February 2, 2012, Assured Guaranty Municipal Corporation ("Assured"), which insured certain senior certificates of the Trusts, filed suit against UBS in New York State Supreme Court.  Complaint, *Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 650327/2012 (N.Y. Sup. Ct. Feb. 2, 2012), Dkt. 2 (the "Assured Action").  Assured's complaint included two claims for breach of contract:  (i) that UBS breached the same Warranties that are at issue in this case; and (ii) that UBS breached its contractual obligations to repurchase the affected Loans.  *Id.* at 25-26.

5.     On March 5, 2012, UBS removed the Assured Action to this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446(b), invoking the Court's subject matter jurisdiction under 28

when UBS discovered the breaches.  To the extent any Finding of Fact reflects a legal conclusion, it shall be deemed a Conclusion of Law, and vice versa.

U.S.C. § 1334(b), as that action "related to" the Chapter 11 bankruptcy proceedings of American Home Mortgage filed on August 6, 2007.  Notice of Removal, *Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 12-CV-1579 (HB) (S.D.N.Y. Mar. 5, 2012), Dkt. 1 ¶¶ 8, 13-18.  The Assured Action was captioned in this Court as *Assured Guaranty Municipal Corp. f/k/a Financial Security Assurance Inc. v. UBS Real Estate Securities Inc.,* No. 12-CV-1579, and was assigned to the late Judge Harold Baer, Jr.  *Id.*

6.      By Order of August 15, 2012, Judge Baer granted in part and denied in part UBS's motion to dismiss Assured's claims.  *Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 12-CV-1579 (HB), 2012 WL 3525613, at *3-4 (S.D.N.Y. Aug. 15, 2012).  Judge Baer allowed Assured's breach of contract claim to proceed, but dismissed Assured's claim for breach of repurchase obligation, ruling that only the Trustee, not Assured, could enforce UBS's repurchase obligations under the PSAs.  *See id.* at *4.

7.      On September 28, 2012, the Trustee commenced this action against UBS on behalf of the Trusts, bringing a breach of contract claim under New York law.  Compl. ¶ 1 (Dkt. 1).  As UBS had done in the Assured Action, the Trustee invoked this Court's subject matter jurisdiction under 28 U.S.C. § 1334(b).  *Id.* ¶ 12.  The Trustee also designated this action as related to the Assured Action, Dkt. 3, a designation that Judge Baer accepted.  On March 22, 2013, Judge Baer consolidated this action with the Assured Action.  Dkt. 60.[3]

8.      On May 6, 2013, Assured and UBS settled the Assured Action, and by Stipulation and Order dated May 6, 2013 voluntarily dismissed that suit with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  *Assured*, 12 Civ. 1579 (HB), Dkt. 90.

9.      On August 15, 2013, Judge Baer denied UBS's motion to dismiss this case.  *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.* ("*MARM I*"), No. 12 Civ. 7322 (HB), 2013 WL 4399210 (S.D.N.Y. Aug. 15, 2013), Dkt. 106.  He first held that the Trustee

---

[3]  The Trusts also argued, and UBS did not dispute, that the Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a).  *See* Dkts. 428, 430.

was bringing suit on behalf of the Trusts, rejecting UBS's argument that the trust entities themselves could not sue to enforce the PSAs. *Id.* at *2. Judge Baer also rejected UBS's argument that the Trusts could not seek money damages, ruling that "I . . . decline to foreclose the possibility of awarding damages in lieu of specific performance." *Id.* at *3. He next rejected UBS's argument that the Trusts had failed to adequately allege that UBS had received notice of its breaches. *Id.* at *5. Finally, Judge Baer rejected UBS's argument that Assured's "withdrawal" of its breach notices to UBS (which was done as part of Assured's settlement with UBS) excused UBS's contractual obligation to repurchase the affected Loans from the Trusts, observing that UBS would still be required to repurchase any Loans triggered by its "discovery" of breaches and that "Section 2.03 [of the PSAs] contains no language about a party's withdrawal of notice[.]" *Id.* at *6.

10.     On June 27, 2014, following Judge Baer's passing, the action was reassigned to the Honorable P. Kevin Castel.

11.     By Order of January 9, 2015, the Court granted in part and denied in part the parties' cross-motions for partial summary judgment. *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.* ("*MARM II*"), No. 12 Civ. 7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015), Dkt. 249. In addition to ruling that material issues of fact precluded ruling on the existence of certain types of material defects, *id.* at *16-17, the Court held that the Trusts could seek relief as to certain Loans on the basis of written notices of breaches that UBS received 90-days or more before the expiration of the six-year limitations periods for bringing breach-of-contract claims, *id.* at *6-8, and as to all Loans on the basis of UBS's discovery of breaches, *id.* at *8-10. The Court also rejected the Trusts' "pervasive breach" theory. *Id.* at *10-12.[4]

12.     The Court further held, consistent with Judge Baer's statements in his ruling on UBS's motion to dismiss, that the Trusts were not foreclosed from seeking money damages in lieu of specific performance. *Id.* at *17-18. The Court also held that the Trusts could seek relief for liquidated Loans, rejecting UBS's argument that the PSAs' definition of "Liquidated Loan" set the

---

[4]  The Trusts respectfully suggested this ruling was erroneous, set forth in their filings on the motion for summary judgment (Dkt. 204) and in their motion for reconsideration (Dkt. 256).

repurchase price for such Loans at zero, as that definition was tied to other definitions that "are not part of the PSAs' remedial scheme," and hence "do not alter the remedies available under section 2.03 of the PSAs." *Id.* at *12-14. Finally, the Court held that, to prove an MAE, the Trusts did not have to prove that a Loan defaulted, but rather "[t]he Trusts may rely upon proof that as to a specific loan, there is a material or significant increase in the risk of loss." *Id.* at *14-15.

13. On February 25, 2015, the Court denied the Trusts' motion for reconsideration concerning the Court's holding on their pervasive breach theory. *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.* ("*MARM III*"), No. 12 Civ. 7322 (PKC), 2015 WL 797972 (S.D.N.Y. Feb. 25, 2015), Dkt. 280.

14. By Order dated March 11, 2015, the Court granted the Trusts' application to reopen expert discovery, allowing such discovery until December 31, 2015. Dkt. 287.[5] On UBS's motion, the Court extended the deadline for UBS to serve its rebuttal expert reports until January 12, 2016. Dkt. 302.

15. Pursuant to an agreed-upon briefing schedule so-ordered by the Court, on January 13, 2016, Dkt. 307, the parties submitted *Daubert* motions and motions *in limine* that were fully briefed on February 12, 2016. The Court reserved decision on all of these motions, Final Pretrial Conference Tr. 3:6-25, 47:1-5, except for UBS's motion to preclude evidence that UBS claimed was foreclosed by the Court's prior rulings. By Order dated April 12, 2016, the Court denied that motion, ruling that under the First Department's decision in *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96 (1st Dep't 2015), UBS had received timely written notice of breaches of Warranties in all disputed Loans in the case, either through pre-suit notice or the August 7, 2015 Third Supplemental Expert Report of Ira H. Holt, Jr. ("Holt Report"). Dkt. 399 at 13. As a result, all breaches in all Loans identified in the Holt Report as materially defective are at issue in this case under both notice and discovery theories. The Court's

---

[5] Expert discovery originally closed on May 30, 2014. *See MARM II*, Dkt. 249 at 8.

Order left the question of whether UBS had discovered the breaches at an earlier date to be resolved at trial.  *See* Part III.C, *below*.

16.     As ordered by the Court, the parties submitted their proposed Joint Pre-Trial Order, stipulations of fact, deposition designations, and exhibit lists to the Court on February 12, 2016, Dkt. 383, and the Court held the Final Pre-Trial Conference on March 21, 2016.  Dkt. 380.  On the same day, the Court approved the parties' proposed Joint Pre-Trial Order.  Dkt. 383.

17.     The parties stipulated that the trial of this action would be to the bench.  Dkt. 333. The trial was conducted pursuant to the Court's individual practices, which includes taking direct testimony from witnesses under a party's control through declarations or affidavits.  The parties submitted the direct testimony of witnesses under their control on April 4, 2016.  Trial occurred from April 18 through April 21 and from May 2 through 13, 2016.  Witnesses included the party-controlled declarants, who were cross-examined and presented their redirect testimony, as well as additional witnesses.

18.     The Trusts called five fact witnesses.   Four were former UBS employees: (i) Adrian Wu ("Wu"), a trader who purchased many of the Loans and structured the Trusts, Tr. 177:2-255:23; (ii) William Twombly ("Twombly"), the manager of UBS's Due Diligence Group, who oversaw the pre-securitization diligence that UBS performed on the Loans, Tr. 1274:3-1383:22; (iii) Christopher Schmidt ("Schmidt"), the co-manager of UBS's Mortgage Finance Group, who oversaw the execution of the Trusts, Tr. 1811:11-1860:18; and (iv) John Lantz ("Lantz"), a manager in UBS's Surveillance Group, who monitored the performance of the Loans and, at times, conducted post-securitization reviews of certain Loans, Tr. 1384:8-1552:19.  The Trust's final fact witness was Diane Reynolds ("Reynolds"), a senior vice president of the Structured Finance Group at the Trustee, who testified about the Trusts and the notices of breach that the Trustee provided to UBS.  PX 1106; Tr. 1736:24-1777:23.

19.     UBS called only one fact witness, Lantz.  Tr. 1525:2-1526:15.[6]

20.     The Trusts offered deposition designations of two unavailable witnesses:  (i)  John Williams ("Williams"), the Rule 30(b)(6) designee for JCIII & Associates, the primary vendor hired by UBS to review the Loans subject to repurchase demands made by Assured; and (ii) Mujtaba Mohiuddin ("Mohiuddin"), a due diligence manager at UBS who reported to Twombly.  Tr. 1979:25-1980:19, 1982:1-20.

21.     UBS offered no deposition designations.  Tr. 1980:25-1981:3.

22.     The Trusts' called five expert witnesses:  (i) Ira H. Holt ("Holt"), an employee of Analytic Focus LLC, who testified about his review and identification of defects in the Loans, PX 1103;  Tr.  747:23-1215:23;  (ii)  Dr. Nelson  Lipshutz  ("Lipshutz"),  President  of  Regulatory Research Corporation, an economic and statistical consulting firm, who testified about his statistical extrapolations of Holt's findings for Loans originated by IndyMac Bank, FSB, PX 1104;  Tr.  1216:1-1273:23;  (iii) Dr. Charles  M.  Cowan  ("Cowan"),  Managing  Partner  of  Analytic Focus  LLC,  who  testified  about  his  use  of  an  "automated  valuation  model"  ("AVM")  and statistical analysis to evaluate the reported appraisal values for the Loans and their corresponding loan-to-value ratios, PX 1108;  Tr. 1554:4-1736:20; and (iv) Dr. Karl Snow ("Snow"), a Partner with Bates White Economic Consulting, who testified about the methods of calculating the Trusts' recoveries consistent with the PSAs.  *See* PX 1110; Tr. 1860:21-1913:21.

23.     UBS called three expert witnesses:  (i) Deborah Grissom ("Grissom")—whom the Trusts also called affirmatively in their case—a Senior Director at Treliant Risk Advisors, who testified in response to Holt, DX LI, Tr. 256:9-747:21; (ii) Dr. Arnold Barnett ("Barnett"), a Professor of Statistics at the Sloan School of Management, Massachusetts Institute of Technology, who testified in response to Lipshutz and Cowan, DX OX; Tr. 1778:16-1802:22, 1932:1-1972:22;

---

[6]  UBS's motion *in limine* for an adverse inference based on the Trustee's purported failure to produce its employees for trial, Dkt. 335, is denied.  The Trustee did not refuse to make any of its witnesses available, and UBS chose to examine only one of the three witnesses for which the Trustee submitted trial declarations.

and (iii) Dr. Andrew S. Carron ("Carron"), Chairman of NERA Economic Consulting, who testified in response to Snow, DX PM; Tr. 1925:10-1926:17.[7]

24.     The Trusts called one summary witness, Charles Cipione ("Cipione"), who testified about his methods for summarizing numerous underlying materials into a series of databases.  PX 1081; Tr. 132:20-176:25.  Those databases summarized (i) expert reports and testimony; (ii) distribution reports and servicing data; (iii) repurchase demand letters; and (iv) loan tapes and the results of reviews performed by UBS and its vendors in the course of due diligence, surveillance, and assessing loans for potential repurchase.  *See* PX 1081 ¶ 9.  The Court received these summaries pursuant to Federal Rule of Evidence 1006.  Tr. 138:6-8.[8]

25.     UBS did not call any summary witness or offer any summary evidence.

26.     The Trusts offered, and the Court received, materials related to the Loans.  First, the Court received the underwriting guidelines pursuant to which the Loans were issued (the "Guidelines"), but not for the truth of the matter asserted therein.  Tr. 1189:8-9.  Second, the Court received the loan files for the Loans (the "Loan Files"), but not for the truth of any statements embedded therein, except that the Court did receive for the truth of statements of employers in W-2s and paystubs, pursuant to Federal Rules of Evidence 807 and 803(6), and embedded statements by the Social Security Administration ("SSA") in award letters and Form 1099 income statements pursuant to Rule 803(8).  *See, e.g.*, Tr. 1075:25 (receiving into evidence PX L10122); Tr. 1122:10 (receiving into evidence PX L11251).  Third, the Court received data and information compiled by the United States Bureau of Labor Statistics ("BLS"), DataVerify, Data Tree, LexisNexis's Accurint service, Mortgage Electronic Registration Systems, Inc. ("MERS"), PACER, Salary.com, and Sitex Group, LLC ("Sitex") (together, the "Commercial Data"); the Court

---

[7]   UBS also submitted trial declarations from experts Michael P. Hedden and William H. Greene, and from UBS employee William Chandler, but UBS ultimately decided not to call them at trial, so those declarations were not received into the record.

[8]   UBS's motion to strike the summary exhibits prepared by Cipione, Tr. 168:25-169:2, is denied.  While UBS asserted that Cipione's trial testimony called the reliability of those summaries into question, the testimony actually reflected UBS's misunderstanding of those databases, apparently resulting from its decision not to depose Cipione in advance of trial or to meet and confer with the Trusts about the databases at any point.  *See* Dkt. 436.

received this information for its truth pursuant to Rule 803(17).  PX SS 1-SS 18088; Tr. 1186:12-15.  Fourth, the Court received distribution reports and servicing data for the Trusts; the Court received this information for its truth under Rule 803(17).  Tr. 1810:4-8.  Fifth, the Court received letters sent by Assured, Wells Fargo Bank, and the Trustee to UBS regarding breaches in the Loans, but not for the truth of the matters asserted therein.  Tr. 1740:12-13, 1742:9-10.

27.     UBS did not offer any non-expert evidence relating to the Loans.

28.     The Trusts offered, and the Court received, documentary evidence including the PSAs, Tr. 1739:5, PX 49 (MARM 2006-OA2), PX 110 (MARM 2007-1), PX 182 (MARM 2007-3), and various emails involving UBS employees, *see, e.g.*, PX 103, PX 710, PX 711, Tr. 1991:24-25.  The Court received statements by UBS employees for their truth as non-hearsay party statements under Rule 801(d)(2)(D).  The Court also received for their truth certain statements by the re-underwriting vendors that UBS hired to review the Loans—specifically, statements that the Loans warranted grades of "Event Level 3" ("EV3") and the reasoning for these grades—as non-hearsay statements that were offered against UBS, under Rules 801(d)(2)(C) and (D).

29.     UBS offered, and the Court received, documentary evidence including internal Trustee emails and policies, and correspondence among counsel regarding Loans still at issue.  *E.g.*, DX HN (US Bank Global Trust Services Procedure).

30.     The bench trial was held from April 18, 2016 to May 13, 2016, including a one-week recess.  The Court ordered the Trusts to provide their proposed findings of fact and conclusions of law on June 6, 2016 and for UBS to provide its proposed findings of facts and conclusions on June 27, 2016.  Tr. 2001:18-20.[9]

## BACKGROUND

## I.      RESIDENTIAL MORTGAGE-BACKED SECURITIES

31.     Residential mortgage-backed securities ("RMBS") are complex financial instruments backed by pools of residential mortgage loans.

---

[9]   Unless otherwise defined, capitalized terms defined in the PSAs have the same meaning as set forth in the PSAs.

A.    **Originating A Residential Mortgage Loan**

32.    Over 90% of the Loans at issue here were made by three financial institutions—American Home Mortgage, Countrywide Home Loans, Inc., and IndyMac Bank, F.S.B.—pursuant to their underwriting guidelines.  PX 1103, Direct Testimony of Ira H. Holt Jr. ¶ 36 ("Holt Direct"); Tr. 406:23-407:7 (Grissom), 495:20-25 (Grissom); PX 99 at 42 (MARM 2006-OA2 Prospectus Supplement); PX 118 at 58 (MARM 2007-1 Prospectus Supplement); PX 264 at 51 (MARM 2007-3 Prospectus Supplement).

33.    Adherence to underwriting guidelines was important:  the criteria imposed by the originators were designed to ensure that the borrowers were willing and able to repay their loans and that the mortgaged properties had sufficient resale value to allow the owner of the loan to recover the balance of the loans in the events of defaults and foreclosures.  Holt Direct (PX 1103) ¶ 41; Direct Testimony of Deborah Grissom (DX LI) ¶ 43 ("Grissom Direct"); Tr. 357:19-358:1 (Grissom); *see also* PX U012 at 1 (Countrywide Guidelines stating its practice is to "determine that the applicant has the ability and willingness to repay the loan"); PX U577 at 3 (American Home Guidelines stating that its "underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided, the property used to collateralize the debt, and the source of the business"); PX 17 at 88 (UBS Underwriting Guidelines stating that the "quality of a loan and the capacity of the borrower to accept a new debt can be determined by reviewing the employment, income, assets, and liabilities of the borrower"); PX 99 at 48 (MARM 2006-OA2 Prospectus Supplement, IndyMac's Underwriting Process); PX 118 at 60 (MARM 2007-1 Prospectus Supplement, American Home Underwriting Criteria); PX 264 at 53 (MARM 2007-3 Prospectus Supplement, Countrywide Underwriting Standards).  Underwriting guidelines thus played a critical role in ensuring the quality of the loans and minimizing the risk of loss to lenders and investors.  Holt Direct (PX 1103) ¶ 40.

1.     **Assessing Credit Risk**

34.     The originators' guidelines required their underwriters to evaluate a borrower's ability and willingness to repay each loan.  Holt Direct (PX 1103) ¶¶ 40-41.  To that end, the originators set forth in their guidelines the objective criteria that borrowers had to meet in order to qualify under various loan programs.  The guidelines generally required a borrower to satisfy certain benchmarks concerning his debt-to-income ("DTI") ratio, employment history, credit history, credit score (or "FICO score"), and assets, as well as the ratio of the loan amount to the value of the property (the loan-to-value ("LTV") ratio), in order to qualify.  Holt Direct (PX 1103) ¶ 42; Grissom Direct (DX LI) ¶ 27.

35.     The amount of information a borrower had to provide to the originator depended on the applicable loan program.  Holt Direct (PX 1103) ¶ 44.  For example, a "full documentation" loan program required the borrower to provide documents sufficient to substantiate his current income and assets, such as pay stubs and W-2s.  *Id.* ¶¶ 44, 61, 63.  A "stated income" program, in contrast, required a borrower to provide employment information and a statement regarding income, but not supporting documentation.  *Id.* ¶ 64.

36.     Stated income programs did, however, require underwriters to assess the reasonableness of the income stated by the borrower.  *Id.* ¶¶ 64-65.  If the stated income was not reasonable, the guidelines required the underwriter to either not approve the loan or to consider it under a full documentation program, along with the required income verification.  Tr. 389:5-9 (Grissom) (testifying that if a borrower's stated income was unreasonable, an underwriter was supposed to "either decline the loan, or they would convert it into a full documentation loan."); *see also, e.g.*, PX U374 at 19 (IndyMac Guidelines listing requirements for stated income loans, including that "Borrower's stated income must be reasonable," and explaining that failure to meet such requirements renders a borrower ineligible for a stated income program).

37.     Under all loan programs, if a loan did not meet guidelines, it could still be approved—*if* the underwriter concluded that sufficient "compensating factors" existed such that the loan nonetheless represented an appropriate credit risk.  Holt Direct (PX 1103) ¶ 43; Grissom

Direct (DX LI) ¶¶ 44-45; Tr. 265:4-10 (Grissom).  This process of approving a loan that did not meet guidelines but had sufficient compensating factors was known as granting an "exception."  Holt Direct (PX 1103) ¶ 43; Grissom Direct (DX LI) ¶ 45.  As discussed below, when an exception was granted, the loan was generally re-priced such that the borrower paid a higher interest rate for the loan.  Holt Direct (PX 1103) ¶¶ 9, 135.  For example, higher interest rates generally would be imposed on loans with higher LTV and DTI ratios, or lower FICO scores, all of which represented an enhanced credit risk.  *Id.*; Tr. 1104:19-1105:17 (Holt).  Exceptions had to be approved in writing.  Tr. 1093:10-1097:22 (Holt); *see also* Part IX.E, *below*.

## 2.    Assessing Collateral Risk

38.    The originators also required their underwriters to assess if the property securing the loan would constitute adequate collateral if the borrower defaulted.  Holt Direct (PX 1103) ¶ 40.  One key component of this collateral risk was the property type.  *Id.* (PX 1103) ¶ 93; Tr. 186:20-187:3 (Wu).  Whether a mortgaged property was a single family residence, a two-to-four family residence, a condominium, a planned unit development ("PUD"), or a cooperative unit would subject the property to different fees and uncertainties, including assessments (for costs like repairs to a common area), maintenance costs (for rental units), uncertainty of rental income, or suits against an ownership association.  Holt Direct (PX 1103) ¶ 93.  Such additional fees and uncertainties rendered loans secured by non-single family homes inherently riskier than loans secured by single-family homes.  *Id.* ¶¶ 93, 134; *e.g.*, PX U008 at 4 (Countrywide Guidelines showing increased risk for condominiums, cooperatives, two-to-four family residence.).  Accordingly, the originators' guidelines imposed more stringent loan requirements for loans that were not secured by single-family homes, and they required that exceptions be granted for loans that did not comply with the guidelines' property type requirements.  PX U020 at 1 (Countrywide Guidelines describing the exception process); PX U064 at 5 (Countrywide Guidelines listing eligible and ineligible properties); PX U198 at 2-4 (Countrywide Guidelines outlining the non-conforming programs property type requirements); Tr. 623:17-624:3 (Grissom).

39.     For any type of property, the most common measure of collateral risk was the LTV ratio.  Tr. 1817:14-20 (Schmidt) (testifying that he could not identify a loan characteristic "more important than LTV."); Holt Direct (PX 1103) ¶¶ 89-90.  An LTV ratio generally compares the amount of the loan to the value of the property, using the lower of the sales price or an appraised value in the denominator.  *Id.* ¶¶ 89, 91.  Originators had detailed policies, including those outlined in their guidelines, setting forth appraisal procedures and acceptable LTV ratios.  *Id.*  ¶¶ 86-88, 91-92.  If an appraised value was overstated, then it did not accurately represent the amount that the borrower might recover if the property was sold in the event of foreclosure—increasing the loan's collateral risk.  *Id.* ¶ 86.

### 3.     Requiring Critical Documents

40.     The guidelines also required that certain critical documents be contained in the loan origination files, as they were necessary for the underwriters to assess debt liability and calculate DTI ratios, among other things.  Holt Direct (PX 1103) ¶¶ 99-115.  These documents included the loan approval, loan application (form 1003/65), appraisal report, first lien note, HUD-1 form, purchase contract, Automated Underwriting Systems ("AUS") report, credit report, hazard insurance, mortgage, preliminary title, and title insurance.  *Id.*  Without these "core" documents, the underwriter could not determine if (i) the loan met the guidelines' criteria; (ii) the borrower was able and willing to repay the loan; (iii) the collateral was adequate; or (iv) the lender would be protected in the event of default or foreclosure.  Holt Direct (PX 1103) ¶ 170.  Accordingly, if the loan file did not contain these documents, then the underwriter should not have approved the loan.  Tr. 720:4-18 (Grissom); Tr. 655:4-656:10 (Grissom); Tr. 1381:19-1382:2 (Twombly).

### B.     Pricing A Residential Mortgage Loan

41.     The risk of a loan determined whether it could be issued at all, and, if so, at what price.  Loan price included the interest rate, points, or fees that the originator would charge the borrower.  Tr. 1103:19-1105:3 (Holt); PX U716 at 9-10 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or

reduce the risk associated with the loan" including loan purpose, property type, documentation type, credit score, and LTV ratio); *see also* Tr. 1129:10-23 (Holt).  The credit and collateral metrics included the following:

42.     **Property Type**.  Loans secured by single-family residences were considered less risky than those secured by multiple-family residences, PUDs, condominiums, or cooperative units.  Holt Direct (PX 1103) ¶ 41.  PX U008 at 4 (Countrywide Guidelines showing increased risk for condominiums, cooperatives, two-to-four family residence); Holt Direct (PX 1103) ¶¶ 93, 134.  Hence, the originators' guidelines applied stricter pricing criteria for loans secured by properties other than single-family homes.  Holt Direct (PX 1103) ¶¶ 93-94; *see also, e.g.*, PX U716 at 9-10 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan" including property type); PX U064 at 5 (Countrywide Guidelines listing eligible and ineligible properties); PX U198 at 2-4 (Countrywide Guidelines outlining the non-conforming programs).

43.     **Documentation Type**.  A "full documentation" loan was considered less risky than a "stated income verified asset" ("SIVA") loan, which was less risky than a "stated income stated asset" ("SISA") loan, which was less risky than a "no documentation" loan.  PX U001 at 16 (Countrywide Underwriting Guidelines describing eligible borrowers); PX 103 at 1 (e-mail from Twombly regarding MARM 2006-OA2 listing risk factors including "lesser doc types."); PX 19 at 14-15 (UBS Policies and Procedures discussing adverse selection criteria that included "[s]tated documentation/[n]o documentation loans" as a factor with a "higher-than-average level of risk"); Tr. 706:23-707:1 (Grissom).  Thus, the guidelines required higher prices for loans that were issued without full documentation and applied different criteria based on documentation type.  *See, e.g.*, PX U044  (Countrywide Guidelines for reduced and stated income/stated assets documentation.); PX U497 (Countrywide Technical Manual for Documentation Types and Requirements, Alternative Documentation.); PX U046 (Countrywide Guidelines for processing limited documentation loans.); PX U001 at 1 (Countrywide Guidelines referencing specific guidelines for loans originated under reduced, no ratio, SISA, and NINA documentation loans.); PX U053

(Countrywide Guidelines for different documentation types and requirements for same.); Grissom Direct (DX LI) ¶ 38; PX 17 at 41 (UBS Credit/Underwriting Guidelines discussing documentation types and requirements.).

44.     **Loan Purpose**.  A purchase-money loan (in which a borrower takes out a loan on a new property) or a "rate-and-term refinance" loan (in which a borrower refinances an existing loan on more favorable terms) were considered less risky than a "cash-out" refinance loan (in which a borrower is paid cash in exchange for a portion of the equity he has in the property).  Holt Direct (PX 1103) ¶ 97.  Hence, the guidelines required higher prices for cash-out refinance loans. *E.g.*, PX U716 at 9-10 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan" including loan purpose).

45.     **FICO Score**.  A FICO score is the "standard score used by the industry" to assess the borrower's credit history and character, specifically the borrowers ability and willingness to repay debts.  Holt Direct (PX 1103) ¶¶ 75-76.  A loan to a borrower with a lower FICO score was considered riskier than a loan to a borrower with a high FICO score.  PX 103 at 1 (e-mail from Twombly regarding MARM 2006-OA2 listing risk factors including "lower FICO scores."); PX 19 at 14-15 (UBS Investment Bank Contract Finance Policies and Procedures discussing adverse selection criteria that included "[c]redit scores less than 620."); Holt Direct (PX 1103) ¶ 76, 134; Tr. 381:12-14 (Grissom) ("Q.  And all other things being equal . . . a lower FICO score increases the risk of loss, correct?  A.  Correct."); *see also id.* 186:12-187:3 (Wu) (testifying that lower FICO scores could significantly increase the risk of loss).  Accordingly, the guidelines generally set 40 point ranges for a loan to qualify under any given program, such that a loan to a borrower whose FICO score fell below the minimum threshold would be priced under a different program.  *See, e.g.*, Tr. 1126:11-1127:7 (Holt) ("Q.  In your experience, what is the gap between those thresholds typically and Loan Program Guidelines for FICO scores?  A.  Typically, you see 40 points so 620, 660, 660 to 700, you see that as a standard length of between the minimum and maximum for those quandrants."); Grissom Direct (DX LI) ¶¶ 41-42.

46.     **Occupancy**.  Loans secured by properties occupied by the borrower (*i.e.*, that were the borrower's primary residence) were considered less risky than properties that were not occupied by the borrower (*i.e.*, second homes or investment properties).  PX 668 at 2; PX 103 at 1 (e-mail from Twombly regarding MARM 2006-OA2 listing risk factors including "[i]nvestor properties."); PX 19 at 14-15 (UBS Investment Bank Contract Finance Policies and Procedures discussing adverse selection criteria that included "[i]ncome producing properties."); Holt Direct (PX 1103) ¶¶ 9, 54; Tr. 186:20-187:3 (Wu), 379:23-380:4 (Grissom).  Hence, the guidelines required higher prices for non-owner occupied loans.  *E.g.*, PX U716 at 9-10 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan" including "Investment properties and second homes"); Holt Direct (PX 1103) ¶¶ 96, 135; PX 34 at 6 (Chevy Chase bank Loan Origination Guidelines, qualifying rates based on occupancy and LTV.).

47.     **DTI Ratio**.  A loan to a borrower with a high DTI ratio was considered riskier than one to a borrower with a low DTI ratio.  Tr. 186:20-187:3 (Wu), 380:23-381:5 (Grissom) ("[t]he higher DTI has a higher risk"); PX 19 at 14-15 (UBS Investment Bank Contract Finance Policies and Procedures discussing adverse selection criteria that included DTI "greater than 50% or equals 0% (no documentation)."); PX 103 at 1 (e-mail from Twombly regarding MARM 2006-OA2 listing risk factors including "higher . . . debt ratios").  Thus, the guidelines required that borrowers fall under certain maximum DTI ratios to qualify for each program, and generally required higher interest rates for loans to borrowers with higher DTI ratios (especially DTI ratios over 40 percent).  *E.g.*, Holt Direct (PX 1103)  ¶¶ 96, 135; PX 17 at 97 (UBS Credit/Underwriting Guidelines discussing DTI ratios); PX 173 at 7 (Chevy Chase Bank Guidelines stating: "[t]otal debt ratio should generally be 40% or below."); PX U202 at 8 (Countrywide Guidelines stating: "[t]otal Debt-to-Income (DTI) ratio: 40 percent.").

48.     **LTV Ratio**.  A loan with a high LTV ratio was considered riskier than one with a low LTV ratio.  Tr. 186:20-187:3 (Wu); *id.* 381:6-11 (Grissom); Holt Direct (PX 1103) ¶¶ 90, 134; PX 19 at 14-15 (UBS Investment Bank Contract Finance Policies and Procedures); PX 103 at 1

(e-mail from Twombly regarding MARM 2006-OA2 listing risk factors including "higher LTV's"). Thus, the guidelines set maximum LTV ratios for each loan program. *See, e.g.*, Tr. 621:21-622:4 (Grissom); *id.* 628:3-22 (Grissom) (testifying that "if you look at a program for a loan in the guidelines, you're looking at certain parameters that are particular to the loan, such as loan to value as documentation type as loan amount. And think of it sort of as a matrix. And generally in these programs, those program characteristics were listed in that matrix form."); PX 17 at 13 (UBS Credit/Underwriting Guidelines requiring different degrees of mortgage insurance depending on LTV ratio); *see also* PX U462 at 3 (Countrywide Guidelines providing different LTV limits for Full/Alternative programs versus "Fast & Easy" programs); PX U374 at 34 (IndyMac Guidelines requiring different down payments from borrowers depending on LTV); PX 140 at 106-09 (UBS summary of American Home Guidelines providing different LTV limits for different types of loans); PX 696 at 32 (UBS Group Internal Audit stating "Minimum credit requirements [such as LTV] differ by product and impact pricing of the loans.").

49.     If a loan did not meet the guidelines' criteria, but an exception was approved, the loan generally would be "funneled into" a different loan program, Tr. 621:21-622:4 (Grissom), where it would receive a higher interest rate, *see* PX U576 at 3-4 (American Home Guidelines providing that any request to approve a loan that did not comply with guidelines would be "routed . . . for exception pricing," and that an exception would be approved for the loan "[o]nce the borrower has accepted the pricing terms of the approved exception request."); PX U008 at 3 (Countrywide Guidelines stating that Countrywide would "price[ ] . . . the guideline exception" as part of "ensur[ing] the investment quality of the loan."); PX U248 at 1 (IndyMac Guidelines stating the exception loans "require both underwriter approval and special pricing, as determined on a case-by-case basis").

### C.     Creating An RMBS

50.     During the relevant time period, the originators' business models generally were based on selling the loans they made to third-party "aggregators," such as UBS, in what were

known as "wholesale" or "whole-loan" purchases.  *See* Holt Direct (PX 1103) ¶¶ 36-37.  In these

transactions, the originator provided the aggregator with "loan tapes" (generally, large Microsoft

Excel files) that listed, among other things, the property type, documentation type, loan purpose,

occupancy status, DTI ratio, and LTV ratio for each loan being offered for sale.  PX 19 at 7, 26;

*see also* PX 22 (MARM 2006-OA2 loan tape); PX 23 (MARM 2007-1 loan tape); PX 8 (MARM

2007-3 loan tape).  Using the loan tapes, the aggregator selected loans that it reviewed as part of

its "due diligence," Tr. 1373:20-1374:23 (Twombly), and, when it bought loans, the aggregator

based the prices it paid to the originators on credit characteristics including property type,

documentation type, loan purpose, FICO score, occupancy status, DTI ratio, and LTV ratio.  Tr.

186:7-187:3 (Wu); 1374:10-16 (Twombly); 1816:18-1817:2 (Schmidt); PX 19 at 7, 26.

      51.    Loans that were deemed to be "not at the highest quality" after origination for

various reasons were treated as "scratch and dent" loans—loans that could still be sold to investors

or other buyers, but at a lower price.  Tr. 713:21-714:16 (Grissom); PX 696 at 35 (defining scratch

and dent loans as re-performing and non-performing loans.  Re-performing loans "suffered serious

delinquency in the past, but have recently demonstrated a recovery in payment ability" and non-

performing loans "have significant delinquencies in payments").

      52.    After acquiring the loans, the aggregator would then select the loans it wished to

securitize and transfer them to a depositor, which usually was an affiliated entity.   Direct

Testimony of Reynolds (PX 1106) ¶ 10 ("Reynolds Direct"); PX 99 at 35 (MARM 2006-OA2

prospectus supplement stating: "the depositor, will acquire the Loans . . . from UBS Real Estate

Securities, Inc., which will have previously acquired the Loans under certain purchase and sale

agreements from the Originators."); PX 118 at 50 (MARM 2007-1 prospectus supplement

describing acquisition and transfer of the Loans); PX 264 at 44 (MARM 2007-3 prospectus

supplement describing acquisition and transfer of the Loans).   The depositor, in turn, was

responsible for issuing offering materials, including registration statements and prospectus

supplements, and for selling the loans into an RMBS trust.  Reynolds Direct (PX 1106) ¶ 10; Lantz

Direct (DX KJ) ¶ 5.  The creation and operation of the trust was governed by the PSA, which was

the contract among parties to the transaction, including the sponsor, the depositor, a trustee, and the servicer of the loans.  Reynolds Direct (PX 1106) ¶ 13; Lantz Direct (DX KJ) ¶ 9; *e.g.*, PX 49 at 7 (MARM 2006-OA2 PSA).

53.     The RMBS trust then issued certificates, which an underwriter marketed and sold to investors, who were known as "certificateholders" or, more simply, "holders."  Reynolds Direct (PX 1106) ¶ 10; *see also* PX 49 at 7 (MARM 2006-OA2 PSA); PX 110 at 7 (MARM 2007-1 PSA), PX 182 at 7 (MARM 2007-3 PSA) (Preliminary Statement providing that the purpose of the PSAs is "to create a trust for the benefit of the Certificateholders").  Holders of RMBS certificates were entitled to receive distributions on the certificates.  *E.g.*, PX 264 at 20 (MARM 2007-3 Prospectus Supplement).  The trust's main source of funds for making distributions on the certificates was the stream of income flowing into the trusts from payments made by borrowers on the securitized loans each month.  *Id.* at 1 ("The trust's main source of funds for making distributions on the certificates will be collections on closed end, adjustable-rate loans secured by first mortgages or deeds of trust on residential one- to four-family properties, all of which are negatively amortizing loans"); Reynolds Direct (PX 1106) ¶¶ 10-11.  The precise outflow of these payments to certificateholders was determined by the PSA, which created different levels (or "classes") of certificates, and established a "waterfall" in which senior certificates generally were entitled to receive the full amount of their monthly income before junior certificates did.  Carron Direct (DX PM) ¶¶ 13-15; Snow Direct (PX 1110) ¶¶ 31-32; *see also, e.g.*, PX 49 at 9-10 (MARM 2006-OA2 PSA) (establishing waterfall).

54.     Based upon information supplied by the aggregator, all but the most junior certificates were assigned a rating by one or more credit rating agency that was supposed to reflect the likelihood of losses on the certificates.  *E.g.*, PX 99 at 7-8 (MARM 2006-OA2 Prospectus Supplement).  Senior certificates often featured "credit enhancements" that protected holders of those certificates against shortfalls in borrower payments.  Tr. 189:19-190:5 (Wu).  One example is certificate insurance, in which a "certificate insurer" agrees that, if the trust does not receive sufficient borrower payments in a given month to make distributions to the holders of those senior

19

bonds in full, then the insurer will pay the amount of the shortfall to the holders, via the trusts. Carron Direct (DX PM) ¶ 13; Lantz Direct (DX KJ) ¶ 7; Tr. 1900:23-1901:9 (Snow).

55.     The majority of the income that RMBS trusts receive—and thus the income available to pay certificates—is from principal and interest payments made by borrowers on the underlying Loans.  *E.g.*, PX 49 at 9 (MARM 2006-OA2 PSA); *see also* Reynolds Direct ¶ 10.  The structure of an RMBS is based on these expected cash flows into the trusts, and the risk that some borrowers might not pay in full is partially offset through overcollateralization (that is, the RMBS is backed by more loans than are necessary to pay holders all of their promised income if all borrowers pay in full).  However, the amount of any overcollateralization directly depends on the cash flow into the trusts from the loan pool.  When any securitized loan defaults, that default reduces the funds received by the trusts, which decreases the amount of collateral protecting the certificates, which in turn increases the certificates' risk of loss.  This in turn can affect the value of the certificates in the secondary market.

## II.     THE TRUSTS

### A.     The PSAs

56.     The Trusts are governed by materially identical PSAs, which are fully-executed and valid agreements, and were dated October 1, 2006 (MARM 2006-OA2), December 1, 2006 (MARM 2007-1), and April 1, 2007 (MARM 2007-3), respectively.  Stipulations of Fact dated Feb. 12, 2016 (Ex. 1 to Joint Pre-Trial Order dated Mar. 22, 2016) ("SOF") ¶¶ 10-12.  Under the PSAs, UBS is the sponsor (or "Transferor") of each Trust, *id.* ¶ 1, and U.S. Bank (the "Trustee") is the Trustee for each Trust.  SOF ¶ 8.  Wells Fargo Bank, N.A. served as Master Servicer, Trust Administrator, Custodian and Credit Risk Manager.  PX 49 at 1 (MARM 2006-OA2 PSA); PX 110 at 1 (MARM 2007-1 PSA); PX 182 at 1 (MARM 2007-3 PSA).  Financial Security Assurance Inc. ("FSA") was the Certificate Insurer and provided financial guaranty insurance with respect to certain classes of Certificates issued by each of the Trusts.  PX 49 at 26 (MARM 2006-OA2 PSA): PX 110 at 48 (MARM 2007-1 PSA); PX 182 at 27 (MARM 2007-3 PSA).  FSA later became

Assured.  Answer.  Dkt. 116 ¶ 9 (admitting that Assured was formerly known as Financial Security Assurance Inc.).

57.     Under the PSAs, UBS was responsible for providing Loans to be deposited into the Trusts of the quality warranted in the PSAs' Schedule II.  PX 49 at 191-99 (MARM 2006-OA2 PSA) (Schedule II); PX 110 at 231-39 (MARM 2007-1 PSA) (Schedule II); PX 182 at 226-33 (MARM 2007-3 PSA) (Schedule II).  The PSAs also provide a remedy in the event that UBS breached its warranties.  Under Section 2.03, UBS has ninety days from either its discovery or receipt of written notice from "any party" to cure the breach.  PX 49 at 73-76 (MARM 2006-OA2 PSA) (§ 2.03); PX 110 at 101-04 (MARM 2007-1 PSA) (§ 2.03); PX 182 at 85-87 (MARM 2007-3 PSA) (§ 2.03).  If UBS could not cure a breach within ninety days, and more than two years had passed since the contracts closed, UBS was required to repurchase the affected Mortgage Loan. *Id.*

### B.     The Loans

58.     The Trusts were issued off of UBS's "MARM" shelf, which was UBS's brand for RMBS backed by adjustable rate ("ARM"), first-lien mortgages of Alternative-A ("Alt-A") and Jumbo-A credit quality.  Tr. 188:8-13 (Wu); Answer ¶ 19 (admitting the Trusts "include first-lien, adjustable-rate residential mortgage loans").  The risk profile of Alt-A loans generally falls between prime and subprime loans.  *E.g.*, PX 696 at 30.  Most of the Loans in the Trusts are Alt-A Loans.  Lantz Direct (DX KJ) ¶ 13.

59.     The MARM 2006-OA2 Trust closed on November 15, 2006; at that time, it was backed by approximately 5,660 Alt-A, ARM Loans with an aggregate principal balance of approximately $2,013,321,248.  SOF ¶ 5.  The Loans were originated by Countrywide (47.51% of the Stated Principal Balance) and IndyMac (37.47% of the Stated Principal Balance), among others.  *Id.* ¶ 5.  The Cut-off Date (a contractually-defined date as of which certain representations and warranties were made) for MARM 2006-OA2 was October 1, 2006.  PX 49 at 33 (MARM 2006-OA2 PSA).

60.     The MARM 2007-1 Trust closed on January 16, 2007; at that time, it was backed by approximately 4,944 Alt-A, ARM Loans with an aggregate principal balance of approximately $2,099,439,579.  SOF ¶ 6.  The Loans were originated by American Home (approximately 78% of the Principal Balance) and IndyMac (approximately 16% of the Principal Balance), among others.  *Id.*  The Cut-off Date for MARM 2007-1 was December 1, 2006.  PX 110 at 42 (MARM 2007-1 PSA).

61.     The MARM 2007-3 Trust closed on May 15, 2007; at that time, it was backed by approximately 6,478 Alt-A ARM Loans with an aggregate principal balance of approximately $2,582,881,408.  SOF ¶ 7.  The Loans were originated by Countrywide (approximately 52% of the Principal Balance) and IndyMac (approximately 40% of the Principal Balance), among others.  *Id.*  The Cut-off Date for MARM 2007-3 was April 1, 2007.  PX 182 at 32 (MARM 2007-3 PSA).

## III.     UBS'S PRE-CLOSING DUE DILIGENCE

62.     Before UBS bought Loans from originators, it performed "due diligence" to "ascertain the credit and collateral quality of the loans originated[.]"  PX 19 at 12 (UBS Contract Finance Group Policies and Procedures).  From each pool of loans it was offered, UBS selected a "representative sample" of loans for review.  PX 19 at 13 (UBS Contract Finance Group Policies and Procedures).  UBS reviewed these sampled loans to "get a general feel" about them, and then "make some assumptions based off the results" of that review that it could "extrapolate" to the loan pool as a whole.  Mohiuddin NCUA Dep. Designation 68:5-20.

63.     UBS's policies provided that, when UBS bought pools of Alt-A loans from American Home, Countrywide, and IndyMac, it was to draw a diligence sample of 25% of the loan pool, with 10% of the pool selected at random,  and 15% of the pool selected as an "adverse selection[,]" PX 41 at 50 (UBS RMBS operational review, Due Diligence Process in Detail), using an automated program, PX 12 at 18 (UBS RMBS Trading Manual, Non-Agency CMO Desk Draft); *see also* Tr. 1302:11-15 (Twombly).

64.     The adverse selection was designed "to target those borrowers and properties that exhibit a higher-than-average level of risk."  PX 19 at 14 (UBS Investment Bank Contract Finance Policies and Procedures, Sampling Criteria).  "[T]o identify[ ] borrowers that may have an inability of repaying mortgage debt," UBS used "adverse selection criteria" including (i) FICO scores below 620; (ii) LTV ratios above 95%; (iii) stated documentation loans; (iv) DTI ratios above 50%; and (v) multiple loans to one borrower.  *Id.*  "[T]o identify[ ] properties that may exhibit a higher-than-average level of risk," UBS used adverse criteria including (i) property types including cooperatives and manufactured homes (*i.e.*, not single family homes); and (ii) income-producing properties (*i.e.*, not owner-occupied properties).  *Id.* at 14-15.[10]  UBS's policies also required it to assess the "layered risk" of the adverse selection loans and "[a] seller's origination practice," including "compliance with [the] Sellers underwriting guidelines[.]"  *Id.* at 15.

65.     UBS retained third-party vendors to perform its diligence reviews, including Clayton Holdings LLC ("Clayton"), The Bohan Group, Inc. ("Bohan"), MDMC, and American Mortgage Consultants ("AMC").  Tr. 1318:22-1320:25 (Twombly); PX 41 at 49.  UBS provided these vendors with instructions, due diligence requirements, and review timelines.  UBS also required that the vendors contact the UBS diligence manager "at the onset of the review," and it required "daily updates."  PX 709 at 4 (email from Twombly regarding Countrywide loan pool).

66.     UBS's vendors reviewed the loan files for all loans in UBS's diligence samples, and compared them to the originators' underwriting guidelines to determine if the loans complied with guidelines.  Tr. 1320:8-12 (Twombly).  Based on their review, the vendors assigned a loan one of three "event level" (or "EV") grades: (i) EV1 meant the loan complied with guidelines; (ii) EV2 meant the loan did not comply with guidelines but had sufficient compensating factors to mitigate risk; and (iii) EV3 meant that the loan did not comply with guidelines, there were not sufficient compensating factors to warrant an exception, and the loan should not be purchased.  Tr.

---

[10]  *See also* PX 12 at 18 (Residential Mortgage Backed Securities Trading Manual, Non-Agency CMO Desk Draft stating:  "adverse" criteria included "High loan to value ratio," "Documentation type," "Low FICO scores," and "High debt to income ratios"); PX 668 at 2 (email from Mohiuddin to Twombly discussing adverse criteria including "docType=no Doc," and "Occupancy=Investor and Second Home").

1320:22-1322:11 (Twombly); *see also* PX 12 at 18 (UBS RMBS Trading Manual, Non-Agency CMO Desk Draft, Due Diligence).  The vendors reported their results to UBS, usually in the form of Excel spreadsheets.  Tr. 1320:13-18 (Twombly).

67.     Upon reviewing its vendors' findings, Tr. 1320:19-25 (Twombly), UBS could then "recommend" that its vendors overturn their grades.  *Id.* 1367:24-1368:4 (Twombly).  In so doing, Twombly testified that he "would have shown [the vendors] what they had done wrong," and then "advised my diligence vendors to provide reasoning that I would have given them," Tr. 1368:5-1369:2 (Twombly); *see also* PX 188 (Mohiuddin stating he was "[w]orking on overturning loans as we speak with my vendors").  For example, when Clayton graded a number of loans as EV3 for guideline violations including "DTI, cash out, [and] missing docs," Twombly asked "Are the 3's that bad? . . . I will look them over but before I do please allow me to bet that someone over there is being way too conservative."  PX 685 at 2-3.  He further stated: "I think it would be a good idea if we got on the phone together . . . to go over this exact pool so you can see where I am thinking on some of the loan exceptions."  *Id.* at 2.

68.     In certain instances, UBS's vendors graded a loan an EV3 and UBS chose not to securitize it for the same reasons the Trusts allege that the Loans breached the PSAs, including missing documentation, loans not conforming with originators' guidelines, unreasonable stated income, an inability of the borrower to repay, and others.  *See, e.g.*, PX O16, tab USIDM7032, rows 169, 181, column U (graded EV3 and not securitized into the Trusts because of missing documents); PX O17 tab IDM60822A, row 6, column V (graded EV3 and not securitized into the Trusts because collateral characteristics exceeded guidelines); (PX O19 tab CTW60919A, row 26, column U (graded EV3 and not securitized into the Trusts because of stated income was not reasonable).

69.     But even though UBS knew that there were loans in the pools with credit deficiencies significant enough to preclude its placement in the Trusts, and UBS's own internal policies stated that UBS samples could be upsized in order for UBS "to gain a comfort level" with the non-diligence portion of the pool, PX 148 at 75; *see also* PX 19 at 19, UBS did not review the

rest of the loans in the pool for similar defects and pull them from securitization.  Tr. 1300:21-1302:5 (Twombly) (goal in selecting sample was not to weed out all loans that failed to adhere to guidelines and lacked sufficient compensating factors); Mohiuddin NCUA Dep. Designation 70:13-71:7 ("The objective [of sampling] was to review the loans that were part of the sample.  So going back into looking at the nonsample loans was not the practice.").

70.     UBS also expressed concerns about the quality of its due diligence vendors.  For example, in mid-2006, UBS employees complained that, "at the same time [UBS was] declaring [B]ohan a POS[,]" an abbreviation signifying total incompetence, UBS was "intentionally pointing more business in their direction," PX 693 at 2, and that " FRIENDS DON'T LET FRIENDS USE CRAPPY DUE DILIGENCE FIRMS." *Id.* (capitals in original).  In late 2006, a UBS audit warned that, because UBS's diligence group did not document its  diligence related to retention of vendors, "providers with inadequate processes or skills may be approved."  PX 696 at 17.  Looking back in early 2008, Twombly ridiculed the employees of Clayton and Bohan as "truck drivers turned underwriters in a week."  PX 694 at 2.

71.     Of the 17,082 Loans at issue, 15,436 were drawn from 16 loans pools that UBS bought from Countrywide, American Home, or IndyMac.  PX 1081 (Ex. 20) ("Loan Summary Database"), Col. J (Originator).  While only some of the vendors' reports for those pools were produced, the available reports showed that that UBS's vendors reviewed at least 12,297 of the Loans at issue in this case and assigned EV3 grades to 529 of them.  PX 1081 (Ex. 16) ("MARM Credit and Compliance Database"), Col. D ("Record Count"); *id.* Col. P ("Ever Overall 3?").  For 425 of those Loans,  UBS overrode the vendors' grades of EV3s and reassigned grades of EV1 or EV2, which meant they stayed in the pool.  *See id.*, Col. N ("Final Overall Grade") (showing that out of the 529 Loans with a "Yes" in Col. P, only 104 had a "Yes" for their final grade).  While Twombly testified that he would sometimes change grades of EV1 or EV2 to EV3, Tr. 1367:24-1368:4, he said it was his practice to make a written record of any such change (apart from a change motivated by recovery of a missing document), Tr. 1368:9-15.  UBS introduced no written records of any such changes into evidence.

72.     In addition, 104 Loans received final grades of EV3 by UBS and were securitized. PX 1081 (Ex. 20) ("Loan Summary Database"), Col. CL ("Final Overall Grade"). Other loans received final grades of EV3 but were not purchased or securitized for reasons similar to the alleged breaches at issue. *E.g.*, PX O16, tab USIDM7032, rows 169, 181, column U (graded EV3 because of missing documents); PX O17 tab IDM60822A, row 6, column V (graded EV3 because collateral characteristics exceeded guidelines); PX O19 (tab CTW60919A, row 26, column U) (graded EV3 because stated income was not reasonable). Despite these results, there is no evidence that UBS conducted any further reviews on any other loans in the pools.

73.     Based on the results of its initial diligence review, UBS's policies provided that "pool samples may be increased in order for UBS to gain a comfort level with pool portions that are not reviewed for due diligence." PX 148 at 75 (UBS Operational Review (February 2007)); *see also* PX 19 at 19 (UBS "reserve[s] the right to increase due diligence samples based on adverse results or systemic issues with a particular seller"). There is no evidence that UBS conducted any additional diligence after reviewing its samples for the loan pools that contained the Loans at issue.

## IV.    UBS'S POST-CLOSING MONITORING

74.     After UBS securitized the Loans into the Trusts, UBS's surveillance Group monitored the performance of the Loans backing them. Tr. 1397:20-1398:2 (Lantz). UBS's policy was to monitor any loan if it became delinquent by 30 days, Tr. 1400:16-23 (Lantz), PX 41 at 99 (UBS RMBS Operational Review August 2006 stating "UBS Surveillance begins to monitor loans when they become 30 days delinquent"), at which point UBS would gather information from the servicer including notes on discussions with borrowers, Tr. 1400:24-1401:11 (Lantz). If loans went delinquent by 60 days, UBS's policy was to submit a subset of them for a re-underwriting review. Tr. 1401:23-1402:1 (Lantz); PX 41 at 99. UBS's policy required it to conduct such a review of all loans that went 90 days delinquent. Tr. 1408:1-5 (Lantz); PX 41 at 99. UBS hired third-party firms to conduct these reviews, primarily Clayton Fixed Income Services and Wells Fargo Bank. Tr. 1404:4-13 (Lantz). These vendors (i) reviewed the loan files for the loans

identified by UBS, (ii) compared them to the originators' underwriting guidelines to determine if the loans met the guidelines, Tr. 1405:10-24 (Lantz); and (iii) then reported their findings to UBS. Tr. 1410:24-1411:8 (Lantz).

75.     As Lantz testified, "a purpose of doing surveillance was reducing Certificateholders' losses by removing nonperforming loans from securitizations and putting them back to the originators[.]"  Tr. 1411:13-20 (Lantz).  As UBS told investors, it sought to use surveillance to "improve bond performance" by "mitigat[ing] bond losses to investors by monitoring deal performance."  PX 148 at 89.  UBS believed it received "a competitive advantage" in the RMBS market from "mitigation of loan delinquencies and loan loss levels resulting from hands-on management of recoveries, indemnification and the prudent repurchase of nonperforming loans[.]"  PX 41 at 92; *see also* Tr. 1412:4-14 (Lantz) (confirming this was UBS's belief).

76.     Accordingly, UBS's policies required that if, through UBS's surveillance reviews, "a breach of rep and warrant is determined, the Trustee is notified of the breach. Once confirmed, the loan is bought out of the deal [by UBS], and cash will flow through to the deal as a pre-payment[.]"  PX 148 at 93.  If UBS repurchased a delinquent Loan from the Trusts, UBS could "put back" that Loan to the originator—that is, it could demand that the originator repurchase the Loan for breaching a warranty the originator provided to UBS.  Tr. 1406:20-1407:4  (Lantz); *see also* PX 148 at 89 (noting UBS could "recoup monies" through "put-back [of] loans [to originators] that are un-saleable due to origination deficiency").

77.     By mid-2007, loan delinquencies—including delinquencies in Loans backing the Trusts—were on the rise.[11]  UBS was not surprised.  On June 29, 2007, David Rashty, head of UBS's trading desk for ARM loans, Tr. 190:21-191:16 (Wu), emailed Schmidt that "MARM 07-

---

[11]   The rise in delinquencies was not surprising, because UBS monitored the condition of the major originators of Loans in the Trusts, and was aware that those originators sold defective loans to be securitized.  *See, e.g.*, PX 710 at 2 (UBS internal email stating:  "the stuff that [Countrywide] sells as whole loans usually don't perform anywhere near as good as the stuff that [Countrywide] securitizes themselves."); PX 88 (noting high rate of missing documents in IndyMac Loans); PX 280 (UBS internal email noting "pending American Home implosion").

3 has HUGE delinquencies in Month 1 (big surprise!)."  PX 271 at 2.  On July 16, 2007, Rashty e-mailed Lantz that UBS "had a huge due dili[gence] issue with [MARM 2007-3] with Countrywide . . . . [sic] and now it's the worst performing neg[ative] am[ortization] deal to date based on the first [month's] delinquencies!"  PX 278.[12]  Rashty asked Lantz:  "Can you comb thru that deal and look into the deal for breaches of reps and warrants?"  *Id.*

78.    Around this same time, however, UBS came to believe it was at risk of bearing the losses of these Loans.  But by mid-2007, as Lantz testified, "almost everyone" in the mortgage industry was going out of business.  Tr. 1465:20-25 (Lantz); *see also e.g.*, PX 280 (Lantz receiving report on UBS's exposure to American Home in light of "the pending American Home implosion").  As Lantz explained, if UBS repurchased from the Trusts a defective Loan that had been made by an originator that had imploded, "[t]here would be nowhere to put the loan back to[.]"  Tr. 1471:3-25.

79.    In the second half of 2007, delinquencies of Loans in the Trusts accelerated.  Tr. 1476:21-1477:20 (Lantz).  By the August 2007 reporting period, there were 235 Loans that had ever been delinquent for 90 days or more; PX 1081 Ex. 20;[13] by October 2007, there were 406 such Loans, PX 1081 Ex. 20;[14] and by December 2007, there were 726 such Loans, PX 1081 Ex. 20.[15]  Under UBS's policy, it had to fully re-underwrite each of these Loans to determine if they complied with the originators' guidelines and, if not, to repurchase them from the Trusts.  PX 148 at 92-93.

80.    On or around January 31, 2008, UBS canceled its surveillance program and shut down its Surveillance Group.  Tr. 1482:19-22 (Lantz).  Toward the end of that month, Lantz was

---

[12]  Lantz understood Rashty to mean that the 2007-3 Trust was "the worst performing negative amortization deal that UBS had done to date, based on the first month delinquencies." Tr. 1421:22-1423:1 (Lantz).

[13]  To ascertain the number of delinquent loans as of August 2007, first filter column BJ "EVER 90?" to "Yes," then filter column BO "First 90D Delq Date" using "Number filters" to "Less than or equal to" "200708."

[14]  To ascertain the number of delinquent loans as of October 2007, first filter column BJ "EVER 90?" to "Yes," then filter column BO "First 90D Delq Date" using "Number filters" to "Less than or equal to" "200710."

[15]  To ascertain the number of delinquent loans as of December 2007, first filter column BJ "EVER 90?" to "Yes," then filter column BO "First 90D Delq Date" using "Number filters" to "Less than or equal to" "200712."

asked by two UBS traders if UBS could repurchase loans out of the MARM 2007-1 and put them back to originators that were in solid financial condition.  PX 309 at 2; Tr. 1483:25-1484:14 (Lantz) (discussing PX 309).  Lantz told them "we do not conduct R&W reviews on loans in our deals any more," and explained "the various reasons why."  PX 309 at 2.  As Lantz acknowledged at trial, when he was deposed as UBS's corporate representative, he could not recall the reasons why UBS shut down its surveillance program other than "it was a decision informed by counsel," Tr. 1494:12-1495:25; during the deposition, UBS's counsel then instructed Lantz not to reveal any discussions he had with counsel on that subject, Tr. 1488:25-1490:17.

## V.     UBS'S RESPONSES TO REPURCHASE DEMANDS

81.     Starting in August 2010, and continuing through September 2012, Assured and Wells Fargo sent letters to UBS demanding that UBS repurchase certain Loans that they alleged contained material defects.  SOF ¶¶ 37-57; Tr. 1499:9-19 (Lantz).  The Trustee ensured that UBS had received copies of all the letters (on which UBS was copied), Reynolds Direct (PX 1106) Direct Exs. 4-5 (contained in PX D4) (Assured's breach notices and duplicate notices the Trustee sent to UBS), and it also sent "me too" notices to UBS for most of the letters, in which it reiterated the breaches alleged by Assured.  Reynolds Direct ¶¶ 23-24.  UBS referred these demands to its Mortgage Strategies and Solutions Group, 1496:11-21 (Lantz), and hired the vendors JCIII and Navigant to review the Loans identified in the notices by comparing the applicable Loan Files to the relevant guidelines, and then to report their results to UBS.  Tr. 1499:24-1500:10 (Lantz).  The vast majority of these reviews were performed by JCIII.  Tr. 1519:3-7 (Lantz).

82.     UBS drafted instructions for JCIII, Tr. 1505:18-1506:11 (Lantz) (identifying UBS employees who drafted instructions), which set "a structure and process for evaluating the alleged breaches,"  Tr. 1506:12-15 (Lantz).  JCIII, working under UBS's instruction, told its re-underwriters that "your assignment entails the rebuttal of breaches set forth by [Assured.]  PX 344 at 2.  JCIII further stated:  "[t]he overwhelming majority of the breaches sited [*sic*] are invalid or immaterial.  Competent and qualified individuals underwrote and processed these loans. Make it

clear that due diligence was conducted at origination and support with your findings.  Treat these file as if you underwrote or processed them and that you must personally write the check to buy it back." *Id.* at 4.

83.     Of the 2,069 Loans that JCIII reviewed pursuant to UBS's instructions, it concurred with the breach allegations for 94 Loans. Cipione Direct (PX 1081), Ex. 7 ("Repurchase Analyses Database").[16]  UBS relied on those reports to decide whether or not to repurchase the Loans.  Tr. 1500:23-1501:10 (Lantz).[17]  In total, JCIII reviewed 2,069 of the Loans in the Trusts.

## VI.     THE PARTIES' EXPERT ANALYSES

### A.     Re-underwriting

#### 1.     Holt's Testimony

84.     The Trusts' primary evidence of UBS's material breaches came through Holt, who has been qualified as an expert on residential mortgage loan underwriting in two prior cases:  *In re Washington Mut. Mortgage Backed Sec. Litig.*, No. C09-37 MJP, 2012 WL 2995046, at *13 (W.D. Wash. July 23, 2012) and *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 607 (S.D. Cal. 2011).[18]  *See* Holt Direct (PX 1103) ¶ 30.  Holt has significant experience underwriting mortgage loans, having worked for 13 years in the retail division of a bank, and for 25 years underwriting loans and supervising and training underwriters. Holt Direct (PX 1103) ¶ 28.  As part of his role, Holt also created policies governing new mortgage products.  *Id.* ¶ 29.  Holt has extensive experience not only with the application of underwriting

---

[16]   To identify the Loans reviewed by JCIII in the Repurchase Analyses Database, filter Column G (JCIII Reviewed?) to "Yes."  To identify those allegations with which JCIII concurred, keep Column G filtered to "Yes" and filter Column L (JCIII Concur?) to "Yes."

[17]   JCIII reported its findings by grading each loan as (i) "concur," meaning JCIII agreed with the alleged breach; (ii) "rebut," meaning JCIII disagreed with the allegation; or (iii) "doc," meaning JCIII was unable to complete the review. PX 447 at 2; Tr. 1510:10-13 (Lantz).  Examples of JCIII's findings were submitted as PX 4.

[18]   UBS's *Daubert* motion to exclude Holt's testimony, Dkt. 314, is denied.  As explained herein (i) Holt's testimony does not contravene any of the Court's prior orders; (ii) Holt's updating of his findings for certain Loans based on additional information does not render his opinions unreliable; (iii) Holt's findings regarding missing documents are reliable (and adopted by the Court); (iv) Holt's reliance on post-origination evidence is entirely proper; (v) UBS's legal interpretation of the MLS Warranty as merely warranting accurate transcription of information is incorrect; and (vi) Holt's reliance on Cowan's analysis was proper.

guidelines, but also with (i) the use of automated underwriting systems ("AUS"), Tr. 1053:5-1054:9 (Holt); (ii) the evaluation, granting, and pricing of exceptions to guidelines, Tr. 1102:7-16 (Holt); 1103:8-1105:17 (Holt); (iii) mortgage compliance rules and industry standards for appraisal requirements, Holt Direct (PX 1103) ¶ 31; (iv) the identification and evaluation of red flags for borrower fraud or misrepresentation, Tr. 884:6-10 (Holt), *id.* 1040:17-1041:3 (Holt); (v) the use of third-party sources (*i.e.*, outside the origination loan file) in connection with loan underwriting and re-underwriting, including the Bureau of Labor Statistics ("BLS") website, Salary.com, bankruptcy records, servicing records, LexisNexis, Accurint, DataVerify, and the Mortgage Electronic Registration System ("MERS"), Tr. 903:14-903:23, 1012:17-1017:4, 1167:17 1168:15, 1204:23-1205:1 (Holt); and (vi) the handling and digitization of loan files in connection with origination, Tr. 780:10-783:8 (Holt). Holt also has experience with due diligence in connection with the sale and acquisition of mortgage loans, Holt Direct (PX 1103) ¶ 31.

85. Holt oversaw a rigorous forensic re-underwriting review that included all the Loans at issue. Holt's review was conducted with the assistance of more than 200 re-underwriters. *Id.* ¶ 124. Holt gave his team a detailed set of written instructions that described how they should review the Loans and supervised the review process. *Id.* ¶ 125, PX 559 (Holt Direct, Ex. D). This process included (i) evaluating the reasonableness of income and income misrepresentations; (ii) evaluating employment verification and employment misrepresentations; (iii) evaluating asset verifications and asset misrepresentation; (iv) evaluating occupancy status and occupancy misrepresentations; (v) evaluating appraisals and recalculating LTVs; (vi) evaluating whether loan files were complete; (vii) evaluating Loans issued as exceptions to guidelines and compensating factors; and (viii) evaluating and recalculating DTIs and determining whether there were debt misrepresentations. Holt Direct (PX 1103) ¶¶ 147, 158, 161, 163, 168, 169, 183. He considered both information in the Loan Files as well as other information including the Bureau of Labor Statistics ("BLS") website, Salary.com, bankruptcy records, servicing records, LexisNexis, Accurint, DataVerify, and MERS. Holt Direct (PX 1103) ¶¶ 152-54, 163, 166, 197-98.

86. Holt and his core team at Analytic Focus, which included two senior underwriters who each had more than 20 years underwriting experience, Tr. 996:24-997:21 (Holt), reviewed a random quality control sample of Loans drawn by Plaintiffs' sampling expert Lipshutz to confirm his instructions were being followed. Holt Direct (PX 1103) ¶ 127 & n.64; Lipshutz Direct (PX 1104) ¶¶ 36-38. Holt, with the assistance of his senior underwriters, made the decision whether a Loan had an MAE for every breaching Loan. Holt Direct (PX 1103) ¶ 191. After submitting his August 2015 expert report, Holt and his team continued to perform extensive additional QC reviews designed to remove any incorrect findings. *Id.* ¶¶ 216-22. This post-report QC review was conservative: Holt solely identified defect findings to be removed, without adding any new findings. *Id.* ¶ 216.

87. Holt reached his own conclusion whether each Loan was "Materially Defective." *Id.* ¶ 191. Holt found that a Loan was Materially Defective if he found a defect that significantly increased the Loan's risk of loss. *Id.* ¶ 7. "[S]uch risk of loss includes (a) the risk that the borrower will default on the Loan, (b) the risk that the property securing the Loan will not constitute adequate collateral in the event of default, and (c) the risk that the Loan and/or collateral documentation will not be fully enforceable against the borrower, in whole or in part." *Id.*

88. Holt concluded that the Loans that remain at issue all suffer from at least one, and often many, material defects. Holt's specific conclusions about particular Loans are discussed in Parts IV-IX, *below*. All of Holt's findings can be sourced to the documents he relied upon and can be independently verified. Holt's findings stand, therefore, irrespective of any conclusions the Court might reach as to his credibility.

### 2. Grissom's Response To Holt's Testimony

89. UBS's primary attacks on Holt's findings came through the testimony of its expert, Grissom. Grissom had no experience with the United States mortgage loan market from 2004 through 2009, Tr. 289:16-25 (Grissom), which UBS conceded was a unique period in the mortgage market. Tr. 2155:13-18. More broadly, Grissom has never underwritten a mortgage loan for

origination; has never had credit authority to approve a loan for origination; has never approved an exception to a loan; has never determined whether compensating factors were adequate for a loan prior to origination; and has never determined what additional interest rate should be charged for a loan that is approved as an exception to guidelines.  Tr. 263:22-265:25 (Grissom).  She has no experience with the use of AUS, *see e.g.*, Tr. 632:17-24 (Grissom), nor (prior to preparation for this trial) with the use of the third-party sources on which Holt relied for many of his findings, Tr. 264:15-25 (Grissom).  Her only underwriting training consisted of two half-day training sessions she attended in 1986 at Wells Fargo.  Tr. 266:1-7 (Grissom).  Grissom's experience relates solely to the due diligence of loans that were being considered for acquisition by entities looking to sell or securitize them—that is, to not hold the risk of the loans on their own books but to sell them to another entity.  Tr. 266:25-267:13, 268:11-22, 272:1-273:2, 274:3-6, 274:20-22, 280:2-17, 287:10-24, 290:4-291:3 (Grissom).

90.     Grissom failed to provide the team of 135 re-underwriters who assisted in her review with any written instructions to guide them in their review and ensure they were applying consistent criteria that reflected her own views; nor did she even provide oral instructions to many of the reviewers—because she never spoke to them.  Tr. 295:19-23, 305:16-22, 304:10-20.  Moreover, while she offered rebuttals to Holt's findings for over 9,000 Loans, Grissom personally reviewed her vendors findings for only 2,000 Loans, Tr. 307:9-308:8 (Grissom).  Grissom looked at the Loan Files for only a subset of these Loans, but she could not identify which ones.  Tr. 310:12-311:19.  Grissom also could not identify which of her vendors' findings she reviewed, or any changes she made to their work, because she did not preserve a copy of any initial findings that she changed, nor did she keep a list of which findings she looked at.  Tr. 316:2-12 (Grissom).  These procedural deficiencies render Grissom's opinions not credible, and also require her exclusion under Federal Rule of Civil Procedure 26(a)(2)(B).  *See* Dkt. 326 (Trusts' *Daubert* motion to exclude Grissom's testimony).

91.     In considering whether Loans complied with guidelines, Grissom based many of her opinions on the improper assumption that the original underwriter had done his job properly,

absent affirmative evidence to the contrary in the Loan Files, simply because the Loan was made. Tr. 670:3-14 (Grissom) ("Q.  So you assume the underwriter was doing their job correctly?  A.  I do."); *see also id.* 411:9-20, 427:24-428:6, 469:1-11, 471:9-25, 642:20-643:13, 646:2-18, 653:8-19, 654:1-20.  With respect to the MLS Warranty, Grissom took the position that it was merely a transcription warranty, and thus that evidence outside the origination Loan Files was irrelevant to whether it had been breached.  Tr. 348:7-20 (Grissom), Tr. 536:8-22; *see also* Grissom Direct (DX LI) ¶ 99.  However, for all Loans with Loan Files, Grissom's team reviewed all of the materials relied on by Holt to show breaches of the MLS Warranty, whether or not they were in the Loan Files, and identified any errors.  Tr. 536:8-538:12 (Grissom).

### 3.   UBS's Cross-Examination Of Holt

92.      In cross-examining Holt, UBS attempted to undermine his testimony in a number of ways, none of which was effective.[19]

93.      *First*, UBS criticized Holt for allegedly misstating the number of breaches he found in various categories in his trial declaration, Tr. 761:25-763:1 (Holt)—but the document upon which UBS relied appears simply to have mislabeled the number of *Loans* with the relevant breaches as "Breaches."   *See* Cipione Direct (PX 1081), Ex. 18 ("Holt Direct Testimony Database").

94.      *Second*, UBS criticized Holt for finding Loans to be materially defective in his 2015 report that he did not find to be so in his 2014 report, Tr. 852:14-854:6—but Holt has explained that those changes resulted from considering additional information for his 2015 report that he did not consider in 2014, including additional information from loan files, guidelines, and third party sources.  *See, e.g.*, Tr. 856:5-9.

---

[19]    UBS also criticized Holt for stating in his declaration that he received a "Graduate Degree in Retail Bank Management from the University of Virginia in 1994," when in fact he received a "graduate diploma" from the Consumers Bankers Association ("CBA") for a course it held at the University.  Tr. 751:15-759:20 (Holt).  But while Holt admitted that he errantly used the term "degree," Tr. 752:21-25, he fully disclosed that he received his diploma through the CBA in his trial testimony, Holt Direct (PX 1103) at 102 (Ex. A, Holt Resume), and the diploma itself was signed by the Dean of the University's McIntyre School of Commerce, Tr. 753:23-25; 990:18-991:10; PX 1105.

95.     *Third*, during closing, UBS asserted that Holt had admitted "that he did not perform any materiality analysis whatsoever at any point in time," Tr. 2102:2-4.  In fact, Holt testified that he performed a materiality analysis, and specifically examined whether breaches were "material," *i.e.*, whether they caused Loans to bear a significantly increased risk of loss.  *E.g.*, Holt Direct (PX 1103) ¶ 7 ("In my opinion, a material defect is a defect that significantly increased the risk of loss with respect to the Loan"); *id.* ¶ 9 ("In my opinion, a Data Defect or Other Defect is material if it significantly increases the risk of loss, regardless of whether it causes the loan to violate guidelines"); Tr. 1001:13-17 ("Q. In determining whether loans were materially defective, did you apply the test you referred to in your direct testimony that loans, the loans had significantly greater increased risk of loss? A. That is correct.").  In the colloquy cited by UBS, Holt appeared to be confused.  Tr. 928:6-15 ("THE COURT:  Let me understand that you did not, you were not asked to, and you did not do an analysis of whether a defect materially increased the risk of loss to the lender, is that correct, or the certificate holder in this case? THE WITNESS:  I did not do any analysis, no, sir.").  Holt's confusion in that exchange does not negate the materiality analysis that UBS acknowledged he "clearly" performed.  Tr. 1004:8-10) (asserting Holt "clearly testified that . . . he measured materiality . . . [at] the date of origination").  Furthermore, the facts upon which the Trusts rely to demonstrate MAEs are undisputed.

96.     *Finally*, UBS asked Holt about 18 Loans.  Holt acknowledged that he should not have included three of the Loans, which the Trusts are no longer putting at issue; and that he mistakenly did not remove statements regarding layered risk for Loans for which he ultimately concluded there was only a single defect (but for which he previously had found multiple defects).  Tr. 928:22-930:9, 939:12-947:7, 967:17-976:7 (Holt).  One other Loan he had found to be materially defective based solely on his reliance on Cowan's work.[20]  Otherwise, and consistent with the Court's conclusions below, the trial proved that Holt's findings of material defects in the remaining 14 Loans were correct, and based on undisputed evidence.

---

[20]  Loan ██████.

97.     For nine Loans, UBS breached the MLS Warranty because of false DTI data resulting from borrower fraud as to income (five Loans),[21] false DTI data resulting from borrower fraud as to debt (five Loans),[22] and/or false occupancy data resulting from borrower fraud (one Loan).[23]



98.     For six Loans, UBS breached the Mortgage File Warranty based on a missing title policy (two Loans),[24] a missing negative amortization endorsement on the title policy (four Loans),[25] and/or a missing recorded deed (one Loan).[26]

99.     For seven Loans, UBS breached the Guideline Warranty based on unreasonable stated income (three Loans),[27] a missing loan application (one Loan),[28] a missing loan approval (one Loan),[29] a missing credit report,[30] and/or a DTI ratio that exceeded guidelines based on information in the Loan File but for which no exception was obtained (two Loans).[31]

---

[24]  Loan ██████ (undisputed that title policy is missing from loan file—Grissom notes commitment to obtain policy and cites statement on HUD-1 that title policy was purchased, but does not dispute the policy itself is missing); Loan ████████ (same).

[25]  Loan ████████ (undisputed that title policy in loan file is missing negative amortization endorsement); Loan ████ (same); Loan ██████ (same); Loan ██████ (same).

[26]  Loan ██████ (undisputed that recorded deed is missing from loan file).

[27]  Loan ████

██████████████████████████████████████████

*see* Tr. 1037:6-1040:5, PX 03127).

[28]  Loan ████████ (undisputed that loan application is missing from loan file, and that it is a core document).

[29]  Loan ████████ (undisputed that loan approval is missing from loan file, and that it is a core document).

[30]  Loan ████████████████████████████████████

[31]  Loan ████

██████████████████████████████████████████

### B.      Appraisals

#### 1.      Cowan's Testimony

100.      Holt relied upon Cowan's analysis in determining that 3,526 Loans were materially defective because of misstated LTV ratios.[32]  To reach his conclusions, Cowan employed an AVM, which uses computer modeling and large volumes of data to estimate the value of a property. Where a conventional appraisal is based on a subjective in-person assessment of a property, and comparison to the sales prices three "comparable" properties subjectively selected by the appraiser, Tr. 1609:22-25, Cowan's AVM is based on a comparison of the subject properties to the sales prices of a much larger number of comparable properties selected by an objective formula.  Cowan Direct (PX 1108) ¶ 2.

101.      Cowan is an expert in the construction and statistical analysis of AVMs, having constructed approximately 20 AVMs over the course of his career, Cowan Direct (PX 1108) ¶ 65, has testified about AVMs he constructed, Trial Tr. 1698:2-19 (Cowan), and is a member of the International Association of Assessing Officers (IAAO), the body of property tax assessors in the United States, *id.* ¶ 25.   Cowan has also been qualified as an expert in sample selection and statistical analysis of AVM results involving RMBS on four occasions.  *Fed. Hous. Fin. Agency v. JP Morgan Chase & Co.*, No. 11-CV-6188 (DLC), 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012); *CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12-CV-073-WMC, 2014 WL 3696233 (W.D. Wisc. July 23, 2014), *aff'd in part, rev'd in part*, 799 F.3d 729 (7th Cir. 2015); *Fed. Hous. Fin. Agency v. Nomura Holding America, Inc.*, No. 11-CV-6201 (DLC), 2015 WL 685231 (Feb. 13, 2015); *Federal Home Loan Bank of Seattle v. Banc of America Securities LLC,* No. 09-2-46319-1 SEA (Wash. Super. Ct., King Cnty., Mar. 16, 2016) (Dkt. 382-1).

---

[32]   UBS's *Daubert* motion to exclude Cowan's testimony, Dkt. 320, is denied.  As explained herein: (i) Cowan is qualified to opine on the construction and use of AVMs; (ii) far from acting as a "mouthpiece" for Phoenix, Cowan directed Phoenix in selected comparable properties for the AVM; (iii) AVMs are well-recognized method of assessing property values.

102.    At Cowan's direction, Phoenix Advisors & Managers USA LLC ("Phoenix"), which maintains tax assessment data obtained from the 3,000+ counties and parishes in the United States, Cowan Direct (PX 1108) ¶¶ 2, 61-69, ran an algorithm that identified the sales price for the 10 most comparable properties for each at-issue property using a metric called the "Mahalanobis" distance, in order to determine the mathematical distance between the subject property and the comparable properties using the following equally weighted factors:  square footage, age, lot size, date of sale, number of bedrooms, and number of bathrooms.  *Id.* ¶ 62; Tr. 1678:16-18.  Based on that metric, Phoenix provided the ten most comparable properties and their sales prices, which were adjusted for the date of sale and square footage.  Cowan Direct (PX 1108) ¶ 74; Tr. 1695:5-20.

103.    Cowan opined that the arithmetic mean of the sales prices of the ten comparable properties was a reliable, unbiased measure of the subject property's fair market value. Cowan Direct ¶¶ 2, 90;  Tr. 1597:24-1598:10, 1599:1-16.   Cowan performed three statistical tests to compare this data to the appraised values.  Each test independently demonstrated that the appraised values were consistently higher than the mean of the sales prices of the comparable properties—a trend of appraisal inflation that was highly unlikely to be due to chance alone.  Cowan Direct (PX 1108) ¶¶ 77-88; *see also* Tr. 1709:3-1710:12 (regarding "form of sign" test);  Tr. 1704:18-1707:11 (regarding test for upward bias); Cowan Direct (PX 1108) ¶¶ 85-88, Tbl. 4 (regarding approximate confidence interval test).

104.    Cowan then used the AVM results to recalculate the LTV ratios of the Loans.  For refinance loans, he used the AVM mean in the denominator, in place of the appraised value; for purchase loans, he used the lesser of the AVM mean or the purchase price.  Cowan Direct (PX 1108) ¶ 91.  Cowan then reported the Loans with recalculated LTV ratios that exceeded any of the three following thresholds selected by Holt (i) more than 80% and more than 5 percentage points greater than the LTV ratio stated in the MLS; (ii) more than the maximum LTV ratio permitted by the applicable underwriting guideline for the Loan by at least 5 percentage points; and (iii) more than the maximum LTV ratio represented in the relevant PSA, plus one percentage point, *i.e.* 96%

for the MARM 2006-OA2 and MARM 2007-3 Trusts and 101% for the MARM 2007-1 Trust.  *Id.*
Apps. D, E, F.  Cowan's results are discussed in Part IV.H, *below*.

### 2.  Barnett's Response To Cowan's Testimony

105.  Barnett did not challenge the construction or operation of the AVM based on
Phoenix's data, as he claimed no expertise outside of statistics.  Tr. 1780:1-3 (Barnett), 1791:4-7
(Barnett).  Rather, Barnett offered three criticisms of Cowan's statistical analysis.

106.  First, Barnett asserted that Cowan could have used the 68% upper confidence bound
of the distribution of the sales prices for the comparable properties to recalculate LTV ratios (as
Cowan had when using his prior data provider, Lewtan), rather than their mean.  Tr. 1790:8-1791:3
(Barnett).  But Barnett offered no opinion on whether the use of the mean or a 68% upper
confidence bound was a more accurate reflection of the subject property's fair market value.  *Id.*
He further conceded that using this upper confidence bound would be appropriate only on the
assumption (not identified in his trial declaration) that the sales prices of the comparable properties
were normally or approximately normally distributed, that he had no evidence that either was the
case, and that he "do[es]n't think you should automatically assume that every distribution is
normal."  Tr. 1943:11-1944:2, 1800:9-10 (Barnett).

107.  Second, Barnett opined that Cowan's use of the lesser of the sales price or the AVM
mean rendered his recalculations of LTV ratios "biased."  DX OX ¶ 69.  Barnett conceded,
however, that he was simply opining that "if we have a quantity in a denominator that is subject to
random variation around the middle value up or down, that even if the quantity in the denominator
is on average correct, the mathematics of taking a quotient means that the quotient itself will be
subject to an upward bias."  Tr. 1951:13-16.  In so doing, Barnett conceded that Cowan's LTV
ratios based on the AVM mean were no more biased that LTV ratios based on appraisals.

108.  Finally, Barnett asserted that the Phoenix AVM provided values that were biased
low because the AVM values were more often lower than the purchase prices.  Tr. 1969:19-
1972:16 (Barnett).  This opinion is suspect, however, as Barnett offered it for the first time during

his live testimony, and UBS did not ask Cowan about it, preventing Cowan from providing a response.  Even if credited, this opinion would speak to only one of Cowan's three tests for appraisal inflation, and does not contradict the results of the other two, which show "that the value of most appraisals is far greater than that of the comparable values" and that there is "less than a 0.1% probability of this result occurring by chance alone."  Cowan Direct (PX 1108) ¶¶ 82-83.  Moreover, Barnett concedes this effect does not occur "all the time," Tr. 1972:13 (Barnett), and, according to his calculations, the AVM values and purchase price values match in the majority of instances.  Barnett Direct (DX OX), Tbl. 4.  In fact, the magnitude of this bias, according to Barnett, was just 4 percentage points (Barnett Direct, Tbl 4), and Barnett described a difference of 10 percentage points as only "moderate."  Tr. 1797:14-1798:13, 1952:11-18 (Barnett) (describing the difference between a confidence interval of 68% and one of 58% or 59%).  These opinions raise no concerns about the reliability of Cowan's methodology.[33]

### 3.    UBS's Cross-Examination of Cowan

109.    In its cross-examination, UBS questioned why Cowan used Phoenix data instead of data provided by Lewtan, which he had used in an earlier version of his expert report.  As a procedural matter, when the Court reopened expert discovery, it did not limit the sources or methods either parties' experts could employ.  Dkt. 287.  As a practical matter, Cowan explained that he switched data providers because Lewtan withdrew consent for Plaintiffs to use its data in litigation.  Tr. 1581:15-23 (Cowan); DX YD at 3 (email from Plaintiffs' counsel to Mauricio Viduarre of Analytic Focus) ("[W]e are relying on the Phoenix data because Lewtan was acquired by Moody's, and Moody's no longer allows Lewtan's AVM data to be used in litigation.  In other words, we had no choice but to seek out new AVM data.").  As a substantive matter, the Phoenix-based AVM provided sales prices for the ten most comparable properties while the earlier, Lewtan-

---

[33]   Barnett also did not quantify the degree of difference between the AVM result and the purchase price in this small number of cases; instead, he merely calculated the number of times they were different, with no threshold for significance.  *See* Barnett Direct (DX OX) ¶¶ 56-57, Tbl. 4.  Consequently, he did not opine that these differences were anything other than *de minimis*, or that they were not fully addressed through the thresholds provided by Holt for the reporting of Cowan's results.

based AVM provided a prediction of value for the subject property, Cowan Direct (PX 1108) ¶¶ 68, 117, but Cowan's fundamental "mission" was the same using both AVMs, Tr. 1573:5-8—to analyze the AVM data to determine the statistical likelihood that the appraised values were incorrect, and recalculated the LTV ratios accordingly, Cowan Direct (PX 1108) ¶ 73.[34]  UBS also argued that Phoenix was an undisclosed expert whose work UBS could not replicate.  In unrebutted testimony, however, Cowan explained that Phoenix acted merely as a data provider and exercised no discretion in providing him with the comparables.  *Id.* ¶ 66 ("To select the comparables, Phoenix exercised no subjective discretion—it simply applied the 'Mahalanobis' distance through a computer program, using a set of factors commonly known for all properties.").  Cowan also explained that to the extent UBS could not replicate his work, that was the result of a deliberate decision by UBS not to access Phoenix's databases.  Tr. 1620:20-1621:1.

## C.     Sampling And Extrapolation

### 1.     Lipshutz's Testimony

110.    Through Lipshutz, the Trusts presented evidence that extrapolated Holt's findings (including those based on Cowan's work) to certain Loans that were originated by IndyMac.[35]  This was necessary because Loan Files for many IndyMac Loans were not available.

111.    Lipshutz was qualified as an expert in statistical sampling in *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 503 (S.D.N.Y. 2013) (JSR).  Lipshutz Direct (PX 1104) ¶ 2.  UBS did not challenge his qualifications here.

112.    Lipshutz provided expert testimony concerning IndyMac Loans for which loan files were not available.  Using loan tapes and a random number generator, Lipshutz drew a random

---

[34]   Relatedly, UBS cross-examined Cowan about discrepancies between the value predicted by the Lewtan-based AVM and the mean of the sales prices for the comparable properties identified by the Phoenix-based AVM—but Cowan explained that those discrepancies were fully accounted for in the margin of error of the Lewtan-based AVM. Tr. 1603:21-1604:7 (Cowan); *see also* Cowan Direct (PX 1108) ¶ 130.

[35]   UBS's *Daubert* motion to exclude Lipshutz's testimony, Dkt 316, is denied.  As explained herein: (i) Lipshutz's extrapolation of Holt's full re-underwriting of Loan Files for a sample of IndyMac loans is not rendered unreliable by the results of Holt's limited review without Loan Files of other IndyMac Loans; and (iii) contrary to UBS's assertion, Holt described his use of the quality control samples drawn by Lipshutz (Holt Direct paragraph 127 and n.64).

sample of 400 Loans from all of the Loans in each Trust (each an "Original Sample"). Lipshutz Direct (PX 1104) ¶¶ 9-11. Lipshutz selected this sample size to ensure that he could extrapolate Holt's findings for the sampled Loans to the full population of Loans in the Trusts with a maximum margin of error of ±5 percentage points at a 95% confidence level. *Id.* ¶ 13. As Lipshutz drew the Original Samples from all the Loans in each Trust, they contained Loans made by various originators, *id.* ¶ 15 & Ex. 1—of the 1,200 total Loans in the Original Samples, 422 were made by IndyMac, *id.* ¶ 3.

113.    After Lipshutz drew the Original Samples, the Trusts entered into an agreement with OneWest, the servicer of the IndyMac Loans in the Trusts, whereby OneWest would produce Loan Files for only the 422 Loans in the Original Samples, and the Trusts would not request additional IndyMac Loan Files from OneWest. The Trusts entered into this agreement based on their understanding that Judge Baer had held that they could use sampling evidence to prove their claims for all Loans in the Trusts, Dkt. 89, which this Court later clarified was not the case, Dkt. 287. Following that clarification, the Trusts asked Holt to re-underwrite Loans outside of the Original Samples. Holt reviewed IndyMac Loans for which Loan Files were not available based solely on information outside of those files, and determined that 1,885 of them contained material defects. Holt was unable to make such findings, however, for the remaining 3,523 IndyMac Loans for which Loan Files were not available.

114.    The Trusts asked Lipshutz to extrapolate Holt's results for the 422 IndyMac Loans that were in the Original Samples (the "IndyMac Sub-Sample"), to all 5,982 loans originated by IndyMac in the Trusts (the "IndyMac Sub-Population"). Lipshutz Direct (PX 1104) ¶ 3. To confirm that the IndyMac Sub-Sample was representative of the IndyMac Sub-Population, Lipshutz used a chi-squared testing method, *id.* ¶ 20, which analyzes whether a sample is representative of a full population by comparing known variables within the sample—here, 13

distinct loan attributes[36]—to the same variables in the full population. *Id.* ¶¶ 20-22. Based on this test, Lipshutz concluded that the IndyMac Sub-Sample was representative of the IndyMac Sub-Population, *id.* ¶ 26, and could reliably be extrapolated to that population, *id.* ¶¶ 28-33.

115.    Lipshutz performed the extrapolations, based on Holt's findings, and determined that, at the 95% confidence level (i) for the 2006-OA2 Trust, 83.93% of the IndyMac Loans were materially defective, within a 5.4% margin of error; (ii) for the 2007-1 Trust, 88.24% of the IndyMac Loans were materially defective, within a 6.69% margin of error; and (iii) for the 2007-3 Trust, 89.94% of the IndyMac Loans were materially defective, with a 4.44% margin of error. *Id.* ¶ 32, Ex. 5.

## 2.    Barnett's Response To Lipshutz's Testimony

116.    UBS's sampling expert, Barnett, did not challenge Lipshutz's method of selecting the Original Samples. Tr. 1780:20-23 (Barnett). Barnett's only criticism was that Lipshutz's extrapolated average breach rate of 87.2% for the IndyMac Sub-Population is supposedly implausible, given that Holt found material defects in only 54.4% of that population. Barnett Direct (DX OX) ¶¶ 23-27. This criticism rests the false premise that Lipshutz's extrapolations— which were based on Holt's *full* re-underwriting, with Loan Files, of the 422 IndyMac Loans in the IndyMac Sub-Sample—are equivalent to the results of Holt's *limited* review, without Loan Files, of the 4,516 IndyMac Loans outside of those samples, based solely on sources outside of the Loan Files. *See id.* ¶ 26 (asserting that "Mr. Holt or his vendors reviewed all 4,516 At-Issue IndyMac Loans" without mentioning that the review was conducted without Loan Files). As both Holt and Lipshutz explained, reviewing the limited material available outside of the Loan File yielded far fewer breaches than could be found in a Loan File review.

117.    Holt testified:

> The number of Material Defects that can be identified relying exclusively on non-loan-file sources is much smaller than the

---

[36] The attributes are Original Loan Balance, Original Interest Rate, Loan Purpose, Type of Documentation, Occupancy Status, Original Loan-to-Value Ratio, Combined Loan-to-Value Ratio, Appraisal Value, Property Type, Borrower Credit Score (FICO), Back Ratio, State of the Property, and Group. Lipshutz Direct (PX 1104) ¶ 23.

> number of Material Defects that can be identified when reviewing
> loan files in conjunction with non-loan-file sources. Nonetheless, I
> was still able to identify a substantial number of Material Defects in
> Loans without loan files. Moreover, based on the number of
> Material Defects I was able to identify via this much more limited
> analysis, I am confident that I would identify a substantial number
> of additional Material Defects were I able to review the loan files
> for these Loans.

Holt Direct (PX 1103) ¶ 11.  Consequently, as Lipshutz explained, it is not surprising that the

results of his extrapolations based on full re-underwriting were higher than Holt's results based on

a much more limited review.  Tr. 1233:16-20.  Barnett's criticism thus provides no basis for the

Court to reject Lipshutz's testimony.

### 3.    UBS's Cross-Examination of Lipshutz

118.    Apart from Barnett's testimony, on cross-examination of Lipshutz, UBS offered

only one substantive criticism of one aspect of his work—that two of the thirteen

representativeness tests Lipshutz performed for the 2006-OA2 Trust showed statistically

meaningful (though small) differences between the sample and the wider population.  Tr. 1262:9-

11.  As Lipshutz explained, however, the probability that any of the Trusts would pass all 13 tests

was about 51%, "not much more likely than a coin flip," while the probability of two failures is

about 11%.  Lipshutz Direct (PX 1104) ¶ 26.  Given these probabilities, and "the very slight

deviations" indicated by the two tests, Lipshutz concluded that the IndyMac Sub-Sample for the

2006 OA-2 Trust is representative.  *Id.*; *see also* Tr. 1260:19-1261:1; 1269:16.

119.    The Court affords UBS's criticism no weight, especially in light of the fact that

Barnett does not join it.  If the slight deviations indicated by these two tests raised serious questions

about the representativeness of the IndyMac Sub-Sample for the 2006 OA-2 Trust, the Court can

reasonably expect that Barnett—the George Eastman Professor of Management Science and

Professor of Statistics at the Sloan School of Management at the Massachusetts Institute of

Technology ("MIT"), whose research specialty is applied statistical analysis, and who has taught

Probability and Statistics at MIT for over 40 years, Barnett Direct (DX OX) ¶ 7—would have

mentioned it.  Yet even though he was aware of Lipshutz's tests, Tr. 1784:4-6, Barnett did not

discuss their results, Tr. 1784:20-25, and he performed no representativeness testing of his own, Tr. 1784:1-3.  UBS's criticism thus provides no basis for the Court to reject Lipshutz's testimony.

### D.    Remedies

#### 1.    Snow's Testimony

120.    Snow, the Trusts' damages expert, is a professional economist with expertise in finance, economics, and statistics.  Snow Direct (PX 1110) ¶ 2.  UBS does not challenge Snow's qualifications to testify as to the amount of the Trusts' damages in this case.

121.    Snow described methods for calculating the amount of the Trusts' recovery once the Court determines which Loans UBS should have repurchased, the dates on which UBS should have repurchased them, and the date of judgment.  *Id.* ¶ 5; Tr. 1861:22-1862:3 (Snow).  Snow's calculations apply the contractually-defined "Purchase Price" which UBS is required to pay for materially defective loans that it must repurchase under Section 2.03's repurchase protocol.  Snow Direct (PX 1110) ¶¶ 4, 19.  *See* PX 110 at 70 (MARM 2007-1 PSA § 1.01's "Purchase Price" definition); PX 49 at 57 (MARM 2006-OA2 definition); PX 182 at 65 (MARM 2007-3 definition).

122.    First, to calculate the Trusts' recovery for Loans that have liquidated, Snow determined the Purchase Price of the Loan by summing each liquidated Loan's unpaid principal balance and accrued, unpaid interest (at the note rate), as of the date when UBS should have repurchased the Loan—that is, 90 days after UBS received written notice or discovered the breach relating to that loan.  Snow Direct (PX 1110) ¶¶ 10, 11.[37]  Snow obtained this data from the Trusts' servicing and remittance reports, which contain each Loan's balance and interest as of the assumed repurchase date.  *Id.* ¶ 10.  If a Loan liquidated with a loss after the repurchase date, Snow reduced the Purchase Price by the amount of any principal payments received on the Loan.  *Id.* ¶ 10 n.2.  Finally, Snow applied New York's statutory prejudgment interest rate of 9% running from the repurchase date, although his method can incorporate any rate ordered by the Court.  *Id.* ¶ 10.  The

---

[37] In his trial testimony, Snow used assumed repurchase dates for illustrative purposes; the Trusts' final recovery will be determined using his methods of calculation, based on the repurchase dates ordered by the Court.  Snow Direct (PX 1110) ¶¶ 11, 19; Tr. 1891:24-1892:2.

total of these calculations forms the amount the Trusts seek as damages for liquidated Loans (other than for certain IndyMac Loans, discussed below).

123.    Second, to calculate the Trusts recovery for Loans that have not liquidated, Snow applied the same basic methodology.  He summed the Loan's unpaid principal balance, and accrued, unpaid interest (at the note rate) through an assumed repurchase date.  *Id.* ¶ 19.  As he explained, if the Court orders repurchase as of the date of judgment, there would be no prejudgment interest to add.  *Id.*  Snow applied this approach to all non-liquidated loans, including those that are modified, delinquent and otherwise not fully performing but are capable of being repurchased. Tr. 1898:23-1899:1.

124.    Finally, Snow offered an estimate of damages for the 3,523 IndyMac Loans for which Loan Files were not available and for which Holt did not find a material defect based on his limited review of non-loan file sources, but for which the Trusts proved breaches through Lipshutz's extrapolations (the "Marginal IndyMac Loans").  Snow first calculated damages for all the IndyMac Loans, using a "Monte Carlo" simulation, Snow Direct (PX 1110) ¶ 27, which is "a widely used technique that employs repeated use or iterations of a model based on probabilities to create a range or distribution of outcomes (damages, in this case)," *id.*  Snow calculated potential damages amounts for each IndyMac Loan, randomly selected Loans from each Trust at the breach rates provided by Lipshutz, and then calculated the aggregate damages for those Loans.  *Id.* ¶¶ 27-29.  He repeated this process 10,000 times, producing a distribution of possible aggregate damages for the IndyMac Loans, with the median being the statistically most likely outcome.  *Id.* ¶ 27.  Snow performed this analysis separately for IndyMac Loans that are liquidated and for those that remain in the Trusts.  *Id.* ¶¶ 40, 41.  From these amounts, Snow then subtracted the total of the Purchase Prices he had calculated for any IndyMac Loan that Holt found to be materially defective, resulting in estimated damages for the liquidated and non-liquidated Marginal IndyMac Loans.  *Id.* ¶¶ 39-41.

## 2.    Carron's Response To Snow's Testimony

125.    UBS's rebuttal expert, Carron, did not dispute the reliability of Snow's calculations of damages and Purchase Prices for individual liquidated and non-liquidated Loans, or Snow's use of a Monte Carlo simulation to determine damages for the Marginal IndyMac Loans.  Carron Direct (DX PM) ¶¶ 27-34.  Instead, he offers four criticisms that provide no basis to question Snow's work (i) Carron criticizes aspects of Snow's "future damages model" that Snow presented as an alternative equitable remedy—but these criticisms have no continued relevance, as the parties agreed at trial that repurchase is the proper remedy for non-liquidated Loans, Tr. 1884:4-23; (ii) Carron also presented calculations using a different rate of prejudgment interest, than the 9% rate designated by statute for contract damages actions, CPLR 5001(a), Carron Direct (DX PM) ¶ 45 ("I modify Dr. Snow's model to use 1-month LIBOR instead of 9% to calculate the present value of Past Repurchase Damages") and 46 n. 23 ("I accrue Repurchase Amounts using 1-Month LIBOR, which is lower than the prejudgment interest rate used by Dr. Snow")—but as the appropriate rate is to be decided by the Court, and Carron offers no opinions as to why an alternative rate would be appropriate; (iii) Carron asserts that Snow estimated damages for 40 Loans which UBS previously "agreed" to repurchase, *id.* ¶¶ 28-29—but neither Carron nor UBS presented evidence that UBS has *in fact* repurchased these Loans or paid equitable damages for breaches related to them; and (iv) Carron summarily asserts that the Trusts' recovery should be offset in the amount of payments that Assured made to certain Certificateholders, *id.* ¶ 37—but that opinion does not call Snow's methods of calculating damages into question.  *See* Part XI.C, *below*.  In sum, Carron's criticisms provide no basis for the Court to reject Snow's testimony.

## 3.    UBS's Cross-Examination of Snow

126.    UBS's cross-examination of Snow focused on the criticisms identified by Carron, none of which identified any flaws in Snow's methods.[38]

---

[38]   UBS's *Daubert* motion to exclude Snow's testimony, Dkt. 323, is denied.  While UBS moved to strike Snow's calculations for the Marginal IndyMac Loans because they were "new," even if they were, the Court did not limit the scope of reopened expert discovery. Dkt. 280 at 8.  While UBS also asked to exclude those same calculations because

## DISCUSSION

127.    The Trusts bring a claim for UBS's breach of express contractual warranties in the PSAs, the operative contracts.  *CBS Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 503 (1990) (breach of express warranty action grounded in contract).

> [A] warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

*Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.).

128.    "To prevail on a breach of warranty claim, the plaintiff must show (1) that it entered into a contract with the defendant, (2) the contract contained an express warranty by the defendant with respect to a material fact, (3) the warranty was part of the basis of the bargain, and (4) the defendant breached the express warranty."  *LaSalle Bank Nat'l. Ass'n. v. Merrill Lynch Mortg. Lending, Inc.,* No. 04 Civ. 5452 (PKL), 2007 WL 2324052, *8 (S.D.N.Y. Aug. 13, 2007) (applying breach of warranty standard to a commercial MBS trust's claims for breach of contractual warranties) (citing *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d  628, 642 (S.D.N.Y. 1999) (citing *CBS*, 75 N.Y.2d at 503); *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, 2013 WL 372149, at *7 (S.D.N.Y. Jan. 31, 2013) (same); *La Salle Bank Nat. Ass'n v. CIBC Inc.*, 2011 WL 4943341, at *3 (S.D.N.Y. Oct. 17, 2011) (same).

129.    The Trusts have met the first three elements of their claim.  The parties entered into the PSAs, which contained express warranties.  SOF ¶¶ 10-24.  These warranties were made with respect to material facts, *i.e.*, facts which formed part of the PSAs.  *Ainger v. Michigan Gen. Corp.*,

---

Snow provided them for the first time at his deposition, Dkt. 324 at 9-11, exclusion of supplementary expert testimony is warranted only if it is not disclosed "sufficiently in advance of trial [so] that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Fed. R. Civ. P. 26 Advisory Comm. Notes.  There was no prejudice here: UBS (i) received Snow's IndyMac calculations five months before trial; (ii) deposed Snow at length about the calculations; and (iii) reserved its rights to re-depose Snow further about them, but opted not to do so.  *Lutes v. Kawasaki Motors Corp., USA*, No. 3:10-cv-1549, 2015 WL 1395898, at *3 (D. Conn. Mar. 25, 2015) (materials "outside the bounds of [the] initial expert report" disclosed at expert's deposition were admissible if defendants suffered no "prejudice . . . in light of their having had the opportunity to depose [the expert] on these very topics.").

476 F. Supp. 1209, 1227 (S.D.N.Y. 1979) (an express warranty context "was 'material,' in the contract sense, as it was 'part of the basis of the bargain'"), *aff'd*, 632 F.2d 1025 (2d Cir. 1980), *adopted in CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503 (1990); *see also Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 Civ. 4062 (JPO), 2013 WL 372149, at *7 (S.D.N.Y. Jan. 31, 2013) (where "it [was] undisputed that the parties . . . entered into a contract, that the contract contained warranties, and that those warranties were a basis of the bargain . . . [t]he only question . . . [was] whether the warranties at issue were breached")  And, as the Second Circuit held, under New York law, because the warranties were included in a "representation and warranties" section of the PSAs, they too were part of the parties' bargain.  *Metromedia Co. v. Fugazy*, 983 F.2d 350, 360 (2d Cir. 1992) (citing *CBS Inc. v. Ziff-Davis Publishing Co.*, 75 N.Y.2d 496, 503-04 (1990)); *see also Morgan Guar. Trust Co. of New York v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 Civ. 8613 (SAS), 2002 WL 818082, at *13 (S.D.N.Y. Apr. 30, 2002).

130.    The only remaining issue as to UBS's contractual liability is whether UBS breached its warranties.  *See Ainger*, 476 F. Supp. at 1227 ("[A] claim for relief in breach of warranty is complete upon proof of the warranty as part of a contract and proof of its breach"); *Ziff-Davis*, 75 N.Y.2d at 503-04 ("Once the express warranty is shown to have been relied on as part of the contract, . . . [t]he right to indemnification depends only on establishing that the warranty was breached[.]"); *LaSalle Bank*, 2007 WL 2324052, at *8 (same, for warranty in a commercial MBS contract).  Because an RMBS sponsor breaches such warranties, if at all, on the date it makes them, *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 589 (2015); *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 867-68 (2d Cir. 2015), the Trusts must prove that the facts which UBS warranted as to a Loan were untrue on the date it made the relevant warranty.

131.    In addition to addressing whether and how UBS breached each of the warranties at issue, the Court must address whether the Trusts can recover for those breaches under Section 2.03 of the PSAs, which provides:

> [UBS] hereby covenants that within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to this Section 2.03 which materially and adversely affects the interest of the Certificateholders . . . in any Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall . . . repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below.

SOF ¶ 25; PX 49 at 73-74; SOF ¶ 28; PX 110 at 101-04; PX 182 at 85-87.  Accordingly, if the Court determines that UBS breached a warranty, it must then determine if that breach caused an MAE.  Further, with respect to liquidated loans, for which the Court must calculate pre-judgment interest, the Court must also determine when UBS first discovered or received written notice of that breach.

132.    To address these questions most efficiently, the Court will examine each warranty, and each type of breach of warranty alleged, in turn.  For each type of breach, the Court will examine in sequence whether (i) the breaches occurred; (ii) the breaches caused MAEs; and (iii) when UBS discovered and/or received written notice of the breaches.  To enable that analysis, however, the Court will first address the evidentiary rules that guide its analysis and its construction of the requirements of Section 2.03—specifically that provision's requirement that a breach "materially and adversely affects" the interests of the Certificateholders and its requirement that UBS "discover" or receive "written notice" of breaches.  Following this analysis, and its breach-by-breach analysis, the Court will turn to issues regarding the Marginal IndyMac Loans, the remedies to which the Trusts are entitled, and UBS's defenses.

## I.    BURDENS OF PROOF

133.    The Trusts have the burden of proving each disputed element of their claims by a preponderance of the evidence.  *E.g.*, *Raymond v. Marks*, 116 F.3d 466, 466 (2d Cir. 1997).  If the Trusts present evidence establishing an element of their claims, UBS must come "forward with evidence . . . to meet or rebut the evidence which supports the cause of defense is then cast upon the other party."  57 N.Y. Jur. 2d Evidence and Witnesses § 164 (2016) ("After a party has introduced adequate evidence in support of his or her cause of action or affirmative defense, the

duty of going forward with evidence . . . to meet or rebut the evidence which supports the cause of defense is then cast upon the other party.").  If UBS fails to do so, the element of the Trusts' claims is established.

134.   UBS cannot rebut the Trusts' evidence with speculation or conjecture.  *E.g.*, *In re Balfour Maclaine Int'l Ltd.*, 873 F. Supp. 862, 869 n.9 (S.D.N.Y. 1995) (in insurance dispute over lost coffee pallets, defendant did not rebut plaintiff's *prima facie* showing that coffee was deposited in certain warehouses during coverage periods, because defendant's "presume[d], without proper support, that much of the evidence relied upon by insureds in making out their prima facie case is fraudulent"), *aff'd sub nom. In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68 (2d Cir. 1996); *AIG Glob. Secs. Lending Corp. v. Banc of Am. Secs. LLC*, 646 F. Supp. 2d 385, 398 (S.D.N.Y. 2009) (in securities fraud case, plaintiff met its burden of proof, in large part through expert testimony, where defendant "did not present any evidence" in support of its attack on plaintiff's expert other than the testimony of its own expert, which was contradicted by the evidence); *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 514 n.50 (S.D.N.Y. 2002) (in patent case, plaintiff met burden of proof where, in response to plaintiff's *prima facie* showing of ownership, defendant offered "no credible evidence" and offered "mere speculation" in rebuttal).

## II.   EVIDENTIARY STANDARDS

135.   The Court applies the following evidentiary standards:

136.   **Expert Evidence**.  The Trusts may meet their burden of proof through expert testimony.  *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 459 (2d Cir. 2007) (expert testimony is sufficient to establish element of breach of warranty claim) (collecting cases); *Dawson v. G. Malina, Inc.*, 463 F. Supp. 461, 468 (S.D.N.Y. 1978) (plaintiff established that defendant breached express warranties concerning antique vase after court gave "considerable weight" to plaintiff's expert's testimony); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 39 Misc. 3d 1220(A), 2013 WL 1845588, at *35-36 (N.Y. Sup. Ct. Apr. 29, 2013) (RMBS plaintiff

made *prima facie* showing that MLS representation was breached through loan review findings of re-underwriting expert).

137.    The Court accords additional weight to expert testimony that is consistent with other record evidence. *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983) (in disability benefits action, expert's testimony supported by "substantial record evidence" satisfied the plaintiff's burden of proof); *AIG*, 646 F. Supp. 2d at 397-98 (S.D.N.Y. 2009) (in securities fraud case, expert testimony that "found independent support in the record evidence" met plaintiffs' burden of proof).

138.    The Court also accords additional weight to expert testimony that is not disputed, or is disputed only on the bases of legal arguments that the Court does not accept. *See MBIA*, 39 Misc. 3d 1220(A), at *28 (finding that Countrywide breached an MLS representation as to 1,414 loans where Countrywide failed to rebut plaintiff's *prima facie* showing based on expert findings); *see also Cash v. Cty. of Erie*, 654 F.3d 324, 338 (2d Cir. 2011) ("jury was entitled to rely on unrebutted expert testimony" concerning adequacy of defendant's policy to protect prisoners from harm); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 511 F. Supp. 486, 493 (S.D.N.Y. 1981), *aff'd,* 687 F.2d 563 (2d Cir. 1982) (granting injunction based on expert testimony and finding testimony credible in part because it was unrebutted); *Farr Man Coffee, Inc. v. P.T. TRIKORA LLOYD*, No. 87 Civ. 4973 (BN), 1990 WL 29437, at *2 n.4 (S.D.N.Y. Mar. 15, 1990) (giving "substantial weight" to "unrebutted expert opinion testimony" in dispute against shipper concerning coffee damaged during transportation); *see also Kawache v. United States*, 471 F. App'x 10, 12-13 (2d Cir. 2012) (affirming district court's decision to credit expert's testimony, despite claims he falsified records and presented false testimony, because such credibility attacks did not "survive[] the standard of review" "especially in light of the fact that the appellant presented no direct evidence to contradict him").

139.    **Sampling and Extrapolation**.  As an evidentiary matter, the Trusts may use sound expert statistical evidence to show the likelihood of material breaches within a population of Loans and to estimate their equitable recoveries for those Loans, as "[s]tatistical sampling is a widely

used method to present evidence from a large population of data." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 30 Misc. 3d 1201(A), 2010 WL 5186702, at *4 (N.Y. Sup. Ct. 2010) (citing *Lavin-McEleney v. Marist College*, 239 F. 3d 476 (2d Cir. 2001) (allowing sampling to show gender-based salary disparity for both liability and damages) and *Muller v. Eno*, 14 N.Y. 597, 603 (1856) (in case for breach of contractual warranty, allowing sampling of several of bales of hay to prove the defective state of all bales)); *see also Flagstar Bank, FSB*, 920 F. Supp. 2d at 514 (at trial, accepting sampling evidence as proof of breach of RMBS warranties for "defective, defaulted loans"); *see generally* David H. Kaye & David A. Freedman, Reference Guide on Statistics, in Fed. Judicial Ctr., Reference Manual on Scientific Evidence 211, 214 (3d ed. 2011) ("Statistical studies suitably designed to address a material issue generally will be admissible under the Federal Rules of Evidence."). The Court finds the Trusts' statistical evidence and Dr. Lipshutz's methodology to be sound, as discussed below. *See* Part XII, *below*. The separate legal question of whether the PSAs allow the Trusts to use this evidence to prove liability and remedies is addressed below as well. Part XII, *below*.

140.     **Imputation.** The Trusts may prove elements of their claims concerning UBS's knowledge and action through evidence of the knowledge and actions of UBS's employees and agents, and the knowledge and conduct of such individuals is presumptively imputed to UBS. *See Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004) (noting "usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal"); *Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it. Underlying the rule is the presumption that an agent has discharged his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency.") (citations and internal quotes omitted); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 281 n.10 (S.D.N.Y. 2012) (imputing scienter and statements of Goldman's Mortgage Department Head to defendant) (citations omitted).

141.   **Later-in-Time Evidence.**   As discussed below (Parts III, IV, and IX), the Warranties at issue are warranties of fact.  It is a basic tenet that later-in-time evidence, such as bankruptcy filings or evidence of undisclosed mortgages revealed through MERs, may be used to prove the existence of a fact at an earlier time. *United States v. Goffer,* 721 F.3d 113, 124 (2d Cir. 2013) ("Relevancy cannot be reduced to [a] mere chronology; whether . . . evidence occurred prior or subsequent . . . is not necessarily determinative to its admissibility and therefore its probative value.").   Accordingly, the Court will consider evidence arising after the operative date of a Warranty in considering whether the Warranty was violated on that date. *FHFA v. Nomura*, 74 F. Supp. 3d 639, 652-53 (S.D.N.Y. 2015) ("*FHFA*") (post-origination evidence is relevant "if it helped to demonstrate that an Originator did or did not follow its own underwriting guidelines"); *Flagstar Bank*, 920 F. Supp. 2d at 505-06 (re-underwriting expert's testimony based on use of post-origination salary verification tools was reliable evidence of guideline representation breaches); *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, Civil Action No. 11 Civ. 30039 (MGM), 2015 WL 2130060, at *14 (D. Mass. May 7, 2015) ("[T]he guidelines generally required underwriters to verify the reasonableness of information and to follow up on red flags. Thus, post-origination sources may provide circumstantial evidence of failures in that regard, as many courts have held.").

142.   **Continuity.**  If the Trusts prove that a condition—such as a breach or an MAE— existed as of a certain date, the Court applies the "general presumption of the continuance of a status or condition once proved to exist." *Jund v. Town of Hempstead*, 941 F.2d 1271, 1288 (2d Cir. 1991) (citing *McFarland v. Gregory*, 425 F.2d 443, 447 (2d Cir. 1970)); *see also Larsen Baking Co. v. City of New York*, 30 A.D.2d 400, 406 (2d Dep't 1968) ("[c]onditions once shown to exist are presumed to continue"), *aff'd.* 24 N.Y.2d 1036 (1969); McCormick on Evidence § 344 (7th ed. 2013) (noting "the general presumption of the continuance of a status or condition once proved to exist").  As the Second Circuit has explained, "a presumption of continuity is a reasonable grounds on which to draw inferences where (1) a situation or the circumstances surrounding it do not go through an apparent material change and (2) the lapse of time is not great

enough to suggest that unknown circumstances or causes, in the normal course of events, will have changed the situation." *Jund*, 941 F.2d at 1288 (quotation omitted); *see also Shepherd v. Powers*, No. 11 Civ. 6860 (LTS) (RLE), 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012) (denying motion to dismiss § 1983 claim regarding improper care for inmates as of March 2010, as deficiencies identified in November 2009 report were presumed to continue to exist four months later).

143.     Similarly, if the Trusts prove that a condition existed as of a certain date, the Court applies "the backward relation presumption," under which "if a situation exists at one point in time, it is to be presumed that it existed before that time." *McFarland,* 425 F.2d at 447; *see also Larsen*, 30 A.D.2d at 406 ("[continuity] presumption may be applied backwards in time from a subsequent condition"). As the Second Circuit has explained, "the subsequent existence of a condition is some evidence of its prior existence at least when the time span is not too great and there is no suggestion of an intervening circumstance that might call its previous existence into question." *United States v. Sliker*, 751 F.2d 477, 484-85 (2d Cir. 1984) (allowing jury to infer bank was insured at the time of robbery upon evidence that bank was subsequently insured).

144.     Even absent these presumptions, moreover, the Court may draw a reasonable inference that a condition that existed on a certain date continued to exist before or after that date. *Id.* (affirming district court's decision to allow jury to infer the continuance of a conspiracy).

## III.     THE CONTRACTS' REPURCHASE PROVISION

145.     In Section 2.03 of the PSAs, UBS covenanted that "within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty . . . which materially and adversely affects the interests of the Certificateholders . . . in any Mortgage Loan" it would cure the breach or, failing cure, repurchase the affected Loan. PX 49 at 73-74 (MARM 2006-OA2 PSA); PX 110 at 101-04 (MARM 2007-1 PSA); PX 182 at 85-87 (MARM 2007-3 PSA). The New York Court of Appeals has held that

these requirements are not a substantive element of a claim, but rather "procedural prerequisites" to the repurchase remedy. *ACE*, 25 N.Y.3d at 599.

146.    Below, the Court addresses the evidence that specific types of breaches caused a material and adverse effect to the interests of the Certificateholders in specific Loans ("MAEs"), and that UBS discovered those breaches. Parts IV-IX, *below*. To inform that discussion, the Court first addresses the standards for determining that an MAE occurred and for showing that UBS discovered a breach.

### A.    The "Material And Adverse Effects" Requirement

147.    Under Section 2.03, the Trusts are entitled to their repurchase remedy only if a false warranty "materially and adversely affects the interests of the Certificateholders or the Certificate Insurer … in any Mortgage Loan" (the "MAE Clause"). PX 49 at 73-74; PX 110 at 101-04; PX 182 at 85-87; *see U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.*, No. 14 Civ. 2859, 2016 WL 1042090, at *2 (2d Cir. Mar. 16, 2016), *as amended* (Mar. 18, 2016) (holding that "'material[ ] and adverse[ ]' effect language" in MLPA "is part of the contractual provision through which the Trust might seek repurchase as one recourse for a breach of representations and warranties made in the MLPA.").

### 1.    UBS's False Warranties Materially And Adversely Affect The Interests Of The Certificateholders, And Those MAEs Persisted

148.    An effect is "material" if it "would affect a person's decision-making," and it is "adverse" if it is "opposed to one's interests." *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) (quoting *Black's Law Dictionary* (7th ed. 1999) & *Merriam–Webster's Collegiate Dictionary* 19 (11th ed. 2003)).

149.    The meaning of the "interests of the Certificateholders … in any Mortgage Loan" flows from the contracts, which create RMBS trust funds "for the benefit of the Certificateholders." PX 49 at 7 (MARM 2006-OA2 PSA, Preliminary Statement); PX 110 at 7 (MARM 2007-1 PSA, Preliminary Statement); PX 182 at 77 (MARM 2007-3 PSA, Preliminary Statement). Payments to the Certificateholders "are contingent on the cash flows generated by the

underlying" Loans. *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 165 (2d Cir. 2014). Accordingly, the Certificateholders have an interest in the "value of the . . . Loan[s]," PX 49 at 67 (MARM 2006-OA2 PSA § 2.03), which includes the present discounted value of the payments the borrower promised to make, as well as the right to receive distributions from the pool of funds generated by those payments. *Cf. NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (under "basic securities valuation principles," the fact that borrowers "were less creditworthy than … represented" "immediately" affects the value of RMBS certificates backed by those loans, because it increases the "credit risk profile" of the certificates).

150.     As this Court held, a breach causes an MAE if it causes a "significant increase in the risk of loss" in the Loan. *MARM II*, Dkt. 249 at 27; *see also Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*, 2014 WL 1259630, at *4 (S.D.N.Y. Mar. 27, 2014), *aff'd sub nom. Wells Fargo Bank, NA v. JPMorgan Chase Bank, N.A.*, No. 14-1414-CV, 2016 WL 1042020 (2d Cir. Mar. 16, 2016) (collecting cases) (recognizing a "growing consensus among New York courts [that] repurchase conditions are triggered when the plaintiff's risk of loss increases and not just when that risk actualizes").[39] The Trusts need not show that the breach cause an actual loss, *id.*, nor that any actual loss suffered was caused by the breach. *E.g., Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12, 18 & n.14 (1st Cir. 2002) (under New York law, it is "irrelevant that the loans may have suffered a loss in value because of changing market conditions rather than" the false warranties, because "a repurchase provision is designed to shift the risk to the selling party in the event that a dispute arises"); *Flagstar*, 920 F. Supp. 2d at 511 ("[I]t is irrelevant to the

---

[39] *Accord Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 131 (S.D.N.Y. 2014) ("material and adverse effect" does not require showing of actual default); *Syncora*, 874 F. Supp. 2d at 339 ("Consistent with the rationale underlying … insurance law principles … , Syncora may establish a material breach of the I&I by proving that EMC's alleged breaches increased Syncora's risk of loss on the Policy, irrespective of whether the breaches caused any of the HELOC loans to default."); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412, 412-13 (1st Dep't 2013) (affirming summary judgment ruling that party to RMBS contract was not required to show causation to recover for breach of warranty claim).

Court's determination of material breach what Flagstar believes ultimately caused the loans to default").

151.    Because Loans are valued based on their risk of loss, the question is "how [the Loan] would have been valued … *at the time of the sale*" had "any breaches proved by" the Trusts been disclosed. *Allegheny*, 500 F.3d at 185 (emphasis added); *cf. Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 335 (S.D.N.Y. 2012) (in RMBS contract, because an insurer relied on "warranties as to the accuracy of material information about the … loans … in deciding whether to insure the Transaction how to price that risk[,] . . . [a] a breach of these warranties, if proven would have adversely affected [the insurer's] interests"); *Assured*, 892 F. Supp. 2d at 602 (RMBS insurer had "an interest in receiving complete and accurate information" in the loans before deciding whether to issue a policy").  That is, the impact of a breach is measured by "the difference between the value of [a Loan] as warranted and its value *as delivered*[.]"  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) (emphasis added); *accord Ziff-Davis*, 75 N.Y.2d at 506 (the "only value" of express warranties is that they are "continuing promises by [the warranting party] to indemnify [the warranted party] if the facts warranted proved to be untrue").[40]

152.    The Trusts have proved that all of UBS's breaches resulted in the Loans having significantly higher risk of loss than warranted to the Trusts, at the very moment UBS made those Warranties to the Trusts.  Nothing else is required to prove an MAE.  "The very purpose of [warranties in an RMBS] contract is the allocation of risk" among the parties, *Assured*, 2014 WL 3288335, *8, and, like insurers, the Certificateholders assumed the "risk [of] every possible problem with the loans not covered by the representations and warranties," but took "*no risk on non-conforming loans*," *id.* at *2 (emphasis altered).  *See also United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, No. 15 Civ. 496, 2016 WL 2956743, at *9 n.13 (2d Cir. May 23,

---

[40] This understanding is consistent with the general rule applied in cases involving the materiality of false statements. *E.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 460 (1976)  (in assessing materiality under the securities laws, courts examine "the difference" between false statement and the truth).

2016) (under similar RMBS repurchase remedy, the "parties . . . bargained precisely in an alternative fashion to provide investment-quality loans or to repurchase defective loans sold[.]") (emphasis removed). Because the Loans were significantly riskier than UBS warranted, UBS must repurchase them. *See LaSalle Commercial Mortg. Sec., Inc. v. Bank of Am., N.A.*, No. 13 Civ. 5605, 2014 WL 4124249, at *7 (N.D. Ill. Aug. 21, 2014) (under CMBS contract, allegations that breaches "significantly decreased the value of [the] loans" established that the alleged breaches caused MAEs) (citing *Allegheny*, 500 F.3d at 185)).[41]

153.    Even if the repurchase provision required an increased risk of loss at the time the remedy is triggered, the Trusts have made that showing. Because the inaccurate information concerning the Loans related directly to key credit characteristics of the Loans, such Loans would be expected to bear significantly increased risks at all points after origination. Holt Direct (PX 1103) ¶ 10 ("[A]n imprudently underwritten loan cannot subsequently be rendered prudent with the benefit of hindsight. For example, if the underwriting guidelines required that the underwriter obtain a verification of the borrower's income and the underwriter failed to obtain such verification, and if it were subsequently determined—post-origination—that the borrower had such income, that would not cure the Material Defect. The risk of loss with respect to the loan was still significantly higher as a result of the failure to obtain the required income verification.").[42]

---

[41] This framework is similar to other cases, in the warranty context, in which causation need not be shown to support a claim. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 185 (2d Cir. 2015) (if insured lies about health on application, her estate can be denied coverage even if the cause of death was unrelated to the undisclosed ailment; similarly, if carrier ships good by route not agreed by the parties, it is liable for destruction of goods in transit, even if destruction was unrelated to route).

[42]    During closing, UBS asserted that Holt admitted "that he did not perform any materiality analysis whatsoever at any point in time," Tr. 2102:2-4. In fact, Holt testified that he performed a materiality analysis, and specifically examined whether breaches were "material," *i.e.*, whether they caused Loans to bear a significantly increased risk of loss. *E.g.* Holt Direct (PX 1103) ¶ 7 ("In my opinion, a material defect is a defect that significantly increased the risk of loss with respect to the Loan"); *id.* ¶ 9 ("In my opinion, a Data Defect or Other Defect is material if it significantly increases the risk of loss, regardless of whether it causes the loan to violate guidelines"); Tr. 1001:13-17 ("Q. In determining whether loans were materially defective, did you apply the test you referred to in your direct testimony that loans, the loans had significantly greater increased risk of loss? A. That is correct."). In the colloquy cited by UBS, Holt appeared to be confused. Tr. 928:6-15 ("THE COURT: Let me understand that you did not, you were not asked to, and you did not do an analysis of whether a defect materially increased the risk of loss to the lender, is that correct, or the certificate holder in this case? THE WITNESS: I did not do any analysis, no, sir."). Holt's confusion in that exchange does not negate the materiality analysis that UBS acknowledged he "clearly" performed. Tr. 1004:8-

This evidence that MAEs caused by UBS's breaches at origination continued thereafter is unrebutted—UBS presents no evidence that the borrowers' circumstances changed so as to dissipate the MAEs at any point.

154.     These heightened risks posed by UBS's breaches almost certainly did not dissipate for the large number of Loans that liquidated.  *See* Tr. 604:2-10 (the Court) ("I would say way back when, when the loan was underwritten, there was a breach of the representation, or actually it became a breach on the date of the closing; and on the date you're giving notice, it has materially and adversely affected the interests of the certificate holders because it had to be liquidated.  I don't know that it's a reasonable contractual construction to say, well, you suffered the loss yesterday so it doesn't count.").  Similarly, it is highly unlikely that these risks dissipated for the even larger number of Loans that modified with losses, or had extended delinquencies.  Tr. 1904:9-12 (Snow) (the economic consequence of a modification is "equivalent to a default on that portion of the unpaid balance"); Tr. 1904:18-4 (Snow) (Loans that went delinquent by 60 days or more have only a 10% chance of fully recovering without a modification).  While the Court hypothesized that risks present at origination might dissipate if the borrower later won the lottery, Tr. 605:19-606:10, the performance of these Loans shows that these borrowers either were not so fortunate, or were unwilling to use their winnings to pay their mortgages.

155.     The Trusts proved that each Loan suffered one or more of these continuing MAEs:

156.     **Altered Loan Terms**.  The Trusts proved that UBS's breaches caused a continuing MAE for any Loan that would not have issued at all, or would have issued on different terms, had the breach been known.  Tr. 1910:12-25 (Snow); *see also* Tr. (Holt) 1129:10-22  (higher interest rates and higher fees are equivalent, as "money is fungible").  This common-sense principle was reflected in the Originators' guidelines, a core purpose of which was to ensure borrower's ability and willingness to repay by conditioning loan approval on the creditworthiness of the borrower and the value of the property. *See Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, 2013 WL 1285289,

---

10 (UBS counsel) (asserting Holt "clearly testified that … he measured materiality … [at] the date of origination"). Furthermore, the facts upon which the Trusts rely to demonstrate MAEs are undisputed.

at *9-10 (S.D.N.Y. Mar. 28, 2013) (in CMBS repurchase case, holding that risk the borrower would have insufficient cash equity was "among those which originally gave rise to origination requirements such as those described in BOA's internal guidelines," and that "such a dearth of capital is necessarily harmful to the interests of the Certificateholders"), *vacated and remanded on other grounds*, 627 F. App'x 27 (2d Cir. 2015).[43]

157.    As Holt explained, "exceptions are usually conditioned on an increased interest rate especially where they are required because one of the big four risk factors identified on the MLS is outside guidelines (DTI, LTV, occupancy status, and FICO score)."  Holt Direct (PX 1103) ¶ 135; *id.* ¶ 9 ("[A]pproval of exceptions is usually conditioned on the borrower paying a higher interest rate, especially where the exception is required because of … credit score …. [T]he lender demands a higher interest payment from the borrower to account for the increased risk associated with the defect.").  Grissom did not disagree, and in fact agreed that exceptions had to be priced, Tr. 635:4-14, by someone other than the original underwriter, Tr. 636:17-637:5.

158.    Consequently, the Trusts proved continuing MAEs by showing that if the condition concealed by the breach was revealed, the Loan would not have qualified under the terms of the program under which it was issued without an exception.  These MAEs continued because, when a borrower made lower interest payments than the ones required by the applicable guidelines, then there was an actual loss of funds flowing into the Trusts.  *See M. Chalom & Son, Inc. v. St. Paul Fire & Marine Ins. Co.*, 285 F.2d 909, 911 (2d Cir. 1961) (materiality of misstatement by insured was established as a matter of law where contract would "have been written at a higher premium than the premium plaintiff paid" had insurer known the truth); *Crotty v. State Mut. Life Assur. Co.*

---

[43]   For example, American Home's guidelines provided that any request to approve a loan that did not comply with guidelines would be "routed … for exception pricing," and that an exception would be approved for the loan "[o]nce the borrower has accepted the pricing terms of the approved exception request[.]" PX U576 at 4 (American Home Mortgage "Exception Procedures").  Similarly, Countrywide's guidelines stated that it would "price[ ] … the guidelines exception" as part of "ensur[ing] the investment quality of the loan." PX U008 at 3.  And IndyMac's guidelines stated that exception loans "require both underwriter approval and special pricing, as determined on a case-by-case basis[.]" PX U248 at 1.  *See also, e.g.*, Tr. 186:7-187:3 (Wu) (when UBS priced RMBS, it was necessary to know information "that could significantly increase the risk of loss" on a loan, such as "FICO," "LTV, DTI[,] … owner occupancy, … [and] the property type[.]"); Tr. 1374:10-16 (Twombly) (UBS's trading desk used collateral characteristics on data tape for "pricing").

*of Am.*, 80 A.D.2d 801, 802 (1st Dep't 1981) (insured's misstatement about suicide attempt in procuring life insurance policy was material as a matter of law, because insurer's "underwriting manual .… specified that where a suicide had been attempted, no life insurance policy was to be issued for at least one year."); *see* Tr. 389:5-390:2 (Grissom) (if a borrower's stated income was unreasonable, an underwriter was supposed to "either decline the loan, or … convert it into a full documentation loan").

159.    The plain terms of the contracts foreclose UBS's closing argument that such breaches do not cause MAEs because they do not necessarily impact the defined payments of principal and interest that a particular Certificateholder receives on a Certificate.  Tr. 2105:1-12 (UBS).  Section 2.03 does not speak of an individual Certificateholder's interest in a *Certificates*, it speaks of "the interest of the Certificateholders (plural) in *any Mortgage Loan*[.]"  PX 49 at 73-74; PX 110 at 101-04; PX 182 at 85-87.  When the Trustee received the Loans "for the benefit" of the Certificateholders, *id.* § 2.01, the Certificateholders received the right to distributions generated by the monthly principal and interest payments made by borrowers on the Loans, which flowed *into* the Trusts.  *E.g.*, PX 264 at 1 (MARM 2007-3 Prospectus Supplement) ("The trust's main source of funds for making distributions on the certificates will be collections on closed end, adjustable-rate loans secured by first mortgages or deeds of trust on residential one- to four-family properties, all of which are negatively amortizing loans"); Snow Direct (PX 1110) ¶ 32.  By referring to the Certificateholders' interests in the Loans, the repurchase provision is concerned with the effect of any breaches on these inflows.  While funds received by the Trusts then flow *out of* the Trusts to Certificates pursuant to the PSAs' 'waterfall' provisions, Reynolds Direct (PX 1106) ¶ 10; Snow Direct (PX 1110) ¶ 32; Tr. 1900:14-1901:9 (Snow) (describing "waterfall" provisions), the MAE clause is not solely concerned with the effect of breaches on those outflows.[44]

---

[44]  During closing, UBS also asserted that the contracts cap the payments that Certificateholders receive, and that any excess funds received by the Trusts are paid to the holders of "residual" certificates, who UBS stated were not Certificateholders.  Tr. 2107:25-2111:1.  In fact, the contracts define Certificateholders to include holders of residual

160.   **Borrower Fraud**.  The Trusts proved that UBS's breaches caused ineradicable MAEs for any Loan affected by a breach revealing borrower fraud.  Both parties' experts agreed that borrower fraud is necessarily material to the underwriting of loans—because fraud shows that the borrower cannot be trusted, it increases the risk of loss.   Tr. 386:10-387:3; 392:10-16 (Grissom); Holt Direct (PX 1103) ¶ 135 ("[W]herever a Data Defect results from fraud or misrepresentation by a borrower, broker, appraiser, or underwriter, it is always material, because fraud or misrepresentation undermines the integrity of the entire underwriting process").[45] Accordingly, where the Trusts showed that a breach revealed borrower fraud, they necessarily showed an MAE, as "fraud is inherently material."  *Flagstar*, 920 F. Supp. 2d at 509-10 (crediting similar testimony, by both parties' re-underwriting experts, "that when a borrower misrepresents his income or omits a debt obligation,  that borrower's overall truthfulness is compromised and the risk of loss associated with that loan increases . . . well supports a finding that evidence of fraud is inherently material").  An MAE related to borrower fraud does not dissipate, and cannot be dissipated, because the owner cannot trust the borrower's truthfulness at any point after learning of the fraud, forever altering the value of the Loan.  *Id.*; *see also Dormer v. Nw. Mut. Life Ins. Co.*, 408 F. App'x 452, 454 (2d Cir. 2011) (insured's misrepresentations were material as a matter of law where insurer's "underwriting guidelines and uncontroverted trial testimony from a[n] … underwriter [for insurer] ma[d]e clear that, had [insured] been forthright in her insurance applications, her applications would have been denied.").[46]

---

certificates. *E.g.*, PX 49 at 22 (MARM 2006-OA2 PSA) (defining "Certificateholder" as a registered holder of a "Certificate"); *id.* at 20 (defining "Certificate" as "[a]ny one of the Certificates executed by the Trust Administrator …  in substantially the forms attached hereto as Exhibits A through F."), *id.* at 231 (providing "Form of Residual Certificate"); *see also id.* at 53 (defining "Residual Certificates" as "specified in the Preliminary Statement"); *id.* at 1 (Preliminary Statement) (providing that "Class R Certificate" and "Class R-X Certificate" each represent "ownership of the sole Class of residual interest" in certain portions of the trust fund).

[45]   *See also* PX 344 at 44 (instructions to UBS's re-underwriting vendor JCIII that "[t]here will be instances of fraud and there is no means to rebut these instances.").

[46]   To be clear, the Trusts do not contend that by proving fraud they prove a *breach*—as UBS observed, the PSAs do not contain a "no fraud" representation. Dkt. 315 at 20.  Rather, if the Trusts prove a breach that reveals the borrower engaged in fraud, it has proved an MAE.

161.   **Unreliable Origination**.  Similarly, the Trusts proved that UBS's breaches caused a continuing MAE for any Loan for which the original underwriter failed to assess the borrower's willingness and ability to repay the Loan.  As UBS recognized in its diligence policy: "Risk does not only extend to individual loan files.  A seller's origination practices … can significantly impact the selection process.  These practices can extend to … [c]ompliance with Seller's underwriting guidelines."  PX 19 at 15.  As the Court recognized, a showing that the underwriter failed to perform a core task in approving a Loan indicates that the underwriter also failed to perform similar core tasks when approving that Loan.   Tr. 2056:22-2057:18 (suggesting an individual underwriter's failure to detect a DTI guideline violation indicated "incompetence" or "poor job performance by the individual [underwriter]").  Just as borrower fraud increases a Loan's credit risk by showing that one cannot rely on the borrower's overall truthfulness, *Flagstar*, 920 F. Supp. 2d at 510, revealing the unreliability of the underwriter increases a Loan's credit risk by showing that one cannot depend on the underwriter's assessment of the borrowers' ability and willingness to repay the Loan.  Such an MAE, like one revealing borrower fraud, cannot be dissipated, as one cannot trust the underwriter's assessment of the borrower's ability to pay at any point after learning of the breach, affecting the Loans' value.

162.   **Missing Documents**.  The Trusts proved that UBS breaches caused MAEs for any Loan that is missing critical documents.  *Cf.* Thomas P. Lemke, *Mortgage-Backed Securities* § 11:10  (West Oct. 2015) (noting that through certain representations and warranties, industry participants "seek[ ] to verify that the mortgage loans have been legally transferred to the MBS issuer (i.e., the transfer qualifies as a true sale) and the appropriate legal opinions have been obtained[.]").  Where warranted title insurance is missing, the Trusts will be unable to receive insurance payments if a borrower defaults or a Loan goes into foreclosure.  Holt Direct (PX 1103) ¶¶ 115.  Where warranted fire insurance or flood insurance is missing, a borrower will be unable to receive insurance payments in the event of fire or flood damage, thereby diminishing the value of the property (if the borrower does not pay for the damage) or the assets of the borrower (if he does), to the detriment of the Trusts.  *Id.* ¶ 95.  As Grissom conceded, "no originator would ever

have closed a loan without the existence of those core documents."  Tr. 649:21-651:14; *see also id.* at 655:4-656:10 (Grissom testifying that, in her prior work for Wells Fargo, she would not purchase loans that were missing critical documents).

163.    UBS concedes that it was possible for it to "cure" breaches of document-based warranties by providing the Trusts with a copy of the missing documents within 90 days, Tr. 2132:14-23 (UBS summation), and that it did not do so.  Consequently, the MAE of these breaches continued throughout the Trusts' ownership of the affected Loans.  As the Court observed, these critical documents are useless to insure against risk unless they can *actually* be produced.  Tr. 2075:13-21 ("It is a rather empty gesture to say, well, in this country, with many title insurers, I surmise that one such title insurer in this country wrote a policy of insurance . . . . [I]f you ever need to collect on it, good luck, because you won't even know whose door to knock on, let alone a policy name.").[47]

### 2.    The Material And Adverse Effects Of UBS's False Warranties Are Measured As Of The Effective Dates Of Those Warranties

164.    During trial, the Court questioned whether the existence of an MAE should be determined as of the time of the breach or as of the time of the notice of the breach.  Tr. 599:23-600:18.  As a practical matter, the Court need not reach the question of the point in time at which Section 2.03 requires an MAE to occur, as the Trusts have shown that all the Loans suffered from continuing or incurable MAE up to the present (or their liquidation date), Part. I.A, and that UBS discovered all breach on or shortly after the Closing Dates, Part II.  To the extent the Court considers this question, it should hold that MAEs are properly measured on the dates the breaches occurred—the Closing Dates.

---

[47]   The MAE of these missing documents is further confirmed by UBS's own practices.  When originating loans, UBS's underwriting guidelines provided that a loan missing necessary documentation would either be subject to a change in price, or entirely ineligible for purchase.  *See* PX 17 at 41 ("In the event a loan is submitted, but does not meet the minimum documentation requirements of the category, it may be considered with a lower documentation level and may be priced accordingly."); *see also* PX 13 (stating that, "[i]f not remedied, [] loans cannot be purchased by UBS [if it is] . . . [m]issing legal files.").  When buying loans to securitize, as Twombly testified, it was "black and white"—if UBS identified a missing document in a loan, then the originator had "to clear it" before UBS would buy that loan. Tr. 1381:19-1382:2.

165.    The truth of the Warranties is determined by the facts existing at the time they were made.  *ACE*, 25 N.Y.3d at 589 (in RMBS contract, because "representations and warranties concern the characteristics of their subject as of the date they are made, they are breached, if at all, on that date"); *Quicken Loans*, 810 F.3d at 866 (construing "materially and adversely affects" language to mean that "[i]mmediately upon effectiveness of the R&Ws, the Trustee was entitled to demand the contractual remedy—cure or repurchase—as to any material breach, and the cause of action therefore accrued at that time[.]").  Accordingly, as discussed, Part II.A.1, *above*, the materiality of a breach of Warranty regarding facts existing at the time of sale is measured "at the time of the sale" by "the difference between the value of [a Loan] as warranted and its value as delivered[.]"  *Allegheny*, 500 F.3d at 185.  This approach does not change simply because the facts revealing the breach are uncovered afterwards.[48]

166.    It follows that the best reading of the MAE Clause is that it speaks in the present tense—as of the time the MAE Clause itself, which was the Closing Date—to refer to any breach that "affects" the Certificateholders' interests as of that same time.  *See Wells Fargo Bank*, 2016 WL 1042020, at *2 (questioning whether it is even possible for an MAE to "occur at a later time than the breach of the representations and warranties themselves").

167.    Moreover, it is well-established that a statement's materiality is assessed with reference to its tendency to affect the audience to which it is addressed, not its future impact.  Thus, the contracts' description of a "breach … which affects" the Certificateholders' interests is best read as describing the *tendency* of that breach to affect those interests as of the time the relevant Warranty was made.  As the Supreme Court has explained, the "natural tendency" standard of

---

[48]   As a general matter, the materiality of a breach of contract is determined as of the time the breach occurred.  *E.g., Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 635 (Stevens, J, dissenting) (in contract law, "[t]he time for determining materiality is the time of the breach . . . . Most significant is the extent to which the breach will deprive the injured party of the benefit that it justifiably expected") (citing and quoting E. Farnsworth, Contracts § 8.16 (3d ed. 1999)).  Similarly, the materiality of false statements is generally determined as of the time those statements were made.  *E.g., Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 165 (2d Cir. 2000) (in securities law, "[m]ateriality is determined in light of the circumstances existing at the time the alleged misstatement occurred"); *United States v. Freedman*, 317 F. App'x 22, 25 (2d Cir. 2008) (in criminal law, the "[m]ateriality [of a perjured statement] is ascertained on the basis of the situation at the time the statement was made.").

materiality provides that a misstatement is material if it "was predictably capable of affecting, *i.e.,* had a natural tendency to affect," the audience to which it was addressed. *Kungys v. United States*, 485 U.S. 759, 770 (1988) (applying natural tendency standard to denaturalization statute). The Second Circuit has explained that this "natural tendency" standard of materiality "is analogous to the securities context, where a statement (or omission) is material if there is a substantial likelihood that a reasonable investor would view it as significantly altering the total mix of information made available." *United States v. An Antique Platter of Gold*, 184 F.3d 131, 136 (2d Cir. 1999) (citations and quotations omitted) (applying natural tendency standard to importation statute).

168.    This "natural tendency" approach is used to assess materiality under insurance contracts. In *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179 (2d Cir. 1984), the Second Circuit examined an insurance contract's "False Swearing Clause," which voided a policy if "the insured has … misrepresented any material fact or circumstance concerning this insurance or the subject thereof." *Id.* at 181 n.4. Noting that the materiality of false statements "consists in their tendency to influence the conduct of the party who has an interest in them and to whom they are addressed," *id.* at 183-84 (citing *Claflin v. Commonwealth Ins. Co.*, 110 U.S. 81, 95 (1884)), the Second Circuit held that the contract's "materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation *as it was then proceeding*," regardless of whether the false statement ultimately affected the outcome of the investigation. *Id.* at 183 (emphasis added). Here, similarly, Section 2.03 effectively insures the Certificateholders— and also, notably, the Certificate Insurer—against the risks of Loans falsely described by UBS's warranties on the Closing Date. *Syncora*, 874 F. Supp. 2d at 335.

169.    Finally, the PSAs should not be given a construction that is "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 Civ. 8440, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (quotation marks and citation omitted). The PSAs' repurchase provision sets forth a straightforward mechanism for UBS to repurchase defective Loans as the Trusts sole remedy; it would be unreasonable to read this provision as conditioning UBS's repurchase obligation on an

investigation of an individual borrower's circumstances years after UBS made it Warranties. That reading would effectively place the burden of this after-the-fact investigation on the Trusts, contrary to the very purpose of UBS's Warranties, which were "intended precisely to relieve the [Trusts] of any duty to ascertain the fact for [themselves.]" *Metro. Coal*, 155 F.2d at 784. It would be unreasonable to assume that the Trusts—the Trustee for which was explicitly exempted from investigating the veracity of UBS's Warranties—intended to assume the risks and burden of such an investigation. *E.g.*, *Forward Indus., Inc. v. Rolm of N.Y. Corp.*, 123 A.D.2d 374, 377 (2d Dep't 1986) (rejecting defendant's interpretation of warranty provision regarding telephone system, as "it defies reason to suppose that the plaintiff, highly dependent on telephone service to remain in business, could have intended to assume the risks of delay *caused* by the defendant's negligence or breach of its affirmative duty to use its best efforts to install an operational system") (original emphasis).[49] Accordingly, the materiality of UBS's violations of those Warranties should be assessed as of the time it made them.

### B. The "Written Notice" Requirement

170.     UBS's cure-and-repurchase obligations arise upon its receipt of "written notice from any party of a breach." SOF ¶ 25; PX 49 at 73-74 (MARM 2006-OA2 PSA).

171.     The Trusts showed, and UBS does not dispute, that UBS received written notices of breaches for 5,973 specific Loans from Assured, Wells Fargo, and U.S. Bank.[50] The Trusts further showed, and UBS does not dispute, that UBS received the Trusts' expert reports on August 7, 2015, which explained in writing all of the specific breaches at issue. *See* PX 947 (transmittal email attaching Holt's report); PX 1109 (transmittal emailing Lipshutz's report).

---

[49]   Moreover, this reading would allow a breach that did *not* cause an MAE at closing (say, a misstated DTI ratio that did not cause an MAE because the borrower had substantial assets) to nevertheless become actionable later on (say, if the borrower lost those assets).

[50]   *See* PX 401-403, PX 437, PX 496, PX 502-504, PX 506, PX 509, PX 510, PX 512, PX 916, PX 1008-1011, PX 1013-1015, PX 1019, PX 1023-1025, PX 1027, PX 1029-1037, PX 1043 (pre-suit breach notice letters). *See also* Part XIII, *below*.

Consequently, and as discussed below, the Trusts have proved that UBS received "written notices" of all breaches at issue.[51]

172.    UBS has not rebutted this proof.  While UBS argues that Assured "withdrew" its breach notices as part of the settlement between UBS and Assured, as Judge Baer correctly observed, "Section 2.03 contains no language about a party's withdrawal of notice[.]"  *MARM I*, 2013 WL 4399210 at *6.  There is thus no basis in the contract to excuse UBS's repurchase obligations based upon its receipt of written notice.

### C.    The "Discovery" Requirement

173.    Independent of its receipt of written notice, UBS's cure-and-repurchase obligations arise "[u]pon its discovery . . . of a breach."  PX 49 at 73-74 (MARM 2006-OA2 PSA).  Although the Trusts proved that UBS received written notice of breaches, the PSAs' "discovery" provision is nonetheless relevant as the Trusts presented evidence that UBS discovered breaches before any of the dates on which UBS received written breach notices, which affects the date at which prejudgment interests begins to run for liquidated Loans.  *See* Part XI, *below*.

174.    The Court previously held that the Trusts must prove that UBS discovered breaches in specific Loans.  Dkt. 249 at 14-17.  While the Court discusses the Trusts' proof of discovery as to various categories of breaches in greater detail below, the Court first explains the standards governing "discovery" under the PSAs.  In short, and as set forth in more detail in this Part, the Trusts proved UBS's discovery with evidence of UBS's actual knowledge, willful blindness, and constructive knowledge of the breaches.  The Court explain these conclusions on a breach-by-breach basis in Parts IV-IX.

#### 1.    UBS Had Actual Knowledge Of Many Breaches

175.    As this Court has held, and as the parties agrees, the Trusts can satisfy the discovery prerequisite by showing that UBS had actual knowledge of the breaches.  Mar. 21, 2016 Hr'g Tr.

---

[51]  UBS asserts that the Trusts' notices were "untimely" and thus that the Trusts could not bring a timely breach-of-contract claim based on those notices.  Those arguments are addressed in the Court's discussion of UBS's affirmative defense regarding the statute of limitations in Part XIII, *below*.

(Pre-Trial Conference) 4:12-18, 51:1-12.  A party has "actual knowledge" of a breach when it "has knowledge of all material facts necessary to understand that" a breach has occurred.  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001) (quotation marks and citation omitted) (discussing "actual knowledge" element of ERISA's statute of limitations (29 U.S.C. § 1132(2)).  The Trusts demonstrated that UBS had actual knowledge of many breaches as a result of the work of their vendors in analyzing the Loans.

176.    A party's knowledge includes the knowledge of its agents acting within the scope of their agency.  *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004); *Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (1985) (citations omitted).  This imputation can extend to independent contractors, if there is sufficient proof that the principal exercises substantial control over their activities.  *Gulf Ins. Co. v. Transatlantic Reins. Co.*, 69 A.D.3d 71, 96-97 (1st Dep't 2009) ("Regardless of whether … recitation [stating that party to contract was an independent contractor] might be effective to disclaim an employment relationship, it is not effective as a disclaimer of an agency relationship," because "'[u]nder New York common law … an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act[.]'" (quoting *New York Mar. & Gen. Ins. Co. v. Tradeline [L.L.C.]*, 266 F.3d 112, 122 (2d Cir. 2001)); *see also Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947) (a "court is not bound by the disclaimer of … agency between the parties in determining their true relationship").

177.    Here, UBS hired its re-underwriting vendors to perform due diligence on the Loans. Dkt. 421 at 2 ("[T]he Vendors were hired to render a single, discrete performance for UBS RESI on a deal-by-deal basis and for specific due diligence functions."); *see also* Tr. 1446:2-1447:1 (Lantz) (regarding Clayton, Bohan, American Mortgage Consultants ("AMC"), Core Logic, Hansen Quality, Collateral Risk Solutions and MGIC); *id.* at 1499:25-1501:10  (Lantz) (regarding JCIII and Navigant); *id.* at 1318:22-1320:25 (Twombly) (regarding Clayton, Bohan, MDMC, and AMC).  UBS exercised substantial control over the vendors' work.  Twombly testified that (i) he "recommended" that vendors change their grades, Tr. 1367:24-1368:4; (ii) he "advised my

71

diligence vendors to provide reasoning that I would have given them," *id.* at 1368:5-8; and (iii) when he overturned a vendor's grade, he "would have shown [the vendors] what they had done wrong," *id.* at 1368:16-1369:2.

178.    Similarly, Lantz testified that (i) "UBS and Williams & Connolly authorized and instructed Naviant and JC[III] on the process to use in order to conduct these reviews," *id.* at 1500:19-22; *see also* 1504:16-1506:19; and (ii) he received emails from JCIII as often as once a day. Tr. 1509:23-1510:2. Contemporaneous documents also demonstrate UBS's continuous control over the vendors' review. *See* Part V, *above*.

179.    Accordingly, under the circumstances of this case, UBS is charged with the actual knowledge of information in the Loan Files, as of the Closing Dates, for the Loans on which its diligence vendors performed pre-securitization diligence reviews.  UBS is also charged with knowledge of information in the Loan Files, as of January 31, 2008, for the additional Loans on which its vendors performed post-securitization surveillance reviews.  Finally, UBS is charged with the knowledge of the information in the Loan Files on which its repurchase vendors, JCIII and Naviant, performed reviews in response to demand letters sent by Assured, Wells Fargo, and the Trustee, as of the dates the vendors reported their review findings to UBS.  *Gulf Ins.*, 69 A.D.3d at 96-97 (imputing knowledge of a rate increase to the principal despite the fact that the parties' agreement named the knowledgeable party as an independent contractor); *accord Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB). 2004 WL 2072536, at *6 n.10 (S.D.N.Y. Sept. 14, 2004) (imputing to plaintiff knowledge of entity that "performed due diligence on the mortgage loans that were part of the D5 Trust and provided information to [the party's] investment advisor, . . . at [that party's] behest in connection with the [at-issue] . . . transaction"), *aff'd sub nom. Steed Fin. LDC. v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66 (2d Cir. 2005); *N.Y. Univ. v. First Fin. Ins. Co.*, 322 F.3d 750, 753 & n.2 (2d Cir. 2003) (imputing third-party insurance investigator's knowledge to insurer); *131 Maine St. Assocs.  v. Manko*, 179 F. Supp. 2d 339, 345 n.4 (S.D.N.Y.), *aff'd*, 54 F. App'x 507 (2d Cir. 2002) ("no doubt" that knowledge of "paid watchdog" from third-

party firm could be imputed to the plaintiffs).  The specific breaches of which UBS had actual knowledge are discussed in Parts IV-IX, *below*.

### 2.    UBS Was Willfully Blind To All Breaches

180.    The Trusts may also satisfy the discovery prerequisite by showing that UBS was willfully blind to the breaches.  *See* Mar. 21, 2016 Hr'g Tr. at 51:13-14 (Court noting that "[w]illful blindness is knowledge[.]").  "[A party] is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where [it] was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom*, 676 F.3d at 35 (citing *United States v. Aina-Marshall,* 336 F.3d 167, 170 (2d Cir. 2003)).  "[W]illful blindness may be inferred from the presence of a pattern of 'red flags' putting [UBS] on notice of the [breaches]."  *United States v. Tusaneza,* 116 F. App'x 305, 306 (2d Cir. 2004).[52]

181.    As the Second Circuit explained, "[t]he principle that willful blindness is tantamount to knowledge is hardly novel," *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 110 n.16 (2d Cir. 2010) (collecting cases), and the willful blindness doctrine has been applied across a wide range of civil contexts.  *See, e.g.*, *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1759 (2013) (Bankruptcy Code); *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 767-70 (2011) (induced patent infringement) (noting that all Courts of Appeals apply willful blindness doctrine to criminal statutes); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 34 (2d Cir. 2012) (DMCA); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84 & n.14 (2d Cir. 2005) (ADEA).  The rationale of those decisions applies fully here: if UBS had "reason to suspect" breaches of its warranties, it should not be permitted to "shield itself from learning of … particular" breaches "by looking the other way."  *Viacom*, 676 F.3d at 35.

182.    It is highly likely that a New York court would apply the "common law" willful blindness doctrine to the discovery provision of the PSAs.  *Id.* at 35.  That doctrine was accepted

---

[52]   A holding that UBS was willfully blind of the breaches of its warranties does not imply that UBS was under any independent duty to investigate those warranties' veracity. *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014).

in New York at common law, *e.g.*, *People v. Sugarman*, 216 A.D. 209, 215 (1st Dep't 1928) (holding that defendant's "lack of knowledge result[ing] from an avoidance of any endeavor to know what happened … amounts in law to knowledge"), and continues to apply in suits governed by New York's version of the Uniform Commercial Code, *e.g.*, *Carr v. Marietta Corp.*, 211 F.3d 724, 732-33 (2d Cir. 2000) (under Article 8 of the N.Y. U.C.C., knowledge can be shown through willful blindness) (collecting cases); *Sav. Banks Trust Co. v. Fed. Reserve Bank of N.Y.*, 738 F.2d 573, 574 (2d Cir. 1984) (similar under Article 4 of the N.Y. U.C.C.); *MCC Proceeds, Inc. v. Advest, Inc.*, 293 A.D.2d 331, 334 (1st Dep't 2002) (similar).   And, notably, the PSAs do not define "discovery" to exclude willful blindness.  *Cf. Meda AB v. 3M Co.*, 969 F. Supp.2d 360, 380 (S.D.N.Y. 2013) (where contract defined "Seller's Knowledge" as "the actual knowledge of any individuals *without inquiry*," knowledge could not be proved through willful blindness) (original emphasis) (quotations omitted).  Accordingly, there is no reason to believe that New York courts would not apply willful blindness to the PSAs' discovery prerequisite.[53]

183.   UBS assured investors that one of the "primary objectives" of its surveillance program was to mitigate losses to investors through the "put-back [of] loans that are un-saleable due to origination deficiency," and that it would "mitigat[e] . . . loan delinquencies" through "the prudent repurchase of nonperforming loans[.]"  *See* Part IV (Background), *above*.  Consistent with these statements, UBS required its surveillance team to conduct loan file reviews of many loans

---

[53]   In an attempt to avoid this conclusion, UBS previously (Mar. 29, 2016 Ltr. from UBS to the Court at 4) cited *Ferring B.V. v. Allergan, Inc.*, but that case is not on point.  4 F. Supp. 3d 612, 626 (S.D.N.Y. 2014).  While *Ferring* states in *dicta* that the plaintiff's "allegations of willful blindness" were insufficient to plead the actual knowledge element of a contractual interference claim, *Ferring* holds that "'allegations of *constructive knowledge*, or a duty to inquire, are inadequate.'"  *Id.*  (emphasis added) (quoting *Business Lenders, LLC v. PKR Stores, LLC*, 2010 WL 4064153 (Sup. Ct. N.Y. Cnty, Sept. 28, 2010) (agreeing that "actual notice is required and allegations of constructive knowledge, or a duty to inquire, are inadequate[.]")); *see also Richardson v. Pratcher*, 48 F. Supp. 3d 651, 673-74 (S.D.N.Y. 2014) (citing *Ferring* for this proposition); *Qube Films Ltd. v. Padell*, 2014 WL 3952931, at *8 (S.D.N.Y. Aug. 12, 2014) (same).  Because willful blindness and constructive knowledge are distinct, *Ferring* is not relevant to whether New York courts would apply a willful blindness standard to the PSAs.  *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.*, LLC, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (Kaplan, J.) ("Constructive knowledge is [k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person.  Conscious avoidance, on the other hand, occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.") (brackets in original) (quotation marks and citations omitted).

that went 60 days delinquent and all Loans that went 90 days delinquent—and through those reviews UBS identified Loans that breached underwriting guidelines. *See* Part IV (Background), *above*. UBS's own internal documents show that, by late 2007, UBS had connected the facts that (i) its diligence on the Loans had been inadequate to screen out defects; (ii) there was a connection between its hasty diligence, high default rates, and potential warranty breaches; (iii) default rates for the Loans had sharply increased; and (iv) the originators that UBS would ask to repurchase the Loans were facing insolvency. *See* Part IV (Background), *above*. UBS thus understood that there was a correlation between its diligence process, defaults, and breaches in the Loans.

184. Taken together, in the circumstances of this case, these facts support the inference that UBS shuttered its surveillance program as part of a conscious decision to avoid reviewing the Loans to confirm that they were materially defective. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 325 (E.D.N.Y. 2009) (finding company was willfully blind to its dealings in counterfeit hoisin sauce based, in part, on evidence that the company "deliberately altered [its] record-keeping practices" to make it difficult to ascertain the amount of sauce it imported and sold), *aff'd*, 409 F. App'x 389 (2d Cir. 2010); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (in securities fraud action, allegations that defendants acted contrary to prior practice could form the basis for proof of conscious misbehavior and recklessness).

185. Notably, UBS precluded itself from offering any alternative explanation of why it shut down its surveillance program. In his Rule 30(b)(6) deposition on behalf of UBS, John Lantz testified that the decision to shutter the program was made by counsel, and UBS's counsel instructed him not to discuss that decision on the basis of attorney-client privilege during discovery. Tr. 1494:12-25; 1495:5-13. The consequence of this invocation is that UBS was precluded from eliciting testimony at trial regarding that decision. *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1642434, at *2-3 (S.D.N.Y. Apr. 20, 2011) (precluding party from offering evidence at trial on subject it had blocked during discovery); *Sec. & Exch. Comm'n v. Payton*, 14 Civ. 4644, 2016 WL 1367237, at *9 (S.D.N.Y. Apr. 5, 2016) (where securities defendant argued

the reason his plea allocution and trial testimony were inconsistent was because his counsel advised him to make certain statements during his allocution, and defendant then asserted privilege over the content of that advice, the Court was left with no basis to credit the defendant's explanation of the inconsistencies).

186.    Even if the Court were to consider Lantz's testimony on this subject—which the Court received only subject to the Trusts' motion to strike, Tr. 1487:4-7—that testimony is not credible.  Lantz testified that, as of late 2007, UBS shut down its surveillance program because UBS's RMBS business "was going away.  This business in general, the mortgage business imploded.  We had already moved to get out of this business, to exit this mortgage business."  Tr. 1487:13-17.  But Lantz's trial testimony that UBS shut down its program for business reasons is flatly contradicted by his deposition testimony, which he reaffirmed at trial, that the decision was made by UBS's *counsel*.  The fact that this decision was made by counsel shows that UBS acted for legal reasons, not business reasons; otherwise, UBS could not have asserted its privilege.  *See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2016 WL 2977175, at *2, *5-6 (S.D.N.Y. May 20, 2016) (holding that discussions among directors and counsel of RMBS sponsor regarding potential sales of RMBS were not privileged).  As UBS stopped issuing RMBS by January 2008, the only legal reasons UBS's could have had at that time to shut down its monitoring of delinquent loans for breaches of warranties was to avoid its legal obligations to repurchase such loans from RMBS it had already issued.

187.    Accordingly, the Court finds that the only inference that can be drawn from the record is that UBS shut down its Surveillance Program because it was aware a substantial and increasing percentage of the Loans were defective; it was aware originators were going out of business and that its ability to put back such loans was diminishing; and it sought to avoid creating a paper trail substantiating the extent of bad loans in the pool at least in part to avoid its repurchase obligations and to hamper any future efforts to enforce those obligations.  Under these circumstances, the Court finds that the Trusts have proved that UBS was willfully blind as to the breaches in all Loans at issue at least as of January 31, 2008, by which time UBS had closed down

its surveillance program.  As discussed below in the context of particular breaches, UBS also had actual or constructive knowledge of many of those breaches earlier, as of the Closing Dates.[54]

### 3. UBS Had Constructive Knowledge Of Most Breaches

188.    The Trusts can also prove that UBS discovered breaches by showing it had constructive knowledge of them.  Recently, the Second Circuit held that a mortgage-backed securities contract "charges a party with discovery of breach … after it has had a reasonable opportunity to investigate and confirm its suspicions[.]"  *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortgage Capital, Inc.* ("*BNY II*"), No. 14-2619 CV, --- F.3d ---, 2016 WL 1658313, at *10 (2d Cir. Apr. 27, 2016).  In so ruling, the appeals court cited with approval the district court's ruling that the term "discovery" created a "kn[ew] or should have known" standard.  *Id.*  (citing *Bank of New York Mellon Trust Co., Nat. Ass'n v. Morgan Stanley Mortgage Capital, Inc.* ("*BNY I*"), 2013 WL 3146824, at *19-20 (S.D.N.Y. June 19, 2013) (collecting cases).  The Second Circuit then remanded the case for a factual determination of the date by which a reasonable period to conduct such an investigation had run.  *BNY II*, 2016 WL 1658313, at *11.

189.    The Second Circuit's holding in *BNY II* was consistent with prior rulings, at the district court level, that "discovery" requirements in PSAs create a "knew or should have known" standard.  *E.g.*, *LaSalle Bank, N.A. v. Citicorp Real Estate, Inc.*, 2003 WL 22047891, *6 (S.D.N.Y. Aug. 29, 2003) (under RMBS contract, "[a] party 'discovers' a breach when it knows or should know that the breach has occurred") (quoting *Morgan Guar. Trust Co. of N. Y. v. Bay View Franchise Mortg. Acceptance Co.*, 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002)); *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 496-97 (S.D.N.Y. 2013) (under RMBS contract, "whether [the defendant] knew, or should have known, of these breaches at the time of its review, is a question of fact").  *BNY II* is also consistent with Supreme Court and Second Circuit precedent, in the limitations context, construing

---

[54]  At a minimum, the Trusts have proved that UBS should be deemed to have had knowledge of each breach in a Loan on the day that that Loan became 90 days delinquent, because such Loans would have been reviewed by UBS had its surveillance program been kept in place.

the term 'discover' to create a constructive knowledge standard.  *E.g.*, *Merck & Co. v. Reynolds*, 559 U.S. 633, 638, 647, 653 (2010) (securities fraud statute of limitation triggered by "discovery of the facts constituting the violation" triggered "once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first"); *Gonzalez v. Hasty*, 802 F.3d 212, 221 (2d Cir. 2015) (FELA statute of limitations, which contains a "discovery-based trigger[,] … begins to run when the plaintiff discovers or has enough information from which he or she should have discovered the injury and its cause") (quotation marks and citation omitted).

190.    The language and structure of the PSAs also support this approach.  The PSAs explicitly trigger various obligations upon "actual knowledge," but do not do so in Section 2.03.[55] Significantly, while Section 2.03 provides the alternatives of "written notice" and "*discovery*" of a breach, Section 8.02(a)(viii), which deals with termination of the Master Servicer, provides the alternatives of "written notice" and "*actual knowledge*" of that event.  *E.g.*, PX 182 at 172 (MARM 2007-3 PSA) (emphasis added).  Because New York law presumes that "[s]ophisticated lawyers … know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning," *BNY II*, 2016 WL 1658313, at *7 (quotation omitted), the use of similar but different terms in a single contract "strongly implies that the terms are to be accorded different meanings." *NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 51 A.D.3d 52, 60-61 (1st Dep't 2008).  The PSAs' use of "actual knowledge" as the alternative to "written notice" in Section 8.02(a)(viii) "strongly implies" that the contracts' use of "discovery" as the alternative to "written notice" in

---

[55]   *E.g.*, PX 182 at 159 (2007-3 PSA) § 5.02(c)(iii)  ("Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree … not to Transfer its Ownership Interest in a Residual Certificate … to any other Person if it has *actual knowledge* that such Person is not a Permitted Transferee.") (emphasis added); –*id.* at 172 (§ 8.02(a)(viii)) (triggering Trustee's knowledge of a termination event upon either written notice or actual knowledge); *id.* at 208 (§ 11.05(a)) ("The Trust Administrator shall use its best efforts to promptly provide notice to each Rating Agency with respect to each of the following of which it has *actual knowledge*[.]"); *id.* at 214 (§ 12.04(e)) ("The Trust Administrator and the Trustee shall promptly notify the Certificate Insurer of … the commencement of any proceeding of which a Responsible Officer of the Trust Administrator or the Trustee, as applicable, has *actual knowledge*[.]") (emphasis added).

Section 2.03 means something other than actual knowledge. *BNY II* makes this "strong impli[cation]" explicit by interpreting "discovery" in an RMBS contract to encompass constructive knowledge. *BNY II*, 2016 WL 1658313, at *10.

191.    Construing "discovery" of breaches to include constructive knowledge of those breaches is also in keeping with the purpose of the PSAs. *See generally Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Monarch Payroll, Inc.*, 2016 WL 634083, at *10 (S.D.N.Y. Feb. 17, 2016) ("A contract must be interpreted 'in a manner that accords the words their fair and reasonable meaning, and achieves 'a practical interpretation of the expressions of the parties.'") (citations and quotations omitted). The Warranties were "intended precisely to relieve [the Trustees, on behalf of the Trusts] of any duty to ascertain the fact for" themselves. *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d. Cir. 1946). The PSAs make this explicit, exempting the Trustee and the Trust Administrator from investigating the veracity of UBS's warranties, PX 49 at 135, 136, 143, 144 (MARM 2006-OA2 PSA, §§ 8.01(i), (iv) (Trustee), 9.01(i), 9.02(iv) (Trust Administrator)); PX 110 at 173, 174, 181, 182 (MARM 2007-1 PSA, §§ 9.01(i), (iv) (Trustee), 10.1(i), 10.2 (iv) (Trust Administrator)); PX 182 at 170, 178 (MARM 2007-3 PSA, §§ 8.01(i), (iv) (Trustee), 9.01(i), 9.02(iv) (Trust Administrator)); *see MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, 295 F.R.D. 77, 87 (S.D.N.Y. 2013) *aff'd*, 2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013) ("[T]he PSAs do not impose on the trustee a duty to assess repurchase demands or investigate possible breaches of representations and warranties in the" Loans). By contrast, as sponsor of the Trusts, UBS was "uniquely positioned to be aware of breaches[.]" *Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 563 (S.D.N.Y. 2014). In short, it accords with the PSAs to apply the constructive knowledge standard of *BNY II*, and "charge [UBS] … with discovery of breach … after it has had a reasonable opportunity to investigate and confirm its suspicions[.]" 2016 WL 1658313, at *10.

192.    Under this standard, UBS was put on notice of facts that showed the breaches. UBS (i) drew "adverse" samples of the Loans to identify Loans with "higher-than-average level[s] of

risk." (PX 19 at 14, PX 103, *see also* Tr. 1287:21-1288:2 (Twombly)); (ii) received reports from its vendors showing that certain Loans breached the PSAs (PX 188, PX 685 at 2-3); and (iii) reviewed those reports, and in some cases, overturned its vendors' results (always doing so without reviewing the Loan Files themselves) (*id.*, *see also* Tr. 1320:19-25, 1367:24-1368:4 (Twombly)).  UBS had the ability to investigate its suspicions before closing—UBS's own policies allowed it to "upsize" adverse selection samples (PX 148 at 75, PX 19 at 19, Tr. 1317:17-1318:6 (Twombly)), and, as a sophisticated entity with significant resources, UBS could have conducted a broader review of the Loan pools in the Trusts by the Closing Dates.  The specific breaches of which UBS had constructive knowledge are discussed in Parts IV-IX, *below*.

## IV.   THE MORTGAGE LOAN SCHEDULE WARRANTY

### A.   Construction Of The MLS Warranty

193.   In Schedule II of the PSAs, UBS warranted that:  "The information set forth in the Mortgage Loan Schedule was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the Mortgage Loan Schedule."  PX 49 at 191 (MARM 2006-OA2 PSA) (Sched. II(i)); PX 110 at 231 (MARM 2007-1 PSA) (Sched. II(i)); PX 182 at 226 (MARM 2007-3 PSA) (Sched. II(1)) (the "MLS Warranty").  The contracts contain a lengthy definition of "Mortgage Loan Schedule," which begins:  "The list of Mortgage Loans (as from time to time amended by the Custodian to reflect the addition of Eligible Substitute Mortgage Loans and the deletion of Deleted Mortgage Loans pursuant to the provisions of this Agreement) transferred to the Trustee as part of the Trust Fund and from time to time subject to this Agreement, attached hereto as Schedule I, setting forth the following information with respect to each Mortgage Loan[.]"  PX 49 at 45-46 (MARM 2006-OA2 PSA);  PX 110 at 56-57 (MARM 2007-1 PSA); PX 182 at 47-48 (MARM 2007-3 PSA) (the "MLS Definition").  The MLS Definition then lists more than forty items of information about each Loan, some of which state that the listed information was "as of" certain dates (including the Cut-off Date, and "origination") while other items do not include date references.  *Id.*

194.    As the parties agree, Tr. 353:5-357:7, the language of the MLS Representation is unambiguous.[56]  Under New York law, an unambiguous contractual provision "must be enforced according to the plain meaning of its terms."  *Banco Espírito Santo, S.A. v Concessionária Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 106 (1st Dep't 2012).[57]

195.    The plain meaning of the MLS Warranty is that UBS warranted that each item of information listed on the MLS would be "true and correct" as of dates referred to in the MLS Definition or, if no specific date was referred to, as of the Closing Date.  This reading is consistent with a recent holding of New York's First Department, which held in *Bank of New York Mellon v. WMC Mortgage, LLC*, 136 A.D.3d 1 (1st Dep't 2015), that a materially similar MLS representation "warrants the truth of the information in the [MLS]" and "warrant[s] against the existence of any material misstatement."[58]  *Id.* at 7; *see also Home Equity Mortg. Tr., Series 2006-1 et al. v. DLJ Mortg. Capital, Inc., et al.*, Index 156016/2012, Dkt. 230 at 4 (N.Y. Sup. Ct., Nov. 8, 2013) (materially similar MLS representation "represented and warranted the truth and accuracy of the information in the Loan Schedule") (Exhibit 1).[59]

196.    While UBS argues (Dkt. 315 (Holt MIL) 18-19; Tr. 121:4-7), that it warranted only that the information was accurately transcribed to the MLS from the loan files, the MLS Warranty says no such thing—it says the information on the MLS "was true and correct."  If UBS, a commercially sophisticated party, *MARM III*, Dkt. 280 at 7, intended something different, "it could well have expressed this intent in the representation by clearly so stating."  *WMC Mortg.*, 136

---

[56]   While the parties offer differing interpretations of the MLS Warranty, that difference of opinion does not make the language ambiguous.  *See Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) ("[A] party cannot create an ambiguity in an otherwise plain agreement merely by urging different interpretations in the litigation.") (citation, alteration, and internal quotes omitted).

[57]   Even if the MLS Representation were ambiguous, UBS would be barred from presenting parol evidence as to its meaning, because UBS's Rule 30(b)(6) witness disclaimed any independent understanding of that provision and UBS asserted privilege to prevent him from answering any questions about the understanding of UBS's counsel.  *See* Dkt. 413-15 (Trusts' Motion to Preclude).

[58]   The warranty at issue in *WMC Mortgage* provided that "[t]he information set forth in the Mortgage Loan Schedule and the tape delivered by [the defendant] to [the plaintiff] is true, correct and complete in all material respects."  *WMC Mortg.*, 136 A.D.3d at 5.

[59]   The warranty at issue in *HEMT* provided that the information in the mortgage loan schedule was "complete, true and accurate in all material respects as of the Cut-Off Date."  *Id.* at 2.

A.D.3d at 7; *see also Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.").

197.    UBS urges that the term "furnished" must refer to transcribing information from the Loan Files, Tr. 370:14-19, but the relevant language states that the information is accurate "at the date or dates respecting which such information is furnished *as specified in the Mortgage Loan Schedule*[.]"  *E.g.*, PX 49 at 191 (MARM 2006-OA2 PSA) (Sched. II(i)).  The Court should not read contractual language to be "superfluous or meaningless," *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 397 (S.D.N.Y. 2011), and UBS's interpretation of "furnished" would render superfluous not only the "as specified" language in the MLS Warranty but also the specific dates listed for information in the MLS Definition—none of which are "transcription" dates.

198.    UBS also argues (Dkt. 315 (Holt MIL) at 19) that the Court's reading of the MLS Warranty would render it identical to the Guideline Warranty and thus meaningless, but this is not so.  For example, an inaccurate statement on the MLS of a Loan's prepayment status would violate the MLS Warranty but not the Guideline Warranty, which does not cover the status of payments made after origination.  Similarly, a failure to verify a borrower's assets would violate the Guideline Warranty, but not the MLS Representation.  The fact that some conduct (*e.g.*, an inaccurate DTI ratio that causes a Loan to violate guidelines) might violate both warranties does not render either warranty superfluous.  *See Home Equity Mortg. Trust Series 2006-5 v. DLJ Mortg. Capital, Inc.*, No. 653787/12, 2014 N.Y. Misc. LEXIS 411, at *20 (N.Y. Sup. Ct. Jan. 27, 2014) (in RMBS contract, if inflated appraisal led to combined LTV ratio over 100%, then loan would breach both representation that guidelines were followed and representation that no loan had a combined LTV ratio over 100%).

199.    In fact, UBS's reading of the MLS Warranty would render it identical to the Guideline Warranty and therefore meaningless.  If UBS's reading were correct, the MLS Warranty would give investors no more assurance than that which the Guideline Warranty already provides.

By providing additional information, some of which is as of the Closing Dates, the MLS Warranty enables investors to value the loans as of the time they are sold to the public.

200.     Finally, UBS argues that the Court's reading of the MLS Warranty effectively turns it into a "no fraud" representation that the parties did not bargain for.  Dkt. 315 (Holt MIL) at 20; *citing NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 152 (2d Cir. 2012) (involving representation that "there was no fraud involved in the origination of any Mortgage Loan").  This is also not so.  For example, a misstated occupancy status violates the MLS Warranty simply by being untrue, but it would violate a "no fraud" representation *only* if the misstatement was the result of fraud.  Accordingly, it is perfectly consistent to conclude that, while UBS did not warrant against fraud, it did warrant the accuracy of the MLS information.  *See Home Equity Mortg. Tr. Series 2006-5 v. DLJ Mortg. Capital, Inc.,* No. 653787/12, 2013 N.Y. Misc. LEXIS 5289, at *16 (N.Y. Sup. Ct. Nov. 14, 2013) (though RMBS contract "did not include a fraud warranty or representation," representation that "information set forth in the [MLS], . . . was complete, true and correct in all material respects" was a warranty of the truth and accuracy of the information in the MLS); *see also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206-07 (2d Cir. 2005) (in commercial MBS contract, warranty that property securing loan in fact had fair market value of 80% of the loan did not render superfluous warranty that loan was a "qualified mortgage," even though a loan had to pass the 80% test to be a qualified mortgage).

201.     In sum, the Court concludes that the MLS Warranty warrants that the information listed on the MLS in fact is true and correct as of the Closing Date or as of the dates referred to in the MLS Definition.  Accordingly, the Trusts can prove that UBS breached the MLS Warranty by showing that an item of information on the MLS was not accurate as of the relevant date.

202.     As discussed in greater detail below, Grissom inaccurately treated the MLS Warranty as one that simply warranted correct transcription of information.  Tr. 348:12-20 (Grissom) ("The MLS rep, and based on my experience, is merely a transcription of the information that is in the loan file to this data file and is evidence of that.").  Consistent with that

83

review, she did not rebut Holt's findings that the information on the MLS was untrue in fact. Grissom Direct (DX LI) ¶ 99 (limiting review to whether "information in the corresponding MLS accurately matched the information in the underlying mortgage loan files"). As a result, Grissom's opinions regarding breaches of the MLS Warranty are of very little relevance and are entitled to little to no weight. *See FHFA*, 74 F. Supp. 3d at 653, 656 (the opinion of an RMBS expert who failed to consider post-origination evidence when assessing the breach of "a representation of fact" had "only limited relevance," and "sp[oke] only tangentially to the determinations that must be made"). Each of the relevant MLS Warranties is discussed.

### B.    The MLS Warranty Regarding Loan Purpose

203.    In the MLS Warranty, UBS warranted that, for each Loan, the MLS contained a true and correct "code indicating the loan purpose (*i.e.*, purchase, rate/term refinance, cash-out refinance)" for each of these Loans, as of the Closing Dates.  PX 49 at 45, 191 (MARM 2006-OA2 PSA) Sched. II(i)); PX 110 at 56, 231 (MARM 2007-1 PSA) (Sched. II(i)); PX 182 at 54, 226 (MARM 2007-3 PSA) (Sched. II(1)).

### 1.    UBS Breached The MLS Warranty Regarding Loan Purpose

204.    The Trusts have demonstrated through expert evidence that, for 98 Loans, the loan purpose stated on the MLS did not match the loan purpose stated in the Loan Files—specifically, that the Loans were warranted as rate-and-term refinance Loans but in fact were cash-out refinance loans.[60]  In 96 instances, Holt based his findings on the loan purpose listed in the HUD-1 Settlement Forms in the Loan Files.  *E.g.*, App. 2, Loan ████████, FID 29046, Col. E (FID: Holt

---

[60] App. 2 (Loan Purpose).

Allegation). [61]  In the other two instances, Holt based his findings on a mortgage verification and evidence the borrower paid off unseasoned loans at closing.[62]

205.   For 95 Loans in this category, Grissom did not dispute the substance of Holt's findings.  *E.g.*, Tr. 706:15-18 (Grissom) (not disputing that Loan ██████████████████ ████████████████████████████████████████  For 17 Loans, Grissom did not dispute that the Loans are materially defective.[63]  For the remaining 78 Loans, Grissom did not dispute that the loan purpose was misstated on the MLS; rather, she asserts that (i) for 64 Loans, the misstatement did not cause a violation of guidelines;[64] (ii) for 13 Loans, she could not underwrite the Loan File;[65] and (iii) for 1 Loan, that the finding is derivative.[66] Even if the Court



[61] To identify the findings for these 96 Loans in Appendix 2, conduct a text search in Column E (FID: Holt Allegation) for "Hud."  *E.g.*, *id.* Loan ██████, FID 12255, Col. E (FID: Holt Allegation) ████████████████████████████████████████████████████████████████████████████

[62] *See id.* Loan ██████, FID 2141, Col. E (FID: Holt Allegation) ████████████████████████████████████████████████████████████████████████████

[63] To identify the findings for these 17 Loans in Appendix 2, filter Column D (Dispute Status) to "Concedes."  *E.g.*, *id.* (Loan ██████, FID 30036, Col. F (FID: Grissom Overall Loan Assessment) ("I am unable to disagree with Holt's ultimate conclusion regarding this loan based on the documents and information available at this time.").

[64] To identify the findings for these 64 Loans in Appendix 2, which tend to contain boilerplate language, such as "Regardless of any variance between," "derivative," or "materially deviated," filter Column D (Dispute Status) to "Undisputed - No Guideline Violation." *E.g. id.* Loan ████████ FID 14046, Col. G (FID: Grissom Rebuttal) (██████████████████████████████████████████████████████████████████); *id.* Loan ██████, FID 11921, Col. G (FID: Grissom Rebuttal) ("Mr. Holt has not indicated that the loan purpose materially deviated from the origination underwriting guidelines."); *id.* (Loan ██████, FID 10752, Col. G (FID: Grissom Rebuttal) ████████████████████████████████████████████████████████████████████████████; *id.* Loan ██████, FID 3189, Col. G (FID: Grissom Rebuttal)).

[65] To identify the findings for these 13 Loans in Appendix 2, filter Column D (Dispute Status) to "Undisputed - Did Not Re-underwrite." *E.g.*, *id.* Loan ██████ FID 30664, Col. F (FID: Grissom Overall Loan Assessment) (responding that the "loan file in its current state is too incomplete to be re-underwritten").

[66] To identify the finding for this Loan in Appendix 2, filter Column D (Dispute Status) to "Undisputed - Derivative."

credited these statements, they would not rebut the Trusts' showing that the MLS Warranty was not true and correct as to the loan purpose of these Loans.

206.    For the remaining three Loans,[67] Grissom disputes Holt's findings based on other evidence in the Loan Files.  In all but one of these instances, however, that evidence does not address Holt's findings,[68] and in the final instance the Court credits Holt's findings, as discussed in Part VI.A.1, *above*.

207.    In sum, the Court finds that UBS breached the MLS Warranty regarding loan purpose for the 98 Loans in this category.

### 2.    UBS's Breaches Caused MAEs

208.    The Trusts presented evidence that cash-out refinance loans are inherently riskier than rate-and-term refinance loans, and thus would have been issued at higher interest rates, an MAE that continues after the Closing Dates.  Holt Direct (PX 1103) ¶ 97 (for cash-out refinances, "the borrower is stripping equity from the property" whereas for rate and term refinances, the rate is adjusted downward and the "borrower's mortgage payment is going down" typically).  Grissom did not dispute this point.  Tr. 706:2-5 (Grissom) ("Q. Now, I believe you testified earlier that a rate and term refinance typically has a lower risk than a cash-out refinance.  Is that right?  A.  Yes, that's how it's perceived.").

209.    The Trusts also presented evidence that, consistent with this increased risk, the originators' guidelines set stricter requirements for cash-out refinance loans than for rate-and-term refinance loans.  Holt Direct (PX 1103) ¶ 97 ("[t]he Originators' guidelines . . . set tighter LTV and loan amount requirements on cash-out refinances than . . . rate-term refinances on primary residence loans"); *id.* ¶ 85 (different "reserve requirements" would apply "depending on the loan's

---

[67]   To identify the findings for these three Loans in Appendix 2, filter Column D (FID: Dispute Status) to "Disputed".

[68]   *Compare, e.g.*, App. 2, Loan ███████, FID: 13124, Col. G ("FID: Grissom Rebuttal") ████████, *with id.* Loan ██████, FID: 13124, Col. H, ("FID: Holt Reply") ████████; *see also id.*, Loan ████████, FID 21353.

purpose"); *see also, e.g.*, PX 173 at 41 (Residential Funding matrix setting separate credit requirements for "Cash-Out Refinance" on the one hand and "Purchase, Rate/Term" on the other; and setting cash-out limits based on the LTV ratio); *id.* (imposing lower LTV/CLTV restrictions for cash-out refinance loans); PX U137 at 1 (Countrywide Guidelines setting the "Maximum LTV/CLTV" for cash-out refinance loans at 65%, but allowing LTV/CLTV ratios of up to 95% for rate and term refinance or purchase loans); PX 67 at 2 (MortgageIT Guidelines requiring the LTV ratio to be calculated differently for cash-out loans).

210.    Consequently, a cash-out refinance loan could not have been issued under guidelines for rate-and-term refinance or purchase loans, and could only have been issued (if at all) under different guidelines at a different price.  *See* PX U716 at 9 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan.  These loan characteristics may include . . . Cash-out refinances"); Tr. 1104:7-1105:17 (Holt) (using rate sheets, originators priced loans based on factors including loan purpose).

211.    Grissom did not dispute these points either.  To the contrary, she testified that where an underwriter found that the stated loan purpose, among other things, differed from the purpose allowed by the guidelines, a loan could not be made unless the underwriter gained approval to grant an exception.  Tr. 329:5-12 (Grissom) (discussing loan purpose as one of the exceptions that "required the underwriter to gain approval from someone else"); *see also* Tr. 621:15-622:4 (Grissom) (testifying that exceptions were necessary for loan characteristics that required that the loan be considered under a specific program).  As Holt testified, Holt Direct (PX 1103) ¶¶ 9, 135, and Grissom conceded, Tr. 635:4-14, 636:17-637:5, approval of exceptions was conditioned on approval of higher interest rates.[69]

---

[69]    While Grissom opines that 64 Loans in this category do not violate guidelines, *see* App. 2, Col. D (FID: Dispute Status), filtered to "Undisputed - No Guideline Violation," Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE.

212.     Consequently, the Trusts have proved that UBS's breaches of the MLS Warranty regarding loan purpose caused MAEs to the 98 Loans in this category by (i) significantly increasing their risk of loss as of origination and the Closing Dates; (ii) causing the Trusts to receive less interest than would have been required on a particular Loan.[70]  Moreover, 69 of the Loans in this category have liquidated, 6 Loans have been modified with losses, and 87 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[71] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

### 3.      UBS Discovered Its Breaches On The Closing Dates

213.     The Trusts proved that UBS discovered these breaches on the Closing Dates.  It is undisputed that UBS and its due diligence vendors performed due diligence on 14 of these Loans.[72]  UBS identified loan purpose as one of the sampling criteria it used to identify loans that could have layered credit risks.  PX 19 at 15 (UBS policies and procedures manual identifying "loan purpose of cash-out refinance in inflated geographic areas/distressed economic areas" as a sample selection criteria presenting layered risk); PX O16 ("AHM61102A," Col. CS); PX O17 ("AHM61102A," Col. CS), PX O19 ("AHM60214A," Col. CS) (UBS due diligence reports listing "purpose type" as factor loans were reviewed for); *cf.* Tr. 1295:12-23 (Twombly) (explaining that UBS's adverse criteria included layered risk factors identified by the due diligence group).  Through its due diligence, UBS determined that some loans in its diligence samples had misstated loan purposes— yet UBS did not update the MLS so that it would reflect the loan purposes that UBS had discovered to be accurate.  *Compare* Cipione Direct (PX 1081), Ex. 15 (Loan ███████, Col. Z ("Confine

---

[70]   Nearly all of the 98 Loans in this category are also affected by other material breaches: (i) for 77 Loans, other violations of the MLS Warranty; (ii) for  11 Loans, breaches of the Maximum LTV Warranty); (iii) for 39 Loans, breaches of the Mortgage File Warranty; (iv) for 7 Loans, breaches of the Hazard Insurance Warranty; and (v) for 89 Loans, breaches of the Guideline Warranty.  *See* Appendix 61

[71]   To identify the findings for these Loans in Appendix 2, filter Columns L (Liquidated), M (Modified with Losses), and N (60 Day Delinquency), respectively, to "Yes."

[72]   The findings for these 14 Loans can be identified in Appendix 2 by filtering Column K  (Due Diligence Records) to "Yes."

Tape Discrepancy Comments")) ███████████████████████████████████
██████████████████████████████, *with id.* Ex. 1 (Consolidated MLS), (Loan ███████,
Col. BK ("Loan Purpose")) ("Rate & Term Refi").  The results would have made a reasonable
person suspicious that Loans outside of UBS's diligence samples also had misstated loan purposes,
and UBS could have, and should have, investigated those suspicions by the Closing Dates.  Finally,
at a minimum, UBS was willfully blind to all breaches as of January 31, 2008.  *See* Part III.C.2,
*above*.

### C.      The MLS Warranty Regarding Property Type

214.     In the MLS Warranty, UBS warranted that, for each Loan, the MLS contained a
true and correct "code indicating whether the Mortgaged Property is a single family residence, a
two-family residence, a three-family residence, a four-family residence, a planned-unit
development, a condominium or a Cooperative Unit," as of the Closing Date.  PX 49 at 45-46
(MARM 2006-OA2 PSA) (defining "Mortgage Loan Schedule"); *id.* at 191 (Sched. II(i)); PX 110
at 56-57 (MARM 2007-1 PSA); *id.* at 231 (Sched. II(i)); PX 182 at 53-54 (MARM 2007-3 PSA);
*id.* at 226 (Sched. II(1)).

### 1.      UBS Breached The MLS Warranty Regarding Property Type

215.     The Trusts have demonstrated through expert evidence that, for 88 Loans, the
property type stated on the MLS did not match the property type stated in the Loan Files—for
example, that the Loans were warranted as being single-family homes but in fact were not.[73]  For
each Loan, Holt based his findings on the appraisal, appraisal search, title search, title insurance,
or other legal documents in the Loan Files that discussed the property type.  *E.g.*, App. 3,
Loan ███████, FID 27172, Col. E ("FID: Holt Allegation") ██████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████.

---

[73] App. 3 (Property Type).

216.    For 87 Loans in this category, Grissom did not dispute the substance of Holt's findings.  For 11 Loans, Grissom did not dispute that the Loans are materially defective.[74]  For the other 76 Loans, Grissom did not dispute the fact that the property type is misstated on the MLS; rather, she asserts that (i) for 72 Loans, the misstatement did not cause a violation of guidelines;[75] and (ii) for 4 Loans, that she could not re-underwrite the Loan File.[76]  These statements, even if credited, would not rebut the Trusts' showing that the MLS Warranty was not true and correct as to the property type of these Loans.

217.    For the remaining Loan, Grissom disputes Holt's finding, but her basis for doing so is unpersuasive:  Grissom cites the wrong part of a document.[77]

218.    In sum, the Court finds that UBS breached the MLS Warranty regarding property type for the 88 Loans in this category.

### 2.    UBS's Breaches Caused MAEs

219.    The Trusts presented evidence that loans made for non-single-family residences (including condominiums, planned unit developments ("PUDs"), and 2- to 4-unit properties) are inherently riskier than loans for single-family units.  Holt Direct (PX 1103) ¶ 93 ("Condominiums

---

[74] To identify the findings for these 11 Loans in Appendix 3, filter Column D (FID: Dispute Status) to "Concedes." *E.g.*, App. 3, Loan ▮▮▮▮▮▮, FID 29111, Col. F ("FID: Grissom Overall Loan Assessment") ("I am unable to disagree with Holt's ultimate conclusion regarding this loan based on the documents and information available at this time.").

[75] To identify the findings for these 72 Loans in Appendix 3, filter Column D (FID: Dispute Status) to "Undisputed - No Guideline Violation." *E.g.* App. 3, Loan ▮▮▮▮▮▮, FID 27172, Col. G (FID: Grissom Rebuttal) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (citation omitted).

[76]  To identify the findings for these 4 Loans in Appendix 3, filter Column D (FID: Dispute Status) to "Undisputed - Did Not Re-underwrite." *E.g.*, App. 3, Loan ▮▮▮▮▮▮, FID 30575, Col. F ("FID: Grissom Overall Loan Assessment") ("In my opinion, this loan file in its current state is too incomplete to be re-underwritten."); *see also*, *e.g. id.* Col.G ("FID: Grissom Rebuttal") (responding "NA" to all MLS Representation property type breaches where Grissom's overall response was to state the loan file was incomplete).

[77]  *Compare* App. 3, Loan ▮▮▮▮▮▮, FID 9830, Col. G ("FID: Grissom Rebuttal") ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *with id.*, Col. H ("FID: Holt Reply") ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

and [PUDs] are typically subject to association fees, and may be subject to additional assessments for costs like repairs to common areas or suits against the association. These additional payments make such properties riskier than standard single-family units ('SFUs'). Also, 2- to 4-unit properties carry additional risks over SFUs because of maintenance costs associated with renting units and the uncertainty of continued rental income."); *see also* PX U008 at 4 (Countrywide Underwriting Philosophy) (ranking property types "varying risk levels" SFR and PUDs as "neutral," "2 units," condominiums and cooperatives as "increases risk," and 3-4 units as "significantly increases risk"). Wu agreed. Tr. 186:20-187:3 (acknowledging that property type was a loan characteristic that "could significantly increase the risk of loss").

220.    The Trusts also presented evidence that, consistent with this increased risk, the originators' guidelines set stricter requirements for loans secured by single-family properties than those secured by other property types. Holt Direct (PX 1103) ¶ 94 ("[I]t is standard for originators to have additional documentation requirements for non-SFU properties, and they commonly put restrictions on what loan programs can be used for such properties. The Originators' guidelines also limited loan programs on the basis of the number of units, such as restricting LTVs over 90% to 2-unit properties."); PX U064 at 4 (Countrywide Guidelines setting more strict LTV/CLTV and credit score requirements for 2-4 unit property types); PX U198 at 2-4 (Countrywide Guidelines providing for same as to 2-unit and high-rise condos); PX U716 at 9 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan. These loan characteristics may include . . . certain property types, such as high-rise condominiums and rural properties . . . . Investment properties and second homes"); *see also* PX 17 at 47 (UBS Credit/Underwriting Guidelines) (noting that "[n]ot all of the property types are eligible for every program offered" and "refer[encing] . . . the individual product matrices to determine the property type eligibility for the product requested").

221.    Accordingly, a loan secured by a non-single-family unit could not have been made under guidelines for loans secured by single-family units, and could have been made (if at all) only

under different guidelines at a different price.  *See, e.g.*, PX U020 at 1 (Countrywide Guidelines stating "Loans that fall outside published guidelines in categories such as . . . property type . . . may only be approved with an exception from either a Divisional SLD or the Secondary SLD"); Tr. 1104:7-1105:17 (Holt) (using rate sheets, originators priced loans based on factors including property type).

222.    Grissom did not dispute these points, but rather acknowledged that a change in property type required the granting of an exception.  Tr. 629:18-24 (Grissom) (agreeing that guidelines required underwriters to document exceptions based on factors including property type).  As Holt testified, Holt Direct (PX 1103) ¶ 9, 135, and Grissom conceded, Tr. 635:4-14, 636:17-637:5, approval of exceptions was conditioned on approval of higher interest rates.[78]

223.    Consequently, the Trusts have proved that UBS's breaches of the MLS Warranty regarding property type caused MAEs to the 88 Loans in this category by (i) significantly increasing their risk of loss as of origination and the Closing Dates; and (ii) causing the Trusts to receive less interest than would have been required on a particular Loan.[79]  Moreover, 52 of the Loans in this category have liquidated, 2 Loans have been modified with losses, and 61 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[80] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

---

[78]   While Grissom opines that 72 Loans in this category do not violate guidelines, *see* App. 3, Col. D (FID: Dispute Status) filtered to "Undisputed - No Guideline Violation," Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE.

[79]   Nearly all of the 88 Loans in this category are also affected by other material breaches: (i) for 58 Loans, other violations of the MLS Warranty; (ii) for 12 Loans, breaches of the Maximum LTV Warranty); (iii) for 24 Loans, breaches of the Mortgage File Warranty; (iv) for 2 Loans, breaches of the Hazard Insurance Warranty; and (v) for 70 Loans, breaches of the Guideline Warranty.  *See* Appendix 61

[80]   To identify the findings for these Loans in Appendix 3, filter Columns L (Liquidated), M (Modified with Losses), and  N (60 Day Delinquency), respectively, to "Yes."

### 3.      UBS Discovered Its Breaches On The Closing Dates

224.    The Trusts proved that UBS discovered these breaches on the Closing Dates.  It is undisputed that UBS and its due diligence vendors performed due diligence on 19 of these Loans.[81] UBS used property types as one of the "adverse criteria" it used to identify loans with risk factors. Tr. 1287:17-1288:2 (Twombly) (explaining that UBS's adverse criteria included risk factors identified by the due diligence group); PX 19 at 14-15 (UBS policies and procedures manual identifying "[s]elect property types (cooperatives, manufactured homes, unique homes)" as presenting heightened risk factors recommended for adverse sample selection); PX 103 at 1 (identifying property type as a common risk factor used in selecting adverse samples); *see also* PX O16 ("AHM61102A," Col. CQ), PX O17 ("AHM61102A," Col. CQ), PX O19 ("AHM60214A," Col. CQ) (UBS due diligence reports listing "property type" as factor loans were reviewed for). Through its due diligence, UBS determined that some loans in its diligence samples had misstated property types—yet UBS did not update the MLS so that it would reflect the property types that UBS had discovered to be accurate.  *Compare* Cipione Direct (PX 1081), Ex. 15 (Loan ███████, Col. Z ("Confine Tape Discrepancy Comments")) ████████████████████████████████ ████████████████████████████████, *with id.* Ex. 1 (Consolidated MLS), (Loan ██████, Col. CD ("Property Type")) ("Townhouse").  The results would have made a reasonable person suspicious that Loans outside of UBS's diligence samples also had misstated property types, and UBS could have investigated those suspicions by the Closing Dates.  Finally, at a minimum, UBS was willfully blind to all breaches as of January 31, 2008.  *See* Part III.C.2, *above*.

### D.      The MLS Warranty Regarding Documentation Type

225.    In the MLS Warranty, UBS warranted that, for each Loan, the MLS contained a true and correct "code indicating the documentation style of the Mortgage Loan" for each of these Loans as of the Closing Date.  PX 49 at 45-46 (MARM 2006-OA2 PSA) (defining "Mortgage

---

[81]   The findings for these 19 Loans can be identified in Appendix 3 by filtering Column K (Due Diligence Record) to "Yes."

Loan Schedule"); *id.* at 191 (Sched. II(i)); PX 110 at 56-57 (MARM 2007-1 PSA); *id.* at 231 (Sched. II(i)); PX 182 at 53-54 (MARM 2007-3 PSA); *id.* at 226 (Sched. II(1)).

### 1.    UBS Breached The MLS Warranty Regarding Documentation Type

226.    The Trusts have demonstrated through expert evidence that, for 38 Loans, the documentation style stated on the MLS did not match the documentation style stated in the Loan Files—for example, that the Loans were warranted as loans requiring full documentation of the borrower's income and/or assets but in fact were loans that required only statements of that information.[82]   For each Loan, Holt based his findings on documents in the Loan Files:  the approval, the loan application, the Desktop Underwriter (DU) approval, or a Form 1008.  *E.g.*, App. 4, Loan ███████, FID 1306, Col. E ("FID: Holt Allegation") ████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████[83]

227.    Grissom did not dispute the substance of any of Holt's findings.  *E.g.*, Tr. 707:2-6 (Grissom) (not disputing that Holt's finding that Loan ███████████████████████████ ████████████████████████████████████████████████.  For five Loans, Grissom did not dispute that the Loans are materially defective.[84]  For the remaining 33 Loans, Grissom did not dispute that the documentation type is misstated on the MLS; rather, she asserts that (i) for 29 Loans, the misstatement did not cause a violation of guidelines;[85] and (ii) for four

---

[82] App. 4 (Documentation Type).

[83] *See also, e.g., id.* Loan ███████, FID 17338, Col. E ("FID: Holt Allegation") (citing the "Loan Application"); *id.* Loan ████, FID 18235, Col. E ("FID: Holt Allegation") (citing the "1008"); *id.* Loan ████, FID 29726, Col. E ("FID: Holt Allegation") (citing "the overall documentation provided in the loan file").

[84] To identify the findings for these five Loans in Appendix 4, filter Column D (FID: Dispute Status) to "Concedes." *E.g.*, App. 4, Loan ███████, FID 34670, Col. F ("FID: Grissom Overall Loan Assessment") ("I am unable to disagree with Mr. Holt's ultimate conclusion regarding this loan based on the documents and information available at this time.").

[85] To identify the findings for these 29 Loans in Appendix 4, filter Column D (Dispute Status) to "Undisputed – No Guideline Violation." *E.g.*, App. 4, Loan ██████, FID 1306, Col. G ("FID: Grissom Rebuttal") ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████; *id.* Loan ██████, FID 3957, Col.

Loans, that she could not underwrite the Loan File.[86]  As with her rebuttals for loan purpose and property type MLS violations, even if credited, Grissom's testimony would not rebut the Trusts' showing that the MLS Warranty was not true and correct as to the documentation style of these Loans.

228.     In sum, the Court finds that UBS breached the MLS Warranty regarding documentation style for the 38 Loans in this category.

### 2.     UBS's Breaches Caused MAEs

229.     The Trusts presented evidence that loans with less stringent documentation requirements are inherently riskier than full documentation loans.  Holt Direct (PX 1103) ¶ 134 (identifying documentation type as a loan characteristic "strongly associated with risk"); *see also*, *e.g.*, PX U001 at 14 (Countrywide Guideline) (noting that "Radian[, a property mortgage insurer,] will only insure loans delivered with Full/Alternative documentation").  Grissom agreed with this point.  Grissom Direct (DX LI) ¶ 41 ("[L]oans that were originated pursuant to lending programs that accepted . . . stated assets, or a borrower's stated income are inherently riskier loans."); Tr. 706:23-707:1 (Grissom) (agreeing that "a stated income full asset loan is regarded as being less risky than a stated income stated asset loan").

230.     The Trusts also presented evidence that, consistent with this increased risk, the originators' guidelines set stricter requirements for loans based on statements of borrower income or assets than for those with verification of those items.  Holt Direct (PX 1103) ¶¶ 44-46 (explaining that stated income programs typically required verification of employment and other information); PX U044 (Countrywide Guidelines setting specific "requirements" for "Reduced" and "Stated Income/Stated Asset" loans in a separate guideline); PX U497 (Countrywide

---

G ("FID: Grissom Rebuttal") ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

*id.* Loan ██████, FID 20945, Col. G ("FID: Grissom Rebuttal") (stating only "Mr. Holt has not indicated that the documentation type materially deviated from the origination underwriting guidelines").

[86]   To identify the findings for these four Loans in Appendix 4, filter Column D (Dispute Status) to "Undisputed – Did Not Re-Underwrite."  *E.g.* App. 4 Loan ██████, FID 31693, Col. F (FID: Grissom Overall Loan Assessment) (responding that the "loan file in its current state is too incomplete to be re-underwritten").

Guidelines providing same for "Alternative Documentation" loans); PX U046 (Countrywide Guidelines providing same for "No Ratio Documentation"); PX U001 at 1 (Countrywide Guidelines noting "Section 10.2 Expanded Criteria, for loans originated under Reduced, No Ratio, SISA, and NINA documentation"); PX U053 at 1 (Countrywide Guidelines setting "Pre-Closing Employment Re-Verification" requirements by documentation type); PX U001 at 12 (Countrywide Guidelines noting certain "option[s]" are not available for SISA loans); *id.* at 4-5 (permitting exceptions for certain requirements but only for certain documentation types); PX U035 at 2 (Countrywide Guidelines setting specific requirements as to occupancy depending on documentation type, among other things).[87]

231.     Accordingly, a loan made based on stated income and/or assets could not have been made under guidelines that required verification of those items, and could have been made (if at all) only under different guidelines at a different price.  *See* PX U020 at 1 (Countrywide Guidelines) (requiring that "[l]oans that fall outside published guidelines [as to] . . . program limitations may only be approved with an exception from either a Divisional SLD or the Secondary SLD" and that "the loan file must fully document the rationale for granting the exception request"); *id.* at 3 (Countrywide Guidelines) (noting "documentation type" "exception request[s]" would be "consider[ed]"); PX U044 at 2 (Countrywide Guidelines) (requiring that loan applications reviewed under the "Reduced" and "Stated Income/Stated Asset" documentation type programs that "contain[] application inconsistencies will be required to be processed using full or alternative documentation"); PX U716 at 9 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan.  These loan characteristics may include . . . Alt-A documentation (Stated, No Ratio, NINA)"); Tr. 1104:7-1105:17 (Holt) (using rate sheets, originators priced loans based on program

---

[87] Countrywide's guidelines constitute a representative example.  *See, e.g.*, PX U312 at 8 (IndyMac Guidelines) (table summarizing "employment, income, and asset" "documentation requirements for each documentation type"); *id.* at 44 ("The Credit Quality tables that follow reflect a minimum number of tradelines required by program and documentation type."); *see also* Holt Direct (PX 1103) ¶ 134 (identifying documentation type as a loan characteristic "strongly associated with risk").

parameters); *see also* PX 17 at 41 (UBS Credit/Underwriting Guidelines) (explaining that where a loan submitted for purchase "does not meet the minimum documentation requirements of the category, it may be considered with a lower documentation level and may be priced accordingly").

232.    Grissom did not dispute these points.    She acknowledged that a loan's documentation type, among other things, determined the guideline that applied, Grissom Direct (DX LI) ¶ 38, and that a change in documentation type required an exception.  Tr. 621:24-622:1 (Grissom) (testifying that exceptions were necessary for loan characteristics that required that the loan be considered under a specific program).    As Holt testified, Holt Direct (PX 1103) ¶ 9 ("[A]pproval of exceptions is usually conditioned on the borrower paying a higher interest rate."); *id* ¶ 135 ("[E]xceptions are usually conditioned on an increased interest rate."), and Grissom conceded, Tr. 635:4-14 (Grissom) ("Q. This document states if an approval is warranted, then the product exception request form will be electronically routed to the S&P exceptions mailbox for exception pricing.  Now, exception pricing meant that when a loan was -- when an exception was requested for a loan, that exception had to be priced by someone higher up than the underwriter, correct?  Someone different than the underwriter.  I don't know that it necessarily means higher up. Q. But the exception had to be priced, correct?  A.  Yes.") *id.* 636:17-637:5 (Grissom), approval of exceptions was conditioned on approval of "special pricing."[88]

233.    Consequently, the Trusts have proved that UBS's breaches of the MLS Warranty regarding documentation type caused MAEs to the 38 Loans in this category by (i) significantly increasing their risk of loss as of origination and the Closing Dates; (ii) causing the Trusts to receive less interest than would have been required on a particular Loan.[89]  Moreover,  23 of the

---

[88]    While Grissom opines that 29 Loans in this category do not violate guidelines, *see* App. 4, Col. D (FID: Dispute Status) filtered to "Undisputed - No Guideline Violation," Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE.

[89]    Nearly all of the 38 Loans in this category are also affected by other material breaches: (i) for 27 Loans, other violations of the MLS Warranty; (ii) for 4 Loans, breaches of the Maximum LTV Warranty; (iii) for 4 Loans, breaches of the Mortgage File Warranty; (iv) for 0 Loans, breaches of the Hazard Insurance Warranty; and (v) for 37 Loans, breaches of the Guideline Warranty.  *See* Appendix 61

Loans in this category have liquidated, 3 Loans have been modified with losses, and 32 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[90] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

### 3.   UBS Discovered Its Breaches On The Closing Dates

234.   The Trusts proved that UBS discovered these breaches on the Closing Dates.  The Trusts presented undisputed evidence that UBS and its vendors reviewed 7 of the Loans in this category, hence UBS is charged with actual knowledge of these breaches, which were apparent from the face of the Loan Files.[91]  *See* Part III.C.2, *above*.

235.   UBS also had constructive knowledge of these breaches by the Closing Dates because its own documents reveal that it considered document type an important risk factor and took steps to identify Loans that did not meet the criteria stated in the MLS.  UBS used documentation type as one of the "adverse criteria" it used to identify loans with risk factors.  Tr. 1287:17-1288:2 (Twombly) (discussing UBS's use of risk factors in selecting loans based on adverse criteria); PX 668 at 1 (defining UBS's adverse criteria to include "docType[s]":  "No Doc," "Stated/Verified, Stated/Stated [] and origLtv > 90.0," and "Full Doc [with] crdtRisk < 660"); PX 19 at 14 (UBS policies and procedural manual identifying "[s]tated documentation/No documentation loans" as presenting heightened risk factors recommended for adverse sample selection); PX 103 at 1 (identifying lesser documentation type as a common risk factor used in selecting adverse samples); PX O16 ("AHM61102A," Col. AZ), PX O17 ("AHM61102A," Col. AZ), PX O19 ("AHM60214A," Col. AZ) (UBS due diligence reports listing "document type" as factor loans were reviewed for).  Through its due diligence, UBS determined that some loans in its diligence samples had misstated documentation types—and UBS then updated the MLS to reflect the proper documentation types.  *Compare* Cipione Direct (PX 1081), Ex. 15 (Credit and

---

[90]   To identify the findings for these Loans in Appendix 4, filter Columns L (Liquidated), M (Modified with Losses), and N (60 Day Delinquency), respectively, to "Yes."

[91]   To identify the findings for these 7 Loans in Appendix 4, filter Column K (Due Diligence Record) to "Yes."

Compliance Details Database) (Loan ████████, Col. Z ("Confine Tape Discrepancy Comments")) , *with id.*, Ex. 1 (Consolidated Loan Tape Database), (Loan ████████, Col. BL ("Documentation")) ████████. The results would have made a reasonable person suspicious that Loans outside of UBS's diligence samples also had misstated documentation types, and UBS could have investigated those suspicions by the Closing Dates.

236.     Finally, at a minimum, UBS was willfully blind to all breaches as of January 31, 2008.  *See* Part III.C.2, *above*.

### E.     The MLS Warranty Regarding Credit Score

237.     In the MLS Warranty, UBS warranted that, for each Loan, the MLS contained the true and correct "credit score (or mortgage score) of the Mortgagor," as of the Closing Date.  PX 49 at 45-46 (MARM 2006-OA2 PSA) (defining "Mortgage Loan Schedule"); *id.* at 191 (Sched. II(i)); PX 110 at 56-57 (MARM 2007-1 PSA); *id.* at 231 (Sched. II(i)); PX 182 at 53-54 (MARM 2007-3 PSA); *id.* at 226 (Sched. II(1)).

#### 1.     UBS Breached The MLS Warranty Regarding Credit Score

238.     The Trusts presented evidence that, for 41 Loans, the FICO score stated on the MLS did not match the borrower's actual FICO score as of the Closing Date.[92]  Wu testified that, shortly before the closing of the 2007-3 Trust, he was sent updated FICO scores for several hundred borrowers, Tr. 214:4-215:14, 221:10-14, 245:8-247:1 (Wu); *see also* 1914:22-1915:6 (Schmidt); *see also* PX 208 at 1 ("We refico'd 300 loans."), which included the 41 Loans at issue.  These updated FICO scores were different than the FICO scores that had been reported to UBS by the originators, with some scores dropping by more than 100 points, but UBS failed to update the MLS for the 2007-3 Trust to reflect the current scores.  PX 208 (showing updated FICO scores obtained by UBS); Tr. 245:11-246:2 (Wu) (agreeing the MLS "shows the old higher [FICO] score[s]," not

---

[92]  App. 5 (Credit Score).

the new FICO scores); Tr. 1919:6-1922 (Schmidt) (agreeing the MLS reflected the old, higher, FICO scores not the more recent, lower FICO scores).[93]  The Trusts also presented expert evidence of these breaches.  Holt Direct (PX 1103) ¶ 201.

239.   UBS and Grissom did not dispute this evidence.  Grissom conceded she took no steps to investigate the borrower's credit scores after origination.  *E.g.*, Grissom Direct (DX LI) ¶ 78; Tr. 534:16-535:19 (Grissom).  Moreover, for two Loans, Grissom did not dispute that the Loans are materially defective.[94]  For the remaining 39 Loans, Grissom did not dispute that the borrower's credit score is misstated on the MLS; rather, she asserts that (i) for 35 Loans, she could not underwrite the Loan File;[95] and (ii) for 4 Loans, only "NA."[96]  Grissom's statements are not relevant to whether the credit score was actually misstated on the MLS, and thus do not rebut Holt's findings.  Even if credited, these statements would do nothing to contradict the evidence showing that the MLS Warranty was not true and correct as to the credit score of these Loans.

### 2.    UBS's Breaches Caused MAEs

240.   The Trusts presented evidence that loans made to borrowers with lower FICO scores were inherently riskier than loans made to borrowers with higher FICO scores.  Holt Direct (PX 1103) ¶ 76 ("The lower the FICO score, the greater the risk associated with the loan."); PX 103 (noting that lower FICO scores was a risk factor commonly used in selecting adverse criteria; PX 19 at 14-15 (same).  Grissom agreed with this point.  Grissom Direct (DX LI) ¶ 41 ("[L]oans that were originated pursuant to lending programs that accepted lower FICO credit scores . . . are inherently riskier loans."); Tr. 381:12-14 (Grissom) (agreeing that "[a]ll other things being equal,

---

[93]  *Compare* App. 5, Columns I (MLS Credit Score) and J (Actual Credit Score).

[94] To identify these two Loans in Appendix 5, filter Column D (FID: Dispute Status) to "Concedes." *E.g.*, App. 5, Loan ▮▮▮▮▮▮, FID 43940, Col. F (FID: Grissom Overall Loan Assessment) ("I am unable to disagree with Mr. Holt's ultimate conclusion regarding this loan based on the documents and information available at this time.").

[95] To identify these 35 Loans in Appendix 5, filter Column D (FID: Dispute Status) to "Undisputed – Did Not Re-underwrite." *E.g.* App. 5 Loan ▮▮▮▮▮▮, FID 43914, Col. F (FID: Grissom Overall Loan Assessment) ("No loan file is currently available for this loan.  I disagree that a loan can be Materially Defective without a loan file available.").

[96] To identify these 4 Loans in Appendix 5, filter Column D (FID: Dispute Status) to "Undisputed – NA." *E.g.*, App. 5 Loan ▮▮▮▮▮▮, FID 43913, Col. G ("FID: Grissom Rebuttal").

. . . a lower FICO score increases the risk of loss"). So did Wu. Tr. 186:20-187:25 (admitting that FICO was a loan characteristic that "could significantly increase the risk of loss").

241.    The Trusts also presented evidence that, consistent with these risks, the guidelines generally required that FICO scores fall within certain 40-point ranges for a loan to qualify under any given program, and that if a FICO score fell below the minimum threshold, then loan could only be considered under a different program. Tr. 1126:11-1127:7 (Holt) (discussing 40 point ranges for FICO scores); PX U020 at 1 (Countrywide Guidelines) (stating that "Loans that fall outside published guidelines in categories such as . . . credit score . . . may **only** be approved with an exception . . . .") (emphasis in original); PX U008 at 2 (Countrywide Guidelines) (explaining that Loans failing to meet credit score requirements would be referred by Countrywide's automated underwriting system for an exception, if warranted). Grissom agreed. Grissom Direct (DX LI) ¶ 42 ("[M]ost of the Loans were originated pursuant to guidelines that permitted a credit score as low as 660, and some permitted credit scores as low as 620. These lending programs and credit parameters, by their nature, increase repayment risk and also the risk of delinquency or default.").

242.    Accordingly, a loan could not be made under the same guidelines to a borrower with a FICO score that was 40 points or more lower than reported, and could have been made (if at all) only under different guidelines at a different price. Holt Direct (PX 1103) ¶ 135 (exceptions for "the big four risk factors" including FICO score, required higher interest rates); *see* PX U716 at 9-10 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan. These loan characteristics may include . . . . Credit score"); *see also* PX U020 at 1 (Countrywide Guideline) (requiring that "[l]oans that fall outside published guidelines [as to] . . . credit score . . . or other program limitations may only be approved with an exception from either a Divisional SLD [Structured Loan Desk] or the Secondary SLD" and that "the loan file must fully document the rationale for granting the exception request"); PX U008 at 2 (Countrywide Guidelines explaining that loans processed through the CLUES AUS that receive a "Refer recommendation . . . due to

loans falling outside of program/product guideline eligibility standards, such as maximum LTV/CLTV and minimum credit score for a given loan amount, purpose, and occupancy type . . . maybe [sic] considered on an exception basis").  Grissom did not dispute this point either.

243.    Consistent with these guideline requirements, as UBS's diligence records show, when a party bought a loan, it mattered whether the borrower's current FICO score would still allow him to qualify for the loan program under which his mortgage was made.  Cipione Direct (PX 1081), Ex. 15 (Loan ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████; *see also* Holt Direct (PX 1103) at ¶ 76 ("The Originators have minimum FICO scores that a borrower must meet in order to qualify for a particular loan.").

244.    For the 41 Loans at issue, as of the Closing Dates, the borrowers' FICO scores were 40 points or more lower than the FICO scores stated on the MLS—including scores that were lower by over 100 points.[97]  *See generally* PX 208 at 1 (Wu noting that "around 40 of the[ loans] went from above 600 to under 600 by a good margin"); Tr. 214:22-215:11 (Wu) (admitting that drops in FICO scores of over 100 points were "significant drops" likely to increase the risk of default).  Grissom conceded that guidelines would require formal exceptions for changes in FICO score, Tr. 744:6-12 (Grissom) ("Formal exceptions are generally for program parameters, which is, you know, LTV, FICO, loan amount, those types of characteristics."); Tr. 629:18-24 (Grissom) (agreeing that guidelines required underwriters to document exceptions based on factors including credit score), and Holt testified, Holt Direct (PX 1103) ¶ 9, 135, and Grissom conceded, Tr. 635:4-14, 636:17-637:5, that approval of exceptions was conditioned on approval of higher interest rates.

---

[97] *See, e.g.*, App. 5, Loan ████████, FID 43920 ████████████████████████████████ ██████████████.

245.     Consequently, the Trusts have proved that UBS's breaches of the MLS Warranty regarding credit score caused MAEs to the 41 Loans in this category by (i) significantly increasing their risk of loss as of the Closing Dates; (ii) causing the Trusts to receive less interest than would have been required on a particular Loan.[98]  Moreover, 30 of the Loans in this category have liquidated, 5 Loans have been modified with losses, and 39 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[99] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

### 3.     UBS Discovered Its Breaches On The Closing Dates

246.     The Trusts proved that UBS discovered the breaches of the credit score representation as of the Closing Dates.  Wu's testimony shows that UBS actually knew that the FICO scores for these Loans was different than the scores stated on the MLS.  Tr. 245:8-247:1; *see also id.* 1921:10-13 (Schmidt admitting that UBS reported false FICO scores); PX 208.

### F.     The MLS Warranty Regarding Owner Occupancy

247.     In the MLS Warranty, UBS warranted that, for each Loan, the MLS contained a true and correct "code indicating whether the Mortgaged Property is owner occupied, a second home or an investor property," as of the Closing Date.  PX 49 at 45-46 (MARM 2006-OA2 PSA) (defining "Mortgage Loan Schedule"); *id.* at 191 (Sched. II(i)); PX 110 at 56-57 (MARM 2007-1 PSA); *id.* at 231 (Sched. II(i)); PX 182 at 53-54 (MARM 2007-3 PSA); *id.* at 226 (Sched. II(1)).

### 1.     UBS Breached The MLS Warranty Regarding Owner Occupancy

248.     The Trusts have demonstrated through expert evidence that, for 822 Loans, the occupancy status listed on the MLS did not match the property's actual occupancy status—

---

[98]   Nearly all of the 41 Loans in this category are also affected by other material breaches: (i) for 16 Loans, other violations of the MLS Warranty; (ii) for 5 Loans, breaches of the Maximum LTV Warranty); (iii) for 6 Loans, breaches of the Mortgage File Warranty; (iv) for 0 Loans, breaches of the Hazard Insurance Warranty; and (v) for 8 Loans, breaches of the Guideline Warranty.  *See* Appendix 61

[99]   To identify the findings for these Loans in Appendix 5, filter Columns L (Liquidated), M (Modified with Losses), and N (60 Day Delinquency), respectively, to "Yes."

specifically, that the Loans were warranted as being occupied by their owners but in fact were not.[100]  Holt made his findings by examining, first, information in the Loan Files, including (i) the borrower's credit report (which would show if the borrower had purchased other properties); and (ii) insurance policies (which might indicate if the policy for the property had been obtained by someone other than the borrower and/or whether the policy was one issued to a homeowner or investor).  Holt Direct (PX 1103) ¶¶ 163-65.  Holt then also looked at third-party data sources, such as (i) LexisNexis phone records (which could show the borrower did not live at the property and/or that someone else did); (ii) bankruptcy records (which could identify where a borrower lived); (iii) information available through DataVerify (which included statements of residence from drivers' license records and tax bills); and (iv) if available, tax returns (which also included a statement of residency).  Id. ¶¶ 163-67.[101]  Holt testified that he took a "conservative approach" and determined that a property was not owner occupied where the totality of this information "strongly indicated that the borrower did not occupy the property."  Id. ¶ 165.[102]

---

[100] App. 6 (MLS – Occupancy).

[101] See, e.g., App. 6, Loan ▮▮▮▮▮▮, FID 34719, Col. E (FID: Holt Allegation)



; id. Loan ▮▮▮▮▮▮, FID 35297, Col. E (FID: Holt Allegation)

; id. Loan ▮▮▮▮▮▮, FID 32215, Col. E (FID: Holt Allegation)

[102]   For 17 of the Loans in this category, Holt found that the borrowers had taken out loans on multiple properties within a short period of time, representing that they would occupy all of those properties, Holt Direct (PX 1103) ¶ 200; these facially impossible representations made it more likely than not that the borrower did not occupy the property covered by the MLS Warranty.  See, e.g., App. 6, Loan ▮▮▮▮▮▮, FID 43963. Col. E (FID: Holt Allegation).

249.    Grissom did not dispute the substance of Holt's findings for any of these Loans.  For 51 Loans, Grissom did not dispute that the Loans are materially defective.[103]  For the remaining 771 Loans, Grissom did not dispute the accuracy of the information that Holt relied on to make his findings, *e.g.*, Tr. 440:7-11; 458:2-459:1, and she did not dispute the accuracy of his findings that properties in fact were not owner-occupied.  Tr. 444:7-10.[104]  Grissom opined only that, in her view, "use of post-origination information to prove the borrower's *intent* at the time of origination is inappropriate and unreliable," Grissom Direct (DX LI) ¶ 81 (emphasis added), and that Holt had not properly shown that the borrowers did not *intend* to occupy the subject properties, Tr. 440:12-443:15.  Consistent with that approach, she stated that (i) for 219 Loans, certain documents demonstrate the borrowers' *intent*, at origination, to occupy the property;[105] (ii) for 68 Loans, Holt relied on post-origination evidence.[106]  As discussed, however, the MLS Warranty regarding occupancy status does not warrant borrower intent at the time of origination, but rather whether the borrowers in fact occupied the properties as of the Closing Dates, *see* Part IV.A, *above*, and the falsity of this warranty may be proved through post-origination evidence.  *See FHFA*, 74 F. Supp. 3d at 653 ("Post-origination evidence is admissible if it tends to show the existence or non-existence of a fact during the relevant period of time."); *cf. United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (noting general principal that later-in-time evidence may be probative as to earlier-in-time facts).  For another 524 Loans, Grissom asserts that she cannot re-underwrite the

---

[103]  To identify the findings for these 51 Loans in Appendix 6, filter Column D (FID: Dispute Status) to "Concedes" or "UBS Concedes." *See, e.g.*, App. 6, Loan ████████, FID 31188, Col. F (FID: Grissom Overall Loan Assessment) ("I am unable to disagree with Mr. Holt's ultimate conclusion regarding this loan based on the documents and information available at this time.").

[104]  To identify the findings for these 771 Loans in Appendix 6, filter Column D (FID: Dispute Status) to exclude "Concedes" and "UBS Concedes." *E.g.*, App. 6, Loan ████████, FID 17563, Col. H (FID: Holt Reply) ██████████████████████ ████████████.

[105]  To identify the findings for these 219 Loans in Appendix 6, filter Column D (FID: Dispute Status) to "Undisputed – Borrower Intent," "Undisputed – Borrower Intent and Post-Origination Evidence," and "Undisputed - Appraisal/Insurance Reference."  *Id.* Loan ████████, FID 17563, Col. G (FID: Grissom Rebuttal).

[106]  To identify the findings for these 68 Loans in Appendix 6, filter Column D (FID: Dispute Status) to "Undisputed – Borrower Intent & Post-Origination."

Loan File.[107] Grissom's decision to address only borrower intention, and not whether the properties in fact were occupied by their owners, leaves Holt's testimony unrebutted.[108]

250.    The Trusts have proved that the borrowers did not occupy the properties as of the Closing Dates.  As discussed, Holt's findings, which cover origination, are not rebutted.  *MBIA*, 39 Misc. 3d 1220(A), at *36 (holding that Countrywide had breached an MLS representation as to 1,414 loans where it failed to rebut plaintiff's *prima facie* showing based on expert findings).  The evidence that Holt relied on, and which Grissom did not dispute, indicates that the borrowers *never* occupied the properties, which would include not occupying them on the Closing Dates.  Moreover, to the evidence of non-occupancy as of origination, the Court applies the presumption of continuity, *Jund*, 941 F.2d at 1288, to find that the borrowers also did not occupy the properties as of the Closing Date.  It is especially appropriate to apply that presumption here, as, in general, a person's residence is unlikely to change, *e.g.*, *Lee v. Charles*, No. 12 Civ. 7374 (JFK), 2013 WL 5878183, at *2 (S.D.N.Y. Nov. 1, 2013) (citing *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000)) (for purposes of diversity jurisdiction, an established domicile is presumed to continue absent evidence of a change), and the time gaps between the origination dates and the Closing Dates for the specific Loans in these categories were relatively short.[109]

251.    The Court's findings that UBS breached the MLS Warranty regarding owner occupancy are additionally bolstered for those 178 Loans where Holt found that the borrower also misrepresented his employment, income, or debts.[110]  Such evidence that a borrower made multiple misrepresentations makes it more likely that he misrepresented his occupancy.  *E.g.*, Loan

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[107]   To identify the findings for these 524 Loans in Appendix 6, filter Column D (FID: Dispute Status) to "Undisputed - Does Not Re-underwrite."

[108]   *See id.* Loan ██████, FID 17563, Col. H (FID: Holt Reply) ████████████████████████████████████ .

[109]   The vast majority of the Loans in the Trusts were securitized shortly after their origination.  *See* PX 1081 (Ex. 20) ("Loan Summary Database"), Col. BT ("LoanAgeOrigination")

[110]   App. 7 (Occupancy – Other Misrepresentations).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████; Loan ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████; Loan ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████.

252.    In sum, the Court finds that UBS breached the MLS Warranty regarding occupancy status for the 822 Loans in this category.

## 2.    UBS's Breaches Caused MAEs

253.    The Trusts presented evidence that loans made to borrowers who do not occupy the subject properties are inherently riskier than loans to borrowers who do.  Holt Direct (PX 1103) ¶ 96 ("Owner-occupied properties are less risky because borrowers typically want to stay in their homes and will make efforts to avoid foreclosure on the homes they live in.  Investment properties and second homes are riskier because the owner has less incentive to make payments or maintain

the property"); *see also id.* ¶¶ 9, 54, 134.[111]  Grissom agreed.  Tr. 381:15-19 (agreeing that, all else held equal, a loan on a second home or an investment property is riskier than a loan on home occupied by the borrower).  So did Wu.  Tr. 186:20-187:3 (admitting that owner occupancy was a loan characteristic that "could significantly increase the risk of loss").

254.    The Trusts also presented evidence that, consistent with this increased risk, the originators' guidelines set stricter requirements for loans secured by properties that were not occupied by their owners than those that were.  *E.g.*, PX 17 at 13 (UBS Credit/Underwriting Guidelines) ("The occupancy type for the subject property will determine the loan products available."); PX 173 at 7, 10 (Chevy Chase Guidelines) (setting specific "cash reserve requirements . . . based on occupancy"); PX U035 at 1 (Countrywide Guidelines) (setting occupancy type-based requirements "to determine the eligibility of a mortgage loan"); PX U077 at 1 (Countrywide Guidelines) (noting "seller contribution" limits are "based on the occupancy and LTV of the loan"); PX U577 at 22 (American Home Guidelines) (occupancy type determining LTV/CLTV and down payment requirements).

255.    Accordingly, a loan could not be made to a borrower who did not occupy the subject property under guidelines that required he do so, and could have been made (if at all) only under different guidelines at a different price.  PX 34 at 6 (Chevy Chase Guidelines) ("The qualifying rate is based on occupancy and the LTV."); PX U008 at 2 (Countrywide Guidelines) (including occupancy among "program/product guidelines" and noting "[l]oans considered to fall outside of published program/product guideline eligibility standards maybe [sic] considered on an exception basis"); Tr. 1104:13-1105:11 (Holt) (using rate sheets, originators priced loans based on factors including occupancy).  Grissom did not dispute these points, but rather conceded that a change in owner occupancy would require an exception, and that approval of exceptions was conditioned on approval of higher interest rates.  Tr. 635:4-14, 636:17-637:5.

---

[111] PX 1103 ¶ 96 ("Owner-occupied properties are less risky because borrowers typically want to stay in their homes and will make efforts to avoid foreclosure on the homes they live in. Investment properties and second homes are riskier because the owner has less incentive to make payments or maintain the property.").

256.     Consistent with these guideline requirements, as UBS's records show, whether a borrower occupied a property mattered at the time a purchaser bought the loan.  *See* Cipione Direct (PX 1081), Ex. 15 (Loan ███████, Col BK ("Confine General Comments")) █████████████████ ██████████████████████████████████████████████; *see also* PX 19 at 15 (describing UBS sample selection criteria for layered risk, and listing among other factors whether "occupancy is a second home"); PX 668 at 2 (listing "Occupancy = investor and Second Home" as adverse selection criteria).

257.     Many Loans with misstated occupancy statuses were also afflicted with fraud. Many of the Loans in this category were not for purchases of new homes, but rather for refinancing of properties that the borrowers claimed were owner occupied—yet the borrowers also owned other properties.  This is clear indicia of fraud.  Where there is evidence that the borrowers already owned other properties, it is reasonable to infer that they had no intention of occupying the property that is the subject of the Loans and instead were using the present loan to refinance another property.  Tr. 922:17-23 (Holt) (Loan █████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████; *id.* 1036:8-1037:5 (Loan ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████.  Because these breaches of the MLS Warranty regarding occupancy revealed borrower fraud, they caused MAEs that could not be cured.[112]

258.     Consequently, the Trusts have proved that UBS's breaches of the MLS Warranty regarding owner occupancy caused MAEs to the 822 Loans in this category by (i) significantly

---

[112]  While Grissom opines that 9 Loans in this category do not violate guidelines, *see* App. 6, Col. D (Dispute Status) filtered to "Undisputed – No Guideline Violation." Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE.

increasing their risk of loss as of the Closing Dates; (ii) causing the Trusts to receive less interest than would have been required on a particular Loan; and (iii) resulting from borrower fraud.[113] Moreover, 654 of the Loans in this category have liquidated, 36 Loans have been modified with losses, and 769 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[114] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

### 3.    UBS Discovered Its Breaches On The Closing Dates

259.    The Trusts proved that UBS discovered these breaches on the Closing Dates because it had constructive knowledge of them at that time.  UBS used occupancy status as one of it "adverse criteria" that indicated a higher risk of loss.  *E.g.*, PX 668 at 2 (listing occupancy statuses "investor and second home" among adverse criteria).  Through its due diligence reviews, UBS determined that some loans in its diligence samples had misstated occupancy statuses— which were graded to be rejected for purchase.  Cipione Direct (PX 1081), Ex. 15 (Loan



, Col. Z ("Confine Tape Discrepancy Comments"))                    , *id.* (Loan

, Col. Z ("Confine Tape Discrepancy Comments"))

These results would have made a reasonable person suspicious that Loans outside of UBS's diligence samples also had misstated occupancy statuses, and UBS could have investigated those suspicions by the Closing Dates.[115]  UBS also was willfully blind to all breaches as of January 31, 2008.  *See* Part III.C.2, *above*.

---

[113]   Nearly all of the 822 Loans in this category are also affected by other material breaches: (i) for 459 Loans, other violations of the MLS Warranty; (ii) for 115 Loans, breaches of the Maximum LTV Warranty); (iii) for 100 Loans, breaches of the Mortgage File Warranty; (iv) for 5 Loans, breaches of the Hazard Insurance Warranty; and (v) for 315 Loans, breaches of the Guideline Warranty.  *See* Appendix 61

[114]   To identify the findings for these Loans in Appendix 6, filter Columns N (Liquidated), O (Modified with Losses), and P (60 Day Delinquency), respectively, to "Yes."

[115]   To identify the findings for these 137 Loans in Appendix 6, filter Column M (Due Diligence Record) to "Yes."

### G.     The MLS Warranty Regarding Debt-To-Income Ratios

260.     In the MLS Warranty, UBS warranted that, for each Loan, the MLS contained the true and correct "debt-to-income ratio of the Mortgage Loan[.]"  PX 49 at 45-46 (MARM 2006-OA2 PSA) (§ 1.01), *id.* at 191 (Schedule II(i)); PX 110 at 56-57 (MARM 2007-1 PSA) (§ 1.01), *id.* at 231 (Schedule II (i)); PX 182 at 53-54 (MARM 2007-3 PSA) (§ 1.01),  *id.* at 226 (Schedule II.1).  At trial, UBS argued that it warranted this information as of origination, and not as of the Closing Date, because the MLS Definition refers to the DTI ratio "of the Mortgage Loan," and not "of the Mortgagor."  Tr. 2139:22-2140:23.  The Court need not address this question, because, as discussed below, the Trusts have proved all breaches of the MLS Warranty regarding DTI ratio both as of origination and as of the Closing Dates.

#### 1.     UBS Breached The MLS Warranty Regarding DTI Ratios

261.     The Trusts have demonstrated through expert evidence that, for 4,753 Loans, the borrowers' actual DTI ratios were higher than the DTI ratios listed on the MLS.[116]  Holt made his findings based on information showing that (i) the borrowers had undisclosed debts that were not reflected in the DTI ratio; (ii) the borrowers' incomes were lower than reflected in the DTI ratio; or (iii) both.  For the remaining Loans in this category, the breaches are shown based on other sources; the Court addresses those sources, and any criticisms that Grissom offered of them, below. *See* Parts IV.G.2-3, *below*.

262.     Otherwise, for all but 39 of these Loans, Grissom did not dispute the substance of Holt's findings. [117]  For 539 Loans, Grissom did not dispute that the Loans are materially defective.[118]  For the remaining 4,175 loans, as she repeatedly testified, Grissom did not dispute the information that Holt relied on to make his findings regarding DTI ratio, *e.g.*, Tr. 457:4-8, 461:2-5, 473:21-474:11, 482:12-16, 531:6-17; 549:10-22; 567:20-568:14; 575:7-576:4; 584:22-

---

[116] App. 8 (DTI Ratio).  The defect heading "correlated," indicates as Mr. Holt explained (Tr. at 878:15-24 (Holt)), that there was evidence of misrepresentations which are reflected as false statements in the MLS.

[117]  To identify the findings for these 39 Loans in Appendix 8, filter Column D (FID: Dispute Status) to "Disputed."

[118]  To identify the findings for these 539 Loans in Appendix 8, filter Column D (FID: Dispute Status) to "Concedes."

585:5 (Grissom), and she does not dispute the accuracy of Holt's findings that in fact the DTI ratios were misstated on the MLS or of Holt's DTI calculations, *e.g.*, Tr. 457:9-11, 461:6-9, 474:17-475:1,482:12-16, 532:7-13, 551:2-7, 568:12-22, 576:1-4 (Grissom).  Rather, consistent with her overall approach, Grissom opined that (i) for 3,919 Loans,[119] the misstated DTI ratio did not result in a breach of guidelines (including, for 2,778 Loans[120] that the breach was "derivative" of other guideline-related related findings, but did not lead her to dispute Holt's DTI findings, *e.g.*, Tr. 643:18-644:10 (Loan ████████), 647:6-20:19-22 (Loan ████████)); and (ii) for 262 Loans[121] that she cannot re-underwrite the Loan File.  For 39 Loans,[122] Grissom disputes Holt's DTI calculations based on the information he identified, but in each instance she is incorrect.

263.    In her responses to 1,959 of the undisclosed mortgage and income misrepresentation findings underlying the DTI-Ratio violations, Grissom argues categorically that it was improper for Holt to rely on post-origination evidence, Grissom Direct (DX LI) ¶¶ 77-78, but this objection is rooted in her legally incorrect opinion that the MLS Warranty does not in fact warrant the accuracy of the DTI ratios listed on the MLS.  *See id.* ¶¶ 98-99.  Because, as discussed, the MLS Warranty was one of fact, it is perfectly appropriate for the Trusts to rely on post-origination evidence to show that the warranted DTI ratios were inaccurate.  *See Goffer*, 721 F.3d at 124.

264.    The Trusts have proved that the borrowers' DTI ratios were misstated as of origination and as of the Closing Dates.  Because the MLS Warranty is one of fact, to prove a breach of that warranty regarding DTI ratio, the Trusts do not have to prove what the borrower's income or debts actually *were* on the Closing Dates—they simply have to prove that the borrowers' debts and/or incomes *were not* those expressed in the DTI ratio listed on the MLS.  Holt's findings

---

[119]  To identify the findings for these 3,919 Loans in Appendix 8, filter Column D (FID: Dispute Status) to "Undisputed - Derivative" and "Undisputed - No Guideline Violation."

[120]  To identify the findings for these 2,778 Loans in Appendix 8, filter Column D (FID: Dispute Status) to "Undisputed – Derivative."

[121]  To identify the findings for these 262 Loans in Appendix 8, filter Column D (FID: Dispute Status) to "Undisputed – Did Not Re-underwrite

[122]  To identify the findings for these 39 Loans in Appendix 8, filter Column D (FID: Dispute Status) to "Disputed."

that the borrowers' debts and incomes were not at the levels warranted in the MLS as of origination are unrebutted—which is sufficient to establish a breach. *MBIA*, 39 Misc. 3d 1220(A), at *28.

265.    The Court applies the presumption of continuity to this evidence, *Larsen Baking*, 30 A.D.2d at 406, to find that the debts and/or incomes also were not at those levels as of the Closing Dates.   Applying this presumption, New York courts have found that proof of a party's income in one year is sufficient proof of that party's income in the following years.   *Lois R. v. Richard R.*, 414 N.Y.S.2d 846, 846 (N.Y. Fam. Ct. 1979), *aff'd sub nom. Lois R., Matter of, v. Richard R.*, 73 A.D.2d 843 (1st Dep't 1979) (applying presumption of continuity to evidence of income in 1976 to find that income was substantially the same in 1979); *Shan F. v. Francis F.*, 387 N.Y.S.2d 593, 593 n.26 (N.Y. Fam. Ct. 1976) (applying presumption of continuity to evidence of income in 1968 to find that income was substantially the same in 1976), *rev'd sub nom. on other grounds, Ferrer v. Ferrer*, 395 N.Y.S.2d 197 (1st Dep't 1977).   Here, the gaps between origination and closing are less than six months in almost all instances, and it is certainly appropriate to presume that, during these short periods of time, the borrowers' income and debts did not improve to the precise levels necessary to make the DTI ratio listed for their Loans on the MLS materially accurate as of the Closing Date.[123]

266.    The Court's findings are bolstered by (i) the fact that the sources cited by Holt, which Grissom did not dispute, also indicate that the borrowers' debts or incomes were not as warranted after closing; (ii) UBS has presented no evidence that the DTI ratios were accurate at any point; and (iii)  3,173 of the Loans in this category have liquidated, 493 Loans have been modified with losses, and 4,192 Loans have been delinquent for 60 days or more (and are thus

---

[123]   The notion that a borrower's income or debts would improve in such a fashion in such a short period of time is highly unlikely.  To the extent that UBS argues such changes did occur, the burden would be on UBS to prove these facts. *Gen. Motors Acceptance Corp. v. Grade A Auto Body Corp. Inc.*, 21 A.D.3d 447, 447 (2nd Dep't 2005) (mere denials of service insufficient to rebut prima facie showing); *Dahroug v. Trifon*, 242 A.D.2d 520, 521 (2nd Dep't 1997) ("surmise and conjecture" insufficient to rebut prima facie showing of tort); *Stukas v. Streiter*, 83 A.D.3d 18, 24 (2nd Dep't 2011) (in medical malpractice context, once defendant has made prima facie showing of following accepted medical malpractice, plaintiff must offer evidence to rebut that showing).  UBS has not presented any such evidence.

only 10 percent likely to fully recover without a modification),[124] which indicates it is very unlikely the borrowers' incomes increased (or debts decreased) after origination.  In sum, the Court finds that UBS breached the MLS Warranty regarding DTI ratios for the 4,751 Loans in this category.

### 2.    Evidence Regarding Debts

267.    The Court now addresses the evidence showing the breaches of the MLS Warranty regarding DTI ratios, beginning with evidence that the borrowers had debts that were not included in the debt used in the DTI ratio in the MLS.[125]  The Court finds the information supporting those breaches to be reliable.

### a.    Mortgage Electronic Research Systems

268.    For 733 Loans, Holt found that the borrowers' debts were misstated as a result of one or more mortgages that they did not list on their applications, but which were uncovered through MERS.[126]  *E.g.*, Loan ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████.  MERS is an electronic system that provides information as to registered mortgages, and was available at the time the Loans were originated. Holt Direct (PX 1103) ¶ 225 n.102.  The Court received this information for its truth under Federal Rule of Evidence 803(17) as commercial data that was generally relied upon by persons in the mortgage industry.  Tr. 1184:15-1186:13 (Holt); 1180:5-1181:7 (Holt) (providing foundation for admission); *see also, e.g.*, *United States v. Cassiere*, 4 F.3d 1006, 1018-19 (1st Cir. 1993) (reports of properties sold, sales prices, and sales dates that were "generally used and relied upon by appraisers" fell under Rule 803(17)) (internal quotation marks omitted).

---

[124]  To identify the findings for these Loans in Appendix 8, filter Columns N (Liquidated), O (Modified with Losses), and P (60 Day Delinquency), respectively, to "Yes."

[125]  App. 9 (DTI Ratio - Debt).

[126]  App. 10 (DTI Ratio – Debt – MERS).

269.     Grissom did not dispute that MERS is accurate or reliable.  To the contrary, she agreed that it was "a reliable source of information about registered loans" that is "relatively straightforward to use[.]"  Tr. at 460:10-18 (Grissom).  She also agreed that MERS was available to underwriters during the 2006 to 2007 timeframe, Tr. 393:15-21 (Grissom), and did not dispute Holt's testimony that mortgage information was uploaded accurately to MERS "as quickly as possible," Tr. 1020:2-1021:3 (Holt).  In fact, UBS's primary repurchase vendor JCIII used MERS data.  PX 344 at 4 (repurchase review instructions for Assured repurchase demands referencing "the fee website[] . . . MERS"); Tr. 1505:18-1506:11 (Lantz) (UBS issued instructions to JCIII); Cipione Direct (PX 1081), Ex. 7 ("Repurchase Analyses Database"), Col. N (showing that JCIII or Navigant referred to MERS in concurring with breach allegations for nine Loans).[127]

270.     Grissom's only criticism is that Holt looked at MERS data "as an automatic step" in reviewing the Loans, even if Grissom could not find a "red flag" in the Loan File that would have required the original underwriter to consult third-party data sources under the guidelines.  Grissom Direct (DX LI) ¶ 69(b).  Because the MLS Warranty is one of fact, however, whether the original underwriter would have consulted MERS is not relevant to whether the DTI ratio in fact was accurate—the question is whether the MERS data shows the debts reflected in the DTI ratio on the MLS were incorrect.  Dispositive on this point, where Holt relied on MERS to find that the DTI ratios were misstated, Grissom did not dispute his findings.  Tr. 461:2-9, 526:21-25, 550:3-16, 569:24-570:18 (Grissom).

271.     Accordingly, the Court finds MERS data to be more credible than the borrowers' statements of their debts, and thus finds that the statements support its findings of breaches of the MLS Warranty regarding DTI ratios.  Even if the MERS data had not been admitted for its truth, moreover, the Court finds that it was reasonable for Holt to rely on that data in reaching his findings.  *See, e.g.*, *Flagstar Bank*, 920 F. Supp. 2d at 494, 510 (crediting re-underwriting expert's

---

[127]   To identify these nine Loans in the Repurchase Analyses Database, conduct a search for " MERS" in Column N (Concur Responses) (it is necessary to include the space in front of MERS to avoid erroneous counts from words containing that combination of letters).

finding of an incorrect DTI calculation based upon MERS data showing the borrower had undisclosed mortgages).

### b.      Other Commercial Data

272.      For 777 Loans, Holt found that the borrowers' debts were misstated as a result of one or more mortgages that they did not list on their applications, but which were uncovered through the commercial data sources Accurint, Data Verify, Data Tree, Sitex, and Lexis Nexis.[128] The Court received this information for its truth under Federal Rule of Evidence 803(17) as commercial data that was generally relied upon by persons in the mortgage industry.  Tr. 1184:15-1186:13 (Holt); 1180:5-1181:7 (Holt) (foundation for admission).

273.      Grissom did not dispute that this information is accurate and reliable.  Grissom Direct (DX LI) ¶¶ 77-78 (stating that post-origination information was not available at origination, but not disputing the reliability of such information);  Tr. 395:1-4 (Grissom) (agreeing that Data Verify was an "on-line data verification and fraud prevention platform" available in 2006 and 2007); *id.* 567:20-568:1 (Grissom) (agreeing that SiteX was available in 2006).  Moreover, as for other commercial data sources, Grissom did not dispute the information that Holt uncovered through these sources.  *E.g.*, *id.* 568:15-22 (Grissom) (not disputing a finding of an undisclosed mortgage based on SiteX); *id.* 548:20-549:22; 550:3-16 (Grissom) (not disputing a finding of an undisclosed mortgage based on Accurint); *id.* 568:15-22, 570:4-7 (Grissom) (not disputing accuracy of information retrieved from Lexis Nexis).

274.      Accordingly, the Court finds this other commercial data to be more credible than the borrowers' statements of their debts, and thus finds that the statements support its findings of breaches of the MLS Warranty regarding DTI ratios.  Even if this data had not been admitted for its truth, moreover, the Court finds that it was reasonable for Holt to rely on that data in reaching his findings.  *See Flagstar Bank*, 920 F. Supp. 2d at 506 (finding that Accurint is "commonly relied upon in the field of underwriting").

---

[128]   App. 11 (DTI Ratio – Debt – Other Commercial Data).

### c.       Multiple Credit Inquiries

275.    The Court's findings that UBS breached the MLS Warranty regarding DTI ratios based on misstated debts are additionally bolstered by Holt's findings for 374 of these Loans for which the Loan Files contained evidence that the borrowers had received multiple credit inquiries.[129]  As Grissom conceded, "credit inquiries, particularly of a mortgage due, produce a red flag for the underwriter.  And it should be investigated."  Tr. 484:5-16 (Grissom).  When learning of such inquiries, she testified, the underwriter should have "ask[ed] the borrower:  Do you have any other mortgages?"  *Id.*; *see also id.* 487:14-16 (Grissom) ("Credit inquiries are a red flag, yes"); PX 67 at 76 (UBS Home Finance Credit/Underwriting Guidelines instructing underwriters to use their judgment in evaluating numerous credit inquiries, stating that "[s]ome key indications are numerous inquiries from mortgage lenders").  Especially in light of Grissom's further concession that it is possible the underwriters overlooked such red flags, Tr. 529:17-20 (Grissom), it is especially likely the DTI ratios for these 374 Loans were misstated.

### d.       Credit Reports

276.    For 373 Loans, Holt found that the borrowers' debts were misstated based on his analysis of the borrowers' credit reports.[130]  The Court received these documents as part of the Loan Files, but did not receive them for the truth of the matters stated therein.  *See, e.g.,* Tr. 1075:15-1089:23 (Holt) (discussing PX L10122); Tr. 1121:24-1122:15 (Holt) (discussing PX L11251); *see also* Holt Direct (PX 1103) ¶ 111 ("Underwriting guidelines typically require all loan files to contain a credit report from an approved credit-reporting agency for the borrower and co-borrowers (if applicable)").  Accordingly, the question is whether it was appropriate for Holt to rely on those statements in reaching his opinions.  Grissom testified that she considered credit reports to be information that underwriters could use to verify income, if the reports were in the loan files.  Tr. 728:17-729:9 (Grissom).  Moreover, at trial, Grissom did not dispute the accuracy of the statements in those reports.  Tr. 566:17-567:19, 572:6-21, 643:21-644:10, 696:7-697:2,

---

[129]   App. 12 (DTI Ratio – Debt – Credit Inquiries).

[130]   App. 19 (DTI Ratio – Debt – Credit Reports).

718:6-719:7 (Grissom).   Accordingly, the Court finds that it was reasonable for Holt to rely on credit reports in his findings.

### e.   Additional Misrepresentations

277.   The Court's findings that UBS breached the MLS Warranty regarding DTI ratios based on misstated debts are also bolstered for those 1,675 Loans where the breach was based on the borrower's misrepresentation of income and Holt found that the borrower also misrepresented his occupancy, employment, or income.[131]   Such evidence that a borrower made multiple misrepresentations makes it more likely that he misrepresented his debts.   *E.g.*, Loan ██████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████ ; Loan ████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████

### 3.   Evidence Regarding Income

278.   The Court now addresses the evidence showing the breaches of the MLS Warranty regarding DTI ratios based on evidence that borrowers' incomes were misstated.[132]   For many of

---

[131] App. 34 (DTI Ratio – Debt – Other Misrepresentations).

[132] App. 13 (DTI Ratio – Income).

118

the Loans with such breaches, Grissom noted that the source relied on by Holt to show the borrower's income is from a year subsequent to the year of origination, although she does not dispute the accuracy of that information.  *See, e.g.*, Tr. 574:23-577:8 (Grissom).  Holt's use of such data does not change the Court's findings.  It is appropriate for the Court to apply "the backward relation presumption," *McFarland,* 425 F.2d at 447; *see also Larsen*, 30 A.D.2d at 406, "when the time span is not too great and there is no suggestion of an intervening circumstance that might call its previous existence into question."  *Sliker*, 751 F.2d at 484.  Here, Holt relied on "subsequent year" evidence of income only if the borrower's stated profession was one in which income was unlikely to have decreased in the interim—such as nurses, firemen, and policemen[133]—and there was no dispute that the borrower's job changed during that time.  *See, e.g.*, Tr. 1022:8-1023:9 (Holt).Where a borrower's stated profession was one that might indicate more variable income, especially in the relevant time period—*e.g.*, a realtor or salesman—Holt did not rely on such information.   Accordingly, the Court concludes that it was reasonable for Holt to rely on "subsequent year" evidence of income as he did.

> a.   **Social Security Administration and Pension Custodian Statements of Income**

279.    For 10 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of Social Security benefit statements issued to borrowers by the Social Security Administration ("SSA") and/or retirement pension income statements issued to borrowers by pension custodians.[134]  The Court received these statements, which fall under Federal Rule of Evidence 803(8)'s hearsay exception for matters reported by public offices, for their truth.  *United*

---

[133]   Specifically, Holt relied on "subsequent year" evidence primarily for borrowers with the following types of position: retiree (57 Loans); manual worker (machine operator, technician, laborer, welder, plumber, electrician, auto tech, maintenance worker, custodian, janitor, etc.) (42 Loans); service industry (truck driver, food service, hair stylist, etc.) (41 Loans); non-executive supervisor or manager (41 Loans); administrator (office manager, paralegal, secretary, legal assistant, medical clerk, etc.) (40 Loans); sales/retail (store clerk, grocery clerk, insurance sales, cashier, retail clerk, etc.) (37 Loans); medical professional (nurse, physical/occupational therapist, dental assistant, optician, etc.) (27 Loans); technical (engineer, computer scientist, scientist, chemical engineer, software engineer, systems administrator, etc.) (23 Loans); educator (teacher, vocational instructor, teaching assistant, school social worker, etc.) (23 Loans); civil servant (police officer, fireman, government agency employee) (14 Loans); postal worker/courier (10 Loans).

[134]   App. 14 (DTI Ratio – Income – SSA).

*States v. Suggs*, 531 F. App'x 609, 617 (6th Cir. 2013) (admitting claim form "as a business or public record of the Social Security Administration"); *see also United States v. Bandera-Salas*, 999 F.2d 544 (unpublished) (9th Cir. 1993) (affirming admission of a "Social Security Administration computer printout"); *Overton v. Reilly*, No. 90 C 0412, 1991 WL 104185, *2 (N.D. Ill. June 6, 1991) (admitting contents of a Social Security file, including a "Social Security Administration Award Certificate," under 803(6)); Fed. R. Evid. 803(8)(A) 1972 advisory committee notes (citing Pension Office record showing that pension was issued as example of public record falling under this hearsay exception).

280.     Grissom did not challenge the reliability of these income statements, and it is not clear that she would have a basis to question the accuracy of statements made by a federal agency or a pension custodian.  The Court finds these statements to be more credible than the borrowers' statements in their original applications, and thus finds that the statements support its findings of breaches of the MLS Warranty regarding DTI ratios.  Even if those statements had not been admitted for their truth, moreover, the Court finds that it was reasonable for Holt to rely on those statements in reaching his findings.

### b.     Employer Statements Of Income

281.     For 282 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of statements of their income by their employers in W-2 forms and paystubs.[135]  The Court received these employer statements—which UBS stipulated were authentic, Dkt. 339, which must be prepared pursuant to regulations of the Internal Revenue Service,[136] and which thus qualify as business records under Federal Rule of Evidence 803(6), *see generally Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir. 1993) (holding payroll records admissible under business records exception); *United States v. Turner*, 189 F.3d 712, 719-21 (8th Cir. 1999) (affirming district court's admission of payroll records under business records exception); *United States v.*

---

[135]   App. 15 (DTI Ratio – Income – Employer Statements).

[136]   Dep't of the Treasury Internal Revenue Serv., *2006 Instructions for Forms W-2 and W-3, available a*t https://www.irs.gov/pub/irs-prior/iw2w3--2006.pdf.

*Hendrickson*, No. 13-cr-20371, 2014 WL 3563441, at *1 (E.D. Mich. July 18, 2014) (admitting W-2s and 1099s under business records exception)—for their truth under Federal Rules of Evidence 807, given their strong indicia of reliability.[137]

282.    Grissom did not challenge the reliability of these documents, Tr. 728:23-729-4, and it is unclear on what basis she would be able to do so, absent evidence that the employers were producing fraudulent income records despite heavy penalties for doing so.   To the contrary, Grissom testified that if W-2 forms appeared in the loan origination files, she would consider them to be "verified information" she "absolutely" would refer to and consider.  Tr. 728:17-729:9.  And UBS, in its own guidelines, required that its underwriters consult W-2s and pay stubs when verifying borrowers' income.  PX 67 at 35 (UBS Home Finance guidelines requiring W-2s and pay stubs); *see also* PX 67 at 225, 234 (IndyMac guidelines requiring W-2s and pay stubs); PX U004 at 19 (Countrywide Guidelines requiring pay stubs).  The Court finds these statements by the borrowers' employers to be more credible than the borrowers' statements in their original applications, and thus finds that the statements support its findings of breaches of the MLS Warranty regarding DTI ratios.  Even if the W-2s and paystubs had not been admitted for their truth, moreover, the Court finds that it was reasonable for Holt to rely on those statements in reaching his findings.

c.    **Bureau of Labor Statistics**

283.    For 72 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of information regarding salaries paid for the borrowers' occupations on the website of the Bureau of Labor Statistics ("BLS"), which provides retrospective income data for past years, Tr. 1014:21-1015:4 (Holt).[138]  The Court received this information for its truth under Federal Rule of Evidence 803(17) as commercial data that was generally relied upon by persons in the mortgage

---

[137]    The parties deferred briefing on the issue of the admissibility of the Loan Files until after trial, at which point the Trusts filed a letter brief explaining that while the Loan Files did not need to be admitted for their truth, certain statements therein—employer statements of income and statements by the Social Security Administration—should be admitted on that basis under exceptions to the hearsay rule.  *See* Dkt. 434.

[138]    App. 16 (DTI Ratio – Income – BLS).

industry.  Tr. 1184:15-1186:13; 1180:5-1181:7 (Holt providing foundation for admission); *see also*

*Citizens Against Longwall Mining v. Colt LLC*, No. 05-3279, 2008 WL 927970, at *3 (C.D. Ill.

Apr. 7, 2008) (reports from the Illinois Bureau of Labor Statistics fell under Rule 803(8)).

284.   Grissom testified that use of BLS data was available to underwriters was "one

[source] that we would use because it's very common."  Tr. 387:19-388:8; *see also* 392:17-393:14

(conceding that BLS was "certainly a tool available" to underwriters) (Grissom).  Nevertheless,

she opined that BLS data "suffers from serious flaws and can be readily misused."  Grissom Direct

(DX LI) ¶ 74.  This opinion is entitled to no weight, given Grissom's admissions she is not an

expert in the use of BLS data, and in fact looked at the BLS website only in preparing a report in

this case, Tr. 478:9-21 (Grissom).  This opinion is also undercut by the fact that UBS's own re-

underwriting vendor JCIII used "salary data bases," PX 344 at 4, and that JCIII relied on BLS data

when reviewing the Loans for potential breaches.[139]

285.   Moreover, Grissom's specific concerns were addressed by Holt's conservative use

of BLS data.  First, Grissom stated that BLS data does not capture overtime or certain bonus pay

or other income variations, Grissom Direct (DX LI) ¶ 74—but Holt used the 90th percentile salary

provided by BLS (the highest available), then he multiplied that figure by 125 percent to provide

a grossed up salary, Holt Direct (PX 1103) ¶ 153; Tr. 1016:4-10 (Holt), and the Trusts only put at

issue findings where the borrowers' stated incomes exceeded that grossed up salary by 10 percent

or more, Tr. 2039:3-20.  Tellingly, Grissom did not identify any Loan for which she opines that

these grossed up BLS figures are undercounting the borrowers' income.  Second, Grissom asserted

that selecting the appropriate BLS occupational code is subjective, and carries a risk of error,

Grissom Direct (DX LI) ¶ 74—but whenever more than one code appeared like it might apply,

Holt used the code with the highest salary, and Grissom did not identify any Loans for which she

---

[139]   *E.g.*, PX 4 (JCIII review results) at Cell AD-50 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Cell AD-102 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Cell AD-154 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮: Cell AD-365 ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

believes a different code with a higher salary should have applied.  PX 1044 at 3 (Holt protocol instructing vendors that "[i]f the borrower's occupation matches multiple BLS occupations, use the relevant BLS occupation with the highest salary").  Finally, Grissom asserts that BLS does not capture the incomes of the self-employed, farmers, or owners of unincorporated businesses, Grissom Direct (DX LI) ¶ 74—but none of the borrowers of the Loans in this category have such occupations, Tr. 1017:16-19 (Holt) (testifying that his "vendors were not supposed to use [BLS or Salary.com] for finding income for self-employed borrowers"); PX 1044 at 4 (Holt protocol instructing vendors that "BLS/Salary.com data shall not be used to assess the reasonability of a self-employed borrower's income" because "borrowers receiving 1099 income from their employment" should be considered "self-employed").

286.    Accordingly, the Court finds BLS data to be more credible than the borrowers' statements of their debts, and thus finds that the statements support its findings of breaches of the MLS Warranty regarding DTI ratios.  Even if the BLS data had not been admitted for its truth, moreover, the Court finds that it was reasonable for Holt to rely on that data in reaching his findings.  *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 528 (S.D.N.Y. 2015) (re-underwriting expert's "reliance on BLS data was entirely reasonable in the circumstances" where expert used 90th percentile of BLS data in conjunction with information in the loan file to assess reasonableness of income); *Massachusetts Mut. Life Ins. Co. v. DB Structured Products, Inc.*, No. 11 Civ. 30039 (MGM), 2015 WL 2130060, at *14 (D. Mass. May 7, 2015) (re-underwriting expert "adequately accounted for the potential that BLS data might understate incomes by finding a borrower's stated income unreasonable only when it exceeded the 90th percentile of the BLS index for the borrower's occupation, position, and geographic location").

### d.    Salary.com

287.    For 4 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of information regarding salaries paid for the borrowers' occupations on the website

salary.com, which reflects salary information including bonuses, commissions, and overtime pay.[140] Tr. 1016:11-13 (Holt).  The Court received this information for its truth under Federal Rule of Evidence 803(17) as commercial data that was generally relied upon by persons in the mortgage industry.   Tr. 1184:15-1186:13 (Holt); 1180:5-1181:7 (Holt) (foundation for admission); *see Flitton v. Primary Residential Mortg., Inc.*, No. 03 Civ. 481 (DAK), 2008 WL 4911225, at *3 (D. Utah Nov. 13, 2008) (admitting compilations of salary information from websites including salary.com under FRE 803(17)).

288.    Grissom did not dispute that Salary.com data was accurate or reliable.   *See generally* Grissom Direct (DX LI).  To the contrary, she acknowledged that she would consult Salary.com as part of "do[ing her] homework" if she could not determine whether a stated income was reasonable.  Tr. 433:5-13.  Moreover, UBS required its own underwriters to use sources including Salary.Com when verifying income.  PX 67 at 35 (UBS Home Finance Guidelines for Stated Income Verified Assets Loans mandating that "[s]tated income must be reasonable for the job/occupation and length of employment of the borrower, and must be validated using online sources that provided employment compensation data such as 'Salary.com'"); *id.* at 0036 (same for Stated Income/Stated Assets (SISA) Loans); *see also* PX U577 at 32 (American Home guidelines stating that "[c]areful consideration must be provided relative to the income stated by the borrower and a reasonableness test is made by the AHM underwriter through various means such as 'Salary.com' or other providers of such information"); PX U578 at 31 (same); *see also, e.g.*, PX 4 AD-3, AD-21, AD-61, AD-73 (JCIII review results citing salary.com data).  Moreover, neither Grissom nor UBS challenged Holt's substantive use of Salary.com data.[141]  Accordingly, the Court finds Salary.com data to be more credible than the borrowers' statements of their

---

[140]   App. 17 (DTI Ratio – Income – Salary.com).

[141]   Holt's use of Salary.Com was also conservative and pragmatic.  When evaluating borrowers' incomes, Holt used only the highest percentile available to approximate a borrowers' income, which gave the borrowers the benefit of the doubt.  Tr. 1016:16-20.  Holt also did not  use Salary.com to test the income of self-employed borrowers, *id.* at 1017:16-19, or when a self-employed borrower's 1099 was available.  *Id.* at 1018:5-1019:2; *see also* PX 1044 at 4.

incomes, and thus finds that this data supports its findings of breaches of the MLS Warranty regarding DTI ratios.

### e.  Work Number

289.   For 37 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of information regarding salaries paid for the borrowers' occupations on the website Work Number.[142]  Grissom did not dispute that this information is accurate and reliable.  *See generally* Grissom Direct (DX LI); Tr. 463:18-21 (Grissom) (agreeing that Work Number was a service underwriters could use to verify the accuracy of borrower information).  And Grissom did not dispute the information that Holt uncovered through this source.  *See generally* Grissom Direct (DX LI).

290.   Accordingly, the Court finds that it was reasonable for Holt to rely on that data in reaching his findings.  *See Flagstar Bank*, 920 F. Supp. 2d at 506 (finding that similar third-party source was "commonly relied upon in the field of underwriting").

### f.  Borrowers' Tax Returns

291.   For 543 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of the borrowers' tax returns or Form 1099s.[143]  The Court received these documents as part of the Loan Files, but did not receive them for the truth of the matters stated therein.  *See, e.g.,* Tr. 1075:15-1089:23 (Holt) (discussing PX L10122); Tr. 1121:24-1122:15 (Holt) (discussing PX L11251); *see also* Holt Direct (PX 1103) ¶ 154 (Documents "in the loan file indicating the borrower's true income . . . often included the borrower's tax return for the relevant year").  Accordingly, the question is whether it was appropriate for Holt to rely on those statements in determining that the DTI ratios were misstated.  Grissom testified that she considered tax returns to be information that verified income, if they were in the origination file.  Tr. at 728:17-729:9.  Similarly, UBS's own guidelines stated that it was appropriate for its underwriters to verify income

---

[142]   App. 18 (DTI Ratio – Income – Work Number).

[143]   App. 20 (DTI Ratio – Income – Tax Returns).

through tax returns.  PX 141 at 124 (UBS Full/Alternate Documentation guidelines requiring tax returns for the "2 most recent tax years" to verify income of self-employed borrowers or borrowers working on commission);  *see also* PX U462 at 18 (Countrywide guidelines requiring "[t]wo years tax returns (all borrowers)" to verify income for Full and Alternative Documentation loans); PX U482 at 5-6 (Countrywide Technical Manual listing "IRS 1099" as a "CLUES PLUS Documentation Requirement"); PX U374 at 10 (IndyMac Lending Guide requiring tax returns for the "2 most recent tax years" in order to underwrite Full/Alternate Documentation loans). Moreover, at trial, Grissom did not dispute the accuracy of the information contained in tax returns relied on by Holt.  Tr. at 456:13-457:8, 458:6-460:2, 512:14-513:13 (Grissom).  Accordingly, the Court finds that it was reasonable for Holt to rely on tax returns and W-2s in reaching his findings.

### g.    Borrower Bankruptcy Filings

292.    For 554 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of the borrowers' bankruptcy filings, which he found through searches of PACER and Lexis Nexis.[144]  *E.g.*, Loan ███████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████, *see* Tr. 882:3-884:23 (Holt)); Loan ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████.  The Court received these documents as part of the Loan Files, but not for the truth of the matters stated therein, so the question is whether it was reasonable for Holt to rely on them.  Holt testified to the reliability of PACER, Tr. 1179:19-1180:3 (Holt), and Lexis Nexis, Tr. 1180:20-1181:7, 1185:11-20 (Holt).  Grissom agreed that Lexis Nexis was available to underwriters in 2006,  Tr. 567:20-568:1; 576:16-577:8 (Grissom), and that they could use Lexis Nexis to help identify fraud, Tr. 394:2-18 (Grissom).  Consistent with that testimony, UBS's re-underwriting vendor JCIII used Lexis Nexis when conducting re-underwriting reviews.  PX 344

---

[144]   App. 21 (DTI Ratio – Income – Bankruptcy).

at 4 (JCIII procedures to follow "when using the fee website[] Lexis . . . ."); *see also* Cipione Direct (PX 1081), Ex. 7 ("Repurchase Analyses Database"), Col. N (showing that JCIII or Navigant referred to MERS in concurring with breach allegations for 21 Loans).

293.    While Grissom raised no substantive criticism of Holt's use of PACER and Lexis Nexis, UBS argued during closing that where a borrower made inconsistent statements in a loan application and a bankruptcy filing, the Court should credit the loan application.  Tr. 2126:23-2127:16.  The Court disagrees.  Statements made by borrowers in bankruptcy filings—which are often made with the assistance of counsel and are made under risk of severe penalties for false statements—have indicia of trustworthiness.  *See generally Taylor v. Freeland & Kronz*, 503 U.S. 638, 644 (2010) ("Debtors and their attorneys face penalties under various provisions for engaging in improper conduct in bankruptcy proceedings," including denial of discharge, penalty of perjury, sanctions, and "criminal penalties for fraud" under 18 U.S.C. § 152).  In light of this, and given that UBS own re-underwriting expert raised no substantive dispute about the information that Holt gathered through Lexis Nexis, Tr. 568:15-22, 570:4-7 (Grissom), the Court finds that it was reasonable for Holt to rely on statements in borrower bankruptcy filings in reaching his findings.

### h.    Borrower Hardship Letters

294.    For 30 Loans, Holt found that the borrowers' incomes were misstated based on his analysis of the "hardship letters" written by borrowers and included in loss mitigation servicing records.[145]  The Court received these documents as part of the Loan Files, Tr. 1184:15-1186:16 (Holt), but not for the truth of the matters stated therein, so the question is whether it was reasonable for Holt to rely on them.  While Grissom criticizes these statements as constituting post-origination evidence, Grissom Direct (DX LI) ¶¶ 8(b), 77-78, she does not dispute the accuracy of that information, Tr. 440:1-11, 442:9-444:10, 456:9-12 (Grissom).  Moreover, UBS's re-underwriting vendors used such "loss mit[igation] docs" to determine facts relating to borrower delinquencies.  PX 344 at 5; *see also id.* at 6 ("Look for post origination letters of explanation for

---

[145]  App. 22 (DTI Ratio – Income – Letters).

delinquency").   Accordingly, the Court finds it was reasonable for Holt to rely on borrower hardship letters in reaching his findings.

**i.**     **Red Flags**

295.     Holt's findings that UBS breached the MLS Warranty regarding DTI ratios based on misstated income are additionally bolstered by his findings for the 552 of these Loans for which the Loan Files contained evidence ("red flags") that the borrowers had misstated their incomes.[146] Grissom did not dispute the accuracy of the information that Holt relied on in determining that these red flags existed.  *See, e.g.*, Tr. 574:23-577:8 (Grissom).

296.     **Low Liquid Assets**.   For 122 Loans, Holt determined that the borrower had relatively low liquid assets, which is a red flag for misstated income, as one would expect borrowers with higher incomes to have more liquid assets.[147]  Holt testified that underwriters use a common rule of thumb that a borrower should have liquid assets of at least three months of stated income.  Tr. 1065:14-21 (Holt).   Therefore, where a borrower claimed to have a relatively high income, but information in the Loan File indicated his liquid assets are relatively low, there was a greater chance that the income is being misrepresented.  *See* PX U487 (Countrywide Technical Manual classifying as a red flag a "[h]igh income [b]orrower [having] . . . minimal liquid assets").

297.     **Low Deposits or No Deposits**.  For 25 Loans, Holt determined that the borrower had low bank deposits or no deposits at all, which is a red flag for misstated income, as one would expect a borrower's deposits to roughly match their income.[148]  *E.g.*, Loan ▮▮▮▮▮▮.  If a borrower claims to have a relatively high income, but bank statements indicate they are depositing a different amount in their bank account, there is a greater chance that the borrower is misrepresenting their income.  This can be seen from the fact that UBS's guidelines, for stated income verified asset loans, required two months of bank statements, PX 67 at 38 (UBS Home Finance guidelines), one

---

[146]  App. 23 (DTI Ratio – Income – Red Flags).

[147]  App. 25 (DTI Ratio – Red Flags – Low Liquid Assets).

[148]  App. 26 (DTI Ratio – Red Flags – Low Deposits).

purpose of which could have been to make certain that the deposits roughly reflected the stated income.

298.     **Unsourced Deposits**.  For 5 Loans, Holt determined that the borrower had both a lower average balance *and* large unsourced deposits over the course of two to three months, which is a red flag for misstated income, as this conduct can indicate the deposits were made solely for the purpose of getting a loan.[149]  *E.g.*, Loan ▆▆▆▆; *see* PX 67 at 229 (IndyMac guidelines, requiring in the context of a full documentation loan that underwriters obtain a "satisfactory explanation" for "[d]eposits that are larger than typical for the account"); *id.* at 247 (in the context of asset verification, for "any account opened within 90 days of verification, or with a balance that is significantly greater than the previously shown balance," requiring "reliable documentation to show that the funds were not borrowed"); *see also* PX U487 at 2 (Countrywide Technical Manual including as a red flag "[s]ignificant changes in balance from prior two months of date of verification"); PX U578 at 20 (American Home guidelines explaining that "[b]orrowers must satisfactorily explain any recent large deposits if used to qualify for the loan").

299.     **Payment Shock**.  For 12 Loans, Holt determined that the borrower could experience "payment shock," which is the risk that a borrower's mortgage payments will greatly increase as a result of a change in the interest rate on the mortgage.[150]  *E.g.*, Loan ▆▆▆▆; Holt Direct (PX 1103) ¶ 51 n.21.  Payment shock is a red flag for misstated income, particularly for adjustable rate mortgages, as it indicates the borrower may experience an inability to pay if interest rates rise or the borrower's income falls.  This was recognized by UBS in its own guidelines, as well as in the Guidelines of the relevant originators.  *See* PX 67 at 37 (UBS Home Finance guidelines stating that for no income/no assets loans "[p]ayment shock may be addressed on a case-by-case basis"); *id.* at 78 ("UBS recognizes the ability for a borrower to repay mortgage debt and the potential impact of payment shock is of utmost importance when evaluating the

---

[149]   App. 27 (DTI Ratio – Red Flags – Unsourced Deposits).

[150]   App. 28 (DTI Ratio – Red Flags – Payment Shock).

creditworthiness of a borrower."); *id.* at 278 (IndyMac guidelines setting forth special considerations for potential payment shock); *see also* PX U374 at 56 (same).

300.    **Prior Bankruptcy**.  For 3 Loans, Holt determined that the borrower had a prior bankruptcy, which is a red flag for misstated income, as individuals who have filed for bankruptcy in the past generally are more likely to have lower incomes.[151]  *E.g.*, Loan ███████.  Further, having evidenced a willingness to file bankruptcy once, it is more likely that the borrower will be willing to do so in the future.  *Cf.* PX U578 at 24 (American Home guidelines explaining that "[a] borrower with a previous bankruptcy . . . represents a higher risk than a borrower without this type of adverse credit history"); PX 35 at 5 (Chevy Chase guidelines requiring bankruptcy to be discharged for two years); PX 36 at 9 (American Home guidelines requiring bankruptcy to be discharged after a certain number of years); PX 67 at 77 (UBS Home Finance guidelines setting restrictions for borrowers who have filed bankruptcy), 268 (IndyMac Lending guide advising that borrowers with prior bankruptcies may be evaluated on a case-by-case basis), 352 (Countrywide guidelines establishing stricter requirements for borrowers with prior bankruptcies), 362 (same).

301.    **Low Credit Limit**.  For 60 Loans, Holt determined that the borrower had a low credit limit, which is a red flag for misstated income, as one would expect borrowers with higher incomes to have higher credit limits.[152]  Holt Direct (PX 1103) ¶ 77 n.34 ("[I]f a borrower states an income of $15,000 a month but has only one credit card with a low limit, that may be an indication that this income is overstated."); *see also* PX U485 at 2 (Countrywide Technical Manual naming "[b]orrowers with a low credit score" as one of the "borrower/loan characteristics that have a **negative** impact in the evaluation process" (emphasis in original)).

302.    **High Credit Utilization**.  For 91 Loans, Holt determined that the borrower regularly utilized a high proportion of his credit limit, which is a red flag for misstated income, as one would expect a borrower with a higher income to have more cash in hand and thus be less

---

[151]  App. 29 (DTI Ratio – Red Flags – Prior Bankruptcy).

[152]  App. 30 (DTI Ratio – Red Flags – Low Credit Limit).

likely to resort to credit to make purchases.[153]  Therefore, if a borrower claims to have a relatively high income, but documents indicate that his or her credit utilization is relatively high, there is a greater chance that the income is being misrepresented.  Loan 

; *see* Holt Direct (PX 1103) ¶¶ 71, 77 n.34 ("Borrowers who have near their maximum credit limit on their accounts may also be living beyond their means, calling into question whether the stated income is reasonable."); Tr. 1024:21-1025:4 (Holt).

303.    **Changed Income in Applications**.  For 24 Loans, Holt determined that the borrower stated different incomes in different versions of their loan application.[154]  *E.g.*, Loan

.  Self-evidently, such behavior raises concerns about the veracity of any of the borrower's stated incomes.

304.    In short, these red flags confirm the Court's findings that UBS breached the MLS Warranty as to DTI ratios for the Loans in this category.[155]

>   **j.    Additional Misrepresentations And Confirmatory Data from BLS or Salary.com**

305.    The Court's findings that UBS breached the MLS Warranty regarding DTI ratios based on misstated income are also bolstered for those 1,398 Loans where the breach was based on the borrower's misrepresentation of income and Holt found that the borrower also misrepresented his occupancy, employment, or debts and/or that data from BLS or Salary.com

---

[153]  App. 31 (DTI Ratio – Red Flags – High Credit Utilization).

[154]  App. 32 (DTI Ratio – Red Flags – Changed Income in Applications).

[155]    For certain other Loans, Holt determined that other suspicious factors warranted further investigation of the borrower's income.  For example, Holt observed that                            .  Loan            ; *see also* PX U487 at 2 (Countrywide Technical Manual setting forth a list of red flags, and instructing underwriters to always question "Does this loan make sense?").

confirmed the borrower's income was overstated.[156]   Evidence that a borrower made multiple misrepresentations makes it especially likely that he misrepresented his income.   Such evidence that a borrower made multiple misrepresentations makes it more likely that he misrepresented his income.   *E.g.*, Loan ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████; Loan

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████.   Similarly, evidence that the income for the same job in the same location was significantly lower than the borrower's stated income also makes it more likely that the borrower misrepresented his income.   *E.g.*, Loan ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ▬

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[156]   App. 38 (DTI Ratio – Income – Other Misrepresentations).

███████████████████████████████████████████████████
██████████████████████████████████████████████████);
Loan ███████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████ ███ ████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████.

#### 4.    UBS's Breaches Caused MAEs

306.    The Trusts presented evidence that loans made to borrowers with higher DTI ratios are riskier than those to borrowers with lower DTI ratios.   Holt Direct (PX 1103) ¶ 73 ("[B]orrowers with higher DTI's have a higher capacity risk), ¶ 54 ("[I]f the key characteristics of the borrower (*e.g.* . . .  debt . . .) are actually worse than what the borrower represented, the loan is more risky, and, thus, less valuable").   Grissom agreed with this point, Tr. 380:23-381:5 (Grissom) ("The higher DTI has a higher risk"), as did Wu, Tr. 186:20-187:3 (Wu) (admitting DTI ratio was a factor that "could significantly increase the risk of loss"); *see also* PX U485 at 2 (Countrywide Technical Manual naming "[i]ncome or debt ratios that exceed individual program guidelines" as one of the "borrower/loan characteristics that have a **negative** impact in the evaluation process" (emphasis in original)); PX U008 at 4 (Countrywide Underwriting Philosophy describing the "varying risk levels" of, *inter alia*, increasing back end ratios and stating that 35 percent would be considered "neutral," 42 percent "increases risk," and 45 percent "*significantly increases risk*.") (emphasis added).

307.    The Trusts also presented evidence that, consistent with these increased risks, the guidelines set maximum limits for DTI ratios and imposed stricter requirements for loans with higher DTI ratios.  *E.g.*, PX 17 at 97 (UBS Credit/Underwriting guidelines) ("The maximum allowable Debt-to-income ratios are stated on the individual product grids."); PX U202 at 8 (Countrywide guidelines setting a maximum DTI of 40 percent); PX U578 at 19 (American Home guidelines) ("The maximum Debt-to-Income qualifying ratio is **38%** for all ARMs and for Fixed Rate Loans with LTV's > 90% and **40%** for Fixed Rate Loans with LTV's less than or equal to 90%." (emphasis in original)); PX U004 at 12 (Countrywide guidelines setting maximum DTI at 40% for "Full/Alt" loans and 38% for Reduced and SISA loans).[157]  Grissom did not dispute that the guidelines imposed DTI ratio requirements that were tied to increased risk of loss. Tr. 594:13-16 (Grissom) ("Q.  Let me ask you it this way.  You would agree that the point of guideline thresholds like the DTI of 38 is to establish a point at which a risk significantly increases, correct? A.  That's correct.").[158]

308.    The evidence also shows that loans could not be made to borrowers that exceeded the guidelines' DTI ratio maximums unless an exception was granted, which would result in a different price.  PX 173 at 7 (Chevy Chase guidelines) ("Total debt ratio should generally be 40% or below.  Higher ratios are acceptable with compensating factor such as lower LTVs, strong reserves, high credit scores, or demonstrated ability to devote a larger portion of income to housing expense."); PX U462 at 10 (Countrywide guidelines saying "ratios may be exceeded if approved by CLUES or if there are compensating factors"); PX U578 at 19 (American Home guidelines for non-conforming loans "allow[ing] flexibility in . . . Debt to Income Ratios when any **two**" of four

---

[157] *See also* Holt Direct (PX 1103) ¶ 135 ("[E]xceptions are usually conditioned on an increased interest rate especially where they are required because one of the big four risk factors identified on the MLS is outside guidelines (DTI, LTV, occupancy status, and FICO score"), ¶ 74 ("The Originators recognized the importance of DTI in their guidelines. They set specific limits on the maximum acceptable DTI for a loan program."), ¶ 134 (identifying documentation type as a loan characteristic "strongly associated with risk").

[158] While Grissom opines that 3,919 Loans in this category do not violate guidelines, *see* App. 8, Col. D (FID: Dispute Status) filtered to "Undisputed - Derivative" and "Undisputed - No Guideline Violation", Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE.

enumerated "compensating factors exist[,]" and even then mandating that "the maximum Debt-to-Income Ratio will be 55%") (emphasis in original); PX U577 at 20 (same).  Grissom did not dispute these points, and rather conceded that approval of exceptions was conditioned on approval of higher interest rates, Tr. 635:4-14, 636:17-637:5 (Grissom).  And the Trusts have put at issue in this category only Loans that Holt found made the Loan  "significantly riskier[.]"  Holt Direct (PX 1103) ¶¶ 134, 136.

309.    Consequently, the Trusts have proved that UBS's breaches of the MLS Warranty regarding DTI caused MAEs for the  3,809 Loans in this category for which the borrowers' actual DTI ratios exceeded the guideline maximums by 2% or more.[159]  Because such Loans did not meet guideline requirements, and because the variation in DTI ratio exceeds the level that an AUS might possibly approve in combination with other factors, the Trusts have proved that these Loans were affected by MAES that (i) significantly increased the Loans' risk of loss as of the Closing Dates; and (ii) caused the Trusts to receive less interest than would have been required on a particular Loan.[160]

310.    The Trusts have also proved that UBS's breaches caused MAEs for the 1,220 Loans in this category for which the borrowers' actual DTI ratios did not exceed the guideline maximums.[161]  As Grissom conceded, a Loan with a higher DTI ratio is riskier than one with a lower DTI ratio, even if the Loan still complies with guidelines.  Tr. 380:24-381:5 (Grissom) ("If you take out the guideline factor, it does not have the same risk.  The higher DTI has a higher risk.").  As UBS's vendor JCIII conceded, a Loan with a higher DTI ratio is riskier because it is more likely to default.  Williams Dep. Designation at 215:9-17.  Corroborating this, if a loan receives an AUS Accept and subsequently turns out to have a DTI more than 2% higher than the

---

[159]  App. 35 (DTI Ratio – Above Guidelines).

[160]  The Trusts note that, of the 4,753 Loans affected by breaches of the MLS Warranty regarding DTI ratios, many Loans have misstated DTI ratios based on evidence of *both* misstated income *and* misstated debts.  For such  Loans, the Trusts could present recalculated DTI ratios based solely on the income evidence or solely on the debt evidence, at the Court's request.

[161]  App. 36 (DTI Ratio – Below Guidelines).

DTI submitted to the AUS, the loan must be re-submitted to the AUS—presumably because such an increased DTI is perceived to increase the risk of loss.  Tr. 1055:22-1056:25 (Holt); Tr. 621:2-10 (Grissom).  All of the Loans in Appendix 36 have recalculated DTI ratios that are at least 10—not 2—percentage points higher than the DTI stated on the MLS and that are also greater than 30%.  Consequently, as Holt explained, even if these Loans were below guidelines, it is reasonable to infer they had a significantly higher risk of loss and that an investor would have paid less for them than for Loans with the represented DTIs.  Holt Decl. ¶ 135.

311.   Moreover, 3,173 of the Loans in this category have liquidated, 493 Loans have been modified with losses, and 4,192 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[162] the Trusts also incurred MAEs for these Loans because they are bearing losses based on a risk of loss they did not bargain for.

312.   Finally, for all Loans in this category, the Trusts have also proved that UBS's breaches caused MAEs by revealing borrower fraud.  As detailed above, for the Loans in this category, the Trusts have presented evidence proving that on the loan application, the borrowers misrepresented either their income or their debts (or both).  Holt provided unrebutted expert testimony that, based on his training, such inconsistencies were indicative of fraud.  Tr. 882:10-885:1 (Holt), 1028:25-1029:2 (Holt) (testifying that "an undisclosed mortgage [is] indicative of fraud").  Even in the absence of Holt's testimony, the Court would find that these misrepresentations were more likely than not fraudulent, as it is difficult to believe that a borrower would unintentionally fail to disclose a mortgage, or misrepresent their income on a loan application.[163]  Accordingly, these breaches caused incurable fraud-based MAEs.

---

[162]   To identify the findings for these Loans in Appendix 8, filter Columns N (Liquidated), O (Modified with Losses), and P (60 Day Delinquency), respectively, to "Yes."

[163]   Nearly all of the 4,751 Loans in this category are also affected by other material breaches: (i) for 1,659 Loans, other violations of the MLS Warranty; (ii) for 657 Loans, breaches of the Maximum LTV Warranty); (iii) for 1,629 Loans, breaches of the Mortgage File Warranty; (iv) for 131 Loans, breaches of the Hazard Insurance Warranty; and (v) for 4,317 Loans, breaches of the Guideline Warranty.  *See* Appendix 61

### 5.    UBS Discovered Its Breaches On The Closing Dates

313.    The Trusts proved that UBS discovered these breaches on the Closing Dates.  The Trusts presented undisputed evidence that UBS and its vendors reviewed 903 of the Loans in this category, hence UBS is charged with actual knowledge of these breaches, which were apparent from the face of the Loan Files.[164]  *See* Part III.C.2, *above*.

314.    Because the Loan Files for these Loans contained "red flags" of misstated incomes and debts, *see* Part IV.G.3, *above*, UBS is also charged with actual knowledge of those red flags. UBS used DTI ratio as one of the "adverse criteria" it used to assess increased credit risk.  *See, e.g.*, PX 12 at 18 (high debt to income ratio as an "adverse" factor); PX 19 at 14-15 (same); PX 13 at 14; PX 103 at 1 (identifying higher "debt ratios" as a common risk factor used in selecting adverse samples).  UBS's awareness of red flags on these points would have made a reasonable person suspicious that Loans both in and outside of UBS's diligence samples also had misstated DTI ratios, and UBS could have investigated those suspicions by the Closing Dates.  UBS also was willfully blind to all breaches as of January 31, 2008.  *See* Part III.C.2, *above*.

### H.    The MLS Warranty Regarding Loan-To-Value Ratios

315.    In the MLS Warranty, UBS warranted that, for each Loan, the MLS contained the true and correct "Loan-to-Value Ratio" for each of these Loans "at origination."  PX 49 at 45-46 (MARM 2006-OA2 PSA) (defining "Mortgage Loan Schedule"); *id.* at 191 (Sched. II-i); PX 110 at 56-57 (MARM 2007-1 PSA); *id.* at 231 (Sched. II-i); PX 182 at 53-54 (MARM 2007-3 PSA); *id.* at 226 (Sched. II-1).  The contracts defined "Loan-to-Value Ratio" as:

> With respect to any Mortgage Loan and as to any date of determination, the fraction (expressed as a percentage) the numerator of which is the principal balance of the related Mortgage Loan at such date of determination and the denominator of which is the Appraised Value of the related Mortgaged Property. For purposes of representation (xxxiii) of Schedule II, the Loan-to-Value Ratio will be the loan-to-value ratio calculated in accordance with applicable state laws regarding primary mortgage insurance.

PX 49 at 36-37 (MARM 2006-OA2 PSA); PX 110 at 48 (MARM 2007-1 PSA); PX 182 at 46.

---

[164]    To identify the findings for these 903 Loans in Appendix 8, filter Column M (Due Diligence Records) to "Yes."

316.     Through this definition, the MLS Warranty warranted that the fair market value of

the properties, as measured by an appraisal, was true and correct.  The contracts define "Appraised

Value" as:

> With respect to any Mortgage Loan, the Appraised Value of the
> related Mortgaged Property shall be: (i) with respect to a Mortgage
> Loan other than a Refinancing Mortgage Loan, the lesser of (a) the
> value of the Mortgaged Property based upon the appraisal made at
> the time of the origination of such Mortgage Loan and (b) the sales
> price of the Mortgaged Property at the time of the origination of such
> Mortgage Loan; and (ii) with respect to a Refinancing Mortgage
> Loan, the value of the Mortgaged Property based upon the appraisal
> made at the time of the origination of such Refinancing Mortgage
> Loan as modified by an updated appraisal.

PX 49 at 23 (MARM 2006-OA2 PSA); PX 110 at 35 (MARM 2007-1 PSA); PX 182 at 24 (MARM

2007-3 PSA).  For all loan types, the "Appraised Value" is either the sales price of the Mortgaged

Property at the time of the origination of such Mortgage Loan" or "the value of the Mortgaged

Property based upon the appraisal made at the time of the origination of such Mortgage Loan."  *Id.*

317.     Through its embedded definitions, then, the MLS Warranty warranted that a Loan's

"value . . . based upon the appraisal" was "true and correct in all material respects" as of

origination.  The natural reading is that UBS warranted both that the "value" of the property was

true and correct and that this value was based upon an appraisal.[165]  Second Circuit precedent

confirms this reading.  In *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, a CMBS breach

of warranty action, the defendant warranted that "the fair market value of such real property *as*

*evidenced by an appraisal* . . . was at least equal to 80% of the principal amount of the Mortgage

Loan."  424 F.3d 195, 202 (2d Cir. 2005) (emphasis added).  On an appeal from summary

judgment, the appeals court held that if the loan "was secured by "real property" the "fair market

---

[165]  Contrary to UBS's arguments, "the value . . . based upon the appraisal" does not simply mean "the appraised value."  This is plain from the PSAs, which expressly used the undefined term "appraised value" in several other contexts when discussing appraisals.  *E.g.,* 07-1 PSA at 79 (defining Clean-Up Call Group II REO Property Price as lesser of unpaid principal balance or "the appraised value of such REO Property as determined by the higher of two appraisals completed by two independent appraisers selected by the Master Servicer"); *id.* at 193 § 11.01(b) (requiring that at least one bid to purchase a Loan in liquidation exceed "the appraised value of any Group I REO Properties, such appraisal to be conducted by an Independent appraiser mutually agreed upon by [certain parties] in their reasonable discretion"); *id.* Schedule II (viii) (warranting that all improvements to mortgaged properties that "are included for the purpose of determining the appraised value of" the properties are within the property lines).

value" of which was equal to at least eighty percent of the loan's value . . . *and if that fact* was evidenced by the required MAI appraisal, of course, there was no such breach" of this warranty. *Id.* at 210 (emphasis added).  That is, the Second Circuit recognized that the contracted warranted both the "fact" that the property's value would be at a certain level and that this fact would be evidenced by an appraisal—not that the appraised value was at that level.  The Court concludes the same here.[166]

318.    In any event, even if construed as statements of opinion, property appraisals give rise to liability under the federal securities laws when they are "both false and not honestly believed when they were made."  *Fait*, 655 F.3d at 113; *Omnicare*, 135 S. Ct. at 1327.  Under this standard, reported LTV ratios may "deviate[] so significantly from the results of plaintiff's loan-level analysis as to raise a plausible inference that the appraisers knowingly inflated their valuations." *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 328 (S.D.N.Y. 2012), *aff'd on other grounds*, 712 F.3d 136 (2d Cir. 2013).  At a minimum, then, the Trusts can prove that UBS breached the MLS Warranty as to LTV ratios by showing that the appraisals were not subjectively believed by the appraisers when made.

### 1.    UBS Breached The MLS Warranty Regarding LTV Ratios

319.    The Trusts have demonstrated through expert evidence that, for 3,599 Loans, the Loan's actual LTV ratios were higher than the LTV ratios listed on the MLS.[167]

---

[166]   The barriers to recovering for false statements of opinion in tort cases are not present in contractual warranty cases.  *See generally Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 732 F.3d 755, 762-65 (7th Cir. 2013) (explaining that a statement as to compliance with the law would be actionable on an express warranty theory, but not on a tort theory); *cf. Omnicare*, 135 S. Ct. at 1325-26 (under tort-derived securities claim, by contrast, statements of compliance with the law are non-actionable statements of opinion); *compare Ziff–Davis*, 75 N.Y.2d at 503-04 (holding that false statement that audited financials of company complied with GAAP supported breach of warranty claim, because plaintiff was "buying businesses which it believed to be of a certain value based on information furnished by the seller which the seller warranted to be true"); *with Fait*, 655 F.3d at 110 (holding that similar statement of GAAP compliance going to value of company would *not* support securities claim absent proof of subjective disbelief).

[167] This number is derived by combining the 100 Loans determined by Holt to be defective (App. 39), and the 3,526 Loans determined by Cowan to be defective (App. 40), and removing the 27 duplicates.

320.     For 100 Loans, Holt determined that the LTV ratio was misstated on the MLS based solely on his own re-underwriting review.[168]  For 19 of these Loans, Holt determined that, based on the guideline requirements, the underwriter made an error determining the "value" used in the LTV calculation, for example, by using the wrong value as between an appraisal and recent purchase price (based on seasoning requirements), or failing to properly account for seller concessions.[169]

321.     For 3,526 Loans, Holt based his findings primarily on the work Dr. Cowan; which, as discussed further below, the Court concludes was permissible.  It was proper for Holt to do so, as "[o]ne expert is permitted to rely on facts, opinions, and data not of the expert's own making— including analyses performed or findings made by another expert in the case."  *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) (permitting expert to consider another expert's report in reaching his own analysis) (citations omitted).

322.     Grissom did not dispute the substance of Holt's findings.  For 19 Loans,  Grissom did not dispute Holt's overall conclusion that the Loans are materially defective.[170]  For the remaining 80 Loans, she asserts that (i) for 69 Loans, the misstatement does not cause the loan to materially deviate from underwriting guidelines;[171] and (ii) for 12 Loans, that the loan file cannot

---

[168]  App. 39 (LTV).

[169]  *E.g.*, App. 39, Loan ██████████, FID 4102, Col. H (FID: Holt Reply) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  These Loans can be located by filtering for "Seasoning Violation" or "incorrect property value was utilized" or "audit LTV was calculated using" or "The lender should have used the appraised value of" or "required the lesser of the" or "incorrectly utilized to calculate the LTV," "failed to utilize," or "seller concession." Mr. Holt's breaches for all but four of these 19 Loans (████████████████████████) were supported by recalculated LTVs based on Mr. Cowan's analysis.

[170]  To identify the findings for these 19 Loans in Appendix 39, filter Column F (FID: Grissom Overall Loan Assessment) to "I am unable to disagree with Mr. Holt's ultimate conclusion regarding this loan based on the documents and information available at this time" and "I understand that UBS previously agreed to repurchase this loan."

[171]  To identify the findings for these 69 Loans in Appendix 39, filter Column F (FID: Grissom Overall Loan Assessment) to "I disagree with Mr. Holt's conclusion that this loan is Materially Defective." *E.g.*, App. 39, Loan

be re-underwritten.[172]  Grissom's statements as to these Loans are not relevant to whether the LTV ratio was actually misstated on the MLS, and thus do not rebut Holt's findings.  For the 3,526 Loans for which Holt relied on Cowan's work in finding a material defect, Grissom did not respond on this basis.[173]  Consequently, the Court finds that UBS breached the MLS Warranty regarding LTV ratios as to these 3,599 Loans.

323.   UBS asserts that the Court should disregard Cowan's analysis because it is based on AVM results, and not on in-person reappraisals of the subject properties.  But, as Cowan explained, "[y]ou don't have to be an appraiser to be able to value or understand the economic theory of valuation."  Tr. 1676:22-1677:2 (Cowan).  Twombly conceded that UBS used AVMs during its due diligence review for the same purposes that Cowan did here—to gauge whether the appraised value was reasonable.  Tr. 1349:8-19.  Similarly, Grissom testified that, the course of her re-underwriting career, she used AVMs to determine the fair market value of properties, and found that AVM results were typically as reliable as appraisals in achieving that objective.  Tr. 291:4-292:9.  While Grissom's experience was limited to using AVMs to assess the current values of residential properties, Tr. 731:4-733:17, neither she nor UBS could explain why this make Cowan's use of the Phoenix-based AVM problematic, especially given that it could also assess current values with no change in methodology or data, Tr. 1715:1-6 (Cowan).  Accordingly, the

---

██████████, FID 24653, Col. G (FID: Grissom Rebuttal)████████████████████████████████████████████████████████████████████████████████████████████.  For some of these Loans Grissom asserted that the MLS breach was "derivative;" and for the remainder, Grissom's response directly addressed a *guideline* breach, not the MLS breach at issue, either including the phrases "regardless of any variance" or "the LTV ratio materially deviated from the origination underwriting guidelines," "falls below the guideline maximum," *e.g.* Loan ██████, FID 14949, Col. G (FID: Grissom Rebuttal), or "compensating factors," *e.g.* Loan ████████, FID 5574, Col. G (FID: Grissom Rebuttal).  Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE.

172   To identify the findings for these 12 Loans in Appendix 39, filter Column F (FID: Grissom Overall Loan Assessment) to "No loan file is currently available for this loan.  I disagree that a loan can be Materially Defective without a loan file available" and "In my opinion, this loan file in its current state is too incomplete to be re-underwritten."  *E.g.*, App. 28, Loan ██████, FID 31251, Col. F (FID: Grissom Overall Loan Assessment) (responding that the "loan file in its current state is too incomplete to be re-underwritten").

173   As stated above, for 27 Loans, Holt found an LTV defect based on both his own analysis and Cowan's, which is why the figures in this paragraph add up to 3,626, not 3,599.

Court agrees with other courts that AVM evidence is acceptable evidence of inflated appraisals. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 500 (S.D.N.Y. 2015) ("AVMs are commonly used as screening tools to identify appraisals that warrant closer review."); *see also Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 505, 506 (S.D.N.Y. 2013) (holding that AVMs may constitute reliable evidence of inflated appraisals).

324.     Cowan reported that 3,526 Loans had Recalculated LTV ratios that exceeded 80% and were at least 5 percentage points higher than the LTV reported on the MLS.  Cowan Direct (PX 1108) App. D.  Of those, 1,499 of those loans were appraised for a value higher than the sales prices of all ten comparable properties provided by Phoenix.[174]  That the appraisal exceeds the sales prices for ten properties that are most similar to the subject property supports the conclusion that the appraiser of that property did not believe that the opinion of the property's fair market value was accurate.  Accordingly, the Court finds that UBS violated the MLS Warranty as to these loans.

325.     Alternatively, Barnett testified that "if Dr. Cowan had used the correct 68% confidence interval around his AVM point estimate instead of the AVM mean," a smaller number of loans would have had Recalculated LTV ratios that exceeded the materiality thresholds set by Holt.  Barnett Declaration (DX OX) ¶ 61 & tbl. 7.  In notes 2 and 3 of Barnett's Table 7, Barnett supplied the following formulas for calculating a 68% confidence interval:

---

[174]   Appendix 40 (LTV Ratio – Cowan) contains the sales prices of the ten comparable properties provided by Phoenix for each loan that Cowan analyzed.  The data in columns A-Z of this Appendix appear exactly as they do on the "AVM Details" tab of DX NU.  Columns Q-Z contain the sales prices of the ten comparable properties.  (The arithmetic mean of the ten comparable sales prices, where ten sales prices were provided, appears in col. AA, and reflects the AVM mean that Cowan used, where applicable, to recalculate the loans' LTV ratios.  This mean is calculated by adding the values in columns Q-Z and dividing by ten.  By sorting column AA to exclude "Blanks," 10,446 loans remain, consistent with Cowan's testimony.  PX 1108 (Cowan Revised Direct) ¶ 70.)  The loans whose Recalculated LTV ratio exceeds 80% and are at least 5 percentage points greater than the LTV ratio reported on the MLS appear in col. AH and can be identified by sorting column AH to "1."  The subset of those loans whose appraisal (as reflected in col. AC and derived from the MLS) exceeds all ten comparable sales prices can be isolated by further sorting col. AB to "1."

[2] Variance of AVM comparables = $\dfrac{\sum(x - \bar{x})^2}{n - 1}$

where $\bar{x}$ = simple mean of 10 AVM comparable and   $n = 10$.
Standard error is calculated as   $\sqrt{Variance}$

[3] AVM 68% Upper Bound = $\bar{X}$ + std. error*t-critical, where t-critical is based on Student's t distribution with 9 degrees of freedom.

326.    While the Trusts disagree as a statistical matter that Barnett's proposed 68% confidence interval is an appropriate value estimate, if one uses that calculation as the substitute value for the appraisal – in lieu of the mean of the ten Phoenix comparable sales prices, which Cowan correctly used – an additional 912 loans still have Recalculated LTV ratios that are greater than 80% and at least 5 percentage points greater than the LTV ratio reported on the MLS.[175] Given that Barnett does not dispute that the appraisal exceeded the 68% confidence interval (using formulas he proposed) for that population of loans, the Court finds that UBS violated the MLS Warranty as to these loans.

327.    Finally, as to the remaining 1,115 loans whose appraisals exceed neither Barnett's proposed 68% confidence interval nor all of the comparable sales prices provided by Phoenix,[176] Cowan nevertheless credibly testified that the mean of the ten comparable sales prices was the statistically appropriate value to use in recalculating LTV, and that the Recalculated LTV ratios for these loans exceeded the threshold set by Holt.  The Court accordingly finds that UBS violated the MLS Warranty as to these Loans.

328.    In summary, the Trusts have proved breaches of 3,526 Loans based on Cowan's analysis.  The Court credits Cowan's findings, and finds that the criticisms offered by Barnett and UBS do not undercut the reliability of his analysis.

---

[175]    Sort column AH of Appendix 40 for "1" to isolate the 3,526 loans whose Recalculated LTV ratios are greater than 80% and at least 5 percentage points higher than the reported LTV ratio on the MLS.  Column AN contains the 68% confidence interval calculated using Barnett's proposed formula.  Sort column AO for "1" to indicates that the appraisal value in column AC exceeds the value in column AN.  Then sort column AB for "0" to isolate the additional 912 loans.

[176]    Sort column AH of Appendix 40 for "1" to isolate the 3,526 loans whose Recalculated LTV ratios are greater than 80% and at least 5 percentage points higher than the reported LTV ratio on the MLS.  Then sort column AB to "0" and column AO to "0" to isolate the remaining 1,115 loans.

## 2.    UBS's Breaches Caused MAEs

329.    UBS's witnesses admitted that the higher the LTV ratio, the greater the risk of loss. Tr. 186:20-187:3 (Wu) (admitting that certain characteristics, including LTV ratio, "could significantly increase the risk of loss"); *id.* at 379:23-380:4 (Grissom) (agreeing that LTV ratio is a factor associated with risk); *id.* at 381:6-11 (Grissom) (agreeing that "[a]ll other things being equal, an increased LTV ratio increases the risk of loss").  Holt confirmed this.  Holt Direct (PX 1103) ¶ 134 (identifying LTV ratio as a characteristic "strongly associated with risk"); *id.* ¶ 90 ("The higher the LTV, the less equity the borrower has in the home and the greater the collateral risk, because there is an inverse relationship between borrower equity and default propensity" and "a higher LTV makes it unlikely that a bank could recover the full value of the loan if the borrower fails to repay the loan.").

330.    Had the Loans' actual LTV ratios been known at origination, the loans could only have been made (if at all) at different prices or under different guidelines.  *See e.g.*, PX U716 at 9-10 (American Home Mortgage Guidelines explaining that "Rate/price adjustments will be applied to loan characteristics that increase or reduce the risk associated with the loan.  These loan characteristics may include . . . Low-LTV purchase transactions"); Tr. 1105:4-8 (Holt) (originators used LTV ratios were used to price loans); Tr. 621:21-622:4 (Grissom) (changes in LTV ratios would "funnel" loans into particular programs and would require exceptions); *see also* PX 696 at 32 (UBS Group Internal Audit stating "Minimum credit requirements [such as LTV] differ by product and impact pricing of the loans."); *see also* PX 17 at 15-20 (UBS Credit/Underwriting Guidelines providing LTV limits for various loan programs).[177]

331.    Consequently, the Trusts have proved that UBS's breaches of the MLS Warranty regarding LTV ratios caused MAEs to the 3,599 Loans in this category by (i) significantly increasing their risk of loss as of the Closing Dates; (ii) causing the Trusts to receive less interest

---

[177]    While Grissom opines that some Loans in this category do not violate guidelines, Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE.

than would have been required on a particular Loan.[178]  Additionally, the guidelines imposed PMI requirements for loans with LTV ratios above 80%, and increased the level of PMI required at 85%, 90% and 95%. *E.g.*, PX U001 at 14 (Countrywide) (requiring PMI for loans with LTV ratios over 80%).  Consequently, if a stated LTV ratio was 76% or more, and the actual LTV ratio was larger by 5% or more, the breach necessarily caused an MAE, as it would have led to different PMI requirements, and different pricing on the Loan.  Moreover, many of the Loans in this category were liquidated, modified with losses, or have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification); the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

### 3.      UBS Discovered Its Breaches On The Closing Dates

332.    UBS constructively discovered these breaches on the Closing Dates.  It is undisputed that UBS's vendors performed diligence on the Loans that the Trusts showed breached the LTV representation, and UBS was therefore alerted to the possibility that the subject property values were misstated.[179]  *See* PX 1081 (Ex. 16) ("MARM Credit and Compliance Database").  UBS also was willfully blind to all breaches as of January 31, 2008.  *See* Part III.C.2, *above*.

## V.     THE MAXIMUM LOAN-TO-VALUE RATIO WARRANTY

### A.      Construction Of The Maximum LTV Ratio Warranty

333.    The Maximum LTV Ratio Warranties provide that "the range of original Loan-to-Value Ratios of the Mortgage Loans is 7.82% to 95.00% . . . ."  PX 49 at 196 (MARM 2006-OA2 PSA) (Sched. II(xxxiii)); PX 110 at 236 (MARM 2007-1 PSA) (Sched. II(xxxiii)) (same, but with LTV ratios ranging from "14.29% to 100%"); PX 182 at 230 (MARM 2007-3 PSA) (Sched. II(31))

---

[178]    Nearly all of the 3,599 Loans in this category are also affected by other material breaches: (i) for 1,560 Loans, other violations of the MLS Warranty; (ii) for 781 Loans, breaches of the Maximum LTV Warranty); (iii) for 924 Loans, breaches of the Mortgage File Warranty; (iv) for 67 Loans, breaches of the Hazard Insurance Warranty; and (v) for 2,143 Loans, breaches of the Guideline Warranty.  *See* Appendix 61

[179]    To identify the findings for these Loans in Appendix 39 (the Holt LTV Appendix), filter Column L (Due Diligence Records) to "Yes," displaying 31 Loans of that set on which UBS or its vendors performed due diligence.

(same, but with LTV ratios ranging from "17.71% to 95.00%").  There is no dispute as to the plain meaning of this warranty.  Tr. 376:21-377-20 (UBS not disputing plain meaning of representation or that it speaks at origination).  As is relevant here, the Maximum LTV Ratio Warranty warrants that the Loans will not have LTV ratios, as of origination, exceeding 95% for the 2006-OA2 and 2007-3 Trusts and 100% for the 2007-1 Trust.[180]  PX 49 at 196 (MARM 2006-OA2 PSA); PX 110 at 236 (MARM 2007-1 PSA); PX 182 at 230 (MARM 2007-3 PSA).

### B.    UBS Breached The Maximum LTV Ratio Warranty

334.    The Trusts showed through Cowan's testimony that 1,461 Loans across all three Trusts breached the Maximum LTV Ratio Warranty because their Recalculated LTV ratios exceed 96% or 101%.  PX 1108 App. F.[181]  Of those, 842 Loans also were appraised for values that exceeded all ten sales prices of the comparable properties provided by Phoenix.[182]  Because an appraiser would not honestly believe an appraisal that exceeds the sales prices for the ten most similar comparable properties, the Court finds that UBS breached the Maximum LTV Ratio Warranty as to these 842 Loans.

335.    An additional 368 Loans were appraised for values that exceed Barnett's proposed 68% Upper Bound.[183]  Because even Barnett does not disagree that these Loans were appraised for a value higher than a value derived using his own calculations, the Court similarly finds that UBS breached the Maximum LTV Ratio Warranty as to these 368 Loans.

336.    Finally, the Court finds that UBS breached the Maximum LTV Ratio Warranty as to the remaining 251 Loans whose properties were not appraised for a value exceeding all ten

---

[180] The warranty also provides that "14.78% of the Cut-Off Date Pool Balance had Loan-to-Value Ratios at origination in excess of 80.00%."  *Id.*  The Court need not address any pool-wide implication of this representation because the Trusts only assert loan-by-loan breaches of this representation and warranty.

[181] Sort column AJ of Appendix 40 to "1" in order to isolate the 1,461 Loans whose Recalculated LTV ratios exceed the maximum LTV ratio warranted in the PSA, plus at least one percentage point.

[182] Keeping column AJ sorted to "1," next sort column AB for "1" to isolate the 842 Loans.

[183] Keeping column AJ sorted to "1," sort column AB to "0" and column AO to "1" to isolate the 368 Loans.

comparable sales prices or Barnett's proposed 68% Upper Bound.[184]  Cowan has reliably testified that the mean of the ten comparable sales prices is the appropriate value to use to Recalculate the LTV ratio.  The Court finds that UBS has violated the Maximum LTV Ratio Warranty as to these Loans as well.[185]

### C.    UBS's Breaches Caused MAEs

337.    As explained above (*see* Part IV.H.2, *above*), these breaches caused MAEs.  In short, Wu, a structurer on UBS's ARMS trading desk, testified that characteristics such as LTV significantly increased of loss on a given Loan, and accordingly impacted how UBS would price the different tranches of securitizations.  Tr. 186:12-187:3.  Moreover, the fact that UBS expressly warranted that the LTV ratios of the Loans in the Trusts would not exceed certain stated thresholds underscores the materiality of this representation—the Certificateholders expressly bargained for this provision.  The Trusts thus met their burden of proving an MAE as to these 1,461 breaches.

### D.    UBS Discovered Its Breaches On The Closing Dates

338.    As explained above, UBS constructively discovered these breaches as of the Closing Dates, or, at a minimum, was willfully blind to them as of January 31, 2008.  *See* Part III.C.2-3, *above*.

## VI.    THE MORTGAGE FILE WARRANTY

### A.    Construction Of The Mortgage File Warranty

339.    In each of the PSAs, UBS warranted that, as of the Closing Date:  "With respect to each Mortgage Loan, the Transferor is in possession of a complete Mortgage File except for the

---

[184]   Keeping column AJ sorted to "1," sort column AB to "0" and column AO to "0" to isolate the 251 Loans.

[185]   Cowan determined that 2,320 Loans had Recalculated LTV Ratios which exceeded the maximum LTV ratio permitted by the applicable underwriting guideline to which the Loan was underwritten, plus five percentage points.  Cowan Direct (PX 1108) ¶¶ 94-95.  He reported those Loans in Appendix E to his direct testimony.  Those loans similarly appear in Appendix 40 in column AI (sort to "1").  Of those 2,320 Loans, 975 were appraised for a value higher than all ten comparable sales prices (further sort column AB to "1"); 598 were appraised for a value higher than Barnett's proposed 68% Upper Bound, but less than at least one of the comparable sales prices (sort column AB to "0" and column AO to "1"); and 747 were appraised for a value less than at least one of the comparable sales prices and Barnett's proposed 68% Upper Bound.  The Court finds that UBS violated the Guideline Warranty as to these 2,320 Loans because their Recalculated LTV ratios exceeded the maximum LTV ratio permitted by the underwriting guidelines by at least five percentage points.

documents which have been delivered to the Trustee or which have been submitted for recording and not yet returned." *See* PX 49 at 196 (MARM 2006-OA2 PSA) (Sched. II(xxxii)); PX 110 at 236 (MARM 2007-1 PSA) (Sched. II(xxxii)); PX 182 at 230 (MARM 2007-3 PSA) (Sched. II(30)).   Section 2.01 defines "Mortgage File" to include a number of specific documents, including "the Original Mortgage Note" and the "lender's title policy and all riders thereto." *See* PX 49 at 67-68; PX 110 at 95-96; PX 182 at 78.  This language is unambiguous, and warrants that, as of the Closing Date, UBS in fact possessed a "complete Mortgage File," including title insurance and "all riders thereto" and a mortgage note.[186]

### B.     UBS Breached The Mortgage File Warranty

340.     The Trusts have demonstrated through expert evidence that (i) for 2,827 Loans, title insurance is entirely missing from the Loan Files (1,170 Loans)[187] or the Loan Files contain a title insurance policy that is missing a negative amortization rider (1,498 Loans);[188] (ii) mortgage notes are missing from the Loan Files of 21 Loans;[189] and (iii)  mortgage deeds are missing from the Loan Files of 41 Loans.[190]  Holt Direct (PX 1103) ¶¶ 171-72.  UBS does not dispute that these documents are missing from the Loan Files as of now, and UBS failed to produce any of these documents to the Trusts.[191, 192]  Consequently, the Trusts have proved that UBS does not have

---

[186]   The only exceptions to this Warranty were for documents that UBS had already delivered to the Trustee as of the Closing Date and for other documents, like certain mortgage assignments, that were still being recorded.

[187]   App. 44 (Mortgage File – Title Insurance – Full Policy)

[188]    App. 45 (Mortgage File – Title Insurance – Neg Am Rider).  Appendix 41 (Mortgage File – Title Insurance) contains all those Loans which appear in either Appendix 44 or 45.

[189]   App. 42 (Mortgage File – Mortgage Note).

[190]   App. 57 (Mortgage File – Deed).

[191]    For eight loans, Grissom asserts the negative amortization endorsement was in the loan file, but she cites to a variable rate endorsement, not a negative amortization endorsement, and there is no dispute that the negative amortization endorsement was missing.  Loan Numbers ███████ ████████████████████████.  For four loans, Grissom asserts there was sufficient coverage but does not dispute the negative amortization endorsement was missing.  Loan Numbers ████████████ ██████████.

[192]    For fourteen loans, Grissom states there is a copy of the note or deed in the file, but Holt notes that the cited document is defective for one of the following undisputed reasons:  (1) the note or deed is unrecorded, Loan Numbers ███████████████████████████████████████████████████████████████████; (2) the note

copies of those documents now. From this proof, the Court reasonably infers that UBS did not possess the documents as of the Closing Dates—if UBS had the documents at that time, then it presumably would have kept them and produced them to the Trusts. *See Sliker*, 751 F.2d at 484-85 (jury could infer bank was insured at the time of robbery from evidence bank was subsequently insured).

341. Further, Twombly admitted that UBS asked the originators to provide it with Loan Files only for Loans that UBS selected for a due diligence review, or about 25% of the loans it purchased. Tr. 1374:24-1376:12; *see also* PX 29 at 255 (noting that only loan files for a chosen sample on which due diligence is to be performed are obtained and sent to the due diligence vendor).[193] UBS's diligence records show that 2,261 of the Loans in this category were not selected for a diligence review,[194] establishing that—by Twombly's admission—UBS never obtained copies of their Loan Files at all. Similarly, Lantz admitted that, when UBS obtained loan files for an underwriting review, it sent them to the third-party vendors that performed the reviews and that, while he was "not certain" what happened to the loan files after the review was done, "[m]aybe they would destroy [the files.]" Tr. 1403:22-25. This evidence shows that UBS never possessed the Mortgage Files for 75% of the Loans, and did not possess the Mortgage Files even for the 578 Loans in this category that did receive third-party diligence reviews.[195]

342. UBS does not rebut this proof. Grissom did not address whether UBS had copies of the required documents as of the Closing Dates. While Grissom opines in some instances that the documents were in the Loan Files at the time of *origination*, *see, e.g.*, App. 42, Loan ███████, FID 790, Col. G (FID: Grissom Rebuttal), even if that opinion was credible, that testimony would

---

relates to the wrong address, Loan Number ███████; (3) the note is missing the required Prepayment Note Addendum, Loan Numbers ███████.

[193] When the Court asked Twombly why UBS did not request copies of loan files for the other 75% of the loans, Twombly replied: "The only thing I could think of in general is that there is -- files and we would be looking to obtain our sample is the only real reason I can think of. I don't have anything else for that." Tr. 1376:16-21.

[194] To identify the findings for these 2,261 Loans in Appendix 43 (Mortgage File), filter Column I (Due Diligence Record) to "Blanks."

[195] To identify the findings for these 578 Loans in Appendix 43, filter Column I (Due Diligence Record) to "Yes."

not rebut the evidence showing that UBS did not have copies of those documents as of the Closing Dates, which is the effective date of the Mortgage File Warranty—especially not in light of the evidence that UBS did not receive copies of the files.  Moreover, UBS did not produce any evidence that it did possess the documents as of the Closing Dates (for example, inventory records) and, of course, UBS did not produce the documents themselves.  Accordingly, the Trusts have proved that UBS breached the Mortgage File Warranty as to the 2,839 Loans in this category.[196]

### C.    UBS's Breaches Caused MAEs

343.    As a general matter, the Mortgage File Warranty must be read *in pari materia* with Section 2.03's repurchase provisions, which provide UBS with 90 days to "cure" a breach in all material respects before UBS is obligated to repurchase a defective Loan.  UBS warranted that it had complete copies of the Mortgage Files, including the specific documents at issue.  If UBS discovered or was notified in writing that one of those documents was missing from a Loan File, it had 90 days to produce the document from its copy of the Mortgage File, in which case it need not repurchase the affected Loan, as UBS concedes.  Tr. 2134:4-20.  The necessary corollary is that if UBS could not produce the missing documents then it is obliged to repurchase the affected Loan.

344.    The Trusts have demonstrated through expert evidence that UBS's failure to possess, and now to produce, the Mortgage Files as warranted caused MAEs on the interests of the Certificateholders in the Loans, no matter when MAE is measured.

345.    **Title Insurance**.  As Holt explained, "[t]itle insurance is a form of indemnity insurance, which insures against financial loss from defects in title to real property and from the invalidity or unenforceability of mortgage loans."  Holt Direct (PX 1103) ¶¶ 115.  Title insurance "[was] designed to protect the collateral and the lender's ability to foreclose in the event the borrower defaulted."  *Id.* ¶ 178.  Grissom agreed, conceding that title insurance "affects the security of the collateral,"  Tr. 680:6-11, hence the absence of title insurance from a Loan File

---

[196]   App. 43 (Mortgage File).

would significantly increase the risk of loss on the Loan. *Id.* 681:11-14. Accordingly, even assuming that title insurance was issued for these Loans, the absence of title insurance means that the owner of the Loan will not have the practical ability to put in a claim for title insurance in the event of default, which significantly increases the Loan's risk of loss.

346. As mentioned, for 1,498 Loans, the Loan Files have a title insurance policy but the policy lacks a negative amortization rider.[197] As Grissom explained, most Loans "have a negative amortization feature, which permits the borrower, subject to certain limits, to make monthly loan payments that are lower than the minimum interest due, with any unpaid interest being added to the principal balance." Grissom Direct (DX LI) ¶ 42. Accordingly, as Holt explained, negative amortization riders are "required by most guidelines for negative amortization loans to ensure that the title insurance policy covers not only the original principal balance but also the amount by which the principal balance might increase as a result of negative amortization." Holt Direct (PX 1103) ¶ 180; *see, e.g.*, PX 67 at 329 (IndyMac Guidelines mandating that "[a] Loan that has scheduled negative amortization or the potential for it must have coverage that equals 110% of the original mortgage amount). "Absent a negative amortization endorsement, there would be a shortfall in coverage on such a loan in the event the owner of the loan had to collect on title insurance." Holt Direct (PX 1103) ¶ 180. Grissom agreed that "a negative amortization endorsement is required for negative amortization loans because negative amortization loans can have their principal increase over time if the borrower pays less than their full amount for some period of time but less than the full amount of principal interest[.]" Tr. 691:8-16. Accordingly, even assuming that negative amortization riders were issued for these Loans, the absence of those riders shows that the owner of the Loan will not have the practical ability to put in a claim for title insurance in the event of default in an amount that covers the amount by which the principal balance might increase as a result of negative amortization, which significantly increases the Loan's risk of loss.

---

[197] App. 45 (Mortgage File – Title Insurance – Neg Am Rider).

347.    UBS does not rebut this proof.  Grissom opines that missing title insurance does not cause an MAE because it "would not have been a factor in the originator's decision whether to make the loan," Grissom Direct (DX LI) ¶ 90, but even if this opinion were credible, it would be irrelevant to an MAE caused by UBS's failure to possess a copy of the relevant documents. Moreover, UBS has produced no evidence that a lack of title insurance documents would not affect the ability of the Loans' owners to file complete insurance claims in the event of default.

348.    **Mortgage Notes**.  Mortgage notes are the borrower's written promise to repay their debt over a specific amount of time and at a specified rate, and identify the terms of the loan, including whether it has a variable or fixed interest rate.  Holt Direct (PX 1103) ¶ 103.  The mortgage note also establishes whether the loan has the potential to negatively amortize or contains any penalty fees.  *Id.*  Because the mortgage note also lists the steps that a mortgage lender may take if the borrower fails to make payments, a valid mortgage note is critical to securing a lender's ability to foreclose on subject property in the event of a default, and the lack of such a document threatens to render a mortgage unenforceable.  *See id.*  In addition, the mortgage note was critical to calculating a borrower's DTI, because it was the only source of information regarding a borrower's monthly mortgage payments for recently closed transactions.  *Id.* ¶ 104.  Inclusion of the mortgage note was thus implicitly required by Guidelines, as it was necessary for the underwriter to perform their duty.  *Id.*

349.    Breaches based on the absence or deficiency of a mortgage note caused MAEs. Such breaches threatened the certificateholders with an increased risk of loss, because they meant that the Loan lacked documentation necessary for the lender to enforce the borrower's obligation to repay.  In addition, because they were required for underwriting, the absence of a mortgage note shows that the underwriter failed to perform their duty, another MAE.  *Id.*  UBS offers no rebuttal on this point, and the Court thus concludes that the Trusts have established MAEs for such breaches.

350.    Accordingly, the Trusts have proved that UBS's breaches of the Mortgage File Warranty—by failing to possess copies of title insurance or mortgage note—caused MAEs to the interests of the Certificateholders in the affected Loans.[198]

### D.    UBS Discovered Its Breaches On The Closing Dates

351.    UBS discovered breaches of the Mortgage File Representation on the Closing Dates.  UBS actually discovered these breaches as to 578 Loans because they were apparent from a review of the Loan Files, and it is undisputed that UBS and its vendors performed pre-closing diligence on these Loans.[199]  *See* Cipione Direct (PX 1081), Ex. 16 (MARM Credit and Compliance Database); PX 29 at 255 (detailing pre-closing due diligence process, involving selecting a due diligence vendor to review and assess the quality of loans being purchased and assigning grades regarding same);  PX 41 at 49-50, 53 (same).  UBS should also be treated as having constructively discovered such breaches as of the Closing Dates because UBS indisputably knew that it lacked complete Mortgage Files for some documents (PX 88), had a policy not to purchase Loans missing such documents, Tr. 1381:19-1382:2, and nonetheless failed to investigate further despite having the ability to request the missing documents.  At a minimum, UBS was willfully blind towards such breaches and should be treated as having discovered them on January 31, 2008.  *See* Part III.C.2, *above*.

## VII.    THE TITLE INSURANCE WARRANTY

### A.    Construction Of The Title Insurance Warranty

352.    In each PSA, UBS warranted that, as of the Closing Date, (i) each Loan "is covered" by a title insurance policy, PX 49 at 193-94 (MARM 2006-OA2 PSA) (Sched. II(xvii)); PX 110 at 233-34 (MARM 2007-1 PSA) (Sched. II(xvii)); PX 182 at 228-29 (MARM 2007-3

---

[198]   App. 43 (Mortgage File).

[199]   To identify the findings for these 578 Loans in Appendix 43, filter Column I (Due Diligence Record) to "Yes."

PSA) (Sched. II(17)) (the "Title Insurance Warranty"). This language is unambiguous, and warrants that, as of the Closing Date, title insurance in fact existed for each Loan.[200]

### B.   UBS Breached The Title Insurance Warranty

353.   The Trusts have demonstrated through expert evidence that (i) for 2,827 Loans,[201] title insurance is entirely missing from the Loan Files (1,170 Loans)[202] or the Loan Files contain a title insurance policy that is missing a negative amortization rider (1,498 Loans).[203] UBS does not dispute that these documents are missing from the Loan Files now, and UBS failed to produce any of these documents to the Trusts. From this evidence that the required insurance documents do not exist as of now, the Court reasonably infers that they did not exist as of the Closing Dates—if they had, then UBS presumably would have kept copies of them and produced them to the Trusts. *See Sliker*, 751 F.2d at 484-85.

354.   UBS did not rebut this proof. Grissom concedes that 267 of the Loans in this category are materially defective.[204] For 1,465 Findings, Grissom's only response is "Mr. Holt concludes the loan was defective because the Title Policy is missing from the current loan file. Mr. Holt has offered no evidence to show that the purportedly missing document was not in fact properly transferred at the time of origination. Moreover, title insurance is issued post-closing and would not have been available to the underwriter at origination." *See, e.g.*, DX IU at 119 (Grissom Appendix B).[205] Grissom's response is irrelevant, because even if title insurance was not available at origination, the Title Insurance Warranty is made as of the Closing Dates, which occurred later.

---

[200]   The Court need not reach the question of whether UBS materially breached the Title Insurance Warranty for these Loans if the Court finds that UBS materially breached the Mortgage File Warranty for those Loans. *See* Part VI, *above*.

[201]   App. 41 (Mortgage File – Title Insurance).

[202]   App. 44 (Mortgage File – Title Insurance – Full Policy).

[203]   App. 45 (Mortgage File – Title Insurance – Neg Am Rider).

[204]   To identify the findings for these 267 Loans in Appendix 41, filter Column D (FID: Dispute Status) to "Concedes."

[205]   To identify these 1,465 Findings in Appendix 41, conduct a text search within Column G (FID: Grissom Rebuttal) for "properly transferred."

### C.   UBS's Breaches Caused MAEs

355.   Like the Mortgage File Warranty, the Title Insurance Warranty must be read in conjunction with Section 2.03's repurchase provision.   UBS warranted that the insurance documents existed.  If it discovered or was notified in writing that the documents were missing, it had 90 days to produce them or to repurchase the affected Loans.  The Trusts have shown that breaches revealing that the necessary title insurance did not exist caused MAEs to the interests of the Certificateholders in the Loans, at whatever time MAEs are measured.  *See* Part VI.C, *above*.

### D.   UBS Discovered Its Breaches On The Closing Dates

356.   UBS discovered breaches based on missing documents on the Closing Dates.  UBS actually discovered these breaches as to 576 Loans because they were apparent from a review of the Loan Files, and it is undisputed that UBS and its vendors performed pre-closing diligence on these Loans.[206]  UBS should also be treated as having constructively discovered such breaches as of the Closing Dates because UBS indisputably knew that Loan Files were missing these documents, PX 88, had a policy not to purchase Loans missing such documents, Tr. 1381:19-1382:2, and nonetheless failed to investigate further despite having the ability to request the missing documents.  At a minimum, UBS was willfully blind towards such breaches and should be treated as having discovered them on January 31, 2008.  *See* Part III.C.2, *above*.

## VIII.   THE HAZARD INSURANCE WARRANTY

### A.   Construction Of The Hazard Insurance Warranty

357.   In each PSA, UBS warranted that, as of the Closing Date, each Loan "is insured" against "loss by fire" and, if necessary, had "a flood insurance policy."  PX 49 at 194 (MARM 2006-OA2 PSA) (Sched. II(xviii)); PX 110 at 234 (MARM 2007-1 PSA) (Sched. II(xviii)); PX 182 at 229 (MARM 2007-3 PSA) (Sched. II(18)) (the "Hazard Insurance Warranty).   This language is unambiguous, and warrants that, as of the Closing Date, hazard insurance in fact existed for each Loan.

---

[206]   To identify the findings for these 576 Loans in Appendix 41, filter Column M (Due Diligence Record) to "Yes."

### B.     UBS Breached The Hazard Insurance Warranty

358.     The Trusts have demonstrated through expert evidence that for 242 Loans, hazard insurance is missing from the Loan Files.[207]  Holt Direct (PX 1103) ¶¶ 171-72.  UBS does not dispute that these documents are missing from the Loan Files as of now, and UBS failed to produce any of these documents to the Trusts.  From this evidence that the required insurance documents do not exist as of now, the Court reasonably infers that they did not exist as of the Closing Dates— if they had, then UBS presumably would have kept copies of them and produced them to the Trusts. *See Sliker*, 751 F.2d at 484-85.

359.     UBS did not rebut this proof.  Grissom concedes that 37 of the Loans in this category are materially defective.[208]  For another 98 Loans, Grissom's response is that there is no evidence that the hazard insurance documents "[were] not in fact properly transferred at the time of origination," *see, e.g.*, DX IU at 180—which does nothing to rebut the evidence that the documents did not exist.[209]  For another 46 Loans, Grissom states that "the security instrument permitted the lender to place sufficient coverage on the property to protect the collateral," *see, e.g.*, *id.* at 183—but this is not evidence that the lender actually did so.[210]

360.     Finally, for 87 of the remaining Loans, Grissom asserts that other documents, such as HUD-1 forms, show that hazard insurance policies were purchased,[211] *see, e.g.*, *id.* at 716 ("line 903 on the HUD-1 shows that funds were collected for hazard insurance)—but the Hazard

---

[207]   App. 46 (Hazard Insurance).

[208]   To identify the findings for these 37 Loans in Appendix 46, filter Column D (FID: Dispute Status) to "Concedes."

[209]   To identify the findings for these 98 Loans in Appendix 46, filer Column D (FID: Dispute Status) to "Undisputed - Transferred at Origination & Security Instrument Allowed" and "Undisputed - Transferred at Origination."

[210]   To identify the findings for these 46 Loans in Appendix 46, filter Column D (FID: Dispute Status) to "Undisputed - Transferred at Origination & Security Instrument Allowed" and "Security Instrument Allowed."  For fifteen loans, Grissom identifies a flood or hazard insurance policy in the loan file but Holt notes that the policy has insufficient coverage.  Loan Numbers ███████████████. For three loans, Grissom identifies what she calls a flood or hazard insurance policy but Holt notes that it is not such a policy.  Loan Numbers: ████████████.  For one loan, Grissom identifies a hazard insurance policy that Holt notes expired before the loan closed.  Loan Number ██████████.

[211]   To identify the findings for these 87 Loans in Appendix 46, filter Column D (FID: Dispute Status) to "Undisputed – Other Document Referenced."

Insurance Warranty requires that the policy have specific coverage levels, *see, e.g.*, PX 49 at 194 ("The Mortgaged Property securing each Mortgage Loan is insured . . . against loss by fire and such hazards as are covered under a standard extended coverage endorsement, in an amount which is not less than the lesser of 100% of the insurable value of the mortgaged Property and the outstanding principal balance of the Mortgage Loan, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis"), which HUD-1 forms do not show, *see, e.g.*, PX L 05416-0788 (HUD-1 Settlement Statement); *see also* App. 46, Loan ███████, FID 24381, Col. H (FID: Holt Reply)  ("The Final HUD-1 is not an adequate substitute for the Hazard Insurance as it does not provide the coverage amounts and the time frame of the policy coverage.").  Accordingly, the Trusts have proved that UBS breached the Hazard Insurance Warranty as to the 242 Loans in this category.

> ### C.  UBS's Breaches Caused MAEs

361.    Like the Mortgage File Warranty and the Title Insurance Warranty, the Hazard Insurance Warranty, read in conjunction with Section 2.03's repurchase provision, requires UBS to produce missing hazard insurance documents within 90 days of discovery or receipt of written notice, or else repurchase the affected Loans.

362.    The Trusts have demonstrated through expert evidence that UBS's breaches of the Hazard Insurance Warranty caused MAEs on the interests of the Certificateholders in the Loans, no matter when MAE is measured.  As Holt explained, "[h]azard insurance protects a homeowner against the costs of damage from fire, vandalism, smoke and other causes."  Holt Direct (PX 1103) ¶ 112.  "[O]riginators require properties to have hazard insurance," because a lender "is likelier to suffer a loss on an uninsured property because if the property is damaged and there is no insurance to cover the costs of rebuilding, then the value of the property (and the originator's chance of recovery) is reduced."  *Id.* ¶ 95.  That is, "[l]enders require the borrower to have hazard insurance to protect their investment."  *Id.* ¶ 112.  Grissom conceded that if hazard insurance was not obtained it would significantly increase the risk of loss on the Loan, Tr. 683:7-10 ("Q.  And if the borrower

did not obtain and provide hazard insurance, and the servicer failed to [] place it, would that significantly increase the risk of loss?  A.  If the servicer did not, yes.").  As a result, revealing the absence of required hazard insurance shows that the owner of the Loan will not have the practical ability to put in a claim for that insurance if the property is damaged, which significantly increases the Loan's risk of loss.

363.    UBS does not rebut this proof.  Grissom opines that "a failure to document hazard insurance pre-closing" would not cause an MAE, because "the security instrument . . . permitted lenders to place insurance if the borrower did not obtain sufficient coverage," Grissom Direct (DX LI) ¶ 87—but the fact that the lender *might* obtain the insurance after closing does not rebut the evidence of an MAE where the evidence shows the required insurance was not obtained at all. Moreover, UBS has produced no evidence that a lack of hazard insurance documents would not affect the ability of the Loans' owners to file complete insurance claims in the event of default. Accordingly, the Trusts have proved that UBS's breaches of the Hazard Insurance Warranty caused MAEs to the interests of the Certificateholders in the affected Loans.

### D.    UBS Discovered Its Breaches On The Closing Dates

364.    UBS discovered breaches based on missing documents on the Closing Dates.  UBS actually discovered these breaches as to 48 Loans because they were apparent from a review of the Loan Files, and it is undisputed that UBS and its vendors performed pre-closing diligence on these Loans.[212]  *See* PX 1081 (Ex. 16) ("MARM Credit and Compliance Database"); *see generally* PX 29 at 255; PX 41 at 49-50, 53.  UBS should also be treated as having constructively discovered such breaches as of the Closing Dates because UBS indisputably knew that Loan Files were missing these documents, PX 88, had a policy not to purchase Loans missing such documents, Tr. 1381:19-1382:2, and nonetheless failed to investigate further despite having the ability to request the missing documents.  At a minimum, UBS was willfully blind towards such breaches and should be treated as having discovered them on January 31, 2008.  *See* Part III.C.2, *above*.

---

[212]    To identify the findings for these 48 Loans in Appendix 46, filter Column M (Due Diligence Records) to "Yes."

## IX.   THE GUIDELINE WARRANTY

365.     In each PSA, UBS warranted that, as of the Closing Date, "[t]he Mortgage Loan was underwritten in accordance with the underwriting guidelines [of the originator] in effect at the time of origination with exceptions thereto exercised in a reasonable manner."  PX 49 at 196 (MARM 2006-OA2 PSA); PX 110 at 236 (MARM 2007-1 PSA); PX 182 at 230 (MARM 2007-3 PSA), (the "Guideline Warranty").  The Court notes at the outset that many Loans for which the Trusts have proved a breach of the Guideline Warranty also breach the MLS Warranty, and, accordingly, while the breaches of the Guideline Warranty bolster the Court's ultimate conclusion, they are not necessary in order for the Trusts to recover under the PSAs.

### A.     Construction Of The Guideline Warranty

366.     In the Guideline Warranty, UBS warranted that in fact (i) the underwriters had underwritten the Loans in accordance with the guidelines; (ii) the Loans complied with those guidelines; and (iii) the underwriters had exercised any exceptions in a reasonable manner.  *FHFA*, 74 F. Supp. 3d at 653 (such a representation in an RMBS offering document meant "that the loans . . . did in fact meet the criteria set forth in their Originators' guidelines.  That is a representation of fact.  It provided assurance to investors that the loans were of a certain quality.") *appeal pending* 15 Civ. 1872 (2d Cir.); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 294 (1st Dep't 2011) (describing "representations about Countrywide's compliance with its underwriting guidelines" as representations of fact); *AMBAC Assurance Corp. v. First Franklin Fin. Corp.*, No. 651217/2012, 2013 WL 3779636, at *3 (N.Y. Sup. Ct. July 18, 2013) (similar).[213] Accordingly, the Trusts may prove a breach of the Guideline Warranty with evidence that (i) a Loan was not in fact originated according to the applicable Guidelines; (ii) a Loan did not comply

---

[213]   UBS offers contradictory positions on the meaning of the Guideline Warranty.  In its opposition to the Trusts' *Daubert* motion regarding Grissom, UBS argued that the Guideline Warranty "refers to guidelines that incorporate originators' *subjective* determination regarding the loans."  Dkt. 342 at 25.  Yet in its own *Daubert* motion regarding Holt, UBS argued that the Guideline Warranty would be rendered "superfluous" if the Court read the MLS Warranty as warranting the accuracy of the information on the MLS, Dkt. 315 at 24 and n.11—an argument that necessarily depends on the Guideline Warranty warranting that the guidelines' underwriting criteria were met in fact.

with the Guidelines' criteria; or (iii) any exceptions that were granted were not exercised in a reasonable manner.

### B.    Loans Without Critical Documents

367.    The originators' guidelines required that loans could not be made without reference to several core documents in addition to those covered by express warranties in the PSAs:

368.    **Appraisals**.  Appraisals are the primary determinant of a property's value, and their accuracy is necessary to ensure that the property securing a loan has sufficient value to serve as collateral in the event that the borrower fails to make mortgage payments.  Holt Direct (PX 1103) ¶¶ 86-87.  If a property is overvalued as the result of an inaccurate appraisal, collateral risk increases because foreclosure will not necessarily be sufficient to recover the lender's outstanding debt.  *Id.* ¶ 86.  The guidelines required appraisals for all Loans.  *See* PX U170 (Countrywide technical manual detailing appraisal documentation requirements); PX U117 (Countrywide Technical Manual requiring appraisals for all Condominium and PUD Project); PX U249 at 1 (IndyMac "Property and Appraisal Standards").  Holt's testimony confirmed this as well.  *Id.* ¶ 88.

369.    **Credit Reports**.  Credit reports are a standard document in the mortgage lending industry, and generally include information such as the borrower's FICO score, payment history, records of any delinquencies, defaults, or bankruptcy filings, and other similar information.  Holt Direct (PX 1103) ¶ 111.  The guidelines required the evaluation of borrowers' credit reports for all Loans.  *See, e.g.*, PX U048 at 2 (Countrywide Streamlined Documentation guidelines, requiring credit reports); PX U091 at 1 (Countrywide Guidelines stating "All loans require a credit report from an approved credit reporting agency."); PX U248 at 35 (IndyMac Guideline stating that "[c]redit scores must be requested from all there of the following repositories:  Equifax, Experian, and TransUnion"); PX U577 at 24 (American Home Mortgage Guidelines stating:  "The loan file must contain, for each borrower whose income or assets are required to qualify for the loan, any one of the following types of credit reports . . . .[listing types]."); PX U585 at 9 (GMAC-RFC

Guidelines stating that "[a] pre-closing review should at a minimum, consist of the following . . . . Obtain duplicate credit report . . . .").

370. **HUD-1 Settlement Statements**. HUD-1 forms are used by settlement agents to itemize all charges imposed on a borrower, and include each party to the transaction with a list of their incoming and outgoing funds. Holt Direct (PX 1103) ¶ 105. Underwriters use HUD-1 forms to evaluate borrowers' assets, confirm the sale price of the transaction, verify debts paid using loan proceeds, and determine whether a loan is a cash-out loan. *Id.* ¶ 106; *see also* PX U466 at 13 (Countrywide Correspondent Lending stating that HUD-1s or similar forms "must be provided" to verify "[i]f any portion of the loan proceeds is being used to pay off debt for qualification purposes . . . ."). Underwriters also reviewed HUD-1 forms to verify whether borrowers had paid off certain debts, which was necessary to calculate DTI. The guidelines required underwriters to evaluate HUD-1 statements for all Loans. *See* PX U069 at 7 (Countrywide Technical Manual stating that "[w]ithin five business days of closing copies of the applicable documents listed must be sent to the Home Improvement Lending Department . . . Copy of DFC or HUD-1"); PX U254 at 2-3 (IndyMac Lending Guide stating "[e]ach Loan File must contain the originals of the following Loan Documents unless stated otherwise: . . . The HUD-1 settlement statement, closing statement and escrow instructions, if applicable."); PX U467 at 4 (Countrywide Guidelines stating that the "[s]eller's quality control reviews must ensure the thoroughness and accuracy of the following closing documentation: . . . HUD-1 Settlement Statement."); PX U577 at 7 (American Home Mortgage Guidelines requiring any "payoffs" from a loan "to be identified as an 'at closing' tracking item and shown on the HUD-1 Closing Statement").

371. **Loan Approvals**. Loan approvals contain documentation of the underwriter's decision to issue a loan, including his discussion of any compensating factors that warranted an exception. Holt Direct (PX 1103) ¶¶ 99-100. Loan approvals were particularly important for loans (like the Loans at issue) that were made in order to be sold into the secondary market, as approvals were the primary evidence that the loans were originated in accordance with guidelines. *Id.* ¶ 99. A Loans without a loan approval thus significantly increases the risk associated with that loan, as

it makes it difficult to evaluate whether the underwriter properly performed his job.  *Id.* ¶ 100; *see also* PX U008 (Countrywide Guidelines stating that for loans referred by an automatic underwriting system, "[t]he underwriter must explain the evaluation by describing the transaction, loan characteristics, risk factors, compensating factors, and the justification for the decision on the Uniform Underwriting and Transmittal Summary 1008."); PX U577 (American Home Mortgage Guidelines setting similar requirement).

372.   **Form 4506-T**.  Form 4506-Ts are forms used to request a borrower's past tax returns, and were required by guidelines to corroborate a borrower's employment history and stated income, particularly for self-employed borrowers.   *See* PX U026 at 6 (Countrywide Guidelines listing "Signed IRS 4506-T" as a required document for self-employment verification); *see also* PX U048 at 1 (Countrywide Guidelines stating that self-employed borrowers "must provide the most recent tax return, and IRS form 4506-T"); PX U269 at 8 (IndyMac Guidelines stating that "[b]ased on the overall credit quality of the Loan, . . . a verbal VOE and IRS 4506-T will be required."); PX U464 at 14 (MortgageIT Guidelines requiring an "IRS 4506-T, signed at closing" for stated income Loans, and "Loan amounts greater than $1 million."); PX U577 at 19 (American Home Mortgage Guidelines stating that "[i]n all cases where income is disclosed and can be verified on the borrower's tax return(s) for qualification purpose, a signed IRS Form 4506-T, Request for Transcript of Tax Return (covering the same time period that is documented by the tax returns), must be obtained . . . .").

373.   **Loan Applications**.  The guidelines generally required complete loan applications, which included information regarding borrower income, assets and liabilities, sources of funds used for closing, and the date of acquisition of the property.  *See, e.g.*, PX U012 at 1 (Countrywide Guidelines for stated income and low documentation loans stating "[t]he application is the primary source of information for evaluating the applicant's profile, asset and liability structure to support stated income, management of financial responsibility and financial capacity therefore a complete loan application is required"); PX U254 (IndyMac Guidelines requiring that "[e]ach Loan file must contain the originals of the . . . Loan Application."); PX U585 (GMAC-RFC Guidelines providing

that "[u]nless performed as an element of the pre-closing review, the post-closing audit should, at a minimum, consist of the following:  . . . [r]eview the remaining documentation, including the Loan application and closing documents, for consistency, accuracy, validity, completeness, etc.").

1.    **UBS Breached The Guideline Warranty For Loans Without Critical Documents**

374.    The Trusts have demonstrated through expert evidence that 1,276 Loans were missing critical documents under the Guidelines:[214]  (i) for 97 Loans, appraisals were missing from the Loan Files;[215] (ii) for 109 Loans, credit reports were missing from the Loan Files;[216] (iii) for 331 Loans, HUD-1 Statements were missing from the Loan Files;[217] (iv) for 297 Loans, Loan Approvals were missing from the Loan Files;[218] (v) for 38 Loans, 4506-T forms were missing from the Loan Files;[219] (vi) and for 235 Loans, Loan applications were missing from the Loan Files.[220] UBS does not dispute that these documents are missing from the Loan Files as of now.  To this evidence, the Court applies the presumption of backward relation to find that the documents were also not present at origination.  *McFarland,* 425 F.2d at 447; *Larsen*, 30 A.D.2d at 406, *see also Sliker*, 751 F.2d at 484-85.

375.    The Court's findings are bolstered by testimony about origination practices during the relevant time period.  Holt, who worked as an underwriter at that time, explained that it was standard industry practice for originators to maintain a full and complete loan file, where possible. Holt Direct (PX 1103) ¶ 175.  The incentive for originators to include all critical documents in a loan file was particularly strong for loans—like the Loans at issue—that were to be sold in the secondary market where purchasers required that they be allowed to review the loan file prior to

---

[214]  App. 47 (Guidelines – Documents).

[215]  App. 48 (Guidelines – Documents – Appraisals).

[216]  App. 49 (Guidelines – Documents – Credit Reports).

[217]  App. 50 (Guidelines – Documents – HUD-1).

[218]  App. 51 (Guidelines – Documents – Loan Approval).

[219]  App. 52 (Guidelines – Documents – Form 4506-T).

[220]  App. 53 (Guidelines – Documents – Loan Application).

purchasing the loan. *Id.* ¶ 175. Accordingly, if core documents existed at the time of origination, then they would have been scanned and added to digital Loan Files. *See* Tr. 780:10-783:8, 784:17-25; Holt Direct (PX 1103) ¶¶ 175 ("These protocols meant it was unlikely that documents could accidentally disappear from loan files, and that even if they did somehow disappear from the manual file, the digitized version of the file should still reflect the complete version of the file as it existed at origination. Although it is true that the digitized version of the loan file could be corrupted, it is not likely that this would result in the selective deletion of critical documents such as I have observed here; rather, it would result in the entire digital loan file being destroyed or becoming inaccessible."), 176, 178. In light of this testimony, the most reasonable conclusion is that if the documents were in the Loan Files at the time of origination, they would be in the Loan Files now.

376. These findings are further bolstered by testimony from UBS witnesses. Twombly, who was charged by UBS with performing due diligence on the Loans during the relevant time period, Tr. 1274:10-24, testified that while he would "expect to find everything in a loan file," "[t]hat wasn't the case, though, not only during the time period, but before it and slightly since" and that "[b]efore the relevant period, missing documents and trailing documents have always been an issue in the industry," Tr. 1379:25-1380:22. Twombly explained that during the 2006 to 2007 time period, loan files obtained from originators shortly after origination "generally . . . were out of order, and sometimes missing documents and incomplete"—before any bankruptcies or any other events could affect the completeness of loan files. Tr. 1365:14-1366:19. Twombly made clear that this was the case for the three primary originators of the Loans at issue—American Home, Countrywide, and IndyMac. *Id.* In a November 2006 email, Twombly candidly summarized this state of affairs: "Missing docs is going to be our saving grace here hopefully. *The exception we can all learn to live with*." PX 88 at 1 (emphasis added); *see also* Tr. 1324:1-19.

377. UBS argued that the documents existed at origination but were lost thereafter, Tr. 2136:24-2137:11, relying solely on Grissom's testimony. First, while admitting that loan files are

digitized, Tr. 658:19-23, Grissom testified that a document existing at the time of origination might not have been scanned into a loan file "in the flurry of funding a loan," Tr. 656:21-25, opining that "[w]hen a loan file is originally digitized, mistakes were commonly made in scanning,"  Tr. 660:14-661:5.  Grissom's testimony about common practices in the mortgage industry during the relevant time period is entitled to no weight, as she admitted that she had no personal experience originating loans, Tr. 263:21-266:24 (agreeing that she had "never underwritten a loan for origination"), or with originators' digitization processes, Tr. 662:3-6, unlike Holt.  Moreover, when the Court asked Grissom how many Loan Files she found that reflected scanning errors, Grissom was able to identify only one, which reflected *additional* documents from different loan files, not *missing* documents required to be in the Loan File itself.  Tr. 661:22-25.[221]

378.   Grissom also testified that it was "quite common" documents that were scanned into files at origination might go missing from the digital files thereafter, Tr. 652:16-21, but she was unable to identify when or how documents that were scanned into loan files might thereafter go missing.  *E.g.*, Tr. 659:18-661:5.  Moreover, Grissom conceded that "[if] the digital information was scanned appropriately to begin with, barring any extraordinary event, I wouldn't think that a digital loan file would be changed."  Tr. 659:7-17.

379.   Finally, Grissom testified that the documents likely existed at the time of origination because the guidelines required that the documents be in the Loan Files and the Loans closed.  Tr. 650:25-651:14.  Grissom admitted that she based this opinion on an assumption that that the original underwriter properly performed their job, Tr. 654:12-20, going so far as to say she would believe a document was in the origination file even if the document was missing the *next day* "unless I can find some evidence in the file that the document never existed[.]"  Tr. 653:14-

---

[221]   At trial, Holt testified that he instructed his team to look for evidence that any document missing from a Loan File at one point existed in the file.  Tr. 778:9-12.  UBS then attempted to impeach Holt by confronting him with his deposition testimony that he did not give that instruction.  Tr. 778:13-15 (citing 2014 Holt Dep. 197:12-17).  But this deposition testimony concerned Holt's instructions to his team for his *2014* report, not for the *2015* report that was the basis for his trial testimony.  Far from contradicting Holt's trial testimony, this deposition testimony shows that Holt tightened his standards for finding breaches based on missing documents between 2014 and 2015.

19.   The Court cannot credit this opinion, which assumes the proposition that Grissom was supposedly testing.  *See Skidd v. JW Marriot Hotels & Resorts*, No. 06 Civ. 1554 (DAB), 2010 WL 2834890, at *6 (S.D.N.Y. July 8, 2010) (refusing to credit speculation of plaintiff's expert that because a selector tape broke, it must not have been properly maintained; granting summary judgment to defendants).

380.   In sum, the Trusts have proved that UBS breached the Guideline Warranty for those Loans where one or more of the core documents discussed above was missing from the Loan Files.

## 2.   UBS's Breaches Caused MAEs

381.   There is no real dispute that UBS's breach of the Guideline Warranty for the Loans in this category caused MAEs.  Grissom conceded that if core documents were missing from the loan files—as the Trusts have proved—then "no originator would ever have closed a loan without the existence of those core documents."  Tr. 649:21-651:17; *see also id.* 720:7-22 (Grissom listing loan application, appraisal, credit report, loan approval, and other types of documents and stating that the loan should not have funded in their absence).[222]  She also acknowledged that, in her work reviewing loans that her employers would buy in order to sell to investors, she would not recommend a loan for purchase if it was missing such documents.  Tr. 655:4-656:10.  The corporate representative of JCIII, the re-underwriting vendor UBS hired to respond to Assured's repurchase demands, testified to the same effect.  Williams Dep. Designation 191:20-192:2.

382.   The guidelines provided that the Loans could not issue on the stated terms without these documents.  *See* Part IX.B, *above*; *see also* Grissom Direct (DX LI) ¶ 53 ("In my opinion, the documents that are key to any underwriting exercise, and therefore any re-underwriting exercise, include the loan approval, credit report, loan application, appraisal, Form 1008, verification of employment, and, as required by the guidelines or loan-specific guidelines in some instances, exception forms, asset documentation, and income documentation."); Tr. 649:21-651:14 (Grissom).  The guidelines further provided that, if required documents were missing, then a loan

---

[222]  Grissom acknowledged this during her deposition as well, although she attempted to walk back on the admission at trial.  *See* Tr. 662:11-666:16.

could be considered only upon pricing changes.  *E.g.*, PX U649 (GMAC-RFC Underwriting Client Guide indicating that GMAC-RFC may "allow re-pricing" upon "any material Loan deficiencies").  This was consistent with UBS's own underwriting policies:  "In the event a loan is submitted, but does not meet the minimum documentation requirements of the category, it may be considered with a lower documentation level and may be priced accordingly."  PX 17 at 41; *see also* PX 13 at 10-11 (stating that, "[i]f not remedied, [] loans cannot be purchased by UBS [if it is] . . . [m]issing legal files.").

383.     While for certain Loans, Grissom argues that a different document was in the Loan File that fulfilled a similar purpose, *e.g.*, Loan ████, FID 11189, this does not rebut the Trusts' *prima facie* showing of an MAE because, as explained above, the missing documents are irreplaceable.  For example, a document stating the property's value does not make up for a missing appraisal, as it does not prove that the Guidelines' appraisal requirements were complied with. Moreover, because the Guidelines required these core documents, their absence shows that the underwriter failed to perform their duty, another incurable MAE that Grissom did not rebut.

384.     Accordingly, there is no dispute that the absence of these required documents either would have prevented the Loans in this category from issuing at all, or would have required them to be considered under a different documentation program.  As a result, the Trusts paid too much for these Loans when it acquired them, causing an MAE to the interests of the Certificateholders that cannot be cured.

### 3.     UBS Discovered Its Breaches On The Closing Dates

385.     UBS discovered breaches based on missing documents on the Closing Dates. Through its vendors, UBS actually knew these of breaches as to 227 Loans because they were apparent from a review of the Loan Files.[223]  *See* Parts III and IV, *above*.  UBS had a policy not to purchase Loans missing such documents, Tr. 1381:19-1382:2 (Twombly), and UBS's actual knowledge that these documents were missing from Loans in its samples would have made a

---

[223]   To identify the findings for these 227 Loans in Appendix 47, filter Column K (Due Diligence Record) to "Yes"

reasonable person suspicious that Loans outside of its samples suffered from similar defects, and UBS could have investigated those suspicions before securitizing the Loans—hence UBS had constructive knowledge of these breaches in all Loans as of the Closing Dates. At a minimum, UBS was willfully blind towards these breaches and should be treated as having discovered them on January 31, 2008. *See* Part III.C.2, *above*.

C. **Loans With Unreasonable Stated Incomes**

386. As both parties agree, if a Loan was issued pursuant to a program that allowed a borrower to state (and not document) their income, the Guidelines required the underwriter to assess whether the borrower's stated income was reasonable. Tr. 422:20-423:7 (Grissom) (" . . . You say you must confirm that the stated income was, in fact, reasonable, correct? A. Yes. Q. You also must confirm that the underwriter actually determined the stated income was reasonable, because that was a guideline requirement, too, correct? A. Yes . . ."); Holt Direct (PX 1103) ¶¶ 65, 147; *see also* PX U578 at 31 (American Home Mortgage Guidelines stating "Careful consideration must be provided relative to the income stated by the borrower and a reasonableness test is made by the AHM underwriter through various means such as 'Salary.com' or other providers of such information."); PX U012 at 12 (Countrywide Guidelines stating "[l]imited income verification **does not** eliminate the need to analyze and evaluate the borrower's ability and willingness to repay the mortgage debt. The analysis must include a judgment about the reasonableness of the income stated on the application in relation to the borrower's occupation and credit information.") (emphasis in original); PX U374 at 19 (IndyMac guidelines stating:  "The Borrower's stated income must be reasonable for the Borrower's type of employment, line of work, and assets.").[224]

---

[224]  *See also, e.g.*, PX U045 at 3 (Countrywide manual providing that for stated income loans, "[t]he income disclosed must be deemed reasonable and consistent with the borrower's occupation"); PX U481 at 2 (similar).

1. **UBS Breached The Guideline Warranty For Loans With Unreasonable Stated Incomes**

387.    The Trusts have demonstrated through expert evidence that for 969 Loans, which were made under stated income programs, the borrowers' incomes as stated in the Loan Files were "plainly so improbable that a reasonable and responsible underwriter could not have accepted it without question[.]"[225]   Holt Direct (PX 1103) ¶ 148.   As Grissom conceded, if a Loan File contained insufficient information for an underwriter to verify that a stated income was reasonable, the underwriter had to take the steps necessary to "satisfy themselves that it was reasonable," Tr. 411:9-13 (Grissom), including by consulting third-party sources like BLS or Salary.com.   Tr. 433:5-15 (Grissom); Tr. 392:17-393:14 (Grissom).[226]

388.    For the Loans in this category, data sources including BLS and Salary.com show that the highest incomes for individuals with the borrowers' professions were significantly lower than the borrowers' stated incomes.   Holt Direct (PX 1103) ¶ 156-57.   There is also no documentation in the Loan Files showing that the original underwriter verified the reasonableness of the stated incomes.   *Id.* ¶ 147.   From this evidence, the Court finds that the original underwriters failed to assess the reasonableness of the borrowers' stated income, as required by the Guidelines. Consequently, the Trusts have proved that UBS breached the Guideline Warranty as to these Loans.

389.    UBS failed to rebut this proof.   For these Loans, Grissom did not dispute (i) what the borrower's stated income in the Loan File was; (ii) that the underwriter failed to document a determination that the borrower's stated income was reasonable; (iii) or that, in most cases, the borrower's stated income was higher than the 90th percentile for the borrower's stated occupation as calculated using BLS data grossed up 125%—a very conservative measure.   While Grissom

---

[225]   App. 58 (Guidelines - SINR).

[226]   For all but one Loan in this category, the Loan Files contained other red flags as well.   *See* App. 58, Loan Number ███, FID 30336, Col. E (FID: Grissom Overall Loan Assessment).

attempts to argue that the borrowers' stated incomes for such Loans were reasonable after-the-fact, her testimony cannot be credited given these concessions.[227]

390.    For a small number of these loans (57),[228] Grissom asserts that the underwriter assessed the reasonableness of the stated income.  However, she cites only to evidence suggesting the underwriter considered whether the stated income was reasonable by reference to the borrowers' assets, credit history, or length of employment, not by reference to the nature of the borrower's job.  Further, for all of these Loans, based on the evidence in the loan file—and, where appropriate, BLS or salary.com, which were available to the underwriter—the stated income was patently unreasonable.

391.    In addition, Grissom opines that BLS data can be flawed, Grissom Direct (DX LI) ¶ 74, but these criticisms are meritless for the reasons discussed above.  *See* Part IV.G.3.C, *above*. Next, Grissom opines that the absence of documentation in the Loan Files does not mean that the original underwriter failed to perform the required verification—even if the guidelines required

---

[227]   In several instances, Grissom defends the reasonableness of the stated income because the original underwriter reduced the income stated by the borrower to a level the re-underwriter considered more reasonable.  *E.g.*, App. 53, Loan ████████, FID 11323, Col. G (FID: Grissom Rebuttal) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; *see also* FIDs 24555, 20356, 21148, 27022, 27057.  But this is a plain violation of the guidelines' requirement that any unreasonable stated income be converted to a full documentation program, Tr. 389:5-9 (Grissom), and an acknowledgement by the original underwriter that the borrower and the information provided by the borrower was untrustworthy.

[228]   The Loan Numbers for these Loans are: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

that documentation.  *Id.* ¶ 66.  This opinion is entitled to no weight, as Grissom never worked as an underwriter, and had no connection to the U.S. mortgage market at all during the relevant time period.  *See* Part VI.A.2 (Background), *above.*  Moreover, Grissom contradicted her opinion in testifying that she would have expected the supervisors of the original underwriters to have required them to document the resolution of red flags.  Tr. 490:1-13.

392.    Next, Grissom asserts that the guidelines did not require the original underwriters to use third-party sources to verify the reasonableness of stated incomes, Grissom Direct (DX LI) ¶ 73, and that BLS data is not generally used in the absence of red flags, *id.* ¶ 74.  But the Trusts do not assert that the Guidelines required underwriters to use those sources in all cases; rather, they assert that if stated incomes appeared patently unreasonable, then the Guidelines required the underwriters to verify the reasonableness of those incomes, and that consulting these publicly-available data sources was one way of doing so.  Grissom did not dispute Holt's findings that all the Loans in this category had the red flag of patently unreasonable income, and she conceded that it would be appropriate to use such sources in performing these verifications.  Tr. 433:5-15 (". . . If I truly didn't know and I was an underwriter, I would do any number of those things.  I could check salary.com and say, does this look right?  You know, I've done my own homework.  I've checked everything else.  It could be I just want one more thing. . ."); *id.* 392:17-393:14.

393.    Finally, Grissom opines that the underwriters must have assessed the verification of stated income "[b]ecause the loan[s] funded."  Tr. 411:9-16.  Once again, Grissom assumes the truth of the proposition she was supposed to be independently testing, and her opinion on this basis is entitled to no weight.

## 2.    UBS's Breaches Caused MAEs

394.    There is no real dispute that these breaches of the Guideline Warranty caused MAEs.  Grissom admitted that if a borrower's stated income was unreasonable, an underwriter was supposed to "either decline the loan, or they would convert it into a full documentation loan."  Tr. 389:5-9; *see also* Tr. 386:10-387:3, 390:11-22 (if a borrower's stated income was

misrepresented, Grissom "would think the underwriter would not make the loan"); 389:12-390:10, 406:14-18, 411:2-13, 423:1-3, 470:20-471:3.  As Grissom agreed, this was so because evaluating the reasonableness of a borrower's stated income was critical to assessing the borrower's ability and willingness to repay their debts, and therefore to assessing a Loan's risk.  *See* Tr. 406:10-408:19 (Grissom).  Moreover, as discussed, the Guidelines made the reasonableness of a borrower's stated income an express condition for issuing loans on a stated income basis.  *E.g.*, PX U481 at 2 (Countrywide manual providing that "[i]ncome must be deemed reasonable and consistent with the applicant's profession and must be a true and accurate reflection of the borrower's income").

395.   Simply put, had it been known that the stated incomes for the borrowers of the Loans in this category were not reasonable, then those Loans would not have been made at all, or would have been considered only under a full documentation program that carried different terms. Consequently, the Trusts paid too much and received too little for these Loans, resulting in an incurable MAE.  Moreover, the magnitude of the gap between these borrowers' stated incomes and the publicly-available salary data indicates that the borrowers committed fraud on their loan applications, resulting in another set of incurable MAEs.  Finally, the failure of the underwriters to verify the reasonableness of stated incomes, which Grissom concedes is a vital function, Tr. 406:10-22, shows that the underwriters of these Loans were not reliable, causing still additional MAEs.  Moreover, 656 of the Loans in this category have liquidated, 106 Loans have been modified with losses, and 870 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[229] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

---

[229]   To identify the findings for these Loans in Appendix 58, filter Columns K (Liquidated), L (Modified with Losses), and M (60 Day Delinquency), respectively, to "Yes."

### 3. UBS Discovered Its Breaches On The Closing Dates

396.    UBS discovered these breaches on the Closing Dates.  Through its vendors, UBS had actual knowledge of these breaches, which were patent on the face of the Loan Files.[230]  *See* Part III, *above*.  At a minimum, UBS was willfully blind towards such breaches and should be treated as having discovered them on January 31, 2008.  *See* Part III.C.2, *above*.

### D. Loans Violating Guidelines With Unreasonable Exceptions

397.    The Guideline Warranty required that exceptions to guidelines be "exercised in a reasonable manner."  PX 49 at 196 (MARM 2006-OA2 PSA); PX 110 at 236 (MARM 2007-1); PX 182 at 230 (MARM 2007-3).  Thus, if an underwriter did exercise and document an exception, the Guideline Warranty requires that the exception was "exercised in a reasonable manner."  PX 49 at 196; PX 110 at 236; PX 182 at 230.  The parties do not dispute this plain reading of the PSAs.

### 1. UBS Breached The Guideline Warranty For Loans Violating Guidelines With Unreasonable Exceptions

398.    The Trusts presented expert testimony that 597 Loans were issued with exceptions that were unreasonable on the face of the Loan File.[231]  Holt testified that either these compensating factors did not exist, or that the compensating factors were invalid in that they did not offset the risk placing the Loan outside Guidelines (*i.e.*, using a borrower's credit score to justify an exception that was required due to the borrower's low credit score).  Holt Direct (PX 1103) ¶ 139.

399.    In response, Grissom did not defend the exception that was granted—that is, she does not opine that the factors that the underwriter cited as the basis for granting the exception were actually reasonable.  Rather, Grissom identifies other, additional compensating factors that she opines would have justified the exception, had the underwriter relied on them.  But these opinions do not rebut the Trusts showing that the actual exceptions were not exercised in a reasonable manner.  As a result, the Trusts have proved 597 breaches of the Guideline Warranty as to the Loans in this category.

---

[230]   To identify the findings for these 184 Loans in Appendix 58, filter Column J (Due Diligence Record) to "Yes."

[231]   App. 54 (Guidelines – Patent – Unreasonable Exceptions).

## 2.   UBS's Breaches Caused MAEs

400.    Loans for which an unreasonable exception was granted caused MAEs.  In addition to violating the plain terms of the Guideline Warranty, such Loans either would have received adverse pricing or, more likely, would not have been issued at all.  The Guidelines themselves made clear that exceptions were to be issued stringently, and unreasonable exceptions therefore harmed the Certificateholders by exposing them to greater risk and less favorable pricing.  *See* PX U020 at 1 (Countrywide Guidelines stating that "[e]xceptions must be considered and approved in moderation.  A large number of approved exceptions may impact the pricing/performance of a specific loan pool and ultimately may 'dry up' our ability to deliver to a specific investor(s).").  Importantly, for Loans where exceptions were found to be unreasonable, there was no evidence in the Loan File supporting the exception, meaning that the underwriter had also failed to comply with the required process for documenting exceptions.  Holt Direct (PX 1103) ¶¶ 183-84; *see also* PX U008 at 2 (Countrywide Guidelines requiring that underwriters should "recommend exception approval only after evaluating *and noting all compensating factors and concluding that the loan meets investment quality underwriting criteria*") (emphasis added).  Accordingly, the Trusts have made a *prima facie* showing of MAEs.

401.    It falls to UBS to rebut this showing.  *In re Mohawk Valley Psychiatric Ctr.*, 818 N.Y.S.2d 766, 767 (N.Y. Sup. Ct. 2006) ("[O]nce the party bearing the burden of proof establishes a prima facie case . . . the adversary has the burden of going forward, that is, offering evidence to contradict the prima facie case.").  Insurance law provides a helpful analogy—it is well-established that, once an insured establishes an entitlement to coverage, the insurer "bears the burden of proving that an exclusion applies."  *See Ment Bros. Iron Works Co.*, 702 F.3d at 121; *see also Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 690 (2002) ("Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage.").  Similarly, in light of the Trusts' showing, it falls on UBS to show that, had the Loan's defects been known at origination, it still would have been issued on the same terms and at the same price.

402.    Here, UBS's only response is that Grissom has identified additional compensating factors *ex post* that she opines would have justified an exception.  But Grissom did not opine that those additional factors would have resulted in the Loans being issued on the *same terms* at the *same interest rates* at which they were actually made—consequently, her opinions do not rebut the Trusts' showing of the incurable MAEs caused by the mispricing of the Loans and their inherently unreliable origination.  *See Georgetown Capital Grp., Inc. v. Everest Nat'l Ins. Co.*, 104 A.D.3d 1150, 1153 (4th Dep't 2013) (in insurance case, granting summary judgment for plaintiff that established its right to coverage and defendant failed to establish that an exclusion applied).

403.    As a result, the Trusts have met their burden of proving that these breaches caused MAEs.  Moreover,  369 of the Loans in this category have liquidated, 38 Loans have been modified with losses, and 507 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[232] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

### 3.    UBS's Discovered Its Breaches On The Closing Dates

404.    UBS discovered these breaches on the Closing Dates.  Through its vendors, UBS had actual knowledge of these breaches, which were patent on the face of the Loan Files.[233]  *See* Part III, *above*.  At a minimum, UBS was willfully blind towards such breaches and should be treated as having discovered them on January 31, 2008.  *See* Part III.C.2, *above*.

### E.    Loans Violating Guidelines With No Exceptions

405.    The Guideline Warranty's requirement that exceptions be "exercised in a reasonable manner," PX 49 at 196 (MARM 2006-OA2 PSA); PX 110 at 236 (MARM 2007-1 PSA); PX 182 at 230 (MARM 2007-3 PSA), also means that if a Loan did not comply with Guidelines, the Warranty was breached unless the underwriter in fact exercised an exception and documented his reasons for doing so.  This common-sense reading is supported by the Guidelines

---

[232]  To identify the findings for these Loans in Appendix 54, filter Columns L (Liquidated), M (Modified with Losses), and N (60 Day Delinquency), respectively, to "Yes."

[233]  To identify the findings for these 129 Loans in Appendix 54, filter Column K (Due Diligence Record) to "Yes."

themselves, including the technical manuals used by the underwriters, which required that underwriters document any exceptions to the Guidelines in writing. *See, e.g.*, PX U479 at 1 (Countrywide Guidelines requiring that "[t]he Underwriter must also clearly describe any guideline exceptions and rationale for approval."); PX U248 at 1 (IndyMac Guidelines stating that "Loans that require an exception must first be submitted for manual underwriting . . . . When submitting a Loan that will require an exception, the Seller should so indicate by checking the appropriate box . . . ."); PX U576 at 1 (American Home Mortgage Guidelines stating "[o]nly exceptions that have been approved in writing . . . will be honored"). UBS's own Credit/Underwriting Guidelines had the same expectation, requiring that exceptions be "clearly documented in the file." PX 67 at 12. And Holt, who worked as an underwriter during the relevant time period, testified that it was standard practice for originators to require that exceptions be documented. Holt Direct (PX 1103) ¶ 121. While Grissom testified that underwriters could grant exceptions without writing them down, that testimony cannot be credited given (i) the plain requirements of the technical manuals to the contrary;[234] (ii) that Grissom never worked as an underwriter or granted an exception as underwriter (Tr. 263:22-265:25); and (iii) that Grissom was not involved with the market for U.S. mortgages during the relevant time period (*id.* 289:16-25).[235] Thus, the Trusts may establish a breach of the Guideline representation where a Loan violates Guidelines and no exception is documented in the Loan File, or no other evidence that an exception was granted at the time of underwriting exists.

---

[234]   *See, e.g.*, PX U374 at 57 (IndyMac Lending Guide stating that "when making exceptions to underwriting guidelines," "[a]ll compensating factors must be clearly documented in the Loan file"); PX U576 at 1(American Home Mortgage "Exception Procedures" stating:   "Only exceptions that have been approved in writing by designated authorities through the use of the Product Exception Request Form and notated in UniFi will be honored.").

[235]   Grissom also asserted that exceptions were not required for DTI guideline violations, but conceded that the basis for this assertion was that in many loan files she has reviewed there is no evidence that the underwriter in fact obtained an exception for such a violation and she assumes the underwriters did their job properly, Tr. 642:20-643:13 (Grissom)—testimony that cannot be credited because it assumes the point Grissom was supposed to be testing.

### 1. UBS Breached The Guideline Warranty For Loans Violating Guidelines With No Exceptions

406.     The Trusts showed that 3,142 Loans violated Guidelines and that no exception was exercised and documented.[236]  UBS has presented no evidence showing that exceptions were, in fact, exercised at the time of underwriting, and therefore has failed to rebut the Trusts' *prima facie* case.  While Grissom opines that exceptions were exercised because the Loans were made, Tr. 694:14-695:15, this testimony also cannot be credited, as it assumes the truth of the matter to be proved.  And while Grissom opines that some of the Loans had sufficient compensating factors such that an exception *could* have been granted at the time of origination, *see, e.g.*, Tr. 637:13-638:4, those opinions do not rebut the Trusts' showing that in fact exceptions *were not* granted.[237] In short, the Trusts have proved 3,142 breaches of the Guideline Representation.[238]

### 2. UBS's Breaches Caused MAEs

407.     These breaches caused MAEs.  The guidelines expressly required that exception Loans be priced differently, as Holt confirmed, Holt Direct (PX 1103) ¶ 135, and as Grissom did not dispute it, Tr. 635:4-14 ("Q.  But the exception had to be priced, correct?  A.  Yes."), 636:17-637:5 (Grissom).  Moreover, the Certificateholders could not trust that an underwriter who failed to exercise and document exceptions adequately assessed the ability and willingness of the borrower to repay the loan.  *See* PX U479 at 1 (Countrywide Guidelines noting that underwriters must "clearly describe any guideline exceptions and rationale for approval" in light of the

---

[236]  App. 55 (Guidelines – Patent – No Exceptions).  The Trusts are not pursuing claims as to any Loans which violated Guidelines by exceeding the Guidelines' DTI threshold where the DTI ratio was not at least 2% greater than the maximum prescribed by the Guidelines.

[237]  While Grissom disputes some of the underlying facts concerning these Loans, for many, she does not dispute that the Loans violate Guidelines and no exception was exercised, and thus only the remainder would require resolution by a special master.

[238]  UBS argued at trial that Loans that deviated from the Guidelines by small amounts (such as where Guidelines limited DTI to 38% and a borrower's DTI was 40%"), but were nonetheless approved by an AUS did not constitute "an exception to guidelines" and therefore required no written exception.  *See* Tr. 610:3-7; *see also* Grissom Direct (DX LI) ¶ 46.  In their post-trial submissions, the Trusts did not assert that any such "AUS-approved" Loans violated the Guideline Warrant on the basis that no exception was granted.  The Trusts did seek to recover for breaches of the Guideline Warranty if an underwriter manually underwrote the loan (either in the first instance or after a referral from an AUS) and then either failed to document a required exception or, as explained below, granted an unreasonable exception.

"excessive layering of risks" presented by Loans requiring exceptions); PX U008 at 2 (Countrywide Guidelines stating that documenting exceptions was part of ensuring that loans met "investment quality" criteria).  The Trusts have thus made a *prima facie* showing of MAEs.

408.    It then falls to UBS to come forward with evidence to the contrary.  *In re Mohawk Valley Psychiatric Ctr.*, 818 N.Y.S.2d at 767; *see also Ment Bros.*, 702 F.3d at 121.  While Grissom attempted to identify compensating factors *ex post*, she made no attempt to show that those factors would have led to approval of the Loans on the *same terms* and that the *same interest rate* as those at which they were issued, and hence she has not rebutted the Trusts' showing.  *Rhino Excavating Corp. v. Assurance Co. of Am.*, No. 4680/06, 2008 WL 2513334, at *5 (N.Y. Sup. Ct. June 11, 2008) (insurer failed to meet its burden of showing an exclusion from coverage where it could not show that insured was actually charged lower rate corresponding to exclusion category that insured allegedly fell into).

409.    Consequently, the Trusts have thus met their burden of proving that these breaches caused MAEs.  Moreover, 2,048 of the Loans in this category have liquidated, 247 Loans have been modified with losses, and 2,690 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[239] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.

### 3.    UBS Discovered Its Breaches On The Closing Dates

410.    UBS discovered these breaches on the Closing Dates.  Through its vendors, UBS had actual knowledge of these breaches, which were patent on the face of the Loan Files.[240]  *See* Part III, *above*.  At a minimum, UBS was willfully blind towards such breaches and should be treated as having discovered them on January 31, 2008.  *See* Part III.C.2, *above*.

---

[239]   To identify the findings for these Loans in Appendix 55, filter Columns L (Liquidated), M (Modified with Losses), and N (60 Day Delinquency), respectively, to "Yes."

[240]   To identify the findings for these 618 Loans in Appendix 55, filter Column K (Due Diligence Records) to "Yes."

### F.   Loans Violating Guidelines As A Result Of Other Defects

411.   Finally, the Trusts showed that 2,583 Loans failed to comply with guidelines as a result of defects that the Court has already found caused breaches of the MLS Warranty, discussed above, including misstated DTI ratios, LTV ratios, and occupancy status.[241]  The Court has already found that these defects existed as of origination, and there is no dispute that these defects caused the Loans not to comply with Guidelines, hence the Trusts have shown that the defects also caused violations of the Guideline Warranty.  The fact that these defects caused the Loans to depart from guidelines is additional evidence that the breaches of the MLS Warranty caused MAEs, both because it shows the Trusts paid too much for the Loans and that the original underwriter was not doing his job.  Moreover,  1,821 of the Loans in this category have liquidated, 255 Loans have been modified with losses, and 2,371 Loans have been delinquent for 60 days or more (and are thus only 10% likely to fully recover without a modification);[242] the Trusts additionally incurred MAEs for these Loans because they are bearing losses based on a risk of loss that they did not bargain for.  UBS discovered these breaches on the dates it discussed the associated violations of the MLS Warranty, as discussed above.  *See* Part IV, *above*.

## X.   MULTIPLE MATERIAL BREACHES

412.   The Court's conclusion that each breach discussed above "materially and adversely affects the interests of the Certificateholders" is reinforced for those Loans affected by multiple breaches.   Section 2.03 requires the Trusts to prove that "any breach" affected the Certificateholders' interests in "any Mortgage Loan," which requires the Court to consider the impact of each breach on the Loan as it actually is—including as the Loan is affected by other defects.  This approach is especially appropriate where UBS breached multiple requirements of a single warranty—as example, if more than one piece of information on the MLS was false—as the "breach" of that warranty reflects both defects.

---

[241]  App. 56 (Guidelines – Other Defects).

[242]  To identify the findings for these Loans in Appendix 56, filter Columns L (Liquidated), M (Modified with Losses), and N (60 Day Delinquency), respectively, to "Yes."

413.    Moreover, the Second Circuit has held that one must assess whether "the cumulative effect of" a party's breaches of express warranties is material to determine if that party has performed its contractual obligations.  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 187 (2d Cir. 2007).  Courts in this District have followed that approach in numerous contexts, including with respect to statements made by RMBS sponsors about securitized loans.  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 571 (S.D.N.Y. 2015) (under Securities Act, "FHFA failed to prove that the materiality threshold was met with respect to the Prospectus Supplements' reporting of owner-occupancy statistics when those representations are taken alone.  Only when combined with one of the other misrepresentations do the owner-occupancy statistics add to the showing of materiality.") (emphasis added); *see also Jantz v. Emblem Health*, No. 10 Civ. 6076 (PKC), 2012 WL 370297, at *13 (S.D.N.Y. Feb. 6, 2012) (Castel, J.) (under Title VII, materiality of adverse employment actions "are 'considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross to be actionable.'") (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)).[243] Accordingly, the Court applies that same approach here.

414.    Assessing the aggregate materiality of breaches is also consistent with the evidence.  Holt testified that underwriters should consider "layered risk associated with the cumulative impact of other defects or risk factors associated" with each Loan, Holt Direct (PX 1103) ¶ 188, and Grissom did not disagree.  In its diligence policies, UBS explicitly considered "layered risk," which it said "occurs when several credit and property attributes together, increase the frequency

---

[243]    *See also Kyles v. Whitley*, 514 U.S. 419, 436, 437 (1995) (materiality of suppressed evidence under *Brady* "[must be] . . . considered collectively, not item by item," and "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of reasonable probability is reached");  *In re White*, No. 12-11847 (SMB), 2015 WL 9274771, at *11 (Bankr. S.D.N.Y. Dec. 18, 2015) (in bankruptcy context, "otherwise immaterial falsehoods or omissions can aggregate into a critical mass substantial enough to bar a debtor's discharge.") (quoting *In re Bressler*, 387 B.R. 446, 462 (Bankr. S.D.N.Y. 2008) (collecting cases));  *Savoca v. United States*, No. 07 Civ. 2524 (LMS), 2013 WL 10054624, at *31 (S.D.N.Y. Aug. 8, 2013) ("When evaluating the materiality of evidence favorable to a criminal defendant that has been suppressed by the government, the suppressed evidence should be considered in the aggregate, rather than evaluating for materiality on a piecemeal basis.");  *People v. Peck*, 403 N.Y.S.2d 624, 627 (N.Y. Sup. Ct. 1978) (aggregating multiple offenses in determining whether the materiality threshold for a felony offense is met) (citing *People v. Hunter*, 34 N.Y.2d 432, 437 (1974)).

and seventy of default.  Independently, these attributes do not appear to be concerning, however, when a seller layers the risk, the potential for loss increases considerably."  PX 19 at 15; *see also* PX 12 at 18 (analysis of adverse criteria includes "Layered Risk").  Both Twombly and Lantz testified to the importance of assessing layered risk.  Tr. 1295:12-23 (Twombly); Tr. 1459:12-15 (Lantz).  And the originators told their underwriters to do the same.  For example, Countrywide stated that its automated underwriting system was designed to identify loans that "present[] excessive layering of risk" such as "insufficient liquid assets, high LTV, credit history, and/or high debt ratios for the loan program selected."  PX U008 at 2.  Similarly, American Home instructed underwriters to "[d]etermine if layering of risk factors is acceptable" for loans referred for failure to meet Fannie Mae's eligibility requirements.  PX U578 at 10.

415.    This evidence bolsters the Court's conclusions that the interests of the Certificateholders are materially and adversely affected for 6,532 of the 9,342 Loans reviewed by Holt affected by more than one breach.  Specifically: (i) 2,075 Loans reflect two breaches; (ii) 1,826 Loans reflect three breaches; (ii) 1,262 Loans reflect four breaches; (iv) 770 Loans reflect five breaches; (v) 391 Loans reflect six breaches; (vi) 168 Loans reflect seven breaches; (vii) 35 Loans reflect eight breaches; (viii) and 5 Loan reflect nine breaches.  *See* Appendix 61.

416.    In summary, the Trusts have proved the elements of their claims as to 9,342 Loans. The Court credits Holt's findings, and affords little to no weight to Grissom's testimony, to the extent she attempts to rebut Holt's findings at all.  The Court also does not credit UBS's criticisms of Holt's work, which consist of either pointing out a few, minor errors in extensive testimony regarding approximately 40,000 re-underwriting findings for about 10,000 loans, or which ignore the additional information that Holt considered for his 2015 report.

## XI.    THE TRUSTS' EQUITABLE REMEDIES

417.    Having found that UBS is liable for breaches of its warranties, and that the PSAs required UBS to repurchase the Loans at issue, the Court now concludes that the Trusts have proved their entitlement to remedies under the plain terms of the PSAs.

### A.   Specific Performance

418.   As the parties agreed, Tr. 1884:4-13 (UBS's counsel); Tr. 1884:20-23 (Trusts' counsel), for non-liquidated Loans, the Trusts are entitled to the specific performance of Section 2.03's repurchase remedy, PX 49 at 74 (MARM 2006-OA2); PX 110 at 102 (MARM 2007-1); PX 182 at 86 (MARM 2007-3) (§ 2.03), as the 90-day period for UBS to cure the relevant defects has long since passed.  *See Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 106 (1st Dep't 2015) ("[B]y the terms of the 'sole remedy' clause, the agreements limit plaintiffs to seeking an order of specific performance requiring defendant to repurchase the defective loans at the purchase price defined in those agreements[.]").  Consistent with the PSAs, UBS shall repurchase those non-liquidated Loans at the Purchase Price defined therein, PX 49 at 57 (MARM 2006-OA2); PX 110 at 70 (MARM 2007-1); PX 182 at 65 (MARM 2007-3) (§ 2.03), pursuant to Snow's methodology,  Part VI.D (Background), *above*.

### B.   Equitable Damages Plus Prejudgment Interest

419.   For liquidated Loans, for which repurchase is not possible, New York law entitles the Trusts to equitable damages in lieu of specific performance.  *Nomura,* 133 A.D.3d at 105-06 (stating that where "loans that have been foreclosed upon or liquidated cannot be repurchased," money damages are available, because 'where the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy'") (collecting cases).  Accordingly, for the liquidated Loans, UBS shall pay the Trusts equitable damages consistent with the terms of the PSAs pursuant to Snow's methodology, Part VI.D, *above*.

420.   UBS's payment of damages shall also include prejudgment interest.  New York law provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract," CPLR § 5001(a), and that the "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute,"  CPLR § 5004; *see also In re Palermo*, 739 F.3d 99, 107 (2d Cir. 2014) (stating an award of prejudgment interest for a state law claim is governed by state rules).  New York law further provides that "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's

discretion." CPLR § 5001(a). However, "[e]ven in actions of an equitable nature that are based on contract, the trend has been to award prejudgment interest as of right." *Bessemer Trust Co., N.A. v. Branin*, 544 F. Supp. 2d 385, 392 n. 15 (S.D.N.Y. 2008) (citing *Matter of Kummer*, 93 A.D.2d 135, 183 (2d Dep't 1983)).

421. It is "commonplace" for courts to award prejudgment interest in equitable actions "to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled." *Lewis v. S.L. & E., Inc.*, 831 F.2d 37, 40 (2d Cir. 1987) (citations omitted). Where the substance of equitable action "is to compensate plaintiffs for funds that were wrongfully diverted by the defendants[,] [p]laintiffs are entitled to be compensated in the form of interest for the use of their money." *Nagoya Venture Ltd. v. Bacopulos*, No. 96-CV-9317, 1999 WL 311918 at *4 (S.D.N.Y. May 18, 1999) (citing *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 694-95 (2d Cir. 1983) and collecting cases). Here, because the Trusts seek equitable damages as compensation for UBS's failure to repurchase Loans as required by the PSAs, prejudgment interest is warranted.

422. The PSAs' "sole remedy" provisions do not waive the Trusts' ability to recover prejudgment interest. New York law "allow[s] parties to agree to give up statutory or constitutional rights in a contract," including statutory interest. *J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 119 (2012). However, a sole remedy provision will be read to waive statutory interest only if it both excludes default contract remedies and contains a "provision for interest" supplanting statutory interest under CPLR 5001(a). *Id.* Thus, a party does not waive its right to statutory interest unless the contract contains an express waiver or a limitation on remedies through which "the parties . . . devised an alternative means of resolving the problem that statutory prejudgment interest serves to rectify:  the economic hardship associated with delayed judgment." *U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.*, No. 12 Civ. 9412, 2014 WL 4290642, at *3 (S.D.N.Y. Aug. 28, 2014) (awarding statutory prejudgment interest under CPLR § 5001(a) in a mortgage-backed securities case despite a "sole remedy" clause in the contract), *vacated and remanded on other grounds*, 14 Civ. 2859, 2016 WL 1042090 (2d Cir. Mar. 16, 2016), *as amended* (Mar. 18, 2016). Here, the PSAs have no provision to account for UBS's failure to repurchase

Loans when it was required to do so, hence they did not waive the application of statutory interest to compensate the Trusts for lost of use of the funds to which they were entitled.

423.    Prejudgment interest shall be imposed starting 90 days after the dates on which UBS discovered or received notice of the breaches.[244]  To put the Trusts in the position they should have been in on those repurchase dates, it is necessary to provide the Trusts with the Purchase Prices they should have then received *plus* prejudgment interest to compensate them for their lost use of Purchase Prices from those dates until the date of judgment.  This award will not prejudice UBS, because borrower payments the Trusts received on those Loans after the repurchase dates through the date of judgment will be deducted from the Purchase Price.  Just as this calculation puts UBS in the position it should have been in on the repurchase dates—when it should have acquired the Loans and the right to receive any subsequent borrower payments on those Loans— an award of prejudgment interest is necessary to restore the Trusts to the *status quo ante*.  *See, e.g,* *Wells Fargo Bank, N.A. v. Bank of Am., N.A.,* No. 10-CV-9584, 2014 WL 476299, at *4 (S.D.N.Y. Feb. 6, 2014), ("The correct calculation of damages is therefore the amount that Bank of America would have paid if it had repurchased the loans when it was supposed to have done so, plus statutory prejudgment interest from that date, plus costs of mitigation and servicing, less unapplied income from the loans and the properties between the date of the repurchase demand and the date of judgment.") *vacated and remanded on other grounds,* 627 F. App'x 27 (2d Cir. 2015);  *Nikolis v. Reznick*, 214 A.D.2d 658, 659 (1st Dep't 1995) (in action for damages and specific performance of a real estate contract, affirming award of prejudgment interest calculated from contract's closing date, "when the appellants' time to perform their part of the parties' bargain . . . finally expired") (citations omitted).

---

[244] Prejudgment interest on contract damages generally "shall be computed from the date incurred."  CPLR § 5001(b); *see Nagoya Venture Ltd. v. Bacopulos*, No. 96-CV-9317, 1999 WL 311918, at *4 (S.D.N.Y. May 18, 1999) (interest runs from "the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred") (quoting CPLR § 5001(b)).  Under New York law, the Trusts' cause of action accrued on the applicable Closing Dates.  *ACE* 25 N.Y.3d at 595.  But because the contracts did not require UBS to repurchase the Loans until 90 days after it discovered (or received written notice of) the breaches, the Trusts seek prejudgment interest starting on the dates on which UBS was required to repurchase the Loans at the Purchase Price.

424.     Prejudgment interest shall be imposed at the rate of 9% annually, without compounding.  This is the rate established by New York law for traditional breach-of-contract damages, CPLR §§ 5001(a), 5004, which courts routinely apply in equitable actions related to breaches of contract.  *See, e.g.*, *Transp. Displays Inc. v. Winston*, 870 F. Supp. 74, 77-78 n. 6 (S.D.N.Y. 1994) (stating that a prejudgment interest rate of 9% was appropriate whether the action was at law or in equity); *F.D.I.C. v. Key Fin. Servs., Inc.*, No. Civ. A. 89-02366, 1999 WL 34866812, at *12 (D. Mass. Dec. 23, 1999) (applying New York law and finding that "the plaintiff's calculation of damages using a 9% rate of prejudgment interest statute was proper" in connection with the defendant's failure to repurchase defective loans under a loan purchase agreement) *aff'd sub nom. Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12 (1st Cir. 2002).  Notably, while the PSAs provide for interest payments in the normal course, precedent indicates that courts should award the statutory rate of prejudgment interest, and not the contract rate, starting on the date of breach.  *Sokolik v. Pateman*, 114 A.D.3d 839, 841 (2d Dep't 2014) (in action for specific performance and damages relating to a promissory note, directing trial court to apply statutory rate of 9% interest, and not note rate, from the date of breach); *In re RMM Records & Video Corp.*, 372 B.R. 619, 623 (Bankr. S.D.N.Y. 2007) (applying statutory 9% rate, not a loan's note rate, under CPLR § 5001(a)).

### C.     No Offset For Assured's Payments To Certificateholders

425.     UBS's argument that the Court should reduce the Trusts' recovery based on insurance payments made by Assured to certain Certificateholders is without merit.  While, as a general matter, a plaintiff's recovery for a breach of contract is "limited to the loss it actually suffered by reason of the breach," *Inchaustegui v. 666 5th Ave. Ltd. P'ship*, 96 N.Y.2d 111, 116 (2001) (citations omitted), and "[c]ourts will not rewrite contracts that have been negotiated between sophisticated, counseled commercial entities." *Flag Wharf, Inc. v. Merrill Lynch Capital Corp.*, 40 A.D.3d 506, 507 (1st Dep't 2007) (citing *Matter of Wallace v 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995)).  Here, the parties agreed that if UBS breached a warranty, the Trusts

were entitled to recover not simply any loss caused by that breach, but rather to have UBS repurchase the materially defective Loan at a set Purchase Price, which the PSAs define as the sum of the Loan's unpaid principal balance, accrued and unpaid interest, any costs or damages incurred by the Trusts for predatory lending violations, and (if applicable) any payments owed to swap counterparties.  PX 49 at 57 (MARM 2006-OA2 PSA) (§ 1.01); PX 110 at 70 (MARM 2007-1 PSA) (§ 1.01); PX 182 (MARM 2007-3 PSA (§ 1.01).  Had the parties intended to reduce the amount of the Purchase Price to reflect payments by Assured to certain Certificateholders, they could have done so, and there is no basis to rewrite the parties' agreement.

426.    Moreover, reducing the Trusts' recovery to account for those payments would result in a windfall for UBS.  All cash flows received by the Trusts are distributed in accordance with the PSAs' "waterfall" provisions, Snow Direct (PX 1110) ¶ 33, and under those provisions, when Assured makes a payment to cover the Certificate-level losses of senior Certificateholders, the Trusts "incur an obligation to repay Assured plus interest." Tr. 1901:16-24.  Thus—unless the Court were to re-write the contracts to void the Trusts' obligations to repay Assured, which it will not do—as Dr. Snow explained, "if the Court awards the full damages owed to the Trusts, then amounts paid by Assured to the Trusts *would not* be double-counted.  Rather, as those damages flow through the Waterfall, Assured would be reimbursed for the amounts it has paid, and those amounts would not flow through to certificateholders."  Snow Direct (PX 1110) ¶ 34 (original emphasis).  By contrast, "if the Court deducts amounts paid by Assured from the damages awarded to the Trusts . . . then the amounts paid by Assured to the Trusts *would* be double-counted—against the Trusts. Specifically, those amounts would first be deducted from the damages that are put *into* the Waterfalls and then also paid out to Assured by the Trusts as the damages flow *through* the Waterfall."  *Id.* at ¶ 35 (original emphasis); *see also* Tr. 1902:5-20.  Such a result would be highly inequitable.[245]

---

[245] Reducing the Purchase Price the Trusts' receive for a materially defective Loan to account for Assured's payments would also be impractical—and contrary to the contractual Purchase Price definition—because Assured's payments are made to cover losses on certain *certificates*, not to cover losses of specific *loans*.  Tr. 1900:20-1901:9.  That is,

427.     In short, the Court accepts Snow's method of calculating the amount of the Trusts' damages for materially defective Loans that have liquidated.   The Court also accepts Snow's method of calculating the Purchase Prices for materially defective Loans that remain in the Trusts. Accordingly, the Trusts have proven their entitlement to remedies for such Loans.

## XII.   THE MARGINAL INDYMAC LOANS

428.     Next, the Court considers the issues of UBS's liability and the Trusts' remedies for the Marginal IndyMac Loans—those 3,523 IndyMac Loans for which Loan Files were not available and for which Holt did not find a material defect based on his limited review of non-Loan File sources.

### A.     Liquidated Marginal IndyMac Loans

429.     As the First Department recently held, for "loans that have been foreclosed upon or liquidated," RMBS plaintiffs "may pursue monetary damages" rather than the "sole remedy" of repurchase set forth in PSAs. *Nomura Home Equity Loan, Inc. Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 105, 107 (1st Dep't 2015).   "Such a rule make sense," the First Department explained, "for to hold otherwise would create a perverse incentive for a sponsor to fill the trust with junk mortgages that would expeditiously default so that they could be released, charged off, or liquidated before a repurchase claim is made." *Id.* at 106 (citation and quotation omitted).  Because liquidated loans "cannot be repurchased," RMBS plaintiffs may seek "damages consistent with" the terms of the PSA's repurchase protocol instead of specific performance. *Id.* at 110.   And because those equitable damages are "*in lieu* of the desired equitable remedy" of repurchase, *id.* at 106 (citing and quoting *Bank of New York Mellon v. WMC Mortg., LLC*, 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015)) (emphasis added)), the PSAs' repurchase protocol

---

Assured does not insure the Trusts against losses that a loan might suffer if borrowers fail to make their principal and interest payments; rather, it insures specific certificates against losses if the Trusts do not receive sufficient cash flow from the loans to make monthly payments to the Certificateholders.   Because Assured's payments are not made at the loan-level, it would be inequitable (and impractical) to reduce the Purchase Prices of those Loans to account for those payments.

is relevant only to determine the amount of plaintiffs' damages.  *Id.* at 110 (RMBS plaintiffs may seek "damages consistent with [the] terms" of the protocol).

430.    Where RMBS plaintiffs seek equitable damages for liquidated loans, Courts allow them to use statistical methods to prove the amount of those damages.  After a bench trial in *Assured*, Judge Rakoff accepted the insurer plaintiff's sampling-based evidence as proof of damages for liquidated and defaulted loans, rejecting the defendant's argument—advanced by UBS here—that such evidence was inconsistent with a contract that limited the plaintiff to the loan-specific remedies of cure or repurchase.  920 F. Supp. 2d at 517.  The court explained:

> [T]he 90–day cure period has long since expired. Moreover, since, . . . Assured's damages model is based only on defective, defaulted loans, Flagstar's right to cure a breach is irrelevant because it is impossible to entirely cure any breach as to a mortgage loan that has already defaulted. Flagstar would also receive nothing back on defaulted loans, even if specific loans in the sample were identified and re-transferred. Thus, the Court rejects Flagstar's objections to sampling as a method of proving damages.

*Assured*, 920 F. Supp. 2d at 514 (citations and quotation marks omitted).  Similarly, in *SACO I Trust 2006-5 v. EMC Mortgage LLC*, Index No. 651820/2012, Dkt. 564 (N.Y. Sup. Ct. Nov. 30, 2015) (Exhibit 2) Justice Bransten of the New York Supreme Court recently reached the same result in an action brought by RMBS trusts under contracts with materially identical repurchase provisions that made cure or repurchase the trusts' sole remedies. Citing *Nomura* and *Assured*, the court ruled that, for liquidated loans, "as a matter of law, the PSAs 'cure-and-repurchase provision' does not bar sampling as a vehicle for proof" to establish "[the] aggregate purchase price for the liquidated loans" as the amount of damages.  *Id.* at 15-17 (issuing partial summary judgment ruling that "the use of statistical sampling to prove liability and damages on [the trusts'] claims is consistent with the terms of the contract[s] governing the transactions, including but not limited to the PSAs").[246]

---

[246] *Accord Deutsche Bank Nat'l Tr. Co. v. WMC Mortg., LLC*, 2014 WL 3824333 (D. Conn. Aug. 4, 2014) ("statistical sampling is . . . an acceptable way of proving liability and damages in an RMBS case such as this one"); *Home Equity Mortg. Trust Series 2006-1 v. DLJ Mortg. Capital, Inc.*, No. 156016/2012, Order at 1 (N.Y. Sup. Ct. Nov. 18, 2013) (Exhibit 3) ("the court agrees that plaintiffs' use of statistical sampling to prove liability and damages would streamline the trial, promote judicial economy, and conserve the resources of the parties and the court").

431.    Consistent with *Nomura*, *Assured*, and *SACO*, the Court concludes that the Trusts may use statistical sampling and extrapolation evidence to prove liability and damages as to their claims for those Marginal IndyMac Loans that have liquidated.  Furthermore, the Court accepts Lipshutz's method of extrapolating material defects in the IndyMac Sub-Samples to the IndyMac Sub-Population, and Snow's method of calculating damages for Marginal IndyMac Loans.

### B.    Non-Liquidated Marginal IndyMac Loans

432.    The First Department's ruling in *Nomura* also allows RMBS plaintiffs to seek equitable damages in lieu of repurchase if actual repurchase "appears to be . . . *impracticable*[.]" 133 A.D.3d at 106 (emphasis added); *see generally 423 S. Salina St., Inc. v. City of Syracuse*, 68 N.Y.2d 474, 483 (1986) (equitable damages are available "when that form of relief becomes necessary in order to prevent a failure of justice and when it is for any reason impracticable to grant the specific relief demanded" (citations omitted)).  A party may prove impracticability by showing that it made reasonable but "unsuccessful attempts" to obtain an event, or that the event may be brought about only "'at an excessive and unreasonable cost,'" *Asphalt Int'l, Inc. v. Enter. Shipping Corp., S.A.*, 514 F. Supp. 1111, 1115 (S.D.N.Y.) (citation omitted), *aff'd*, 667 F.2d 261 (2d Cir. 1981), that past events render it impossible "to restore the *status quo*" under which equitable relief would be practicable, *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13-14 (1st Dep't 1972), or that enforcing an equitable remedy would "would require further lengthy litigation," *Ungewitter v. Toch*, 31 A.D.2d 583, 584 (3d Dep't 1968), *aff'd*, 26 N.Y.2d 687 (1970).[247]

433.    Here, the relevant Loan Files for the Marginal IndyMac Loans that remain in the trust are in the possession of the Loans' servicer, One West.  In July 2011, before this action commenced and while the Assured Action was pending, Assured asked that One West produce

---

[247] *Accord Devitt v. Providence Washington Ins. Co.*, 61 A.D. 390, 397 (2d Dep't 1901), *aff'd*, 173 N.Y. 17 (1902) ("[A] thing is impracticable when it can only be done at an excessive or unreasonable cost. A man may be said to have lost a shilling when he has dropped it into deep water, though it might be possible by some very expensive contrivance to recover it."); *see also* Black's Law Dictionary 874 (10th ed. 2014) (defining an occurrence as "impracticable" when "unanticipated" circumstances make it "more difficult" or "more expensive").

these Loan Files.  DX PC at 9.  One West refused unless Assured (i) paid over $100 per file (a total cost of $650,000); (ii) released OneWest from "its fraudulent and intentional misconduct" in relation to its duties as servicer; and (iii) agreed to restrict Assured's contractual rights to conduct servicer reviews.  DX PC at 7.  In 2011, after the Trusts filed this action, they repeated Assured's request that OneWest produce the Loan Files on reasonable terms, DX PC at 4, but One West refused.  Given OneWest's conduct, and based on the Trusts' understanding at that time they could prove their claims through sampling, Dkt. 86, the Trusts agreed that OneWest would produce only 422 Loan Files for Loans in the Trusts' samples and that the Trusts would not seek the production of additional Loan Files.  After this Court clarified that it had not approved (or disapproved) of sampling, Dkt. 287, the Trusts' contract with OneWest precluded them from obtaining the remaining files.

434.    Under these circumstances, because it is impractical (and likely legally impossible) for the Trusts to obtain Loan Files for the non-liquidated Marginal IndyMac Loans, it is impractical for them to identify specific defective Loans for repurchase.  Moreover, as explained in Part VI.C (Background), Holt's analysis of 422 Loan Files provided a sufficient basis for Lipshutz to extrapolate breach rates for the Marginal IndyMac Loans.  The Trusts therefore may seek equitable damages in lieu of specific performance for these Loans, *Nomura*, 133 A.D.3d at 106, and may use statistical evidence to prove liability and damages, *Assured*, 920 F. Supp. 2d at 517; *SACO*, (Exhibit 2) at 14-15.[248]

## C.    Liability And Remedies For The Marginal IndyMac Loans

435.    Having determined that the Trusts may use sampling and extrapolation evidence to prove UBS's liability, and the amount of their equitable damages, for Marginal IndyMac Loans, the Court now concludes that the Trusts have done precisely that.  The Court has adopted Holt's

---

[248]  The Court also notes that at least 368 of the non-liquidated Marginal IndyMac Loans have been modified—imposing losses on the Trusts—and 211 were reported delinquent, in foreclosure, in bankruptcy, or real estate owned as of February 2016—creating a high likelihood that they will not fully recover and so will cause the Trusts additional losses.  *See* Tr. 1904:4-1905:10 (Snow testimony that modifications and delinquencies greatly increase probability that Trust will not recover in full payments due on a loan).

findings that 368 Loans out of the 422 in the IndyMac Sub-Samples were materially defective, Part VI.C.1, *above*, it has found that Loans in the IndyMac Sub-Population are materially defective at a rate calculated using Lipshutz's extrapolations, *id.*, and it has accepted Snow's method of calculating damages for the Marginal IndyMac Loans, Part VI.D, *above*.

436.   As for Section 2.03's other requirements, the Court has found that UBS was willfully blind to the breaches in all Loans—which includes the Marginal IndyMac Loans—as of January 31, 2008.  Part III.C.2, *above*.  Moreover, the Trusts have shown that UBS received Dr. Lipshutz's report in August 2015, which stated that as many as 100% of the IndyMac Loans were likely materially defective, PX 1109;[249] this was sufficient "written notice" of the breaches. Accordingly, the Court  concludes that the Trusts are entitled to equitable damages in an amount to be determined based on the Court's findings of material breach, Lipshutz's extrapolation of those findings, and Snow's calculation of damages.

## XIII.  UBS'S DEFENSES

437.   In the Joint Pretrial Order, Dkt. 383, UBS asserted five defenses.  In its first two defenses, UBS asserted that the Trusts could not prove that UBS breached its warranties or that those breaches cased MAEs; in fact, as shown, the Trusts have proved their claims.  *See* Parts IV-IX, *above*.  In its third defense, UBS asserted that it did not discover or receive written notice of the breaches; in fact, as shown, the Trusts have proved both.  *See* Parts III-IX, *above*.  In its fifth defense, UBS asserted that the Trusts could not seek remedies other than repurchase of specific Loans; in fact, as shown, the Trusts may seek equitable damages where repurchase of specific Loans is impossible or impractical.  *See* Part XI, *above* (discussing equitable remedies); Part XII, *above* (discussing equitable remedies for Marginal IndyMac Loans).  UBS's remaining defenses—

---

[249]   As explained by UBS's expert, Barnett, in his trial testimony, this report gave UBS written notice that the Trusts believed, based on Holt's findings that 420 out of the 422 sampled IndyMac Loans were materially defective, that the remaining IndyMac Loan population had a material breach rate of 99.53% with a margin of error of .63%—and thus potentially 100%.  Barnett Direct (DX OX) ¶ 26.  In other words, the August 8, 2015 Lipshutz report put UBS on notice that every remaining IndyMac Loan was potentially at issue.

that it did not receive "prompt written notice" and that the Trusts' claims are barred by the statute of limitations—are also without merit.

### A. "Prompt Written Notice"

438.   In its third defense, UBS asserted it "was not provided with the required 'prompt written notice' of any [breach]." *See* Joint Pre-Trial Order at 4 (Dkt. 383 at 3-4). But the PSAs clearly do not impose on the Trustee any prompt notice requirement, and this Court has already found that the Trustee has adequately notified UBS of all contested Loans in this case.

439.   First, the PSAs do not require the Trustee to provide UBS with "prompt written notice" of breaches. The second paragraph of Section 2.03 provides that "upon discovery" of material breaches by any of five specific parties to those contracts—none of which is the Trustee— "the party discovering such breach shall give prompt notice thereof to the other parties and the Trustee." PX 49 at 74 (MARM 2006-OA2 PSA) (§ 2.03); PX 110 at 102 (MARM 2007-1 PSA) (§ 2.03); PX 182 at 85 (MARM 2007-3 PSA) (§ 2.03). This obligation to provide "prompt notice" does not apply to the Trustee, which is supposed to *receive* that prompt notice, and whose own obligations to provide notice are dealt with in the next sentence of the paragraph.

440.   To the extent that UBS argued it was not required to cure or repurchase defective Loans unless it first received "prompt written notice" of breaches, the plain language of the PSAs belies that argument. Section 2.03 does not trigger UBS's cure-or-repurchase obligations upon its receipt of "prompt written notice" of a breach; rather, it triggers those obligations upon UBS's "discovery" or receipt of "*written notice*" of breaches. *See* PX 49, 110, 182, § 2.03 (emphasis added). "Where the contract is clear and unambiguous on its face, the courts must determine the intent of the parties from within the four corners of the instrument," *Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524, 527 (2d Cir. 2005) (quoting *Meccico v. Meccico*, 76 N.Y.2d 822, 824 (1990)), and there is no reason to re-write the unambiguous language of Section 2.03 to excuse

UBS from its obligations if it did not receive "written notice" of breaches that was also "prompt."[250]

441.    Second, this Court has already determined that the Trustee has adequately notified UBS of all contested loans here.  Under the contracts, the Trustee's obligation is simply to "notify" UBS of breaches after others have first notified the Trustee of them—the contracts do not require that this notice be "prompt" or "written."  PX 49 at 74 (MARM 2006-OA2 PSA); PX 110 at 101 (MARM 2007-1 PSA); PX 182 at 85 (MARM 2007-3 PSA).  At trial, the Trusts proved that the Trustee notified UBS of all breaches that were identified by Assured or Wells Fargo, either by sending "me too" notices to UBS, Reynolds Direct ¶¶ 23-24, or by ensuring that UBS had received copies of all of the Assured and Wells Fargo notices (on which UBS was copied).  *See* Reynolds Exhibits 4-5.  The Trusts also proved that they notified UBS of all breaches at issue by serving their pleadings and experts' reports identifying the breaches.  *See* PX 947, 1109 (transmittal emails attaching expert reports).

442.    As a result, the Court rejects UBS's prompt notice argument.[251]

---

[250]   Even if the Trustee had not reiterated most of the Assured notices or subsequently notified UBS of the breaches through the complaint and the expert reports, assuming it were required to do so, it would not matter.  Under New York law, UBS's breach of the PSAs on the Closing Dates excuses any subsequent performance by the Trustee. Restatement (Second) of Contracts § 237 (1981); *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 601 (2d Cir. 2005) (relying on Section 237 as accurate statement of New York contract law) (citing *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 693 (1995)); *see also U.W. Marx, Inc. v. Koko Contracting, Inc.*, 124 A.D.3d 1121, 1122-23 (3d Dep't 2015) (general contractor's breach of contract by failing to pay subcontractor was not excused by subcontractor's subsequent breach of contract by stopping work without first providing seven days' written notice).

[251]   The contractual performance of the purchaser is not an element of a breach of warranty claim.  *E.g.*, *LaSalle Bank N.A. v. Merrill Lynch Mortgage Lending, Inc.*, No. 04 Civ. 5452 (PKL), 2007 WL 2324052 at *8 (S.D.N.Y. Aug. 13, 2007) (stating elements of claim).  And to the extent it is required to prove breach of contract, the Trustee has demonstrated its performance.  The Trusts presented credible evidence that the Trustee fully performed all of its relevant obligations under the PSAs.  Reynolds Direct ¶¶ 14-17, 24 (explaining that "the Trustee has a limited role in these transactions" which are "largely administrative" and include "receiv[ing] breach notices" and "provid[ing] notice of breach notices," which the Trustee did here).  To rebut the Trusts' evidence of performance, UBS would have to demonstrate that the Trustee "substantially failed to perform its side of the bargain" or "committed a material breach."  *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citing *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96 (1974)) (applying *Hadden* to claims for breaches of contractual warranties).  UBS presented no evidence that the Trustee substantially failed to perform its side of the bargain or committed a material breach.  In fact, UBS presented no contrary evidence at all.  Hence, the Trustee performed.

### B.      Statute Of Limitations

443.     In its fourth defense, UBS invoked the statute of limitations (Dkt. 383 at 3-4), which is an affirmative defense on which it bears the burden of proof.  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) (statute of limitations is an affirmative defense).  UBS has failed to meet that burden as to any of the Trusts' claims.

444.     Under New York law, the Trusts had six years to bring a breach-of-contract claim, C.P.L.R. § 213(1), running from the dates the contracts were executed, *ACE*, 25 N.Y.3d at 598. As the Court held at the Rule 56 stage, the Trusts brought timely claims based on UBS's "discovery" of breaches as to all Loans, as the Trusts had pled that UBS discovered defects in certain Loans and could endeavor to prove at trial that UBS had discovered defects in others. *MARM II*, Dkt. 249 at 14-17.  The Trusts also brought timely claims based on UBS's receipt of "written notice" of thousands of Loans for which UBS indisputably received such notice 90 days before the expiration of the limitations period.  *Id.* at 10-14.

445.     As explained in the Court's April 12 Order (Dkt. 399), the Trusts are also permitted to bring notice-based claims based on UBS's receipt of "written notice" of breaches after the expiration of the limitations periods, because such claims relate back to the Trusts' timely-filed claims.   Dkt. 399 at 10-13 (citing *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96 (1st Dep't 2015)).   Consequently, the Trusts' claims based upon UBS's receipt of written notice of breaches in the Trusts' expert reports (*see, e.g.*, PX 552, PX 1109) relate back to the Trusts timely claims based on UBS's discovery of breaches in the same Loans, as well as to UBS's receipt of written notice as to other Loans in the same Trusts.  *Id.*  Thus, UBS has failed to show that the Trusts' claims as to any Loan is barred by the statute of limitations.[252]

---

[252]  While the Trusts' written pleadings did not discuss the breaches identified in their experts' reports, the Trusts moved under Federal Rule of Civil Procedure 15(b) to amend their pleadings to conform to the evidence presented at trial, Tr. 1978:15-21, and the Court provisionally granted that motion, Tr. 1979:1-3.  As the Court held, UBS cannot claim prejudice from this amendment, as all the Loans identified in those reports were the subject of thorough expert discovery, and were already "potentially in play" on a discovery theory.  Dkt. 399 at 12-13.  Accordingly, the Trusts

## CONCLUSION

446.    For the reasons stated, the Court grants judgment in favor of the Trusts on their claims for breach of contract against UBS.

447.    UBS shall repurchase from the Trusts the non-liquidated Loans listed on Appendix 59, at the Purchase Prices set forth in the PSAs.  The Trusts shall submit a calculation of these Purchase Prices, pursuant to Snow's methodology.

448.    UBS shall pay equitable damages to the Trusts for the liquidated Loans listed on Appendix 60 in an amount equivalent to the Purchase Prices, plus prejudgment interest at rate of 9% annually, starting from the dates on which UBS should have repurchased the Loans.  The Trusts shall submit a calculation of these damages, pursuant to Snow's methodology.

449.    UBS shall pay equitable damage to the Trusts for the Marginal IndyMac Loans in an amount to be calculated pursuant to Lipshutz's extrapolation methods and Snow's damages methodology.  The Trusts shall submit a calculation of these damages.[253]

Dated:    June 13, 2016
New York, New York


Respectfully submitted,


QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By:   _/s/ Sean P. Baldwin___
David L. Elsberg
Sean P. Baldwin
Andrew R. Dunlap
Steven M. Edwards
Nicholas F. Joseph
Paul P. Hughes
Marlo A. Pecora
51 Madison Avenue, 22nd Floor

---

motion to amend was properly granted.  *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 528 (S.D.N.Y. 2011) (amending pleadings after trial to include aiding and abetting claims that involved the same set of facts involved in the previously-pled tortious interference with prospective economic advantage claims).

[253]   As UBS agreed during closing arguments, "until there is a finding of fact and conclusion of law as to what amounts to a defect, you can't extrapolate across the missing IndyMac files[.]"  Tr. 2150:13-16.

New York, New York 10010
Tel:  212-849-7000
Facsimile:  212-849-7100

Paul A. Riley
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel:  213-443-3000
Facsimile:  213-443-3100

*Attorneys for Plaintiffs*