UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES | : | |
| TRUST 2006-OA2, MASTR ADJUSTABLE | : | |
| RATE MORTGAGES TRUST 2007-1, AND | : | 12-cv-7322 (PKC) |
| MASTR ADJUSTABLE RATE MORTGAGES | : | |
| TRUST 2007-3, | : | **ECF Case** |
| | : | |
| Plaintiffs, | : | **Electronically Filed** |
| | : | |
| - against - | : | |
| | : | |
| UBS REAL ESTATE SECURITIES INC., | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Scott D. Musoff
Robert A. Fumerton
Robert L. Dunn
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone: (212) 735-3000

Thomas J. Nolan
Allison B. Holcombe
Abraham A. Tabaie
300 South Grand Avenue
Los Angeles, California 90071
Phone: (213) 687-5000

Charles F. Smith
Lara A. Flath
155 N. Wacker Drive
Chicago, Illinois 60606
Phone: (312) 407-0700

*Attorneys for Defendant UBS Real
  Estate Securities Inc.*

**TABLE OF CONTENTS**

FORMAT OF SUBMISSION ...................................................................................................i

PRELIMINARY STATEMENT ............................................................................................1

RELEVANT PROCEDURAL AND FACTUAL HISTORY .....................................................25

      A.    The Parties ...........................................................................................25

      B.    The Loans Underlying The Trusts ....................................................26

      C.    The PSAs ...............................................................................................29

      D.    The Breach Notices ...............................................................................32

      E.    The Assured Action ...............................................................................33

      F.    This Action ............................................................................................34

      G.    UBS RESI's Motion to Dismiss .........................................................34

      H.    Plaintiffs' Expert Reports.....................................................................35

      I.    The Court's Summary Judgment Ruling...............................................36

      J.    Plaintiffs' Motion For Reconsideration And To Reopen Discovery ...................38

      K.    The Parties' Pre-Trial Submissions .....................................................39

      L.    The Trial ................................................................................................40

DISCUSSION..........................................................................................................................42

I.    BURDEN OF PROOF ................................................................................................42

II.    THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED ........................................................................45

      A.    Holt's Opinions Are Not Reliable .......................................................45

      B.    Holt Is Not Credible..............................................................................55

      C.    Holt's Testimony Is Not Relevant ........................................................58

III.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO PROVE MATERIALITY FOR ANY ALLEGED BREACHES OF R&Ws................................59

A.      Plaintiffs Must Show That All Alleged Breaches Materially And Adversely Affected The Interests Of Certificateholders At the Time of UBS RESI's Notice Or Discovery ......................................................59

B.      Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect ........................................................................67

C.      Holt Did Not Consider Material And Adverse Effects Post Origination .............74

D.      Plaintiffs' Contention That The Breaches Caused "Continuing" And "Ineradicable" Material And Adverse Effects Is Without Merit .........................76

IV.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE MLS REP ........................................................................90

A.      The MLS Rep Is More Reasonably Read As A Transcription Rep .....................90

B.      In Any Event, Plaintiffs Have Not Proven That LTV Or DTI Information Was Inaccurate ........................................................................93

C.      Holt Relies On Impermissible Hearsay To Show MLS Rep Breaches ................97

D.      Holt Blindly Accepted The Hearsay Sources For Their Truth .........................103

V.     PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE GUIDELINE REP ........................................................................107

A.      Holt's Use Of Post-Origination Information Is Improper .................................107

B.      Holt Did Not Follow The Actual Requirements Of The Underwriting Guidelines ........................................................................113

C.      Plaintiffs' Missing Document Allegations Are Not Credible ...........................115

D.      Plaintiffs' Missing "Core Documents" Allegations Are Implausible ...............122

VI.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE "MORTGAGE LOAN FILE WARRANTY" ......................................126

VII.   THE LOAN FILES ARE INADMISSIBLE ....................................................129

VIII.  PLAINTIFFS HAVE NOT PROVEN THE COWAN LOANS TO BE DEFECTIVE ........................................................................133

A.      MLS Representation .......................................................................134

B.      Maximum LTV Ratio .....................................................................140

C.      Guideline Representations ..............................................................141

D.      Plaintiffs Have Not Shown That The Phoenix AVM Is Reliable ......................142

E.      Plaintiffs Did Not Disclose Aspects of Cowan's Methodology ........................152

IX.     PLAINTIFFS' SAMPLING ANALYSIS OF INDYMAC LOANS IS
        EXCLUDED ...........................................................................................................154

X.      PLAINTIFFS' "SUMMARY EVIDENCE" IS EXCLUDED .....................................162

XI.     PLAINTIFFS HAVE NOT PROVEN UBS RESI'S PROMPT NOTICE OR
        DISCOVERY OF R&W BREACHES ......................................................................167

A.      UBS RESI Did Not Receive Prompt Written Notice ........................................167

B.      UBS RESI Did Not "Discover" Any Breaches .................................................169

C.      UBS RESI Did Not Have Actual Knowledge Of Breaches ..............................180

XII.    PLAINTIFFS' EXPERT TESTIMONY IS EXCLUDED TO THE EXTENT
        THAT IT GOES BEYOND THEIR EXPERT REPORTS ...........................................184

XIII.   PLAINTIFFS HAVE NOT PROVEN ENTITLEMENT TO DAMAGES ....................191

A.      Dr. Snow Failed To Comply With The Purchase Price Formula .......................191

B.      Plaintiffs Did Not Offer Any Evidence Of Direct And Proximate
        Causation ...........................................................................................................196

C.      Plaintiffs Did Not Adjust Damages To Account For The Full Insurance
        Recoveries From Assured .................................................................................198

D.      Plaintiffs Are Not Entitled To Prejudgment Interest ........................................200

CONCLUSION ........................................................................................................................204

Defendant UBS Real Estate Securities Inc. ("UBS RESI") respectfully submits these proposed findings of fact and conclusions of law following the bench trial in this action, which concluded on May 13, 2016.

## FORMAT OF SUBMISSION

UBS RESI's proposed findings of fact and conclusions of law respond to Plaintiffs'[1] proposed findings of fact and conclusions of law dated June 13, 2016 ("Pl. FOF" (ECF No. 477)) as follows:  the Preliminary Statement provides an overview of UBS RESI's legal and factual defenses to Plaintiffs' claims, followed by UBS RESI's specific responses to Plaintiffs' proposed findings of fact and conclusions of law.  Each section of UBS RESI's responses indicates in the heading the specific paragraph or paragraphs of Plaintiffs' proposed findings of fact and conclusions of law to which the section responds, and sets forth UBS RESI's proposed findings of fact and conclusions of law in support of its defenses.  **Appendix B** hereto sets forth UBS RESI's responses to Plaintiffs' categories of alleged loan defects.

Below is a "Reference Key," which lists Plaintiffs' sections and paragraphs in numerical order and the corresponding responses to those sections and paragraphs in this submission.  While UBS RESI provided this format in an effort to reduce redundancy and link UBS RESI's proposed findings of fact and conclusions of law to Plaintiffs' submission, UBS RESI stands ready to provide its submission in any other format the Court may request.  To the extent that any proposed finding of fact included herein reflects a legal conclusion, it should be deemed a conclusion of law and vice versa.

---

[1] Plaintiffs are three RMBS trusts:  MASTR Adjustable Rate Mortgages Trust 2006-OA2, MASTR Adjustable Rate Mortgages Trust 2007-1 and MASTR Adjustable Rate Mortgages Trust 2007-3 ("Plaintiffs" or the "Trusts"), acting through U.S. Bank National Association ("U.S. Bank" or the "Trustee").

**REFERENCE KEY**

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 1-3 | INTRODUCTION | p. 1-24 | PRELIMINARY STATEMENT |
| ¶¶ 4-30 | PROCEDURAL HISTORY | ¶¶ 22-24 | D. The Breach Notices |
| | | ¶¶ 25-29 | E. The Assured Action |
| | | ¶¶ 30-33 | F. This Action |
| | | ¶¶ 34-35 | G. UBS RESI's Motion to Dismiss |
| | | ¶¶ 36-38 | H. Plaintiffs' Expert Reports |
| | | ¶¶ 39-42 | I. The Court's Summary Judgment Ruling |
| | | ¶¶ 43-46 | J. Plaintiffs' Motion For Reconsideration And To Reopen Discovery |
| | | ¶¶ 47-53 | K. The Parties' Pre-Trial Submissions |
| | | ¶¶ 54-58 | L. The Trial |
| p. 9 | BACKGROUND | p. 25 | RELEVANT PROCEDURAL AND FACTUAL HISTORY |
| ¶ 31-55 | I. RESIDENTIAL MORTGAGE-BACKED SECURITIES | ¶¶ 7-13 | B. The Loans Underlying The Trusts |
| ¶¶ 56-61 | II. THE TRUSTS | ¶¶ 1-6 | A. The Parties |
| | | ¶¶ 14-21 | C. The PSAs |
| | | ¶¶ 7-13 | B. The Loans Underlying The Trusts |
| ¶¶ 62-73 | III. UBS'S PRE-CLOSING DUE DILIGENCE | ¶¶ 369-375 | XI.C. UBS RESI Did Not Have Actual Knowledge Of Breaches |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 74-80 | IV. UBS'S POST-CLOSING MONITORING | ¶¶ 347-368 | XI.B. UBS RESI Did Not "Discover" Any Breaches |
| ¶¶ 81-83 | V. UBS'S RESPONSES TO REPURCHASE DEMANDS | ¶¶ 22-24 | D. The Breach Notices |
| p. 30 | VI. THE PARTIES' EXPERT ANALYSES | ¶¶ 376-388 | XII. PLAINTIFFS' EXPERT TESTIMONY IS EXCLUDED TO THE EXTENT THAT IT GOES BEYOND THEIR EXPERT REPORTS |
| ¶¶ 84-99 | VI.A. Re-underwriting | ¶¶ 65-67 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| | | ¶¶ 68-84 | II.A. Holt's Opinions Are Not Reliable |
| | | ¶¶ 85-90 | II.B. Holt Is Not Credible |
| | | ¶¶ 91-93 | II.C. Holt's Testimony Is Not Relevant |
| ¶¶ 100-109 | VI.B. Appraisals | ¶¶ 256-308 | VIII. PLAINTIFFS HAVE NOT PROVEN THE COWAN LOANS TO BE DEFECTIVE |
| ¶¶ 110-119 | VII.C. Sampling And Extrapolation | ¶¶ 309-327 | IX. PLAINTIFFS' SAMPLING ANALYSIS OF INDYMAC LOANS IS EXCLUDED |
| ¶¶ 120-126 | VII.D. Remedies | ¶¶ 389-408 | XIII.A. Dr. Snow Failed To Comply With The Purchase Price Formula |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 127-132<br><br>¶¶ 133-134<br><br>¶¶ 135-144 | DISCUSSION<br><br>I. BURDENS OF PROOF<br><br>II. EVIDENTIARY STANDARDS | ¶¶ 59-64 | I. BURDEN OF PROOF |
| ¶¶ 145-146 | III. THE CONTRACTS' REPURCHASE PROVISION | ¶¶ 14-21 | C. The PSAs |
| ¶ 147-169 | III.A. The "Material And Adverse Effects" Requirement | ¶¶ 95-158 | III. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO PROVE MATERIALITY FOR ANY ALLEGED BREACHES OF R&Ws |
| ¶¶ 170-172 | III.B. The "Written Notice" Requirement | ¶¶ 14-21<br><br>¶¶ 341-346 | C. The PSAs<br><br>XI.A. UBS RESI Did Not Receive Prompt Written Notice |
| ¶¶ 173-192 | III.C. The "Discovery" Requirement | ¶¶ 341-375 | XI. PLAINTIFFS HAVE NOT PROVEN UBS RESI'S PROMPT NOTICE OR DISCOVERY OF R&W BREACHES |
| p. 80 | IV. THE MORTGAGE LOAN SCHEDULE WARRANTY | p. 90 | IV. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE MLS REP |
| ¶¶ 193-202 | IV.A. Construction Of The MLS Warranty | ¶¶ 159-165 | IV.A. The MLS Rep Is More Reasonably Read As A Transcription Rep |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 203-213 | IV.B. The MLS Warranty Regarding Loan Purpose | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| ¶¶ 214-224 | IV.C. The MLS Warranty Regarding Property Type | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶¶ 225-236 | IV.D. The MLS Warranty Regarding Documentation Type | | |
| ¶¶ 237-246 | IV.E. The MLS Warranty Regarding Credit Score | ¶¶ 173-191 | IV.C. Holt Relies On Impermissible Hearsay To Show MLS Rep Breaches |
| ¶¶ 247-259 | IV.F. The MLS Warranty Regarding Owner Occupancy | ¶ 196 n.42 | IV.D. Holt Blindly Accepted The Hearsay Sources For Their Truth |
| ¶¶ 260-314 | IV.G. The MLS Warranty Regarding Debt-To-Income Ratios | ¶¶ 166-172 | IV.B In Any Event, Plaintiffs Have Not Proven That LTV Or DTI Information Was Inaccurate |
| | | ¶¶ 173-191 | IV.C. Holt Relies On Impermissible Hearsay To Show MLS Rep Breaches |
| | | ¶¶ 192-196 | IV.D. Holt Blindly Accepted The Hearsay Sources For Their Truth |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 315-332 | IV.H. The MLS Warranty Regarding Loan-To-Value Ratios | ¶¶ 166-172 | IV.B. In Any Event, Plaintiffs Have Not Proven That LTV Or DTI Information Was Inaccurate |
| | | ¶¶ 256-308 | VIII. PLAINTIFFS HAVE NOT PROVEN THE COWAN LOANS TO BE DEFECTIVE |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶¶ 333-338 | V. THE MAXIMUM LOAN-TO-VALUE RATIO WARRANTY | ¶¶ 256-308 | VIII. PLAINTIFFS HAVE NOT PROVEN THE COWAN LOANS TO BE DEFECTIVE |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 339-351 | VI. THE MORTGAGE FILE WARRANTY | ¶¶ 241-247 | VI. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE "MORTGAGE LOAN FILE WARRANTY" |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶¶ 352-356 | VII. THE TITLE INSURANCE WARRANTY | ¶¶ 216-230 | V.C. Plaintiffs' Missing Document Allegations Are Not Credible |
| | | ¶¶ 231-240 | V.D. Plaintiffs' Missing "Core Documents" Allegations Are Implausible |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 357-364 | VIII. THE HAZARD INSURANCE WARRANTY | ¶¶ 216-230 | V.C. Plaintiffs' Missing Document Allegations Are Not Credible |
| | | ¶¶ 231-240 | V.D. Plaintiffs' Missing "Core Documents" Allegations Are Implausible |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶ 365 | IX. THE GUIDELINE WARRANTY | p. 107 | V. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE GUIDELINE REP |
| | | ¶¶ 248-255 | VII. THE LOAN FILES ARE INADMISSIBLE |
| ¶ 366 | IX.A. Construction Of The Guideline Warranty | ¶¶ 212-215 | V.B. Holt Did Not Follow The Actual Requirements Of The Underwriting Guidelines |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 367-387 | IX.B. Loans Without Critical Documents | ¶¶ 216-230 | V.C. Plaintiffs' Missing Document Allegations Are Not Credible |
| | | ¶¶ 231-240 | V.D. Plaintiffs' Missing "Core Documents" Allegations Are Implausible |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶¶ 386-396 | IX.C. Loans With Unreasonable Stated Incomes | ¶¶ 197-211 | V.A. Holt's Use Of Post-Origination Information Is Improper |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 397-404 | IX.D. Loans Violating Guidelines With Unreasonable Exceptions | ¶¶ 212-215 | V.B. Holt Did Not Follow The Actual Requirements Of The Underwriting Guidelines |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶¶ 405-410 | IX.E. Loans Violating Guidelines With No Exceptions | ¶¶ 197-211 | V.A. Holt's Use Of Post-Origination Information Is Improper |
| | | ¶¶ 212-215 | V.B. Holt Did Not Follow The Actual Requirements Of The Underwriting Guidelines |
| | | ¶¶ 112-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶ 411 | IX.F. Loans Violating Guidelines As A Result of Other Defects | ¶¶ 121-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶¶ 412-416 | X. MULTIPLE MATERIAL BREACHES | ¶¶ 121-125 | III.B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect |
| | | ¶¶ 65-93 | II. THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED |
| ¶ 417 | XI. THE TRUSTS' EQUITABLE REMEDIES | ¶ 319 | IX. PLAINTIFFS' SAMPLING ANALYSIS OF INDYMAC LOANS IS EXCLUDED |
| ¶ 418 | XI.A. Specific Performance | ¶¶ 14-21 | C. The PSAs |
| | | ¶¶ 389-408 | XIII.A. Dr. Snow Failed To Comply With The Purchase Price Formula |
| ¶¶ 419-424 | XI.B. Equitable Damages Plus Prejudgment Interest | ¶¶ 409-416 | XIII.D. Plaintiffs Are Not Entitled To Prejudgment Interest |
| ¶¶ 425-427 | XI.C. No Offset For Assured's Payments To Certificateholders | ¶¶ 404-408 | XIII.C. Plaintiffs Did Not Adjust Damages To Account For The Full Insurance Recoveries From Assured |

| Plaintiffs' FOF | Plaintiffs' Section Heading | Defendant's Response | Defendant's Section Heading |
|---|---|---|---|
| ¶¶ 428-436 | XII. THE MARGINAL INDYMAC LOANS | ¶¶ 309-327 | IX. PLAINTIFFS' SAMPLING ANALYSIS OF INDYMAC LOANS IS EXCLUDED |
| ¶ 437 | XIII. UBS'S DEFENSES | ¶¶ 389-416 | XIII. PLAINTIFFS HAVE FAILED TO PROVE ENTITLEMENT TO DAMAGES |
| ¶¶ 438-442 | XIII.A. "Prompt Written Notice" | ¶¶ 341-346 | XI.A. UBS RESI Did Not Receive Prompt Written Notice |
| ¶¶ 443-445 | XIII.B. Statute Of Limitations | ¶¶ 104-105 | III. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO PROVE MATERIALITY FOR ANY ALLEGED BREACHES OF R&Ws |
| ¶¶ 446-449 | CONCLUSION | p. 204 | CONCLUSION |

## PRELIMINARY STATEMENT

Relying almost entirely on their re-underwriting expert, Ira H. Holt, Plaintiffs seek an award of over $2.5 billion in damages in connection with 9,342 mortgage loans that they allege to be in breach of UBS RESI's contractual representations and warranties ("R&Ws"). During the course of the 14-day bench trial in this action, however, it became clear that Plaintiffs' case suffers from a number of fatal evidentiary holes, which they sought to plug through testimony from Holt on subjects that were either far afield from his disclosed area of purported expertise or that required no expertise at all, turning Holt into a mere conduit for hearsay. Indeed, while on the stand, Holt suddenly professed expertise on a wide range of new topics, including W-2 requirements and fraud detection; loan file "digitization" and the record-keeping practices of originators a decade ago; and the integrity of bankruptcy and servicing records that he admittedly never relied on before undertaking his work in this case. Not only were the vast majority of these makeshift opinions never disclosed in any of Holt's multiple expert reports, but time and again during trial, UBS RESI demonstrated that Holt's opinions on any subject simply were not reliable.[2]

Rather than present fact testimony from the originators, servicers or other relevant witnesses, Plaintiffs built their case upon the incredible testimony of Holt, which is untethered to the actual terms of the governing pooling and servicing agreements ("PSAs"), pays little heed to the Court's previous rulings regarding their requirements, and often constituted little more than comparing two data points and always deeming the one adverse to UBS RESI to be "true and correct." Plaintiffs' legal and evidentiary shortcomings are myriad, and their request for relief

---

[2] UBS RESI incorporates by reference the arguments made in its Motions in Limine Nos. 1-5, which sought to exclude each of Plaintiffs' experts, including Holt, under *Daubert* and Rule 702 for the reasons set forth therein.

should be denied in its entirety for at least the following separate and independent reasons:

**Holt's Opinions Are Not Credible Or Reliable (*Infra* Part II)**

Most significantly, Plaintiffs' claims must fail due to the specific shortcomings of their purported re-underwriting expert.  Holt proved to be an unreliable witness, repeatedly altering his methodologies at Plaintiffs' request.  (*Infra* ¶¶ 74-75.)  Holt also withdrew thousands of defect allegations involving hundreds of loans in the months following his expert report up to the eve of trial, and, indeed, during the trial itself.  (*Infra* ¶¶ 81-84.)  In fact, through their submission of new appendices in connection with their post-trial findings of fact and conclusions of law, Plaintiffs appear to have dropped another ***3,000*** of Holt's defect allegations – a stark admission that even Plaintiffs lack confidence in a significant number of the conclusions in Holt's expert report and trial declaration.  (*Infra* ¶ 82.)  The reasoning and methodology behind these withdrawals remain unknown – Holt admitted at trial that he had no insight into the basis for many of the withdrawals from his report, which were decided solely by Plaintiffs' counsel and which Holt continued to assert were valid breaches.  At the same time, Holt simply abandoned allegations on the stand, in one instance telling the Court that it should "strike" certain language from his Appendix 1 summary exhibit wherever it appeared.  (*Infra* ¶ 70.)  And yet, after all these attempts to clean up Holt's shoddy work, he continues to assert breaches that are manifestly baseless.

Holt also proved to lack credibility.  When questioned about his credentials – which he claimed were a basis for his opinions in this case – Holt admitted that he had testified falsely when he stated in his numerous expert reports and sworn trial declaration that he had earned a "Graduate Degree" from the University of Virginia.  (*Infra* ¶¶ 86-88.)  That alone is enough for the Court to discount his testimony entirely.  *See, e.g., Harkabi v. SanDisk Corp.*, 891

F. Supp. 2d 527, 539 (S.D.N.Y. 2012) ("Moreover, Dr. Johnson misrepresented her credentials to the Court by describing herself as a former 'professor' at Stanford University when, in fact, she was only a lecturer. . . . Accordingly, this Court discounts Dr. Johnson's opinions and views them skeptically."). Additionally, Holt made incredible claims at trial about his purported ability to detect "borrower fraud," which also turned out to be patently unreliable if not knowingly false. Holt contended that the absence of commas in numbers greater than one thousand in certain W-2 tax forms was indicative of fraud and asserted that his "fraud training" allowed him to opine on the validity of these forms. Not only were these claims never disclosed in Holt's expert report, they are simply wrong. Publicly available Internal Revenue Service information, of which the Court took judicial notice, states precisely the opposite – that W-2 forms are to be prepared *without* such commas. (*See infra* ¶ 89.) Holt also made the implausible claim that originators for whom he never worked would immediately "digitize" a complete and accurate loan file at the time of origination, which was conclusively refuted by his later testimony that his re-underwriting team received multiple versions of the loan files at issue, some of which contained more documents than others. (*Infra* ¶ 221.) Holt himself testified that when a borrower is shown to have misrepresented one aspect of a loan application, it calls into doubt "the integrity" of all other information in the loan file. (*Infra* ¶ 90.) This same reasoning should apply to Holt's own sworn testimony, which has conclusively been shown to lack integrity.

In light of the numerous significant deficiencies discussed herein, Holt's expert testimony should be excluded or, at the very least, afforded no weight. Without such testimony from their only re-underwriting expert, Plaintiffs' breach claims necessarily fail. *See Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (affirming exclusion of expert witness and holding that "[w]ithout the testimony of their expert witness,

[plaintiff's breach of warranty] claims fail").

**Plaintiffs Have Not Proven Material And Adverse Effects (*Infra* Part III)**

Even if the Court were to overlook these overarching credibility and reliability

issues, Plaintiffs failed to present through Holt any competent evidence that the alleged R&W

breaches "materially and adversely affect[ed]" the interests of the Certificateholders at the time

UBS RESI received notice of or discovered the purported breach, as required under the

unambiguous terms of the PSAs.  (*See infra* Part III.B.)  As the Court emphasized, there is a

requirement under the PSAs "that a defect or a breach not be immaterial or insignificant. . . .

[T]here is also a *separate requirement* that the nature of the breach *as of the time the repurchase*

*obligation is triggered* materially increases the risk of loss to the certificate holders."  (Tr.

1003:13-20 (emphasis added).)  Holt's testimony on this issue was hopelessly contradictory and

unreliable, and Plaintiffs have accordingly failed to meet their burden to show either materiality

or the required material and adverse effect ("MAE") for each alleged breach at the time the

repurchase obligation was triggered.

Indeed, Holt's view of materiality and MAE mutated at every turn and ultimately

fell apart under cross-examination and questioning by the Court.  As discussed more fully below,

Holt asserted in his report and direct testimony (without any explanation of his methodology or

analysis) that every defect he identified "significantly increases the risk of loss" on the loan, but

admitted on the stand that, in fact, he did not perform any materiality or MAE analysis

whatsoever – an admission corroborated by his report and the thousands of immaterial defects

identified therein.  Holt similarly asserted in his report and direct testimony that each defect,

standing alone, was sufficient to show an increased risk of loss, but abandoned that view at trial

and instead adopted an approach that required an assessment of the totality of all alleged

breaches for each loan.  (*Infra* ¶¶ 121-122.)  In his report, Holt also rejected wholesale, almost *verbatim*, the Court's holding that an increased risk of loss at origination could be eliminated or offset by other factors or events; he then modified this opinion in his trial declaration by adding a single, conclusory sentence asserting that the "significantly increased risk" for each of the tens of thousands of defects he identified persisted for all time; and then, on the stand, Holt testified that he was not aware of the Court's analysis at all, and in fact, had *not* assessed any materiality at any time, including post origination.  (*Infra* Part III.B-C.)  Holt's fatal admissions at trial, his inability to articulate any coherent theory of materiality or MAE, and the many other defects in his report and testimony undermine Holt's competence as an expert and establish conclusively that Plaintiffs failed to meet their burden to prove materiality or MAE.

First and foremost, Holt admitted at trial that he did not perform *any* analysis as to whether any breach had the requisite MAE.  Nowhere is this more apparent than in the following exchange with the Court, during which Holt testified in no uncertain terms:

> THE COURT.  Let me understand that you did not, you were not asked to, and you did not do an analysis of whether a defect materially increased the risk of loss to the lender, is that correct, or the certificate holder in this case?
>
> *A.  I did not do any analysis, no, sir.*
>
> THE COURT.  Right.  Okay.  You weren't asked to?
>
> A.  Just to verify the information, yes.
>
> THE COURT.  That would be true across the board as to all of the underwriting files you reviewed?
>
> *A.  Yes.*

(Tr. 928:11-20 (emphasis added); *see also* Tr. 1192:5-18 ("THE COURT.  [Y]ou don't have an opinion, or do you, on whether or not the breach which you're testifying about has any adverse effect on investors if, for example, it was the individual's income?  A.  That's correct, just the

violation. THE COURT. Just the violation? Okay, thank you.").) Holt's expert report and

Plaintiffs' post-trial submission corroborate this testimony – they show conclusively that Holt

performed no materiality or MAE analysis, drew no distinction between material and immaterial

defects and concluded that thousands of loans were "Materially Defective" even where the

alleged "defects" were plainly *de minimis*; were offset by significant compensating factors; or

resulted in loans that were still well within underwriting guidelines. (*Infra* Part III.B-C; *see, e.g.*,

Appendix 39, **Loan 1477653** (asserting data tape discrepancy where Mortgage Loan Schedule

indicated LTV ratio of 80% but "actual" LTV ratio alleged by Holt was 65% (*i.e.*, *better* than

reported)); Appendix 39, **Loan 1483491** (asserting data tape discrepancy where Mortgage Loan

Schedule indicated LTV ratio was 79.46% but "actual" LTV ratio alleged by Holt was 80%).)

        Plaintiffs cannot reconcile Holt's unequivocal testimony with the actual terms of

the PSAs, which require that *each* alleged breach materially and adversely affect the interests of

Certificateholders at the relevant time. (*Infra* Part III.A.) While Plaintiffs claim that Holt was

merely "confused" at trial, this explanation is implausible given his clear, straightforward

testimony on the stand. But even if the Court were to credit the bare assertion of materiality

found in Holt's trial declaration over this live testimony, Plaintiffs still would not be entitled to

relief, as Holt did not assess whether any MAE existed *on the date of notice or UBS RESI's*

*discovery of breach*, as is required under the plain terms of the PSAs. (*See* Memorandum and

Order, ECF No. 249 ("SJ Order"), at 18 ("[T]he determination of whether the breach 'materially

and adversely affect the interest of the Certificateholders . . .' is assessed *as of the cure-*

*repurchase period*." (emphasis added).) This was repeatedly confirmed by Holt at trial, where

he testified that he made no effort to determine the existence of MAE at the time of (i) discovery

of the breach, (ii) notice to UBS RESI, (iii) loan liquidation, (iv) service of any of Holt's

numerous expert reports, or (v) any other time period following occurrence of the breach.  (*Infra* ¶ 128.)

If there were any lingering doubt that Holt failed to analyze MAE, it is dispelled by his use of a hypothetical loan example in his expert report, which is the very same hypothetical employed by the Court in its decision denying reconsideration, except that Holt comes to the exact opposite conclusion (*infra* ¶ 119):

| The Court | Holt |
|---|---|
| "Thus, for example, the failure to obtain written verification of the salary and employment of a borrower may be a material deviation from underwriting standards, but if the borrower, in fact, was paid the exact salary and had the exact employment that he claimed, *the material deviation would not have 'materially and adversely affect the interests of the Certificateholders . . . .'*"<br><br>(Reconsid. Order at 6 (emphasis added).) | "For example, if the underwriting guidelines required that the underwriter obtain a verification of the borrower's income and the underwriter failed to obtain such verification, and if it were subsequently determined – post-origination – that the borrower had such income, that would not cure the Material Defect.  *The risk of loss with respect to the loan was still significantly higher as a result of the failure to obtain the required income verification.*"<br><br>(Holt Expert Report ¶ 8 (emphasis added).) |

Holt could not have performed the MAE analysis required to meet Plaintiffs' burden because, as illustrated above, he rejected at the outset the Court's view of MAE (and never explains why the "risk of loss . . . was still significantly higher" in his hypothetical).  Holt testified at trial that he was never even informed of the Court's rulings on MAE, let alone that his analysis directly conflicted with the Court's reasoning.  (Tr. 848:4 – 848:9.)

Finally, Holt asserted in his report that each defect, standing alone, significantly increased the risk of loss on the loan.  The *de minimis* nature of many of his alleged defects undermines this assertion, but in any event, Holt abandoned this position at trial.  He testified instead that any determination of materiality must be based on the *totality* of all alleged defects

7

(*i.e.*, the "layered risk") associated with a given loan.  (*Infra* ¶ 121.)  When confronted with a loan where he agreed that one of his defect allegations was baseless and should be withdrawn, Holt not only withdrew the defect and the related "derivative" defects, but also agreed to withdraw an entirely unrelated missing document allegation on the basis that this remaining defect – now standing alone – was no longer sufficient in his overall assessment of the loan. (*See infra* ¶ 122-123.)  But Plaintiffs have not offered any way to assess materiality or MAE in the event that the Court rejects some, but not all, of Holt's defect allegations for a given loan, and instead ask the Court to determine on its own how each alleged defect may or may not contribute to the overall assessment of materiality or MAE for each loan (which, in any event, is contrary to the PSAs' requirement that *each* breach have an MAE (*infra* ¶ 121)).  This evidentiary gap alone is fatal to the success of their claims.  *See Barnes v. Anderson*, 202 F.3d 150, 160 (2d Cir. 1999) ("[W]e do not see how a jury could rationally decide [an expert issue] without the aid of expert testimony."); *Marine Carriers Corp. v. Fowler*, 429 F.2d 702, 710 (2d Cir. 1970) (court could not make technical determinations "[w]ithout the benefit of expert testimony").

Plaintiffs offer a host of justifications for their failure to prove MAE, none of which has any merit.  First, Plaintiffs assert that for loans with alleged defects based on "inaccurate information concerning the Loans relating directly to key credit characteristics," the alleged defects caused a "continuing" and "ineradicable" MAE "at all points after origination." (*Infra* Part III.D.)  Setting aside that Plaintiffs offer no materiality or MAE analysis for the loans with defects that do not concern "credit characteristics," their own expert acknowledged repeatedly that so-called "compensating factors" – which can include high cash reserves, high credit score and low loan-to-value ratio, among others – may "offset the risk" associated with a

"credit" defect.  Plaintiffs never explain why such factors, or similar ones, could not have arisen in the many years between origination and UBS RESI's discovery or notice of breach and thus offset any increased risk of loss for this subset of loans.  (*Infra* ¶ 134.)  This is equally true where Plaintiffs claim that "the original underwriter failed to assess the borrower's willingness to repay the Loan."  (*Infra* ¶¶ 142-143; Tr. 600:13-18 (The Court) ("The person who was underwriting the loan may have been a fool and incompetent and did an awful job.  That's why there is a breach.  But in this courtroom do you not have to prove that that breach – and this relates particularly with regard to a guideline situation – materially and adversely affects the certificate holder's interest?").)

Plaintiffs' related argument that instances of "borrower fraud" are *per se* material and adverse at all times after origination fares no better.  (*Infra* ¶¶ 144-148.)  As a threshold matter, Plaintiffs failed to present adequate evidence at trial to meet their burden to show fraud in connection with the at-issue loans.  If this were an action alleging borrower fraud, the lender would be required to prove such fraud by clear and convincing evidence.  Here, Holt accuses thousands of borrowers of out-and-out fraud (including in *every instance* where he concluded that debt-to-income ratios varied from the Mortgage Loan Schedule) based solely on hearsay and conclusory assertions.  (*Infra* ¶ 145.)  Moreover, as Plaintiffs readily acknowledge, "borrower fraud" in and of itself is not a breach of any R&W, as the PSAs do not contain a "no fraud" representation.  Rather, the supposed fraud must result in a breach of the relevant R&Ws and a finding of MAE, and nothing in the PSAs dictates that the potential MAE of a breach of R&W caused by fraud (whether based on deviations from underwriting guidelines or discrepancies in the Mortgage Loan Schedule) cannot be offset by compensating factors just like any other breaches.  (*Infra* ¶ 147.)

Finally, aware of the gaping hole in their case, Plaintiffs argued in summation and in their post-trial submission that "if the condition concealed by the breach was revealed, the Loan would not have qualified under the terms of the program under which it was issued without an exception" and that this "exception" necessarily would have resulted in an increase in the interest rate or additional fees to the borrower.  (*Infra* ¶ 150.)  Plaintiffs offer no evidence whatsoever that this is true for any loan.  Instead, they merely cite to various underwriting guidelines and leave it to the Court to guess, without any guidance whatsoever, whether the loans at issue should have been approved under different terms or rates and what those different terms and rates might have been (taking into account any compensating factors in the file).  Plaintiffs also fail to explain how any hypothetical increase in a given borrower's fees (which are paid to, *and retained by*, the originator) or monthly interest payments would materially and adversely affect the Certificateholders' interests.  These interests are primarily focused on the repayment of the principal balance of their certificates and associated interest payments, which are not directly correlated to any particular loan, but rather are independently determined based on a number of factors, including the aggregate weighted average of hundreds or thousands of loans – issues upon which Plaintiffs have offered no evidence, expert or otherwise.  (*Infra* ¶ 6.)  Plaintiffs' hypothetical repricing theory also suffers from other fatal flaws – for example, it ignores that the inclusion of higher-interest loans could have resulted in an entirely different structure for the Trusts (or certificates that were offered to investors on very different terms).  *See United States v. Litvak*, 808 F.3d 160, 182-83 (2d Cir. 2015) ("The pricing of RMBS is 'more complicated' because it 'tend[s] to be more subjective . . . and [is] often based on models as opposed to prices from prior transactions.'" (citations omitted)).  Plaintiffs' theory also rests on the speculation that some of the stated income loans should have been converted by the underwriter into other loan

programs, such as "full documentation loan[s]" (*infra* ¶ 157), but Plaintiffs ignore that the

interest rates for "full documentation" loans likely would have been *lower* than for stated income

loans.  Again, Plaintiffs offered no evidence on this point.

Left with nothing else, Plaintiffs argue that UBS RESI's re-underwriting expert,

Ms. Grissom, "does not opine that such Loans would have qualified under the same guidelines at

the same rate." (*Infra* ¶ 153.)  But this argument has it backwards – it is *Plaintiffs'* burden to

prove the requisite MAE, not UBS RESI's burden to *disprove* them.  Moreover, the reason

Grissom did not offer any view on this point in her rebuttal report is not surprising – Holt never

disclosed this new theory of MAE in his report and thus there was nothing for Grissom to rebut.

In sum, Plaintiffs failed to provide adequate evidence for *any loan* – let alone

evidence sufficient to meet their burden of proof on their claims – that the supposed defects

identified by Holt had a requisite MAE at the time of notice or UBS RESI's discovery of each

alleged breach.  As a result, their claims fail in their entirety.

## Plaintiffs Have Not Proven Breaches Of The MLS Rep (*Infra* Part IV)

Putting aside Plaintiffs' failure to prove MAE for any loan, Plaintiffs also have

not met their threshold burden to prove that UBS RESI breached the Mortgage Loan Schedule

representation ("MLS Rep") in the first place.  Holt claims that thousands of loans are defective

based on breaches of this representation, which states that "[t]he information set forth in the

Mortgage Loan Schedule was true and correct in all material respects at the date or dates

respecting which such information is furnished as specified in the Mortgage Loan Schedule."

(*Infra* ¶ 159.)  As set forth herein and in UBS RESI's Motion in Limine No. 2 to exclude the

testimony and opinions of Holt (ECF No. 315), Holt's construction of the MLS Rep as a broad

"no fraud and no misrepresentation" guaranty is commercially unreasonable, particularly in light

of the fact that many other securitizations at that time included explicit "no fraud"

representations, and the parties to the PSAs surely knew how to make that representation had

they wanted to include it.  Plaintiffs' proposed reading would effectively have UBS RESI

guarantee the absolute factual accuracy of thousands of data points for loans it did not originate

(and for which, in many cases, the originators were not required to verify certain borrower data,

including income), thus exposing UBS RESI to risks it never agreed to undertake.  (SJ Order at

30.)  Rather, the language of the MLS Rep and its reference to data "furnished" to UBS RESI

supports the view that UBS RESI warranted only that the mortgage loan schedule accurately

transcribed data as it existed in the loan files.  *See Cent. Mortg. Co. v. Morgan Stanley Capital*

*Holdings, LLC*, C.A. No. 5140-VCS, 2010 WL 3258620, at *9 n.75 (Del. Ch. Aug. 19, 2010)

(the "'argument that [the loan seller] was representing that all of the underlying [loan data] in all

loan files was accurate seems strained,'" and "'the more plausible reading of the contract is that

[the seller] was simply representing that it accurately compiled the loan data'"), *rev'd on other*

*grounds*, 27 A.3d 531 (Del. 2011).

   In any event, Plaintiffs choose to ignore the self-limiting language of key

definitions in the PSAs related to the MLS Rep and, as a result, shoot at the wrong target and fail

to prove that the loan-to-value ("LTV") or debt-to-income ("DTI") information included on the

Mortgage Loan Schedule was materially incorrect for any loan at issue.  (*Infra* Part IV.B.)

Specifically, while Plaintiffs employed an Automated Valuation Model ("AVM") to

retrospectively second-guess the appraisals obtained at origination for the properties underlying

the at-issue loans (and, in turn, to second-guess the LTVs for those loans as reflected on the

Mortgage Loan Schedule), this exercise is beside the point – the PSAs *define* the "Loan-to-Value

Ratio" set out in the Mortgage Loan Schedule as follows:  "the fraction (expressed as a

percentage) the numerator of which is the principal balance of the related Mortgage Loan at the date of determination and *the denominator of which is the Appraised Value of the related Mortgage Property*." (*Infra* ¶ 167.) The "Appraised Value," in turn, is defined as the lesser of "the value of the Mortgaged Property *based upon the appraisal made at the time of the origination* of such Mortgage Loan" and "the *sales price* of the Mortgaged Property at the time of the origination." (*Infra* ¶ 167.) This unambiguous language forecloses Plaintiffs' ability to show MLS Rep "breaches" by substituting an AVM-based opinion generated a decade later for either the appraisal obtained at origination or the sales price.

Likewise, the PSAs define the Mortgage Loan Schedule as including data regarding the "debt-to-income ratio *of the Mortgage Loan*." (*Infra* ¶ 171.) "Mortgage Loans," in turn, are defined as those loans "identified in the Mortgage Loan Schedule." (*Infra* ¶ 171.) This stands in contrast to other items listed on the Mortgage Loan Schedule, such as "the credit score (or mortgage score) *of the Mortgagor*." (*Infra* ¶ 171.) The parties' use of the phrase "of the Mortgage Loan" – as opposed to "of the Mortgagor" as in other definitions – is strong evidence that the Mortgage Loan Schedule was intended only to reflect the DTI information for the loans as originated (a fixed value) and not the DTI of the borrower (which might change over time). Moreover, Holt admitted at trial that he only attempted to recalculate the DTIs "of the mortgagors," and thus Plaintiffs' evidence is insufficient to prove any MLS Rep breach based on DTI of the "Mortgage Loan."

Even more fundamentally, however, Plaintiffs' attempt to prove breaches of the MLS Rep is fatally flawed because Plaintiffs rely largely on inadmissible post-origination hearsay sources. (*Infra* Part IV.C.) Indeed, Holt testified that his expert "analysis" of MLS Rep breaches involved no expertise at all, but rather consisted solely of a straightforward comparison

of data found through third-party sources to data on the Mortgage Loan Schedule and, in some cases, performing "long division." (*Infra* ¶ 174.)  As a result, Holt served as nothing more than "'a conduit for introducing hearsay'" – an impermissible function for an expert under controlling Second Circuit law. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citation omitted).  Plaintiffs' various attempts to admit these third-party hearsay sources are unavailing (*infra* ¶¶ 176-191), and thus Holt's allegations regarding MLS Rep breaches should be disregarded.

Even if these post-origination sources were admissible (and they are not), Holt blindly and improperly accepted the truth of their contents whenever they conflicted with the information contained in the loan files – including in instances where the loan file information was verified or provided by parties other than the borrower – thus rendering his analysis inherently unreliable. (*Infra* Part IV.D.)  This flaw was made apparent through numerous loan examples introduced at trial, including where Holt found MLS Rep violations despite the presence of paystubs and W-2 tax documents in the loan file that fully corroborated the information listed on the Mortgage Loan Schedule at the time of closing. (*Infra* ¶¶ 194-196.) Fatally, Holt also admitted that he would not look to third-party sources to *clear* alleged breaches of R&W, but only to *generate* them – a methodology that is impossible to justify and eliminates any pretense of Holt acting to assist the finder of fact in this case.

## Plaintiffs Have Not Proven Breaches Of The Guideline Rep (*Infra* Part V)

Plaintiffs similarly have failed to meet their threshold burden to prove breaches of the so-called "Guideline Rep," which provides that "[t]he Mortgage Loan was underwritten in accordance with the underwriting guidelines of the related Loan Seller in effect at the time of origination with exceptions thereto exercised in a reasonable manner." (*Infra* ¶ 197.)  This

14

representation speaks solely to the time at which the originator approved the loan, as confirmed
by Holt himself, who testified that "one of the goals of reunderwriting is to step into the shoes of
the original underwriter who made the loan" and that re-underwriters would "try to go back and
look at the loan files [as] if you were taking the application right from the borrower across the
desk and reviewing the file."  (Tr. 864:22 – 865:5.)  For this reason, Holt testified that prior to
this case, when he and his team "reunderwrote a loan to determine whether it had been originated
in guidelines, it was [his] policy *never* to look at servicing records, such as collection notices or
foreclosure documents."  (Tr. 865:13-18 (emphasis added).)

       Despite all this, at Plaintiffs' request and in an effort to generate more alleged
breaches, Holt departed from his prior practice and claimed Guideline Rep breaches by relying
heavily on post-origination materials that were not only unavailable to originators (and thus
could not have played any role in their underwriting decisions), but also constitute inadmissible
hearsay (because Plaintiffs have not shown that experts in the re-underwriting field regularly rely
on such information when determining whether loans were underwritten in compliance with
guidelines).  (*Infra* ¶¶ 208-209.)  Indeed, such evidence is simply irrelevant to the determination
of whether underwriting guidelines were followed at origination, which concerns the originator's
assessments based on the information available at that time.  And, as noted, Holt only used this
evidence as a one-way street – he and his team simply *ignored* post-origination information
where it contradicted his findings of breach, highlighting his "hired gun" approach to re-
underwriting.  (*See infra* ¶ 210; *see also* Tr. 729:25 – 730:24 (Grissom explaining that it is not
customary for re-underwriters to rely upon post-origination information to determine whether
there were departures from guidelines).)

       Holt also ignored the text of the applicable guidelines and told his team to find

breaches even where no guideline requirement had been violated.  (*Infra* ¶¶ 212-215.)  Indeed, he conceded at trial that he had instructed his team to find defects by employing his own "rules of thumb" that were not a part of the guidelines at issue, including by requiring that certain documents be in the file and that the originators document their assessment of income reasonableness.  (*Infra* ¶ 212.)  This approach not only invalidates Holt's alleged Guideline Rep breaches based on standards or "rules" nowhere to be found in the guidelines, but also casts serious doubts upon Holt's credibility and reliability more generally.

Finally, Holt's allegations that thousands of loans are in breach of R&Ws based on missing documents that he claims were never obtained are equally flawed.  (*Infra* Part V.C.) As Holt admitted at trial, he simply assumed that where a document was missing from the loan file as it exists today, it must never have existed, notwithstanding that the loans at issue were originated up to a decade ago.  But the evidence adduced at trial makes clear that Holt's assumption is without basis.  In numerous instances, Holt was forced to concede that multiple versions of the loan file existed, with some versions containing more or fewer "core documents" than others.  Plaintiffs' counsel admitted to the Court that when confronted with these different versions, they arbitrarily chose to review the "larger" file, blithely ignoring that documents Holt found to be "missing" could be sitting in another file.  (*Infra* ¶ 221 n.49.)  Moreover, Holt conceded that Plaintiffs' counsel never informed him of a letter it received from OneWest, the servicer for the at-issue IndyMac loans, indicating that the loan files Plaintiffs sought in this case were kept in such "disarray" that they would take significant effort to be produced.  (*Infra* ¶ 228.)  Plaintiffs' only response is to argue, against substantial evidence to the contrary, that the loan files were "digitized" shortly after origination and thereby fully and accurately preserved. But Plaintiffs' proof supporting this theory (which appears nowhere in Holt's expert report) is

entirely lacking, as Holt admitted that he had no firsthand knowledge of any of the at-issue originators' purported "digitization" practices, and in fact conceded during trial that "his versions" of these very loan files were often materially different than the versions reviewed by Grissom and her re-underwriting team. (*Infra* ¶¶ 219-226.)

The same reasoning applies *a fortiori* to Plaintiffs' breach claims regarding certain so-called "critical documents," including title insurance and loan approvals. (*Infra* ¶¶ 231-240.) As the uncontroverted evidence at trial made clear, such documents were not only necessary for the subject loans to close, but third-party settlement agents were typically required to certify that these documents existed at closing – evidence that Holt simply chooses not to credit. (*Infra* ¶ 232.) At its core, Holt's opinions and missing document allegations are premised on a far-reaching conspiracy theory whereby the numerous originators (including their underwriters, quality control personnel and supervisors), home buyers and sellers, and settlement agents across the country all worked together to close thousands of loans without the required documentation. This conspiracy apparently included *U.S. Bank itself*, which was required under the PSAs to review final certifications by the Custodian regarding Mortgage Loan File documents within 90 days of closing and to notify UBS RESI of any deficiencies. (*Infra* ¶¶ 21, 246.) In contrast, Ms. Grissom offered a far more plausible explanation – that these documents existed at the time of origination and were simply lost or misplaced "given the passage of time, the bankruptcy or other changes to corporate structure of originators and servicers, and the number of times a loan file will have changed hands between origination and today." (DX LI, Grissom Trial Dec. ¶ 49; *infra* ¶ 237.)

## Plaintiffs' Valuation And Sampling Experts Are Not Reliable (*Infra* Parts VIII and IX)

Plaintiffs' proffered valuation and sampling experts, Dr. Charles Cowan and Dr.

Nelson Lipshutz, respectively, fare no better than Holt and their opinions should be wholly
disregarded. While Cowan claims that the appraisals for thousands of the loans at issue were
overstated through his analysis of results generated by an after-the-fact AVM, the evidence
adduced at trial demonstrates that he could not – and was not even purporting to – opine that any
individual appraisal was not conducted in accordance with the standards required by the PSAs or
the applicable underwriting guidelines. (*Infra* ¶¶ 260-263.) Rather, Cowan opined that, on
average, the AVM results generated by a third-party, Phoenix, were closer to the "true" market
values of the subject properties at origination than the appraisals conducted at the time. But the
PSAs *define* the LTVs in the MLS Rep being based on *appraisals or sales prices*. Cowan simply
ignores this, and, further undermining his expert credibility, even used AVM values to calculate
new LTVs for *purchase money loans*, *i.e.* – loans for properties sold on the market in arms-
length transactions. The sales prices for these properties were the very definition of "fair market
value" but were nevertheless overruled by Cowan and his AVM. (*Infra* ¶ 262.) Even for the
Guideline Rep, Plaintiffs provide no basis for substituting the appraisals with their own
retrospective AVM opinion in order to determine the supposed "true" market values of the
properties, given that the guidelines themselves similarly require LTV to be calculated based on
a contemporaneous appraisal or sales price. (*Infra* ¶¶ 275-276.)

Even if the PSAs or underwriting guidelines could be read to permit AVMs as a
substitute for appraisals (and they cannot), Plaintiffs did not prove that the Phoenix AVM was in
any way reliable. To the contrary, the trial evidence showed (and Cowan admitted) that the
Phoenix AVM was untested and had a considerable error rate, such that Cowan himself could not
determine whether any individual appraisal was deficient. (*Infra* ¶ 277 & n.57.) Finally,
Cowan's testimony should be disregarded because, among other things, Plaintiffs admittedly did

not disclose critical elements of his opinions in his expert reports, such as the actual variables used in finding purported comparable properties, and thus it was not possible to replicate his "expert analysis." (*Infra* ¶ 306.)  Indeed, Cowan represented under oath multiple times in pretrial submissions that his methodology did not change.  Yet, on cross examination, he revealed that the Phoenix AVM methodology was in fact completely different from the Lewtan AVM he used in his previous report.

As to Lipshutz, the evidence at trial showed that his analysis involving a sample of IndyMac-originated loans is similarly irrelevant and unreliable.  (*Infra* ¶¶ 309-310.) Lipshutz's use of statistical sampling is contrary to the terms of the Sole Remedy Provision, which contemplates the repurchase of an actual loan and thus requires Plaintiffs to prove breaches and "material and adverse effects" on a loan-by-loan basis, not simply through statistical estimates.  Plaintiffs claim they have no choice but to try and prove breaches concerning certain IndyMac loans through sampling because they do not have access to the loan files, but this dilemma is entirely a result of Plaintiffs' own strategic decision not to exercise their rights to obtain these loan files (and is contradicted by Plaintiffs' simultaneous claim to be able to find breaches without loan files).  (*Infra* ¶ 320.)

**Plaintiffs Have Not Proven That UBS RESI "Discovered"**
**Or Received Prompt Written Notice Of R&W Breaches (*Infra* Part XI)**

Plaintiffs also failed to prove that UBS RESI "discovered" additional R&W breaches beyond those contained in the breach notices it received from the certificate insurer. Plaintiffs argue that UBS RESI received written notice for all loans at issue in the form of the August 7, 2015 Holt Report.  However, the Holt Report fails to comply with the contractual requirements for notice outlined in the PSAs.  (*Infra* Part XI.V.)

19

Moreover, while Plaintiffs assert that UBS RESI was "willfully blind" to all loans at issue as of the date that UBS RESI's surveillance program ceased operations, they make no attempt to show willful blindness as to any specific defect for any specific loan.  (*Infra* ¶ 348.) Plaintiffs' willful blindness theory is yet another attempt to evade the Court's rulings rejecting their "pervasive breach" theory – *i.e.*, that UBS RESI was made *constructively aware* of R&W breaches throughout the pools based merely on its awareness of a subset of breaches.  (*Infra* ¶¶ 349-350.)  Moreover, Plaintiffs have not provided any example of the willful blindness doctrine ever being applied in the breach of contract context (much less to a contract that, as here, requires loan-specific inquiry and relief), and even if the doctrine were appropriate here (and it is not), Plaintiffs' evidence does not fall within the "limited scope" of its application.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-70 (2011).  Indeed, this is especially true given that the PSAs contemplate that some loans (which UBS RESI did not originate itself) could breach the R&Ws, and set forth a detailed remedial process for such circumstances.  (*Infra* ¶ 357); *see Footbridge Ltd. Tr. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *16 (S.D.N.Y. Sept. 28, 2010) (Castel, J.) ("[T]he offering documents covenant that there ought not be any Mortgage Loans in default at the time of the Securitizations, but acknowledge the possibility that there could be delinquent loans and, in that event, Countrywide would cure the delinquent loan in one manner or another.").

**Plaintiffs Have Not Proven Damages (*Infra* Part XIII)**

Finally, even assuming *arguendo* that Plaintiffs could overcome all of the above obstacles to recovery (and they cannot), their theory of damages is significantly flawed.  (*Infra* ¶ 389.)  First, Plaintiffs' damages expert, Snow – who admitted that he was simply a "placeholder" for the more developed analysis that Plaintiffs apparently intend to offer at some

undetermined time in the future (*infra* ¶ 415) – employed a damages formula that is divorced from the prescribed "Purchase Price" formula set forth in the PSAs.  This formula is unambiguously grounded in the Principal Balance of the breaching loan *as of the date that it is purchased out of the Trust* by UBS RESI.  (*Infra* ¶¶ 390-393.)  In its summary judgment order, the Court held that liquidation does not foreclose Plaintiffs' relief altogether, but it did not decide the quantum of money damages to which Plaintiffs are entitled for liquidated loans, which must be calculated in accordance with the Purchase Price formula to which the parties agreed and which Snow's expert report disregards.

   This was the conclusion reached by Judge Cote in virtually identical circumstances, where the court had previously denied a defendant's motion for summary judgment that it was not liable for liquidated loans yet, in granting a motion to exclude plaintiff's damages expert, held that the parties were bound by the unambiguous purchase price formula in the contract, which, as here, assigned a zero principal balance to loans that had been liquidated by the time of the defendant's actual repurchase.  *See* Opinion & Order, *Bank of New York Mellon v. WMC Mortg.*, LLC, 12-cv-7096 (DLC) (S.D.N.Y. Aug. 18, 2015), ECF No. 323 (Ex. A).[3]  As the court there recognized, "[u]nlike repurchasing loans that can no longer exist, following the contractual formula for calculating the [stated principal balance] is not 'impossible,'" and thus the "formula, to which the parties explicitly agreed, guides any calculation of damages."  (*Id.* at 16-17.)  The same reasoning applies here as well.  (*See* Tr. 605:19-21 (the parties are "all prisoners of the words of the agreement"); *see also* Memorandum and Order on Reconsideration, ECF No. 280 ("Reconsid. Order"), at 7 ("When it comes to

---

[3]  Exhibit A is attached to the Declaration of Scott D. Musoff, dated July 1, 2016, exhibits to which are referenced herein as "Ex. __."

written, integrated contracts among sophisticated parties, predictable outcomes in accordance with the expressed intentions of the contracting parties is justice and fairness.").)

        To the extent Plaintiffs seek to depart from the agreed-upon remedial process and damages formula in the PSAs and proceed on a broader theory of general breach-of-contract damages, their claims fail because Plaintiffs have not, as they must, established proximate and "but for" causation – *i.e.*, that the alleged R&W breaches directly caused the Trusts' claimed losses.  (*Infra* ¶¶ 399-403); *see In Touch Concepts, Inc. v. Cellco P'ship*, No. 13 Civ. 1419 (PKC), 2013 WL 6182949, at *5 (S.D.N.Y. 2013) (Castel, J.) ("Causation is an essential element in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused [the claimed] damages." (citation omitted)), *aff'd*, 788 F.3d 98 (2d Cir. 2015).  Indeed, courts in this Circuit routinely hold that, under New York law, a "plaintiff must demonstrate more than simply that defendant breached its contract and that the plaintiff suffered damage," and "cannot recover if it would have suffered the harm *regardless of defendant's actions.*" *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (emphasis added).  Here, Plaintiffs provided no evidence whatsoever of proximate causation, and in fact, their re-underwriting expert disclaimed any analysis as to the possible causes of the Trusts' losses.  (*Infra* ¶¶ 112-113, 128-129.)

        Accordingly, Plaintiffs are between a rock and a hard place:  either they are strictly bound by the Purchase Price formula included in the PSAs (which their damages expert failed to follow) or they must prove proximate causation to recover broader breach-of-contract damages (which their damages expert also failed to do).  In either scenario, Plaintiffs' damages claim fails.

In all events, Plaintiffs' damages calculation also does not account in any way for insurance payments already made by certificate insurer Assured Guaranty Municipal Corp. ("Assured") to certain tranches of certificateholders, which prevented any loss to those certificateholders (and for which Assured was compensated when it settled its claims against UBS RESI relating to the same three Trusts).  (*Infra* ¶ 404.)  New York law is clear that a party may not recover for damages covered by third-party insurance payments – precisely the result Plaintiffs urge here.  (*Infra* ¶ 405.)  Their assertion that excluding these amounts from any award would result in "double-counting" is a problem of their own making, since they point to no reason why U.S. Bank, as trustee, cannot structure the distribution of any recovery to exclude the certificateholders covered by Assured's previous payments.  This is precisely what U.S. Bank has proposed to do in connection with its settlement of claims relating to other RMBS trusts.  (*Infra* ¶ 406; *see also* Ex. B § 3.05(a), RMBS Trust Settlement Agreement, Index No. 652382/2014 (Sup. Ct. N.Y. County Aug. 3, 2014) (for purposes of settlement, calculating "Net Losses" for each participating trustee, including U.S. Bank, by *excluding* "past and expected future reimbursements by monoline or other third party insurers or credit enhancement providers to a Trust").)

Plaintiffs' request for 9% prejudgment interest should also be denied.  (*Infra* ¶¶ 409-410.)  CPLR 5001 governs prejudgment interest and does not apply where, as here, the parties agreed to an "exclusive remedy" excluding such interest.  *See J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 188-19 (2012) ("Regardless of what [Section] 5001(a) customarily requires in terms of statutory interest for breach of contract cases," when parties bargain for an "exclusive remedy" for breach, that remedy "should be honored.").  Even if the parties had not contracted out of New York's statutory prejudgment interest rate, because

Plaintiffs' claims sound in equity, the Court is free to exercise its broad discretion in awarding prejudgment interest. (*Infra* ¶ 411.) The Court should not award any prejudgment interest or, at the very most, should do so at the coupon rate that Certificateholders were entitled to receive, as this rate would put the parties in the same position had the alleged breaches not occurred. (*See infra* ¶ 414.)[4]

---

[4] Moreover, as discussed herein, Plaintiffs' "summary evidence" should be excluded given the numerous uncorrected errors identified at trial (*infra* Part X), and the Court should strike any expert evidence and testimony that goes beyond Plaintiffs' expert reports (*infra* Part XII). Plaintiffs' experts offered substantial trial testimony that was never disclosed to UBS RESI under Rule 26 and thus should be excluded.

## RELEVANT PROCEDURAL AND FACTUAL HISTORY

**[Defendant's Response To ¶¶ 4-61 of Pl. FOF]**

### A.    The Parties

1.    Plaintiffs are three RMBS trusts identified as MASTR Adjustable Rate Mortgages Trust 2006-OA2 ("MARM 2006-OA2"), MASTR Adjustable Rate Mortgages Trust 2007-1 ("MARM 2007-1") and MASTR Adjustable Rate Mortgages Trust 2007-3 ("MARM 2007-3"), acting through their Trustee, U.S. Bank.  *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 7322 (HB), 2013 WL 4399210, at *1 (S.D.N.Y. Aug. 15, 2013); (Compl. ¶ 7, ECF No. 1).[5]

2.    Defendant UBS RESI acted as the "sponsor" and "transferor" for the three RMBS securitization transactions and "acquired the underlying mortgage loans," which were subsequently conveyed to the Trusts.  (Compl. ¶ 2; Stip. of Facts ¶¶ 1-2.)

3.    The Trusts issued certificates entitling investors to a portion of the payments made by homeowners on the mortgage loans held in the Trusts.  *MARM 2006-OA2*, 2013 WL 4399210, at *1.

4.    The Trusts have multiple-tranche structures with various classes of certificates arranged in a credit hierarchy structure.  (DX PM, Carron Trial Dec. ¶¶ 12-13.)  The certificate classes that are higher in the credit hierarchy receive payment priority over "subordinate" classes in the event of defaults and losses among the underlying mortgage loans.  (*Id.* ¶ 13.)  Moreover, certain classes were insured by financial guaranty insurer Assured.  (*Id.*; DX KJ, Lantz Trial Dec. ¶ 7.)  Under its insurance policies, Assured agreed that if certificateholders in the insured

---

[5]  Plaintiffs recently filed a motion to amend the Complaint to clarify that the plaintiff is U.S. Bank, acting in its capacity as Trustee on behalf of the Trusts.  As previously indicated, UBS RESI does not oppose the motion.

tranches lost money due to defaulting or delinquent mortgage loans, Assured would cover those losses through money payments.  (DX KJ, Lantz Trial Dec. ¶ 7.)  Thus, in this way, certificateholders in the insured tranches have been shielded from losses based on the underlying collateral.  (DX PM, Carron Trial Dec. ¶ 13.)

5.      Each class of certificates has its own characteristics.  For example, some may pay fixed coupon rates to certificateholders, while others may pay rates that vary in accordance with market interest rates.  (DX PM, Carron Trial Dec. ¶ 12.)  The certificateholders' only interests in an RMBS trust concern the repayment of the principal balance of their certificates and the receipt of the agreed-upon coupon rate on their certificates, as defined and set forth in the transaction documents.

6.      For the Trusts at issue, each class of certificates in these transactions is entitled to receive a defined coupon rate that may be dependent, in whole or in part, on a floating rate index; a fixed rate; and/or a weighted average net mortgage rate.  (*See* PX 99 at 7-9; PX 118 at 7-11; PX 264 at 7-9.)  Regardless of the coupon rate to which they are entitled, the Certificateholders have no interest in the trade value or price of any particular loan underlying the trust because the Trusts are created to hold the loans and distribute the cash flows from the loans only.  If loans are repurchased out of the Trusts, if at all, it is based on the Purchase Price formula, which concerns the outstanding principal based on a defined formula.  (*Infra* ¶¶ 19, 390-393.)  The trade value or "price" of a single loan cannot have a material effect on the defined certificate rate to which a Certificateholder is entitled.  Rather, the Certificateholders' interests in the loans themselves are limited to whether the loans make the prescribed payments.  (*See generally* PX 49 at 9; DX KJ, Lantz Trial Dec. ¶ 44.)

**B.      The Loans Underlying The Trusts**

7.      Significantly, UBS RESI did not originate any of the loans that underlie the

26

certificates, but rather acquired them from third-party originators such as Countrywide Home

Loans, Inc., American Home Mortgage Corp. and IndyMac Federal Bank, FSB, among others.

(Stip. of Facts ¶ 3.)

8.     Most of the loans conveyed into the Trusts were "Alt-A" loans, which were

different from prime loans and generally carried a higher risk of default.  (DX KJ, Lantz Trial

Dec. ¶¶ 13-14; PX 99 at 42.)  For example, many of the loans underlying the Trusts were

originated under reduced documentation programs, often referred to in the industry as "stated

income" or "stated asset" loans.  (DX KJ, Lantz Trial Dec. ¶ 14.)  Under these programs, the

loan originator was not required to obtain documentation from the borrower to verify the

borrower's income or assets, which instead were simply "stated" on the borrower's loan

application.  (*Id.*)  These loans were commonly referred to in the mortgage industry as "liar

loans" given the understanding that such loans carried with them the inherent risk of borrower

misrepresentation regarding income or assets.  (*Id.*)  Borrowers who stated their income or assets

would typically pay higher interest rates on their loans to account for the increased risk.  (*Id.*)

9.     The loans underlying the Trusts also had other characteristics that increased their

risk of delinquency or default.  For example, all of the loans were "adjustable rate mortgages," or

"ARMS," which had low introductory interest rates that were likely to significantly increase over

the life of the loan.  (DX KJ, Lantz Trial Dec. ¶ 15.)  These loans were generally attractive to

borrowers who were looking to lower their initial monthly payments but carried with them the

risk that borrowers would no longer be able to make their monthly mortgage payments once the

interest rates adjusted upwards (if the borrower could not refinance the loan based on an increase

in the value of the underlying property).  (*Id.*)

10.     Many of the ARM loans were also "negative amortization" loans, meaning that the borrowers could choose to make lower monthly payments that would not cover the entire amount of interest, and the shortfall in interest would be added to the amount of principal due on the loan, resulting in an increase in the amount of principal owed over time.  (DX KJ, Lantz Trial Dec. ¶ 15.)  As UBS RESI disclosed to investors, "[t]hese features may affect the rate at which principal on these loans is paid and *may create a greater risk of default* if the borrowers are unable to pay the monthly payments on the related increased principal balances."  (PX 99 at 26.)

11.     Additionally, many of the loans were mortgage refinances.  (DX KJ, Lantz Trial Dec. ¶ 16.)  For such loans, there was no actual sale price of the underlying property to compare to the appraised value, making it more difficult to assess the accuracy of the property's appraisal.  (*Id.*)

12.     The risks associated with the types of loans underlying the certificates were fully disclosed to potential investors in the Prospectus Supplements used to market the securities at issue.  (DX KJ, Lantz Trial Dec. ¶ 17; PX 99 at 42.)  For example, the Prospectus Supplements disclosed that "[t]he underwriting standards applicable to the Loans . . . typically differ from, and are, with respect to a substantial number of such Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types."  (PX 99 at 42.)

13.     The Prospectus Supplements stated that "[c]ertain of the Loans have been originated under alternative documentation, streamlined documentation, reduced documentation, "lite" documentation, stated income, low/limited or 'Express' documentation, no stated income,

no ratio, 'NIV' or no documentation programs, which require less documentation and verification than do traditional full documentation programs."  (PX 99 at 42.)  They also disclosed:  "Under a no stated income program or a no ratio program, certain borrowers with acceptable payment histories *will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.*  Under a no documentation program, the borrower is not required to state either their income or assets, and accordingly *no verification of such borrower's income or assets is undertaken by the originator.*"  (*Id.* at 43 (emphasis added).)  In those cases, "[t]he underwriting for such Loans may be based primarily or entirely on other factors, such as an appraisal of the mortgaged property, the loan-to-value ratio at origination and the borrower's credit score and previous mortgage payment history."  (*Id.*)

### C.   The PSAs

14.   Each of the Transactions is governed by a separate and materially identical PSA, and each PSA is governed by New York law.  (Stip. of Facts ¶¶ 10-13); *Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12-cv-1579 (HB), 2012 WL 3525613, at *1 (S.D.N.Y. Aug. 15, 2012).

15.   In the PSAs, UBS RESI made certain representations and warranties ("R&Ws") primarily regarding the characteristics of the mortgage loans held in each Trust.  (Stip. of Facts ¶ 16.)

16.   The parties to the PSAs contemplated that some of the loans UBS RESI acquired from unaffiliated third parties would not conform to the R&Ws, and agreed to a detailed remedial process, sometimes referred to as the "Sole Remedy Provision," to address instances of R&W breaches.  (*See* DX KJ, Lantz Trial Dec. ¶ 20.)

29

17.     Section 2.03 of the PSAs (which encompasses the Sole Remedy Provision)

provides that "[u]pon discovery by any of the Depositor, the Certificate Insurer, the Transferor,

the Master Servicer, the Trusts Administrator or the Custodian of a breach of a representation or

warranty made by [UBS RESI] pursuant to this Section 2.03 that materially and adversely affects

the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan, the party

discovering such breach *shall give prompt notice* thereof to the other parties and the Trustee."

(PX 49 at 74 (emphasis added).)   Upon receipt of such notice, the Trustee "shall in turn notify

[UBS RESI] of such breach."   (*Id.*)   The Sole Remedy Provision further provides:

> [W]ithin ninety (90) days of the earlier of its discovery or its receipt of
> written notice from any party of a breach of any representation or
> warranty made pursuant to this Section 2.03 *which materially and
> adversely affects* the interest of the Certificateholders or the Certificate
> Insurer in any Mortgage Loan, it shall *cure* such breach in all material
> respects, and if such breach is not so cured, shall . . . *repurchase* the
> affected Mortgage Loan or Mortgage Loans from the Trustee *at the
> Purchase Price* in the manner set forth below.

(*Id.* (emphasis added); Stip. of Facts ¶¶ 25, 28.)[6]

18.     The PSAs make clear that "the obligation under this Agreement of [UBS RESI] to

cure, repurchase or replace any Mortgage Loan as to which a breach has occurred *and is

continuing* shall constitute the *sole remedies* against [UBS RESI] respecting such matters"

available to Certificateholders *or the Trustee* on their behalf.   (PX 49 at 75-76 (emphasis

added).)[7]

---

[6]   For clarity, all pin citations to the exhibits refer to the stamped page numbers at the bottom of
each document, not the documents' original numbering.   For example, citation to "PX 49 at 74"
is to the page marked "PX 0049 – 0074."

[7]   UBS RESI further had the option to substitute the breaching loan with a conforming loan but
that remedy expired two years post-closing.   (PX 49 at 74.)

19.     To repurchase a mortgage loan from the Trust, UBS RESI must deposit the "Purchase Price" of the loan in the respective Trust.  (PX 49 at 74-75.)  "Purchase Price" is defined as:

> With respect to any Mortgage Loan *that is purchased by the transferor pursuant to Section 2.02 or 2.03 hereof*, a price equal to the outstanding Principal Balance of such Mortgage Loan *as of the date of purchase*, plus all accrued and unpaid interest thereon, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected, plus any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law.

(*Id.* at 57 (emphasis added); Stip. of Facts ¶¶ 29-30.)

20.     As of the date of closing, UBS RESI made a qualified representation about its possession of "Mortgage Files":  "[w]ith respect to each Mortgage Loan, [UBS RESI] is in possession of a complete Mortgage File *except for the documents which have been delivered to the Trustee or which have been submitted for recording and not yet returned*."  (PX 49 at 196 (emphasis added).)  The "Mortgage File" is a defined term in the PSAs that includes only certain enumerated documents.   (*Id.* at 67-68.)[8]  UBS RESI was under no contractual obligation, however, to maintain any of the origination files or other loan files or documents for the loans in the Trusts, including the Mortgage Files.  To the contrary, legal ownership of the loans themselves was assigned to the Trusts at closing (*see* Tr. 1745:14-23; 1746:16-20 (Reynolds)), and the Custodian took possession of the Mortgage Files.  (*See* PX 49 at 71.)

21.     Specifically, the PSAs provide that, at closing, "[t]he Custodian, on behalf of the Trustee, acknowledges receipt of the documents identified in the Initial Certification" and

---

[8]  The Mortgage File consists of the Mortgage Note; the original or certified Mortgage; an executed assignment of the Mortgage; original copies of each assumption, modification, written assurance or substitution agreement, if any; and the original lender's title policy.  (PX 49 at 61-62.)

"declares that it holds and will hold such related documents and other documents delivered to it constituting the Mortgage Files." (PX 49 at 71.) The Custodian agreed to provide, within 90 days after closing, a "Final Certification" that such Mortgage File documents had been received, and "[u]pon receiving each Final Certification from the Custodian, the Trustee shall notify [UBS RESI] and the Certificate Insurer of any document defects listed as exceptions in each such Final Certification." (*Id.* at 72.)[9] The Custodian further agreed to "retain possession and custody of each related Mortgage File in accordance with and subject to the terms and conditions set forth [in the PSAs]." (*Id.*)

### D.    The Breach Notices

22.    In April 2010, representatives from Assured, the certificate insurer for the Trusts,[10] contacted UBS RESI about increased claims on its financial guaranty policies covering certain certificates in the Trusts. (DX KJ, Lantz Trial Dec. ¶ 22.)

23.    Beginning in August 2010, "[p]ursuant to Section 2.03 of each of the PSAs," Assured sent UBS RESI multiple notices identifying purportedly defective mortgage loans in each Transaction and "demanding that [UBS RESI] either cure the defects or repurchase those mortgage loans within 90 days of the notice." (Compl. ¶ 37.) Assured's notices stated that they "give[] notice that each of the Mortgage Loans referenced [therein] . . . (the 'Subject Loans') breaches one or more of the representations and warranties" set forth in the PSAs and demand only that UBS RESI "repurchase the Subject Loans within 90 days of the date of this letter." (PX 334.) The Breach Notices further identified the Subject Loans by loan number and

---

[9]  The Initial Certification and Final Certification cover the same documents comprising the Mortgage File as defined in Section 2.01.

[10]  Assured is formerly known as Financial Security Assurance Inc. and referred to as such in the PSAs. (PX 49 at 26.)

purported to specify each alleged breach of R&W on a loan-by-loan basis.

24.     Beginning in January 2012, U.S. Bank, acting as trustee on behalf of the Trusts, began sending its own letters to UBS RESI, which did not contain any new repurchase requests but simply reiterated earlier requests made by Assured.  (DX KJ, Lantz Trial Dec. ¶¶ 39-40.)

**E.     The Assured Action**

25.     On February 2, 2012, Assured filed suit against UBS RESI in New York State court alleging, among other things, that UBS RESI breached its purported obligation to repurchase some, but not all, of the loans that were the subject of its breach notices.  (Compl., *Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, 12-cv-1579 (HB) (S.D.N.Y.), ECF No. 1 ("Assured Compl.").)

26.     UBS RESI removed the action to federal court on March 5, 2012 pursuant to 28 U.S.C. §§ 1441(a) and 1446(b), invoking "related to" bankruptcy subject matter jurisdiction under 28 U.S.C. § 1334(b).  (UBS RESI Ltr., ECF No. 430, at 3.)  Plaintiffs did not dispute federal subject matter jurisdiction and the case was assigned to Judge Harold Baer, Jr.  (*Id.*)

27.     Assured asserted, *inter alia*, the following claims:

- breach of the "Mortgage Representations" "concerning the mortgage loans collateralizing the [Trusts]" (Assured Compl. ¶ 70);

- breach of UBS RESI's "Repurchase Obligations" with respect only to the loans set forth in Assured's breach notices (*id.* ¶¶ 82-85); and

- a declaratory judgment that UBS RESI "must honor its PSA cure-or-repurchase obligations within the prescribed 90-day period with respect to all defective mortgage loans in the Transactions for which Assured provides notice" (*id.* ¶ 100).

28.     On August 15, 2012, Judge Baer dismissed Assured's claim against UBS RESI for breach of the "repurchase obligations," holding that only U.S. Bank, as Trustee, was

contractually authorized to enforce UBS RESI's obligations to cure or repurchase any loans under the Sole Remedy Provision.  *Assured*, 2012 WL 3525613, at *4.

29.     On May 6, 2013, UBS RESI and Assured executed a Settlement Agreement and Release whereby Assured agreed to voluntarily dismiss its remaining claims.  *Assured*, 12-cv-1579 (HB) (S.D.N.Y. May 10, 2013), ECF No. 90, 92-1.

F.     **This Action**

30.     Following Judge Baer's dismissal of Assured's repurchase claim, Assured directed U.S. Bank to file the instant action on behalf of the Trusts and provided U.S. Bank with the Complaint to file in order to initiate the suit.  (*See* Memorandum of Law Regarding the Impact of the Assured Settlement on the Trust Action, 12-cv-1579 (HB) (S.D.N.Y. May 10, 2013), ECF No. 91 at 2; ECF No. 92-4.)  The action was marked as related to Judge Baer and consolidated with the Assured action.  (*See* ECF No. 60.)

31.     The Complaint was filed on September 28, 2012 and alleged the same purported breaches and notices described in Assured's complaint and several additional purported breaches and notices that Assured had sent UBS RESI after the filing of its lawsuit.  (Compl. ¶¶ 37-38.)

32.     In filing the Complaint, Plaintiffs invoked the Court's federal subject matter jurisdiction under 28 U.S.C. § 1334(b).  (Compl. ¶ 12.)

33.     The Complaint contains a single cause of action for the one claim that was dismissed by this Court from the Assured action – *i.e.*, UBS RESI's alleged breach of its "repurchase obligation" for the mortgage loans identified in the "Breach Notices."  (Compl. ¶¶ 43-49.)

G.     **UBS RESI's Motion to Dismiss**

34.     On October 22, 2012, UBS RESI moved to dismiss the Complaint principally on the following grounds:  (1) the Trusts lacked capacity to sue under the PSAs; (2) Plaintiffs

34

improperly sought money damages in derogation of the Sole Remedy Provision, which mandates specific performance as the sole remedy available; and (3) the Complaint failed to adequately state a claim because many of the loans at issue were not subject to repurchase under the PSAs. *MARM 2006-OA2*, 2013 WL 4399210, at *2-5.

35.     The Court denied the motion to dismiss, holding that many of the issues raised in UBS RESI's motion could not be decided "[a]t this stage of the litigation." *Id.* at *5. Although the Court "decline[d] to dismiss the entire Complaint on the ground that the Trusts seek money damages," it "disagree[d] with the Trusts to the extent that they argue that breach of the repurchase obligation somehow entitles them to damages that are greater than those that are commensurate with the sole remedy clause." *Id.* at *3-4. The Court concluded: "No matter how the breach is characterized, Plaintiffs' repurchase remedy is limited to 'the Purchase Price' under the PSAs." *Id.* at *4.

**H.     Plaintiffs' Expert Reports**

36.     On February 21, 2014, Plaintiffs served UBS RESI with their expert reports from four purported experts: Ira H. Holt, Jr. (re-underwriting); Charles D. Cowan (property valuation); Nelson R. Lipshutz (sampling); and Karl N. Snow (damages).

37.     Nearly a month later, on March 19, 2014, Plaintiffs served UBS RESI with "Corrected and Supplemental" versions of these reports. Magistrate Judge Francis permitted Plaintiffs to serve a third round of supplemental expert reports by April 25, 2014, but limited them to only addressing certain loan files produced after the close of fact discovery.

38.     These reports indicated that Plaintiffs were seeking to recover damages for all mortgage loans throughout the Trusts, including loans that were never identified in any of the Breach Notices and for which UBS RESI never received any notice or opportunity to cure under the terms of the PSAs. For example, Plaintiffs' reports on sampling and damages made no

35

distinction between loans that were the subject of Plaintiffs' allegations and included in the Breach Notices and those in the pools more generally. Moreover, the damages calculation advanced by Plaintiffs was unrelated to the Purchase Price formula in the PSAs.

**I.    The Court's Summary Judgment Ruling**

39.    Following the completion of fact and expert discovery in 2014, UBS RESI moved for summary judgment on the basis that Plaintiffs could not seek relief as to all loans allegedly in breach throughout the Trusts but instead were limited only to those loans pled in the Complaint for which UBS RESI received timely and specific pre-suit notice. (*See* UBS RESI SJ Br. (ECF No. 193) at 11-20.) Plaintiffs responded that the Breach Notices had put UBS RESI on constructive notice of so-called "pervasive breaches" throughout the Trusts, which allowed Plaintiffs to seek pool-wide relief. (*See* Pl. Opp. Br. (ECF No. 265) at 9-13.)

40.    On January 9, 2015, the Court granted partial summary judgment in UBS RESI's favor, rejecting Plaintiffs' "broad and improvised" theory of "pervasive breach" as contrary to the terms of the PSAs. (SJ Order at 17.) The Court recognized that "the repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans." (*Id.* at 19.)

41.    Accordingly, the Court limited Plaintiffs' claim to (i) 4,460 loans[11] identified in the "Breach Notices" and "Additional Breach Notices" pled in the Complaint and timely

---

[11] The 4,460 Noticed Loans consisted of the 3,616 loans identified in the Breach Notices plus the 1,026 loans identified in the Additional Breach Notices, less 180 loans for which Plaintiffs' claims were time-barred and two loans that are duplicates. (SJ Order at 10-14; UBS RESI SJ Br. (ECF No. 193) at 2 n.2.)  Plaintiffs allege 5,566 loans were the subject of written notice based on additional notices not pled in the Complaint. (*See* Snow Report (ECF No. 328-5).) Inexplicably, that number has now increased to 5,973 (Pl. FOF ¶ 171), as Plaintiffs now claim an additional 407 loans (from PX 504 (Sept. 26, 2012) and PX 512 (Jan. 14, 2013)) are "Noticed" without explanation.

received by UBS RESI in accordance with the PSAs (the "Noticed Loans"); and (ii) any specific loans that UBS RESI "knew to be defective" (SJ Order at 15) – *i.e.*, claims that UBS RESI "discover[ed] that it had breached a representation and warranty as to a specific defect in a specific mortgage loan" (*id.* at 17). In so holding, the Court emphasized that "the repurchase remedy negotiated by the parties is loan specific." (*Id.* at 18.)

42.    The Court also denied UBS RESI's motion for summary judgment that it had no liability for loans that were liquidated or for which the underlying properties had been foreclosed upon and sold. (SJ Order at 22.) The Court held that "the PSAs' remedial scheme does not exempt 'Liquidated Loans' or loans to now-defaulted properties." (*Id.*) After reviewing the various definitions of the PSAs, the Court concluded that "[f]or the purposes of the current dispute, these definitional sections do not alter the remedies available under section 2.03 of the PSAs." (*Id.* at 24.) Specifically, the Court held that "'Purchase Price' is defined as 'a price equal to the outstanding Principal Balance of such Mortgage Loan *as of the date of purchase*' by UBS," noting that "if a loan were eventually to be liquidated subsequent to purchase, that Liquidated Loan would not automatically render the Purchase Price as zero." (*Id.* at 23.) The "date of purchase" referenced in this definition, however, necessarily refers to the date of UBS RESI's *repurchase* of the breaching loan from the Trust, as is made clear by the full definition of Purchase Price, which begins by referencing any "Mortgage Loan that is *purchased* by the transferor *pursuant to [the Sole Remedy Provision]*." (*Supra* ¶ 19.) Ultimately, the Court did not address the appropriate calculation of damages under the PSAs or the quantum of damages Plaintiffs may be entitled to recover with respect to any loan found to be in material breach of R&W, liquidated or otherwise.

### J.    Plaintiffs' Motion For Reconsideration And To Reopen Discovery

43.    Following the Court's summary judgment order, Plaintiffs moved for reconsideration of the decision, or alternatively, for leave to reopen discovery "to permit the submission of revised expert reports designed to prove UBS's liability and damages with respect to the 4,460 loans the Court held in its summary judgment ruling were specifically and timely noticed and a proper focus of the Trusts' claims."  (Pl. Ltr. (ECF No. 283) at 1; Pl. Reconsid. Br. (ECF No. 253).)  By Order dated February 25, 2015, the Court denied Plaintiffs' request for reconsideration, once again rejecting Plaintiffs' "pervasive breach" theory and holding that "[t]he parties could have, but did not, bargain for an inquiry notice standard."  (Reconsid. Order at 7.)

44.    The Court also denied Plaintiffs' motion to reopen expert discovery "without prejudice to renewal by the submission of a letter brief . . . identifying the expert(s), describing the central points of the proposed revised expert report and the methodology for developing same, and proposing a revised schedule."  (Reconsid. Order at 8.)

45.    In response, Plaintiffs submitted a letter brief on March 4, 2015 purporting to detail "a methodology by which they may prove their claims specifically as to the Noticed Loans, and further explain why they believe re-opening of expert discovery to permit them to use this methodology is warranted."  (Pl. Ltr. (ECF No. 283) at 1.)  Plaintiffs proposed two alternative methods for "adjust[ing] their evidence to the parameters set by the Court in its January 9, 2015 Order" (*Id.* at 5) and represented that "the Trusts' experts will use the same techniques and methodologies they used previously," emphasizing that "[t]he Trusts are not proposing anything that would require UBS to evaluate techniques or methodologies that were not already at issue in the case."  (*Id.* at 4.)  Based on these representations, UBS RESI submitted a declaration detailing the amount of time necessary for its experts to respond to Plaintiffs' proposed supplementation.  (*See* Decl. of Deborah Grissom dated Mar. 6, 2015 (ECF No. 286).)

46.    On March 11, 2015, the Court granted Plaintiffs' request to reopen discovery and vacated the pretrial conference and trial dates.  (Order (ECF No. 287) at 2.)

### K.    The Parties' Pre-Trial Submissions

47.    On August 7, 2015, Plaintiffs served a fourth round of supplemental expert reports from Holt, Cowan, Lipshutz and Snow which, as described in detail in UBS RESI's Motion in Limine No. 1, go well beyond the Court's previous rulings on summary judgment and in reopening expert discovery.  (*See* ECF No. 313.)  Through these reports, Plaintiffs claim overall damages of $2.3 billion – an increase of over $500 million from their previous calculations.  (*Id.* at 7.)

48.    On August 17, 2015, UBS RESI filed a pre-motion letter requesting that the Court stay the expert discovery schedule pending UBS RESI's anticipated motion to strike the supplemental expert reports.  (*See* UBS RESI Ltr., ECF No. 296.)  The Court denied the request, stating that "[i]f plaintiffs have pursued unviable theories of liability, there will be time enough to explore that at the motion *in limine* stage," adding that "[i]f [those] theories (on round two) are not viable and their case cannot otherwise proceed to trial, the case will be over and the plaintiffs' remedies will lie in an appellate tribunal."  (Order, ECF No. 298, at 1-2.)

49.    Under the schedule permitted by the Court, on January 13, 2016, UBS RESI served rebuttal expert reports from its own experts, Deborah Grissom, Dr. Arnold Barnett, Dr. William H. Greene, Dr. Andrew Carron and Michael Hedden.

50.    The parties submitted in limine motions on January 13, 2016.  UBS RESI moved to exclude all four of Plaintiffs' experts as well as to strike any expert opinions that exceeded the scope of the Court's previous orders (*see* ECF Nos. 312, 314, 316, 320, 323), and Plaintiffs moved to exclude certain testimony of Dr. Greene (ECF No. 317) and Ms. Grissom (ECF No. 325).

51.     During the pretrial conference held on March 21, 2016, the Court reserved

decision on all motions in limine.

52.     The Court entered the Joint Pretrial Order on March 22, 2016.  (ECF No. 383.)

53.     On April 12, 2016, the Court issued a Memorandum and Order (*see* ECF No.

399), holding that, "under the reasoning of [the First Department's decision in *Nomura Home*

*Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96 (1st Dep't 2015)], any newly

asserted breaches would relate back to the filing of the Complaint, and therefore are timely," and

thus "the Trusts are not precluded from relying upon the August 7, 2015 Holt Report as notice of

beaches of certain representations and warranties as to specific loans identified therein."  (ECF

No. 399 at 8, 13.)[12]

**L.**     **The Trial**

54.     The parties stipulated to a bench trial.  (ECF No. 333.)

55.     Pursuant to the Court's individual rules of practice, the parties submitted direct

testimony of all witnesses within their control through declarations.  Plaintiffs submitted trial

declarations from Holt, Cowan, Lipshutz and Cowan, as well as from U.S. Bank employees

Diane Reynolds, Toby Robillard and Joseph Wagner.  Plaintiffs also submitted a trial declaration

from their purported "summary witness," Charles Cipione.  UBS RESI submitted trial

declarations from its experts, Grissom, Barnett, Greene, Carron and Hedden, as well as from

UBS employees William Chandler and John Lantz.

56.     The trial commenced on April 18, 2016, and took place over the course of 14

days, from April 18 to April 21, 2016, and from May 2 to May 13, 2016.

---

[12]   The *Nomura* decision is currently on appeal to the New York Court of Appeals.  UBS RESI
respectfully maintains the position that the Court's decision regarding the application of *Nomura*
was incorrect for the reasons set forth in its letter dated March 23, 2016 (*see* ECF No. 385).

57.     In the Joint Pretrial Order, Plaintiffs listed twenty witnesses they expected to call, as well as 19 additional witnesses they reserved the right to call.[13]

58.     At trial, Plaintiffs called 11 witnesses (including two of UBS RESI's witnesses) in the following order:  (1) Charles Cipione; (2) Adrian Wu; (3) Deborah Grissom; (4) Ira Holt; (5) Nelson Lipshutz; (6) William Twombly; (7) John Lantz; (8) Charles Cowan; (9) Diane Reynolds; (10) Christopher Schmidt; and (11) Karl Snow.[14]   UBS RESI called two remaining witnesses in the following order:  (1) Dr. Arnold Barnett and (2) Andrew Carron.

---

[13]  This included four witnesses on Plaintiffs' "may call" list as well as all witnesses on UBS RESI's witness list, whom Plaintiffs also reserved the right to call at trial in their case-in-chief.

[14]  By agreement of the parties and with permission of the Court, Plaintiffs called Christopher Schmidt and Karl Snow following commencement of Arnold Barnett's testimony in order to accommodate the witnesses' schedules.

## DISCUSSION

## I.   BURDEN OF PROOF

### [Defendant's Response To ¶¶ 133-134 of Pl. FOF]

59.     As Plaintiffs recognize, in a breach of contract action, they "have the burden of proving each disputed element of their claims by a preponderance of the evidence."  (Pl. FOF ¶ 133 (citing *Raymond v. Marks*, 116 F.3d 466, 1997 WL 345984, at *1 (2d Cir. 1997)); *see also* 23 Williston on Contracts § 63:14 (4th ed. 2015) (it is black letter law that the "plaintiff or party alleging the breach has the burden of proof on all of its breach of contract claims").

60.     This is also true with respect to conditions precedent.  *See Greenbaum v. Columbian Nat'l Life Ins. Co. of Boston, Ma.*, 62 F.2d 56, 58 (2d Cir. 1932); *1014 Fifth Ave. Realty Corp. v. Manhattan Realty Co.*, 67 N.Y.2d 718, 719 (1986); *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 196 (1st Dep't 1995) ("The party to whom the duty is owed usually has the burden of proving the occurrence of conditions precedent to the performance of the duty.") (quoting *Lindenbaum v. Royco Prop. Corp.*, 165 A.D.2d 254, 258 (1st Dep't 1991)); 13 Williston on Contracts § 38:26 (4th ed. 2015).)

61.     More than a century ago, the New York Court of Appeals explained that, under New York law, this burden of proof never shifts to a defendant rebutting a breach of contract claim:

> There is confusion sometimes in treating of the burden of proof, arising out of unexact definitions. The burden is upon a plaintiff to establish his cause of action when it is in proper form, denied by the other party. . . . It is very common to say in such cases that the burden is upon the defendant to establish the fact relied upon [to rebut Plaintiffs' prima facie evidence].  All that this can properly mean is that when the plaintiff has established a prima facie case, the defendant is bound to controvert it by evidence, otherwise he will be cast in judgment.  When such evidence is given, and the case upon the whole evidence, that for and that against the fact asserted by the plaintiff, is submitted to court or jury, then the question of the burden of proof as to any fact, in its proper sense, arises, and rests upon the party upon whom it was at

the outset, *and is not shifted by the course of the trial*, and the jury may be
properly instructed that all material issues tendered by the plaintiff must be
established by him by a preponderance of evidence.

*Farmers' Loan & Trust Co. v. Siefke*, 144 N.Y. 354, 359 (1895) (emphasis added); *see also*

*Polstein v. Blauner*, 86 N.Y.S. 794, 795 (App. Term 1904) ("The mere fact that [plaintiff] may

have made out a prima facie case did not shift the burden of proof; on the contrary, it remained

with him throughout the case."); *accord MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 34

Misc. 3d 895, 906 (Sup. Ct. N.Y. County 2012) ("MBIA must prove for its breach of warranty

claim that Countrywide's alleged misrepresentations materially increased MBIA's risk of loss.")

*aff'd as modified* 105 A.D.3d 412 (1st Dep't 2013).

62.     Thus, it is Plaintiffs' burden to prove their claims, including that each alleged

breach "materially and adversely affect[]" the interests of the Certificateholders (*infra* Part III),

and this burden "is not shifted by the course of the trial."  *Siefke*, 144 N.Y. at 359.

63.     Moreover, Plaintiffs bear this burden with respect to *each* alleged breach for *each*

loan as to which they seek relief.  *See Ret. Bd. of the Policemen's Annuity & Benefit Fund of the

City of Chi. v. Bank of N.Y. Mellon*, Nos. 13-1776-CV, 13-1777-CV, 2014 WL 7272269, at *7

(2d Cir. Dec. 23, 2014) (RMBS defendant's "alleged misconduct must be proved loan-by-loan

and trust-by-trust"); (SJ Order at 21 ("[T]he PSAs' cure-or-repurchase remedy is addressed to

'such Mortgage Loan' and the Purchase Price mechanism is loan specific.").)

64.     Further, the Second Circuit has held that competent expert testimony is required

where certain complex or technical issues to be decided would not be obvious to the lay

factfinder.  *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (expert testimony

required to prove causation because "the nexus between the injury and the alleged cause would

not be obvious to the lay juror").  Courts have routinely required expert testimony on a variety of

43

issues, including in connection with breach of warranty, injury and causation issues.  *See, e.g.*, *Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (affirming exclusion of expert witness and holding that "[w]ithout the testimony of their expert witness, [plaintiff's breach of warranty] claims fail"); *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir. 2005) (requiring expert testimony because "without expert assistance a jury will often have no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine" (citation omitted)); *Hackl Enters., Inc. v. Dresser-Rand Co.*, 130 F. App'x 495, 497 (2d Cir. 2005) (district court did not abuse discretion "in concluding that in the absence of expert testimony, a jury could not determine whether the accident would have occurred even if the compressor had been secured in the manner in which [plaintiff] says it should have been"); *Barnes v. Anderson*, 202 F.3d 150, 160 (2d Cir. 1999) ("[W]e do not see how a jury could rationally decide causation without the aid of expert testimony."); *Marine Carriers Corp. v. Fowler*, 429 F.2d 702, 710 (2d Cir. 1970) (court could not make technical determinations "[w]ithout the benefit of expert testimony").

## II.     THE TESTIMONY OF PLAINTIFFS' SOLE RE-UNDERWRITING EXPERT, MR. HOLT, IS DISREGARDED

### [Defendant's Response To ¶¶ 84–99 of Pl. FOF]

65.     Plaintiffs' breach of R&W claims fail generally because the Court finds that it cannot rely upon the testimony and analysis of Plaintiffs' only re-underwriting expert, Holt.

66.     First, Holt's opinions and testimony are excluded in their entirety for the reasons set forth in UBS RESI's Motion in Limine No. 2.  (*See* ECF No. 315.)  In any event, even if the Court were not to exclude Holt's opinions in their entirety, it affords Holt's testimony no weight.

67.     In assessing an expert's testimony, courts look to the reliability, credibility and relevance of the expert.  Here, the trial evidence makes clear that Holt is not a reliable, credible or relevant expert witness.  *See Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 553 (2d Cir. 1977) (affirming dismissal of count based on expert testimony that "the trial court found, as was its prerogative, not to be worthy of credit"); *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 234 (S.D.N.Y. 2012) (rejecting, after a bench trial, damages expert as unreliable because expert "did no real nexus analysis"); *Berroyer v. United States*, 990 F. Supp. 2d 283, 309 (E.D.N.Y. 2014) (rejecting, after a bench trial, "testimony of the plaintiff's expert as to loss of earnings [which] was confusing, contradictory and not credible").

### A.     <u>Holt's Opinions Are Not Reliable</u>

68.     First, Holt's expert analysis is entirely unreliable.  Under Fed. R. Evid. 702, expert testimony must be "based on sufficient facts or data."  Fed. R. Evid. 702(b); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

69.     Throughout trial, Holt repeatedly admitted that his Appendix 1 (which contained his opinions as to the loans at issue) included numerous errors and could not be relied upon by the Court:

> THE COURT.  I can't use your Appendix 1 if I am looking at reasonableness, I cannot read every word you've written and make any decision whatsoever with regard to this defect?
>
> A.  This particular defect?
>
> THE COURT.  Yes.
>
> A.  If you read this, it is not clear, but again a loan as a whole in totality, there were other –
>
> THE COURT.  Other defects.
>
> A.  – other defects, yeah.
>
> THE COURT.  I am asking you, are you standing on this defect or would you, on further reflection, would you withdraw this defect, the reasonableness defect?
>
> A.  If there was nothing else in the file and this was the only defect and nothing timed to it, then I would look at dropping it.

(Tr. 942:23 – 943:13.)

70.     In fact, Holt could not explain certain conclusions reached in his direct testimony, such as his contention that compensating factors were irrelevant given "the layered risk associated with cumulative impact of all defects in the loan," even though the loan in question had only a single defect alleged.  On examination by the Court, Holt stated that the Court should simply "strike" that sentence from his Appendix 1 wherever it appeared in connection with a single defect allegation:

> A.  But in terms of layered risk, you could probably take that layered risk sentence out of there.  But the finding itself is still the same.  So that layered risk sentence could be removed.
>
> THE COURT.  Should I remove it?

46

> A.  Sure, just remove it.  Actually, remove it . . . .
>
> THE COURT.  So any place that I find in appendix one, I should mentally remove that sentence, that entire sentence?
>
> A.  If that's the only defect.  If there are other defects, then that goes into play.

(Tr. 976:1-7, 19-23; 977:3-7.)

71.     Holt also admitted that he could not explain which breach allegations he was dropping and which he was continuing to stand behind, and conceded that he was unsure why certain allegations still remained:

> THE COURT.  [O]nce you saw the version of the loan file containing the verification of employment, why did you continue to assert that this was a defect?
>
> A.  In this appendix we are replying to Ms. Grissom, so I am not sure how it is supposed to be applied.  I am just replying it was found in her file.  If it was found, she would –
>
> THE COURT.  You would remove the breach, this particular breach?
>
> A.  That particular breach, yes, sir.

(Tr. 1197:19 – 1198:4; *see also* Tr. 943:19 – 943:24 ("THE COURT.  All I'm asking you is do you stand on the defect of stated income not reasonable, or do you withdraw that defect?  A. Without looking – if this was the only one, I have no other information, then I would drop that defect.").)

72.     As discussed in greater detail below, Holt testified that he does not know whether remaining breaches materially and adversely affect loans for which some, but not all, of the defect allegations for those loans were withdrawn.  (*See infra* ¶ 121.)

73.     Holt conceded that he did not know how many allegations remained in the case:

> THE COURT.  As you sit here today, can you tell me approximately how many material defects there are in how many loans?

A.  The numbers have dropped.  I don't have the exact number, but counsel has dropped some loans since my declaration.  I don't know the exact total numbers sitting here right this second, but I can get them, but I don't have them right now. . . .  I think there is somewhere around 24,000 breaches or defects in the loans that dropped.  There is other categories of loans I'm not familiar with that had dropped.  It is somewhere 8,000, somewhere around 8,000 loans.

THE COURT.  All right.  These are changes that were made by counsel in this case.  Is that right?

A.  Yes, sir.

(Tr. 765:7-22.)[15]

74.  Further, Holt testified that he continuously changed his methodology and opinions at the request of Plaintiffs' counsel.  (*See* DX OJ (Demonstrative showing changes)); *see also In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (expert's analysis was "unreliable and unpersuasive" where it "changed so many times in important ways" from first analysis to second, inconsistent one).  As illustrated below, the difference in results from his 2014 expert report to his 2015 expert report are striking:

|  | **2014 Holt Report** | **2015 Holt Report** |
|---|---|---|
| Loans Analyzed | 1,200 | 12,757 |
| Loans Re-underwritten | 698 | 8,010 |
| Breach Rate for "Noticed Loans" | 55% | 97.5% |
| Breach Rate for Loans Without Loan Files | Loans not reviewed | 35.8% |

---

[15]  Holt also made vague references to other categories of defects that he found but that do not appear anywhere in his trial declaration (Tr. 762:25 – 763:3), and in numerous instances, his Declaration and/or expert report contained errors for which he could not offer any explanation. (*See, e.g.*, Tr. 762:3 – 764:14 (discussing discrepancies in number of defects alleged between Trial Declaration and Expert Report); 772:1 – 774:6 (discussing purported "typo" in Expert Report regarding number of loans where UBS RESI allegedly should have discovered defects).)

(*See* DX OJ.)

75.     Through Holt's testimony at trial, it became clear that these stark differences were driven in large part by changes to his methodology made at the request of Plaintiffs' counsel following the Court's decision on summary judgment.  These changes appear designed to increase the number of breaches, and in particular, breaches of the MLS Rep.  For example, Holt used information from outside of the loan files that he admittedly had never relied upon as an expert prior to this case.  (Tr. 1205:13-15 ("Q.  On the post-origination bankruptcy issue, again the first issue that we talked about since the break, in the other matters where you've testified you have not relied on post-origination bankruptcies; is that right?  A.  Not that I've – that's correct.  I am doing it on other cases but not to date have I testified on that, correct.") (playing 2014 Deposition 134:25 – 135:9).)  Holt admitted that he did so at the request of Plaintiffs' counsel.  (Tr. 1206:2-7 ("Q.  And, in fact, you testified that the reason you did so in this case was because plaintiffs' counsel specifically asked you to rely on post-origination bankruptcy information, isn't that correct?  A.  Correct, for misrepresentation on – certain income and that type.  So, yes, sir."); *see also* Tr. 840:25 – 842:2 ("Q.  In this case, counsel for plaintiffs specifically asked you to rely upon post-origination information.  Isn't that correct?  A.  Yes, sir.").)

76.     Holt's reliance on new and additional post-origination materials dramatically increased for purposes of his latest report, even though these sources were all generally available at the time of his earlier reports.  (*See* PX 1103, Holt Trial Dec. ¶ 225 & n.102; *see also* Tr. 856:10-25.)  And, as discussed above, Holt previously had not relied on them in any matter

where he had testified as an expert.  (*Supra* ¶ 75.)[16]

77.    "[E]xpert reports may be discredited if they 'merely express the opinions of the lawyers who hired them.'"  *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1118 (D. Or. 2010) (excluding as unreliable "ever-changing" expert testimony tainted by "litigation bias" (citation omitted)).  "[A]n expert report 'ghost-written' from 'whole cloth' violates the spirit, if not the letter of [Rule 26], as do reports that have been altered by counsel or prepared 'merely for appeasement or because of intimidation or some undue influence by the party or counsel who has retained him.'"  *Id.* (citations omitted).  Federal courts routinely exclude or disregard such expert testimony.  *See, e.g.*, *U.S. Equal Emp't Opportunity Comm'n v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) (excluding report and testimony of expert who "was directed to employ principles that contradicted his normal methodology" and "performed analyses he would not normally perform"), *aff'd sub nom. Equal Emp't Opportunity Comm'n v. Rockwell Int'l Corp.*, 243 F.3d 1012 (7th Cir. 2001); *Polsby v. Shalala,* 925 F. Supp. 379, 393 (D. Md. 1996) (physician's "lack of independence as an expert witness destroys his credibility"), *aff'd*, 165 F.3d 19 (4th Cir. 1998); *Marbled Murrelet (Brachyramphus Marmoratus) v. Pac. Lumber Co.,* 880 F. Supp. 1343, 1365 (N.D. Cal. 1995) (finding that the expert's testimony lacked objectivity and credibility where it appeared to have been crafted by attorneys), *aff'd sub nom. Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996); *Occulto v. Adamar of N.J., Inc.,* 125 F.R.D. 611, 615-16 (D.N.J. 1989) (noting that an expert cannot simply be an alter ego of the attorney trying the case); *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, No. 96-MD-1122, 2000 WL 33654070,

---

[16]  The defect allegations in Holt's expert reports are also substantially different than the defect allegations identified by Assured in its original breach notices (*see supra* ¶ 23), further underscoring that Holt was not retained to opine on the validity of the breach allegations in Plaintiffs' Complaint, but rather to generate his own, new allegations of breach for thousands of loans.  This also confirms the unreliability of Holt's expert re-underwriting work.

at *1 (W.D. Mich. Feb. 8, 2000) (excluding report because "counsel's participation so exceeded the bounds of legitimate 'assistance' as to negate the possibility that [expert] actually prepared his own report within the meaning of Rule 26(a)(2)"); *Mondry v. Speedway Superamerica LLC*, No. 96 C 2159, 1999 WL 1072623, at *7 (N.D. Ill. 1999) ("The court concludes that, while Dr. Abdul is qualified to render an expert opinion in this case, his credibility is suspect because . . . he is not truly independent . . . ."); *Clintec Nutrition Co. v. Baxa Corp.*, No. 94 C 7050, 1998 WL 560284, at *6 (N.D. Ill. 1998) (that expert did not draft his report and incorporated verbatim language suggested by counsel could be used to attack expert's independence and credibility).[17]

78.      Holt also departed from his prior practice and analyzed thousands of loans where there was no loan file available.  He did this for the very first time in 2015.  (Tr. 854:7-10 ("Q. And as you testified, you also analyzed loans with no loan files as part of your 2015 report but didn't do so with respect to 2014, correct?  A.  That is correct."); 840:9-15 ("Q.  Sir, you have never done this type of analysis in any other case.  Isn't that correct?  A.  The analysis of looking for misrep for MLS, is that the question?  Q.  The analysis of analyzing loan files without any loan files?  A.  In this regard, this would be the first time, yes, sir.").)  Holt performed this task by relying primarily on data derived from post-origination documentation and comparing it to data in the Mortgage Loan Schedule.  (*See* Tr. 840:5-15.)  This testimony and Holt's new methodology (which, as discussed below, required no special expertise (*infra* ¶ 176)), leads the Court to conclude that Holt was not acting as an independent expert but was instead manufacturing defects based on instructions from Plaintiffs' counsel.

---

[17]  In addition to allowing his expert opinions to be shaped by counsel, Holt also is employed by Dr. Charles Cowan and relies upon him in finding thousands of loans defective.  As explained below, the Court finds Cowan to have offered testimony that lacks credibility and reliability. (*Infra* Part VIII.)

79.     Also, as set forth in UBS RESI's Motion in Limine No. 2 to exclude Holt's testimony and opinions, Holt admittedly also changed his conclusions as to hundreds of loans he reviewed more than once.  (*See* UBS RESI Motion in Limine No. 2. (ECF No. 315).)  In fact, of the 545 loans that Holt analyzed in both his 2014 and 2015 reports, Holt changed his conclusions for **226** of them (*i.e.*, over **41%**) and found them to be Materially Defective in 2015 when he had not found them to be Materially Defective in 2014.  (*See* PX 1103, Holt Trial Dec. ¶ 224.)  These changes were based not only on Holt's increased use of third-party post-origination materials that were fully available at the time of his earlier report, but also based on his changed view of the underlying characteristics of the loans.  (*See* UBS RESI Motion in Limine No. 2 (ECF No. 315) at 10-11.)  These changed opinions on the very same loans further undermine the Court's confidence in the reliability of Holt's conclusions.  *See Fed. Home Loan Mortg. Corp.*, 281 F.R.D. at 181; *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2005) (affirming exclusion of expert whose "sudden reversal of opinion . . . seriously undermines the reliability of the [offered] opinions"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1322 (9th Cir. 1995) ("[T]o augment the substantive testimony as to causation would require the experts to change their conclusions altogether.  Any such tailoring of the experts' conclusions would, at this stage of the proceedings, fatally undermine any attempt to show that these findings were 'derived by the scientific method.'" (citation omitted)).

80.     Additionally, as discussed further below in the context of explaining why Plaintiffs have failed to prove breaches of the Guideline Rep, Holt conceded at trial that he did not follow the applicable underwriting guidelines in significant ways, and in fact instructed his re-underwriting team to find loan defects based on requirements that were not found anywhere in the guidelines themselves.  (*See infra* ¶¶ 212-215.)

81.     Finally, Holt admitted that the number of alleged defects has dropped dramatically since the filing of his Expert Report.  The below chart reflects the number of defects and loans withdrawn in the period of time between service of Holt's final expert report and the commencement of trial:

| Withdrawal Letter | Number of Loans Withdrawn | Number of Defects Withdrawn | Number of Loans Affected[18] |
|---|---|---|---|
| 12/11/2015 | 27 | 69 | 27 |
| 4/4/2016 | 142 | 3443 | 2158 |
| 4/15/2016 | 220 | 222 | 220 |
| 4/29/2016 | 187 | 541 | 187 |
| **Total** | **576** | **4275** | **2592** |

(*See* DX OI; Tr. 988:10 – 989:14.)

82.     Holt not only continued to withdraw individual loan defects as they were presented to him during the course of the trial (*see, e.g.*, Tr. 939:7-9; 941:24 – 947:7; 1197:19 – 1198:4; 1199:16-25; 1201:2-13), but since the end of trial, Plaintiffs have withdrawn over **3,000** additional alleged defects, according to the appendices accompanying their proposed findings of fact and conclusions of law.  (*Compare* Holt Appendix 1 (identifying approximately 30,000 defects alleged by Holt), *with* Appendices to Pl. FOF (identifying approximately 27,000 defects alleged by Holt).)  These significant and serial withdrawals indicate that *even Plaintiffs* lack confidence in a substantial number of the conclusions contained in Holt's expert reports and trial declaration.  Yet, even after multiple rounds of withdrawals, to this day Holt continues to allege defects that clearly are unsupportable.  (*See, e.g.*, Appendix 39, **Loan 1477653** (asserting data tape discrepancy where Mortgage Loan Schedule indicated LTV of 80% but "actual LTV" was 65% (*i.e.*, lower); Appendix 39, **Loan 1483491** (asserting data tape discrepancy where Mortgage

---

[18]  This column reflects the total number of loans where a defect allegation was withdrawn, even if withdrawing the defect allegation did not result in the loan being withdrawn in its entirety.

Loan Schedule indicated LTV ratio was 79.46% but "actual" LTV ratio alleged by Holt was 80%); *see infra* ¶¶ 114-116 & n.26).)  All of this severely undermines any confidence the Court could have in Holt's defect allegations.

83.    Critically, Holt admitted that he has no idea why certain loans and defects were withdrawn and has no insight into the methodology that was used for determining that they should be withdrawn:

> Q.  It is your testimony, so we're clear, for all the loans that plaintiffs have indicated to us that they've dropped over the past few weeks, you still believe they're materially defective, but for some reason unbeknownst to you, counsel doesn't believe or does not wish to pursue claims for those loans.  Is that your testimony?
>
> A.  Over the last several weeks, *yes, sir, counsel decided to not pursue [certain breach allegations].  I don't know the exact reason for all of them, no*. . . .
>
> Q.  So these loans were dropped not as a result of your continuing QC process, but as a result of counsels' decision, correct?
>
> A.  We continue to do QC.  There have been some dropped, just breached.  There might have been a few loans there, but I don't know the exact number of them.
>
> Q.  Can you tell this Court which loans it was your decision to drop and which loans it was counsels' decision to drop?
>
> A.  Not sitting right here without the information, no, sir.

(Tr. 766:15 – 767:1 (emphasis added).); *see also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996) ("[E]xpert testimony should be excluded if it is speculative or conjectural" or "not 'accompanied by a sufficient factual foundation.'" (citation omitted)); *Lava Trading Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *7 (S.D.N.Y. Apr. 11, 2005) (Castel, J.) (adopting report and recommendation excluding proffered testimony where expert failed to identify "the methodology that he used (other than in the most general and unhelpful terms)").

84.     The cumulative effect of the above testimony undermines entirely the reliability of Holt's expert analysis and remaining contentions.  *See United States v. Ochs*, 548 F. Supp. 502, 513 (S.D.N.Y. 1982) ("The inconsistencies set forth above, among others, succumb so disfavorably to the indicia of reliability that decades of judicial service have engrained in us, that we are compelled to discount the veracity of the entire testimony striving to establish recantation by [the witness]."), *aff'd*, 742 F.2d 1444 (2d Cir. 1983).

**B.     Holt Is Not Credible**

85.     Additionally, Holt demonstrated at trial that he was not a credible witness.  "[A]n expert witness who is not credible does not, as a general rule, provide reliable expert testimony." *Contreras v. Sec'y of Health & Human Servs.*, 121 Fed. Cl. 230, 238 (2015).

86.     Holt made repeated false statements under oath about his education, which he claimed formed the basis of his expert opinions.  For example, his Trial Declaration and Expert Report state under the section entitled "Basis for Opinions" that he received "a Graduate Degree in Retail Bank Management *from the University of Virginia* in 1994."  (PX 1103, Holt Trial Dec. ¶ 28 (emphasis added); PX 552, Holt Report ¶ 20; Tr. 751:19-25.)  In fact, Holt received only a certificate from an industry group called the Commercial Bankers Association, after he attended three 10-day sessions that took place on the University of Virginia campus.  (Tr. 752:21-25.)[19]

87.     When asked during cross-examination:  "What I am asking you is you know *it is a false statement* that you received a graduate degree from the University of Virginia in 1994, isn't that correct, sir," Holt responded:  *Correct*."  (Tr. 752:17-20 (emphasis added); *see also* Tr. 752:1-5 ("Q.  Mr. Holt, if one were to check with the University of Virginia Registrar, they

---

[19]  That sponsored program no longer takes place on the University of Virginia campus, but rather relocated to the campus of Furman University.  (Tr. 755:1-9); *see generally* http://consumerbankers.com/.

would have no record of you ever receiving a degree, graduate or otherwise, from that institution. Isn't that correct?  A.  Yes, sir.").)  Holt repeated this false statement that he received a "graduate degree" from the "University of Virginia" in his biography posted on his employer's website and on his LinkedIn profile, neither of which made any mention of the Commercial Bankers Association.  (*See* Tr. 756:23 – 758:19.)[20]

88.      Holt's admittedly false testimony about his credentials is enough for the Court to exclude, or at the very least heavily discount, his expert testimony in its entirety.  *See Harkabi v. SanDisk Corp.*, 891 F. Supp. 2d 527, 539 (S.D.N.Y. 2012) ("Moreover, Dr. Johnson misrepresented her credentials to the Court by describing herself as a former 'professor' at Stanford University when, in fact, she was only a lecturer. . . . Accordingly, this Court discounts Dr. Johnson's opinions and views them skeptically."); *see also In re Unisys Savings Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999) (affirming trial court's refusal in a bench trial to accept expert's testimony because, inter alia, "the District Court found [the expert] not to be credible because he had made statements about his credentials that were inconsistent with his deposition testimony"); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383-86 (11th Cir. 1988) (where the testifying expert for prevailing party had perjured himself by lying about the schools he attended, a lower court abused its discretion by refusing to vacate the portion of an arbitration award that relied upon the tainted expert's testimony); *Contreras*, 121 Fed. Cl. at 238-42 (holding that special master abused his discretion by failing to exclude expert's testimony who lied about having an active medical license); *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 371 (Bankr. W.D. La. 2001)

---

[20]  Holt made the same false statement under oath in another trial before Judge Rakoff in which he testified as a re-underwriting expert.  (Tr. 758:25 – 759:14.)

(declining to "ascribe any weight to the evidence supplied by" the expert where the expert lied about attending Stanford because "[t]he court cannot trust the word of an expert witness who would brazenly lie about her credentials and then further lie when caught.  If she would lie about her academic credentials, there is no reason to believe that she would not provide erroneous and/or misleading valuation testimony if she believed it would benefit her client.").

89.     Holt made other statements at trial that further undermined his credibility.  For example, in an effort to explain why he ignored W-2 forms from borrowers in the loan files that corroborated their stated income at the time of origination, Holt stated that he had "gone through training of red flags to look and see if a W-2 or pay stub is" fraudulent, and in reliance on such training, Holt rejected the authenticity of W-2 documentation because the salary figures that were greater than one thousand did not contain commas.  (*See* Tr. 882:10 – 884:10.)  Holt never disclosed this opinion or this training in his expert report.  In fact, the Internal Revenue Service instructions on the preparation of such forms, of which the Court takes judicial notice  (Tr. 2128:7-14), explicitly instructs that, when preparing a W-2 form, one should "[m]ake all dollar entries on Copy A *without the dollar sign and comma* but with the decimal point" – the exact opposite of what Holt claimed his supposed training had taught him.  (Ex. C at 14 (emphasis added).)  Once again, Holt's demonstrably false testimony provides a basis for discounting his opinions entirely.  *See United States v. Stofsky*, 527 F.2d 237, 245-46 (2d Cir. 1975) (recognizing "the standard jury instruction that upon finding that a witness had deliberately proffered false testimony in part, the jury may disregard his entire testimony").

90.     Holt himself testified in his trial declaration that "[m]isrepresentations by a borrower also call into question the borrower's character" and "the integrity of other information in the loan file," and thus "[t]he entire process by which a loan application was recorded and

analyzed becomes suspect when there is an indication that at least one aspect of the application was misrepresented." (PX 1103, Holt Trial Dec. ¶ 54.) The same logic holds true for Holt himself, who admittedly made repeated false statements under oath, thus rendering all of his testimony highly suspect and unreliable. Holt's testimony is excluded in its entirety on this basis, and even if the Court were not to exclude his testimony, it would be afforded no weight.

### C.    Holt's Testimony Is Not Relevant

91.    Finally, even if Holt's testimony were not excluded on reliability and credibility grounds, it also is not relevant to the issues to be decided. An expert's testimony must "fit" the facts of the case. *Daubert*, 509 U.S. at 591. "Fit" is an aspect of relevance, and it means that an expert's testimony must be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Id.* (citation omitted).

92.    As discussed in further detail below, Holt did not perform any relevant materiality or MAE analysis regarding the loans at issue. (*See infra* ¶¶ 112-125.) *See also Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (affirming exclusion of expert report as unhelpful to the factfinder where it did not analyze the proper group of employees); *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 517-18 (S.D.N.Y. 2010) (Castel, J.) (excluding expert's damages report under Rule 403 because it did not address damages tied to plaintiff's allegations); *S.E.C. v. World Info. Tech., Inc.*, 250 F.R.D. 149, 152 (S.D.N.Y. 2008) (excluding evidence "irrelevant to any issue in the case"), *aff'd*, 334 F. App'x 386 (2d Cir. 2009).

93.    Also, as discussed below, in attempting to assert breaches of the MLS Rep, Holt applied incorrect definitions of "debt-to-income" and "loan-to-value" ratios and thus failed to engage in relevant analysis under the PSAs. (*Infra* ¶¶ 166-172.) Holt also acted as a mere conduit for unreliable hearsay in connection with thousands of alleged R&W breaches. (*Infra* ¶¶ 173-174.)

94.     In sum, Plaintiffs' failure to offer a relevant, competent and reliable re-underwriting expert is fatal to their case and leaves the Court with no way to adequately assess their breach allegations.  Accordingly, Plaintiffs' claims are dismissed in their entirety with prejudice.

## III.  PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO PROVE MATERIALITY FOR ANY ALLEGED BREACHES OF R&WS

### A.     Plaintiffs Must Show That All Alleged Breaches Materially And Adversely Affected The Interests Of Certificateholders At the Time of UBS RESI's Notice Or Discovery

**[Defendant's Response To ¶¶ 147–155 of Pl. FOF]**

95.     The PSAs require that any breach "materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan."  (PX 49 at 74; Pl. FOF ¶ 131.)

96.     The Court has held that this means the breach must cause a "significant increase in the risk of loss" on the loan (SJ Order at 27), and Plaintiffs' expert purportedly applied this definition in his report.  (PX 552, Holt Report ¶ 6 ("In my opinion, a material defect is a defect that significantly increased the risk of loss with respect to the Loan.").)

97.     Section 2.03 of the PSAs (*i.e.*, the Sole Remedy Provision) provides in relevant part:

> [UBS RESI] hereby covenants that within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to this Section 2.03 *which materially and adversely affects* the interest of the Certificateholders or the Certificate Insurer in any Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall . . . repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below.

(Stip. of Facts ¶¶ 25, 28 (emphasis added); PX 49 at 74.)

98.     The Court has recognized in the context of the parties' competing motions for

summary judgment that "not all breaches trigger a cure or repurchase obligation. The breach must 'materially and adversely affect the interests of the Certificateholders in such Mortgage Loan.'" (SJ Order at 17); *see also U.S. Bank N.A. v. Dexia Real Estate Capital Mkts.*, 959 F. Supp. 2d 443, 446 (S.D.N.Y. 2013) ("The Trust is not entitled to demand cure or repurchase merely because a breach of the Representation exists; in order for the Special Servicer to demand cure or repurchase, the material and adverse effect condition must be met."); *Lehman XS Trust, Series 2006-4N v. GreenPoint Mortg. Funding, Inc.*, 991 F. Supp. 2d 472, 479 (S.D.N.Y. 2014); *LaSalle Bank N.A. v. CIBC Inc.*, No. 08 Civ. 8426 (WHP), 2011 WL 4943341, at *3 (S.D.N.Y. Oct. 17, 2011).

99.     The Court has held, under the unambiguous contractual language quoted above, that "the determination of whether the breach 'materially and adversely affect the interest of the Certificateholders . . .' is assessed *as of the cure-repurchase period*." (SJ Order at 18 (emphasis added).)

100.     In this case, Plaintiffs contend that the cure-repurchase period occurred at different times – August 2015 for all loans in Holt's expert report served on that date; and other earlier times based on UBS RESI's purported discovery of breaching loans or receipt of Assured's breach notices. For **4,460** loans, the only notice UBS RESI received was in August 2015. Approximately 54% of these 4,460 loans were liquidated as of that date. In fact, approximately 26% of all at-issue loans were liquidated as of August 2010, when UBS RESI received the first Assured breach notices (*supra* ¶ 23).

101.     In denying Plaintiffs' motion for reconsideration, the Court made clear that any supposed MAE from a breach would be negated where the "significantly increased risk of loss" was mitigated or eliminated by other circumstances. As the Court explained: "[F]or example,

the failure to obtain written verification of the salary and employment of a borrower may be a material deviation from underwriting standards, but if the borrower, in fact, was paid the exact salary and had the exact employment that he claimed, the material deviation would not 'materially and adversely affect the interests of the Certificateholders . . . .'"  (Reconsid. Order at 6.)

102.     The Court's articulated standard of MAE is grounded in the plain language of the PSAs, which uses the word "*affects*" in the present tense, referring clearly to the cure-repurchase time period – *i.e.*, "within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty."  (PX 49 at 74; *see also* Tr. 128:22-24 (The Court) ("But I'm saying as a matter of construction of the word 'affects' it is speaking as of the moment of the triggering of the cure or repurchase obligation."); *see also id.* 128:7-12 (The Court) ("The contract was written with the cure or repurchase remedy in mind, and so it says there must be a breach of a rep and a warranty *which has been discovered and noticed*, which triggers a cure or repurchase obligation if the defect materially and adversely affects the interest of the certificate holder.") (emphasis added).)  It is therefore incumbent on Plaintiffs to prove that the alleged breach had an MAE on Certificateholders' interests at the time the repurchase obligation is triggered.

103.     This plain reading of the PSAs is further supported by other language in the Sole Remedy Provision, including:  "It is understood and agreed that the obligation under this Agreement of the Transferor to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred *and is continuing* shall constitute the sole remedies against [UBS RESI] respecting such matters available to Certificateholders . . . ."  (PX 49 at 75-76 (emphasis

added).)[21]

104.    The Court further notes that the New York Court of Appeals has held that the

remedial provisions of the PSAs, which include the "material and adverse effect" requirement,

are not an element of the breach of R&W itself, but rather are a procedural condition that must

be met in order to later trigger the defendant's obligations to cure or repurchase breaching loans.

Indeed, *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581 (2015), held that the cure-

or-repurchase provision in a materially similar RMBS contract was a "procedural prerequisite"

that did not delay accrual of the statute of limitations beyond the date that the R&Ws were first

breached.  While Plaintiffs cite this case for the proposition that R&Ws "are breached, if at all,

on [the date they are made]" (Pl. Br. at 28), *ACE* says nothing about when the required MAE of

such breaches should be assessed.  In *Deutsche Bank Nat'l Trust Co. v. Quicken Loans, Inc.*, 810

F.3d 861 (2d Cir. 2015), the Second Circuit, applying New York law, followed the decision in

*ACE* that the R&Ws are breached if at all "upon effectiveness" and thus the statute of limitations

began to run at that time.[22]  *Id.* at . 869.  The Second Circuit said nothing about establishing an

entitlement to the contractual repurchase remedy, which is a separate inquiry that, under the plain

language of the contracts, must be made at the time the remedy is sought.

105.    Indeed, in a later decision, the Second Circuit clarified that, under the reasoning

of *ACE*, "[t]he 'material[] and adverse[]' effect language does not create an element of an

---

[21]  Indeed, UBS RESI's ability to "cure" defects under the Sole Remedy Provision (*supra* ¶ 18) contemplates that any MAE be extant and "continuing" at the time of notice or discovery.

[22]  Plaintiffs cite *Quicken Loans* as supposedly "construing 'materially and adversely affects' language to mean that '[i]mmediately upon the effectiveness of the R&Ws, the Trustee was entitled to demand the contractual remedy." (Pl. Br. at 28.)  The Second Circuit did not "construe[]" the materially and adversely affects language at all, let alone decide when it needed to be satisfied.

actionable breach.  Rather, the language referring to material adverse effects is part of the provision through which [plaintiff] might seek to repurchase as one recourse for a breach of representations and warranties made in the MLPA."  *Wells Fargo Bank, NA v. JP Morgan Chase Bank, N.A.*, No. 14-1414-cv, 2016 WL 1042020, at *2 (2d Cir. Mar. 16, 2016) (summary order).  The Second Circuit added:  "the material and adverse effect requirement is a component *of the remedy and not of the breach*; thus, like the cure period in *Quicken Loans*, it does not delay accrual" of the statute of limitations.  *Id.* (emphasis added).[23]

106.     For this reason, Plaintiffs' citation to cases holding that the "materiality of a breach of contract is determined as of the time the breach occurred" (Pl. Br. at 28-29 & n.29) misses the point.  It is true that to establish their claim, Plaintiffs must show a material and not insignificant breach of R&W, as this Court has recognized.  But that is not the end of the inquiry if they are to show an entitlement to relief.  Plaintiffs also must meet their burden to prove that this material breach also has an MAE on the Certificateholders' interests at the time repurchase is sought.  (*See* Tr. 1003:13-20 (The Court) ("All right.  There is I think implicit in the language of the agreement that a defect or a breach not be immaterial or insignificant. . . .  [T]here is also a *separate requirement* that the nature of the breach *as of the time the repurchase obligation is triggered* materially increases the risk of loss to the certificate holders[.]" (emphasis added)); *see also Wells Fargo v. LaSalle Bank*, No. 3:07-cv-449, ECF No. 299, at *2 (S.D. Ohio Oct. 27, 2009) (rejecting trustee's argument that it could "prove a material and adverse effect on the loans or the mortgaged property by showing that th[e] loan would have been rejected by the investors,"

---

[23]  The Second Circuit also stated that it was not determining "when a material and adverse effect was pled to exist in this case or whether the proper interpretation of material adverse effects even contemplates that such an effect can or does occur at a later time than the breach of the representations and warranties themselves."  *Wells Fargo Bank, NA v. JP Morgan Chase Bank, N.A.*, No. 14-1414-cv, 2016 WL 1042020, at *2 (2d Cir. Mar. 16, 2016) (summary order).

because "that position begs the question. To put it another way, the fact that an investor might have made a different decision had he or she had different information may make that information material to the investor's decision, *but it does not make the omission of that information cause a material and adverse effect on the loan. 'Material information' and 'material effect' are not the same thing.*" (emphasis added)).

107.    Plaintiffs cite *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007), to argue that "the materiality of a breach of warranty regarding facts existing at the time of sale is measured 'at the time of the sale,' by 'the difference between the value of [a Loan] as warranted and its value as delivered[.]'" (Pl. Br. at 28.) *Allegheny* is inapposite in that the sale contract at issue did not concern R&Ws, a PSA, or even an RMBS transaction, nor did it contain a provision like the one at issue here, affirmatively requiring that a breach must "materially and adversely affect" the interests of Certificateholders at the time a remedy is sought.

108.    Further, the language quoted by Plaintiffs is in relation to the unremarkable principle that "contract damages are measured at the time of the breach." *Allegheny*, 500 F.3d at 185. Indeed, after finding a material breach of the *Allegheny* defendant's warranty concerning the accuracy of the financial records of a business it was selling, the Second Circuit remanded the case and asserted that damages should be calculated as "the difference between the value of [the business] as warranted and its value as delivered." *Id.* This holding has nothing to do with the circumstances of this case, which involves a prescribed contractual remedy with a specific damages formula and not general contract damages.

109.    Similarly, while Plaintiff cites to insurance contract cases discussing the "natural tendency" approach to materiality, these cases also are not relevant here as they do not speak to

the contractual language at issue or how that language bears on the timing of the MAE analysis. Moreover, cases involving an insurer's "interest in receiving complete and accurate information . . . before deciding whether to issue a policy" (Pl. FOF ¶ 151) are inapposite because such cases invoke statutory rules regarding causation and effect that are unique to insurance providers. *See Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 334 & n.5 (S.D.N.Y. 2012) (citing New York Insurance Law § 3105 to hold that "New York law provides that an insurer has an interest in receiving complete and accurate information before deciding whether to issue a policy"). Indeed, U.S. Bank's own expert, Justice Anthony J. Carpinello, stated in connection with another U.S. Bank settlement that any comparison between recoveries in monoline insurer cases and anticipated recoveries in cases brought by trustees would be inappropriate because "monoline insurers have no requirement to prove proximately caused damages" and thus monolines "enjoy a greater probability of success." (Ex. D at 3–6, Carpinello Report.)[24]

110.    Plaintiffs also argue that the plain reading of the PSAs as requiring proof of MAE at the time of notice or discovery would be "absurd" and "commercially unreasonable" (Pl. Br. at 30), but fail to explain how that is so. To the contrary, it is perfectly reasonable for UBS RESI to bargain for a limitation on its R&Ws such that its repurchase obligation is triggered only where a material breach at the time of contracting continues to have an MAE at the time the breach is noticed or discovered and a remedy is sought. To hold otherwise would give Plaintiffs the unilateral ability to put back loans that, after many years of performance, do not have defects that

---

[24]  The out-of-Circuit decision in *LaSalle Commercial Mortgage Bank v. Bank of America*, No. 13 C 5605, 2014 WL 4124249, at *7 (N.D. Ill. Aug, 21, 2014), relied upon by Plaintiffs (Pl. FOF ¶ 152), improperly found "no meaningful difference" between materiality on the one hand, and the "material and adverse effect" requirement on the other, which, as the Court has already recognized, are distinct requirements under the PSAs. (Tr. 1003:13-20.)

have no impact on Certificateholders' interests, and that is not the parties' bargain.[25]  In any

event, the Court has already emphasized that the plain and unambiguous language of the PSAs

should control over the parties' claims of "commercially unreasonable results," as the parties are

"all prisoners of the words of the agreement."  (Tr. 605:19-21; *see also* Reconsid. Order at 7

("When it comes to written, integrated contracts among sophisticated parties, predictable

outcomes in accordance with the expressed intentions of the contracting parties is justice and

fairness.").)

111.    Finally, Plaintiffs argue that this reading of the PSAs "would allow a breach that

did *not* cause an MAE at closing (say, a misstated DTI ratio that did not cause an MAE because

the borrower had substantial assets) to nevertheless become actionable later on (say, if the

borrower lost those assets)."  (Pl. Br. at 30 n.30.)  But under such a scenario, the "substantial

assets" could be a compensating factor for the misstated DTI, such that  there would be no

material R&W breach at the time of closing (*i.e.*, the date the R&Ws were made), and thus what

happened thereafter would be irrelevant.  In any event, the parties expressly contemplated that

---

[25]  Indeed, Plaintiffs now allege that they gave notice of R&W breaches through the August 2015
Holt Report.  Putting aside whether that satisfies the PSAs' notice requirement, which, as
discussed below, it does not (*see infra* ¶ 341-346), Plaintiffs cannot prove MAE as of that date
where the loans had already been liquidated any more than they could prove MAE for a loan that
had fully repaid because both have an outstanding principal balance of zero under the PSAs.
(*See* Tr. 128:13-17 (The Court) ("[I]f, for example, a loan was hopefully out of compliance with
warranty XXX – hopefully out of compliance – and on the day that that lack of compliance was
discovered or noticed, the loan was fully repaid, *you wouldn't have a claim*.") (emphasis added);
*accord* PX 49 at 56 (assigning a Principal Balance of "zero" to "any Mortgage Loan that has
been prepaid in full or has become a Liquidated Loan").)  This MAE timing requirement also
makes sense when one considers that the repurchase of a loan out of the Trust could well be
contrary to the Certificateholders' interests if no MAE exists when repurchase is sought.  If a
breach no longer has an MAE, then that fully-performing loan should remain in the Trust and
Certificateholders should not be deprived of future payments on the loan by having it paid down
through repurchase – thus, it is in their interests to have repurchase occur only where there is an
extant MAE.  (DX KJ, Lantz Trial Dec. ¶ 44.)

there could be non-compliant loans within the pool, but also agreed to a limited remedy that allows for repurchase only where MAE is shown at the time the remedy is sought. (*See supra* ¶¶ 16-18.)

### B. Plaintiffs Have Not Offered Any Evidence Regarding Material And Adverse Effect

**[Defendant's Response To ¶¶ 156–169; 208–212; 219–222; 229–233; 240–245; 253–258; 306–312; 329–331; 337; 343–350; 355; 361–363; 381–384; 394–395; 400–403; 407–409 of Pl. FOF]**

112.     Despite the unambiguous contractual language cited above, Plaintiffs' sole re-underwriting expert, Holt, admitted at trial that he did not perform any analysis of the material and adverse effect requirement when assessing the at-issue loans.  Indeed, in response to the Court's straightforward questioning, Holt testified:

> THE COURT.  Let me understand that you did not, you were not asked to, and you did not do an analysis of whether a defect materially increased the risk of loss to the lender, is that correct, or the certificate holder in this case?
>
> A.  I did not do any analysis, no, sir.
>
> THE COURT.  Right.  Okay.  You weren't asked to?
>
> A.  Just to verify the information, yes.
>
> THE COURT.  That would be true across the board as to all of the underwriting files you reviewed?
>
> A.  Yes.

(Tr. 928:11-20.)

113.     Later, Holt similarly testified in response to the Court's questioning:

> THE COURT.  Now I want you to assume hypothetically that that is the borrower's actual income.  How would the breach of that underwriting guideline materially and adversely affect anyone, if at all?
>
> A.  Because the lender was not assessing the risk going through the determination capacity, character and collateral based on the guidelines

67

as stated to do that test to prove reasonableness, and because of that, that's why I would determine a guideline breach.

THE COURT.  I understand that, there is a breach, but you don't have an opinion, or do you, on whether or not the breach which you're testifying about has any adverse effect on investors if, for example, it was the individual's income?

*A.  That's correct, just the violation.*

THE COURT.  Just the violation?  Okay, thank you.

(Tr. 1192:5-18 (emphasis added).)

114.　　The fact that Holt performed no material and adverse effect analysis is corroborated by his results, as shown through several loan examples presented at trial.  For example, Holt alleged that **Loan 1091043** is Materially Defective based on a "data tape discrepancy" (which purportedly connotes a breach of the MLS Rep) because the Mortgage Loan Schedule indicated a DTI of 12.32% and Holt alleged an actual DTI of 17.2%  – a difference of less than 5%.  (Tr. 926:19 – 928:4.)  Holt admitted that a DTI of 17% was "low" and significantly below the guideline maximum of 45%, yet nevertheless found the loan to be Materially Defective on the basis of this discrepancy.  (*Id.*)  Holt does not explain in his report or trial declaration how this discrepancy "significantly increased the risk of loss" on the loan.  Rather, when asked by the Court why he thought this was a defect, Holt responded:  "Because the reps and warranties stated the MLS, the data on MLS was supposed to be true and correct. So we looked to see if it was true and correct based on what was in – recalculated or even approved by desktop underwriter."  (Tr. 928:6-10.)  Holt then stated that he was asked "[j]ust to verify the information [in the Mortgage Loan Schedule]" (Tr. 928:16-17), which further confirms the lack of any materiality analysis of the breach itself, much less an analysis of its MAE.  In sum, Holt made clear that he deemed loans defective merely because the information on the

Mortgage Loan Schedule differed in any respect from information in the loan file or from information found in post-origination sources, without regard to whether that difference was material or significantly increased the risk of loss on the loan. (Tr. 928:6-20.)

115. As another example, Holt alleged that **Loan 1334487** is Materially Defective based on a "data tape discrepancy" where the Mortgage Loan Schedule listed a credit score of 743 but the origination credit report showed a score of 732 – a difference of just 11 points. (Tr. 928:22 – 929:18.) Holt admitted 732 was a "strong credit score" and 32 points above the guideline minimum of 700 (*id.*), yet continued to insist that the loan is Materially Defective on this basis. Holt also concluded that the loan is Materially Defective because the DTI was 34%, as opposed to the 29% DTI listed on the Mortgage Loan Schedule, despite the fact that the guideline maximum for DTI was 45%. (*See* Tr. 929:19 – 930:9.) Again, Holt could not explain how these minor discrepancies constituted a material breach of the MLS Rep or how they "materially and adversely affected" Certificateholders' interests, establishing conclusively, as he testified, that Holt simply did not consider this contractual requirement in his analysis.

116. In fact, even now, Plaintiffs seek relief as to loans where Holt claims that the actual LTV ratio was *better* (*i.e.*, lower) or effectively the same as the LTV ratio listed on the Mortgage Loan Schedule. (*See, e.g.*, Appendix 39, **Loan 1477653** ("The data tape indicated the loan to value (LTV) ratio was 80%. As indicated in the Misrepresentation of Occupancy finding, *the actual LTV ratio was 65%*. This resulted in a data tape discrepancy." (emphasis added)); *see also* Appendix 39, **Loan 1454904** ("The data tape indicated the loan to value (LTV) ratio was 52.22%. However, the actual LTV ratio was 53%. This resulted in a data tape discrepancy."); Appendix 39, **Loan 1483491** ("The data tape indicated the loan to value (LTV) ratio was

69

79.46%.  However, the actual LTV ratio was 80%.  This resulted in a data tape discrepancy.").)[26]

117.    Moreover, according to Plaintiffs' Appendix 61, in **508** instances,[27] Holt found a loan to be Materially Defective based on a data discrepancy where the purported "recalculated" loan attributes were still within the parameters set by the applicable underwriting guidelines. These examples undermine Plaintiffs' claim that they "have proved that all of UBS's breaches resulted in the Loans having significantly higher risk of loss than warranted to the Trusts."  (Pl. FOF ¶ 152.)

118.    Plaintiffs respond by arguing that "Holt appeared to be confused" at trial and refer the Court to his Trial Declaration (Pl. Br. at 21 n.23), but there is no confusion in Holt's unequivocal testimony and the substance of his report fully supports the answers he gave on the stand.  The only plausible inference to be drawn is that Holt meant exactly what he said in response to the direct questioning of the Court and Defendant's counsel.  Further, Plaintiffs' reliance on a single paragraph of Holt's Trial Declaration to satisfy the material and adverse effect requirement (*Id.* (citing PX 1103 ¶ 7)) is unavailing, as this testimony is directly contradicted by Holt's live testimony on the stand, as discussed above.  Accordingly, this portion of Holt's trial declaration is afforded no weight.  *See Eichler v. Lufthansa German Airlines*, No. 91 CIV. 8407 (CSH), 1994 WL 30464, at *6 n.4 (S.D.N.Y. Jan. 28, 1994) ("To the extent that Eichler's trial testimony on this point may seem inconsistent with her prior affidavit, . . . I credit her trial testimony, having observed her demeanor.").

119.    Moreover, in his Expert Report, Holt includes the very same hypothetical that the

---

[26]  For additional examples, *see* **Appendix B**, Defendant's Response to IV.H. The MLS Warranty Regarding Loan-To-Value Ratios.

[27]  This total is **1,489** loans when one includes the loans that were found to be Materially Defective based on Cowan's AVM analysis (*see infra* Part VIII).

Court used in its order denying Plaintiffs' motion for reconsideration of the Court's summary judgment decision, only Holt notably came to the exact opposite conclusion regarding MAE:

| The Court | Holt |
|---|---|
| "Thus, for example, the failure to obtain written verification of the salary and employment of a borrower may be a material deviation from underwriting standards, but if the borrower, in fact, was paid the exact salary and had the exact employment that he claimed, the material deviation *would not have 'materially and adversely affect the interests of the Certificateholders . . . .'"*<br><br>(Reconsid. Order at 6 (emphasis added).) | "For example, if the underwriting guidelines required that the underwriter obtain a verification of the borrower's income and the underwriter failed to obtain such verification, and if it were subsequently determined – post-origination – that the borrower had such income, that would not cure the Material Defect. *The risk of loss with respect to the loan was still significantly higher as a result of the failure to obtain the required income verification.*"<br><br>(Holt Expert Report ¶ 8 (emphasis added).) |

120.    At trial, Holt disavowed any knowledge of the Court's decisions construing the MAE requirement, and admitted that he was never even informed of them by Plaintiffs' counsel:

> THE COURT.  Well, did you read either of the Court's two decisions on summary judgment or the motion to reconsider?
>
> A.  No, sir.
>
> THE COURT.  Were you briefed by counsel for the plaintiff as to the holdings in those decisions?
>
> A.  No, sir.

(Tr. 848:4 – 848:9.)

121.    This leads to another fundamental shortcoming in Holt's analysis:  the majority of loans at issue are alleged to have multiple defects, and Holt did not do any analysis as to whether the loans would still be "Materially Defective" where some, but not all, of the alleged defects are removed.  In his report, Holt defined a "Material Defect" as "a defect that significantly increased the risk of loss with respect to the Loan."  (PX 552, Holt Report ¶ 6.)  In other words, Holt's

report posits that each Material Defect, standing alone, significantly increased the risk of loss on the related loan.  (*See* Pl. FOF ¶ 152.)  But at trial, Holt made clear his opinion that any assessment of materiality is based on the totality of the alleged breaches and the "layered risk" of each loan, taking into account all alleged defects for that loan.  (*See* Tr. 939:7-9 ("That particular breach, *without looking at the other ones*, then, yes, sir, I would say we made a mistake and it should be withdrawn.") (conditioning removal of alleged stated income defect associated with **Loan 131440163** on a review of other alleged breaches); Tr. 941:24 – 947:7 (conditioning removal of alleged stated income breach associated with **Loan 6093488** on a review of every breach associated with the loan and ultimately dropping all four alleged defects on the loan – including an alleged missing document defect – because standing by itself the missing document defect was not "sufficient to constitute a material defect"); *see also* Pl. FOF ¶ 412 ("Section 2.03 . . . requires the Court to consider the impact of each breach on the Loan as it actually is – including as the Loan is affected by other defects.").[28]

122.    In response to the Court's questioning at trial, Holt testified as follows:

> THE COURT.  Yes. Let me ask you, upon reflection, is this another example of the defect that should be withdrawn?
>
> A.  No sir, not without – this one looks a little deeper, *so I would look at all the breaches to see what is in there*.  If there was like an employment issue or something of that nature, that would have triggered this, I would want to look further through this loan to see if there was anything else that had been noted. . . .

---

[28]  This "layered risk" approach is inconsistent with the plain terms of the PSAs, which require that the material and adverse effect analysis be done on a breach-by-breach basis, requiring  "a breach of any representation or warranty made pursuant to this Section 2.03 *which materially and adversely affects*" the interests of Certificateholders in the loan, and speaking of the opportunity to cure that *breach*.  (*Supra* ¶ 17; SJ Order at 17-19 (explaining that material and adverse effect analysis and repurchase remedy are loan-specific inquiries).)

THE COURT.  I can't use your Appendix I if I am looking at the reasonableness, I cannot read every word you've written and make any decision whatsoever with regard to this defect?

A.  This particular defect?

THE COURT.  Yes.

A.  If you read this, it is not clear, but again a loan as a whole in totality, there were other . . . other defects, yeah. . . .

THE COURT.  Well, what should I do?  Tell me what I should do when I go back to my Chambers and review Appendix I?  What should I do to know whether or not the defect should be sustained as proven or rejected as unproven?  Tell me what you think I should do.  You're the expert.

A.  The way it was set up, and what I would do, *what you should do is look at all the breaches for that loan*.  It is all described, everything, if it was employment, occupancy, there is a separate breach for every finding that was found in that loan file, so it would all tell the entire picture or story of that loan that might not be indicated in this particular breach, but there are also other facts in there that we discovered, *breaches that would tell the entire story of that loan*.

(Tr. 941:24 – 945:10 (emphasis added).)

123.    The Court asked Holt to review all of the alleged Material Defects for this particular loan during recess.  Following that review, Holt testified as follows:

A.  Based on my review of QC and this loan, I would drop that breach *as well as drop this loan*.

THE COURT.  All right.  Thank you.  How many defects did you find in this loan?

A.  There were four, your Honor. . . .

Q.  Just to clarify that last point, sir, when you say there were four defects, you would agree that three are entirely derivative of the allegation that stated income wasn't reasonable.  Is that correct?

A.  Yes, sir, they were based on that one breach. . . .

Q.  And you would just be left with one defect based on missing note.  Is that correct?

> A.  Right, and I would go ahead and drop it.  I wouldn't accept that for this loan.  I would go ahead and drop that breach from the loan.
>
> Q.  So your view of the allegation there is a document deficiency because the second note isn't in the file, that standing alone isn't sufficient to constitute a material defect.  Is that correct?
>
> A.  That is correct, yes, sir.

(Tr. 946:4 – 947:7.)

124.    Holt again addressed the issue of layered risk when describing the review he performed once he received Ms. Grissom's rebuttal:

> Q.  What was your personal role in the double-blind QC?
>
> A.  When a vendor, another vendor that had performed the QC, if they found errors or omissions in any of the vendors' initial findings, then my senior team I already mentioned and myself would go through, look at those.  If there were any ones that we knew to remove, we removed those breaches.  *If the removal of those breaches affected whether or not those loans were materially defective, then we removed that loan from the list of materially defective loans.*

(Tr. 1006:18 – 1007:2 (emphasis added).)

125.    Accordingly, where the Court finds that certain of Plaintiffs' defect allegations are incorrect or insufficient and should be removed, Plaintiffs have not offered any evidence or methodology regarding the effect of removing those defect allegations on the MAE of the remaining defects for those loans.  This leaves the Court with no way to determine whether the remaining alleged defects satisfy the contractual requirements for repurchase.

## C.    Holt Did Not Consider Material And Adverse Effects Post Origination

**[Defendant's Response To ¶¶ 147–169 of Pl. FOF]**

126.    In any event, even if the Court were to credit Holt's assertions that he considered MAE in his trial declaration, he offers nothing more than a bare legal conclusion that is inconsistent with the standard set forth in the PSAs and articulated by the Court in its previous

74

orders.

127.    Holt did not analyze whether the breaches he identified had an MAE on the

interests of Certificateholders *at the time of UBS RESI's notice or discovery* of the breach.  The

Court reiterated at trial:  "Now, there may have been – that may have on the day of the breach

materially and adversely affected the interests of the certificate holders, but that situation may or

may not be true for every loan, and that may not be the situation on the date of discovery or

notice."  (Tr. 602:8-12; *see also* 1003:13-20.)

128.    Nevertheless, Holt repeatedly testified that he did not assess MAE subsequent to

the time of breach – either at the time of discovery, notice, liquidation, his expert report or any

other time period.  (Tr. 843:2 – 844:12.)

129.    Holt conceded that he determined only whether there were defects at the time of

origination:

> Q.  And what I'm asking you is whether you made any effort to
> determine subsequent to origination whether there were any events that
> mitigated the risk of loss represented by that defect.
>
> A.  After the time of origination?
>
> Q.  That's correct.
>
> A.  If we found that the loan was *imprudently underwritten at the time of
> origination*, then we would – *that's what we were looking for*.

(Tr. 844:22 – 845:5 (emphasis added).)

130.    Holt's only attempt to meet the standard articulated by the Court and compelled

by the plain language of the PSAs is a single sentence that appears for the first time in his trial

declaration, which reads:  "However, all of the defects I found to be Material Defects would also

be Material Defects, *i.e.*, they would still significantly increase the risk of loss, even if

materiality were assessed at a later date, including at the date the Loans defaulted, or at the time

notice of the defects was provided to UBS." (PX 1103, Holt Trial Dec. ¶ 10.) Putting aside the *ipse dixit* nature of this statement, which is insufficient to satisfy Plaintiffs' burden to prove its claim, it also was not included in any of Holt's expert reports and thus is stricken. (*Infra* Part XII.)

131.    In light of the above, the Court does not credit Plaintiffs' argument that Holt was confused and concludes that Holt did not conduct any materiality or MAE analysis, much less one that accorded with this Court's rulings. In the absence of such evidence, Plaintiffs' claims necessarily fail. *See Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) ("Without the testimony of their expert witness, [plaintiff's breach of warranty] claims fail."); *Hackl Enters., Inc. v. Dresser-Rand Co.*, 130 F. App'x 495, 497 (2d Cir. 2005) (district court did not abuse discretion "in concluding that in the absence of expert testimony, a jury could not determine whether the accident would have occurred even if the compressor had been secured in the manner in which [plaintiff] says it should have been"); *Barnes v. Anderson*, 202 F.3d 150, 160 (2d Cir. 1999) ("[W]e do not see how a jury could rationally decide causation without the aid of expert testimony."); *Marine Carriers Corp. v. Fowler*, 429 F.2d 702, 710 (2d Cir. 1970) (court could not make technical determinations "[w]ithout the benefit of expert testimony").

**D.     Plaintiffs' Contention That The Breaches Caused "Continuing" And "Ineradicable" Material And Adverse Effects Is Without Merit**

**[Defendant's Response To ¶¶ 147–169 of Pl. FOF]**

132.    Plaintiffs urge that "[e]ven if the repurchase provision required an increased risk of loss at the time the remedy is triggered, the Trusts have made that showing as well." (Pl. Br. at 21.) This assertion lacks merit.

133.    First, Plaintiffs' claim that "the inaccurate information concerning the Loans

related directly to key credit characteristics of the Loans," such that the loans "would be expected to bear significantly increased risks at all points after origination" (Pl. Br. at 21) is unsupported by any evidence and inconsistent with the Court's statements above.  Setting aside that Plaintiffs offer no theory of "persistent MAE" for information that is not "related directly to key credit characteristics," their theory ignores a critical distinction between material breach of R&W and MAE.  (*See supra* ¶ 106); *see also Wells Fargo v. LaSalle Bank*, No. 3:07-cv-449, ECF No. 299, at *2 (S.D. Ohio Oct. 27, 2009)  ("'Material information' and 'material effect' are not the same thing.").[29]

134.    Indeed, Holt acknowledges that so-called "compensating factors" (which include higher credit scores and significant reserves, among others) may "offset the increased risk associated with" a deviation from underwriting guidelines.  (PX 1103, Holt Trial Dec. ¶ 8.)  But Plaintiffs never explain why such mitigating factors (or similar ones) could not arise in the many years between origination and UBS RESI's discovery or notice of breach and offset the increased risk allegedly caused by the breach.

135.    As the Court asked during trial:

> THE COURT.  But here is a question that I put to you:  In the case of a breach, could there not be compensating factors in the loan file which mean that despite a proven breach the proven breach does not materially and adversely affect the interests of the certificate holder?
>
> The person is a lottery winner, perhaps the income is not correctly stated not in a fraudulent way but it's not correctly stated.  It would appear that there could potentially be an instance there where the breach does not materially and adversely affect the interest of the certificate holder.  Is that not a possibility?
>
> MR. BALDWIN:  I think that is definitely a possibility, your Honor.

---

[29]  Plaintiffs allege numerous R&W breaches that have nothing to do with the loans' "key credit characteristics," such as missing documents, to which this argument does not, and cannot, apply.

(Tr. 598:17 – 599:4; *see also* Tr. 606:5 – 606:10 ("THE COURT.  The breach of the guideline with regard to the reasonableness – failure to investigate the reasonableness of the income – didn't materially and adversely affect the interests of the certificate holders because there wasn't even a remote possibility of a default with $15 million sitting in the bank account.").)

136.    There are countless other plausible examples to choose from, including the borrower gaining better employment or a raise in salary; receiving a large sum of money from any source (including inheritance); an increase in the value of the subject property; or the borrower making the property a primary residence.  Indeed, in the decision denying reconsideration of its summary judgment decision, the Court highlighted one such possibility that could defeat any MAE caused by a breach for failure to obtain written verification of salary and employment as required by underwriting guidelines:  the borrower "was paid the exact salary and had the exact employment that he claimed" at the time of origination.[30]  (Reconsid. Order at 6.)  Holt (and by extension, Plaintiffs) simply ignore this consideration.

137.    Plaintiffs' reliance on the "general presumption of the continuance of a status or condition once proved to exist" (Pl. FOF ¶ 142) is inapplicable.  The Supreme Court has cautioned against uncritical reliance on presumptions of continuity:  "such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason. . . . [T]he inference from yesterday's possession is one thing, that permissible from possession twenty months ago quite another."  *Maggio v. Zeitz*, 333 U.S. 56, 65-66 (1948) (vacating order to turnover assets that was based on presumed continued

---

[30]  While post-closing events are highly relevant to whether a given defect "materially and adversely" affected the Certificateholders at the time of notice or discovery, as discussed below, they are entirely irrelevant to whether UBS RESI breached the Guideline Rep based on the originators' actions *at the time of origination*.  (*See infra* ¶¶ 197-200.)

possession where last evidence of possession was over a year before order); *see also United States v. Patterson*, 219 F.2d 659, 661 (2d Cir. 1955) (reversing conviction that was based on presumption of continued existence of records because the presumption is only "as strong or as weak as the nature of the surrounding circumstances permits" and evidence showed the records changed hands repeatedly and may have been destroyed). The cases Plaintiffs cite have nothing to do with the contractual requirements at issue here and do not support a presumption that a material breach on "Day 1" of the transactions at issue had any MAE years (and in some cases, almost a decade) later when UBS RESI first discovered or received notice of breach. In fact, Plaintiffs' cases weigh against such a presumption. Plaintiffs rely on *McFarland v. Gregory*, 425 F.2d 443 (2d Cir. 1970), but in that case, the Second Circuit rejected the presumptions of continuity and relation backward in light of a significant lapse in time and evidence of changed conditions. *Id.* at 447. The court explained that a "presumption of relation backward has only a very limited worth and will not survive the changing of the parties and the legal limitations under which they operate without independently convincing proof." *Id.*

138. Similarly, *Jund v. Town of Hempstead*, 941 F.2d 1271 (2d Cir. 1991), on which Plaintiffs also rely, involved the jury's inference regarding the continuation of a coercive scheme by defendants. The Court held that "a presumption of continuity" is only appropriate where "'(1) a situation or the circumstances surrounding it do not go through an apparent material change and (2) the lapse of time is not great enough to suggest that unknown circumstances or causes, in the normal course of events, will have changed the situation.'" *Id.* at 1288 (quoting *McFarland*, 425 F.2d at 477). Even if such an inference were permissible here (and it is not), the circumstances of this case and "lapse of time" destroy any inference of the type that Plaintiffs urge here. Finally, *Shepherd v. Powers*, No. 11 Civ. 6860 (LTS)(RLE), 2012 WL 4477241

(S.D.N.Y. Sept. 27, 2012), also invoked by Plaintiffs, involved a presumption that inmate care continued to exist as reported over a mere four month period – circumstances that find no analogue in this case.

139. Plaintiffs' argument that "UBS presents no evidence that the borrowers' circumstances changed so as to dissipate the MAEs at any point" (Pl. Br. at 22) has it backwards. As discussed above (*supra* ¶¶ 59-64), it is Plaintiffs' burden to prove that the MAE requirement has been satisfied, and their attempt to shift the burden onto UBS RESI is inconsistent with New York law.[31] *See Raymond v. Marks*, 116 F.3d 466, 1997 WL 345984, at *1 (2d Cir. 1997) (unpublished table decision) ("Under New York law, the party asserting a breach of contract claim has the burden of proving the material allegations in the complaint"); *see also Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (upholding dismissal after bench trial on ground that plaintiff failed to prove material breach); *McKenzie v. Fishko*, No. 12CV7297-LTS-KNF, 2015 WL 685927, at *7 (S.D.N.Y. Feb. 13, 2015) ("Plaintiffs bear the burden of proof as to all elements of their breach of contract claim." (citing *Kaul v. Hanover Direct, Inc.*, 296 F. Supp. 2d 506, 523 (S.D.N.Y. 2004) ("[A] party asserting breach of contract

---

[31] Plaintiffs' argument that UBS RESI must rebut their *prima facie* showing of material breach (Pl. FOF ¶ 211 n.69) is without merit because Plaintiffs have not made even a *prima facie* showing of MAE, as Holt conceded he did no such relevant analysis. Indeed, the insurance case upon which they rely, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 39 Misc. 3d 1220(A) 2013 Slip Op. 50677(U) (Sup. Ct. N.Y. County Apr. 29, 2013), stated that the party moving for summary judgment must make a *prima facie* showing of entitlement to relief, which it did through expert findings that the defendant did not claim were incorrect. *Id.* at *36. Here, in stark contrast, Plaintiffs have not put forth any expert evidence on materiality and UBS RESI certainly does dispute all of Holt's findings on multiple bases, through Grissom and otherwise.

claim has [the] 'burden of proof to establish all elements of its cause of action.'") (citation omitted)).)[32]

140.     Moreover, Plaintiffs' suggestion that the later liquidation or modification of certain loans is evidence that any increased risk of loss at origination did not dissipate also finds no support in the record.  (Pl. Br. at 22.)  To the contrary, Plaintiffs have conceded throughout the course of this litigation that loans may default for any number of reasons having nothing to do with underwriting risks, including but not limited to macroeconomic events, personal illness or job loss, or strategic defaults based on declining home values.[33]  Holt testified:

> Q.  Sir, you testified earlier that when underwriting a loan, you would not consider whether the borrower actually performed or failed to perform on the loan.  Is that correct?
>
> A.  I would not look at payment history, yes, sir.
>
> Q.  There is always credit risk with every mortgage loan made.  Is that right?
>
> A.  That's correct.
>
> Q.  Just because a loan defaults doesn't mean the loan was not underwritten in accordance with guidelines or is materially defective.  Isn't that correct?
>
> A.  That's correct.
>
> Q.  A loan can be perfectly underwritten without a single problem or defect, and the borrower can still default, correct?

---

[32]  The cases Plaintiffs cite provide no support for their burden-shifting proposition.  *In re Mohawk Valley Psychiatric Ctr.*, 818 N.Y.S.2d 766 (Sup. Ct. Onieda County 2006), was a proceeding under Mental Hygiene Law § 9.27 to keep a patient in a psychiatric hospital, which involved a unique and atypical structure of burdens.  Plaintiffs also cite several cases dealing with the unique burdens applicable to insurance contracts, which, as already discussed (*supra* ¶ 109), do not have any bearing here.

[33]  Incredibly, Holt testified at trial that he was unfamiliar with "strategic defaults" by borrowers and had never even heard the term despite having worked in the mortgage industry for years. (Tr. 948:7-13.)

A.  That's correct.

(Tr. 947:8-25; *see also* 127:22-24 (Mr. Baldwin) ("[W]e will argue that the post-trial – two

things – one, the post-[closing] performance of a loan is irrelevant to material and adverse

effect.").).)[34]

141.    Plaintiffs also offer several new theories as to why any MAE on Day 1 could not

be offset by subsequent events.  None of these theories is supported by evidence or was included

in Holt's multiple expert reports in this case (*see infra* ¶ 383).

142.    **"Unreliable Origination."**  Plaintiffs argue that breaches are automatically

"material and adverse" and cannot be offset by events subsequent to origination where "the

original underwriter failed to assess the borrower's willingness and ability to repay the Loan."

(Pl. Br. at 26.)  But this argument reads the MAE requirement out of the PSAs and holds UBS

RESI to an agreement it never made.

143.    As the Court raised at trial:  "The person who was underwriting the loan may

have been a fool and incompetent and did an awful job.  That's why there is a breach.  But in this

courtroom do you not have to prove that that breach – and this relates particularly with regard to

a guideline situation – materially and adversely affects the certificate holder's interest[.]"  (Tr.

600:13-18.)  In response to Plaintiffs' summation regarding their ability to prove MAE, the Court

stated:  "You have a long road to travel to establish that a failure to detect a DTI guideline

violation by an underwriter was more than incompetence, poor job performance by the individual

and by the institution as distinguished from some systematic breakdown, not motivated by

incompetence, but by an intent to deceive, thereby undermining the validity of the overall

---

[34]  If, as Plaintiffs suggest, loan performance should be viewed as a proxy for MAE, then
Plaintiffs should be required to establish some causal connection between the MAE and
performance, which they have not attempted to do.  (*See infra* ¶¶ 399-403.)

underwriting process.  That is quite a distance to travel."  (Tr. 2056:22 – 2057:4.)  Plaintiffs have

not met (and did not attempt to meet) this high burden.

144.    **"Borrower Fraud."**  Plaintiffs' argument that "where the Trusts showed that a

breach revealed borrower fraud, they necessarily showed an MAE" (Pl. Br. at 25) is similarly

unavailing.

145.    As a threshold matter, and as discussed further below, Plaintiffs have not met

their burden to show fraud.  If this were a case involving borrower fraud allegations, Plaintiffs

would have to prove their case by clear and convincing evidence.  But Holt's approach does not

meet even minimal standards of proof:  instead, he claims that thousands of borrowers engaged

in fraud, including in every one of the **4,753** instances where, for whatever reason, the

borrowers' "actual" debt-to-income ratios were higher than the ratios listed on the Mortgage

Loan Schedule (Pl. FOF ¶¶ 261-262), leaving the Court with no way to distinguish between

human error, negligence or supposed "fraud."  Moreover, Holt merely accepted the truth of post-

origination documentation for purposes of assessing the borrowers' veracity and blindly gave it

credence over anything to the contrary in the loan file, even where that documentation was

specifically refuted by verified information in the file.  (*Infra* ¶¶ 192-196.)  This is a far cry from

proving fraud.

146.    Plaintiffs' citation to certain instructions that UBS RESI's vendor, JCIII, provided

to its team (Pl. Br. at 25 n.26) does not support their position.  Although these instructions, which

were not drafted by UBS RESI, stated that "[t]here will be instances of fraud and there is no

means to rebut these instances," JCIII was not opining on the legal standards applicable to the

case (which are the exclusive province of this Court), and in any event, this statement says

nothing about the MAE of any supposed "fraud" (an analysis that Plaintiffs never showed that

JCIII was tasked with performing).

147.    Moreover, as Plaintiffs readily acknowledge, "borrower fraud" in and of itself is *not* a breach of any R&W because the PSAs do not contain a "no fraud" representation.  (*See* SJ Order at 30; PX 1044, Holt Protocol ("There is no fraud rep.  Therefore, fraud findings without red flags *will not have an associated rep*.") (emphasis added).)  Rather, any alleged fraud must result in a breach of an R&W, and nothing in the PSAs dictates that an increased risk of loss associated with those breaches cannot be offset by compensating factors just like any other breaches.

148.    While Plaintiffs cite to *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 510 (S.D.N.Y. 2013), for the notion that "fraud is inherently material" (Pl. Br. at 25), this fails to answer the pertinent question:  whether a material breach of a R&W based on borrower fraud continues to have a *material and adverse effect* at the time of UBS RESI's notice or discovery of the breach, and whether such effect can be mitigated or offset by events subsequent to origination.  Once again, Plaintiffs failed to offer any evidence on this point and their conclusory argument is not a substitute for proof.

149.    **"Altered Loan Terms."**  Plaintiffs also argue that "UBS's breaches caused a continuing MAE for any Loan that would not have issued at all, or would have issued on different terms," including in some instances increased origination fees and interest rates.  (*See* Pl. Br. at 22.)[35]  Plaintiffs have not offered any competent evidence to support this new theory, which was argued for the first time during Plaintiffs' closing arguments.  Other than vague

---

[35]  (*See also* Pl. FOF ¶ 384 ("[T]he absence of these required documents either would have prevented the Loans in this category from being issued at all, or would have required them to be considered under a different documentation program.  As a result, the Trusts paid too much for these Loans when it acquired them, causing an MAE to the interests of the Certificateholders that cannot be cured.").)

statements in Holt's trial declaration (which were not disclosed in any of his expert reports and thus are stricken, *see infra* ¶ 383), Plaintiffs did not provide any evidence that the loans would have been priced differently or approved on different terms.

150.   While Plaintiffs assert that they "proved continuing MAEs by showing that if the condition concealed by the breach was revealed, the Loan would not have qualified under the terms of the program under which it was issued without an exception" (Pl. Br. at 23), they never provided any evidence at trial – and similarly do not provide the Court with any evidence now – that a single loan's fees or interest payments would have been different, much less materially different (especially when taking into account the existence of compensating factors).  Notably, Plaintiffs did not offer any of the pricing matrices for the loans and could have, but did not, call any fact witnesses from any of the originators at issue (or anywhere else) to attempt to support this theory.  Nor did the Plaintiffs offer any expert on loan or securitization pricing.  Instead, Plaintiffs leave it to the Court to decide whether pricing would have been different for each of the loans at issue, without expert guidance or explanation.  This is wholly insufficient to satisfy their burden of proof as to an essential element of their claim.[36]

151.   Indeed, while Holt made generic assertions that "the Originators' guidelines" set tighter requirements if loans presented additional risk (*see, e.g.*, Pl. FOF ¶ 209), he did not undertake any analysis of the purported pricing impact that would have on any particular loan

---

[36]  While Plaintiffs cite to Holt's generalized trial testimony that "money is fungible" (Pl. FOF ¶ 156), this opinion, which did not appear in any of Holt's expert reports (*infra* Part XII), is a far cry from evidence that any particular alleged breach satisfied the material and adverse effect requirement, and does not even attempt to explain how increased borrower fees – which are *charged and retained by the originators* – could affect the Certificateholders' interests.  Additionally, Plaintiffs' citation to the trial testimony of Snow (Pl. FOF ¶ 154) merely serves to highlight their desperation on this point – Snow was never proffered as an expert on materiality and no such opinions appear anywhere in any of his numerous expert reports in this case.

(nor could he, as originators' rate sheets or pricing matrices were not disclosed as documents he relied upon in forming his opinions or introduced as evidence at trial) or how that could have materially and adversely affected Certificateholders' interests.  Simply asserting that the loan price "would have been different" does not carry Plaintiffs' burden.

152.    Plaintiffs' argument that the loans would have been subjected to different fees, terms and requirements also ignores the role of compensating factors.  For example, American Home Mortgage's underwriting guidelines (which are the most specific guidelines with respect to loan pricing), indicated that "[r]ate/price adjustments will be applied to loan characteristics that increase *or reduce* the risk associated with the loan." (PX U716 at 9 (emphasis added).) Without an individualized assessment of each loan in light of the loan's and borrower's overall risk profile, including compensating factors and characteristics that would have *decreased* risk, Plaintiffs are merely speculating that any loan would have been priced differently or subjected to different terms or conditions, and offer no proof as to the degree of any hypothetical difference in light of the overall profile of the loan (or that the difference would have been material). Again, Plaintiffs have offered no evidence, fact or expert, to support their speculation.

153.    Plaintiffs argue that "Grissom does not opine that such Loans would have qualified under the same guidelines at the same rate, and therefore has failed to rebut the Trusts' *prima facie* showing of an MAE."  (Pl. FOF ¶ 307 n.158.)  But, as already stated, it is Plaintiffs' burden to prove material breaches, not UBS RESI's burden to disprove them.  Moreover, Ms. Grissom did not opine on this point in her rebuttal report or trial declaration because Holt did not disclose any such opinions in his expert reports to which she responded.

154.    In any event, repricing the loans or approving them under a different program does not, and cannot, affect "the interests of the Certificateholders . . . in any Mortgage Loan"

because the Certificateholders did not purchase the mortgage loans – they purchased certificates backed by loans and those certificates carried with them a defined rate of return.  (*Supra* ¶ 6.) UBS RESI purchased the mortgage loans backing the Trusts in entirely separate transactions, and Plaintiffs have offered no evidence of how these loans were priced by UBS RESI or how the price paid by UBS RESI could have impacted the structure of the securitization Trusts that issued the certificates at issue here.  Indeed, the PSAs refer in certain sections to breaches that materially and adversely affect "*the value* of the related Mortgage Loan," but the Sole Remedy Provision requires an MAE on the Certificateholders' "*interests*" in the loan (not "the value"). (PX 49 at 73-74 (emphasis added)); *see NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008) (under New York contract law, "[t]he use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings").  Because certificateholders acquire certificates with a defined principal balance and interest rate, their "interest" in the underlying "Mortgage Loans" concerns the loans' *performance* – that is to say, receiving the expected cash flows from the loans. Certificateholders are not buying or selling mortgage loans, and the Sole Remedy Provision does not provide them with a remedy where the loan's "value" is impaired.

155.    Instead, as described in the prospectus supplements for the transactions, the Certificateholders are entitled to receive a defined coupon rate that may be equal to a fixed rate or some other aggregated interest rate.  (*Supra* ¶ 6.)  The level of fees that the borrower may be charged by an originator (which would also be retained by that originator) in connection with any given loan simply does not and cannot affect this rate in any way.  Further, Plaintiffs have offered no evidence whatsoever that the coupon rate Certificateholders are entitled to receive would (or could) be materially affected by an increase in the monthly interest rate on any single

loan out of the thousands of loans underlying the Trusts.  In the absence of such evidence, Plaintiffs' theory fails.

156.    Plaintiffs' "repricing theory" is also flawed because it hypothesizes (again, without evidence) that the very structure of these transactions would have remained the same had the allegedly breaching loans paid higher interest rates.  Plaintiffs have offered no evidence that these hypothetically "higher-paying loans" would have even been included in the Trusts (or that, with their inclusion, the certificates would have been offered to investors on the same terms).  In the end, this new theory of MAE is unsupported by any expert or other evidence, has no basis in the contractual language of the PSAs and is too speculative to carry Plaintiffs' burden of proof on this issue.  *See United States v. Litvak*, 808 F.3d 160, 182-83 (2d Cir. 2015) (reversing securities fraud conviction on basis of exclusion of expert regarding RMBS valuation and emphasizing that "[t]he pricing of RMBS is 'more complicated' because it 'tend[s] to be more subjective . . . and [is] often based on models as opposed to prices from prior transactions.'" (quoting Thomas P. Lemke, Gerald T. Lins & Marie E. Picard, *Mortgage–Backed Securities* § 5:14 (Westlaw 2015), § 5:12 (explaining that "complicated nature" of RMBS "makes placing value on them more subjective"))).

157.    Additionally, as Plaintiffs acknowledge, if a borrower's stated income was unreasonable, the underwriter could possibly "convert it into a full documentation loan."  (Pl. Br. at 24 (citing Tr. 389:17 – 390:2 (Grissom).)  But in such circumstances, however, the interest rate paid by the borrower would be *lower* than under a stated income program – thus turning Plaintiffs' theory on its head.  (*See* DX KJ, Lantz Trial Dec. ¶ 14 (stated income loans "generally carried a higher interest rate as compared to certain other products because of these increased risks to the lender").)

158.    Based on the above, Plaintiffs have failed to satisfy their burden of showing the contractually-required MAE for any of the alleged breaches at issue.  As a result, their claims are dismissed in their entirety.

## IV.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE MLS REP

### A.   The MLS Rep Is More Reasonably Read As A Transcription Rep

**[Defendant's Response To ¶¶ 193–202 of Pl. FOF]**

159.   The MLS Rep reads:  "The information set forth in the Mortgage Loan Schedule was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the Mortgage Loan Schedule."  (PX 49 at 191.)

160.   There are **7,428** loans at issue that Plaintiffs claim are Materially Defective in whole or in part based upon alleged MLS Rep breaches listed in Plaintiffs' Appendix 61.  For the reasons below, Plaintiffs' claims that these loans breach the MLS Rep fail.

161.   This representation is reasonably read as referring only to information "furnished" to UBS RESI regarding loans it did not originate (many of which did not require the originator to verify income or other borrower data, *see supra* ¶ 13)[37] and transcribed to the Mortgage Loan Schedule, not as an overarching strict liability or no fraud representation ensuring the absolute truth of each of the thousands of data points contained therein.  (Tr. 348:15-20 (Grissom) ("The MLS Rep, and based on my experience, is merely a transcription of the information that is in the loan file to this data file and is evidence of that."); DX KJ, Lantz Trial Dec. ¶ 57 (MLS Rep "was intended to represent that the data in the Mortgage Loan Schedule correctly matched the information in the underlying mortgage loan files")); *see also Cent. Mortg. Co.*, 2010 WL 3258620 at *9 n.75 (the "'argument that [the loan seller] was representing that all of the

---

[37]   The word "furnished" must refer to the date or dates on which UBS RESI received the information, not any date on which UBS RESI may have provided it to investors.  This is made clear by the definition of the Mortgage Loan Schedule itself, which refers to certain points in time prior to UBS RESI's possession of the loan – for example, "the Mortgage Rate in effect immediately following origination."  (*See* PX 49 at 45.)

underlying [loan data] in all loan files was accurate seems strained,'" and "'the more plausible

reading of the contract is that [the seller] was simply representing that it accurately compiled the

loan data'").[38]

162.    The First Department's decision in *Bank of New York Mellon v. WMC Mortgage,*

*LLC*, 136 A.D.3d 1 (1st Dep't 2015) (Pl. FOF ¶ 195), which is currently on appeal to the New

York Court of Appeals (Ex. E, Notice), did not parse the language of the MLS Rep or address

this precise interpretive issue, since the defendant there was solely concerned with the time

period the representation covered and did "not dispute that the [] complaint sufficiently alleged

the existence of these misstatements [on the mortgage loan schedule] or their materiality." (*See*

UBS RESI Opp. Br. (ECF No. 342) at 20.)  Thus, the *WMC* court did not have occasion to

address any of the issues presented in this case, including whether the MLS Rep can reasonably

be read as a warranty against borrower fraud where the contracting parties did not include the

industry standard "no fraud" representation in the contract.  Thus, the Court is not bound to

follow *WMC*.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 279 F.R.D. 131,

---

[38]  UBS RESI's offered interpretation is at the very least reasonable and thus gives rise to an
ambiguity for the Court to resolve upon consideration of all of the evidence at trial, including the
testimony of John Lantz and Deborah Grissom.  As the Second Circuit has recognized, "[a]n
ambiguity exists where the terms of the contract 'could suggest more than one meaning when
viewed objectively by a reasonably intelligent person who has examined the context of the entire
integrated agreement and who is cognizant of the customs, practices, usages and terminology as
generally understood in the particular trade or business.'"  *Law Debenture Trust Co. of N.Y. v.
Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted); *Haber v. St. Paul
Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998) ("Language in an insurance contract will be
deemed ambiguous if reasonable minds could differ as to its meaning."); *see also Bear Stearns
Mortg. Funding Trust 2007-AR2 v. EMC Mortg. LLC*, No. 6861-VCL, 2014 WL 2469668, at *2
(Del. Ch. June 2, 2014) (assessing virtually identical MLS representation and holding that it was
appropriate to "hear live testimony from the parties' experts about custom and usage in the
industry" rather than "trying to interpret the Mortgage Loan Schedule Rep in the abstract").

134 (S.D.N.Y. 2011) (refusing to follow state appellate decision on grounds that it "is dicta that I am not bound to follow").

163.    Plaintiffs' proposed reading of the MLS Rep would have the effect of creating a "no fraud" representation of the kind that UBS RESI specifically declined to make in light of the stated income nature of the loans at issue (*see* SJ Order at 30), the data for which  (such as DTI) was included on the  Mortgage Loan Schedule based on unverified statements by the borrower. (*See supra* ¶ 13.)  If the MLS Rep could be stretched to cover all instances of borrower fraud and misrepresentation, as Plaintiffs urge here, no one in the RMBS industry would ever have felt the need to separately bargain for a "no fraud representation" in their contracts.  (*See* SJ Order at 29 ("However, unlike other sponsors in RMBS transactions, UBS did not warrant against borrower fraud and misrepresentation in the loans' origination."); *see also Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*, 44 Misc. 3d 1206(A), 2014 N.Y. Slip Op 51044(U), at *4 (Sup. Ct. N.Y. County July 3, 2014) ("[W]hen Assured does not negotiate for the inclusion of a 'no fraud rep' (or any other representation not included in the PSA), perhaps, thereby, charging a higher premium, it makes a conscious decision to take the risk that if such non-included representations cause losses resulting in claims payments, Assured will not be reimbursed by Credit Suisse via a put-back."); *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, Index No. 603751/2009 (Sup. Ct. N.Y. County May 24, 2012), Tr. 3:17-20 (NYSCEF No. 238-2) (finding that plaintiff's assertion that "there's no difference between a no fraud warranty" and other standard reps "makes no sense because why would anybody get a no fraud warranty if there is no difference").

164.    Accordingly, adopting Plaintiffs' interpretation would impose upon UBS RESI obligations that it never agreed to assume and upend the allocation of risk set forth in the PSAs by importing a guaranty against borrower fraud that neither party intended.  Plaintiffs' efforts to

conjure up examples where a hypothetical loan could breach the MLS Rep but not a "no fraud rep" (Pl. FOF ¶ 200) misses the mark.  Regardless of this distinction, they acknowledge that their proposed reading improperly expands the MLS Rep to include any instance of borrower fraud, thus creating a backdoor "no fraud" representation where none was made.  (*See* SJ Order at 30 (denying Plaintiffs' motion for summary judgment because Holt had "apparently based his determinations of fraud on agreements that are not at issue here")); *see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 151 (2d Cir. 2012) (observing that parties specifically bargained for "no fraud" representation).

165.    As discussed above, it would be commercially unreasonable for UBS RESI to have warranted to the absolute truth of thousands of stated income loans, which were specifically disclosed as high-risk to investors, and thus Plaintiffs' reading gives rise to an absurd interpretation of these transactions and the contractual obligations of the parties.  *See In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." ); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 174 (S.D.N.Y. 2015) (rejecting contract interpretation that would "upend the payment structure of the CDO" because contract must be interpreted in light of the "business purposes sought to be achieved").

## B.    In Any Event, Plaintiffs Have Not Proven That LTV Or DTI Information Was Inaccurate

**[Defendant's Response To ¶¶ 260–266; 315–328 of Pl. FOF]**

166.    In any event, Plaintiffs' reading of the MLS Rep also ignores key contractual definitions that limit its scope.  The PSAs' definition of "Mortgage Loan Schedule" defines the "information" referenced in the MLS Rep, which consists of 40 individual data points relating to

the mortgage loans held in the Trust.  Plaintiffs ignore many of these contractual definitions completely.  (PX 49 at 45-46.)

167.    For example, Item 20 of the Mortgage Loan Schedule is the "Loan-to-Value Ratio at origination," (PX 49 at 45) which is defined in the PSAs as "the fraction (expressed as a percentage) the numerator of which is the principal balance of the related Mortgage Loan at the date of determination and the denominator of which *is the Appraised Value* of the related Mortgage Property."  (*Id.* at 42-43 (emphasis added).)  The "Appraised Value" is defined in relevant part as "the lesser of (a) the value of the Mortgaged Property *based upon the appraisal made at the time of the origination of such Mortgage Loan* and (b) the *sales price of the Mortgaged Property* at the time of the origination of such Mortgage Loan."  (*Id.* at 23 (emphasis added).).  Despite these contractual definitions – which make clear that the Loan-to-Value Ratios listed on the Mortgage Loan Schedule reflect the actual appraised value or sales price of the underlying properties – Plaintiffs contend that the LTV ratios on the Mortgage Loan Schedule are not "true" and challenge their accuracy through the use of a retrospective AVM.  (*Infra* Part VIII.A.)

168.    Plaintiffs' claims as to this aspect of the Mortgage Loan Schedule are alleged with respect to **3,599** loans in Plaintiffs' Appendix 61.  All of these breach allegations are dismissed as they are not relevant to the MLS Rep and the definitions in the PSA cited above.

169.    Plaintiffs' AVM argument suffers from other infirmities as well.  As Plaintiffs' purported AVM expert, Cowan, readily conceded at trial, however, AVMs are simply an alternative opinion regarding the value of the properties in question.  (Tr. 1595:5-6 ("THE COURT.  A value generated by an AVM is an opinion as to the value of the property; is that your testimony?  A.  Yes, sir.").)  Plaintiffs thus have failed to offer any proof that the appraisal

94

opinions were not reasonably held by the appraisers at the relevant time or that the Loan-to-Value Ratios listed on the Mortgage Loan Schedule inaccurately reflected the actual appraisals or sales prices of the properties at issue.  Such proof would be required to show that LTVs on the Mortgage Loan Schedule were not "true and correct."[39]

170.    Plaintiffs have also ignored the PSAs with respect to their claim that the debt-to-income  ("DTI") ratios listed on the Mortgage Loan Schedule were not "true and correct."  This type of alleged MLS Rep breach is asserted with respect to at least **4,751** loans.[40]

171.    Item 27 of the definition of Mortgage Loan Schedule is the "debt-to-income ratio *of the Mortgage Loan*."  (PX 49 at 45 (emphasis added).)  Mortgage Loans, in turn, are defined as those loans "*being identified in the Mortgage Loan Schedule*."  (*Id.* at 46 (emphasis added).)  The parties' use of the phrase DTI "of the Mortgage Loan" demonstrates that Item 27 was intended to identify the DTI associated with the Mortgage Loans, not as a warrant as to the "truth" of the reported DTI for any particular borrower (defined in the PSAs as the Mortgagor).  This is in contrast to Item 26, which refers to "the credit score (or mortgage score) *of the Mortgagor*."  (*Id.* at 45 (emphasis added).)  Under New York contract law, "[t]he use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings."  *NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008).  Nevertheless, Plaintiffs' re-underwriting expert, Holt, testified at trial that he only attempted to re-calculate the DTIs of the Mortgagor – not the Mortgage Loan – in assessing data

---

[39]  *Cf. In re Weight Watchers Int'l, Inc. Sec. Litig.*, No. 14-cv-1997 (LAK), 2016 WL 2757760, at *5 n. 43 (S.D.N.Y. May 11, 2016) ("Where the speaker's opinion or belief is genuine, a bare allegation that her opinion or belief ultimately proved incorrect is not enough . . . .").

[40]  Plaintiffs offer two contradictory numbers for this claim:  4,753 loans in their Appendix 8 and 4,751 loans in their Appendix 61.

defects based on DTI, contrary to the language of the PSAs.  (Tr. 869:10-13 ("Q.  And for those loans which you claim a data defect based on DTI, you're trying to recalculate the DTI of the mortgagor, correct?  A.  That would be correct.").)   Accordingly, as with the LTV ratios, by ignoring the contractual language, Plaintiffs have failed to meet their burden to prove that the DTI ratio of any Mortgage Loan was incorrect.

172.    In addition to disregarding the definition of Mortgage Loan Schedule in the PSAs, Plaintiffs attempt to challenge the accuracy of DTI data by second-guessing the originators' subjective assessment of the reasonableness of the borrower's stated income and substituting it with Holt's assessment.  (*See* Tr. 10:19 – 12:11.)  This leads to absurd results.  Under Plaintiffs' interpretation, in order to avoid breaching the MLS Rep, UBS RESI should have re-underwritten every stated income loan to determine the borrower's "true" income or any additional debts and then recalculate the DTI and insert these new numbers into the Mortgage Loan Schedule – even if the amounts *differed* from the DTI of the Mortgage Loans, as reflected in the loan files themselves.  And even if UBS RESI had done this, Plaintiffs presumably would still claim breach unless UBS RESI happened to have arrived at the same DTI as Holt (a virtual impossibility given that the post-origination evidence Holt relied on did not yet exist).  Plaintiffs' reading lays an inevitable trap for UBS RESI and, in any event, cannot be squared with the commercial reality of these transactions.  (*See* DX KJ, Lantz Trial Dec. ¶ 58 (opining that, based on industry practice, "[i]f the data in the loan files was incorrect or false for whatever reason, but that data was correctly reflected on the corresponding Mortgage Loan Schedule, then the MLS Representation would not be breached").)

### C.     Holt Relies On Impermissible
####        Hearsay To Show MLS Rep Breaches

**[Defendant's Response To ¶¶ 267–294 of Pl. FOF; Plaintiffs' 6/6/2016 Ltr. (ECF No. 434)]**

173.     The Second Circuit has made clear that "a party cannot call an expert simply as a conduit for introducing hearsay under the guise the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citation omitted).  "Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows the [Plaintiffs] 'to circumvent the rules prohibiting hearsay.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citation omitted).

174.     Here, Holt testified that, in order to assert breaches of the MLS Rep, he did nothing more than compare data in the loan files to data he retrieved from post-origination hearsay sources, without performing any independent reliability analyses or expert work.  (*See* Tr. 839:12 – 841:2.)  In fact, he admitted that his work on MLS defects was "[j]ust to verify the information," in some cases performing "basically long division."  (Tr. 839:12 – 841:2; 928:11-20.)  Accordingly, Holt served as nothing more than a "conduit" for these out-of-Court statements contained in post-origination materials, and thus his "work" was tantamount to ratifying hearsay as his own expert opinions, rendering those opinions inadmissible under Rule 703.

175.     Moreover, under Second Circuit case law and Rule 702, experts are prohibited from testifying to matters that can be readily understood and deduced by members of the general public.  *See United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (experts cannot testify to "'lay matters which a jury is capable of understanding and deciding without the expert's help'" (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989))).

Since Holt did not perform any expert analysis in simply comparing two data sources, his opinions that depend upon hearsay sources are inadmissible under Rule 702.

176.    Even if the Court were inclined to admit into evidence the hearsay on which Holt relied for its truth, all such materials constitute inadmissible hearsay as to which no exception applies.

177.    Plaintiffs submitted a letter to the Court on June 6, 2016, seeking admission of some but not all of these materials – specifically, the data found through the Bureau of Labor Statistics ("BLS"), DataVerify, Data Tree, LexisNexis's Accurint service, MERS, PACER, Salary.com, Sitex and other third-party sources (the "Hearsay Sources").  (ECF No. 434.)

178.    The Court did not admit these Hearsay Sources at trial for their truth (Tr. 1184:15 – 1186:15) and Plaintiffs have not provided any basis to admit them for that reason now.  *See Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994) ("Rules 702 and 703 do not . . . permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible.").

179.    The Hearsay Sources are not admissible under the commercial reports exception to the rule against hearsay.  Fed. R. Evid. 803(17).  In order to admit evidence under Rule 803(17), the Plaintiff must lay a sufficient foundation to show that the hearsay to be admitted is a factual, list-type document, created for public consumption using a reliable methodology.  *See In re C.R. Bard, Inc., MDL No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*, 810 F.3d 913, 924 (4th Cir. 2016) (must be a "factual, list-type document");  *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 393 (Fed. Cir. 1996) (must have been created with intent that it be relied upon by the public or professionals);  *Crane v. Crest Tankers, Inc.*, 47 F.3d 292, 296 (8th Cir. 1995) (same);  *Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-cv-1499 (CSH), 2016 WL 1367725, at *17 (D. Conn. April 5,

2016) (must lay sufficient foundation to show that methodology is reliable).

180.    The only foundation in the record as to any of the Hearsay Sources is Holt's bare

conclusion that they are relied upon by experts in his field.  (*See* Tr. 1185:11-20.)  Holt admitted,

however, that he was unfamiliar with some of the Hearsay Sources and never laid any foundation

as to the reliability of the others (and in any event, Holt's statement would not be sufficient to

admit the Hearsay Sources for their truth, *supra* ¶¶ 175-177.)

181.    As to all Hearsay Sources, Plaintiff did not sufficiently identify the source; did not

establish that it was a "factual, list-type document" or that it was created for public reliance; and

did not show that it was compiled using a methodology that makes it reliable for the purpose

Holt used it.  *See C.R. Bard*, 810 F.3d at 924 (excluding evidence under Rule 803(17) where it

was not a "factual, list-type document"); *Conoco*, 99 F.3d at 393 (excluding evidence under Rule

803(17) where there was no indication that the evidence's creator offered the evidence for

general commercial or public reliance); *Tucker*, 2016 WL 1367725, at *17 (finding that the

record was insufficient to rule on the admissibility of evidence under Rule 803(17) where the

proponent offered no foundation showing that the evidence was made using a reliable

methodology).  The Court finds that unsupported record testimony asserting that the Hearsay

Sources are "a compilation of information . . . generally relied upon by members of" a profession

is insufficient foundation as a matter of law to admit evidence under Rule 803(17).  *Tucker*, 2016

WL 1367725, at *17 (declining to admit evidence under Rule 803(17) where the foundation laid

only showed that the evidence was relied upon by members of the legal profession).

182.    The bankruptcy records Holt retrieved from PACER and Lexis Nexis are not

admissible because Plaintiffs never established at trial the indicia of reliability of the data

contained in those records, as required by Rule 803(17).  Indeed, while the filings themselves

may be compiled by those services, the *borrowers' information* found within those filings (which was supplied by borrowers themselves and is what Holt relies on) bears no indicia of reliability whatsoever.[41]

183.   As to Data Verify, Holt testified that he was unfamiliar with that source.   (*See* Tr. 1013:18-22 ("Q. What is Data Verify? You're not familiar with that?  A. I am not familiar with that, no, sir.   We have used it, I have seen it in the past. Again a lot of these sources, a lot of these firms and third-party sources provide information from public records.").)   Plaintiffs' argument that underwriters in Holt's field rely on Data Verify is not credible in light of Holt's testimony that he was unfamiliar with it.

184.   BLS data also is not admissible under Rule 803(17).  Plaintiffs never adduced any evidence to establish how BLS collects and provides its data, and thus have not established its indicia of reliability.  Moreover, although Holt testified that the BLS reports regional employment and salary data (*see* Tr. 1014:13-20; PX 1103, Holt Trial Dec. ¶ 152), he did not lay sufficient foundation to show that BLS intended for its data to be relied upon to determine a specific individual's income, rather than to merely show general income ranges and trends within a given market.   The Court, therefore, cannot determine whether Plaintiffs are using the BLS data in a sufficiently reliable way, and Plaintiffs have not carried their burden to show that this evidence is admissible for its truth.  *Tucker*, 2016 WL 1367725, at *17 (finding that the court

---

[41]   *Accord Conoco*, 99 F.3d at 393 (holding that summaries were not admissible under Rule 803(17) where the people who prepared the summaries "did not, by transmitting them to Conoco, stake their business or public reputations on the accuracy of the summaries"); *JIPC Mgmt., Inc. v. Incredible Pizza Co., Inc.*, No. CV 08-04310 MMM(PLAx), 2009 WL 8591607, at *24 (C.D. Cal. July 14, 2009) (finding that evidence is not admissible under Rule 803(17) when it is created for "a narrow segment of interested parties" summaries rather than all "persons in particular occupations"); *Wantanabe Realty Corp. v. City of New York*, No. 01 Civ. 10137 (LAK), 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004) (Rule 803(17) "covers only those market quotations prepared for general use by an industry or the general public"), *aff'd*, 159 F. App'x 235 (2d Cir. 2005).

could not admit hearsay under Rule 803(17) without sufficient foundation to show the evidence's reliability).

185.     Plaintiffs have likewise failed to carry their burden to show that the Salary.com data is admissible under Rule 803(17).  Plaintiff also never explained how Salary.com collects and calculates its salary data.  Without such foundation, the Court cannot determine whether Salary.com data is sufficiently reliable to be admitted, *see id.*, or whether Salary.com made "any effort to verify the accuracy of the information contained in" the document.  *Personal Audio, LLC v. CBS Corp.*, No. 2:13-CV-270-JRG-RSP, 2014 WL 1202698, at *5 (E.D. Tex. Mar. 20, 2014) (declining to admit evidence under Rule 803(17) when the record did not show that the hearsay evidence's creators verified the evidence's accuracy).

186.     For the same reason, the Court will not admit data from Lexis Nexis's Accurint service.  The sole testimony on the record regarding Accurint is that "[i]t is a database that you can use to verify borrowers' names, addresses, social security numbers.  It is a product from Lexis-Nexis." (Tr. 1013:3-5.)  The Court cannot tell on this bare record whether Accurint was compiled using a reliable methodology, or whether its creators intended for it to be used the way Holt employed it.

187.     The Court will also decline to admit the Mortgage Electronic Registration System ("MERS") data.  Holt used this data in an attempt to show that borrowers had undisclosed mortgage debt, but he testified that he has no first-hand knowledge of recording mortgages on MERS.  (Tr. 1020:9-10 ("Q.  And you personally recorded mortgages on MERS?  A.  Well, not me personally, but I had staff that would do it.").  Moreover, when asked, Holt was unable to provide the Court with a definite time frame for how long it takes for a mortgage to be recorded in MERS, beyond a vague assurance that such mortgages are recorded "as soon as possible."

(Tr. 1020:24.)  On this record, the Court cannot determine whether the MERS data that Holt

reviewed in 2015 is reliable for the purpose of determining whether individual mortgage loan

applicants had undisclosed mortgages recorded in MERS at the time they applied for their loans

years ago.  Absent such indicia of reliability, the Court will not admit this hearsay evidence.

188.    Finally, Holt hardly mentioned Sitex or Data Tree at all during his testimony.  The

only mention of Sitex is that Mr. Holt used it "for tax records that include occupancy

information."  (PX 1103, Holt Trial Dec. ¶ 198.)  Mr. Holt only mentioned Data Tree once in a

footnote to his trial declaration, claiming that it is used for "property search reports by owner and

transaction history."  (*Id.* at ¶ 225 n.102.)  The record before the Court thus does not even

disclose what these sources are, let alone that the sources are "factual, list-type documents"

sufficiently reliable to be admitted notwithstanding the prohibition against hearsay.  The Court

therefore declines to admit these sources as well.

189.    The Hearsay Sources also are not admissible under Rules 803(8) or 807.  Rule

803(8) requires Plaintiffs to show that the Hearsay Sources came from, *inter alia*, an authorized

government investigation.  *See* Fed. R. Evid. 803(8)(C) (admitting "in civil actions and

proceedings and against the Government in criminal cases, factual findings resulting from an

investigation made pursuant to authority granted by law, unless the sources of information or

other circumstances indicate lack of trustworthiness"); *see also City of New York v. Pullman Inc.*,

662 F.2d 910, 914 (2d Cir. 1981) (reports must be "final"); *In re Parmalat Sec. Litig.*, 477 F.

Supp. 2d 637, 640 (S.D.N.Y. 2007) (reports must be reliable).  Plaintiffs have not laid any such

foundation or even identified the "government investigation" at issue.

190.    Moreover, Plaintiffs did not provide any argument regarding Rule 807 (*i.e.*, the

"residual exception"), other than a single conclusory sentence in a footnote to their letter to the

Court.  (*See* Pl. Ltr. (ECF No. 434) at 2 n.5.)  As the Second Circuit has emphasized, the residual exception is "'used very rarely, and only in exceptional circumstances.'"  *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (citation omitted); *see also United States v. DeVillio*, 983 F.2d 1185, 1190 (2d Cir. 1993).  Plaintiffs have not laid any foundation to meet their burden to show that the Hearsay Sources are sufficiently reliable in spite of their inadmissibility.  Thus, the residual exception cannot apply.  *See Gupta v. Att'y Gen. of U.S.*, No. 12 Civ. 5637 (FM), 2014 WL 1116730, at *8 (S.D.N.Y. Mar. 20, 2014) (holding that materials did not have "the necessary 'equivalent circumstantial guarantees of trustworthiness'" to qualify for residual exception, which "does not permit a court to consider statements of such dubious reliability" (citation omitted)).

191.     In total, Holt relies on Hearsay Sources to allege MLS Rep violations as to **3,194** loans.  Because Holt admittedly applied no expertise to his review of these sources and because they constitute inadmissible hearsay, Plaintiffs' allegations as to these loans are without merit and are dismissed.

### D.     **Holt Blindly Accepted The Hearsay Sources For Their Truth**
### **[Defendant's Response To ¶¶ 267–294 of Pl. FOF]**

192.     Putting aside the inadmissibility of the post-origination materials upon which Holt relied, Holt's analyses are unreliable for the separate and independent reason that he blindly assumed the information contained in the Hearsay Sources was true and correct when comparing it to the loan files.  This was his approach even in the case of bankruptcy filings where borrowers were incentivized to understate income[42] and even where the information in the loan files was

_____

[42]  During trial, Holt resisted this common sense notion, claiming:  "I've never heard that before" when asked whether "borrowers have an incentive to understate income on bankruptcy filings."

*(cont'd)*

plainly more reliable.  (*See* Ex. J, Department of Justice Public Report at 3-4, 9 (reporting an overall material misstatement rate of over 23% in individual bankruptcy cases and that, "in general, [the] material misstatements relate to the understatement or omission of the debtor's assets, income, or pre-petition transfer of property").)[43]

193.    Holt testified as follows:

> Q.  In other words, you were assuming that the borrower's lying on the loan application but telling the truth in the bankruptcy filing. Is that correct?
>
> A.  Yes, sir, that's correct?

(Tr. 872:15-18.)

> THE COURT.  If the bankruptcy filing had a statement by the borrower which indicated a lower income, you would credit that statement over the W-2 in the underwriting file; is that your testimony?
>
> A.  Yes, sir.
>
> THE COURT.  Okay.  And that would be the practice and the protocol in every case? . . .
>
> A.  That was our protocol, yes, sir.

(Tr. 906:24 – 907:10.)

> THE COURT.  And if the bankruptcy filing showed a lower income than that on the W-2 in the loan file, would that cause you to credit the bankruptcy filing, without more?

_____
*(cont'd from previous page)*
(Tr. 873:6-10.)  Holt also admitted that he and his team never did any research regarding the percentage of bankruptcy filings that contained material misstatements.  (Tr. 873:11-15.)

[43]   The Court takes judicial notice of the  Department of Justice's Public Report regarding borrower misrepresentations in bankruptcy cases.  *See Paskar v. City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014) ("Official government reports and other types of government records are appropriate for judicial notice."); *see also Lee v. Virginia State Bd. of Elections*, No. 3:15CV357-HEH, 2016 WL 2946181, at *24 n.16 (E.D. Va. May 19, 2016) (taking judicial notice of summary of Virginia registration and turnout statistics from the Virginia Department of Elections website and noting that "the Court 'may take judicial notice of official government reports and statistics.'" (citation omitted)).

A. To credit it – we would accept that.

THE COURT. To accept the bankruptcy?

A. Yes.

THE COURT. So it wasn't dependent on a red flag in the loan file, unless you consider the fact that the borrower filed bankruptcy after origination – there was no other red flag – you would still credit the bankruptcy filing, correct?

A. If there was no other red flags?

THE COURT. Yes.

A. Yes, sir.

(Tr. 907:24 – 908:11.)

194. For example, in **Loan 158609489**, Holt claimed "Income Misrepresentation" based on statements made years after origination by the borrower in bankruptcy proceedings that contradicted the borrower's income of $11,482 per month as a Sales Representative for Champion Motors. (Tr. 896:17 – 899:20.) Holt claimed that the bankruptcy filings indicated a monthly salary of only $9,727. (*Id.*) But the loan file contained a W-2 and paystubs from Champion Motors (*see* DX OG) that fully supported the borrower's stated income. Holt simply ignored these documents. (Tr. 899:21 – 902:18.) His response in Appendix 1 was merely to state that "the borrower's income was proven to be misrepresented at the time of origination," but when pressed by the Court, Holt testified that it was his opinion that "the information [that borrowers] put in the bankruptcy petition to me is *always more correct* than information than what I've seen on the application." (Tr. 902:20 – 903:21 (emphasis added).) Holt confirmed that this remained his opinion even where the W-2 or other loan file information was furnished by a third party, and Holt would look to the bankruptcy information and substitute it for information in the loan file, even if there were no red flags in the loan file suggesting a misstatement. (Tr. 903:24 – 908:13.)

195.    As another example, **Loan 138058233**, Holt claimed "Income Misrepresentation" based on the borrower's statement in a bankruptcy proceeding regarding his employment years earlier.  The loan file itself contained paystubs from the borrower's employer, Niram, Inc., and W-2s fully corroborating the borrower's income as stated at origination.  (*See* DX NX.)  Again, Holt simply ignored this information in the loan file and opined that the information in the bankruptcy proceeding was "true" and the information in the loan file was "false."  (Tr. 876:23 – 885:1.)

196.    As yet another example, **Loan 1477160**, Holt claimed a Material Defect based on "Occupancy Misrepresentation with Red Flags" in light of a bankruptcy filing which, in his opinion, showed that the borrower had "never" occupied the subject property.  (Tr. 915:16 – 919:8.)  Holt had no explanation when confronted with the very bankruptcy filing and other post-origination materials that he cited (including a Lexis property search) indicating that the borrower did in fact occupy the property after origination.  (*Id.*)  Holt also ignored a Letter of Explanation in the loan file making clear that the property "was vacant at the time of inspection because it was undergoing construction."  (Tr. 919:17 – 920:17.)  In his Appendix 1, Holt simply concluded that "the borrower's occupancy *was proven to be misrepresented* at the time of origination" based on the post-origination bankruptcy materials.  (*Id.* emphasis added).)[44]

---

[44]  Plaintiffs also fail to meet their burden to prove breaches of the MLS Rep premised upon other data points in the Mortgage Loan Schedule, including loan purpose, property type, documentation type, credit score, and owner occupancy.  For example, in addition to Plaintiffs' failures to prove MAE generally (see Section III), Holt's analysis is disregarded in its entirety as unreliable because it improperly relies on post-origination information and also fails to prove any underlying breaches based on these data points.  (*See* **Appendix B**.)

## V.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE GUIDELINE REP

### A.   Holt's Use Of Post-Origination Information Is Improper

**[Defendant's Response To ¶¶ 365–410 of Pl. FOF]**

197.   Plaintiffs have also failed to meet their burden to show that UBS RESI breached the Guideline Rep, which reads:  "[t]he Mortgage Loan was underwritten in accordance with the underwriting guidelines of the related Loan Seller in effect at the time of origination with exceptions thereto exercised in a reasonable manner."  (PX 49 at 196.)

198.   The Guideline Rep speaks solely to the time at which the originator approved the loan.  Accordingly, Holt's reliance on post-origination documentation is improper because such information was not available to the underwriter at the time of origination.  (*See* UBS RESI Motion in Limine No. 2 (ECF No. 315) at 15; SJ Order at 16 (holding that post-closing events do "not prove a breach of representation and warranty at the time of closing.  Hindsight is not the standard.").)

199.   Indeed, Holt testified at trial that "one of the goals of reunderwriting is to step into the shoes of the original underwriter who made the loan," and re-underwriters "try to go back and look at the loan files [as] if you were taking the application right from the borrower across the desk and reviewing the file."  (Tr. 864:22 – 865:5; *accord* DX LI, Grissom Trial Dec. ¶ 78 ("In my opinion, it is improper to consider post-origination documentation in the re-underwriting process because, by definition, that information would not have been available to the underwriter at the time of origination and therefore would not and could not have played any part in the underwriter's decision whether to approve the loan.").)  For this reason, Holt testified that, prior to this case, when he and his team "reunderwrote a loan to determine whether it had been originated in guidelines, it was [his] policy never to look at servicing records, such as collection

notices or foreclosure documents." (Tr. 865:13-18.)

200.    Mr. Holt further testified as follows:

> Q.  And you testified that it was your policy never to look at those types of documents because they are not representative of what was going on at the time of origination, correct?
>
> A.  That's correct.  You can't look at payment history to tell whether or not a loan is within guidelines.  And these were payment histories, collection letters, so we tried to put those out and only reunderwrite the loan prudently based on the guidelines we had.
>
> Q.  And you testified that if you or your team found documents relating to a post-origination bankruptcy in the loan file, you would instruct them to turn a blind eye to it, correct?
>
> A.  If they were in the loan file themselves.  Say that again?  I'm sorry.
>
> Q.  Sure.  You testified that if you found documents relating to a post-origination bankruptcy in the four corners of the loan file, you would turn a blind eye to them, is that right?
>
> A.  In the loan file, correct.  It would be just like if there were collections, loss net documents, we would not do that based on the underwriting of the loans based on the guidelines.

(Tr. 865:19 – 866:12.)

201.    Despite this testimony, Holt routinely relied on post-origination documentation to assert Guideline Rep violations in his 2015 expert report – including materials that were not available to the originator at the time of origination.

202.    At the same time, Holt ignored post-origination information where it did (or could) contradict his findings of breach:

> Q.  Sir, you relied on post-origination information throughout your analysis to allege material defects, correct?
>
> A.  Yes, sir, I did.
>
> Q.  Would one source of post [] origination information be checking with the County Recorder's Office to see whether, in fact, the is deed had been recorded?

A.  Well, I guess it could have.  We were looking at the four corners of
the loan file to see if it was in there.  It is possible.

(Tr. 828:12-20); *see also* PX 1044, Holt Protocol at 9 ("Note:  We will pursue an Employment

Violation finding if the VVOE was missing from the loan file at the time of origination, *even if*

*the borrower's employment was verified through servicing documentation and/or research*.")

(emphasis added).)

203.    Plaintiffs' reliance on the non-binding decision in *Federal Housing Finance*

*Agency v. Nomura Holding America, Inc.*, 74 F. Supp. 3d 639 (S.D.N.Y. 2015) (Pl. Br. at 10; Pl.

FOF ¶ 141), as support for Holt's reliance on post-origination materials to prove Guideline Rep

violations, is unavailing.  There, the plaintiff brought claims under securities laws that imposed

strict liability on the defendants for misstatements in public offering documents, including

certain "collateral tables" in the offering documents that presented aggregate data about the

characteristics of loans underlying the securities at issue.  *FHFA*, 74 F. Supp. at 652.  The court

held that the unavailability of post-origination information at the time of origination was

"irrelevant to the issue of *whether the Prospectus Supplement contained a false statement.*"  *Id.*

at 653 (emphasis added).  This case, by contrast, does not involve strict-liability securities claims

for a false statement.  Rather, the only claims at issue here are purely contractual and the

pertinent term of the contract, the Guideline Rep, is specifically limited in time and scope and

speaks directly to determinations made by loan originators.[45]  Significantly, the *FHFA* court

stated that a party's inability to access post-origination materials "*would* be relevant" to whether

that party could "discover the misrepresentation" at the time it conducted due diligence.  *Id.*

---

[45]  For this same reason, Plaintiffs' reliance on *Mass. Mut. Life Ins. Co. v. DB Structured Prods.,*
*Inc.*, Civil Action No. 11-30039-MGM, 2015 WL 2130060 (D. Mass. May 7, 2015) (Pl. FOF
¶ 141), is also misplaced.

(emphasis added).  This is directly analogous to the loan originators' adherence to guidelines, which can only be assessed based on the information available to them "at the time of origination," as stated in the Guideline Rep.

204.    Plaintiffs' reliance on *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013) (Pl. FOF ¶ 141) is similarly unavailing.  That case, unlike here, involved a "no fraud" representation and thus is inapposite to this case, where there is no such representation.  Instead, the Guideline Rep concerns only the originators' application of underwriting guidelines *at the time of origination* – an inquiry that necessarily involves "step[ping] into the shoes" of those parties, as Holt testified.  (Tr. 864:22 – 865:5; *see supra* ¶ 199.)

205.    Plaintiffs' argument that "[i]t is a basic tenet that later-in-time evidence . . . may be used to prove the existence of a fact at an earlier time" (Pl. FOF ¶ 141) misses the point. Plaintiffs are not simply trying to establish whether a fact is more or less likely; they must instead establish whether those facts were known or knowable at origination, an inquiry for which post-origination evidence is irrelevant.[46]

206.    For example, where post-origination bankruptcy documents suggest that the borrower may have misrepresented the stated income on the loan application, that says nothing about whether the originator *knew or should have known* of the misrepresentation at origination, years before this evidence even existed and such evidence accordingly is irrelevant to any determination of whether underwriting guidelines were followed.  (*See* Tr. 865:19 – 866:1)

---

[46]  Use of this post-origination information is even more inappropriate when it does not even relate to the year of the loan's origination.  Yet, Holt regularly relied upon bankruptcy and tax return information from "near years" (*e.g.*, Holt used 2007 tax returns to claim that a borrower's 2006 income was misrepresented).  (*See, e.g.*, Tr. 885:15-21.)

(Holt) ("And you testified that it was your policy never to look at those types of documents because they are not representative of what was going on at the time of origination, correct?  A. That's correct. . . .").)

207.    Adopting Plaintiffs' proposed interpretation of the Guideline Rep to permit an after-the-fact consideration of post-origination information would allow hindsight to become the standard, contrary to both the Court's orders and the parties' bargain.

208.    Further, as already discussed above, the post-origination information upon which Holt relies to claim breaches of the Guideline Rep is inadmissible hearsay for which no exception applies.  (*Supra* Part IV.C.)  Plaintiffs cannot plausibly assert that re-underwriting experts regularly rely on post-origination information to formulate their opinions regarding the originators' conduct at origination.  Indeed, Ms. Grissom confirmed that she never relied on post-origination information, either in her capacity as a re-underwriting expert or in performing diligence on securitizations.  Nor did she refer to post-origination information to perform her analysis in this litigation because it is not customary to do so:

> Q.  Well, in undertaking this assignment did you receive any instructions from any lawyers or anybody representing your client in this matter as to how you should go about conducting the reunderwriting?
>
> A.  No. It was my opinion on how it should be done.
>
> Q.  So nobody established parameters and said, you cannot use or refer to post-origination information, correct?
>
> A.  No, they did not.
>
> Q.  And so the approach that you took in this case, is it similar to the approach you've taken in other litigation matters?
>
> A.  Yes, absolutely it is.
>
> Q.  What about in nonlitigation matters?  I mean, are there instances there where you apply a different approach?

A.  It's the same. You know, I've – in my experience, I've done diligence for securitizations as a due diligence underwriter.  Granted, these loans were reviewed much closer to origination.  But I was never asked to use post-origination information even in those cases, even for stated income loans.

Q.  Do you recall ever in your interview process, did anybody ask you, by the way, as a practice do you refer to post-loan origination information when you're reunderwriting?

A.  No, I don't.

Q.  So that was not a condition of your employment?

A.  I don't believe so.

(Tr. 729:25 – 730:24.)

209.    Moreover, as discussed above, Holt himself confirmed that he and his team had never relied on post-origination information to conduct re-underwriting analyses prior to this litigation.  (*Supra* ¶¶ 199-200; *see also* 2014 Tr. 135:10-14 ("Q.  Did counsel in this case ask you to rely on post-origination bankruptcy information?  A.  That was part of the engagement that I was asked to do, correct."); Trial Tr. 1206:2-7).)  And, as discussed (*supra* ¶ 199), Holt readily admitted that "the goal[ ] of reunderwriting is to step into the shoes of the original underwriter who made the loan," who necessarily would not have had access to the types of post-origination information Holt relied upon.  (Tr. 864:22 – 865:5.)

210.    Further undermining the integrity of Holt's review, he admitted that he did not consider post-loan origination information to confirm that there was *not* a material breach at the time of closing.  (Tr. 828:12-20; *supra* Part IV.D; *see also* Tr. 729:18-24 (Grissom) ("Q.  Do you have any understanding as to why Mr. Holt and his team would only rely on post-origination documents to show a material breach and not clear an issue at the time of origination?  A.  I'm not sure.  I mean, you know, he was tasked to find material breaches, so I'm assuming that's probably the reason why.  I don't know.  I can't answer you.").)

211.     Plaintiffs allege Guideline Rep breaches as to **1,115** loans based on the use of post-origination Hearsay Sources that were unavailable to the originators.  These allegations fail.

**B.     Holt Did Not Follow The Actual
Requirements Of The Underwriting Guidelines**

**[Defendant's Response To ¶¶ 365–410 of Pl. FOF]**

212.     In addition to improperly relying on post-origination information to assert breaches of the Guideline Rep, Holt also found alleged breaches based on requirements he himself devised as part of his "rules of thumb" but that were not part of the actual underwriting guidelines.  (*See, e.g.*, PX 1103 at 80.)  Holt took the position that the underwriters were required not only to do a "reasonableness assessment" of borrowers' stated income, but were also required to document that assessment in the loan file.  Holt conceded when questioned by the Court that such documentation in fact was not required by the guidelines at issue:

> THE COURT.  And do the underwriting guidelines require that for each loan there be documentation that a reasonableness analysis was conducted?
>
> A.  It states that a reasonableness test has to be conducted.  *Does not say in print that documentation has been filed, has to be filed.*  But based on my experience, training and all that, when it says something like that, then we're trying – *I train my people to put the documents in the file.* Not expressed there.
>
> THE COURT.  But in this exercise there was no documentation, those who reviewed the file were instructed to classify that loan or that underwriting as defective, correct?
>
> A.  Based – it would have been based on the guidelines, yes, sir.
>
> THE COURT.  No.
>
> A.  Have a breach –
>
> THE COURT.  Nope.  Nope.  Sorry.  You told me that the guidelines require a reasonableness assessment.  You've also told me that you expect there to be documentation of the reasonableness assessment.  And I thought you just testified a moment ago if there was no such

113

documentation – not a handwritten notation indicating that a reasonableness assessment was done, not a printout from a website or from some other source – then that loan was marked as defective because there was not evidence in the underwriting file that a reasonableness assessment was conducted.  Is that still your testimony?

A.  Yes, sir.

THE COURT.  *But such evidence, you've also testified, is not required by the underwriting guidelines; is that also your testimony?*

A.  *Yes, sir.*

THE COURT.  But you would conclude that such a file, such an underwriting, violated the underwriter's guideline solely because there is not evidence that a reasonableness assessment was conducted; is that your testimony?

A.  *Correct.  There's no way to know that they did that with that documentation.*

(Tr. 913:21 – 915:7 (emphasis added); *see also* Tr. 411:22 – 412:1 (Grissom) ("Underwriters didn't work in a silo.  They reported to people; there were QC programs after the fact.  And in any origination shop there were people who were watching out for them.  These guidelines just do not require them to document their analysis.").)  Plaintiffs simply offered Holt's say-so without any evidentiary support.

213.    In total, Plaintiffs allege Guideline Rep violations for **894** loans based on the underwriter's failure to document its reasonableness assessment.  These allegations are dismissed.

214.    Holt also told his vendors to find Guideline Rep violations for missing documents even where there was no guideline requiring those documents.  (*See* PX 1044 at 9, 12, Holt Protocol ("**Missing VVOE.**  Employment Violation:  Pursue a finding for failure to obtain verbal VOE if there is no verbal VOE in file.  (*Cite as an Imprudent Underwriting finding if there was not a guideline which required a verbal VOE.*)" (emphasis added))); Tr. 820:17-22 ("Q.  In the

section you tell your re-underwriting vendors to find a loan defective where there is no VVOE in the file even if there was not an applicable guideline requirement of VVOE to be in the file.  Is that correct?  A.  That's correct."); Tr. 824:15-20 ("Q.  You instructed your team to find defects for all categories of missing documents even where there were no guidelines requiring those documents, correct?  A.  They would capture those documents if they were missing from the loan file, yes, sir.  *It was a way of collecting the breaches*.") (emphasis added).)

215.    In at least **455** instances, Holt alleged Material Defects based on missing documents that were not required by the applicable guidelines.  (*See* DX LI, Grissom Trial Dec. ¶¶ 63-64 (listing examples where Holt cited missing documents not required by applicable guidelines).)  Since the end of trial, Plaintiffs have indicated their lack of confidence in Holt's findings and have since withdrawn many of these defects (*supra* ¶ 82), although at least 27 remain.  These allegations are dismissed.

    **C.**    **Plaintiffs' Missing Document Allegations Are Not Credible**

    **[Defendant's Response To ¶¶ 367–380 of Pl. FOF]**

216.    Holt claims that UBS RESI breached the Guideline Rep where certain documents were missing from the loan files as they exist today.  Holt testified that he identified over **5,500** "critical documents" missing from loan files he reviewed, which resulted in **3,600** of the loans he analyzed being "Materially Defective" (*i.e.*, the loans had a "significantly increased risk of loss") as a result of the missing documents.  (Tr. 774:8-16.)  Based upon the Plaintiffs' Appendices attached to their proposed findings of fact and conclusions of law, those values apparently have now changed to **4,207** allegedly missing "critical documents" affecting **3,251** loans.

217.    But, even assuming that a missing document could have an MAE on Certificateholders' interests in the loan (something Plaintiffs have not attempted to prove, *see supra* Part III.B-C), Holt's allegations rest on an assumption that because these documents are

115

missing from the version of the loan files that Holt and his team reviewed, then they must have

been missing at the time of origination in 2004 to 2007 – *i.e.*, nine to eleven years ago[47]:

> Q. Now, sir, in performing your reunderwriting review, you assumed that if a document was missing from the loan file you or your vendors were reviewing in 2015, it must have been missing at the time of origination between '04 and '07; is that correct?
>
> A. That is correct.
>
> Q. You've applied that assumption to every single one of your 5,000-plus determinations that a loan is materially defective on the basis of missing documentation, correct?
>
> A. Well, again, if there was other reasons for breaches in the loan, we'd look at the loan in totality.  But if there were breaches of missing documents, then we would cite that.

(Tr. 777:6-17.)

218.    In fact, Holt made no effort to determine whether missing documents existed at

the time of origination.  (Tr. 778:13-15 ("Q.  If a document was missing, did you instruct your

team to look for evidence elsewhere in the file that the document existed at some point in time in

the loan file?  A.  No, sir.") (playing clip from 2014 Deposition 197:12-17).)

219.    In an attempt to support this wholesale assumption, Holt testified (for the first

time in his trial declaration, *see infra* ¶ 383[48]) that "after origination all documents in the loan file

were imaged so that a complete copy of the loan file would be available in digital form."  (Tr.

779:5-9; PX 1103, Holt Trial Dec. ¶ 175.)  This bald assertion is without foundation and was

---

[47]  Holt testified that he had never re-underwritten loans as many as nine to eleven years after origination.  (Tr. 776:17 – 777:5 (testifying that "somewhere between six and seven years" was longest period of time from origination).)

[48]  (Tr. 779:15-21 ("Q.  Now, this claim that loan files were digitized immediately after origination, that opinion also appears nowhere in any of your expert reports, is that correct?  A.  I don't – I don't believe so. . . .").)

undermined by the evidence at trial.

220.    As a threshold matter, Holt admitted that he never underwrote loans for Countrywide, American Home or IndyMac – the three principal originators in this case – and thus had "no firsthand knowledge during the relevant period of what the practices were, if any, concerning digitization." (Tr. 783:11-25.)

221.    Moreover, the evidence at trial showed that origination files were often kept in a state of disarray and that, in many instances, multiple versions of the same loan file existed. Holt himself conceded at trial that there were multiple versions of at-issue loan files:

> Q.  As I believe you told the Court your team often received multiple versions of loan files for a single loan, correct?
>
> A.  Yes, sir.
>
> Q.  And those different versions could contain different documents, is that correct?
>
> THE COURT.  Well, you can ask the question, did those files contain different documents; not could they have, but did they?
>
> MR. FUMERTON.  Thank you your Honor.
>
> Q.  Did those multiple versions of the loan files for a single loan contain different documents in certain instances?
>
> A.  Yes sir. Sometimes they could.
>
> THE COURT.  The question is not could; the question is: Did it?
>
> A.  Yes, sir. They did.
>
> . . .
>
> Q.  And there were other instances where you only had a single version of a loan file for a given loan, correct?
>
> A.  That would be correct.
>
> Q.  And then those instances where you only had one version of a loan,

you had no way of knowing whether additional versions of the loan file may have existed somewhere, correct?

A.  When it was my understanding that counsel had gone to every possible place, resource to find loan files.  So it was my understanding that what I was receiving was documents from the final loan file, whether they were in different versions or not.

(Tr. 802:21 – 803:25.)[49]

222.    Indeed, there were numerous instances introduced at trial where Holt alleged that a loan was Materially Defective based on a missing document that was in fact found in the loan file that Grissom reviewed.  For example, in connection with **Loan 40577613**, Holt alleged that the loan was Materially Defective because the Verification of Employment was missing from the loan file, but Ms. Grissom found the missing document when she looked.  (PX 553, Holt App'x 1 Row 221.)  Holt's response in Appendix 1 was:  "*The Grissom loan file* contains the Verification of Employment; however, this document was not present at the time of the initial audit reunderwriting review."  (*Id.* (emphasis added); *see also* Tr. 807:15 – 809:8.)

223.    As another example, in connection with **Loan 40588193**, Holt alleged that the Verification of Employment was missing, but again, Ms. Grissom found it in the loan file.  (PX 553, Holt App'x 1 Row 276.)  In response, Holt simply stated:  "Grissom references the verbal verification of employment is in file (LF 341).  This document was not present in the loan files from original audit."  (*Id.*; Tr. 813:17-21 ("Q.  Is it still your opinion this loan has an employment violation on the basis of this allegedly missing verification of employment.  It is a

---

[49] Plaintiffs admitted to the Court that they selected which versions of the loan files to use based simply on their size.  (Tr. 74:24-75:5 (Mr. Baldwin) ("In some cases, inexplicably, some of these files are smaller than others. They are missing documents. But there is a larger file for every one of the loans that we're talking about here. And the larger file, we submit there's no reason to believe that's not the version that it was extant back in 2006 and '7.").)

yes or no question. *A. Based on this right here, it looks like the verbal verification was satisfied the employment violation.*" (emphasis added)); *see also* Tr. 1198:25 – 1199:25.)

224. In total, there were at least **265** instances where documents that Holt claimed were missing were found in the loan file by Ms. Grissom and her team. (DX LI, Grissom Trial Dec. ¶ 62.) These differences call into question not just Holt's findings on loans where Grissom found the "missing" documents, but undermine the reliability of his overall expert assessment.

225. When confronted with this evidence of the existence of documents alleged to be missing, Holt testified that he was not certain how many times it occurred or how he would withdraw such allegations.

> Q. Do you intend to withdraw your allegation of defect based on the fact that Ms. Grissom found the exact document you claim was missing?
>
> A. However that works technically-wise, then I would say that would be removed, yes, sir.
>
> Q. Just so we're clear, you're not aware of technicality-wise of how you remove a claim of defect from the Appendix 1 of your expert report?
>
> A. I don't know how it all works, but I would remove it from the appendix, yes, sir.
>
> . . .
>
> Q. Sitting here today, you have no idea how many times Ms. Grissom found a document in her version of the file that you didn't find independent your version of the file. Is that correct?
>
> *A. That's correct.*

(Tr. 1199:16-25; 1201:9-13 (emphasis added).)

226. Holt also could not explain how Grissom found these documents that he had claimed were missing and, even more significantly, Holt testified that there were defect allegations that he would withdraw after seeing Ms. Grissom's rebuttal but could not explain why they were not withdrawn:

THE COURT.  I guess I don't understand the reply that you've listed here.  I take it you don't dispute that the verification of employment was, indeed, found in the loan file?

A.  *In Ms. Grissom's own file that we did not have at the time, yes, sir.*

THE COURT.  What loan file did she have that you didn't have?

A.  I don't know, sir.  I don't have the production letter.

THE COURT.  You looked at the loan file she looked at, correct?

A.  After the rebuttal.

THE COURT.  All right.  You were not directed to the loan file that you already had?  There was a version of the loan file you maintained that Ms. Grissom had that you and your colleagues did not have access to?

A.  That is my understanding, yes, sir.

THE COURT.  Assuming that to be the case, once you saw the version of the loan file containing the verification of employment, why did you continue to assert that this was a defect?

A.  In the is appendix we are replying to Ms. Grissom, s*o I am not sure how it is supposed to be applied.  I am just replying it was found in her file.*

THE COURT.  You would remove the breach, this particular breach?

A.  *That particular breach, yes, sir.*

(Tr. 1197:1 – 1198:4 (emphasis added).)

227.    In addition to Holt's admissions as to the existence of multiple versions of the loan file for a given loan, other evidence at trial proved that many of the loan files were kept in a state of disarray.  In September 2011, Plaintiffs' counsel was told by One West, the servicer for the at-issue IndyMac loans, that the loan files they were seeking were "*in such disarray* that its employees must spend significant time organizing them."  (DX PC at 7 (emphasis added).)

228.    Holt was never informed by Plaintiffs' counsel about the OneWest letter or that serious questions existed regarding the organization and integrity of the loan files he reviewed,

but rather assumed that Plaintiffs' counsel "would be collecting the information and sending it to [him] upon receipt." (*See* Tr. 799:24 – 800:7.)

229.    This evidence, and the fact that it was not shared with Holt, severely undermines Holt's overriding assumption that the loan files he reviewed contained all the documents that they contained at the time of origination. (*See also* DX KJ, Lantz Trial Dec. ¶ 28 ("UBS RESI was not required to, and did not, maintain any of the loan files in its ordinary course of business" and "loan files often were kept by [] third parties haphazardly or in a state of disarray and one could never be certain of the accuracy, authenticity or completeness of their contents.").

230.    Plaintiffs cite an email authored by Mr. Twombly, which stated:  "Missing docs is going to be our saving grace here hopefully.  The exception we can learn to live with."  (Pl. FOF ¶ 376 (citing PX 88).)  During opening statements, Plaintiffs' counsel admitted:  "I'm not sure what [Mr. Twombly] meant by that" (Tr. 74:2-7), and in fact, Plaintiff never asked Mr. Twombly to explain what he meant during trial (*see* Tr. 1324:1-10).  The most reasonable interpretation of this statement is that missing documents were a "saving grace" because, as Mr. Twombly testified, UBS RESI could obtain the missing documents from the originators and thus clear the exceptions.  (*See* Tr. 1367:3-6 ("If a loan was a level three for a missing document, and the document was provided and then subsequently reviewed and there were no issues with it, that might become a level one."); 1365:25 – 1366:10 ("Q.  Would you have to go to multiple sources to obtain complete loans files?  A.  In general, we would deal with the seller and we could advise them that documents were missing[.]  They, in turn, from what I understand and what they would tell me, would have to go to various sources to collect the documents that may not have been provided.  Q.  During the course of the review of a loan file, would you ever receive additional documents following your receipt of initial documents?  A.  Quite often.").)

### D.   Plaintiffs' Missing "Core Documents" Allegations Are Implausible

**[Defendant's Response To ¶¶ 339–364; 367–380 of Pl. FOF]**

231.    This leads to another significant shortcoming in Plaintiffs' theory that significant numbers of "core documents" were missing as of the time of origination:  it is undisputed that certain "core documents," including title insurance, hazard insurance, the mortgage note, the mortgage application and the HUD-1, were required to be present in order for the loan to close in the first place.  Under Holt's theory of the case, the closing or settlement agent, the buyer and seller, and the underwriter all would have had to conspire to allow the loan to close without the necessary core documents.

232.    Holt acknowledged that the settlement agent was commonly an attorney who was unaffiliated with the originators, and that the settlement or closing agent is tasked with certifying that the loan file includes certain key documents such as title insurance, hazard insurance, flood insurance, and HUD-1 statement.  (*See* Tr. 829:24 – 830:10.)

233.    He also conceded that if a loan file did not have these "core" documents at closing, the settlement agent – wholly apart from the underwriter – should not let the loan close:

> Q. If a loan doesn't have those documents at closing, the settlement
> agent or the closing agent or the closing attorney should not let the loan
> close. Is that correct?
>
> A. It depends on what the document is.  If it is hazard insurance or flood
> insureds [sic], that would have been verified prior to closing.  The other
> documents, they need to be sure [they're] executed.
>
> Q. Wholly apart from the underwriter or settlement agent, the settlement
> agent has to make sure the document origination or other core
> documents are in the loan file?
>
> A. Certain documents, yes, sir.  Not in the loan file, but they have been
> executed per where the instructions were.
>
> Q. And they exist at the closing, correct?

122

A. I don't know if they existed at the closing.  That is the[ir] responsibility to do that.

(Tr. 830:11-25; *see also* 831:1 – 836:18 (Holt describing closing process and numerous individuals involved).)

234.    For example, for **Loan 158522879**, the loan file contained loan closing instructions that contained a checklist of documents that must be delivered to the settlement agent to hold in trust.  The checklist included a 1003 application (*i.e.*, loan application) – the very document Holt alleged was missing from the loan file.  (*See* Tr. 831:1 – 832:24.)  The Court also questioned Holt on whether it was fair to conclude that a loan closed where the closing conditions themselves required the final mortgage loan application.  (Tr. 833:6 – 834:8 (". . . if you don't see a mortgage loan application in the file, but then you look at the closing conditions or the settlement person or whatever their title is who is employed by the originator, and one of the items is at the time of closing that there is a final mortgage loan application would it not be fair for you to infer from this combination of facts that at the closing there was a mortgage loan application?").)  Holt agreed:  "That's the way it is supposed to work, yes, sir, there was supposed to be an application there. I can't say that was the case all the time, but that is the purpose of the closing."  (Tr. 834:9-12.)  Holt later testified that if the signed and dated loan application was not present in the loan file today but was required under the closing instructions, he would nevertheless conclude that "if there was an application, it was not executed and returned to the lender."  (Tr. 834:23 – 835:9.)

235.    Even when pressed by the Court to consider his role "as an archaeologist" examining the entirety of the loan file and drawing inferences from the information therein, Holt continued to assert that the requirement that a settlement agent obtain and hold certain "core" documents at closing did not support the inference that such documents were in fact present at

closing and went missing at a later point in time.  (Tr. 834:13 – 835:10 ("THE COURT.  I am asking you as somebody who re-underwrites loans, the conclusion you draw on this combination of facts, the loan closed without a signed and dated mortgage loan application, that is the conclusion you would reach?  A.  Yes, sir.").)

236.    Holt's position, however, is implausible and posits a far-reaching conspiracy involving numerous unaffiliated parties.  Indeed, Holt testified that for a loan to close, the line underwriter, the "QC person," the "post-QC person" and the settlement agent would all have to have been complicit in the closing violation, along with the borrower.  (Tr. 835:17-836:18.)

237.    This is in marked contrast to Grissom's more plausible testimony, which confirms that underwriters did not work in a "silo," but rather were exposed to and received  several layers of oversight from supervisors and through post-closing quality control procedures.  (Tr. 427:6-12 ("Well, a reunderwriter . . . has knowledge of the industry and knowledge of what happened, you know, on – as the loan was being reviewed by the underwriter.  Underwriters do not work in a silo.  They also have supervisors who were looking over their shoulders.  There are QC programs after the fact that review loans on a random basis.").)  As Ms. Grissom explained, rather than a conspiracy among various unaffiliated parties to a loan transaction, the more plausible explanation for these missing documents is that they were simply lost or misplaced sometime in the decade following origination.  (*See, e.g.*, DX LI, Grissom Trial Dec. ¶ 49 ("Based on my years of experience in the mortgage industry, the loss of documents that were present at origination often cannot be avoided given the passage of time, the bankruptcy or other changes to corporate structure of originators and servicers, and the number of times a loan file will have changed hands between origination and today.").)

238.    The fact that UBS RESI has not cured these alleged document deficiencies nearly

a decade after closing does not make Plaintiffs' claims any more plausible.  UBS RESI was under no obligation, contractual or otherwise, to maintain any of the documents that Plaintiffs now claim are missing, and Plaintiffs have presented no evidence suggesting that it had such an obligation.  To the contrary, U.S. Bank employee Reynolds testified at trial that "the mortgage files . . . are assigned to the trust" and the "servicing files are with the servicer.  We as a trustee can request that they be gathered and forwarded."  (Tr. 1745:14-23.)

239.    While UBS RESI bargained for the ability to "cure" certain alleged breaches upon prompt notice or discovery, the failure to find and produce these documents years later says nothing about whether they were missing at the time of origination or closing – the only relevant time periods for establishing a breach.  Numerous courts, including the New York Court of Appeals and Second Circuit, have held that the failure to comply with the remedial cure provision does not give rise to a separate breach under the PSAs.  *See Deutsche Bank Nat'l Trust Co v. Quicken Loans, Inc.*, 810 F.3d 861, 869 (2d Cir. 2015); *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 588-89 (2015).

240.    In total, Holt alleges R&W breaches based on missing "core" documents for **3,580** loans.  These allegations have no merit.

125

## VI.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE BREACHES OF THE "MORTGAGE LOAN FILE WARRANTY"

[Defendant's Response To ¶¶ 339–344 of Pl. FOF]

241.    The same is true with respect to Plaintiffs' allegations that UBS RESI breached the so-called "Mortgage File Warranty."  (Pl. FOF ¶ 340.)  The Mortgage File is a defined term consisting of certain enumerated items, including the Mortgage Note and lenders' title policy. (*Supra* ¶ 20.)

242.    As with the other missing document allegations, Plaintiffs do not offer any evidence that UBS RESI breached this representation at the "Closing Date" – *i.e.*, the only relevant time period.

243.    First, the Mortgage File Warranty was qualified and did *not* warrant that UBS RESI had complete Mortgage Files for all loans.  The representation reads:  "With respect to each Mortgage Loan, the Transferor is in possession of a complete Mortgage File *except for the documents which have been delivered to the Trustee or which have been submitted for recording and not yet returned*."  (PX 49 at 196 (emphasis added).)  Plaintiffs presented no evidence to establish which Mortgage Files were complete at origination (*i.e.*, Mortgage Files where documents were not already delivered to the Trustee or submitted for recording and not yet returned).  Plaintiffs therefore cannot establish a breach based on the Mortgage File being incomplete at a later date.

244.    In any event, as noted, because the documents constituting the Mortgage File are missing *now* does not mean that they were missing at the "Closing Date" nine or ten years ago, or that these documents were not "delivered to the Trustee" or "submitted for recording and not yet returned" (thus exempting them from this representation).  (PX 49 at 196.)  Plaintiffs' "inference" that "if UBS had the documents at that time, then it presumably would have kept

126

them and produced them to the Trusts" (Pl. FOF ¶ 340) is without basis, and in fact is far outweighed by the competing inference that these documents must have existed at some point in order for the loans at issue to close.  Moreover, UBS RESI had no obligation to retain copies of these documents, and no reason to incur the expense of maintaining files for decades just to someday rebut claims of R&W breach that lack any contractual basis.

245.    Plaintiffs go so far as to say that this representation is still breached even where Grissom showed that the documents had been present *at origination*, because it "would not rebut the evidence showing that UBS did not have copies of those documents *as of the Closing Dates*." (Pl. FOF ¶ 342.)  Plaintiffs provide no compelling reason for drawing this inference against UBS RESI or for their claim that this technical distinction could satisfy the PSAs' materiality requirements.

246.    Significantly, simultaneously with the closing, UBS RESI no longer had any responsibility for the Mortgage Files.  Section 2.02 of the PSAs expressly provides that "[t]he Custodian, on behalf of the Trustee, acknowledges receipt of the documents identified in the Initial Certification . . . and declares that it holds and will hold such related documents and other documents delivered to it *constituting the Mortgage Files* . . . ."  (PX 49 at 71 (emphasis added.) The Custodian further agreed to provide, within 90 days after closing, a "Final Certification" that such documents had been received, and "[u]pon receiving each Final Certification from the Custodian, the Trustee [*i.e.*, U.S. Bank] *shall notify [UBS RESI]* and the Certificate Insurer of any document defects listed as exceptions in each such Final Certification."  (*Id.* at 72 (emphasis added).)  This section provides that "[t]he Custodian shall retain possession and custody of each related Mortgage File in accordance with and subject to the terms and conditions set forth herein."  (*Id.*)  At trial, Plaintiffs never called any witness from the Custodian (Wells Fargo

Bank, N.A. (*see* PX 49 at 1)), nor did they seek to introduce any evidence that U.S. Bank received a Final Certification indicating any document deficiencies in the Mortgage Files and notified UBS RESI of such defects, as it was required to do under Section 2.02.  The only credible inference is that such documents were in fact present as of the Closing Date, and thus the Mortgage File Warranty was not breached.[50]

247.    Additionally, even if such documents were missing at the time (and Plaintiffs have offered no evidence that they were), Plaintiffs can hardly fault UBS RESI for not finding these missing documents now, nine to ten years after closing, when U.S. Bank did not provide UBS RESI with the required notice of such defects under Section 2.02 (discussed above), when UBS RESI had a far greater chance of locating the documents.  *See M & I Bank, FSB v. Coughlin*, No. CV 09-02282-PHX-NVM, 2012 WL 602365, at *5 (D. Ariz. Feb. 24, 2012) ("Given the momentous consequences of breaching the [R&Ws], the benefit of [defendant's] bargain can only be achieved through . . . strict compliance with the 'prompt written notice' requirement.").

---

[50]  Plaintiffs' argument that, because the majority of the loan files typically were handled by UBS RESI's vendors, this means "UBS never obtained copies of their Loan Files at all" and thus proves breach of the Mortgage File Warranty (Pl. FOF ¶ 341) confuses the issue and completely misses the point. The "Mortgage File" is not the same as the loan files – it is a defined term involving a select number of specific documents.

.

## VII.   THE LOAN FILES ARE INADMISSIBLE

**[Defendant's Response To Plaintiffs' 6/6/2016 Ltr. (ECF No. 434)]**

248.     The loan files upon which Holt relies in asserting R&W breaches are not admitted for any purpose.  Plaintiffs submitted a letter to the Court on June 6, claiming that the loan files should be admitted "*not for their truth*, but to enable the Court to assess whether UBS breached the Guideline Warranty."  (Pl. Ltr. (ECF No. 434) at 3 (emphasis added).)[51]

249.     As a threshold matter, all but one of the 14,403 individual loan file exhibits that Plaintiffs now seek to admit post trial will not be received into evidence because Plaintiffs never sought to offer them before both parties rested.  Plaintiffs offered only one loan file into evidence (not for its truth) during trial.  (*See* Tr. 1076:1 (PX L10122).)  It was not until *after* Plaintiffs' summation that they moved to admit the other 14,401 loan files.  (Tr. 2097:12-15).  Thus, Plaintiffs' untimely request to admit is denied.  *See United States v. Aiken*, 373 F.2d 294, 300 (2d Cir. 1967) (trial court did not abuse its discretion by refusing to reopen a criminal case for additional testimony after close of evidence but prior to summations); *Shred–It USA, Inc. v. Mobile Data Shred, Inc.*, 238 F. Supp. 2d 604, 607 (S.D.N.Y. 2002) (refusing to admit evidence post trial where there was no compelling reason why the trial record should be reopened, the failure to introduce the post-trial submission at trial reflected lack of due diligence, and admission of evidence would have caused undue prejudice), *aff'd*, 92 F. App'x 812 (2d Cir. 2004); *see also Romeo v. Sherry*, 308 F. Supp. 2d 128, 141 (E.D.N.Y. 2004) (refusing to admit evidence after a bench trial because "Plaintiff's lack of diligence is a result of his own conduct; the evidence, if admitted, would be highly prejudicial to Defendants, and the interests of justice

---

[51]  Plaintiffs do not claim to seek admission of the loan files for purposes of establishing any other R&W breaches, and thus they cannot be used for those purposes.

do not support the admission of the evidence"); *United States v. Hatfield*, No. 06-CR-0550(JS), 2011 WL 4434219, at *7-8 (E.D.N.Y. Sept. 22, 2011) (refusing, after a bench trial, to reopen the record to allow for supplemental submissions or additional testimony).

250.     Nor will the Court "rely on the loan files to determine whether statements in the Loan Files are inconsistent with the Guidelines and therefore the Guideline Warranty was breached," as Plaintiffs urge.  (Pl. Ltr. (ECF No. 434) at 3.)  This would require the Court to rely on the loan files for the truth of their contents, and Plaintiffs have never sought to admit the loan files for their truth.

251.     Just as importantly, this inquiry would be relevant only if the Court could match a particular loan file as it existed at the time of origination with the applicable guidelines.  When stipulating to the authenticity of certain documents, the parties expressly noted that they "do not agree that the Loan Files are complete or are the same as the loan files that existed at the time of each corresponding loan's origination" (ECF No. 339 ¶ 3), and UBS RESI has offered significant evidence that the loan files do not exist in the same form today as they did at the time of origination.  (*Supra* ¶¶ 227-229; *see also* DX LI, Grissom Trial Dec. ¶ 50 ("I encountered examples of flawed loan files during the course of my review.").)

252.     Plaintiffs also claim that two categories of documents in the Loan Files should be admitted for their truth:  statements in W-2s and paystubs; and Social Security Administration statements in social security award letters and Form 1099s.  (Pl. Ltr. (ECF No. 434) at 5.)  This request is denied as untimely as Plaintiffs did not seek to admit any part of the Loan Files into evidence at trial and certainly not for the truth of the matters asserted within them.

253.     Even if this request were considered by the Court, Plaintiffs seek to admit the employer statements under FRE 807, the residual hearsay exception, without citing any

applicable case law.[52]   However, FRE 807(a)(1) requires that hearsay evidence "has equivalent

circumstantial guarantees of trustworthiness" which were not provided at trial.  Fed. R. Evid.

807(a)(1).  In fact, Plaintiffs' efforts to use the residual exception is undermined by their expert's

own position at trial that some of the W-2s in the loan files should not be relied upon.  (*See* Tr.

882:3-20.)  The Court will not admit hearsay evidence the trustworthiness of which is doubted by

Plaintiffs' own expert.  *See Azkour v. Little Rest Twelve, Inc.*, No. 10 Civ. 4132 (RJS) (KNF),

2012 WL 402049, at *3 n.1 (S.D.N.Y. Feb. 7, 2012) (excluding payroll records because "LRT

offered no evidence establishing that the documents are within any of the Hearsay Rule

exceptions"), *report and recommendation adopted*, 2012 WL 1026730 (S.D.N.Y. Mar. 27,

2012); *Wright v. Aargo Sec. Servs., Inc.*, No. 99 CIV. 9115 (CSH), 2001 WL 91705, at *9 n.6

(S.D.N.Y. Feb. 2, 2001) (striking payroll report as inadmissible hearsay where accompanying

affidavit was "silent about when these records were compiled and whether they were kept in the

course of regularly conducted . . . business activities"); *Trustees of Joint Bd. of IBEW Local No.*

*164 v. C.V.I. Elec.*, No. 89-3827, 1990 WL 153959, at *2 (D.N.J. Sept. 24, 1990) ("The monthly

payroll reports and the quarterly payments reports are inadmissible hearsay and fail to support

the Trustees' motion.").

254.   Finally, Plaintiffs seek to admit the SSA statements under FRE 803(8) which

allows "[a] record or statement of a public office."  Fed. R. Evid. 803(8).  But again, Plaintiffs

---

[52]  Plaintiffs' case law only addresses FRE 803(6) the "business record exception."  Fed. R. Evid.
803(6); *see also United States v. Turner*, 189 F.3d 712, 720 (8th Cir. 1999) (describing
foundation testimony by records custodian); *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d
Cir. 1993) (discussing the admissibility of payroll records under the business records exception
which were  never actually presented at trial); *United States v. Hendrickson*, No. 13-cr-20371,
2014 WL 3563441, at *1 (E.D. Mich. July 18, 2014) (deciding motion in limine under business
and public records exceptions).  Plaintiffs do not argue that this exception applies, nor could they
since Plaintiffs failed to request the admission of the documents at trial or lay the required
foundation.  *See Turner*, 189 F.3d at 720.

failed to lay any foundation at trial to admit these documents as public records at trial or to cite any case law that supports their admittance without such foundation.[53]  In the absence of any business or public records foundation, these documents cannot be admitted for their truth.  *See United States v. Suggs*, 531 F. App'x 609, 617 (6th Cir. 2013) (discussing foundation for SSA claim form).

255.     Accordingly, even if Plaintiffs' request were timely, including the employer statements and SSA documents, are not admitted for any purpose.

---

[53] *See Unum v. Dep't of Taxation & Fin.*, No. 1:13-cv-586 (MAD/RFT), 2014 WL 3888286, at *11 (N.D.N.Y. Aug. 7, 2014) (order on motion to dismiss which makes no evidentiary rulings); *United States v. Suggs*, 531 F. App'x 609, 617 (6th Cir. 2013) (discussing foundation for SSA claim form); *Williams v. Ford Motor Co.*, No. 08-4830 (JAG), 2010 WL 1186298, at *5 (D.N.J. Mar. 23, 2010) (making no evidentiary findings).

## VIII.  PLAINTIFFS HAVE NOT PROVEN THE COWAN LOANS TO BE DEFECTIVE
### [Defendant's Response To ¶¶ 100–109; 315–337 of Pl. FOF]

256.     Holt claims that approximately **4,482** loans are Materially Defective based on Cowan's purported analysis using the Phoenix AVM (approximately **1,630** of which are alleged to be Materially Defective based solely on this analysis).

257.     For the reasons set forth in UBS RESI's Motion in Limine No. 4 (ECF No. 322), Cowan's analysis is neither credible nor reliable and thus is excluded.  Even if not excluded in its entirety, the Court affords Cowan's testimony no weight for the reasons discussed herein.

258.     Cowan used the mean of ten comparable properties generated by the Phoenix AVM to recalculate the at-issue properties' LTV ratios.  (PX 1108 ¶ 6; Pl. FOF ¶ 104.)  Plaintiffs then used Cowan's recalculated LTVs to claim three types of R&W breaches on certain loans: (1) LTV data in the MLS was incorrect in breach of the MLS Rep (Pl. FOF ¶¶ 315-328); (2) the LTVs were above the "Maximum LTV Ratio" defined in the PSAs (*id.* ¶¶ 333-37); and (3) the maximum LTV permitted under the applicable underwriting guidelines were exceeded, in breach of the Guideline Rep (*id.* ¶ 336 n.185).

259.     However, as addressed below, the R&W at issue defined LTV based on a traditional appraisal or sales price, not an AVM.  Cowan disclaimed that he was opining on whether any of the original appraisals were conducted according to the industry's Uniform Standards of Professional Appraisal Practice ("USPAP") standards.  He also disclaimed any view as to whether an individual AVM estimate necessarily demonstrated that the original appraisal was unreasonable or was not reasonably believed by the appraiser.  Even if Plaintiffs could prove breaches of the MLS or Guideline Reps through an AVM (and they cannot), Plaintiffs have not shown that the Phoenix AVM is reliable or sufficiently precise to value individual properties and calculate purportedly "correct" LTV ratios.  For all these reasons,

Plaintiffs' allegations based on Cowan's analysis are dismissed.

### A. MLS Representation

260.    As discussed (*supra* ¶ 167), "Loan-to-Value Ratio" is defined in the PSAs as

follows:  "With respect to any Mortgage Loan and as to any date of determination, the fraction

(expressed as a percentage) the numerator of which is the principal balance of the related

Mortgage Loan at such date of determination and the denominator of which is the Appraised

Value of the related Mortgaged Property.  For purposes of representation (xxxi) of Schedule II,

the Loan-to-Value Ratio will be the loan-to-value ratio calculated in accordance with applicable

state laws regarding primary mortgage insurance."  (PX 49 at 42-43.)

261.    "Appraised Value" is defined as follows:  "With respect to any Mortgage Loan,

the Appraised Value of the related Mortgaged Property shall be: (i) with respect to a Mortgage

Loan other than a Refinancing Mortgage Loan, the lesser of (a) *the value* of the Mortgaged

Property *based upon the appraisal made at the time of the origination of such Mortgage Loan*

and (b) the sales price of the Mortgaged Property at the time of the origination of such Mortgage

Loan; and (ii) with respect to a Refinancing Mortgage Loan, *the value* of the Mortgaged Property

*based upon the appraisal made at the time of the origination* of such Refinancing Mortgage

Loan as modified *by an updated appraisal*."  (PX 49 at 23 (emphasis added).)

262.    As such, the parties agreed that the value in calculating the LTV would be

determined by an appraisal at the time of origination – *i.e.*, an opinion by a licensed human

appraiser visiting the property and complying with applicable standards –  not by a statistical

model, which in Plaintiffs' view, better approximates market value.  Plaintiffs' argument that this

MLS Rep requires the "value" to be "true and correct" ignores not only that for thousands of

refinanced loans, fair market value could only be a matter of opinion, but also that "value" is

contractually defined as "the appraisal made at the time of origination" or sales price (if lower

than the appraisal).  That phrase would be rendered mere surplusage if UBS RESI had warranted

that the numbers on the Mortgage Loan Schedule were intended to be an absolute guarantee of

market value.  *See, e.g.*, *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law

an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or

meaningless . . . is not preferred and will be avoided if possible.' Rather, an interpretation that

'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one

that leaves a part unreasonable or of no effect.'" (citations omitted)).[54]

263.   Cowan did not and could not claim that the Phoenix AVM or his work based on

that Phoenix AVM was a full traditional appraisal, as required by the contracts.  Cowan admitted

he did not review any of the original appraisal reports and testified that "whether or not [the

---

[54]  Contrary to Plaintiffs' assertion, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005), does not "confirm" their construction of the MLS Rep as it relates to LTV.  (Pl. FOF ¶ 317.)  There, the defendant warranted that the "the fair market value of such real property as evidenced by an [appraisal by a member of the Appraisal Institute ('MAI')]" was 80% of the loan amount.  *LaSalle Bank*, 424 F.3d at 202. In reversing the district court's grant of summary judgment, the Second Circuit held that there was a genuine issue of material fact as to whether the warranty was breached because there were several different types of appraisals done at origination (such as one based on the income generated by the property and another based on comparable sales), and the "evidence submitted by both sides is at odds on the question of which of the appraisal's values for various components of the Doctors Hospital property corresponds to the fair market value of the 'real property' that is relevant for purposes of the eighty percent warranty."  *Id.* at 208.  Accordingly, in *LaSalle*, the plaintiff submitted evidence that a different appraisal approach should have been used – it did not present evidence using sources (such as AVMs) that do not constitute appraisals that it deemed to be a better indicator of market value than the original appraisals that were required to be performed under the contract. Moreover, Plaintiffs misleadingly provide a heavily edited quote from the decision purporting to hold that the court found the warranty required both the actual fair market value to be 80% of the loan and be supported by an appraisal.  (Pl. FOF ¶ 317.)  The quote is taken from the portion of the opinion discussing a separate "qualified mortgage warranty" concerning compliance with certain IRS regulations not at issue here, which defined fair market value without requiring it to be based on an appraisal.  *See LaSalle*, 424 F.3d at 210; *see also id.* at 206 ("The qualified mortgage warranty does not require an appraisal – and specifically not an MAI appraisal, which is performed by a certified member of the Appraisal Institute.").  As such, the quoted portion was discussing that to satisfy both warranties together, the property must have a specific fair market value and be supported by an appraisal.

original appraisals] conformed to the standards is immaterial to [his] report." (Tr. 1575:3-6; *see also* Tr. 1574:23 – 1575:2 ("Q. You're not offering an opinion as to whether any of the appraisals here were performed consistently with the appraisal standards, are you? A. No, I didn't address that at all in my report. I addressed values of the appraisals."). Nor could he have offered such an opinion – Cowan does not claim to be an appraiser nor is he licensed or certified to be a real estate appraiser in any state. (Tr. 1558:3-7; *see also* Tr. 1685:22 – 1686:12 ("THE COURT. . . . So you have the county with the superior school district and the county, adjacent county, with the inferior school district. Would not that characteristic alone account for greater or fewer sales in one county or the other? Wouldn't that skew the sample inherently, that characteristic? A. And I understood your question. I'm of two minds on this. If you're in a good county, you probably don't want to move while your kids are still there. So you may have fewer sales. On the other hand, if you're not in the good county, there may not be as many places to go in the good county, and so you can't make a move. THE COURT. But this is not your area of expertise? A. No.").

264. Even if Plaintiffs' reading of the definition of Appraised Value were correct (and it is not), such that the Appraised Value had to reflect the supposedly "correct" measure of market value, Cowan's testimony does not support a finding of R&W breaches under that definition, as AVMs are not appropriate substitutes for traditional appraisals.[55]

---

[55] Plaintiffs are incorrect that Twombly "conceded that UBS used AVMs during its due diligence review for the same purposes that Cowan did here." (Pl. FOF ¶ 323 (citing Tr. 1349:8-19).) Twombly agreed that UBS RESI performed "valuation diligence" that "included several phases and several filters." (Tr. 1349:5-23.) Twombly did not testify (and Plaintiffs have pointed to no evidence in the record showing) that UBS RESI substituted AVM estimates for appraisals or purchase prices in reporting LTVs, or even used AVMs alone without further review of the appraisal reports, to determine whether the original appraisals were reasonable. Instead, PX 31, which Plaintiffs questioned Twombly about when addressing valuation diligence, shows that UBS RESI used AVMs as a filtering tool to determine which individual appraisals warranted

*(cont'd)*

265.     While Cowan opined that, on average, the Phoenix AVM was more accurate than the appraisals at origination, he agreed that he could not determine (and was not opining) for any individual property "whether the Phoenix AVM average mean for those 10 comps is more accurate than the appraisal." (*See* Tr. 1609:18-25 ("Q.  You're saying you're using statistics because on the whole you think it averaged out, but for any individual property you don't know whether the Phoenix AVM average mean for those 10 comps is more accurate than the appraisal, correct? A.  Well, let me point out that I understood your question *and you're correct. I don't know*, but the appraisal is based on three comparables that the appraiser chose, hopefully out of the 10 that I chose, but apparently not necessarily."); *see also CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12-cv-037-wmc, 2014 WL 3696233, at *13 (W.D. Wis. July 23, 2014) ("Dr. Cowan certainly cannot opine that the AVM outputs themselves are *correct*; he lacks the qualifications to offer such an opinion."), *aff'd in part, rev'd in part*, 799 F.3d 729 (7th Cir. 2015).

266.     To that end, Cowan agreed that a "reasonable appraiser" can differ from the Phoenix AVM estimate. (Tr. 1703:6-17.)  For example, when presented with individual loan examples, Cowan admitted that an appraisal could fall within the range of ten comparable properties generated by the Phoenix AVM, any of which he opined could have been used by a reasonable appraiser as comparable properties. (Tr. 1598:16-25 ("Q.  Right. And that's what you used to substitute for the denominator in an LTV in recalculating your LTVs, correct? A.  Only if it was lower than the sales price or the appraisal.  Q.  So on the 5,000 loans that you alleged resulted in incorrect LTVs, that's what you did, correct, Mr. Cowan? A.  Yes, that's what I did. Q. Even if it's a loan like this, where there are comps that are above the subject purchase price,

---

*(cont'd from previous page)*
additional review,  such as ordering "Desk Reviews" and Broker Price Opinions, before determining whether to reject a loan based on valuation diligence.  (*See* PX 31.)

and even if there's three times difference between comp one and comp ten, correct?  A.  That's true.").)

267.    As another example, the Court presented Plaintiffs with a random loan where Cowan's AVM was used to find an alleged R&W breach – the Phoenix AVM generated comparable properties with a range of $301,786 to $362,164, with a mean of $349,400.  The original appraisal reflected a value of $359,000.  (*See* Tr. 1730:9 – 1733:21 (discussing **Loan No. 1334487**).)  Plaintiffs conceded at trial that this analysis would not show that the appraisal "was not honestly rendered," and thus would "drop out" the loan if that standard were applied. (Tr. 1733:14-21.)

268.    Even worse, Plaintiffs used Cowan's AVM mean to calculate LTVs for "purchase-money loans."  Cowan admitted that the purchase price in an arm's length transaction is the "gold standard" for determining fair market value; nevertheless, where the Phoenix AVM mean value was below the purchase price, Cowan used the mean to recalculate the LTV and find an alleged material defect.  (*See* Tr. 1604:8-12.)  For example, **Loan No. 1381590** was appraised at $495,000 with a purchase price of $478,228; thus, the original LTV of 80% was calculated using the purchase price.  (Pl. Appendix 40.)  The Phoenix AVM generated ten comparable properties with a range of $282,322 to $422,999, such that the original appraisal fell outside of the ten comparables, with a mean of $351,676.  (*Id*.)  Dr. Cowan used the $351,676 mean, which was over $100,000 less than *the actual purchase price*, to recalculate the LTV of 108.8% that Plaintiffs then used to find a breach of R&W.  (*Id*.)

269.    As another example, **Loan No. 124546076** was appraised originally at $605,000 and was purchased at origination for $603,308.  (Pl. Appendix 40.)  The purchase price was used to calculate the original LTV of 80%.  (*Id*.)  The Phoenix AVM generated ten comparables

valued between $231,308 and $531,921, such that the original appraisal was above the range of comparables, with a mean of $398,353. (*Id.*) The AVM mean was used by Plaintiffs to recalculate an LTV of 121% and allege R&W breaches. (*Id.*) This post hoc second-guessing of the purchase price does not comport with the plain language of the PSAs, even under Plaintiffs' strained construction of the MLS Rep as requiring the "correct" market value.

270.    While Plaintiffs now, for the first time post-trial, take the position that any appraisals which exceeded all ten comparables generated by the Phoenix AVM could not have been "honestly believed" by the appraiser,[56] Cowan never offered this opinion (nor could he have) and the Phoenix AVM and Cowan's opinions do not constitute reliable evidence that the appraisers (who chose different comparable properties) did not comply with applicable appraisal standards or provide honestly held opinions of value. As discussed more fully below, Cowan could not testify as to where Phoenix chose to cut off its "distance" metric to come up with ten comparables or why ten was the appropriate number. Nor could he tell the Court whether the higher-valued comparables were more similar than the lower-valued ones, so he treated them all equally. There is no way to know whether the use of additional comparables, for example 11 or 12 instead, would have brought the appraisal into the range. This alone renders Plaintiffs' newly

---

[56] Plaintiffs are incorrect that *Lyon Financial Services, Inc. v. Illinois Paper & Copier Co.*, 732 F.3d 755 (7th Cir. 2013) (construing Minnesota law) and *CBS Inc. v. Ziff-Davis Publishing Co.*, 75 N.Y.2d 496 (1990) support their contention that "barriers to recovering for false statements of opinion in tort cases are not present in contractual warranty cases." (Pl. FOF ¶ 317 n.166.) Both cases address whether reasonable reliance is an element of a breach of warranty claim; they do not address whether a breach of warranty based on an opinion is actionable and, if so, whether the requirements are any different than in tort. *See Lyon Fin. Servs.*, 732 F.3d at 766 ("It's not clear whether the state high court would hold that a cause of action for breach of an express warranty includes an element of reliance."); *CBS*, 75 N.Y.2d at 505 ("The determinative question is this: should Ziff–Davis be relieved from any contractual obligation under these warranties, as it contends that it should, because, prior to the closing, CBS and its accountants questioned the accuracy of the financial information and because CBS, when it closed, did so without *believing in* or *relying on* the truth of the information?").

created use for the Phoenix AVM impermissible.  Notably, as Cowan recognized, even assuming

the Phoenix AVM was reliable on an individual property basis, appraisals that exceeded all ten

comparables were not necessarily unreasonable.  (Tr. 1708:23-25 ("THE COURT.  Would you

expect an appraiser to value a home above all 10 comparables?  A.  Yes, again 9 percent of the

time."); *see also* DX OX, Barnett Trial Dec. ¶ 63 & n.14.)  Moreover, as discussed below,

AVMs inherently have a margin of error and suffer from shortcomings compared to traditional

appraisals, and Plaintiffs did not establish (or attempt to establish) that the Phoenix AVM was

more reliable than any of the original appraisals.

### B.     Maximum LTV Ratio

271.     The PSAs provide that "the range of original Loan-to-Value Ratios of the

Mortgage Loans" is 7.82% to 95.00% for 2006-OA2; up to 100% for 2007-1 and up to 95% for

2007-3.  (PX 49 at 196, Sched. II (xxxiii); PX 110 at 236, Sched. II (xxxiii); PX 182 at 230,

Sched. II (31).)  As discussed, the "Loan-to-Value Ratio" was defined for purposes of

"representation (xxxi) of Schedule II" as "the loan-to-value ratio calculated in accordance with

applicable state laws regarding primary mortgage insurance."  (PX 49 at 42-43.)  Representation

"(xxxi) of Schedule II" for any of the PSAs does not use the term "Loan-to-Value Ratio," which

is likely a typographical error, and was meant to refer to the LTV representation, which is

(xxxiiii).  Indeed, for MARM 2007-1, the PSA defines Loan-to-Value Ratio in the same manner,

except there, Representation 31 of Schedule II does pertain to the range of Loan-to-Value Ratios

of the Mortgage Loans.

272.     Cowan admitted he does not know how the various states calculate primary

mortgage insurance ("PMI") ratios, and he never considered state PMI laws because he "wasn't

trying to determine whether or not the borrower was required to pay PMI."  (Tr. 1627:20 –

1628:2; *see also* Tr. 1626:14-20 ("THE COURT.  My question is, do you know how the various

140

states calculate the loan-to-value ratio, the components that they use and the standards and the methodology that they use for calculating a loan-to-value ratio, whatever that ratio may be?   A. I don't personally, but Mr. Holt, who works for me, would have that information in his database.").)

273.    Plaintiffs did not offer any evidence or otherwise assert that Cowan's methodology is consistent with how state PMI laws calculate LTV ratios.  (*See, e.g.*, DX YL at 1 (defining the "value" for loan-to-value ratio for purposes of New York law as the "appraised value").)

274.    To the extent Plaintiffs contend that Loan-to-Value Ratio should be defined the same way as for the MLS Representation, the Phoenix AVM is an inappropriate substitute for appraisals for the same reasons as discussed above and below.

**C.    Guideline Representations**

275.    Relegated to a footnote in their Findings of Fact and Conclusions of Law, Plaintiffs also assert that Cowan's recalculated LTVs based on the Phoenix AVM can be used to show breaches of the relevant guidelines.  (*See* Pl. FOF ¶ 336 n.185.)  This assertion fares even worse, as Plaintiffs do not even attempt to reconcile the actual guidelines with use of an AVM.

276.    Cowan admitted he did not consult the underwriting guidelines in recalculating the LTVs, and did not opine that AVMs were acceptable substitutes for appraisals under any of the guidelines.  (*See* Tr. 1630:16-22.)  In fact, Holt's testimony is irreconcilable with Plaintiffs' attempt to use AVMs alone to second-guess appraisals under the guidelines and use them to recalculate the LTVs.  Holt explained that "[t]he Originators had detailed policies governing appraisal requirements and underwriters' responsibilities in reviewing those appraisals.  The Originators' individual guidelines also had specific appraisal requirements, such as requiring an appraisal using Fannie Mae form 1004."  (PX 1103, Holt Trial Dec. ¶ 88.)  He testified that

"[v]alue is determined primarily through an appraisal. Industry standards for appraisals are embodied by the Uniform Standards of Professional Appraisal Practice ('USPAP')," which "sets forth standards that appraisers must comply with in performing an appraisal, including what information should be considered and included in appraisal reports." (*Id.* ¶ 87.) Neither Plaintiffs nor Cowan explained how the Phoenix AVM or Cowan's testimony complied with USPAP or could have been acceptable under any of the individual guidelines (nor can they, given the "detailed" appraisal requirements).

      D.     **Plaintiffs Have Not Shown That The Phoenix AVM Is Reliable**

277.     Even if it were hypothetically permissible under the PSAs and the Guidelines to use an AVM instead of an appraisal (and it is not), Plaintiffs have not shown that AVMs are a better measure of fair market value for any individual property because of the inherent variability of individual AVM values in general (and the Phoenix AVM specifically), and Plaintiffs' failure to show that the Phoenix AVM was more reliable than individual appraisals.[57]

---

[57] Plaintiffs' citation to *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441 (S.D.N.Y. 2015) ("*FHFA*") and *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013), to support their reliance on AVMs as substitutes for original appraisals is misplaced. (Pl. FOF ¶ 323.) In fact, *FHFA* demonstrates the flaws in Cowan's approach here. There, the court merely acknowledged that "AVMs are commonly used as screening tools to identify appraisals that warrant closer review." *FHFA*, 104 F. Supp. 3d at 500. The valuation expert only used AVM results as a first step "gating mechanism" to identify specific appraisals that warranted such further review, which he then analyzed under a different metric to determine whether they complied with USPAP. *Id.* at 500-02, 508-11. Here, by contrast, Cowan expressly disclaimed that he was opining on whether any individual appraisals were performed according to the correct standards, and Plaintiffs performed no review of any of the individual appraisal reports beyond running the Phoenix AVM. Moreover, *FHFA* arose under state and federal securities laws and the plaintiff was not seeking to prove that the LTVs of individual loans breached contractual R&Ws. *See id.* at 454, 497-99. Similarly, *Assured* is inapposite because there (unlike here), the court held the plaintiff-insurer was not bound by a loan-by-loan put-back requirement; instead under the relevant agreements, the plaintiffs could allege portfolio-wide breaches, which did not require loan-by-loan proof that individual appraisals were incorrect or unreasonable, or violated the appropriate appraisal standards, for

*(cont'd)*

### 1.      Human Appraisals Have Advantages in Valuing Individual Properties

278.    Cowan conceded that appraisers have "certain advantages over AVMs," for example appraisers can observe features that are "not recorded or knowable on a large database." (Tr. 1556:15-24.)  He agreed that AVMs "cannot know for an individual property the condition of a property or unique feature of the property," (Tr. 1562:12-15), for example, whether there was a "hole in the roof," (Tr. 1599:17-21).

279.    Cowan further admitted that on a "mass basis," AVMs could not determine whether a house was in a flood plain or close to a parking lot, which could greatly affect the value of a house:

> THE COURT.  But if you're talking about a house that's in a flood plain or not in a flood plain, that's not necessarily true; or close to a parking lot, for example, it would make a big difference if it's adjacent to the parking lot rather than one house away from the parking lot, no?
>
> A.  Oh, I agree, and you are correct. It doesn't take account of that. There isn't a way to do that on a mass basis.
>
> THE COURT.  All right. And what about whether it is a property that is situated on a hill or on a flat parcel, is that taken into account?
>
> A.  No, sir.

(Tr. 1600:16 – 1601:4.)

280.    Nor can AVMs take into account factors such as school districts, which, again, could significantly affect the value of a house:

> THE COURT.  And you have homes that are in Polk County and homes that are right over the county line.
>
> A.  Yes, sir.

_____

*(cont'd from previous page)*

which, as discussed above, AVMs are ill-suited.  *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11 Civ. 2375 (JSR), 2011 WL 5335566, at *7 (S.D.N.Y. Oct. 31, 2011).  (*See also* SJ Order at 21 (distinguishing *Assured* from the instant case).)

THE COURT.  And let's assume that in terms of school districts, there is a great advantage in being in Polk County.  It may be that it works the exact opposite. And the identity of the school district in which a home is situated has a material impact on the price of the home.  How does the modeling take that into account if the modeling does not distinguish between, in developing comparables, a home on one side of a county line and a home on another side of a county line? I don't know if my question is clear enough for you.

A.  Oh, that was -- no, I understand your question perfectly. It's a good question.  So to answer your -- I have a two-part answer to your question. First of all, within the span of the modeling, there is no distinction between those two counties. The computer program just says, hey, look, they're right next to each other, although technically they're across the street so they're in different counties. The computer program doesn't know that they're in different counties.

(Tr. 1683:5 – 1684:3 (Cowan).)

281.    Indeed, Cowan merely speculated based on his "experience" (which he conceded was not based on any empirical data or peer-reviewed methodology) that the variables he chose accounted for over 80% of the value, leaving a significant portion of the value based on characteristics unaccounted for in the Phoenix AVM.  (*See* Tr. 1677:3-12.)

282.    These limitations undermine any confidence in the reliability of the Phoenix AVM or its ability to select ten comparable properties with the type of precision necessary to make appropriate recalculations of LTVs for individual loans.  For example, Cowan said it "sounds about right" that if you "averaged all of the valuations that your Phoenix AVM created for comp one and all of the values it created for comp ten, across all of the subject properties, that would have an average difference of over 50 percent."  (Tr. 1596:14-18.)

## 2.    AVMs Produce Values With Significant Variability As Demonstrated by the Differences Between Lewtan's and Phoenix's AVMs

283.    As a result of AVMs' blind-spots, Cowan agreed that AVMs produce values with "significant variability for an individual property."  (Tr. 1562:5-7.)  Plaintiffs provided a perfect

144

example of variability inherent in AVM use in this case – by first using an AVM in 2014 created

by Lewtan and then in 2015 switching to the AVM created by Phoenix.  Cowan agreed that the

Lewtan and Phoenix AVMs – each, according to Cowan, reliable in predicting fair market values

– differed by plus or minus 10 percent 43% of the time, and 21% of the estimates varied by plus

or minus 20% or more.  Cowan agreed it was in line with what he "would expect":

> THE COURT.  All right. It's consistent with what you would expect. . . .
> But it is, nevertheless, the case that for 43 percent of the Phoenix
> predictions, 43 percent of the Phoenix predictions were plus or minus 10
> percent different than the Lewtan AVM?
>
> A.  Yes, sir.
>
> THE COURT.  And it's also true that for 21 percent of them, they varied
> from the Lewtan AVM by plus or minus 20 percent?
>
> A.  Yes, sir.

(Tr. 1723:18 – 1724:4; *see also* DX OX, Barnett Trial Dec. ¶ 67 & Table 9.)

### 3.    The Phoenix AVM Is Based on an Untested Method That Cowan Had Never Used or Seen Used Before

284.    The Phoenix AVM and use of the "Mahalanobis" distance measure to select ten

comparable properties has not been tested for accuracy.  There was nothing that prevented

Cowan from testing the Phoenix AVM against the actual sales price of the subject properties to

see if it approximated market value.  Yet, Cowan did not perform such a test, even though

according to him, sales price is the "gold standard" for market value.  (*See* Tr. 1602:9-14;

1604:8-12.)  In fact, the Phoenix AVM completely ignored the actual purchase price.  (Tr.

1606:24 – 1607:7.)

285.    The Phoenix AVM often was not close to the actual sales price, but Cowan relied

upon the Phoenix AVM anyway.  For example, loan number 1492376 had a purchase price of

$1.7 million, but the Phoenix AVM predicted a value of $980,000.  (DX NU; Tr. 1606:7-22.)  As

another example, loan 10749375 had a sale price of $710,000, but the Phoenix AVM predicted

its market value should be about $485,000.  (DX NU; Tr. 1608:11-16.)

286.    On the other hand, UBS RESI's expert, Dr. Arnold Barnett, showed in his direct

testimony (unrebutted by Plaintiffs) that actual purchase prices (where available) were widely

distributed compared to the Phoenix AVM predictions, with a downward bias.  (DX OX, Barnett

Trial Dec. ¶ 54, Table 7.)[58]

287.    Cowan's failure to test the AVM (or even provide the results of any third-party's

tests) is particularly troubling because this was the first time Cowan had built or relied upon an

AVM similar to the Phoenix AVM.  Specifically, the Phoenix AVM used the "Mahalanobis"

---

[58]  Plaintiffs try to downplay this discrepancy between how the distribution of an accurate
predictor of sale prices would compare to actual sale prices by claiming the downward bias was
"de minimis."  (Pl. FOF ¶ 108 & n.33.)  Plaintiffs' counter-argument misses the mark.
Regardless of any downward bias, the wide distribution demonstrated by Dr. Barnett shows that
the Phoenix AVM is unreliable in assessing the accuracy of individual appraisals.  Specifically,
his unrebutted testimony demonstrated that the difference between the expected distribution of
68% of the sale prices within the already broad 68% confidence interval and the actual 21%
within the 68% confidence interval was of "great statistical significance."  (DX OX, Barnett
Trial Dec. ¶ 57, Table 4.)  Accordingly, the Phoenix AVM is ill-suited to perform the precise
LTV calculations, where even a difference in 1% from the LTV threshold specified by the PSAs
was used to find a breach by Plaintiffs.  (See Pl. FOF ¶ 334.)  In all events, Barnett's testimony
shows a meaningful downward bias as compared to the purchase prices that were available, as
approximately 10% more purchase prices were above the Phoenix AVM's 68% confidence
interval as calculated by Cowan than were below Cowan's confidence interval.  (DX OX,
Barnett Trial Dec. ¶ 57, Table 4.)  As Dr. Barnett testified, " [g]iven the enormous sample sizes,
because we're dealing with very large sample sizes here, 2,400, that difference is statistically
significant . . .  I would suggest using the same sign tests Cowan uses that this constitutes
statistically significant evidence that the Phoenix AVM predictions tend to be too low. . . .  the
Phoenix AVM does not constitute a purely neutral yardstick to which the appraisals should be
compare."  (Tr. 1969:19 – 1970:15.)  Notably, this downward bias was not rebutted by Cowan –
instead, he brushed it off (without explanation) as "unbiased," while providing calculations
showing that approximately one-third of as many purchase prices were above the 68% upper
bound than where below the bound.  (PX 1108, Cowan Trial Dec. ¶ 128 Table 10; Tr. 1971:17 –
1972:16.)

distance measure to find ten comparable properties, use local HPIs to adjust their sales prices based on date of sale and square footage and then calculate the mean of those ten prices.  (PX 1108, ¶ 62.)

288.    This method used by Phoenix is not a regression.  (Tr. 1583:5-6.)  However, Cowan agreed that "multiple regression is used by most appraisers and recommended by the International Association of Assessing Officers as a generally accepted method to evaluate trends in sale prices and to determine mass appraisal values."  (Tr. 1614:2-7.)  In *FHFA* and *CMFG*, Cowan relied upon third-party regression models.  (Tr. 1563:21-23; 1564:7-9.)  In the local AVMs he built for disparate impact cases, Cowan always used regression models – not the Mahalanobis distance measure.  (Tr. 1567:22-1568:9.)

289.    Indeed, when Cowan consulted with Phoenix on how to improve their AVM, he told them "they should consider in the appraisal emulation a feedback loop that involves errors in the predictions that they would come up with, were they to run a regression," and that this "feedback loop" would test the prediction against the actual sales price so it could be improved.  (Tr. 1670:7 – 1671:4.)

290.    Cowan could also cite no other expert or other literature discussing use of the Mahalanobis distance measure for AVMs.  (Tr. 1583:19-22.)

### 4.    The Data Underlying the Phoenix AVM Is Unreliable

291.    Cowan testified that the "primary" source of Phoenix's data was "tax assessment databases obtained from the 3,000+ counties and parishes in the United States."  (PX 1108, Cowan Trial Dec. ¶ 67.)  Leaving aside that Cowan did not disclose any of the other "secondary" sources, Cowan conceded  that tax assessor databases are "retained for tax assessment purposes, not research, and so it may be incomplete with respect to important characteristics needed to predict the value of the property."  (Tr. 1697:17-22.)  As a result, in past cases, Cowan testified

that these same databases had "major problems" such as missing data.  (Tr. 1697:8-16.)  Here, Cowan admitted he did not have access to the underlying data and therefore could not review it for accuracy and completeness, yet he still found flaws in the data.  (PX 1108, Cowan Trial Dec. ¶ 70; Tr. 1697:5-7.)

<b>5.    Cowan Is A Mouthpiece for Important Expert Judgments Made by Phoenix That Cannot Be Replicated or Tested by UBS RESI</b>

292.    Further, Cowan was a mere mouthpiece for Phoenix on critical aspects of the methodology.  As discussed in more detail in UBS RESI's motion in limine to exclude Cowan's testimony, an expert cannot merely repeat testimony of another non-disclosed expert, which the Court and the opposing party cannot replicate or test.  *See, e.g.*, *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,  285 F.3d 609, 622 (7th Cir. 2002); *Lava Trading Ins. V. Hartford Fire Ins. Co.*, No. 03 Civ. 7037(PKC), 2005 WL 4684238, at *17 (S.D.N.Y. Apr. 11, 2005) (Castel, J.) ("'An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable.  *Someone else using the same data and methods must be able to replicate the result*.'" (emphasis added) (citation omitted)).  Nor can a party or its expert satisfy their burdens of proof or disclosure while failing to disclose key expert methodology because it is supposedly proprietary.  *See Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 145 (S.D.N.Y. 2006) ("This apportionment was calculated on a proprietary software program whose methodology was not explained to the Court and may have been unknown to Carlson himself.  Thus, the Court is asked to take, essentially on blind faith, the product of a 'black box' algorithm, with no way of knowing whether all of the extraneous circumstances that impeded Oldcastle's performance of its work were properly considered.").

293.    Plaintiffs' counsel chose Phoenix (*see* Tr. 1584:10-12), which then dictated key aspects of the methodology, without Cowan's knowledge or supervision.  Phoenix decided to

148

select ten comparable properties.  (*See* Tr. 1613:12-17 ("Q.  You're the one that chose to have only 10 comparables, that is correct, per subject property?  A.  I am not the one who chose that. It was part of the standard Phoenix output that was requested and, as you established earlier, Quinn Emanuel is the one that commissioned this.").)  Phoenix decided the maximum physical distance used for a property to still be comparable – a value Cowan did not know.  (Tr. 1679:22-24 ("Q.  So what was the distance that you used for a property located in one of the five boroughs of New York?  A.  I don't know. That's up to Phoenix.").)

294.    Cowan believed there was a maximum statistical difference between the subject property and the comparables that would render them not comparable, but he did not know the maximum distance or the standard Phoenix used to determine whether a property was too different to be "comparable."  (Tr. 1691:5-21; 1692:23 – 1693:15.)  Cowan also had "no way of knowing" which of the ten comparable properties were most similar to the subject property, so he weighted them all equally.  (Tr. 1693:22 – 1694:9.)

295.    Cowan never disclosed the identities of the ten supposedly comparable properties. (Tr. 1589:15-18.)  He also did not provide "any of the underlying calculations" that came up with the ten comparable properties.  (Tr. 1659:14-17.)

296.     Phoenix adjusted the purchase prices of the ten comparables based on square footage and date of sale, and Cowan admitted there was no way to check the adjustment.  (Tr. 1695:18-24 ("Q.  We don't know the sales date of any of the comparables, correct?  A.  No, because we've adjusted out to that factor.  Q.  If somebody wanted to check that adjustment, there is no way to do that based on what you provided, correct?  A.  It is part of the Phoenix routine, so it is part of their proprietary information.").)  At bottom, the Phoenix AVM relied upon a proprietary computer program, which was never disclosed.  (Tr. 1619:15-17 ("Q.  You

149

never disclosed or turned over that computer program, did you?  A.  I don't have that computer program.").)  Without access to Phoenix's proprietary work, which was not disclosed, Cowan admitted his work was not replicable.  (Tr. 1620:15 – 1621:1.)

297.    The following exchange with Cowan at trial captures Plaintiffs' untenable position:

> Q.  So sometime prior to this case you worked with Phoenix on developing a model. You don't disclose that model at all to us, and then you simply run statistics on the output and say it is our responsibility to go to Phoenix and find it, is that what I understand?
>
> A.  Pretty much, yes.

(Tr. 1659:21 – 1660:1.)

298.    Therefore, UBS RESI and the Court could not and cannot fully test Phoenix's work and methods.

299.    Cowan demonstrated why it is inappropriate as a practical matter to simply rely on an undisclosed expert with no way to test its methodology, where he revealed that he rejected and found flaws in certain of Phoenix's calculations, such as its "standard error" and use of the median instead of the mean in providing a point estimate.  (Tr. 1617:2-8.)

### 6.    Cowan Is Not Credible

300.    The Court also cannot rely upon Cowan's testimony because he was simply not credible, based upon his willingness to offer testimony under oath that was demonstrably false, take positions that were untenable, and change his methodology at counsel's direction to drive up the breach rate, without any plausible explanation based in his expertise.  *See also In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012); *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2004) (affirming exclusion of expert whose "sudden reversal of opinion . . . seriously undermines the reliability of

the [offered] opinions").

301.    Cowan's explanation for his switch from Lewtan in 2014 to Phoenix in 2015 was wrong, or at least seriously misleading.  When describing his change in his direct testimony, he testified the "Phoenix AVM was run on the At-Issue Loans underlying the Securitizations, rather than just on Dr. Lipshutz's samples" drawn in 2014.  (PX 1108, Cowan Trial Dec. ¶ 61.)  But he admitted on cross-examination and under questioning by the Court that he had data from Lewtan on almost every loan in the collateral pools (not just the 2014 Lipshutz sample).  (Tr. 1571:2-16; 1571:24 – 1572:2; 1577:12-16.)

302.    In an effort to survive UBS RESI's *Daubert* motion, he asserted under oath, "UBS wrongly claims that I changed my methodology in my 2015 Report.  My methodology did not change."  (DX XK ¶ 18.)  On the witness stand, however, Cowan admitted that by switching from the Lewtan AVM to the Phoenix AVM, he was using a "completely different methodology," and performed a "completely different and new analysis."  (Tr. 1572:3-7; 1575:23 – 1576:4.)  He admitted that, rather than based upon his principled expert judgment, Quinn Emanuel asked him to change from a regression methodology to the Mahalanobis methodology.  (Tr. 1614:17-19 ("Q. And you changed from the Lewtan regression methodology as we talked about to this Mahalanobis methodology, correct?  A. I was asked to do that by Quinn Emanuel, yes, I did.").)

303.    Cowan also changed from using the 68% upper bound to the mean, which admittedly drove up the alleged breach rate (Tr. 1620:12-14), based on an explanation that completely fell apart.  He claimed he could not calculate a reliable 68% upper bound with only ten observations, even though he actually did calculate a 68% upper bound, and did not dispute Barnett's testimony that you can calculate a 68% upper bound with less than 10 observations.

(Tr. 1611:14-19;  *see also* DX OX, Barnett Trial Dec. ¶¶ 48-49.)

304.     He also stated in his trial testimony that "there is no forecast standard deviation"
provided by Phoenix, (PX 1108, Cowan Trial Dec. ¶ 68), but then admitted that Phoenix
provided a standard error rate and a confidence score—Cowan just did not agree with it and
ignored it.  (Tr. 1617:2-8; 1618:18-23.)

305.     These credibility issues undermine any confidence the Court can take in Cowan's
truthfulness and the reliability of his opinions.

### E.     Plaintiffs Did Not Disclose Aspects of Cowan's Methodology

306.     Finally, aside from the fact that, as discussed above, Plaintiffs never disclosed
Phoenix's methodology, Cowan admitted on the stand that he did not disclose key aspects of his
methodology – including a full list of variables used and details about the distance metric used –
until his direct testimony.  His testimony is disregarded on this basis alone.  *See* Fed. R. Civ. P.
26(a)(2)(B); *Lava Trading*, 2005 WL 4684238, at *7 (excluding testimony under Rule 37
because expert "did not disclose any of the essential details needed to understand and assess [the
expert's] conclusions").  He withheld the complete list of variables used to find comparable
properties until his trial testimony, despite stating under oath in his motion in limine declaration
that he provided UBS RESI with all the information it needed.  (*Compare* DX XK ¶ 19 ("The
specifications for the selection of the data that I purchased from Phoenix are my work. In
particular, I gave Phoenix the methodology for selection of the data. I disclosed these
specifications in my 2015 Report at ¶ 5") *with* Tr. 1624:14 – 1625:2 ("THE COURT.  Yes. Let
me see. Is it your sworn testimony that based on Paragraph 5, you could replicate your
methodology that you used in coming up with the 5,000 or so loans and recalculated LTV if all
we had access to was the underlying source data of the Phoenix automated underwriting system
for the properties?  A.  That specific question, the answer would be no because they're missing

three of the six factors that were used."); Tr. 1673:20 – 1674:19 ("So to be clear, then, the first time you disclosed the full list of variables that Phoenix used was on April 4, 2016?  A. Yes, sir, as we discussed before. That's the first time.").)  He did not disclose to UBS RESI in his expert report that Phoenix was relying upon a Mahalanobis distance metric analysis, again despite claiming in his motion in limine declaration he had done so, preventing UBS RESI from trying to replicate his work even if UBS RESI had access to Phoenix's underlying data.  (Tr. 1656:22 – 1657:7 ("Q. So you would agree that somebody could not replicate your Mahalanobis distance metric analysis even if they were given access to the underlying source data that Phoenix had, correct?  A. Not as a result of that one report, no.").)  While Cowan's report makes reference to a paper he previously authored, that paper described three different methodologies and does not provide any guidance as to how to apply them to selecting comparable properties for AVM analysis.  (Tr. 1672:7-14.)

307.    Cowan also did not disclose Phoenix's data sources in his report, and in his direct testimony only disclosed generally the "primary data source."  (Tr. 1696:9-18; PX 1108, Cowan Trial Dec. ¶ 67.)

308.    As a result, Cowan's testimony is excluded, and even if it were admitted, the Court would afford it no weight and enters judgment for UBS RESI for all allegations based on his testimony.

IX.    **PLAINTIFFS' SAMPLING ANALYSIS OF INDYMAC LOANS IS EXCLUDED**
       **[Defendant's Response To ¶¶ 110–119; 428–436 of Pl. FOF]**

309.    For the reasons set forth in UBS RESI's Motion in Limine No. 3 (*see* ECF No.

318), Lipshutz's testimony is also excluded in its entirety.  Even if the Court were not to exclude

Lipshutz's testimony in its entirety, it is afforded no weight for the reasons discussed herein.

310.    Lipshutz's testimony does not "help the trier of fact to understand the evidence or

to determine a fact in issue."  Fed. R. Evid. 702(a).  Lipshutz estimated that, based on Holt's re-

underwriting of a sample of 422 loans originated by IndyMac (assuming Holt's work was

accurate), 87.2% of the 5,982 total loans in the Trusts originated by IndyMac were Materially

Defective, with a margin of error of 3.09% at a 95% confidence level.  (PX 1104, Lipshutz

Revised Trial Dec. at 17, Exhibit 5 & ¶ 3.)  In other words, Lipshutz predicted that there is a 95%

chance the actual breach rate among the IndyMac Loans is between 90.16% and 83.79%.  (Tr.

1264:23 – 1265:18.)  However, Lipshutz cannot tell whether the actual defect rate is 90.16

percent, 83.79 percent, or any other figure inside that range.  (*See* Tr. 1265:19 – 1266:1.)

311.    Even if the Court assumes that the actual breach rate is 87.2%, that would mean

12.8% of the loans are not defective, yet Lipshutz admitted that there is no way to tell from his

extrapolation which individual loans were part of the 87.2% that were Materially Defective and

which were part of the 12.8% that were not Materially Defective.  (*See* Tr. 1266:2-19.)  As a

result, Lipshutz agreed that it was "absolutely right" that if the Court picked a specific IndyMac

loan out of the overall population, Lipshutz's extrapolation analysis would not be able to identify

if that individual loan was Materially Defective and subject to repurchase by UBS RESI.  (Tr.

1266:20 – 1267:4.)

312.    Without being able to identify the individual loans from outside the sample that

UBS RESI purportedly should repurchase, Lipshutz's testimony is irrelevant and unhelpful to the

Court as trier of fact.  As the Court held in its summary judgment order, the PSAs provide for *loan-specific* repurchase or cure remedies that cannot be sufficiently addressed through statistical sampling.  (*See* Reconsid. Order at 5 ("Summary judgment was denied because plaintiffs' theories and expert sampling data did not align with the materiality requirement of the parties' agreements.").)  The Court held, in language applicable here:  "Despite the Trusts' claims to the contrary, the proposed statistical sampling *does not adequately distinguish between breaches that are material and adverse* as to a particular loan and those that are not. . . . .  [T]he repurchase remedy negotiated by the parties is *loan specific*, i.e., an obligation to 'purchase such Mortgage Loan' . . . .  the repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans."  (SJ Order at 18-19 (emphasis added); *see also* SJ Order at 16 (explaining Plaintiffs must "prove at trial that UBS discovered breaches of the PSAs' representations and warranties as to specific loans beyond those in the breach notices")).)

313.    In denying Plaintiffs' motion for reconsideration on this same issue, the Court further explained:

> Specifically, in their summary judgment motion, the plaintiffs argued that their underwriting experts examined 1,092 loans.  Their experts found that 37% of the sampled loans were "materially defective." Plaintiffs sought partial summary judgment that the repurchase obligation (or its money damage equivalent) was triggered as to 37% of the 4,462 loans covered by the notice as well as 37% of 12,620 loans not covered by the written breach notices but of which plaintiffs argued UBS had constructive notice.  In terms of the summary judgment motion, the Court interprets this to mean that, based upon statistical sampling, the Court should have concluded that the repurchase obligation was established as to 6,320 loans, or 37% of 17,082 loans. In neither the motion for partial summary judgment nor the motion to reconsider do the plaintiffs identify which 6,320 loans should have been repurchased.  Presumably, that would have come later.

(Reconsid. Order at 5.)

314.    Despite the Court's previous admonitions, Lipshutz deems a broad category of

155

loans – *i.e.*, between 90.16% and 83.79% originated by IndyMac – in breach, without identifying the specific loans outside of the sample that are in breach or "distinguish[ing] between breaches that are material and adverse as to a particular loan and those that are not."   For the third time, the Court rejects this approach as contrary to the PSAs' loan-specific notice and sole remedy provisions.

315.    Plaintiffs try to circumvent the plain language of the PSAs and the Court's prior orders by claiming that Lipshutz's report stating "as many as 100% of the IndyMac Loans were likely materially defective" amounts to notice that all loans should have been repurchased and obviates the need for loan specific notice.  (Pl. FOF ¶ 436.)  Leaving aside that Lipshutz's original testimony provided a range from 100% to 98.54% at a 95% statistical level (PX 535 at 17, Exhibit 5), or that Lipshutz has since changed his testimony to claim that the range is now between 90.16% and 83.79% (PX 1104, Lipshutz Revised Trial Dec. at 17, Exhibit 5), this purported "notice" is simply the same "pervasive breach" theory that the Court previously rejected.  (SJ Order at 19.)

316.    Plaintiffs moved for reconsideration of the Court's summary judgment order earlier in this case, claiming they were entitled to prove a pervasive breach theory through statistical sampling and raising arguments virtually identical to the ones they make in their proposed findings of fact and conclusions of law.  In denying Plaintiffs' motion, the Court explained:

> This Court's Summary Judgment Opinion granted summary judgment dismissing the plaintiffs' "pervasive breach" theory of liability.  Had such a theory survived, *statistical sampling may have been a valid method of proving it*.  But for the reasons explained in the Summary Judgment Opinion, the Court concluded that the language of the agreements at issue, which varies in material respects from the language of other agreements in other RMBS actions, foreclosed the use of a "pervasive breach" theory to prove liability at trial.

(Reconsid. Order at 4-5 (emphasis added).)

317.   With Lipshutz's (now-withdrawn) opinion that somewhere close to 100% of the IndyMac loans were in breach – again without identifying individual material breaches outside of the sample – Plaintiffs are merely asserting that the breaches pervade the loans based on a statistical sample, the precise argument this Court has already rejected twice.  The Court rejects Plaintiffs' attempt to establish their claims based upon a pervasive breach theory a third time.[59]

318.   As a fallback, Plaintiffs claim that they can rely upon Lipshutz's testimony to prove liability for the IndyMac loans that have been liquidated because they cannot be repurchased and, therefore, Plaintiffs are entitled to money damages for those loans.  (*See* Pl. FOF ¶¶ 429-431.)  As discussed below (*infra* Part XIII.A), even assuming *arguendo* "money damages" are appropriate for liquidated loans, the damages must still be tethered to the Purchase Price of the individual loan.  Plaintiffs admit as much, asserting "RMBS plaintiffs may seek 'damages consistent with' the terms of the PSA's repurchase protocol instead of specific performance."  (Pl. FOF ¶ 429.)  The Sole Remedy Provision is loan-specific; accordingly, to determine the Purchase Price for even liquidated loans, Plaintiffs still must direct UBS RESI and this Court to the individual loans that are in material breach.  Because Lipshutz's analysis fails to identify such individual loans, monetary relief based on a percentage of liquidated loans and not specific loans is not grounded in the PSAs.[60]

---

[59] The Court notes that if Plaintiffs actually believed Lipshutz's testimony was relevant and sufficient to establish breaches under the PSAs, they likely would not have gone through the time and expense of re-underwriting thousands of other loans in the Trusts.

[60] Plaintiffs rely upon the First Department's decision in *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96 (1st Dep't 2015) (Pl. FOF ¶ 429), but as discussed *infra* ¶ 395 n.79, the First Department in Nomura did not calculate how such "monetary damages" could be calculated or hold that the parties could disregard any damages formulas contained in the relevant agreements.  Plaintiffs also again rely upon *Assured Guar.*

*(cont'd)*

319.     Plaintiffs further contend they can essentially ignore the plain language of the
PSAs and obtain "equitable damages" through sampling because it is "impracticable" to prove
IndyMac loans were materially defective on a loan-by-loan basis, citing cases where obtaining
equitable relief would have involved excessive costs or lengthy litigation.  (Pl. FOF ¶ 432.)  But
Plaintiffs – sophisticated parties entering into transactions worth billions of dollars – ignore that
they agreed to these remedies they now claim are too impractical to follow (even though they
have also undertaken that burden with respect to all other loans in the Trusts other than the
IndyMac loans outside of their purported sample).

320.     According to Plaintiffs, with respect to the IndyMac loans not in the sample,
Lipshutz's extrapolations were "necessary because Loan Files for many IndyMac Loans were not
available."  (Pl. FOF ¶ 110.)  Any added burden in proving breaches for the IndyMac loans

_____

(cont'd from previous page)
*Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013), but the Court already
explained in its summary judgment decision that *Assured* – a case brought by a certificate insurer
that was not limited to a sole remedy provision – is readily distinguishable.  (*See* SJ Order at 21
(discussing *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11 Civ. 2375(JSR), 2011 WL
5335566, at *7 (S.D.N.Y. Oct. 31, 2011), and distinguishing the case because "the agreement
allowed defendant to 'take whatever action at law or in equity that may appear necessary or
desirable in its judgment to enforce performance. . . .'").)  In *SACO I Trust 2006-5 v. EMC
Mortgage LLC*, Index No. 651820/2012, Dkt. 564 (N.Y. Sup. Ct. Nov. 30, 2015), an unreported
state trial court transcript ruling, the court emphasized that "whether the jury will find this
presentation of proof persuasive is a separate and – is a separate matter."  (Pl. COL Ex. 3 at 15.)
Here, of course, the Court is the factfinder and, for the reasons discussed above and below, is not
persuaded that the proof is sufficient for Plaintiffs to meet their burden under the PSAs.
Moreover, the decision in *SACO I* does not reflect the precise language of the agreements at
issue and, to the extent it was the same as the PSAs here, the Court respectfully disagrees with
*SACO I*, as it relies almost entirely on *Assured* to permit sampling, which is easily
distinguishable.  (*See id.* at 15-16.)  Likewise, the court in *Deutsche Bank Nat'l Trust Co. v.
WMC Mortgage, LLC*,  much like Judge Baer here, merely held that it was "satisfied that
statistical sampling is, *in principle*, an acceptable way of proving liability and damages in an
RMBS case such as this one. Whether *in practice* particular proffered statistical sampling
evidence is admissible and persuasive are quite different questions, which have not yet been
reached in the five cases before me."  No. 3:12-cv-933 (CSH et al.), 2014 WL 3824333, at *9 (D.
Conn. Aug. 4, 2014).

outside of the sample is the result of Plaintiffs' own strategic decision to strike a deal with OneWest, the servicer for the IndyMac loans – not to seek loan files for loans outside of the sample before the Court had ruled on whether statistical sampling was appropriate to prove Plaintiffs' claims under the PSAs. (Pl. FOF ¶ 433; Tr. 1236:20-22 ("[Mr. Baldwin]: "we didn't have the ability to go to One West and get more loan files because we had precluded ourselves by agreeing not to seek more from them.").) Had Plaintiffs not "precluded [them]selves" from seeking the loan files from OneWest, they could have obtained all the files and Holt could have attempted to re-underwrite them, rendering any sampling "pointless." (*See* Tr. 1225:9-12.)

321.     In their post-trial submission, Plaintiffs suggest they were somehow forced into their deal by OneWest's refusal to turn over the loan files. (Pl. FOF ¶¶ 433-34.) But Plaintiffs certainly had other remedies to get the loan files. They could have sought the Court's intervention to enforce a subpoena for the loan files, but did not do so. One of Plaintiffs' representatives, Diane Reynolds, testified that as a practice generally "[w]e as the trustee, as the trustee for the trust, have the ability to go to the servicer who will release them to a party that we request," and that the Trustee could have obtained all the IndyMac loan files from OneWest had it been willing to pay OneWest the amount it demanded for copying and production. (*See* Tr. 1745:1 – 1746:14; 1753:1-7.) Accordingly, the Court rejects Plaintiffs' attempt to negate the language of the PSAs by claiming impracticality caused by Plaintiffs' own decisions.

322.     In all events, even if sampling could hypothetically be sufficient to establish breaches under the PSAs, Lipshutz's calculations are "wholly dependent on Mr. Holt's results," such that if Holt's conclusions "are in error, then [Lipshutz's] calculation can't remedy the errors." (Tr. 1228:24 – 1229:4.) As discussed *supra* Part II, Holt's work and opinions were fundamentally flawed.

323.     Plaintiffs also demonstrated the failure of sampling here to support sufficiently precise information with a high degree of confidence by changing Lipshutz's testimony on the IndyMac beach rate during trial.  In Lipshutz's initial trial declaration, he testified that the IndyMac loans had a breach rate of 99.53% with a margin of error of .63% at a 95% confidence level.  (Lipshutz Original Trial Dec., dated Apr. 4, 2016 at 17, Exhibit 5; Tr. 1228:18-23.)  On Saturday, April 30, 2016, during the middle of trial, Plaintiffs submitted a revised direct testimony of Lipshutz, revising the estimated breach rate of the IndyMac loans because Plaintiffs decided that certain IndyMac Loans were not actually in breach.  (Tr. 1218:21 – 1219:16, 1232:8-11.)  In his revised testimony, Lipshutz now opined that that the IndyMac Loans had an 87.20% breach rate, with a 3.09% margin of error at a 95% confidence level.  (PX 1104, Lipshutz Revised Trial Dec. at 17, Exhibit 5; Tr. 1232:2-16.)  This change further demonstrates that Plaintiffs cannot provide the Court with sufficient confidence that a specific number of IndyMac loans were in breach based upon sampling, which they must do, at a minimum.

324.     Moreover, Lipshutz further admitted that two of the variables in the MARM 2006-OA2 transaction failed his representative test at a statistically significant level.  (PX 1104, Lipshutz Revised Trial Dec. at 12, Exhibit 2; Tr. 1261:18-20.)  In his 2014 report, if even one variable failed the same test, he discarded the test and drew a new sample.  (Tr. 1261:25 – 1262:11; 1263:25 – 1264:7.)  While Lipshutz and Plaintiffs try to downplay Lipshutz's change of methodology and the failures as minor, it further calls into question the precision and, therefore, the suitability of sampling here, given the PSAs' requirement of a loan-by-loan remedy.

325.     Finally, Holt re-underwrote or otherwise analyzed all of the IndyMac loans for which Plaintiffs are seeking recovery.  Lipshutz himself admitted that it is "pointless" to sample a population if all items within that population have been tested, as Plaintiffs contend they were

here.  (Tr. 1225:5-12.)  Lipshutz stated that he extrapolated an overall breach rate of 87% for all of the IndyMac loans, based upon Holt's findings for the 422 IndyMac loans that comprised Lipshutz's sample.  This breach rate, however, bears no relation to the 54.45% breach rate derived from Holt's individual review of the 4,516 IndyMac loans that Plaintiffs claim are at issue.  In his Report, Lipshutz does not even acknowledge Holt's much lower breach rate (which apparently was never brought to his attention), much less reconcile the disparity.

326.    During his trial testimony, Lipshutz tried to justify this difference by testifying that the re-underwriting was based upon different information; however, this opinion appears nowhere in his expert report and is stricken.  (Tr. 1249:10 – 1250:1.)

327.    For all of the above reasons, the Court rejects Lipshutz's testimony as inadmissible and, even if it were admissible, insufficient to establish any material R&W breaches.

## X.    PLAINTIFFS' "SUMMARY EVIDENCE" IS EXCLUDED

### [Defendant's Response To ¶ 24 of Pl. FOF]

328.    Plaintiffs' "summary evidence," introduced at trial through Charles Cipione as the "Summary Databases" (PX 1081), is excluded.[61]

329.    For a summary exhibit to be admitted under FRE 1006, its proponent must lay a proper foundation for the admissibility of the material summarized and show that the summary is accurate.  *See Weiss v. Allstate Ins. Co.*, 512 F. Supp. 2d 463, 477-78 (E.D. La. 2007) (holding that summary evidence is improper under FRE 1006 where it "does not accurately summarize the underlying material that is purported to be summarized"); *Emmel v. Coca-Cola Bottling Co. of Chi.*, 904 F. Supp 723, 742 (N.D. Ill. 1995) (holding that summary evidence was inadmissible where the information was duplicative and counsel could not establish the accuracy of the information on the exhibit), *aff'd*, 95 F.3d 627 (7th Cir. 1996); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 301 (3d Cir. 1961) (holding that the trial court did not abuse its discretion in excluding unverified summary evidence; "[m]ore importantly, it must be shown that the summation accurately summarizes the materials involved by not referring to information not contained in the original").

330.    Here, the Summary Databases were shown at trial to be error-prone and inaccurate and they are therefore excluded.  Thus, even if the Court were to admit the Summary Databases, it would nevertheless afford them no weight.

331.    At trial, Plaintiffs failed to establish the accuracy or reliability of the Summary Databases.  Specifically, Cipione admitted that the Summary Databases would need adjustment

---

[61]   UBS RESI moved to strike the direct testimony of Mr. Cipione at trial along with the Databases. (*See* Tr. 169:1-2.)  Plaintiffs filed a letter brief on June 6, 2016, opposing this motion. (Pl. Ltr (ECF 436).)

to reflect accurate information even as of the date they were originally submitted.  (Tr. 147:22 – 148:3 ("THE COURT.  The question is, if I want to rely on the exhibit that's up on the screen, database YF, in order to do so, at least as of April 4th, I would take the number of defective loans and subtract either what you said, 77, or what Mr. Smith said, 27, from that number to find the accurate number that I should use; is that correct?  A.  That sounds correct to me.").)  In their post-trial submission, Plaintiffs made no attempt to update or correct the Summary Databases but instead provided approximately 60 Appendices purportedly "drawn (in part) from [the Cipione] Databases."  (ECF No. 436 at 1; Appendices to FOF.)  Simply resubmitting part of the Summary Databases in the form of "Appendices" does not cure or otherwise remedy the issues with the Summary Databases such that they (or anything based on them) become admissible.

332.    In addition to admitting that adjustments would need to be made to the Summary Databases, Cipione also admitted that he did not know whether other adjustments had been made or whether future adjustments would need to be made to the underlying data itself:

> THE COURT.  All right.  And then I should make a further adjustment based on the information contained in Exhibit LG, the April 15th letter?
>
> A.  We would have to look at perhaps that adjustment that would have been made at the time to the feeder data by the time April 15th came around.
>
> THE COURT.  Do you know whether it was adjusted?
>
> A.  I don't know.  I don't know the particulars about those individual loans.  I don't know.

(Tr. 148:4-12.)

333.    Cipione also admitted that the Summary Databases could not be trusted to show what they purported to show and that the Court would need to refer to the underlying source data to understand what particular databases, including the so-called Expert Report Information

163

Database meant:

> THE COURT.  I'm not suggesting there's any inconsistencies.  I'm just
> trying to understand what the columns meant. I thought I heard you to
> say – and maybe I misunderstood you – that the problem may be with
> the heading in the column.  And I was just asking you, as the trier of
> fact, if I click on this and I go to the column Holt received, I might have,
> before I heard your testimony, assumed that these were the loans that
> Holt – reviewed rather. I said "received." I meant reviewed.
>
> A.  Yes.
>
> THE COURT.  But now I understand from you that I should not make
> that assumption, correct?
>
> A.  For this column, it appears that there's an inconsistency.  And in
> order to resolve that, we would have to do further referencing and to the
> appendices.
>
> THE COURT.  What should I do? Because I'm the guy who's doing
> this. So tell me what I'm supposed to do.
>
> A.  I would suggest referring to the appendices that I sent along that
> explains exactly what – how these columns were populated.

(Tr. 162:2 – 163:19.)  This entirely defeats the purpose of a summary.

334.    Cipione testified to even more errors within the Summary Databases, including

errors that Plaintiffs do not contest in their Opposition to UBS's motion to strike.  For example,

Cipione testified that his Expert Report Information Database, which purported to accurately

summarize information from Grissom's expert report, did not reflect the fact that Grissom altered

her conclusions with respect to a small number of loans.  (*See* Tr. 149:20 – 150:10.)  Cipione

also agreed that an accurate summary of Grissom's opinion should have reflected this change.  In

their Opposition, Plaintiffs do not claim that the Expert Report Information Database is accurate.

Instead, their only response is that an entirely separate database – "the Loan Summary Database"

– reflects Grissom's final opinions correctly.  (Pl. Ltr. (ECF No. 436) at 4.)  But tellingly,

Plaintiffs do not claim that the Expert Report Information Database itself is accurate.  Simply

164

pointing to a *different* database does not fix the fundamental issues that make the Summary Databases inaccurate and unreliable.  Apparently, Plaintiffs leave the Court to guess at which database contains the correct answer.

335.    Cipione also could not even testify that the Summary Databases accurately show how many loans Grissom reviewed.  (*See* Tr. 152:22 – 153:1 ("Q.  Ah.  But the bottom line is, your summary of how many loans Ms. Grissom responded to, at least as of your April 4th declaration, reaches a different number than, in fact, are in her report, correct?  A.  That is correct.").)  This fundamental error remained uncorrected even though Plaintiffs submitted revised versions of the Summary Databases prior to trial.  (*See* Tr. 156:24 – 157:2 ("Q.  So the inconsistency, to use your word, in your April 4th report database remains at your April 15th database, correct?  A.  Appears to be the same, yes.").)[62]

336.    Finally, Cipione could not testify as to what other additional errors existed.  (Tr. 150:13-15 ("Q.  And you can't tell us today what other errors there are in that database, correct?  A.  I'm – that's correct.").)

337.    Even in the face of these admissions of inaccuracy and unreliability at trial, Plaintiffs failed to submit revised Summary Databases.  Indeed, Plaintiffs failed even to revise the Summary Databases to reflect the additional loans and defect allegations they withdrew during trial and in their post-trial submissions.  The Summary Databases as moved into evidence are deeply flawed.

338.    Error-filled and unreliable summary evidence does not aid the trier of fact. Accordingly, Plaintiffs' summary evidence (PX 1081) is excluded as inherently unreliable and

---

[62] These errors are even more troubling given Plaintiffs' statement that "[b]efore trial, [Plaintiffs] asked Charles Cipione and his team to spend *months* summarizing information."  (Pl. Ltr. (ECF No. 436) at 1 (emphasis added).)

unhelpful to the trier of fact.

339.    The Appendices submitted with Plaintiffs' Findings of Fact and Conclusions of Law are also excluded as unhelpful to the trier of fact.  Indeed, the inaccurate nature of the Summary Databases continues to pervade these Appendices.[63]  Plaintiffs purport that Appendix 61 is a loan-level breach summary of Appendices 2 through 58, and demonstrates that they seek to recover for 9,342 materially defective loans.  (*See* Pl. FOF ¶ 415 (citing Appendix 61).)  But Appendix 61 actually refers to 9,079 purportedly materially defective loans.  Even Plaintiffs' value of 9,342 loans cannot be reconciled against the underlying Appendices, which actually total 9,331 loans.  In other words, even the total number of loans that Plaintiffs purportedly seek to recover for now is not supported by the again revised summary materials Plaintiffs have submitted.[64]

340.    No doubt Plaintiffs will advocate, as they do in their proposed findings of fact with respect to the myriad errors in Holt's work, that such instances are a "few, minor errors in extensive testimony."  (Pl. FOF ¶ 416.)  But Plaintiffs have revised their claims, over and over again.  Each time, Plaintiffs' assertions are repeatedly inaccurate to the point that they are unreliable.  The Court excludes the Summary Databases.

---

[63]  *See* **Appendix B** discussing additional errors within Plaintiffs' Appendices.

[64]  Plaintiffs' Appendices also reflect another recasting of their allegations:  for example, Appendix 8 ("MLS – DTI Ratio Revised") includes 1,389 allegations relating to 871 loans that Holt did not previously claim had breached the MLS Rep.  Instead, he characterized these alleged defects as Guideline Rep violations.  Plaintiffs cannot change the nature of their allegations *after trial*.

XI.    **PLAINTIFFS HAVE NOT PROVEN UBS RESI'S PROMPT NOTICE OR DISCOVERY OF R&W BREACHES**

A.    <u>**UBS RESI Did Not Receive Prompt Written Notice**</u>

**[Defendant's Response To ¶¶ 173–192 of Pl. FOF]**

341.    Plaintiffs' claims are barred for the separate and independent reason that they cannot show UBS RESI received prompt written notice of or discovered the alleged R&W breaches as required under the PSAs.  (*See supra* ¶ 17.)

342.    Plaintiffs state that "this Court has already held that UBS received written notice of all breaches when it received the Trusts' expert reports explaining all of the breaches at issue." (Pl. Br. at 31.)  This is not true.  The Court instead held only that "the Trusts are not precluded from relying upon the August 7, 2015 Holt Report as notice of breaches of certain representations and warranties as to specific loans identified therein."  (ECF No. 399 at 12.)  The Court did not consider or decide whether the Holt Report met the contractual requirements of notice contained in the PSAs.  It does not.

343.    The PSAs contain specific requirements for breach notices to UBS RESI.  The notice is required to be made "*pursuant to this Section 2.03*" and to be sent to UBS's General Counsel at its New York offices.  (PX 49 §§ 2.03; 11.05(b).)  The Holt Report does not comply with either of these requirements.

344.    First, the Holt Report is not notice "made pursuant to 2.03," but rather is a discovery requirement required by Federal Rule of Civil Procedure 26(a).  Section 2.03 mandates that certain enumerated parties must give "prompt notice" of breaches of R&W to the other parties, including UBS RESI and the Trustee.  (*Supra* ¶ 17.)  The Trustee in turn must notify UBS RESI of such prompt notice.  Thus, while UBS RESI's obligations are triggered upon discovery or receipt of "written notice from any party of a breach of any representation or

167

warranty," such notice must be "made pursuant to this Section 2.03," which can only be one of two things: (1) the "prompt notice" given by certain enumerated parties to the PSAs (which does not include the Trustee); or (2) the Trustee's own reiteration of such "prompt notice" upon its receipt. The Holt Report – which was not prompt and was provided by an expert hired by Plaintiffs in the context of litigation – satisfies neither of these categories. In fact, Plaintiffs have expressly acknowledged that they never intended the report to serve as the contractually-required notice. (*See* Order (ECF No. 399) at 6 ("The Trusts candidly state that they had intended to pursue notice-based claims only for those loans that were listed in the pre-suit breach notices, and that they intended to pursue only discovery-based claims for all other loans.").)

345.    Additionally, the Holt Report was never sent to the address specified for notices in the PSAs, but was served on UBS RESI's counsel as a part of expert discovery – the only purpose the document was ever intended to serve. Therefore, Plaintiffs failed to meet the contractual notice requirements of the PSAs. *See Knights of Columbus v. Bank of N.Y. Mellon*, Index No. 651442/2011, 2015 N.Y. Slip Op. 31362(U), at *8 (Sup. Ct. N.Y. County July 10, 2015) (finding plaintiff failed to give adequate "written notice" of event of default under RMBS contract); s*ee also Rockland Exposition, Inc., v. Great Am. Assurance Co.*, 746 F. Supp. 2d 528, 539 (S.D.N.Y. 2010) (finding insured had not given proper notice under contract where notice was made in the incorrect form (oral rather than written) and to the incorrect person (insurance broker rather than insurer or agent)), *aff'd*, 445 F. App'x 387 (2d Cir. 2011).

346.    Moreover, Plaintiffs never provided any evidence at trial that either the Holt Report or the Assured Breach Notices that UBS RESI received constitute "prompt notice" under

the PSAs (*supra* ¶ 17).[65]  As numerous courts have held, this requirement is critical so that an

RMBS defendant can cure, substitute or repurchase defective loans *prior* to suit – a right that

Plaintiffs seek to render meaningless here.  *See U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital,*

*Inc.*, 121 A.D. 3d 535, 536 (1st Dep't 2014) ("[T]he demand to cure is a *precondition to suit*, and

the cure period must have passed *before suit can be brought*." (emphasis added)); *see also U.S.*

*Bank Nat'l Ass'n v. Greenpoint Mortg. Funding, Inc.*, 991 F. Supp. 3d 472, 477 (S.D.N.Y. 2014)

(trust "could not sue before [notice and cure] conditions were met"), *aff'd*, 2016 WL 1039917

(2d Cir. Mar. 16, 2016);.*U.S. Bank Nat'l Ass'n v. WMC Mortg. Co.*, 2012 WL 4511065, at *7 (D.

Minn. Oct. 1, 2012) (notice requirement intended to allow for opportunity to cure or "take

whatever meaningful action [defendant] chooses to take in order to protect its interest in the

repurchased loan.").[66]

### B.  UBS RESI Did Not "Discover" Any Breaches

347.   Plaintiffs advance two theories of UBS RESI's purported discovery:  "willful

blindness" and "constructive knowledge."  Both theories constitute impermissible attempts to

bypass the Court's previous rulings regarding "pervasive breach."

348.   At trial, Plaintiffs did not provide evidence of UBS RESI's "willful blindness" of

---

[65]  Nor would they have been able to, as U.S. Bank's employees all consistently testified in their depositions that they had no understanding of whether the Assured notices met the "prompt notice" requirement in the PSAs.

[66]  Even if the "prompt notice" requirement in the PSAs were not a formal condition precedent to Plaintiffs' claims, Plaintiffs' failure to provide timely notice of breaches compels dismissal on equitable grounds.  *See City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) ("Laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief.").  Here, Plaintiffs seek equitable relief (Pl. FOF ¶ 419), and their failure to provide prompt notice in the manner specified by the PSAs prejudiced UBS RESI.  *See Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 622 (S.D.N.Y. 2014) (dismissing claims as barred by laches); *see also Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) (affirming dismissal of claims on laches grounds).

a single specific defect in a single specific loan.  Instead, they now claim that UBS RESI was "willfully blind" to *all* breaching loans across the Trusts based on its supposed actual knowledge of *some* breaching loans.  This theory is without merit.

349.    On several occasions in this litigation, the Court has rejected Plaintiffs' "pervasive breach" theory of notice or discovery as inconsistent with the loan-specific terms and remedies contained in the PSAs.  (Reconsid. Order at 7 ("The parties could have, but did not, bargain for an inquiry notice standard."); Pretrial Conf. Tr. 4:11-17 ("Discovery in that context [of the PSAs] was not constructive knowledge *but actual knowledge*.") (emphasis added); *id.* 13:1-3 ("You have nothing to fear from a pervasive breach theory with me until a New York appellate court adopts it").)  These rulings were based on the Sole Remedy Provision, which is necessarily "targeted to a specific loan, and not to a group or category of loans."  (SJ Order at 17-18.)

350.    Undeterred by these holdings, Plaintiffs seek yet again to advance their "pervasive breach" theory, this time under the labels of "willful blindness" and "constructive knowledge." (*See* Pl. Br. at 33-39.)  Plaintiffs' latest attempt to hold UBS RESI to a standard other than actual discovery is thus denied.  *See Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 626 (S.D.N.Y. 2014) ("Plaintiffs' new allegations of willful blindness are similarly insufficient to infer actual knowledge: 'actual notice' is required, and 'allegations of constructive knowledge, or a duty to inquire, are inadequate to constitute an enforceable claim.'" (citation omitted)); *see also* Pretrial Conf. Tr. 49:9-15 (The Court) ("I went to considerable length to address and unpack what was meant by the pervasive breach theory, and it was that there were a level of breaches that had been reached that put UBS on notice that it should look at all of the loans to see which ones were defective. *That's a should have known standard*.") (emphasis added).  But UBS RESI had no

170

obligation to review the pools of loans underlying the Trusts.  (*See* SJ Order at 19-21 (emphasizing that "[o]ther sophisticated parties have bargained for a broader obligation to repurchase the entire pool of loans under specified circumstances.  These parties did not.")); *see also U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, Index No. 652388/2011, 2014 N.Y. Slip Op. 30882(U), at *4 (Sup. Ct. N.Y. County Nov. 1, 2013) (RMBS agreement contained provision requiring defendant to repurchase *all* loans in the event that certain specific representations and warranties were breached).

351.    While Plaintiffs claim that the language cited above from *Ferring* is dicta and improperly equates willful blindness with constructive knowledge, other courts have routinely rejected the notion of willful blindness as a substitute for actual knowledge.  *See, e.g.*, *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, No. 11 Civ. 5201(DLC) et al., 2013 WL 3284118, at *16-17 (S.D.N.Y. June 28, 2013); *see also Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 380 (S.D.N.Y. 2013); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115(JSR), 2013 WL 1609154, at *4 n.2 (S.D.N.Y. Apr. 15, 2013).

352.    Plaintiffs' position is also undercut by U.S. Bank's own legal positions in this and other RMBS litigation.  Indeed, U.S. Bank's 30(b)(6) corporate representative in this case testified that loan-specific notice was required to trigger UBS RESI's repurchase obligations under the PSAs and "breach notices which broadly communicate suspected breaches" do not suffice.  (*See* UBS RESI SJ Br. (ECF No. 202) at 19-20; UBS RESI SJ Reply Br. (ECF No. 223) at 6.)

353.    This is also consistent with U.S. Bank's position in other RMBS litigation where it was named as a defendant.  For example, in *Royal Park Investments SA/NV v. U.S. Bank*, the plaintiff certificateholder alleged that U.S. Bank failed to enforce the loan sellers' repurchase

obligations despite "knowledge of pervasive breaches of representations and warranties by [those sellers]." (Complaint, No. 14-cv-2590 (VM), ECF No. 2 ¶¶ 99, 333-38 (S.D.N.Y. April 11, 2014).) In response, U.S. Bank argued that the claim should be dismissed because plaintiff "does not allege that U.S. Bank 'discovered' any loan-specific breaches of R&Ws as necessarily contemplated in the [contracts] to trigger any enforcement obligations by U.S. Bank," adding that "the parties intended that any 'discovery' of breaches of R&Ws *could only be on a loan-by-loan basis* because such information is essential to 'enforce' the [sellers'] obligations to cure, repurchase, or substitute a breaching loan." (U.S. Bank Letter to Court, No. 14-cv-2590 (VM), ECF No. 16 at 3 (S.D.N.Y. July 28, 2014) (emphasis added).) U.S. Bank's position in *Royal Park – i.e.*, that "loan-specific" knowledge is "essential" to enforcing the repurchase remedy – is consistent with the Court's articulated standard for discovery in this case and directly contrary to its position that UBS RESI could be put on "constructive notice" of all materially defective loans in the Trusts.

354.     Even if Plaintiffs' "willful blindness" theory were not foreclosed by the PSAs, Plaintiffs' evidence falls far short of meeting the high standard imposed by the case law. The contexts in which the willful blindness doctrine typically arises involve criminal, fraudulent or tortious conduct of which a culpable state of mind of wrongdoing is typically an element. *See Global-Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 766 (2011) ("The traditional rationale for the [willful blindness] doctrine is that defendants who . . . [deliberately shield themselves from clear evidence] are just as culpable as those who have actual knowledge."). There is little reason to believe the doctrine would be extended to include breach of contract claims where the required knowledge and duty to inquire are not elements of the claim, but bargained-for aspects of the agreements between the parties. *See Meda*, 969 F. Supp. 2d at 380; *Sec. Inv'r Prot. Corp.,*

172

2013 WL 1609154, at *4.[67]

355.    In *Global-Tech*, the Supreme Court articulated the "two basic requirements" for applying willful blindness:  that "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  563 U.S. 754 at 769.[68]  The Court held that these two requirements "give willful blindness an appropriately limited scope that surpasses recklessness and negligence."  *Id.*  Thus, "'[a] court can properly find [willful] blindness *only where it can almost be said that the defendant actually knew.*'"  *Id.* at 770 (emphasis added) (citation omitted).  "By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, . . . and a negligent defendant is one who should have known of a similar risk but, in fact, did not . . . ."  *Id.* (citations omitted).

---

[67] Plaintiffs cite *Meda* for their proposition that the PSAs must be written to expressly exclude willful blindness for the doctrine not to apply.  (Pl. Br. at 34.)  However, the *Meda* court says no such thing, and Plaintiffs have failed to cite any case that applied willful blindness to a breach of contract claim regardless of the contractual language.

[68] None of Plaintiffs' cases apply the willful blindness doctrine to breach of contract claims – let alone breach of contract claims governed by a loan-specific remedy such as that found in the PSAs.  *See Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1759 (2013) (applying doctrine to bankruptcy code and analogizing to Model Penal Code); *Glob-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 767-70 (2011) (applying doctrine to induced patent infringement claim and discussing willful blindness doctrine as applied to criminal statutes); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 34-35 (2d Cir. 2012) (discussing how doctrine applies in conjunction with specific language of copyright statute); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84 & n.14 (2d Cir. 2005) (applying doctrine to age discrimination claim); *People v. Sugarman*, 216 A.D. 209, 215 (1st Dep't 1926), *aff'd*, 243 N.Y. 638 (1926) (applying doctrine to criminal statute); *Carr v. Marietta Corp.*, 211 F.3d 724, 732-33 (2d Cir. 2000) (applying doctrine to New York Uniform Commercial Code); *Sav. Banks Tr. Co. v. Fed. Reserve Bank of N.Y.*, 738 F.2d 573, 574 (2d Cir. 1984) (interpreting good faith requirement of UCC); *MCC Proceeds, Inc. v. Advest, Inc.*, 293 A.D. 2d 331, 334 (1st Dep't 2002) (same); *Catizone v. Memry Corp.*, 897 F. Supp. 732, 737 (S.D.N.Y. 1995) (analyzing Delaware statute); *Picard v. Merkin* (In re Bernard L. Madoff Inv. Sec. LLC), 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014) (analyzing willful blindness within the statutory requirement of good faith); *United States v. Tusaneza*, 116 F. App'x 305, 306 (2d Cir. 2004) (analyzing doctrine in criminal context).

356.    Plaintiffs' own case law highlights the difficulty of meeting this standard.  *See*

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 110 n.16 (2d Cir. 2010) (rejecting claim of willful

blindness in trademark case); *Woodman*, 411 F.3d at 84 & n.14 (finding plaintiff failed to meet

willful blindness standard in discrimination case).  Other cases only addressed the lower

recklessness standard, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001)

(analyzing recklessness standard as applied to securities claim), or do not analyze willful

blindness at all, *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628

F. Supp. 2d 312, 323 (E.D.N.Y. 2009) (analyzing whether defendant's actions were willful for

purposes of treble damages), *aff'd*, 409 F. App'x 389 (2d Cir. 2010).

357.    Even more fundamentally, Plaintiffs' theory ignores that UBS RESI was not the

originator of the loans at issue, that the parties understood that some of the loans in the pools

would be in breach—indeed, the existence of the repurchase remedy in the PSAs was an express

acknowledgment that such loans would in fact exist.  (DX KJ, Lantz Trial Dec. ¶ 20 ("There was

always a risk that the loan pools could contain loans that did not conform to UBS RESI's

representations and warranties.  This is expressly contemplated by the PSAs themselves, which

contain a detailed process . . . to address breaches of representations and warranties that provides

protection to both the Trusts and UBS RESI.")); *see also Footbridge Ltd. Tr. v. Countrywide

Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *16 (S.D.N.Y. Sept. 28,

2010) (Castel, J.) ("[T]he offering documents covenant that there ought not be any Mortgage

Loans in default at the time of the Securitizations, but acknowledge the possibility that there

could be delinquent loans and, in that event, Countrywide would cure the delinquent loan in one

manner or another."); *In re Enron Corp.*, No. 04 Civ. 1367 et al., 2005 WL 356985, at *8

(S.D.N.Y. Feb. 15, 2005); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383,

390 (5th Cir. 2010).

358.     Plaintiffs' also assert that through UBS's surveillance group's review of delinquent loans, "[it] identified loans that breached underwriting guidelines" (Pl. Br. at 35), and make an implausible leap, without any evidence, to assume that UBS shut down the surveillance group following the nationwide housing crash because it believed that the program would reveal widespread defective loans.  (Pl. FOF ¶¶ 79, 184.)  This speculation is insufficient to prove "willful blindness" and is directly contrary to the testimony of John Lantz who, as Plaintiffs acknowledge, testified both at deposition and at trial that the surveillance program was shut down because there was no longer a business need for that type of work.  (Pl. FOF ¶ 186.)

359.     In response to questions from the Court, Mr. Lantz explained that UBS had stopped re-underwriting loans by Fall 2007 because the "business was going away.  This business in general, the mortgage business imploded.  We already had laid off hundreds of traders.  We had already moved to get out of this business, to exit this mortgage business."  (Tr. 1487:12-17.)

360.     Plaintiffs have moved to strike these portions of Mr. Lantz's trial testimony, arguing that "Mr. Lantz should not be allowed to invent after-the-fact excuses for UBS's decision at trial."  (*See* ECF No. 432 at 5.)  Plaintiffs' motion is denied.  Contrary to their claim that "UBS asserted privilege to prevent the Trusts from learning the reasons why it suspended its surveillance program for delinquent loans," (*id.* at 1), Mr. Lantz addressed this precise issue at his deposition in response to questions from Plaintiffs' counsel:

> Q. Why did the surveillance group come to an end?
>
> A. Well, at some point in the, you know, at UBS there were a few waves of layoffs that occurred and, you know, so the sort of infrastructure or not infrastructure but, you know, the sort of environment that existed there changed at that point.

Q. Was there nothing for the surveillance group to do as of early 2008?

A. Well, I would say that, you know, because of, you know, the number of layoffs that occurred, you know, there was a shift in focus for the individuals that they chose to stick around at that point.

(Ex. F, Lantz Dep. 12:3-17.)

361.    UBS RESI did not object to this questioning, much less invoke privilege and instruct him not to answer.[69]

362.    Ignoring this testimony, Plaintiffs point to a different exchange later in the deposition where Plaintiffs' counsel asked Mr. Lantz about specific reasons that may have motivated UBS to stop reviewing 60-day delinquent loans for potential R&W breaches (ECF No. 432 at 2-3):

Q.  Is it possible that the reason UBS stopped reviewing 60-day delinquent loans for representation and warranty breaches sometime before January 2008 is that it didn't want to expose itself to having to repurchase loans from the trusts?

MR. FUMERTON.  Same instruction. Go ahead.

A. I don't remember the specific reason or reasons, but what I remember is that it was a decision informed by counsel.

Q. So just to be clear, the decision to stop reviewing 60-day delinquent loans for representation and warranty breaches sometime prior to January 2008 was a decision made by counsel within UBS?

MR. FUMERTON.  You can answer yes or no to the extent you remember or understand.

---

[69] Because Mr. Lantz answered questions related to the shutting down of the surveillance group consistently at both deposition and trial and was not prevented from answering such questions on the basis of privilege, Plaintiffs' case law on these points is irrelevant.  (*See* Pl. Br. at 36, n.34 (citing *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936 KMW, 2011 WL 1642434, at *2-3 (S.D.N.Y. Apr. 20, 2011); *Sec. & Exch. Comm'n v. Payton*, No. 14 CIV. 4644, 2016 WL 1367237, at *8 (S.D.N.Y. Apr. 5, 2016).)

A. Yes, that's my recollection.

(Ex. F, Lantz Dep. 234:4-22.)

363.     The instruction referred to above was:  "To the extent you know the answer and the answer was informed by communications with counsel, you're not to reveal the substance of those communications."  (Tr. 233:11-15.)  Mr. Lantz was simply instructed not to reveal the substance of any communications with counsel—he was never instructed not to respond to the hypothetical posed by Plaintiffs' counsel as to the reasons why UBS decided to stop reviewing certain loans or not to explain why the Surveillance Group ended – a question he answered both earlier in his deposition and later at trial.  Accordingly, Plaintiffs' motion to strike this aspect of Mr. Lantz's trial testimony is denied.

364.     Because Plaintiffs' rank speculation as to why the surveillance program ended is the sole basis for Plaintiffs' assertion that UBS RESI was "willfully blind" as to every loan at issue at that time (*see* Pl. Br. at 36), Plaintiffs' theory falls far short of the subjective belief standard articulated above.[70]

365.     For the same reasons, Plaintiffs' attempt to now impose a "constructive knowledge" standard on UBS RESI is equally without merit.  Plaintiffs rely on *Bank of New York Mellon Trust Co., N.A. v. Morgan Stanley Mortgage Capital, Inc.* ("*BNY II*"), No. 14-2619-cv, 2016 WL 1658313 (2d Cir. Apr. 27, 2016), to argue that the "discover" language in the PSAs

---

[70]  Plaintiffs argue that their theory is supported by the fact that the reason to shut down surveillance "was made by UBS's *counsel*."  (Pl. FOF ¶ 186 (emphasis in original).)  Even if that were true, Plaintiffs conflate the decision to shut down surveillance (a business decision) with the reasoning behind UBS's decision to stop reviewing certain loans for potential R&W breaches.  Mr. Lantz answered the latter question ("I don't remember the specific reason or reasons, but what I remember is that it was a decision informed by counsel") and was instructed not to disclose any communications with counsel, but that has no bearing on his testimony at his deposition and trial that UBS's decision to shutter its surveillance program in the wake of the economic crisis was a business decision.

creates a constructive knowledge standard that allows UBS RESI to be liable for breaches that were neither the subject of notice nor specifically discovered. (Pl. Br. at 36-39.) Plaintiffs argue that alleged defects that were detected as part of UBS's pre-closing due diligence of a sample of loans somehow required UBS RESI to perform due diligence on all of the loans at issue despite no contractual agreement to do so. (*Id.*) However, as above, this is just another attempt to yet again reargue their "pervasive breach" theory, under which Plaintiffs urged the Court to find UBS RESI on notice of breaches throughout the Trusts based on the defects discovered in some of the loans.

366.    While Plaintiffs argue that "UBS was 'uniquely positioned to be aware of breaches,'" they ignore that UBS RESI did not originate any of the loans at issue, unlike the defendant in the case upon which they rely for support, which had close affiliations with the originators at issue. (Pl. FOF ¶ 191 (citing *ACE Sec. Corp. Home Equity v. DB Struc. Prods.*, 5 F. Supp. 3d 543, 563 (S.D.N.Y. 2014).) Moreover, while Plaintiffs point to UBS RESI's due diligence efforts (Pl. FOF ¶ 192), they cannot dispute that UBS RESI either cleared so-called "EV3s" when identified or removed those loans from the pools it acquired. Instead, they argue only that "UBS *could have* conducted a broader review of the Loan pools in the Trusts by the Closing Dates," without support or reason. (*Id.*) This cannot constitute "willful blindness."

367.    In any event, Plaintiffs misinterpret the Second Circuit's decision in *BNY II*. That case involved a single commercial loan and the defendant's representation that it had "no knowledge of any material and adverse environmental condition or circumstance." 2016 WL 1658313, at *2. The court held that fact issues existed as to the servicer's "discovery" of the breach, where it was aware of numerous defaults "based on methane gas intrusion into the store"; a complaint had been filed by the Ohio Attorney General against the borrower for environmental

regulatory violations; and "the Ohio Agency for Toxic Substances & Disease Registry had determined that conditions at the property amounted to an urgent public hazard." *Id.* In so doing, the Second Circuit held that "the law charges a party with discovery of breach only after it has had a reasonable opportunity to investigate and confirm its suspicions – *in short, when it effectively becomes aware, rather than simply suspicious, of breach.*" *BNY II*, 2016 WL 1658313, at *10 (emphasis added).[71] The court explained that "[t]he reason the law thus delays discovery of a breach is to avoid creating an incentive for litigation before a party *knows* that it has suffered injury." *Id.* (emphasis added). Here, Plaintiffs claim that UBS RESI constructively "discovered" not just one breaching loan with known and identified problems, as in *BNY II*, but thousands of unspecified loans that UBS RESI had no obligation to investigate (and which were disclosed as prone to risk of delinquency or default). But, as their own case law exemplifies, Plaintiffs have not met their burden to show that UBS RESI knew, or was "effectively aware," of additional breaches in particular loans requiring repurchase.

368. Accordingly, Plaintiffs repeated efforts to graft a constructive knowledge standard onto the loan-specific provisions of the PSAs is rejected.

---

[71] Plaintiffs' efforts to bolster their interpretation by citing cases for general principles of contract interpretation does not change this analysis. (Pl. Br. at 38-39.) In addition, several cases cited by Plaintiffs supporting their interpretation of "discover" are inapposite and only address "discover" as used as a "term of art" in the context of the discovery rule for statutes of limitations purposes not applicable here. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010); *Gonzalez v. Hasty*, 802 F.3d 212, 221 (2d Cir. 2015) (discussing discovery rule of statutes of limitations). Plaintiffs' remaining non-controlling case law is similarly unavailing. *See LaSalle Bank, N.A. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7867(HB), 2003 WL22047891, at *6 (S.D.N.Y. Aug. 29, 2003) (no discussion of duty to investigate other loans based on suspicion of breach in one specific loan); *Morgan Guar. Tr. Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 CIV 8613(SAS), 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002) (same); *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 496-97 (S.D.N.Y. 2013) (same).

### C.   UBS RESI Did Not Have Actual Knowledge Of Breaches

369.    Finally, Plaintiffs claim that UBS RESI had actual knowledge of breaches related to loans reviewed by vendors hired to perform pre-closing due diligence reviews and reviews connected to UBS's responses to Assured's repurchase demands.  (Pl. FOF ¶¶ 175-79.) Plaintiffs argue that in performing these reviews, the vendors gained actual knowledge of breaches that can be imputed to UBS RESI.  (*Id.*)

370.    As an initial matter,  Plaintiffs' assertion in their submission that "[o]f the 17,082 Loans at issue, . . . UBS's vendors reviewed at least 12,297 of the Loans at issue in this case" (Pl. FOF ¶ 71) is unsupported by any evidence and flatly inconsistent with their allegations and the analysis of their re-underwriting expert.  In Holt's trial declaration, he states that 3,768 of the loans in the Trusts received due diligence.  (PX 1103, Holt Trial Dec. ¶ 20.)  In his August 2015 expert report, he claimed that number was 3,755 loans.  (PX 552, 2015 Holt Report ¶ 16.)  And elsewhere in Plaintiffs' proposed findings of fact and conclusions of law, they state that UBS RESI selected for its due diligence review only "about 25% of the loans it purchased."  (Pl. FOF ¶ 341 (citing Tr. 1374:24-1376:12).)

371.    Putting this aside, any imputed "knowledge" on the part of UBS RESI requires evidence that UBS RESI exerted enough control over its due diligence vendors (who were independent contractors) to establish an agency relationship.  *See Randolph v. IMBS, Inc.*, 368 F.3d 726 (7th Cir. 2004) (refusing to impute knowledge to debt collectors who were independent contractors, not agents); *Chang Bee Yang v. Sun Trust Mortg., Inc.*, No. 1:10-cv-01541-AWI-SKO, 2011 WL 6749076, at *6 (E.D. Cal. Dec. 22, 2011) (declining to impute knowledge where "Plaintiffs only make the conclusory allegations . . . [of agency, and] it appears that

[representative] was an independent contractor and not an employee"). Plaintiffs failed to

present such evidence here.   (*See* UBS RESI Ltr. (ECF No. 421).)[72]

372.   Plaintiffs seek to impute the knowledge of two groups of vendors hired to do two

distinct tasks.  The first group consists of at least seven separate companies hired by UBS RESI

to work on pre-closing due diligence.  (*See* Pl. FOF ¶ 177.)  In an attempt to show that these

vendors acted as agents of UBS RESI, Plaintiffs rely primarily on testimony from William

Twombly generally describing how the vendors "graded" a loan.  (*Id.*)  Plaintiffs also generally

state that "UBS provided [a subset of] these vendors with instructions, due diligence

requirements and review timelines" without citation to any specific evidence.  (*Id.* ¶ 65.)

Nowhere do Plaintiffs provide proof of interactions with any specific vendor or describe other

aspects of the relationship between UBS RESI and its due diligence vendors that would allow for

---

[72]  Most of Plaintiffs' cited case law on imputed knowledge does not discuss independent
contractors and finds agency on the type of factual basis Plaintiffs have failed to present.  *See
Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 179 (2d. Cir. 2004) (discussing
"officers and employees"); *Center v Hampton Affiliates*, 66 N.Y.2d 782, 784 (1985) (discussing
knowledge of plaintiff's "agent, defendant Gross, an attorney and director of the corporation");
*Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947) (finding that "the defendant was
entrusted with the plaintiff's money under circumstances manifesting a fiduciary relationship"
with no discussion of independent contractors); *Steed Fin. LDC v. Nomura Sec. Intern., Inc.*, No.
00 Civ. 8058 (NRB), 2004 WL 2072536, at 6 n.10 (S.D.N.Y. Sept. 14, 2004) (finding agency
relationship based on affidavits appointing company "attorney-in-fact" and stating that agent was
"acting on behalf" of principal), *aff'd*, 148 F. App'x 66 (2d Cir. 2005); *N.Y. Univ. v. First Fin.
Ins. Co.*, 322 F.3d 750, 753 & n.2 (2d Cir. 2003) (imputing knowledge of investigator "acting in
its capacity as [defendant's] representative"); *131 Main St. Assocs. v. Manko*, 179 F. Supp. 2d
339, 345 n.6 (S.D.N.Y. 2002) (imputing knowledge of "a paid 'watchdog' whose job it was to
'monitor the integrity of the defendants' operations'" (citation omitted)).  In the only case that
discusses independent contractors, the court found that the independent contractor label could
not be used to disavow an agency relationship where that relationship was clearly established by
the contract between the parties.  *Gulf Ins. Co. v Transatlantic Reins. Co.*, 69 A.D.3d 71, 97 (1st
Dep't 2009) ("As a review of the 'General Agency Agreement' makes clear, the true relationship
between Gulf and L&M with respect to Gulf's RVI program is that of principal and agent.").
Plaintiffs have not pointed to any similar evidence that suggests an agency, rather than
independent contractor, relationship here.

the finding of an agency relationship.  The testimony certainly provides no evidence of consent

to any vendor acting as the agent of UBS RESI.  *See Prestige Brands Inc. v. Guardian Drug Co.*,

951 F. Supp. 2d 441, 448 (S.D.N.Y. 2013) (finding no agency where there we no allegations of

control between drug manufacturer and distributor); *United States v. Bonds*, 608 F.3d 495, 506

(9th Cir. 2010) (finding no agency relationship where neither contractor nor defendant

"manifest[ed] assent that [defendant] had the right to control [contractor's] actions").[73]

373.    Second, Plaintiffs seek to impute the knowledge of JCIII and Navigant, two

companies hired to assist UBS RESI in responding to Assured's repurchase demands.  Here,

Plaintiffs rely entirely on the fact that JCIII and Navigant were hired by UBS RESI, provided

them with instructions and communicated by email "as often as once a day."  (Pl. FOF ¶¶ 81-82,

178.)  These scant facts cannot support a finding that JCII and Navigant were agents of UBS

RESI as opposed to merely independent contractors hired to perform a discrete task.

374.    Even if the knowledge of the third-party vendors could be imputed to UBS RESI,

Plaintiffs have not presented any evidence that the vendors themselves possessed "actual

knowledge" of breaches.  Plaintiffs only present evidence that the vendors reviewed certain loan

files and then assert that this review gave the vendors actual knowledge of specific breaches.

Plaintiffs do not cite any evidence suggesting that the vendors concluded that any loan was in

breach of R&Ws, the knowledge of which could then be imputed to UBS RESI.  (*See* Tr.

1342:24 – 1343:3 (Twombly) ("Q.  The due diligence group never did any diligence on loans

that UBS securitized to determine whether those loans complied with the reps and warranties that

---

[73]  It is undisputed that UBS RESI acquired the loans that were later deposited in the Trusts
months before the execution of the PSAs and *before* UBS RESI made any R&W therein.
Plaintiffs do not explain how UBS's due diligence vendors gained knowledge of breaches of
R&W that had not yet been made.

UBS made in the securitization documents?  A.  That is not part of my role, correct."); *see also* 1342:3-11.)  In fact, Plaintiffs' own case law states that information which does not constitute "an inherent breach" cannot be used to establish actual knowledge.  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001) (where evidence offered in support of breach was not "inherently suspect, nor did it constitute a breach of fiduciary duty" "plaintiffs' knowledge of" the existence of such evidence was "insufficient" to establish actual knowledge).

375.    Plaintiffs' attempt to impute actual knowledge to UBS RESI also fails because the information that is the source of the alleged "actual knowledge" – *i.e.*, the loan files – is not properly before the court.  (*See* Pl. FOF ¶ 179 ("UBS is charged with the actual knowledge of information in the Loan Files, as of the Closing Dates . . . .").)  As discussed above (*supra* Part VII), the loan files are not admissible for the truth of the matter asserted therein and, therefore, cannot be used to support Plaintiffs' claims that vendors (and by imputation, UBS RESI) had actual knowledge of any specific R&W breaches.

## XII.   PLAINTIFFS' EXPERT TESTIMONY IS EXCLUDED TO THE EXTENT THAT IT GOES BEYOND THEIR EXPERT REPORTS

376.   In numerous instances throughout the trial, Plaintiffs' experts offered declarations and other testimony that far exceeded the opinions disclosed in their expert reports, in violation of Rule 26 of the Federal Rules of Civil Procedure.   These new and undisclosed opinions are stricken, and even if admitted, would be afforded no weight.   *See Horvath v. Deutsche Lufthansa, AG*, No. 02 Civ. 3269 (PKC), 2004 WL 486976, at *5 (S.D.N.Y. Mar. 12, 2004) (Castel, J.) (limiting testimony of Plaintiff's expert to the opinions disclosed in his report).   A chart containing the opinions of Plaintiffs' experts that go beyond their expert reports is attached hereto as **Appendix A**.

377.   Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert testimony.   Expert witnesses must provide a report that includes "a *complete* statement of *all opinions* the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added); *see also* Rule 26 Advisory Committee Notes on 1993 amend. ¶ (2) ("[Rule 26(a)] requires that persons retained or specially employed to provide expert testimony . . . must prepare a detailed and complete written report, *stating the testimony the witness is expected to present during direct examination*, together with the reasons therefor." (emphasis added)).   "A party must make these disclosures at the times and in the sequence that the court orders."   Fed. R. Civ. P. 26(a)(2)(D).   It is well-established that an expert's testimony is limited to the four corners of his report.   Rule 37(c)(1) is the mechanism by which the expert disclosure requirements of Rule 26(a)(2) are enforced.   It provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."   Fed. R. Civ. P. 37(c)(1); *see also Advanced*

*Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 301 F.R.D. 31, 36 (S.D.N.Y. 2014) (holding "[e]xpert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)" and assembling cases excluding opinions not contained in an expert's timely-served report (citation omitted)).

378.    The purpose of Rule 37(c) is to prevent a party from "sandbagging" an adversary with new evidence. *See, e.g.*, *Williams v. Blvd. Lines, Inc.*, No. 10 Civ. 2924(DF), 2013 WL 5652589, at *3 (S.D.N.Y. Sept. 30, 2013) (citations omitted). The risk of "sandbagging" through the introduction of new evidence at trial is particularly heightened where expert testimony is concerned. Indeed, courts have deemed Rule 26 as the "centerpiece" of discovery in litigation that uses expert witnesses. *See Wilkins v. Montgomery*, 751 F.3d 214, 221 (4th Cir. 2014) (citing *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278-79 (4th Cir. 2005)). And, expert testimony to be used at trial which criticizes another expert's analyses are not exempt from Rule 26(a)(2)(B)'s stringent disclosure requirements – if this were the case, "parties would have no incentive to file rebuttal reports." *See In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 276 (S.D.N.Y. 1998).

379.    Where a party has failed to satisfy his disclosure obligations under Rule 26(a), that party bears the burden of demonstrating that his non-compliance was "substantially justified" or "harmless." *Williams*, 2013 WL 5652589, at *3. No showing of bad faith is required before a court may preclude testimony. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006). A district court has "wide discretion" in applying Rule 37(c)(1) to preclude evidence and its ruling will be reversed only if it constitutes an abuse of discretion. *Id.* at 294.

380.    When a party cannot establish that its failure to timely disclose a new opinion of

its expert was substantially justified or harmless, courts in the Second Circuit routinely exclude

those new opinions. *See, e.g.*, *Franconero v. UMG Recordings, Inc.*, 542 F. App'x 14, 16 (2d

Cir. 2013) (finding expert opinion contained in affidavit inadmissible because new opinion was

not included in expert report and Plaintiff did not justify that omission); *U.S. Bank, Nat'l Ass'n v.*

*PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131-32 (S.D.N.Y. 2015) (granting U.S. Bank's

motion *in limine* to preclude an expert from offering "testimony exceeding the bounds" of his

report at trial); *Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 301 F.R.D. 31, 36

(S.D.N.Y. 2014) (assembling S.D.N.Y. cases and excluding expert opinions outside the scope of

an expert's prior reports); *Morritt v. Stryker Corp.*, No. 07-CV-2919, 2011 WL 3876960, at *5-8

(E.D.N.Y. 2011) (granting motion to strike portion of expert declaration containing opinions

outside those expressed in timely-served expert report).

381.    First, Holt offered many new opinions for the first time in his trial declaration.

Most obviously, Holt attached to his trial declaration an "Appendix 1" that included not only his

previously-disclosed opinions as to each allegedly Materially Defective Loan (which changed

from his expert report to trial declaration, *see supra* ¶ 81) and Ms. Grissom's rebuttals to those

opinions, but also his entirely new "reply" responses to Ms. Grissom's rebuttals for each of these

loans  (contained in Column O of Appendix 1).  (*See* Tr. 807:22-24 ("Q.  I think as we

mentioned before the break, Column O is not disclosed anywhere in your expert reports, correct?

A.  That is correct."); Tr. 878:25 – 879:4 ("Q. . . . [T]he opinions in column O are nowhere

contained in any of your expert reports, correct?  A.  No sir, just in declaration.").  These

responses were not – and indeed could not have been – included in Holt's expert report served in

August 2015, since they respond directly to Ms. Grissom's rebuttals served in January 2016.  *See*

Tr. 969:21-25 ("Q.  And again, column O wasn't part of your report, correct? This was just

served on April 4th, part of your trial declaration?  A.  Yes, sir.  We hadn't received Grissom's rebuttal report at that time.").

382.     If Plaintiffs wanted the opportunity to have Holt, or any of their experts, serve a supplemental or rebuttal report responding to Ms. Grissom's rebuttal expert report, they could have negotiated an expert discovery schedule permitting that course of action.  They did not do so, and should not be allowed to supplement their expert disclosures through the guise of offering new expert opinions at trial.  *See, e.g., In re Kreta Shipping,* 181 F.R.D. at 276 (finding that Plaintiff's expert's criticisms of Defendant's expert violated the requirements of Rule 26(a)(2)(B) because it was not previously disclosed in the form of a rebuttal expert report).

383.     Beyond the new responses contained in his Appendix 1, Holt also offers entirely new opinions on a variety of other issues, including, among other things:  (1) his purported "experience" regarding investors' reliance the Mortgage Loan Schedule; (2) his view concerning persistent MAE of the defects he identified; and (3) a bevy of new information concerning the bases for his opinions on allegedly missing documents he claims to have identified in the loan files, including new opinions regarding the supposedly "strict protocols concerning the maintenance of loan files" that originators followed and originators' protocols for creating "digitized" versions of loan files.[74]  (*See* Appendix A.)  These new opinions were never disclosed in Holt's expert report, and are therefore excluded.

---

[74]  Holt conceded during cross examination that many of these opinions did not appear in his Rule 26 disclosures.  (*See* Tr. 775:11-19 ("Q.  Sure. And you opine in your trial declaration that in the period of 2006 to 2007, missing documents were a chronic problem in the loan origination industry, correct?  A.  That is correct.  Q.  And that's paragraph 173 of your trial declaration?  A. Yes, sir.  Q.  Now, that opinion doesn't appear anywhere in any of your expert reports, does it?  A.  In the prior three, correct. . . ."); Tr. 779:15-21 ("Q.  Now, this claim that loan files were digitized immediately after origination, that opinion also appears nowhere in any of your expert reports, is that correct?  A.  I don't – I don't believe so. . . .").)

384.     Second, Plaintiffs offered new opinions from Cowan that did not appear anywhere in his expert report.[75]  Like Holt, Cowan added responses to UBS RESI's expert critiques of his analyses through his trial declaration.  For the first time in his trial testimony, Cowan "examined precisely how UBS used AVMs," and challenged the calculations performed by UBS through its due diligence process to test the variance between AVMs and appraisals.  Cowan also provided new opinions on how AVMs differ from appraisals, including the untested assertion that at least 80% of a house's purchase price is accounted for by an AVM simply by using age of the property, square footage and the date of sale.  (See Appendix A.)  He also testified for the first time in his trial declaration, as pure *ipse dixit*, that AVMs are commonly used in litigation to assess property values, and also provided for the first time the additional details and explanations concerning the Phoenix AVM such as the "Mahalanobis" distance measure for selecting comparable properties and the databases the AVM used to ultimately arrive at Cowan's valuation results.  (*See id.*)

385.     During cross examination, Cowan acknowledged that many of these opinions are found nowhere in his Rule 26 disclosures.  (*See* Tr. 1625:12-25 (acknowledging that he does not identify the term "Mahalanobis" in his 2015 report); Tr. 1674:17-19 ("Q.  So to be clear, then, the first time you disclosed the full list of variables that Phoenix used was on April 4, 2016?  A. Yes, sir, as we discussed before. That's the first time.").)

386.     Finally, Plaintiffs offered new opinions by Snow that are perhaps the most egregious example of previously undisclosed opinions.  (*See* Appendix A.)  Snow includes as alleged damages $300 million of "Marginal IndyMac damages" based upon an extrapolation

---

[75] Not only did Cowan supplement his 2015 expert report through his trial declaration served on April 4, 2016, but Plaintiffs also served a revised trial declaration on Wednesday May 4, 2016 – the day before Cowan could have taken the stand.

performed by Plaintiffs' sampling expert, Lipshutz.  But Snow's August 2015 report made *no* mention of this IndyMac extrapolation and instead only estimated damages relating to the 12,757 loans analyzed by Holt and Cowan.  On November 16, 2015, however – three months after the August 7, 2015 Court-ordered deadline for Plaintiffs to provide their expert disclosures – Snow testified at his deposition for the first time that the Trusts had suffered an additional $316.3 million in damages as a result of Lipshutz's extrapolation of the IndyMac Original Sample Loans and provided a brand new exhibit to his Supplemental Report calculating those damages at the deposition.

387.    Snow also provided new opinions relating to whether an adjustment should be made for the payments to Assured and damages estimates based on two brand new repurchase dates at the instruction of counsel.[76]

388.    Plaintiffs provide no justification for these new and untimely expert opinions, which prejudiced UBS RESI by being disclosed on the eve of trial, after UBS RESI had already prepared and served its expert rebuttal reports.  Accordingly, all of the new expert opinions listed in Appendix 1 are stricken.  *See Lava Trading, Inc. v. Hartford Fire Ins. Co.,* No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *8 (S.D.N.Y. Apr. 11, 2005) (Castel, J.) (describing untimely expert opinions as "subject to 'near automatic exclusion' under Rule 37(c)(1)" where plaintiff showed no justification for failing to adhere to Rule 26 and defendant was prejudiced by the delay (citation omitted)); *see also Sandata Techs., Inc. v. Infocrossing, Inc.*, No. 05 CIV. 09546,

---

[76] Snow conceded these opinions were not disclosed in his Rule 26 reports and that the alleged IndyMac extrapolation was provided at his deposition.  (*See* Tr. 1866:9 – 1867:8 (confirming that he did not include Assured-adjusted damages calculations in his direct testimony at the instruction of counsel; Tr. 1871:10 – 1873:6 (recognizing the IndyMac extrapolation "has never appeared in an expert report" that Snow has presented); Tr. 1879:4 – 1880:2 (describing the two "potential repurchase dates" as "placeholders" and noting their use for the first time in the trial declaration).)

2007 WL 4157163, at *6 (S.D.N.Y. Nov. 16, 2007) ("Put simply, experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions.").

## XIII.   PLAINTIFFS HAVE NOT PROVEN ENTITLEMENT TO DAMAGES

**[Defendant's Response To ¶¶ 120–126; 417–427 of Pl. FOF]**

### A.   Dr. Snow Failed To Comply With The Purchase Price Formula

389.   Snow's damages analysis suffers from various significant flaws.  For example, when calculating potential damages, Snow failed to follow the agreed-upon and unambiguous Purchase Price formula in the PSAs.

390.   The PSAs provide that when a breach of R&W "materially and adversely affects the interests of the Certificateholders" in the loan, UBS RESI has 90 days to determine whether to cure the breach or, if not so cured, to "repurchase the affected Mortgage Loan from the Trustee *at the Purchase Price*."  (PX 49 at 74 (emphasis added).)

391.   The PSAs make clear that these are the "sole remedies" available to Plaintiffs. Indeed, as Judge Baer already held in this case, "[n]o matter how the breach is characterized, *Plaintiffs' repurchase remedy is limited to 'the Purchase Price' under the PSAs*." *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 7322 (HB), 2013 WL 4399210, at *4 (S.D.N.Y. Aug. 15, 2013) (emphasis added) (citation omitted).

392.   "Purchase Price" is defined as follows:  "With respect to any Mortgage Loan that is *purchased* by [UBS RESI] *pursuant to Section 2.02 or 2.03 hereof*, a price equal to the outstanding Principal Balance of such Mortgage Loan *as of the date of purchase*, plus all accrued and unpaid interest thereon . . . plus any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law."  (*Supra* ¶ 19 (emphasis added).)  Despite this, Snow's damages report rests upon a fabricated damages calculation untethered to the Purchase Price formula.

393.   Because the definition of Purchase Price refers to the date that a particular loan "is purchased by [UBS RESI] *pursuant to Section 2.02 or 2.03 [i.e.*, the Sole Remedy Provision]," it

is clear that the phrase "the date of purchase" later in that same sentence should be afforded the same meaning.  *See Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 351 (S.D.N.Y. 2013) (under New York law, "a Court 'may presume that the same words used in different parts of a writing have the same meaning,' and "the use of the definite article 'the' to modify a noun tends, in appropriate circumstances, to refer back to a previous appearance of the noun") (citations omitted); *see also Sher v. RBC Capital Markets, LL*C, 539 B.R. 260, 275 (D. Md. 2015) (interpreting provision in Master Repurchase Agreement ("MRA") – concerning RMBS and governed by New York law – in accordance with previous use of term in the MRA to calculate damages for breach of contract).  Thus, for purposes of calculating the Purchase Price, the "date of purchase" is the date of UBS RESI's purchase of the subject loan from the Trusts under the Sole Remedy Provision in Section 2.03, which Plaintiffs seek to enforce in this action. *See Cytec Indus., Inc. v. Allnex (Luxembourg) & Cy S.C.A.*, No. 14-cv-1561, 2015 WL 3762592, at *6 (S.D.N.Y. May 15, 2015) (Castel, J.) ("'The best evidence of what parties to a written agreement intend is what they say in their writing,' and '[c]ourts will give effect to the contract's language and the parties must live with the consequences of their agreement.'" (citations omitted)).[77]

394.    Notwithstanding this unambiguous formula, Snow calculates damages for loans that have been liquidated by essentially assigning a repurchase amount equal to the realized loss

---

[77]   In denying UBS RESI's motion for summary judgment that it has no liability for liquidated or extinguished loans, the Court noted that "nothing in the language that UBS cites moves the Purchase Price to a point after 'the date of purchase,'" and thus "[i]f a loan were eventually to be liquidated subsequent to purchase, that Liquidated Loan would not automatically render the Purchase Price as zero."  (SJ Order at 23.)  But because the "date of purchase" clearly means the date of UBS RESI's *repurchase* of the loan at issue pursuant to the Sole Remedy Provision, that is the point in time at which the Purchase Price is to be calculated.  As the Court already noted, this does not "automatically render the Purchase Price as zero" in every instance.

on that loan as of the date of calculation or, for loans that liquidated prior to the date UBS RESI allegedly *should have* repurchased the loan, as of the date of liquidation.  (Tr. 1889:24 – 1891:2.) This is contrary to plain terms of the PSAs.  As this Court emphasized at trial, "we're all prisoners of the words of the agreement."  (Tr. 605:19-21.)  And the words here leave nothing to the imagination about how the Purchase Price formula is to be applied:  UBS RESI must pay the outstanding Principal Balance of the repurchased loan on the actual date the loan is purchased from the Trusts, plus any unpaid interest on the loan, and potentially other costs and damages upon a showing of violations of predatory lending laws.  *See Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("'[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" (citation omitted)).[78]

395.    This is precisely the conclusion reached by Judge Cote in a recent RMBS decision involving a materially identical "Purchase Price" formula based on the Principle Balance as of the "date of purchase."  *See* Opinion & Order, *Bank of New York Mellon v. WMC Mortg.*, LLC, 12-cv-7096, at *5 (S.D.N.Y. Aug. 18, 2015), ECF No. 323 (Ex. A).  In *WMC*, the court granted defendant's motion to exclude plaintiff's damages expert on the ground that his formula for calculating repurchase damages as to liquidated loans was inconsistent with the plain terms of the governing contract.  The plaintiff's expert employed a formula just as Snow did here, whereby he considered the outstanding principal balance on the loan just *prior to* its liquidation.

---

[78]  Ironically, Plaintiffs cite to the Purchase Price formula as a reason to deny UBS RESI's request to reduce any recovery in light of Assured's insurance payments, stating that "[h]ad the parties intended to reduce the amount of the Purchase Price to reflect payments by Assured to certain Certificateholders, they could have done so, and there is no basis to rewrite the parties' agreement."  (Pl. FOF ¶ 425.)  Of course, the same can be said of Plaintiffs' attempts to ignore the Purchase Price formula themselves.

Judge Cote excluded the evidence, holding that the parties were bound by the Purchase Price formula which, as here, unambiguously assigned a zero principal balance to loans that had been liquidated by the "date of purchase" – *i.e.*, the defendant's *actual repurchase*.  (*Id.* at 5.)  The court held that "[u]nlike repurchasing loans that can no longer exist, following the contractual formula for calculating the [stated principal balance] is not 'impossible,'" and thus the "formula, to which the parties explicitly agreed, guides any calculation of damages."  (*Id.* at 16-17); *see also MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*, 2012 WL 4511065, at *6 n.9 (D. Minn. Oct. 1, 2012) ("[T]he repurchase price of the 80 loans, calculated per the terms of the Purchase Agreement, would amount to $0 per loan were the Trustee able to compel repurchase.").[79]

396.     Judge Cote's reasoning applies with equal force here.  If the sophisticated parties to these transactions had intended for the outstanding Principal Balance to be determined as of the date of liquidation (or some other date predating the repurchase), they "would surely have been more explicit."  (Ex. A at 16); *see also Cytec*, 2015 WL 3762592, at *6 ("Under New York law, '[c]ourts will not rewrite contracts that have been negotiated between sophisticated, counseled commercial entities . . . .'" (citation omitted)).

397.     While the Court denied UBS RESI's motion for summary judgment that Plaintiffs

---

[79]  This accords with the view that Plaintiffs have no entitlement to relief for loans that have liquidated any more than for loans that have prepaid in full.  (*See supra* n.25; *see also* PX 49 at 56 (assigning a Principal Balance of "zero" to "any Mortgage Loan that has been prepaid in full or has become a Liquidated Loan").)  The First Department's decision in *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96 (1st Dep't 2015) (Pl. FOF ¶ 419), is not to the contrary.  Like Judge Cote in *WMC*, the *Nomura* court held that "plaintiffs may pursue monetary damages with respect to any defective mortgage loan in those instances where cure or repurchase is impossible," 133 A.D.3d at 107, but did not specify how such "monetary damages" could be calculated or hold that the parties could disregard any damages formulas contained in the parties' agreement.

are precluded from seeking any money damages for liquidated or extinguished loans, this holding does not foreclose – and, in fact, is entirely consistent with – UBS RESI's argument that the plain language of the Purchase Price formula must be followed in calculating the amount of any damages for liquidated loans. Indeed, Judge Cote had previously denied a similar motion for summary judgment brought by the defendant in *Bank of New York Mellon v. WMC* with respect to liability for liquidated loans. (*See* Ex. A at 8.) In excluding the plaintiff's damages expert, however, Judge Cote emphasized that while "monetary damages were not *foreclosed* by the contract language and that New York contract law may permit recovery of money damages in the circumstances present here," the court's earlier denial of summary judgment "did not reach the issue of *what measure or quantum* of damage would be appropriate," which is dictated by the Purchase Price formula. (*Id.* (emphasis added)); *MARM 2006-OA2,* 2013 WL 4399210, at *4 (S.D.N.Y. Aug. 15, 2013) ("No matter how the breach is characterized, Plaintiffs' repurchase remedy is limited to 'the Purchase Price' under the PSAs." (citation omitted)).

398.     Similarly here, in response to UBS RESI's motion for summary judgment that it "has no liability with respect to Liquidated Loans or loans where the underlying properties had been sold" (*see* UBS RESI SJ Br. (ECF No. 193), at 21), the Court held that "the PSAs' remedial scheme does not exempt" those loans from recovery (SJ Order at 22). The ruling did not, however, endorse any particular calculation of money damages for such loans, nor did it relieve Plaintiffs of their obligation to follow the Purchase Price formula agreed to by the parties. While the Court stated that "[t]he entire definition of 'Liquidated Mortgage Loan' is conditioned on the language, 'With respect to any Distribution Date . . . .'" (SJ Order at 24), this does not alter the conclusion, compelled by the plain language of the PSAs, that the Sole Remedy Provision only requires UBS RESI to repurchase materially breaching loans according to the "Purchase Price"

formula, which Snow has ignored.  (*Supra* ¶¶ 19, 35; *WMC* Opinion, Ex. A at 20 ("This is a

breach of contract action, and the merits of the parties' arguments rest upon the text of the

contract they signed . . . .").)   Because Snow's damages opinions and analyses are divorced

from, and contrary to, the Purchase Price formula, his supplemental expert report is excluded.

### B.   Plaintiffs Did Not Offer Any Evidence Of Direct And Proximate Causation

399.    To the extent Plaintiffs contend that they are not bound by the agreed-upon

Purchase Price damages formula contained in the PSAs but rather can seek broader breach-of-

contract damages, they must prove that their damages were directly and proximately caused by

UBS RESI's alleged breaches – an element for which they offered no evidence at trial.

400.    "Causation is an essential element of damages in a breach of contract action; and,

as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused [the

claimed] damages."  *In Touch Concepts, Inc. v. Cellco P'ship*, No. 13 Civ. 1419 (PKC), 2013

WL 6182949, at *5 (S.D.N.Y. Nov. 8, 2013) (Castel, J.) (quoting *Nat'l Mkt. Share, Inc. v.

Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)) *aff'd*, 788 F.3d 98 (2d Cir. 2015); *Diesel

Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07 Civ. 9580 (HB), 2009 WL 2514033, at *11

(S.D.N.Y. Aug. 18, 2009)), *aff'd in part and rev'd in part on other grounds*, 631 F.3d 42 (2d Cir.

2011).  Thus, "[t]he necessity of establishing a causal connection between the defendant's

conduct and the harmful consequence is equally present in cases of breach of contract as in the

field of wrongs."  *Point Prods. A.G. v. Sony Music Entm't*, 215 F. Supp. 2d 336, 341 (S.D.N.Y.

2002) (quoting Charles McCormick, *Handbook on the Law of Damages* § 73, at 261 (1935)).[80]

---

[80] *See also Jorgensen v. Century 21 Real Estate Corp.*, 217 A.D.2d 533, 534 (2d Dep't 1995)
("[C]ontrary to the plaintiffs' contentions, proximate cause is not an element of negligence only,
but is also an element of breach of contract."); *Drummer v. Valeron Corp.*, 154 A.D.2d 897, 897
(4th Dep't 1989) ("The term 'proximate cause' is not an element of negligence only, but is an

*(cont'd)*

401.   "In a breach of contract action, the plaintiff must demonstrate more than simply that defendant breached its contract and that the plaintiff suffered damage.  Plaintiff cannot recover if it would have suffered the harm *regardless of defendant's actions*."  *Point Prods.* , 215 F. Supp. 2d at 341 (emphasis added); *see also Granite Partners, LP v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 96 Civ. 7874 (RWS), 2002 WL 826956, at *5 n.5 (S.D.N.Y. May 1, 2002) ("Under New York law . . . the Funds must prove that but for the allegedly wrongful margin calls, the injury they suffered through the liquidation of their securities could not have occurred.  Thus, if the injury would have occurred in the absence of the margin calls on March 31, the element of 'but for' causation is lacking."); *In Touch Concepts*, 2013 WL 6182949, at *5 ("'[Plaintiff] has failed to 'allege that the *breach* – the failure to give notice and opportunity to negotiate – caused the alleged damages.'" (citation omitted)).

402.   "[W]hen there are multiple potential causes of a plaintiff's injury, the plaintiff is still required to present evidence of a causal relationship between a defendant's actions and the harm suffered . . . .  Thus, *the burden remains on the plaintiff in a contract case* to prove that the defendant's breach was a significant, if not the exclusive, cause of the injury."  *Point Prods.*, 215 F. Supp. 2d at 343 (emphasis added) (citation omitted); *accord Krofft Entm't, Inc. v. CBS Songs, a Div. of CBS, Inc.*, 653 F. Supp. 1530, 1534 (S.D.N.Y. 1987) (act or omission can only be substantial factor of plaintiff's injury if the plaintiff has demonstrated factual causation "where the damage would not have occurred but for the alleged wrongful act or omission"); *see also Point Prods.*, 215 F. Supp. 2d at 344-45 ("[P]laintiff was unable to point to sufficient evidence in the record that could persuade any reasonable jury that Sony's actions caused Point's

_____
*(cont'd from previous page)*
element of breach of contract and breach of warranty among other actions.  Indeed, a plaintiff may not recover in an action of any nature unless he shows that his injuries were proximately caused by the defendant." (citations omitted)).

bankruptcy . . . . [P]laintiff has produced no expert report to show that Point was likely to have remained solvent had Sony not breached.").

403.    Here, Plaintiffs did not prove at trial that any alleged breaches of R&Ws were the proximate cause of their purported damages or that their alleged losses were not caused by other factors – such as macroeconomic events, declining housing prices or strategic defaults by borrowers – that would have occurred "regardless of defendant's actions." *Point Prods.*, 215 F. Supp. 2d at 341.

### C.    Plaintiffs Did Not Adjust Damages To Account For The Full Insurance Recoveries From Assured

404.    In his trial declaration, Snow also failed to consider that the insured tranches of the Trusts have suffered no losses based on Assured's payments to those Certificateholders (payments for which Assured was compensated as part of its previous settlement with UBS RESI).  (*Supra* ¶ 29.)  This is inconsistent with his expert reports in this case, in which he expressly calculated so-called "Assured Adjusted" damages figures to account for Assured's payments to the insured tranches.  (PX 524, Snow Report ¶ 18; *see* Tr. 1866:9 – 1867:8.)

405.    Under New York contract law, a plaintiff cannot recover for economic losses covered by third-party insurance.  *See, e.g.*, *Consol. Edison Co. of N.Y. v. Lexington Ins. Co.*, No. 14 Civ. 6547 (CM) (JLC), 2015 WL 4611206, at *5-6 (S.D.N.Y. July 30, 2015) (determining that New York law has a "no double recovery" rule for breach of contract damages and holding that plaintiff could not recover for damages that had already been compensated by insurance); *Garafalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp. 2d 343, 347 (S.D.N.Y. 1999) (dismissing plaintiff's breach of contract claim for lack of Article III standing where plaintiff suffered no "actual out-of-pocket loss" because insurance had covered her damages); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995) (explaining that New York follows the

"net loss" theory of contract damages and that any damages must be offset by sums saved or received as a result of the breach).[81]

406.    Indeed, U.S. Bank admitted as much in *Matter of U.S. Bank N.A.*, No. 653902/2014 (N.Y. Sup. Ct. 2015), another RMBS case where U.S. Bank was the plaintiff trustee and retained Professor Alan Schwartz to analyze, among other things, whether the Trustee's damages were subject to any litigation offsets.  Professor Schwartz ultimately concluded that, under New York law, the Trustee's recovery should be reduced by any insurance proceeds that certificateholders had received from insurance policies guaranteeing reimbursement of any losses on insured certificates.  (Ex. G, NYSCEF No. 87).  U.S. Bank incorporated Professor Schwartz's analysis into the resulting settlement formula in that case, as reflected by its memorandum of law in support of the settlement agreement (Ex. H, NYSCEF No. 134).  The court ultimately accepted the settlement, including Professor Schwartz's insurance-offset recommendations.  *See In re U.S. Bank N.A.*, 51 Misc. 3d 273, 279-80 (N.Y. Sup. Ct. 2015); s*ee also* Ex. B § 3.05(a), RMBS Trust Settlement Agreement, Index No. 652382/2014 (Sup. Ct. N.Y. County Aug. 3, 2014) (describing calculation of "Net Losses" for each participating trustee, including U.S. Bank, and stating that "past and expected future reimbursements by monoline or other third party insurers or credit enhancement providers to a Trust *shall not be considered in the calculation*") (emphasis added).)

407.    Although Plaintiffs argue that "reducing the Trusts' recovery to account for those payments [to Assured] would result in a windfall to UBS" (Pl. FOF ¶ 426), this is not true. Snow claims that the amounts paid to Assured would be "double-counted" – first when the funds

---

[81]  This is consistent with language in the PSAs which makes a distinction between the interests of Certificateholders and the interests of the Certificate Insurer.  (*See* PX 49 at 74.)

are put into the Trusts and a second time when they are "paid out to Assured by the Trusts." (*Id.*) This is not an issue of how much is recovered, but rather the method U.S. Bank uses to distribute any recovery.  The contractual arrangements (or interpretations of such arrangements) relating to the distribution of any recovery is an issue between the U.S. Bank and Certificateholders, but it does not impact or create damages for the alleged breaches at issue here.  Moreover, U.S. Bank can exclude the Assured-insured tranches from any recovery, since they have already been compensated for their losses by Assured (and Assured has already been compensated through its settlement with UBS RESI), as U.S. Bank has agreed to do in other RMBS cases.  (*See* Ex. I, U.S. Bank Petition for settlement approval in *In re U.S. Bank*, Index No. 652382/2014 (Sup. Ct. N.Y. County Aug. 3, 2014), at *2 n.1 (settlement agreement allowing participating trustees, including U.S. Bank, to "accept or not accept on behalf of each loan group" for "trusts that have more than one loan group").)

408.    While Plaintiffs assert that "Assured's payments are made to cover losses on certain *certificates*, not to cover losses of specific *loans*" (Pl. FOF ¶ 426 n.245), this is a red herring.  The holders of insured certificates have not experienced losses on any loans.

**D.    Plaintiffs Are Not Entitled To Prejudgment Interest**

**[Defendant's Response To ¶¶ 420–424 of Pl. FOF]**

409.    Plaintiffs also seek prejudgment interest at 9% annually.  (Pl. FOF ¶ 424.)  Under New York, CPLR 5001 *et seq.* "imposes an affirmative mandate on trial courts" to award prejudgment interest when a plaintiff obtains contract damages.  *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 93 (2d Cir. 2000).  However, CPLR 5001 is not applicable where, as here, the parties have contracted for their own remedy.  *J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 118-19 (2012) ("[R]egardless of what [Section] 5001(a) customarily requires in terms of statutory interest for breach of contract cases," when parties bargain for an "exclusive

remedy" for breach, that remedy "should be honored"); *European Am. Bank v. Peddlers Pond Holding Corp.*, 185 A.D.2d 805, 806 (2d Dep't 1992) ("It is well established that when a contract provides for interest to be paid at a specified rate until the principal is paid, the contract rate of interest, rather than the statutory rate set forth in CPLR 5004 [9%], governs until the payment of the principal or until the contract is merged into a judgment.").[82]

410.    Here, contrary to Plaintiffs' assertion (Pl. FOF ¶¶ 419-424), the parties have already settled the question of whether prejudgment interest is available to the Trustee.  The Sole Remedy Provision provides that, in the event of breach, UBS RESI would "repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price" plus any unpaid interest "on the loan," as of that time, but nowhere contemplates prejudgment interest. (*Supra* ¶ 17).  Thus, just like the "exclusive remedy" at issue in *J. D'Addario*, the Sole Remedy Provision here makes clear that the parties agreed to forgo prejudgment interest.  20 N.Y.3d 113, at 119; *see also Peddler's Pond*, 185 A.D.2d at 806.[83]

411.    Even if the Court were to find that the parties have not already agreed upon the

_____

[82] *See also NYCTL 1998-2 Tr. v. Wagner*, 61 A.D.3d 728, 729 (2d Dep't 2009) (same); *Citibank N.A. v. Liebowitz*, 110 A.D.2d 615, 616 (2d Dep't 1985) (same); *Astoria Fed. Sav. & Loan Ass'n v. Rambalakos*, 49 A.D.2d 715, 716 (2d Dep't 1975) (holding that the trial court erred in applying the statutory interest rate, rather than the contract rate); *Nuera Commc'ns, Inc. v. Telron Commc'ns USA, Inc.*, No. 00 Civ. 9167 (RMB) (FM), 2002 WL 31778796, at *3 (S.D.N.Y. Nov. 15, 2002) ("If the contract provides a rate at which interest is to be calculated, then the contractual rate, rather than the statutory rate of nine percent per year as set forth in CPLR Section 5004, governs.").

[83] Plaintiffs' citation to *U.S. Bank v. Dexia*, No. 12-cv-9412 (SAS), 2014 WL 4290642 (S.D.N.Y. Aug. 28, 2014), *rev'd*, 2016 WL 1042090 (Mar. 16, 2016), to argue that *J. D'Addario* should only apply where the parties' exclusive remedy provision sets forth an alternative prejudgment interest rate (Pl. FOF ¶ 422), is unavailing.  In that case, Judge Scheindlin adopted an admittedly "narrow reading of *J. D'Addario*" that is contrary to the Sole Remedy Provision here and the overarching policy of New York contract law allowing sophisticated parties to agree on any remedial scheme they wish.  *Id.* at *3 & n.29.

full extent of recovery to which Plaintiffs are entitled under the PSAs, the Court nevertheless

exercises its discretion to deny prejudgment interest in the amount that Plaintiffs seek because

the nature of the relief demanded by Plaintiffs is primarily equitable in nature.  (*See* Pl. FOF

¶ 419.)  A trial court's discretion in awarding prejudgment interest in cases where equitable relief

is sought is exceptionally broad, and covers both the question of whether to award interest at all,

and if so, at what rate.  *See U.S. Bank Nat'l Ass'n v. Williams*, 121 A.D.3d 1098, 1100-01 (2d

Dep't 2014) (upholding trial court's decision to deny U.S. Bank interest where it repeatedly

demanded additional information from mortgageholder in support of proposed modification,

despite the fact that such modifications were prohibited under the Pooling and Service

Agreement); *Bank of N.Y. Tr. Co., N.A. v. Franklin Advisers, Inc.*, 726 F.3d 269, 282 (2d Cir.

2013) (upholding decision not to award additional interest in an interpleader action); *Zielinski v.

Associated Mut. Ins. Co.*, 217 A.D.2d 938, 939 (4th Dep't 1995) (upholding refusal to grant

interest where prevailing party was dilatory in seeking reformation); *Cohen v. Akabas & Cohen*,

71 A.D.3d 419, 420 (1st Dep't 2010) (upholding imposition of interest stemming from

partnership dissolution proceedings).

412.    Here, Plaintiffs claim that they are seeking the equivalent of specific performance

where such performance has been rendered impractical due to loan liquidation or foreclosure.

(*See* Pl. FOF ¶¶ 419-20.)  Accordingly, the Court may exercise its discretion regarding whether,

and to what extent, to award prejudgment interest if Plaintiffs prevail.  *See Rhodes v. Davis*, 628

F. App'x 787, 792-93 (2d Cir. 2015); *Rathe v. Adirondack Concepts*, 131 A.D.2d 81, 85-86 (3d

Dep't 1987).  As a result, even if the parties did not formally waive prejudgment interest through

the Sole Remedy Provision, the Court nevertheless declines to award it here since such interest is

not included in the PSA's "Purchase Price" formula to which the parties agreed.

413.     Plaintiffs cite *Bessemer Trust Co., N.A. v. Branin*, 544 F. Supp. 2d 385, 392 n.15 (S.D.N.Y. 2008), to argue that "[e]ven in actions of an equitable nature that are based on contract, the trend has been to award prejudgment interest as of right."  (Pl. FOF ¶ 420.)  But this assertion is belied by the numerous cases above denying prejudgment interest, or awarding such interest at a rate lower than 9%.[84]

414.     At the very most, Plaintiffs should be awarded prejudgment interest at the "coupon rate" of the Certificates, as that is the rate of return that Plaintiffs bargained to receive during the relevant time period.  *See Nat'l Credit Union Admin. Bd. v. UBS Sec. LLC*, No. 13CV6731 (DLC), 2016 WL 1179203, at *7 (S.D.N.Y. Mar. 24, 2016) (awarding prejudgment interest on RMBS claims at each Certificate's coupon rate because "use of the coupon rate awards a plaintiff the same interest it expected to receive by virtue of purchasing the Certificate"); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 584 (S.D.N.Y. 2015) (awarding prejudgment interest on RMBS claims at each Certificate's coupon rate because "[t]hat rate vindicates the [plaintiffs'] original expectations when purchasing the Certificates").

415.     The net result of these errors by Snow is that Plaintiffs have failed to establish a reasonable estimate of the damages purportedly incurred.  Indeed, Snow admitted that he was

---

[84]  Plaintiff's citation to *Nagoya Venture Ltd. v. Bacopulos*, No. 96 CIV 9317 (DLC), 1999 WL 311918, at *4 (S.D.N.Y. Mar. 18, 1999) (Pl. FOF ¶ 421), is misleading, as that case held that the substance of the plaintiff's claims were *legal*, rather than equitable, in nature, and awarded prejudgment interest as a matter of right.  Here, by contrast, Plaintiffs have conceded that this action is one for equitable relief.  (*Id.* ("Here . . . the Trusts seek equitable damages . . . .").)  Plaintiffs' remaining cases (*id.* at ¶ 424) are inapposite, as they involved actions at law where prejudgment interest was permitted as a matter of right.  *See Transp. Displays Inc. v. Winston*, 870 F. Supp. 74, 77-78 n.6 (S.D.N.Y. 1994), *F.D.I.C. v. Key Fin. Servs., Inc.*, No. 89-02366-DPW, 1999 WL 34866812, at *12 (D. Mass. Dec. 23, 1999), *aff'd sub nom. Resolution Tr. Corp. v. Key Fin. Servs.*, 280 F.3d 12 (1st Cir. 2002); *Sokolik v. Pateman*, 114 A.D.3d 839, 841 (2d Dep't 2014).

merely a "placeholder" expert who would need to re-submit his opinions in the future as a result of Plaintiffs' further analysis. (*See* Tr. 1861:22 – 1862:3; 1879:15-23.)  Although Plaintiffs are correct that bifurcation of damages is typically the exception and not the rule (*see* Pl. Br. at 40 n.38), they never even moved to bifurcate in this case or have the Court otherwise separately address the issue of damages if or when liability was established.  Plaintiffs provide no justification for failing to provide a final and concrete damages request and, as a result, Snow's "placeholder" analysis is thus disregarded.[85]

## CONCLUSION

For the reasons stated herein, the Court finds in favor of Defendant UBS RESI on the issue of liability.  Plaintiffs failed to meet their burden to prove that UBS RESI materially breached the governing PSAs and that any alleged breaches materially and adversely affected the interests of Certificateholders at the time of UBS RESI's discovery or notice of breach.  Finally, Plaintiffs failed to meet their burden to prove entitlement to damages.

---

[85] Plaintiffs recently submitted a letter to the Court suggesting that they also intend to seek attorneys' fees and costs.  (*See* ECF No. 479.)  But Plaintiffs never offered any proof at trial of their alleged entitlement to such relief (or even mention such relief in their proposed findings of fact and conclusions of law).  UBS RESI reserves all rights to oppose such relief to the extent necessary.

Dated: July 1, 2016
    New York, New York

Respectfully submitted,

/s/ Scott D. Musoff

Scott D. Musoff
Robert A. Fumerton
Robert L. Dunn
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

Thomas J. Nolan
Allison B. Holcombe
Abraham A. Tabaie
300 South Grand Avenue
Los Angeles, California 90071
Phone:  (213) 687-5000

Charles F. Smith
Lara A. Flath
155 N. Wacker Drive
Chicago, Illinois 60606
Phone:  (312) 407-0700

*Attorneys for Defendant UBS Real
Estate Securities Inc.*

205