**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3,<br><br>               Plaintiffs,<br><br>        -against-<br><br>UBS REAL ESTATE SECURITIES INC.,<br><br>            Defendant. | 12 Civ. 7322 (PKC) |

## PLAINTIFF'S REPLY POST-TRIAL BRIEF

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

David L. Elsberg
Sean P. Baldwin
Andrew R. Dunlap
Steven M. Edwards
Paul P. Hughes
Marlo A. Pecora
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel:  212-849-7000
Facsimile:  212-849-7100

July 26, 2016

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 4

I.　　HOLT'S RE-UNDERWRITING WORK WAS RELIABLE AND CREDIBLE ............. 4

II.　　UBS FAILS TO REBUT THE EVIDENCE OF ITS LIABILITY ................................ 10

　　　A.　　UBS Fails To Rebut The Evidence Of Material And Adverse Effects ................ 11

　　　　　　1.　　The Contracts' Text And Overwhelming Authority Show That
　　　　　　　　　Material And Adverse Effects Are Measured At Breach ........................ 12

　　　　　　2.　　MAEs Arose At Breach And Persisted Thereafter .................................. 17

　　　　　　3.　　Most Loans Have Multiple Material Breaches ......................................... 22

　　　B.　　UBS Fails To Rebut The Evidence Of Written Notice And Discovery ............... 23

　　　　　　1.　　UBS Received Written Notice Of All Breaches ....................................... 23

　　　　　　2.　　UBS Discovered All Breaches ................................................................ 25

　　　C.　　UBS Fails To Rebut The Evidence That It Breached The MLS Warranty .......... 30

　　　　　　1.　　The MLS Warranty Unambiguously Warrants That In Fact The
　　　　　　　　　MLS Information Was "True And Accurate" ........................................... 30

　　　　　　2.　　The MLS Misstated Loan Purpose, Property Type, And
　　　　　　　　　Documentation Type ............................................................................... 32

　　　　　　3.　　The MLS Misstated Borrowers' Credit Scores ........................................ 33

　　　　　　4.　　The MLS Misstated That Properties Were Owner Occupied ................... 33

　　　　　　5.　　The MLS Misstated DTI Ratios ............................................................... 35

　　　　　　6.　　The MLS Misstated LTV Ratios ............................................................. 42

　　　D.　　UBS Fails To Rebut The Evidence That It Breached The Maximum LTV
　　　　　　Ratio Warranty ................................................................................................ 47

　　　E.　　UBS Fails To Rebut The Evidence That It Breached The Mortgage File
　　　　　　Warranty .......................................................................................................... 47

F.   UBS Fails To Rebut The Evidence That It Breached The Hazard And Title Insurance Warranties ......................................................................................49

G.   UBS Fails To Rebut The Evidence That It Breached The Guideline Warranty ..............................................................................................................50

    1.   The Guideline Warranty Unambiguously Warrants That Each Loan In Fact Was Originated In Accordance With Guidelines .........................50

    2.   Loans Were Made Without Critical Documents........................................53

    3.   Loans Were Made Despite Unreasonable Stated Incomes .......................55

    4.   Loans Were Made That Violated Guidelines Based On Unreasonable Exceptions...........................................................................59

    5.   Loans Were Made That Violated Guidelines Without Any Exceptions...................................................................................................60

III.   UBS FAILS TO SHOW THAT THE COURT SHOULD IGNORE THE EVIDENCE OF ITS LIABILITY ....................................................................61

A.   Plaintiff's Experts Testified On Topics Discussed In Their Expert Reports And In Response To UBS's Experts On Those Topics ...........................62

B.   The Loan Files Are Admissible ......................................................................68

C.   The Summary Evidence Is Admissible...........................................................71

IV.   UBS FAILS TO SHOW THAT THE TRUSTS ARE NOT ENTITLED TO THEIR EQUITABLE REMEDIES ........................................................................72

A.   UBS Must Pay Equitable Damages For Liquidated Loans.....................................72

B.   Establishing Equitable Damages For Liquidated Loans Does Not Require Proving That UBS's Breaches Caused The Trusts' Losses .................................76

C.   The Trusts Are Entitled To Prejudgment Interest For Liquidated Loans .............78

D.   UBS Has Not Shown That It Is Entitled To An Offset For Assured's Payments To Cover Losses On Certain Certificates, Which The Trusts Must Reimburse To Assured .........................................................................81

V.   UBS FAILS TO REBUT THE EVIDENCE OF ITS LIABILITY AND THE TRUSTS' REMEDIES FOR THE MARGINAL INDYMAC LOANS..........................83

CONCLUSION.......................................................................................................85

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*131 Main St. Assocs. v. Manko*,
179 F. Supp. 2d 339 (S.D.N.Y. 2002).................................................................25

*135 E. 57th St. LLC v. Daffy's Inc.*,
91 A.D.3d 1 (1st Dep't 2011) .............................................................................84

*Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel.
HSBC Bank USA, Nat. Ass'n v. DB Structured Products, Inc.*,
5 F. Supp. 3d 543 (S.D.N.Y. 2014) ..............................................................30, 75

*ACE Sec. Corp. v. DB Structured Prods., Inc.*,
40 Misc. 3d 562, 569 (Sup. Ct. N.Y. Cty. 2013), *rev'd on other grounds*,
112 A.D.3d 522 (1st Dep't 2013), *aff'd* 25 N.Y.3d 581 (2015) ........................75

*Action S.A. v. Marc Rich & Co.*,
951 F.2d 504 (2d Cir. 1991)................................................................................80

*Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*,
301 F.R.D. 31 (S.D.N.Y. 2014) ..........................................................................65

*Aniero Concrete Co. v. N.Y.C. Const. Auth.*,
308 F. Supp. 2d 164 (S.D.N.Y. 2003).................................................................79

*Aristocrat Leisure Limited v. Deutsche Bank Tr. Co.*,
727 F. Supp. 2d 256 (S.D.N.Y. 2010).................................................................80

*Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*,
44 Misc. 3d 1206(A) ............................................................................................31

*Assured Guar. Mun. Corp. v. Flagstar Bank FSB*,
892 F. Supp. 2d 596 (S.D.N.Y. 2012).................................................................77

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
11 CIV. 2375 (JSR) (S.D.N.Y. Oct. 12, 2012) (Dkt. 113)..................................37

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
No. 11 CIV. 2375 (JSR), 2011 WL 5335566 (S.D.N.Y. Oct. 31, 2011) .............75

*Assured Guar. Mun. Corp. v. Flagstar Bank*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013)...............................................6, 50, 51, 52

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
222 F. Supp. 2d 423 (S.D.N.Y. 2002).................................................................52

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mort. Capital, Inc. ("BNY II")*,
821 F.3d 297 (2d Cir. 2016)...........................................................................28, 29

iv

*Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Morgan Stanley Mortg. Capital, Inc., ("BNY I"),*
  No. 11 Civ. 0505 CM GWG, 2013 WL 3146824 (S.D.N.Y. June 19, 2013) .........................29

*Bank of N.Y. Mellon v. WMC Mortg., LLC,*
  136 A.D.3d 1 (1st Dep't 2015) ...............................................................................30, 31

*Bank of N.Y. Trust Co. v. Franklin Advisers, Inc.,*
  726 F.3d 269 (2d Cir. 2013) ................................................................................79

*Bank of New York Mellon v. WMC Mortgage, LLC,*
  No. 12-CV-7096 (DLC), 2015 WL 4164691 (S.D.N.Y. July 10, 2015) .........................75, 76

*Bank of New York Mellon v. WMC Mortgage, LLC,*
  No. 12-CV-7096 (S.D.N.Y. Aug. 18, 2015), Dkt. 323 ..............................................73

*Banque Arab Et Int'l D'Investissement v. Md. Nat'l Bank,*
  850 F. Supp. 1199 (S.D.N.Y. 1994), *aff'd,* 57 F.3d 146 (2d Cir. 1995) ..............................29

*Barnes v. Anderson,*
  202 F.3d 150 (2d Cir. 1999) ................................................................................11

*Batavia Turf Farms, Inc. v. Cty. of Genesee,*
  239 A.D.2d 903 (4th Dep't 1997) ..............................................................................82

*Bic Corp. v. Far E. Source Corp.,*
  23 F. App'x 36 (2d Cir. 2001) ................................................................................5

*Blanche Road Corp. v. Bensalem Twp.,* No. CIV. A. 89-9040,
  1996 WL 368347 (E.D. Pa. June 25, 1996) ..............................................................40

*Bonar v. Dean Witter Reynolds, Inc.,*
  835 F.2d 1378 (11th Cir. 1988) ................................................................................9

*Caputo v. Pfizer, Inc.,*
  267 F.3d 181 (2d Cir. 2001) ................................................................................25

*Carcone v. Gordon Heating & Air Conditioning Co., Inc.,*
  212 A.D.2d 1017 (4th Dep't 1995) ..............................................................................80

*Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.,*
  No. 99 Civ. 1725 (VM), 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) ..............................64

*CBS Inc. v. Ziff-Davis Pub. Co.,*
  75 N.Y.2d 496 (1990) ................................................................................45

*Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., Ltd.,*
  769 F. Supp. 2d 269 (S.D.N.Y. 2011) ..............................................................62, 63

*Cent. Mortg. Co. v. Morgan Stanley Mortgage Capital Holdings LLC,*
  No. CV-5140-VCS, 2010 WL 3258620 (Del. Ch. Aug. 19, 2010) .........................31

*City of New York v. Pullman Inc.,*
  662 F.2d 910 (2d Cir. 1981) ................................................................................39

*CMFG Life Ins. Co. v. RBS Sec., Inc.*,
   799 F.3d 729 (7th Cir. 2015) ........................................................................37

*Cohen v. Akabas & Cohen*,
   71 A.D.3d 419 (1st Dep't 2010) ...................................................................79

*Cole v. Macklowe*,
   99 A.D.3d 595, 596 (1st Dep't 2012) ...........................................................36

*Conoco Inc. v. Dep't of Energy*,
   99 F.3d 387 (Fed Cir. 1996) ........................................................................38

*Consol. Edison Co. of New York v. Lexington Ins. Co.*,
   No. 14 Civ. 6547, 2015 WL 4611206 (S.D.N.Y. July 30, 2015) .................81

*Contreras v. Sec'y of Health & Human Servs.*,
   121 Fed. Cl. 230 (2015) ................................................................................9

*Crane v. Crest Tankers, Inc.*,
   47 F.3d 292 (8th Cir. 1995) ..........................................................................38

*Crawford v. Tribeca Lending Corp.*,
   815 F.3d 121 (2d Cir. 2016) ..........................................................................26

*David E. Watson, P.C. v. United States*,
   668 F.3d 1008 (8th Cir. 2012) ........................................................................7

*Design Strategy Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006)..........................................................................65

*Deutsche Alt-A Sec. Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc.*,
   958 F. Supp. 2d 488 (S.D.N.Y. 2013).........................................................75

*Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*,
   810 F.3d 861 (2d Cir. 2015)...................................................................13, 14

*Dibella v. Hopkins*,
   403 F.3d 102 (2d. Cir. 2005)..........................................................................68

*Diesel, Props S.R.L. v. Greystone Bus. Credit II LLC*,
   No. 07 CIV. 9580 (HB), 2009 WL 2514033 (S.D.N.Y. Aug. 18, 2009)..............76

*DLJ Mortg. Capital, Inc. v. Right-Away Mortg., Inc.*,
   No. 07 Civ. 2791, 2008 WL 4078661 (S.D.N.Y. July 29, 2008) .................79

*Drummer v. Valeron Corp.*,
   154 A.D.2d 897 (4th Dep't 1989)..................................................................77

*Dunkel v. McDonald*,
   272 A.D. 267 (1st Dep't 1947), *overruled in part on other grounds by I. H. P. Corp. v. 210 Cent. Park S. Corp.*, 16 A.D.2d 461, 228 N.Y.S.2d 883 (1st Dep't 1962)............................75

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ...................................................................................46

*EMF Gen. Contracting Corp. v. Bisbee*,
  6 A.D.3d 45 (1st Dep't 2004) .................................................................................76

*Emmel v. Coca-Cola Bottling Co. of Chicago, Inc.*,
  904 F. Supp. 723 (N.D. Ill. 1995) ..........................................................................71

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ..............................................................37, 80

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*,
  No. 11 CIV. 5201 DLC, 2013 WL 3284118 (S.D.N.Y. June 28, 2013)...................27

*Ferring B.V. v. Allergan, Inc*
  4 F. Supp. 3d 612 (S.D.N.Y. 2014) .........................................................................26

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  74 F. Supp. 3d 639, 653 (S.D.N.Y. 2015) .................................................50, 51, 52

*Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*,
  412 F.3d 745 (7th Cir. 2005) ..................................................................................71

*Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*,
  394 F.3d 1054 (8th Cir. 2005) ..................................................................................7

*Flitton v. Primary Residential Mortg., Inc.*,
  No. 2:03CV481DAK, 2008 WL 4911225 (D. Utah Nov. 13, 2008)........................39

*Franconero v. UMG Recordings, Inc.*,
  542 F. App'x 14 (2d Cir. 2013) ...............................................................................65

*Furr v. Brady*,
  440 F.3d 43 (1st Cir. 2006)......................................................................................69

*Garofalo v. Empire Blue Cross & Blue Shield*,
  67 F. Supp. 2d 343 (S.D.N.Y. 1999).......................................................................81

*Gay v. Stonebridge Life Ins. Co.*,
  660 F.3d 58 (1st Cir. 2011)......................................................................................64

*Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  No. 96 CIV. 7874 (RWS), 2002 WL 826956 (S.D.N.Y. May 1, 2002) ..................77

*Gulf Ins. Co. v Transatlantic Reins. Co.*,
  69 A.D.3d 71 (1st Dep't 2009) ................................................................................25

*Gupta v. Attorney General of the United States*,
  No. 12 Civ. 5637 (FM), 2014 WL 1116730 (S.D.N.Y. Mar. 20, 2014) .................40

*Hackl Enters., Inc. v. Dresser-Rand Co.*,
  130 F. App'x 495 (2d Cir. 2005) .............................................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014)........................................................................................................20

*Harbaki v. SanDisk Corp.*,
    891 F. Supp. 2d 527 (S.D.N.Y. 2012).................................................................................9

*Home Equity Mortg. Tr. Series 2006-1 v. DLJ Mortg. Capital, Inc.*,
    Index No. 653787/2012 (N.Y. Sup. Ct. Mar. 25, 2015) ....................................................15

*Horvath v. Deutsche Lufthansa, AG*,
    No. 02 Civ. 3269 (PKC), 2004 WL 486976 (S.D.N.Y. Mar. 12, 2004)................................65

*Hotchkiss v. Nat'l City Bank of N.Y.*,
    200 F. 287 (S.D.N.Y. 1911).................................................................................................31

*Hutchinson v. Essence Commc'ns, Inc.*,
    769 F. Supp. 541 (S.D.N.Y. 1991) ......................................................................................40

*In re Balfour Maclaine Int'l Ltd.*,
    873 F. Supp. 862 (S.D.N.Y. 1995) ......................................................................................49

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)
    *No. 07 CIV. 10453,* 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011)......................................20

*In re CR Bard Inc.*,
    810 F.3d 913 (4th Cir. 2016) ..............................................................................................38

*In re Ear, Nose and Throat Surgeons of Worcester, Inc.*,
    49 B.R. 316 (Bankr. D. Mass. 1985) ...................................................................................71

*In re Ephedra Prods. Liab. Litig.*,
    393 F. Supp. 2d 181 (S.D.N.Y. 2005)...................................................................................5

*In re Ephedra Prods. Liab. Litig.*,
    494 F. Supp. 2d 256 (S.D.N.Y. 2007)..................................................................................47

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) ...........................................................................................7

*In re Kreta Shipping, S.A.*,
    181 F.R.D. 273 (S.D.N.Y. 1998) .........................................................................................66

*In re Louis Frey Co., Inc.*,
    No. 03 Civ. 15297, 2006 WL 2090083 (Bankr. S.D.N.Y. July 28, 2006)............................79

*In re Methyl Tertiary Butyl Ether ("MBTE") Prods. Liab. Litig.*,
    643 F. Supp. 2d 471 (S.D.N.Y. 2009)..................................................................................62

*In re Parmalat Sec. Litig.*,
    477 F. Supp. 2d 637 (S.D.N.Y. 2007)..................................................................................39

*In re Scholastic Corp. Sec. Litig*,
   252 F.3d 63 (2d Cir. 2001) ................................................................................... 28

*In re U.S. Bank Nat'l. Ass'n*,
   51 Misc. 3d 273 (N.Y. Sup. Ct. 2015) ................................................................. 82

*In re Unisys Savings Plan Litig.*,
   173 F.3d 145 (3d Cir. 1999) ................................................................................... 9

*In re WRT Energy Corp.*,
   282 B.R. 343 (Bankr. W.D. La. 2001) .................................................................... 9

*In Touch Concepts, Inc. v. Cellco P'ship*,
   No. 13 CIV. 1419 PKC, 2013 WL 6182949 (S.D.N.Y. Nov. 18, 2013),
   *aff'd*, 788 F.3d 98 (2d Cir. 2015) ......................................................................... 76

*Indradjaja v. Holder*,
   737 F.3d 212 (2d Cir. 2013) ................................................................................... 8

*Indu Craft, Inc. v. Bank of Baroda*,
   47 F.3d 490 (2d Cir. 1995) ................................................................................... 81

*J. D'Addario & Co. v. Embassy Indus., Inc.*,
   20 N.Y.3d 113 (2012) ................................................................................. 78, 80

*Jones-Reid v. Astrue*,
   924 F. Supp. 2d 381 (D. Conn. 2012) ................................................................. 39

*Jorgensen v. Century 21 Real Estate Corp.*,
   217 A.D.2d 533 (2d Dep't 1995) ......................................................................... 77

*Knights of Columbus v. Bank of N.Y. Mellon*,
   Index No. 651442/2011, 2015 N.Y. Slip Op. 31362(U), at *8 (N.Y. Sup. Ct. July 10, 2015) . 24

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*,
   628 F. Supp. 2d 312 (E.D.N.Y. 2009) ................................................................. 28

*Krofft Entm't, Inc. v. CBS Songs, a Div. of CBS, Inc.*,
   653 F. Supp. 1530 (S.D.N.Y. 1987) ................................................................... 77

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*,
   424 F.3d 195 (2d Cir. 2005) ........................................................................ 44, 45

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
   No. 0603339/2003, 2006 WL 6916430 (N.Y. Sup. Ct. Sept. 6, 2006) ................. 77

*LaSalle Commercial Mortg. Sec., Inc. v. Bank of Am., N.A.*,
   No. 13 Civ. 5605, 2014 WL 4124249 (N.D. Ill. Aug. 21, 2014) ..................... 13, 14

*Lava Trading Ins. v. Hartford Fire Ins. Co.*,
   No. 03 Civ. 7037 (PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ......... 46, 47, 64

*Lidle ex rel. Lidle v. Cirrus Design Corp.*,
    No. 08 Civ. 1253, 2010 WL 2674584 (S.D.N.Y. July 6, 2010) ...............................................62

*Lorme v. Delta Air Lines*,
    251 F. App'x 691 (2d Cir. 2007) ................................................................................64

*Lorraine v. Markel Am. Ins. Co.*,
    241 F.R.D. 534 (D. Md. 2007).....................................................................................39

*Lutes v. Kawasaki Motors Corp., USA*,
    No. 3:10-cv-1549, 2015 WL 1395898 (D. Conn. Mar. 25, 2015)..........................................67

*Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*,
    732 F.3d 755 (7th Cir. 2013) ......................................................................................44

*M & I Bank, FSB v. Coughlin*,
    No. CV 09-02282-PHX-NVM,
    2012 WL 602365 (D. Ariz. Feb. 24, 2012).....................................................................48

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*,
    127 A.D.3d 48 (1st Dep't 2015) ............................................................................16, 48

*Maggio v. Zeitz*,
    333 U.S. 56 (1948)...................................................................................................18

*Mannino v. Int'l Mfg. Co.*,
    650 F.2d 846 (6th Cir. 1981) ......................................................................................8

*Marine Carriers Corp. v. Fowler*,
    429 F.2d 702 (2d Cir. 1970)......................................................................................11

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013).......................................................................................37

*Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*,
    11 Civ. 30039 (MGM), 2015 WL 2130060 (D. Mass. May 7, 2015)..............................50, 52

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*,
    2013 WL 4399210 (S.D.N.Y. Aug. 15, 2013).................................................................75

*MASTR Adjustable Rate Mortgs. Trust 2006-OA2 ("MARM") v. UBS Real Estate Sec. Inc.*,
    12 Civ. 7322, 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015)................................................ passim

*MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Securities Inc.*,
    No. 12 Civ. 7322 (PKC), 2015 WL 797972 (S.D.N.Y. Feb. 25, 2015)...................................17

*Matthew Bender & Co., Inc. v. West Pub. Co.*,
    158 F.3d 674 (2d Cir. 1998).......................................................................................68

*MBIA Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
    103 A.D.3d 486 (1st Dep't 2013) ................................................................................15

*MBIA Ins. Corp. v Credit Suisse Sec (USA) LLC*,
   Index No 603751-2009 (N.Y. Sup. Ct. May 24, 2012) ........................................................31

*McCulloch v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995)..............................................................................................5

*McNally v. Mosbacher*,
   36 A.D.2d 522 (1st Dep't 1971) .......................................................................................23

*Meda AB v. 3M Co.*,
   969 F. Supp. 2d 360 (S.D.N.Y. 2013)...............................................................................26

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)..........................................................................................................29

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
   500 F.3d 171 (2d Cir. 2007).......................................................................................14, 22

*Metavante Corp. v. Emigrant Sav. Bank*,
   619 F.3d 748 (7th Cir. 2010) ............................................................................................66

*Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*,
   No. 00 CIV. 8613 (SAS), 2002 WL 818082 (S.D.N.Y. Apr. 30, 2002)..............................29

*Morganti Inc. v. Liberty Bond Serv., Inc.*,
   67 F. App'x 68 (2d Cir. 2003) ..........................................................................................79

*Morritt v. Stryker Corp.*,
   No. 07-CV-2919, 2011 WL 3876960 (E.D.N.Y. 2011) ......................................................65

*Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*,
   493 F.3d 160 (D.C. Cir. 2007)...........................................................................................62

*Nat'l Credit Union Admin. Bd. v. UBS Sec. LLC*,
   No. 13 CV 6731 (DLC), 2016 WL 1179203 (S.D.N.Y. Mar. 24, 2016) ..............................80

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
   392 F.3d 520 (2d Cir. 2004)..............................................................................................76

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)..............................................................................................21

*Newby v. Bank of Am. Corp.*,
   No. 12 Civ. 614, 2013 WL 940943 (E.D.N.Y. Mar. 8, 2013) .............................................45

*Nom In re Unisys Sav. Plan Litigation*,
   No. 91-3067, 1997 WL 732473 (E.D. Pa. Nov. 24, 1997) ..................................................9

*Nomura Home Equity Loan, Inc. Series 2006-FM2 v. Nomura Credit & Capital, Inc.*,
   133 A.D.3d 96 (1st Dep't 2015) ..................................................................16, 75, 76, 78

*Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*,
   458 F. Supp. 2d 131 (S.D.N.Y. 2006)................................................................................46

*Olivier v. Robert L. Yeager Mental Health Ctr.*
   398 F.3d 183 (2d Cir. 2005) ...................................................................................11

*Patterson v. Balsamico,*
   440 F.3d 104 (2d Cir. 2006)....................................................................................65

*Personal Audio, LLC v. CBS Corp.,*
   No. 2:13-CV-270-JRG-RSP, 2014 WL 1202698 (E.D. Tex. Mar. 20, 2014) ........39

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
   134 S. Ct. 1962 (2014)............................................................................................24

*Piga v. Rubin,*
   300 A.D.2d 68 (1st Dep't 2002) .............................................................................76

*Point Prods. A.G. v. Sony Music Entm't, Inc.,*
   215 F. Supp. 2d 336 (S.D.N.Y. 2002).....................................................................77

*Prestige Brands Inc. v. Guardian Drug Co.,*
   951 F. Supp. 2d 441 (S.D.N.Y. 2013).....................................................................25

*Pritchard v. Liggett & Myers Tobacco Co.,*
   295 F.2d 292 (3d Cir. 1961)....................................................................................71

*Rentas v. Ruffin,*
   816 F.3d 214 (2d Cir. 2016)....................................................................................68

*Resolution Trust Corp. v. Key Fin. Servs., Inc.,*
   280 F.3d 12 (1st Cir. 2002)...............................................................................27, 75

*Rockland Exposition, Inc., v. Great Am. Assurance Co.,*
   746 F. Supp. 2d 528 (S.D.N.Y. 2010).....................................................................24

*Russo v. Keough's Turn of the River Hardware, LLC,*
   529 F. App'x 50 (2d Cir. 2013) ...............................................................................11

*Sandata Techs., Inc. v. Infocrossing, Inc.,*
   No. 05 CIV. 09546, 2007 WL 4157163 (S.D.N.Y. Nov. 16, 2007) .......................65

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
   No. 12 MC 115 JSR, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ......................27

*Shubert v Lawrence,*
   27 A.D.2d 292 (N.Y. 1967) .....................................................................................79

*Singer Co. v. Alka Knitting Mills, Inc.,*
   41 A.D.2d 856 (2d Dep't 1973)...............................................................................81

*Skidd v. JW Marriot Hotels & Resorts,*
   No. 06 Civ. 1554 (DAB), 2010 WL 2834890 (S.D.N.Y. July 8, 2010) ..................59

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,*
   467 F.3d 107 (2d Cir. 2006).......................................................................................5

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
   No. 00 Civ. 8058 (NRB), 2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004) ...............................25

*Stillman v. InService Am. Inc.*,
   738 F. Supp. 2d 480 (S.D.N.Y. 2010), *aff'd*, 455 F. App'x 48 (2d Cir. 2012) ......................79

*Suffolk Anesthesiology Assocs., P.C. v. Verdone*,
   134 A.D.3d 1016 (2d Dep't 2015) ...............................................................................11

*Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*,
   36 Misc. 3d 328 (N.Y. Sup. Ct. 2012) .........................................................................75

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*,
   874 F. Supp. 2d 328 (S.D.N.Y. 2012) ...............................................................13, 14, 15

*Tedder v. Am. Railcar Indus.*,
   739 F.3d 1104 (8th Cir. 2014) ......................................................................................7

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   Nos. 08 Civ. 7611 (BSJ) (AJP), 09 Civ. 8824 (BSJ) (AJP),
   2011 WL 4063297 (S.D.N.Y. 2011) ..............................................................................64

*Thompson v. Doane Pet Care Co.*,
   470 F.3d 1201 (6th Cir. 2006) .....................................................................................62

*Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v.
   Love Funding Corp.*,
   No. 04 CIV. 9890 (SAS), 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) ...............................24

*Tucker v. Am. Int'l Grp., Inc.*,
   No. 3:09-cv-1499 (CSH), 2016 WL 1367725 (D. Conn. Apr. 5, 2016) ................................38

*U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*,
   121 A.D. 3d 535 (1st Dep't 2014) ...............................................................................23

*U.S. Bank Nat'l Ass'n v. Greenpoint Mortg. Funding, Inc.*,
   991 F. Supp. 3d 472 (S.D.N.Y. 2014), *aff'd*, 2016 WL 1039917 ...........................................23

*U.S. Bank Nat'l Ass'n v. Williams*,
   121 A.D.3d 1098 (2d Dep't 2014) ................................................................................79

*U.S. Bank Nat'l Ass'n v. WMC Mortg. Co.*,
   No. CIV. 11-2542 JRT/TNL, 2012 WL 4511065 (D. Minn. Oct. 1, 2012) ......................23, 75

*U.S. Bank v. Dexia*,
   No. 12-cv-9412 (SAS), 2014 WL 4290642 (S.D.N.Y. Aug. 28, 2014),
   *rev'd on other grounds*, 2016 WL 1042090 (Mar. 16, 2016) ................................................79

*U.S. Bank, Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
   112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) .....................................................................65

*U.S. ex rel. Maris Equip. Co. v. Morganti, Inc.*,
   163 F. Supp. 2d 174 (E.D.N.Y. 2001) ...........................................................................79

*United States v. Bonds,*
  608 F.3d 495 (9th Cir. 2010) ...................................................................................25

*United States v. Collins,*
  581 F. App'x 59 (2d Cir. 2014) ...............................................................................11

*United States v. Doyle,*
  130 F.3d 523 (2d Cir. 1997).....................................................................................70

*United States v. Germosen,*
  139 F.3d 120 (2d Cir. 1998).....................................................................................51

*United States v. Locascio,*
  6 F.3d 924 (2d Cir. 1993).........................................................................................37

*United States v. Mejia,*
  545 F.3d 179 (2d Cir. 2008).....................................................................................38

*United States v. Ochs,*
  548 F. Supp. 502 (S.D.N.Y. 1982) ...........................................................................9

*United States v. Patterson,*
  219 F.2d 659 (2d Cir. 1955).....................................................................................18

*United States v. Paulino,*
  935 F.2d 739 (6th Cir. 1991) ...................................................................................71

*United States v. Sliker,*
  751 F.2d 477 (2d Cir. 1984).....................................................................................34

*United States v. Suggs,*
  531 F. App'x 609 (2d Cir. 2013) .............................................................................70

*United States v. West,*
  574 F.2d 1131 (4th Cir. 1978) .................................................................................69

*Update Art, Inc. v. Modiin Pub., Ltd.,*
  843 F.2d 67 (2d Cir. 1988).......................................................................................64

*Watanabe Realty Corp. v. City of New York,*
  No. 01 CIV. 10137 (LAK), 2004 WL 169751 (S.D.N.Y. Jan. 28, 2004)................45

*Weiss v. Allstate Ins. Co.,*
  512 F. Supp. 2d 463 (E.D. La. 2007) ......................................................................71

*Wells Fargo Bank N.A. v. Bank of Am. N.A.,*
  No. 10 Civ. 9584 (JPO), 2014 WL 476299 (S.D.N.Y. Feb. 6, 2014)
  *rev'd on other grounds*, 627 F. App'x 27 (2d Cir. 2015) ........................................79

*Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.,*
  No. 14-1414-CV, 2016 WL 1042020 (2d Cir. Mar. 16, 2016)................................13

*Wilkins v. Montgomery*,
    751 F.3d 214 (4th Cir. 2004) ...................................................................................65

*Williams v. Blvd. Lines, Inc.*,
    No. 10 Civ. 2924 (DF), 2013 WL 5652589 (S.D.N.Y. Sept. 30, 2013) ....................65

*Williams v. Illinois*,
    132 S. Ct. 2221 (2012) ..........................................................................................68

*Wills v. Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004)......................................................................................11

*Zielinski v. Associated Mut. Ins. Co.*,
    217 A.D.2d 938 (4th Dep't 1995) ............................................................................79

### Statutes & Rules

15 U.S.C. § 77k(a) ...........................................................................................................27

15 U.S.C. § 77l(a)(2) ........................................................................................................27

15 U.S.C. § 1117(b) ..........................................................................................................28

Bankruptcy Code § 546(e) ................................................................................................27

Fed. R. Civ. P. 26 .............................................................................................................66

Fed. R. Civ. P. 26(a)(2)(E) ..................................................................................................7

Fed. R. Evid. 703 ...................................................................................................7, 52, 68

Fed. R. Evid. 803(17).............................................................................................37, 38, 39, 40

Fed. R. Evid. 803(8)...............................................................................................39, 70

N.Y. CPLR § 5001(a) .......................................................................................................78

N.Y. CPLR § 5004 ...........................................................................................................78

### Treatises

11 C. Wright & A. Miller & M. Kane, *Federal Practice and Procedure* (2d ed. 1995)................5

1 D. Dobbs, *Law of Remedies* § 2.4(4) (2d ed. 1993)..................................................24

## **PRELIMINARY STATEMENT**

UBS does not rebut the overwhelming evidence showing that it materially breached the Warranties it made for more than 9,000 Loans.[1]  Instead, UBS tries to conjure up reasons for the Court to disregard that evidence by misconstruing the parties' unambiguous contracts, misapplying evidentiary rules, and imploring the Court to strike all of Plaintiff's[2] expert testimony for the flimsiest of purported reasons.  UBS's arguments are legally meritless, factually baseless, invite reversal, and as a practical matter would make it impossible for Plaintiff to recover for any defective Loan under the contracts in this case.

For the vast majority of Loans, UBS cannot dispute the facts on which Holt based his material breach findings because *Grissom did not dispute those facts.  E.g.*, Part II.C.5 *below*. Grissom testified that she reviewed these underlying facts and Holt's supporting materials and identified any errors she found; thus, for the vast majority of Loans for which Grissom identified no purported errors, Grissom *agreed* that the facts underpinning Holt's findings are true. Moreover, with a few exceptions (addressed below), UBS does not dispute that Plaintiff's descriptions of the facts concerning the breach findings in each of Plaintiff's Appendices are accurate.  Accordingly, for most Loans, the Court can determine liability by assessing whether the undisputed facts concerning each breach category constitute a material breach.

Recognizing this, UBS tries to avoid liability by raising several all-or-nothing arguments, most notably that the Court should exclude Plaintiff's expert testimony and should not consider any evidence the experts reviewed.  In particular, UBS argues that Holt's testimony should be stricken, despite his undisputed underwriting expertise and rigorous review process, based on inconsequential errors concerning a small number of Loans and an inaccurate description of a qualification with, at best, peripheral relevance to his expertise.  UBS's challenges neither render

---

[1]   All capitalized terms herein have the meanings defined in Plaintiff's Proposed Findings Of Fact And Conclusions Of Law ("FOFs") and Plaintiff's Post-Trial Brief ("Br."), unless otherwise indicated.

[2]   "Plaintiff" refers to the Trustee, by and on behalf of the Trusts.  *See* Dkt. 475 at 2 (Memorandum of Law in Support of Plaintiff's Motion To Amend The Complaint) (explaining that this action is brought by the Trustee acting on behalf of the Trusts, not by the Trusts themselves).

Holt's opinions inadmissible nor undermine his findings, especially those findings based on undisputed facts.

Moreover, the Court can enter judgment on many categories of breaches even without Holt's testimony, based on Grissom's concessions and evidence in the Loan Files, the Guidelines, the MLS, and/or certain other commercial data:[3]

> Grissom does not dispute that many Loans contain material breaches (App. 61).
>
> For the Loans with breaches of the Mortgage File Warranty (App. 43), the breaches are evident from the Loan Files, the MAE is conceded by Grissom and is evident from the nature of the Warranty and the cure prong of the cure-or-repurchase protocol, and UBS offers in response only its misinterpretation of the Warranty and speculation that the Mortgage File documents might have been in UBS's possession—despite Twombly's acknowledgement that for most of the Loans UBS never possessed these documents.
>
> For the Loans with breaches of the Title Insurance Warranty (App. 41), the Hazard Insurance Warranty (App. 46), or the Guideline Warranty based on missing documents (App. 47), the breaches are evident from the Loan Files, the MAE is conceded by Grissom and/or evident from the Guidelines, and UBS offers only its misinterpretations of the Warranties and speculation that the documents must have existed.
>
> For the Loans with breaches of the MLS Warranty regarding Credit Score (App. 5), the breaches are evident from the Loan Files and the MLS, the MAE is conceded by Wu and Grissom, and UBS offers no substantive response.
>
> For the Loans with breaches of the MLS Warranty regarding Loan Purpose, Property Type, Documentation Type, and Owner -Occupancy (Apps. 2, 3, 4, and 6), the breaches are evident from the Loan Files and the MLS, the MAE is conceded by Grissom and/or evident from the Guidelines, and UBS offers only its misinterpretation of the Warranty.
>
> For the Loans with breaches of the MLS Warranty regarding DTI Ratios that are based on Commercial Data (Apps. 10, 11), on

_____

[3]   To help clarify the issues for the Court, Plaintiff is submitting revised Appendices, each of which includes a "Loan Summary" tab that distills the critical information in that Appendix.  For each Appendix, the Loan Summary tab shows:  (i) the number of Loans at issue; (ii) Plaintiff's current estimated damages; and (iii) Plaintiff's current estimated pre-judgment interest.  It also shows, by category, how many Loans UBS has conceded (either by agreeing to repurchase them or because Grissom does not dispute Holt's finding that the Loan is materially defective) ("Conceded"), as well as how many Loans have liquidated.  None of this information is new, and this tab simply provides the Court with a convenient reference that it can use when ruling on Plaintiff's breach categories.

employer statements in W-2s and paystubs (App. 15), or on statements by the Social Security Administration (App. 14), the breaches are evident from the data, the MAE is conceded by Grissom and/or evident from the Loan Files, and UBS offers only its misinterpretation of the Warranty and asks that the Court not consider the statements for their truth.

Further, for other categories of breaches, where expert evidence is required, there is no dispute about the facts that Holt relied on and with which Grissom agrees. Hence, the Court can find both breaches and MAEs for the Loans in these categories based on those undisputed facts, Grissom's concessions, and the Guidelines:

For the Loans with breaches of the MLS Warranty regarding DTI Ratios that are based on borrower statements (Apps. 21, 22) UBS offers only its misinterpretation of the Warranty and argues that Holt should not have relied on such statements, even though underwriters regularly did so.

For the Loans with breaches of the LTV Warranty based on Cowan's expert work (App. 40)—which includes those Loans for which the appraisal exceeded the sales prices of *all* comparable properties—UBS offers only its misinterpretation of the Warranty and mischaracterizations of Cowan's work.

For the Loans with breaches of the Guideline Warranty where Loans did not comply with guidelines and no exception was granted (App. 55), UBS offers only its misinterpretation of the warranty and Grissom's speculation that exceptions could have been granted based on factors not documented in the Loan Files.

The only category of breaches that might require a more detailed review is where Holt found a loan defective based on an invalid or unreasonable exception to the Guideline Warranty and Grissom disagrees, although she often bases her opinion on factors the underwriter did not consider (App. 54).

Moreover, Plaintiff's proof is even more compelling—as to both breach and MAE—when the breach findings for each Loan are reviewed as a whole rather than in isolation from one another. This is because most Loans were infected by multiple, independent breaches—for example, (i) multiple types of MLS Warranty breach (regarding DTI ratio based on undisclosed debt, DTI ratio based on false income, occupancy, LTV ratio, and/or credit score); (ii) an MLS Warranty breach and a Guideline Warranty breach without an exception or with an invalid or

3

unreasonable exception; (iii) an MLS Warranty breach and a Mortgage File Warranty breach or a Guideline Warranty breach based on missing core documents.  Many of these breaches themselves provide evidence supporting other, independent breaches:  for example, that a borrower committed income fraud (causing an MLS Warranty breach regarding DTI ratio) increases the likelihood that the borrower committed other types of fraud (*e.g.*, as to occupancy, causing an MLS Warranty breach regarding occupancy); and that an underwriter overlooked an obvious Guideline requirement (*e.g.*, as to DTI ratio) increases the likelihood that the underwriter also failed to ensure core documents were obtained (resulting in a Guideline Warranty breach based on missing core documents).  Likewise, the MAE of multiple, independent breaches is generally significantly greater than the MAE of individual breaches considered in isolation, because of the "layered risk" presented by such breaches.

In short, based upon extensive, largely undisputed evidence, Plaintiff has proved UBS's material breaches with respect to all Loans remaining at issue.  UBS bought these Loans, selected them for securitization, and discovered numerous material defects in the Loans while conducting diligence, but nevertheless made Warranties guaranteeing their credit quality and promised to repurchase them promptly if the Warranties were untrue.  UBS must be held responsible for the contractual obligations to which it agreed, and judgment should be entered for Plaintiff.

## <u>ARGUMENT</u>

## I.    HOLT'S RE-UNDERWRITING WORK WAS RELIABLE AND CREDIBLE

Plaintiff set forth Holt's extensive underwriting qualifications and the rigorous process that he and his team of more than 200 re-underwriters used to review the thousands of Loans at issue (FOFs ¶¶ 84-88).  Plaintiff contrasted this with Grissom's lack of relevant personal experience and her rubber-stamp procedures, which involved no written instructions, few oral communications, the deletion of her vendors' initial findings, and repeated assumption the that original underwriters acted properly.  FOFs ¶¶ 89-91.

UBS does not, and cannot, dispute Holt's underwriting qualifications.  Nor, tellingly, does UBS make any effort to defend Grissom's testimony.  Further, for the vast majority of Loans, *UBS*

*does not dispute the facts upon which Holt relies*.  Grissom testified that she reviewed all of the facts found by Holt and the supporting evidence in the Loan Files and identified any errors she found.  FOFs ¶ 91.  For most Loans, she has not identified any such errors.  Accordingly, for most of the Loans, the facts relied on by Holt must be deemed true.

Unable to rebut either Holt's qualifications or the substance of his opinions, UBS tries to attack his reliability (Dkt. 483 ¶¶ 65-94), hoping that minor flaws in his work will lead the Court to throw out his entire comprehensive review of thousands of Loans.  At the threshold, under Second Circuit law, UBS's criticisms go only to weight, not admissibility, and cannot justify exclusion of Holt's testimony.  *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [the expert's] credentials, faults in his use of . . . a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *see also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006) ("To the extent that there are gaps or inconsistencies in [experts'] testimony, those issues go to the weight of the evidence, not to its admissibility.") (quotations omitted); *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005) ("Often . . . 'gaps or inconsistencies in the reasoning leading to [the] opinion . . . go to the weight of the evidence, not to its admissibility.'") (quoting *Campbell v. Metropolitan Property and Casualty Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)).[4]

Moreover, UBS's attacks are small-bore, and do not meaningfully diminish the weight of Holt's testimony.  UBS asserts (Dkt. 483 ¶¶ 68-73) that Holt's testimony contained "numerous" errors.  But at trial, UBS alleged errors in only 18 Loans of the more than 12,000 reviewed and, as

---

[4]   It would be especially inappropriate to exclude Holt's testimony because this action was tried to the bench.  *Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001) ("[T]he admission of evidence in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis"); *Assured Guar. Mun. Corp. v. Flagstar Bank*, 920 F. Supp. 2d 475, 504-508 (S.D.N.Y. 2013) (in RMBS case, stating that in bench trials "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis," and admitting testimony of plaintiff's reunderwriting expert over *Daubert* challenge renewed after the close of evidence); 11 C. Wright & A. Miller & M. Kane, *Federal Practice and Procedure* § 2885, at 454-55 (2d ed. 1995) ("[I]n nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence.").

Plaintiff showed (FOFs ¶¶ 96-99), for 15 of those 18 Loans either Holt made no error or those Loans are materially defective on other grounds—UBS makes no attempt to rebut Plaintiff's showing as to these Loans.

UBS now tries to identify other purported "errors" in its Appendix B, about which it did not examine Holt despite its nearly 17 unused hours of allotted trial time. As Plaintiff shows in its Responsive Appendix B, most of these are either not errors at all or are inconsequential. *See* Plaintiff's Responsive Appendix B.[5] All told, even after scouring Holt's findings for nearly a year, UBS manages to identify purported "errors" in only approximately 68 of the more than 9,000 Loans at issue—a trifling number. *See Flagstar*, 920 F. Supp. 2d at 507-08 (refusing to exclude testimony of plaintiff's reunderwriting expert due to purported errors because "given the volume of loans that [the expert] reviewed, it seems inevitable that occasional errors would slip by, but there has been no showing that such errors were either frequent or material").

UBS also suggests that Holt's willingness to acknowledge the few erroneous findings identified by UBS diminishes his reliability (Dkt. 483 ¶¶ 69-71); to the contrary, it *enhances* Holt's reliability and credibility, leaving the Court with only those findings that have been fully vetted. Similarly, UBS challenges the fact that Holt did not know precisely which Loans had been withdrawn from issue by Plaintiff (Dkt. 483 ¶¶ 72-73, 82-84); but Plaintiff and its counsel withdrew these Loans, not Holt, and Holt's lack of knowledge concerning Plaintiff's strategic decisions does not undermine his reliability as to the Loans that remain at issue. Nor does Holt's inadvertent failure to omit references to "layered risk"[6] in certain replies relating to an

---

[5]   As explained in Plaintiff's Responsive Appendix B, most of these purported "errors" have nothing to do with Holt's work, and instead are the result of Plaintiff having been extremely conservative in selecting the number of Loans at issue. For example, Plaintiff put forward breaches of the MLS Warranty regarding DTI ratios only if the actual DTI ratio either exceeded the guideline maximum by more than 2% or if the actual DTI ratio was both 10% greater than the stated DTI ratio and above 30%. FOFs ¶¶ 309-10. In certain instances, these parameters were not applied consistently, and corrected versions of the relevant Appendices are provided herewith. Issues like this have nothing to do with Holt's credibility.

In addition, in the few cases where UBS has identified additional errors in Holt's findings, revised versions of the relevant Appendices are provided herewith. This *de minimis* number of errors does nothing to harm Holt's credibility.

[6]   UBS argues (Dkt. 483 ¶ 121) that for any Loan suffering from multiple defects, "Holt did not do any analysis" as to whether withdrawing some, but not all, defect findings for that Loan would affect his ultimate conclusion that the

insignificant number of Loans for which findings had been withdrawn, obviating a "layered risk" issue (Dkt. 483 ¶ 70), undermine the reliability of his other findings.

Contrary to UBS's assertion (Dkt. 483 ¶¶ 74-76, 79, 81), Holt's testimony is also not undercut by the fact that he changed his findings as to certain Loans from his 2014 report to his 2015 report.  It is, of course, permissible for an expert to change his mind based on additional evidence, even at trial.  *See* Fed. R. Evid. 703 advisory committee's note (expert may base an opinion on facts which they learned by "attend[ing] the trial and hear[ing] the testimony establishing the facts"); Fed. R. Civ. P. 26(a)(2)(E) (requiring experts to serve supplemental reports if they discover new facts or change their opinions); *Tedder v. Am. Railcar Indus.*, 739 F.3d 1104, 1109 (8th Cir. 2014) (affirming admission of expert's testimony when expert "modified his diagnosis to account for this new information" learned at trial); *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014-15 (8th Cir. 2012) (affirming district court's decision to consider expert testimony where the expert "revised his opinion to reflect a lower salary after he considered new facts revealed at [plaintiff's] deposition.").  Here, as Holt testified, the changes in his opinions—some of which led him to drop findings of material breach, Holt Direct (PX 1103) ¶ 224—resulted primarily from his review of additional materials, including additional guidelines, loan files, and third-party commercial data.  *Id.* ¶¶ 224-27; Pl. Opp. to Defs. Mot. *In Limine* Nos. 1-5, Dkt. 345, at 16-17 (responding to identical arguments made by UBS in its second motion *in limine*).[7]  Moreover, given that Grissom changed her own conclusions as to 34 Loans between her 2014 and 2015 reports (Dkt. 345 at 16-17), and, further, *conceded* that ten of the Loans as to which Holt's findings changed were materially defective, Holt Direct ¶ 224, UBS can hardly be heard to argue that Holt's opinions were unreliable based on the fact that he updated them.[8]

---

Loan was materially defective.  However, the only example UBS cites where this might be true is defects based on a missing second note where all other breaches have been dropped, and because Plaintiff withdrew all such Loans from its appendices prior to filing its Findings of Fact.

[7]  Although UBS asserts (Dkt. 483 ¶ 79) that Holt simply changed his mind as to some of the Loans without additional evidence, UBS is unable to cite any examples.

[8]  UBS's cited cases (Dkt. 483 ¶ 79) are inapposite because the experts in those cases did not change their minds based on additional information.  *See In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174,

UBS argues that Holt's consideration of evidence outside of the Loan Files was improper because it purportedly was not his normal practice to review such evidence and he did so only at counsel's request (Dkt. 483 ¶¶ 74-79). But the very testimony that UBS cites (*id.* ¶ 75) shows otherwise—that Holt *has* reviewed this evidence in other cases, just not in cases in which he has testified. Tr. 1205:13-15 ("Q. On the post-origination bankruptcy issue, again the first issue that we talked about since the break, in the other matters where you've testified you have not relied on post-origination bankruptcies; is that right? A. Not that I've – that's correct. *I am doing it on other cases but not to date have I testified* on that, correct.") (playing 2014 Deposition 134:25-135:9) (emphasis added). Moreover, Holt testified that he frequently used the underlying sources of this information in both his underwriting and re-underwriting work and that those sources were generally used and relied on by other underwriters for the very purposes for which he used them here—to identify borrower fraud as to income or occupancy, to discover undisclosed debts, and to determine whether stated incomes were reasonable. Tr. 1179:19-1181:7; 1185:11-20.

Contrary to UBS's assertion (Dkt. 483 ¶ 77), Holt's consideration of materials outside of the Loan Files at counsel's request does not mean his report "merely expressed the opinions of the lawyers who hired [him]." Lawyers are allowed to ask experts to consider various materials in reaching their opinions. *Indradjaja v. Holder*, 737 F.3d 212, 215 (2d Cir. 2013) (Board of Immigration Appeals abused its discretion in disregarding expert affidavit relying, in part, on "information provided to [expert] about [appellant] by her attorney."); *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 853 (6th Cir. 1981) (Expert had "adequate basis for his opinion . . . [where] [h]e relied upon . . . literature and information furnished him by plaintiff's attorney."). UBS does not (and could not) allege that Holt followed counsel's direction in deciding which *opinions* to reach based on these materials; rather, Holt used his own expertise to determine which of the materials

---

182 (S.D.N.Y. 2012) (expert "changed the relevant news dates from the first study to the second, and then changed them again in his testimony"); *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2005) (expert reversed opinion regarding the meaning of certain evidence "where that evidence was the sole basis from which to infer the location of a defect").

he considered that he would rely on and to evaluate the significance of the data in those materials, and UBS has no basis to claim otherwise. Moreover, Grissom does not dispute general industry reliance on those data sources for the purposes for which Holt used them (only the timing of the data he considered), and, critically, Grissom does not dispute the facts that Holt found based on those materials.[9] In short, UBS fails to undermine the reliability of Holt's methodology or the substance of his testimony.[10]

UBS also repeats its failed attack on Holt's credibility, asserting that, despite his 25 years of practical experience in the industry, Holt's comprehensive reunderwriting of thousands of Loans should be disregarded in its entirety because he purportedly misrepresented his graduate qualification in Retail Bank Management from the University of Virginia (Dkt. 483 ¶¶ 85-88). That qualification—which UBS fails to address—states on its face that Holt received a "Diploma of Graduation" from the "Graduate School of Retail Bank Management at the McIntire School of Commerce University of Virginia," which was "sponsored by" the "Consumer Bankers Association," and which was signed by Dean of the University of Virginia's McIntire School of Commerce. PX 1105. That is exactly what Holt stated in the resume submitted as part of his direct testimony, Holt Direct (PX 1103) ¶ 28; *id*., Ex. A (resume) and what he testified in court, Tr. 752:6-753:25—with the exception that he mis-described the "diploma" as a "degree." The description of the "diploma" as a "degree" is a distinction that does not undermine Holt's undisputed underwriting qualifications, which are derived not from this single course but from 25 years of practical experience. *See* Tr. 266:8-21 (Grissom testifying that underwriting expertise is based on on-the-job experience).[11]

---

[9] UBS's meritless argument (Dkt. 483 ¶ 80) that Holt instructed his vendors to find breaches based on rules outside of the guidelines is addressed in Part II.G.5, *below*.

[10] UBS cites *United States v. Ochs*, 548 F. Supp. 502, 513 (S.D.N.Y. 1982) to argue that cumulative effects of the minor issues it raises warrants exclusion; *Ochs* is not at all on point, however, as it excluded *lay* testimony based on extreme conduct—a lay witness testified the defendant extorted her through threats of violence, and the court did not credit a recantation of that testimony where her memory of that recantation was contrary to that of other witnesses.

[11] UBS's cited cases (Dkt. 483 ¶ 88) are inapposite, as they involved experts who fundamentally misrepresented highly relevant qualifications to mislead the trier of fact and had no expertise in the claimed areas. *Harbaki v. SanDisk Corp.*, 891 F. Supp. 2d 527, 539 (S.D.N.Y. 2012) (expert conceded she exaggerated her credentials and had

UBS's only other credibility attack is premised on UBS's false statement that Holt "rejected the authenticity of W-2 documentation because the salary figures that were greater than one thousand did not contain commas." Dkt. 483 ¶ 89. None of Holt's findings reject information from W-2 forms on that basis. This issue arose at trial only because Holt testified on cross-examination that a specific W-2 form presented to him by UBS's counsel contained indicia of fraud, not only because of the absence of commas, but also because the font sizes and line spacings were mismatched and that certain information looked to have been typed in rather than prepared by computer. Tr. 883:8-12. Although Holt also noted the absence of commas, the fact that he failed to remember, off the cuff, the exact IRS requirements for including or excluding commas in W-2 forms hardly undermines his overall credibility, particularly where his findings with respect to the Loan at issue were not determined solely by that W-2.[12]

## II.    UBS FAILS TO REBUT THE EVIDENCE OF ITS LIABILITY

UBS concedes (Dkt. 483 ¶ 139 n.31) that once Plaintiff proves its *prima facie* case, it must offer rebuttal evidence to escape liability, and UBS does not dispute that it cannot rebut the extensive evidence of its liability "with speculation or conjecture." FOFs ¶ 134 (collecting authorities); Dkt. 483 ¶¶ 59-63 (not addressing those authorities). Yet, because UBS cannot rebut the facts, its defense comes down to its assertion that Plaintiff has not disproven the existence of certain speculative facts (such as whether a borrower won the lottery). UBS's rebuttal fails.

---

"no knowledge" of the firmware she was called to analyze); *see also In re Unisys Savings Plan Litig.*, 173 F.3d 145, 156-57 (3d Cir. 1999) (*aff'g sub. Nom In re Unisys Sav. Plan Litig.*, No. 91-3067, 1997 WL 732473, *21-22 (E.D. Pa. Nov. 24, 1997) (expert with experience in property casualty insurance had no basis to opine about life insurance)); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1380-81 (11th Cir. 1988) (expert falsely testified he had an accounting degree from Columbia University and worked at a firm as a money manager; he had been an engineering student at the University of Alabama but did not graduate); *Contreras v. Sec'y of Health & Human Servs.*, 121 Fed. Cl. 230, 234, 236 (2015) (expert "repeatedly misrepresented his credentials to his employer and various judicial officers"); *In re WRT Energy Corp.*, 282 B.R. 343, 371 & n.209 (Bankr. W.D. La. 2001) (expert lied about attending Stanford University, "created a more elaborate lie when confronted on the witness stand with her first lie," continued it in a chambers conference, and later *pled guilty to criminal contempt*).

[12]    UBS's final argument (Dkt. 483 ¶¶ 91-94) that Holt's testimony does not "fit" the facts of the case simply references arguments that UBS makes elsewhere, falsely stating that Holt did not conduct an MAE analysis (*see* Part I, *above*), advancing misinterpretations of the MLS Warranty regarding DTI ratios and LTV ratios (*see* Parts II.C.5-6, *below*), and inaccurately stating that Holt was a conduit for hearsay (*see* Part II.C.5, *below*).

### A.    UBS Fails To Rebut The Evidence Of Material And Adverse Effects

As Plaintiff showed (Br. 18-19; FOFs ¶¶ 149-51), it can satisfy the contracts' MAE Clause by identifying a false warranty that, when compared to the warranted facts, significantly increases a Loan's risk of loss.  UBS points to preliminary statements by the Court that an MAE must be assessed as of the cure-repurchase period, Dkt. 483 ¶ 99, but even that construction cannot mean—as UBS would have it—that Plaintiff was required to depose every borrower to see if his or her circumstances had changed, given the very low likelihood of any meaningful change.  It is sufficient to show that the breach's effect was likely to continue and there is no reason to believe that it was cured.

UBS erroneously asserts (Dkt. 483 ¶¶ 64, 131) that "expert testimony is required" for the Court to find MAEs; in fact, New York courts do not require expert testimony to establish contractual material or adverse effects.  *E.g.*, *Suffolk Anesthesiology Assocs., P.C. v. Verdone*, 134 A.D.3d 1016, 1017-18 (2d Dep't 2015) (affirming trial court ruling based on lay testimony that "employee-shareholder engaged in willful misconduct that had a 'material adverse effect'" on corporation within meaning of shareholders' agreement); *see also, e.g.*, *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) ("fact witness[ ] [testimony] [was] . . . sufficient" to prove "materiality" of failure to disclose Proceeds Participation Agreement in connection with leveraged buyout).  The cases cited by UBS are not to the contrary, as they do not address materiality or even sound in contract.[13]  Accordingly, while Plaintiff provided expert evidence of MAEs, even

---

[13]    Three of the six cases that UBS cites on this issue (Dkt. 483 ¶¶ 64, 121) held expert testimony was required to address complex questions of proximate causation, which is not at issue here.  *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 ("MARM") v. UBS Real Estate Sec. Inc.*, 12 Civ. 7322, 2015 WL 764665, at *15 (S.D.N.Y. Jan. 9, 2015), Dkt. 249.  *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) ("the causal link between exposure to toxins and . . . squamous cell carcinoma is sufficiently beyond the knowledge of the lay juror that expert testimony is required to establish causation."); *Hackl Enters., Inc. v. Dresser-Rand Co.*, 130 F. App'x 495, 496-97 (2d Cir. 2005) (similar holding regarding "the causal link between the way in which the compressor was secured and the resulting accident" in personal injury case); *Barnes v. Anderson*, 202 F.3d 150, 160 (2d Cir. 1999) (similar, proximate causation of miscarriage).  A fourth case, *Olivier v. Robert L. Yeager Mental Health Ctr.* addressed a professional standard of care, which is also not at issue here.  398 F.3d 183, 190 (2d Cir. 2005) (expert testimony was required to prove that psychiatrist negligently ordered involuntary commitment).  A fifth case held that, once an expert's testimony that a ladder was defective was excluded, there was no evidence showing the defect, but it did not hold that expert testimony was required to prove the defect.  *Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 50-52 (2d Cir. 2013) ("[w]ithout the testimony of [excluded] . . . expert witness, [plaintiff's] claims fail because there would be no evidence from which a reasonable jury could conclude that the ladder was defective").  Similarly, the court in

without it, the Court can find MAEs based on the other evidence in the record, establishing MAEs for each Loan that persisted throughout all relevant periods, Br. 21-27.

### 1. The Contracts' Text And Overwhelming Authority Show That Material And Adverse Effects Are Measured At Breach

The MAE Clause requires that a false warranty "materially and adversely affects the interests of the Certificateholders or the Certificate Insurer . . . in any Mortgage Loan[.]" PX 49 at 73-74; PX 110 at 101-04; PX 182 at 85-87. As Plaintiff showed (Br. 20-21, 27-30; FOFs ¶¶ 164-69), every source of interpretative authority—from the PSAs' text, to settled precedent describing materiality and breach of warranty claims, to the parties' practical expectations—indicates that MAEs under this Clause are to be determined as of the date of breach.[14]

UBS's arguments to the contrary invite error. UBS's primary argument (Dkt. 483 ¶ 102) for measuring MAEs at the time of notice or discovery is that the MAE Clause uses the present tense verb "affects." *Id.* (citing Tr. 128:22-24, 128:7-12). UBS's construction should be rejected because it ignores the most natural reading of this clause—that a breach is not actionable unless it causes a MAE. It does not make sense, as UBS argues, to separate the phrase "breach of any representation or warranty . . . which materially and adversely affects the interest of Certificateholders" into two separate requirements that operate at two separate times. The purpose of the MAE requirement is to define those breaches that are actionable. The MAE Clause speaks in the present tense because the contract speaks in the present tense.[15]

---

UBS's final case held that, on the "rather sparse record" before it, it could not determine if a ship was a rebuilt version of another ship, and therefore eligible for coast-wide trade, but it did not hold that expert testimony would be required to make that determination on other facts. *Marine Carriers Corp. v. Fowler*, 429 F.2d 702, 710 (2d Cir. 1970) (significance of record facts relating to composition of ship could not be weighed "[w]ithout the benefit of expert testimony").

[14]  UBS seeks to justify its reading of the MAE Clause by citing dicta in the Court's summary judgment order, in which the Court stated: "At this juncture, the Court need not determine the contours of how materiality may be proven." *MARM*, 2015 WL 764665, at *10. The issue of when an MAE should be measured was not before the Court and the parties never briefed it—instead, the issue then before the Court was whether UBS received notice of defects beyond those identified in repurchase demands. *Id.* at 17; Pl.'s Mot. ISO PSJ, Dkt. 204, at 10-11; Def.'s Opp. to Pl.'s PSJ, Dkt. 212, at 12-20; Pl.'s Reply IFSO PSJ, Dkt. 225, at 2-4; Pl.'s Opp. to Def.'s PSJ, Dkt. 217, at 9-13; Def.'s MOL IFSO PSJ, Dkt. 223, at 4-9.

[15]  UBS also asks (Dkt. 483 ¶ 109) the Court to ignore the well-settled principle that the materiality of false statements "consists in their tendency to influence the conduct of the party who has an interest in them and to whom they are addressed," (Dkt. 483 ¶ 168 (quoting *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 183-84 (2d Cir.

UBS's effort to bolster its present-tense argument through Section 2.03's reference to a "breach [that] has occurred and is continuing," Dkt. 483 ¶ 103 (quoting PX 49 at 75-76) (emphasis added), is unavailing.  This language refers to a "breach," not to a MAE, that "is continuing," meaning only that the breach had not otherwise been cured by the time of the cure period (*e.g.*, a Loan did not have title insurance, breaching the Title Insurance Warranty, and the required insurance remained missing as of the cure period).

Similarly, while UBS points to its right to "cure" defects under Section 2.03 (Dkt. 483 ¶ 103 & n.21), that provision refers to UBS's right to "cure such *breach* in all material respects"— that is, the material aspects of the breach itself—and does not require a separate MAE that must be measured after the breach occurs.  PX 49 at 74 (emphasis added).  Contrary to UBS's suggestion (Dkt. 483 ¶ 106), the MAE Clause does not require Plaintiff to demonstrate both a material breach and also an MAE.  The MAE Clause simply defines which breaches will be deemed material and does not create separate requirements that the breach be both material and have a material adverse effect.  *See, e.g.*, *LaSalle Commercial Mortg. Sec., Inc. v. Bank of Am., N.A.*, No. 13 Civ. 5605, 2014 WL 4124249, at *7 (N.D. Ill. Aug. 21, 2014) (material adverse effect establishes that breaches were material); *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 335 (S.D.N.Y. 2012) (same construction).

UBS says (Dkt. 483 ¶¶ 104-05) the MAE Clause is not itself an element of a breach of warranty claim but rather is a "procedural prerequisite" to bringing suit; but it does not follow that, if a plaintiff shows that an MAE existed at the time of the breach, then the plaintiff must also affirmatively demonstrate that the MAE continued to exist at the time the breach was uncovered. The contracts provide that MAEs must arise from a "breach of any representation or warranty," PX 49 at 74, and the Second Circuit has held that such warranties "guarantee, at their core, no

---

1984) (internal quotation marks omitted)), on the sole basis that the cited cases did not interpret the language of the MAE Clause.  But UBS does not rebut the underlying point—because the materiality of a statement refers to the tendency of that statement to affect relevant interests, the term "affects" in the MAE Clause is properly understood as referring to that tendency, rather than to a later point in time (just as a document that "affects an interest in property" has the tendency to do so, regardless of when the document is discovered).

more than the present characteristics and quality of the loans as of a *specific moment in time*[.]" *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 866 (2d Cir. 2015) (emphasis added); *see also id.* at 866 n.5 (warranties represent a "static condition" as of "the initial sale"). While the Second Circuit has not resolved "whether . . . [an MAE] can . . . occur at a later time than the breach of the . . . warranties themselves," *Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*, No. 14-1414-CV, 2016 WL 1042020, at *2 (2d Cir. Mar. 16, 2016), its conclusion that "[i]mmediately upon effectiveness of the . . . R & Ws," which speak only to the time of sale, a party is "entitled to demand . . . repurchase . . . as to any material breach," *Quicken Loans*, 810 F.3d 866, demonstrates that a plaintiff need only show an MAE at the time of breach.  FOFs ¶¶ 165-166.[16]

UBS also asks (Dkt. 483 ¶ 106) the Court to ignore the authorities demonstrating that the materiality of false statements is determined as of the time the statements were made.  FOFs ¶ 165 & n.28.[17]  In response to the Second Circuit's holding in *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) that a material breach of warranty is measured by the disparity between "the value of [a Loan] as warranted and its value as delivered," UBS argues (Dkt. 483 ¶ 107-08) only that the case did not involve an RMBS contract.  But *LaSalle*, 2014 WL 4124249, at *6-7, shows that *Allegheny* is highly probative of how to assess the impact of a false warranty on a mortgage loan's value—that case held that under a CMBS contract governed by New York law, evidence of a false warranty that "increase[s] the loans' riskiness beyond what was

---

[16] UBS asserts (Dkt. 483 ¶ 104 n.22 (quoting Br. 28)) that the Second Circuit in *Quicken Loans* "did not 'construe[]' the materiality and adversely affects language at all."  In fact, the Circuit considered a provision providing for repurchase "[u]pon discover[y] [of] any breach of the R & Ws that materially and adversely affected the value of the loan or the trust's interests," *Quicken Loans*, 810 F.3d at 863, and held the plaintiff was entitled to demand repurchase under that provision, "[i]mmediately upon effectiveness of the R & Ws, [a party is] . . . entitled to demand . . . repurchase . . . as to any material breach," *id.* at 866.

[17]  To support its erroneous assertion that MAE is not measured at the time of breach, UBS cites only an out-of-state's magistrate's two-page summary order, *Wells Fargo N.A. v. LaSalle Bank Nat'l Ass'n*, which somewhat cryptically states that "'[m]aterial information' and 'material effect' are not the same thing."  3:07-cv-449, at *2 (S.D. Ohio Oct. 27, 2009).  But this statement was not related to the present-tense term "affects"—which is UBS's argument here, and UBS does not explain how the distinction the magistrate draws between "material information" and "material effects" assists it.

contractually bargained for and thus made the loans less valuable than they were represented to be" satisfied both an MAE requirement and the "material breach" requirement of contract law.  *Id.* at *7 (citing *Allegheny*, 500 F.3d at 185)).[18]

With respect to *Syncora*, 874 F. Supp. 2d at 335—which held that, because a monoline RMBS insurer relied on "warranties as to the accuracy of material information about the . . . loans . . . in deciding whether to insure the Transaction and how to price that risk[,] . . . [a] breach of these warranties, if proven would have adversely affected [the insurer's] interests"—UBS's only argument (Dkt. 483 ¶ 109) is that Plaintiff is not an insurer.  But that point is irrelevant:  the same MAE Clause applies to *both* the interests of the Certificateholders and the interests "of the Certificate *Insurer*," PX 49 at 73-74 (emphasis added), and this Court has already cited *Syncora* as relevant to the MAE Clause's meaning here.  *MARM*, 2015 WL 764665, at *12 (citing *Syncora*, 874 F. Supp. 2d at 335 in support of ruling that a breach causes an MAE when it "increases the risk of loss, and that the loan need not be in default").

Finally, contrary to UBS's assertion (Dkt. 483 ¶ 110 n.25), Plaintiff explained why UBS's misreading of the MAE Clause would lead to impractical results (FOFs ¶ 169 & n.49)—requiring an investigation into individual borrowers' circumstances as of points in time after the Trusts had closed would undermine the intended simplicity of the repurchase mechanism.  FOFs ¶ 169.  In fact, courts presiding over similar RMBS actions have shut down efforts by plaintiffs to seek discovery from borrowers or their employers.  *E.g.*, *MBIA Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 103 A.D.3d 486 (1st Dep't 2013) (finding that subpoenas to borrowers' employers were unduly burdensome and harassing); *see also* Transcript of Hearing, Tr. 16:7-17:13, *Home Equity Mortg. Tr. Series 2006-1 v. DLJ Mortg. Capital, Inc.*, Index No. 653787/2012 and 156016/12 (N.Y. Sup. Ct. Mar. 25, 2015) (Ex. 5) (denying request to subpoena borrowers' employers because

---

[18]  UBS's only response to *LaSalle Commercial Mortg. Sec., Inc. v. Bank of America* is to argue mistakenly (Dkt. 483 ¶ 109 n.24) that the court held that the MAE requirement and the "material breach" requirement were the same; in fact, the court held that the plaintiff pleaded both requirements.  *LaSalle*, 2014 WL 4124249, at *7 (finding that plaintiff satisfied either requirement by alleging that defendant "breached certain representations and warranties with respect to each of the loans at issue and that these breaches significantly decreased the value of these loans").

of "the burdensomeness" and the "private confidential information" sought).  Plaintiff also pointed out that, under UBS's construction, a breach might not be actionable at closing, but then become actionable later on, only to not be actionable again, etc., which was likely not the parties' intent, FOFs ¶ 169 n.49; other than speculating (Dkt. 483 ¶ 111) that there might be a hidden "compensating factor" in such a scenario, UBS does not respond to these points.

UBS's attempt (Dkt. 483 ¶ 110 n.25) to justify its reading of the MAE Clause only serves to highlight its impracticality.  Most significantly, UBS asserts that its reading would not allow the Trusts to recover *anything* for Loans that liquidated before the point of discovery or notice, on the theory that after the Loans are liquidated they can never suffer an MAE.  UBS's argument is commercially unreasonable, *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 53 (1st Dep't 2015) (("It is well settled 'that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties") (citation omitted), and is contrary to the First Department's guidance to avoid constructions of RMBS contracts that would leave investors without remedies for liquidated loans. *Nomura Home Equity Loan, Inc. Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 105, 107 (1st Dep't 2015) (permitting damages in lieu of repurchase for liquidated loans); *accord generally* Tr. 604:2-10 ("THE COURT:  I don't know that it's a reasonable contractual construction to say, well, you suffered the loss yesterday so it doesn't count.").[19]

In sum, UBS's construction of the MAE Clause is unsupportable.  UBS would have the Court toss aside reams of clear authority regarding materiality based solely on the contracts' present-tense use of "affects," in the face of a much more plausible reading that this language defines, at the time the breaches occur, which breaches are actionable.  UBS also asks the Court to

---

[19]  UBS's other arguments on this point (Dkt. 483 ¶ 110 n.25) are specious.  UBS asserts that it is sensible to make it impossible to prove an MAE for a liquidated Loan because such a Loan is like a Loan that paid in full—but in obvious fact, they are quite different, as a Loan that was paid in full has paid the Trusts all funds owed while a liquidated Loan has not, leaving the Trusts with a loss.  UBS also asserts that allowing repurchase of defective but fully performing Loans might be contrary to the Certificateholders' interests—but the contracts provide that UBS, and not the Certificateholders, will bear the risks of loans that breach UBS's Warranties with MAEs, and that UBS must repurchase such Loans without forcing the Trusts to conduct a new investigation of the borrowers' updated circumstances.  *E.g.* PX 49 at 73-76 (§ 2.03).

accept that in a contract designed to place the risk of materially defective Loans on UBS, the parties agreed—solely by using "affects" in the present tense—that the Trusts would bear the burden of investigating borrowers' circumstances after closing and would have no recovery for Loans that liquidated before UBS's breaches came to light.   The Court should reject this construction, and hold that MAEs are to be assessed as of the time of breach.

### 2.      MAEs Arose At Breach And Persisted Thereafter

Even if UBS's interpretation of the MAE Clause were correct, UBS concedes (Dkt. 483 ¶¶ 126-31) that Holt analyzed MAEs at the time of the Loans' origination, and Holt testified that "if the loan is imprudently underwritten at the time of origination, it doesn't matter when you look at it. . . . [the breach's] materiality will remain the same."  Tr. 843:2-844:12 (Holt Cross), *cited in* Dkt. 483 ¶ 128; *see also* PX 1103 (Holt Direct) ¶ 10 ("[A]ll of the defects I found to be Material Defects would also be Material Defects, i.e., they would still significantly increase the risk of loss, even if materiality were assessed at a later date").[20]  In the face of this testimony, and the extensive evidence offered showing how material defects at origination persisted (Br. 21-27; FOFs ¶¶ 153-63), UBS argues (Dkt. 483 ¶ 133) that mitigating factors "*could* . . . arise" after origination, and it imagines ways in which borrowers' circumstances *might* improve, Dkt. 483 ¶¶ 134-36, but this speculation is not rebuttal evidence.  FOFs ¶ 134.  Nor could it be the case, as UBS would have it, that Plaintiff was required to depose every borrower to see if his circumstances had changed, where there is no reason to believe that the breaches were cured.  Br. 21-27.

UBS cannot disguise its failure of rebuttal evidence by citing (Dkt. 483 ¶ 136) the following passage from a prior Court ruling:  "Thus, for example, the failure to obtain written verification of the salary and employment of a borrower may be a material deviation from underwriting standards, but if the borrower, in fact, was paid the exact salary and had the exact employment that he claimed, the material deviation would not have 'materially and adversely

---

[20]    UBS baselessly argues (Dkt. 483 ¶ 130) that this opinion is outside of the scope of Holt's expert report, and therefore should be stricken.  In fact, a materiality analysis based on underwriting defects was well within the scope of Holt's expert report.  Part III.A.1, *above*.

affect the interests of the Certificateholders[.]'" *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Securities Inc.*, No. 12 Civ. 7322 (PKC), 2015 WL 797972, at *3 (S.D.N.Y. Feb. 25, 2015).  The Court made clear that this ruling was not addressed to evidentiary issues, Tr. 607:15-20; Plaintiff offered evidence that, for example, the relevant borrowers did not earn the incomes reported in the DTI ratios on the MLS and as required by guidelines; and UBS has presented no evidence that any of those incomes in fact did increase.

UBS also objects (Dkt. 483 ¶¶ 137-39) to invoking the presumptions of continuity and backward relation on the sole basis that time has passed, but UBS presents no reason to suspect that the passage of time would mend underwriting defects or make missing documents appear, and as Plaintiff explained (FOFs ¶ 2), those presumptions are appropriate in part because during that intervening time the vast majority of Loans liquidated, were modified with a loss, or went severely delinquent, indicating that the borrowers' circumstances did not improve.[21]  UBS's only response (Dkt. 483 ¶ 140) is that a borrower might default on a loan for reasons including macroeconomic events, personal illness, or  job loss—but this represents rank speculation and proves too much, as all of these examples are consistent with a borrower's income *not* improving to the represented levels.[22]  The whole point of underwriting (FOFs ¶¶ 32-33) is to determine if the amount of the loan can be recovered notwithstanding events that may occur in the future—the fact that loans were improperly underwritten *and* then did not perform is strong evidence that the breaches had lasting effects.

---

[21]  The only new cases that UBS cites regarding these presumptions (Dkt. 483 ¶ 137) confirms that the presumption that missing documents remained missing (even over long periods of time) "might be warranted" on the right facts. *Maggio v. Zeitz*, 333 U.S. 56, 66 (1948) ("Of course, the fact that a man at one time had a given item of property is a circumstance to be weighed in determining whether he may properly be found to have it at a later date. . . .The inference of continued possession might be warranted when applied to books of account which are not consumable or marketable[.]"); *United States v. Patterson*, 219 F.2d 659, 661 (2d Cir. 1955) (similarly endorsing presumption of continued possession but holding it did not apply on facts of case).

[22]  UBS also suggests (Dkt. 483 ¶ 140) that borrowers might have engaged in "strategic defaults" based on declining home values.  UBS offered no evidence that strategic defaults occurred, and even if they did, it would only show that the borrower's *willingness* to repay the Loan—which is a key component of mortgage credit (Holt Direct (PX 1103) ¶¶ 40, 52; Grissom Direct (DX LI) ¶¶ 43, 78; Tr. 357:19-358:1 (Grissom); 948:14-20 (Holt))—was not in line with the risk profile indicated by the warranted credit information.

Its speculation aside, UBS has no valid responses to Plaintiff's showing of the types of MAEs caused by its breaches.  In response to Plaintiff's showing of **Unreliable Origination** (FOFs ¶ 161; Holt Direct (PX 1103) ¶¶ 40-41, 64-65), UBS says only (Dkt. 483 ¶¶ 142-43) that the evidence does not meet the burden of proof without explaining why.  UBS does not dispute or rebut that evidence.

In response to Plaintiff's showing of **Borrower Fraud** (FOFs ¶ 160; Holt Direct (PX 1103) ¶¶ 40-41, 64-65), UBS says only (Dkt. 483 ¶¶ 144-48) that when its vendor JCIII stated that "there is no means to rebut" "instances of fraud," PX 344 at 44, "JCIII was not opining on the legal standards applicable to the case."  UBS misunderstands the import of this document—it shows that UBS and its own vendors regarded fraud as being material.  *See also* Tr. 386:10-387:3, 392:10-16 (Grissom); Holt Direct (PX 1103) ¶ 135 (both parties' experts agreeing that borrower misrepresentations are necessarily material).  UBS also notes (Dkt. 483 ¶ 147) that the contracts do not have a warranty against fraud, but this also misses the point—Plaintiff does not argue that fraud causes a breach of warranty; rather, Plaintiff shows that a breach of warranty revealing fraud causes an MAE.[23]

Finally, in response to Plaintiff's showing of **Altered Loan Terms** (FOFs ¶¶ 156-59), UBS fails to rebut (Dkt. 483 ¶¶ 149-58) the evidence that breaches caused persistent MAEs because, had the breaches been disclosed, the loans would have been issued, if at all, on different loan terms.  While UBS asserts (*id.* ¶ 149) that Plaintiff "ha[s] not offered any . . . evidence" of these MAEs, in fact, expert testimony, the testimony of UBS's employees, and contemporaneous underwriting guidelines for the Loans all bear out the unsurprising point that deviations from key credit characteristics materially change the terms on which loans could be originated.  *E.g.*, Tr. 1910:12-25 (Snow); Tr. 1129:10-22 (Holt); Holt Direct (PX 1103) ¶¶ 9, 135; Tr. 635:4-14,

---

[23] UBS asserts (Dkt. 483 ¶ 145) that Plaintiff has not proven fraud by clear and convincing evidence, but Plaintiff is not required to prove the legal elements of fraud to show that borrower fraud existed—rather, Plaintiff must prove the existence of MAEs by a preponderance of the evidence.  FOFs ¶¶ 133; 160 n.45.  UBS also objects to finding fraud based on post-origination evidence, but UBS offers no reason for rejecting post-origination evidence to prove MAEs. Dkt. 483 ¶ 145.

636:17-637:5 (Grissom); PX U576 at 4; PX U008 at 3; Tr. 186:7-187:3 (Wu); Tr. 1374:10-16 (Twombly).[24]

Instead of rebutting this evidence, UBS argues (Dkt. 483 ¶ 150) that Plaintiff had to produce *additional* evidence such as pricing matrices or testimony from now-defunct originators—but this additional evidence would be cumulative of the evidence Plaintiff already presented. UBS also insists (*id.* ¶¶ 150-51) that Plaintiff had to present a "securitization pricing expert" and provide granular pricing analyses for each Loan, but securitization pricing is not required for the Loan-by-Loan MAE analysis required by the PSAs, *MASTR*, 2015 WL 764665 at *10-12, and such quantifications are not required to prove materiality, *e.g.*, *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 519 (S.D.N.Y. 2011) (collecting cases), *on reconsideration*, No. 07 CIV. 10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011), and *on reconsideration*, No. 07 CIV. 10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011); *cf. Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2416 (2014) (noting that "price impact differs from materiality").

UBS also argues (Dkt. 483 ¶ 154) that because "the PSAs refer in certain sections to . . . 'the value of the related Mortgage Loan,' [while] the Sole Remedy Provision requires an MAE on the Certificateholders' '*interests*' in the loan (not 'the *value*')," the Certificateholders' interests therefore cannot encompass an interest in the value of the Mortgage Loans. *Id.* (original emphasis) (quoting PX 49 at 73-74). But UBS does not dispute that the "interests of the Certificateholders or the Certificate Insurer . . . in any Mortgage Loan" stem from the PSAs, PX 49 at 73-74; PX 110 at 101-04; PX 182 at 85-87, FOFs ¶ 149, and UBS concedes that these "interests" consist of "receiving the expected cash flows from the loans[.]" Dkt. 483 ¶ 154. Because a loan's value is the present discounted amount of the stream of payments it is expected

---

[24] UBS complains that "Mr. Snow was never proffered as an expert on materiality," and that Mr. Holt's trial testimony—in response to the Court's questioning—regarding the fungibility of money "did not appear in . . . [his] expert reports," Dkt. 483 ¶ 150 n.36, but UBS cites no authority to suggest that the Court cannot consider this testimony.

to generate, it follows that the Certificateholders and Certificate Insurer's contractual "interests" in a "Mortgage Loan" include an interest in the *value* of the Loan. FOFs ¶ 149 (quoting PX 49 at 73). UBS's contrary argument that the Certificateholders have no interest in the value of the collateral for their certificates is absurd on its face, and does not follow from its premises; the PSAs' use of these "different terms" establishes only that the terms have "different meanings," not that these meanings cannot overlap. Dkt. 483 ¶ 154 (quoting *NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008)). As the Trusts indicated, the PSAs use the broader term "interests of the Certificateholders and Certificate Insurer" to refer to *both* the value of the loans—its expected stream of payments—*and* those parties' interests in capturing that value through the Trusts. FOFs ¶ 149.[25] Because the value of the Certificates depends on the value of the Loans backing those Certificates, it does not require expert testimony to conclude that a change in the value of a Loan changes the value of the Certificates and affects the interests of the Certificateholders in that Loan. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (under "basic securities valuation principles," the fact that borrowers "were less creditworthy than . . . represented" "immediately" affects the value of RMBS certificates backed by those loans, because it increases the "credit risk profile" of the certificates).

Finally, in response to Plaintiff's showing of **Missing Documents** (FOFs ¶¶ 343-50, 355, 361-63, 381-84), UBS has no response other than to state in a footnote (Dkt. 483 ¶ 133 n.29) that missing documents were not a "credit characteristic." Otherwise, UBS does not address Plaintiff's

---

[25] UBS's remaining arguments on this points are also meritless. UBS notes (Dkt. 483 ¶ 152) that loan terms could be altered in a positive direction, and speculates in the face of the Loans' actual dismal performance history that the Loans might be subject to undiscovered compensating factors—but Holt searched for and failed to locate such factors in his review, Holt Direct (PX 1103) ¶ 191, and UBS's speculation that such factors might exist is not valid rebuttal evidence. UBS argues (Dkt. 483 ¶¶ 155-56) that Certificateholders would not have been affected by re-pricing the Loans using accurate information because the Securitizations would have issued with more subordination, or on different terms—but alterations to the Trusts' subordination structure would be material to Certificateholders and, in any event, the contracts are concerned with interests in individual *Loans*. Finally, UBS offers the unique argument (Dkt. 483 ¶ 157) that if a borrower's stated income is shown to be false, and his loan would have been issued under a full documentation loan with a lower interest rate, then the Trusts have not suffered an MAE—in fact, a disclosure that the borrower had misrepresented his income most likely would have prevented the loan from having been made at all. FOFs ¶¶ 394-95.

showing that missing critical documents exerted continuing MAEs.  For example, the absence of title insurance can prevent the recovery of funds if borrowers default where there is a defect in the title, liens or similar impediment to foreclosure.

### 3. Most Loans Have Multiple Material Breaches

Plaintiff showed (FOFs ¶¶ 412-16) that Holt's layered risk approach to materiality—in which he analyzed not only the MAE of each breach, but also the layered risk of the MAEs posed by multiple, independent breaches on a single Loan—was fully appropriate.  UBS objects (Dkt. 483 ¶¶ 121-25) to this approach, but identifies no errors in Holt's layered-risk MAE analysis,[26] and does not dispute that it employed the same approach in its putback reviews.[27]  UBS's footnote argument (Dkt. 483 ¶ 121 n.28) that this Court must ignore the cumulative effect of multiple MAEs because Section 2.03 speaks of the MAE of "a" singular "breach" fares no better.  A single warranty might be breached in multiple ways (*e.g.*, the MLS Warranty might be breached for a single Loan regarding DTI ratio and LTV ratio and also documentation type).  Moreover, Section 2.03 makes explicit that a single warranty breach may give rise to multiple MAEs, as it provides UBS with the opportunity to cure "such *breach* in all *material respects*[.]"  FOFs ¶ 131 (emphasis added).  Accordingly, UBS has done nothing to rebut Plaintiffs' showing that Holt appropriately considered the cumulative impact of multiple breaches' MAEs.  *See* FOFs ¶¶ 413-14 (citing *Allegheny*, 500 F.3d at 187 (holding that courts must assess "the cumulative effect of" a party's warranty breaches in assessing materiality and collecting like authorities).[28]

---

[26]  UBS cites examples of Holt agreeing that certain *breach* findings should be withdrawn "without looking at the other ones," Tr. 939:7-9, but UBS does not explain what bearing this has on Holt's "layered risk" approach to *materiality*, and identifies no other flaws in Mr. Holt's layered risk approach.

[27]  Tr. 1295:12-23 (Twombly); PX 19 at 14 (UBS Investment Bank Contract Finance Policies and Procedures, Sampling Criteria) at 15.

[28]  Recognizing that most of the Loans suffered multiple MAEs, UBS argues (Dkt. ¶ 121) that Holt did not provide any guidance on whether the Loans would still be materially defective if some, but not all, of the alleged defects were removed.  In fact, each of the breaches causes an MAE—the fact that multiple breaches cause the MAE to be greater does not mean that the MAE disappears if a breach is eliminated.

**B.      UBS Fails To Rebut The Evidence Of Written Notice And Discovery**

      **1.      UBS Received Written Notice Of All Breaches**

UBS's efforts to invalidate the notices it received must be rejected.  UBS admits that it received "written notice" of all breaches (FOFs ¶¶ 170-72), and this Court ruled prior to trial that UBS, in fact, received notice of all Defective Loans at issue here, Dkt. 399.  Nevertheless, UBS now asks the Court to effectively invalidate these notices and shield it from liability based on hyper-technical mis-readings of the contracts.  First, UBS argues (Dkt. 483 ¶¶ 342), that the Court did not rule that the Holt Report established notice, but the evidence shows that UBS received Plaintiff's expert reports, PX 947, PX 1109, and UBS does not dispute that those reports notified it of breaches in writing.

UBS argues that the reports were not "prompt" notice, but the repurchase provision does not require "promptness," only "discovery" or receipt of "written notice":

> The Transferor hereby covenants that within ninety (90) days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to this Section 2.03 which materially and adversely affects the interest of the Certificateholders or the Certificate Insurer in any Mortgage Loan, it shall [cure or repurchase the Loan]

PX 49 at 74 (MARM 2006-OA2 PSA) (§ 2.03); PX 110 at 102 (MARM 2007-1 PSA) (§ 2.03); PX 182 at 86 (MARM 2007-3 PSA) (§ 2.03).  UBS argues that the phrase "made pursuant to this Section 2.03" refers to the prompt notice requirement in a prior paragraph of Section 2.03.  That interpretation is contrary to the express language quoted above, which makes clear that the words "made pursuant to this Section 2.03" refer to "any representation or warranty," and Section 2.03 begins:  "The Transferor hereby *makes* the representation and warranties set forth in Schedule II hereto," which include the Warranties at issue here.  Moreover, the Trustee's actual notice requirements are to provide notice (that need not be prompt) only after receiving notices from other defined parties, *e.g.*, PX 49 at 74; hence, even if the prior notice requirements of Section 2.03 applied in this instance, the Holt Report would comply with the requirements applicable to the Trustee.  Under UBS's tortured reading, the Trustee could *never* provide a breach notice that requires UBS to cure or repurchase a defective Loan because it would inevitably follow notice

from another party to the PSAs and therefore not be "prompt."[29]

UBS's new laches argument (Dkt. 483 ¶ 346 n.66) is likewise meritless, as the Trustee commenced a timely action as to *all* defective Loans, based on allegations that UBS had discovered the relevant breaches.[30]  *E.g.*, *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 CIV. 9890 (SAS), 2005 WL 2582177, at *8 (S.D.N.Y. Oct. 11, 2005) (under New York law, laches defense was inapplicable in breach of contract case by trust seeking equitable remedy of repurchase of mortgage loans because action was commenced within the limitations period); *cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1976 (2014) ("laches . . . may have originated in equity because no statute of limitations applied, . . . suggest[ing] that laches should be limited to cases in which no statute of limitations applies") (original alterations) (quoting 1 D. Dobbs, *Law of Remedies* § 2.4(4), 104 (2d ed. 1993)).[31]

---

[29]  As the "prompt notice" requirement does not apply to the Trustee and is not necessary to trigger UBS's repurchase obligations, the cases that UBS cites (Dkt. 483 ¶ 346) regarding notice are inapposite.  *See U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, 121 A.D. 3d 535, 536 (1st Dep't 2014); *see also U.S. Bank Nat'l Ass'n v. Greenpoint Mortg. Funding, Inc.*, 991 F. Supp. 3d 472, 477 (S.D.N.Y. 2014), *aff'd*, 2016 WL 1039917 (2d Cir. Mar. 16, 2016); *U.S. Bank Nat'l Ass'n v. WMC Mortg. Co.*, No. CIV. 11-2542 JRT/TNL, 2012 WL 4511065, at *7 (D. Minn. Oct. 1, 2012).  Moreover, UBS cites these cases for the proposition that notice requirements are designed to provide RMBS defendants notice to cure or repurchase defective loans prior to suit—and UBS was given that opportunity. Dkt. 399 at 12.

[30]  UBS also fails to explain how it could have been prejudiced by the timing of the notice in the Holt Report, and any non-prejudicial delay in providing or receiving notice is not grounds for escaping a contractual obligation.  *See McNally v. Mosbacher*, 36 A.D.2d 522, 522 (1st Dep't 1971) (rejecting laches defense because defendants suffered no prejudice since they were on notice of plaintiff's potential claim during depositions).

[31]  UBS also argues (Dkt. 483 ¶ 343) that the PSAs "required" that any breach notices be sent to UBS's General Counsel's office, and not to its litigation counsel, citing Section 11.05(b) of the contracts.  In fact, that provision (*e.g.*, PX 49 at 162-63) simply says that notices sent to the General Counsel "shall be deemed to have been duly given;" it does not *require* that all notices be sent to the General Counsel and it does not deem notices otherwise provided to UBS ineffective.  Nor can UBS seriously contend that its litigation counsel did not apprise UBS's General Counsel's office.  Similarly, UBS suggests (Dkt. 483 ¶ 344) that Plaintiff's expert reports were not "intended" to serve as notice of breaches, but the Court has already correctly rejected this argument (Dkt. 399 at 5, 13).  The "written notice" required to trigger UBS's obligations does not contain an intent requirement nor dictate a particular form of notice.  The cases cited by UBS (Dkt. 484) ¶ 345 are inapposite.  In *Knights of Columbus v. Bank of N.Y. Mellon*, Index No. 651442/2011, 2015 N.Y. Slip Op. 31362(U), at *8 (N.Y. Sup. Ct. July 10, 2015), cited by UBS (Dkt. 483 ¶ 345), the plaintiff failed to provide *any* written notice of most breaches—quite unlike here, where UBS received written notice of *all* breaches.  *Id.* at *5 (finding notice deficient where letter "did not apply to 16 out of 18 of the subject trusts" at issue, and expressly did not allege that counterparty had breached contract).  As UBS acknowledges (Dkt. 483 ¶ 345), *Rockland Exposition, Inc., v. Great Am. Assurance Co*., 746 F. Supp. 2d 528, 539 (S.D.N.Y. 2010), concerned oral notice, while this case concerns written notice.

### 2. UBS Discovered All Breaches

Plaintiff showed (FOFs ¶¶ 173-92) that UBS discovered the breaches through its actual knowledge, willful blindness, and constructive knowledge.  UBS fails to rebut this evidence.

#### (a) UBS Had Actual Knowledge Of Many Breaches

Plaintiff showed (FOFs ¶¶ 175-79) that UBS actually knew of many breaches through reviews its vendors conducted.[32]  UBS does not deny (Dkt. 483 ¶¶ 369-75) that many breaches were apparent from the face of the Loan Files, and it concedes (Dkt. 483 ¶ 374) that "Plaintiffs . . . present[ed] evidence that the vendors reviewed certain [L]oan [F]iles[.]"  Instead, UBS argues (*id.*) that Plaintiff must show that UBS's "vendors *concluded* that any loan was in breach of R&Ws," (emphasis added) but this is not the law—"knowledge of all material facts *necessary to understand* that" a breach has occurred is all that is required.  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001) (emphasis added) (quotation marks and citation omitted).[33]

UBS argues (Dkt. 483 ¶¶ 371-73) that its vendors' knowledge cannot be imputed to it, but that is not the law, as Plaintiff explained (FOFs ¶¶ 140, 176-78).[34]  UBS does not dispute the evidence showing that it (i) provided its due diligence vendors with instructions, requirements, and

---

[32]  UBS notes (Dkt. 483 ¶ 370) that in one paragraph of Plaintiff's FOFs Fact (¶ 71), Plaintiff reports the incorrect number of loans subjected to UBS's credit-and-compliance due diligence reviews.  As UBS notes (Dkt. 483 ¶ 370), that number is correctly stated elsewhere in Plaintiff's Findings of Fact, as well as in Mr. Holt's trial testimony.  FOFs ¶ 341 (citing Tr. 1374:24-1376:12, PX 1103 (Holt Direct) ¶ 20).  There is no actual dispute as to the underlying facts showing the number of loans subjected to UBS's credit and compliance reviews, which, as explained in Holt's direct testimony, is 3,768.  PX 1103 (Holt Direct) ¶ 20.

[33]  Because Plaintiff needs only prove knowledge of the facts constituting breach, *Caputo*, 267 F.3d at 193, UBS's argument (Dkt. 483 ¶ 372 n.37) that "UBS's due diligence vendors [could not have] gained knowledge of breaches of R&W that had not yet been made" falls flat—UBS knew its Warranties were false at the moment it made them.

[34]  UBS is incorrect (Dkt. 483 ¶ 371 n.72) that Plaintiff's cited authorities are not on point.  For example, Plaintiff referred (FOFs ¶ 179) the Court to *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, which is squarely on point.  No. 00 Civ. 8058 (NRB), 2004 WL 2072536, at *6 n.10 (S.D.N.Y. Sept. 14, 2004).  The court in *Steed* held that a due diligence vendor, AMRESCO, was a "due diligence agent" of the plaintiff, because it "performed due diligence on the mortgage loans that were part of the [at-issue] Trust and provided information . . . at [the plaintiff's] Steed's behest in connection with the . . . [at-issue] transaction[.]"  *Id.*  UBS misleads with its claim that the court found an "agency relationship based on affidavits appointing [a] company 'attorney-in-fact,'" because that holding referred to the plaintiff's investment advisor, which—like Williams & Connolly on behalf of UBS here (FOFs ¶ 178)—engaged the diligence vendor on behalf of the plaintiff.  UBS similarly fails to distinguish Plaintiff's remaining authorities demonstrating that the evidence of control presented here more than suffices to establish imputation.  *E.g.*, *131 Main St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 345 n.6 (S.D.N.Y. 2002) (imputing knowledge of non-fiduciary "paid 'watchdog'"); *Gulf Ins. Co. v Transatlantic Reins. Co.*, 69 A.D.3d 71, 97 (1st Dep't 2009) (establishing that under New York law, evidence of control, not labels such as "independent contractor," determine imputation of knowledge).

timelines, and required them to provide daily updates to UBS's diligence manager; and, (ii) directed its repurchase vendors' performance through a written set of instructions that set "a structure and process for evaluating . . . alleged breaches"  FOFs ¶ 82 (quoting PX 344 at 2); *see id.* ¶¶ 177-78 (collecting additional evidence of UBS's continuous control over its vendors).  This evidence of UBS's control of the vendors and the vendors' consent to perform the tasks giving rise to the imputed knowledge is sufficient, as the authorities cited by UBS confirm.  *Prestige Brands Inc. v. Guardian Drug Co.*, 951 F. Supp. 2d 441, 448 (S.D.N.Y. 2013) (imputation of knowledge regarding drug recall did not exist only because defendant "failed to allege it was subject to NuSil's control in conducting the recall."); *see also United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (no agency relationship where neither contractor nor defendant "manifest[ed] assent that [defendant] had the right to control [contractor's] actions" regarding the at-issue transaction).  UBS also argues (Dkt. 483 ¶ 375) that the Loan Files "are not admissible for the truth of the matter asserted," but this is irrelevant, as they are admissible to show UBS's knowledge of their contents.  *E.g.*, *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016).

### (b)   UBS Was Willfully Blind To All Breaches

Plaintiff showed (FOFs ¶¶ 180-87) that UBS was willfully blind to all breaches.  UBS seeks to evade this evidence (Dkt. 483 ¶¶ 348-350) by falsely equating willful blindness with the pervasive breach theory that the Court rejected and by seeking to diminish the import of its own conduct.  But as the Court recognized, "[w]illful blindness is knowledge."  Tr. 51:14.  The concepts of pervasive breach and willful blindness are distinct—the pervasive breach theory relates to UBS's receipt of *notice* of breaches under the *notice* prong of Section 2.03 (Dkt. 249 at 19-21).  A theory that a third party's allegation of breach should put UBS on notice of those breaches under Section 2.03's *written notice* prong is distinct from proving that UBS itself discovered breaches under the separate *discovery* prong, which is subject to different requirements.  *See* FOFs ¶ 180.

Contrary to UBS's argument (Dkt. 483 ¶ 354-55 & 355 n.68), the fact that Plaintiff did not cite breach of contract cases applying the willful blindness standard (FOFs ¶ 181-82) does not

settle the question of whether New York's highest court would do so here. Breach-of-contract claims do not have a knowledge element, so the absence of such cases dealing with knowledge is hardly surprising. Moreover, as explained (FOFs ¶ 182), in the sole breach-of-contract action cited by UBS, the court declined to apply willful blindness *only* because the contract expressly forbade it, which is not the case here. *Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 380 (S.D.N.Y. 2013) (declining to apply willful blindness only because the contract explicitly defined "Seller's Knowledge" as "the *actual knowledge* of any individuals without inquiry") (emphasis added).[35] UBS's citation (Dkt. 483 ¶ 352) to Plaintiff's statements that *notices* must be loan-specific is irrelevant to how the unambiguous text of the *discovery* provision should be construed. Likewise, UBS simply is wrong when it argues (*id.* ¶ 353) that Plaintiff's refutation of its own discovery— based on entirely different facts in another case—somehow disproves the record in this case demonstrating UBS's discovery of defective Loans. In short, UBS offers nothing to rebut the authority Plaintiffs cited (FOFs ¶¶ 180-87) that supports applying the willful blindness doctrine here.

UBS also fails to rebut the evidence (Dkt. 483 ¶¶ 354-64) of its willful blindness: that (i) UBS believed 60- and 90-day delinquent loans were highly likely to have material guidelines breaches (FOFs ¶ 183, Part IV (Background)); and (ii) in response to a rising number of such delinquencies in the Trusts, UBS shuttered its loan surveillance program to avoid discovering

---

[35] The other cases cited by UBS (Dkt. 483 ¶¶ 350-51) do not support its argument. As explained (FOFs ¶ 182 n.53), UBS's citation (Dkt. 483 ¶ 350-51) of dicta from *Ferring B.V. v. Allergan, Inc.* does not relate to willful blindness, but rather to "constructive knowledge[.]" 4 F. Supp. 3d 612, 626 (S.D.N.Y. 2014). In the two remaining cases, the courts declined to apply the doctrine to show securities purchasers' knowledge because a contrary holding would interfere with an expressed legislative intent to protect such investors. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 JSR, 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) (Trustee must show "transferee's . . . actual knowledge" of securities fraud to overcome statutory safe harbor under Bankruptcy Code § 546(e), as safe harbor's "purpose is protection of the securities markets and of the reasonable expectations of legitimate participants in these markets"); *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, No. 11 CIV. 5201 DLC, 2013 WL 3284118, at *16 (S.D.N.Y. June 28, 2013) (declining to hold, for purposes of discovery motion, that Securities Act purchaser's knowledge under 15 U.S.C. § 77k(a) & 77l(a)(2), could be proved through willful blindness, as "such an interpretation would be inconsistent with the text and purpose of the statute" to shift burden of investigation to securities offerors and sellers). The investor-protection rationale of these cases *supports* applying willful blindness here, because—like the securities laws—the "repurchase provision [was] designed to shift the risk" of loss to UBS. *Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12, 18 & n.14 (1st Cir. 2002).

additional evidence of warranty breaches that would expand its liability.  *Id.* ¶ 184.

UBS offers no legitimate explanation as to why it shuttered its surveillance program.  After precluding one witness from explaining its decision during discovery, UBS changed its approach at trial and tried to come up with an after-the-fact explanation through the testimony of John Lantz.  Dkt. 483 ¶¶ 358-63.  But as shown in Plaintiff's prior briefs, this testimony should be stricken, as UBS invoked attorney-client privilege during discovery to prevent Lantz from testifying about the reasons that UBS closed its surveillance department.  Dkt. 483 ¶ 185; Dkt. 432.  Even if not stricken, Lantz's testimony *supports* a finding of willful blindness.  UBS claims that the surveillance was shut down because "there was no longer a business need for that type of work."  Dkt. 483 ¶ 358.  But Lantz testified that UBS's decision to end its surveillance "was a decision informed by counsel" (Dkt. 483 ¶ 362 (quoting Lantz Dep. 234:4-22)), and there is no reason for counsel to be involved in this business decision, other than to address UBS's ongoing legal responsibilities to the RMBS it had issued—specifically, its obligation to repurchase Loans upon discovering they are defective (FOFs ¶ 186).  UBS has no answer (Dkt. 483 ¶ 364 n.70) as to why else counsel would have been involved or any other basis for counsel's decision.  Accordingly, Plaintiff proved UBS's willful blindness.[36]

(c)    <b>UBS Constructively Knew Of Most Breaches</b>

Plaintiff demonstrated (FOFs ¶¶ 188-92) that the Second Circuit's recent decision in *Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mort. Capital, Inc.* ("*BNY II*"), 821 F.3d 297 (2d Cir. 2016) shows that, the term "discovery" in the contracts here should be construed to include constructive knowledge, and showed further that UBS had constructive knowledge of most

---

[36]  UBS fails (Dkt. 483 ¶ 356) to distinguish the authorities showing its willful blindness.  UBS asserts that *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 325 (E.D.N.Y. 2009) "d[id] not analyze willful blindness at all," Dkt. 483 ¶ 356—in fact, that case held that the defendant's knowledge of a counterfeit mark under Lanham Act, 15 U.S.C. § 1117(b), was proven because defendant's "failure to investigate and learn readily discernible facts, especially in light of the differences in price and taste he concededly did know about, constitutes *willful blindness* to the fact that the sauce he purchased was counterfeit.") (emphasis added).  UBS also does not contest that *Koon Chun* held that "deliberately alter[ing] … record-keeping practices" may constitute evidence of willful blindness.  628 F. Supp. 2d at 325.  Nor does UBS contest that *In re Scholastic Corp. Sec. Litig*, 252 F.3d 63, 77 (2d Cir. 2001) supports this proposition, arguing only that *Scholastic* involved recklessness, not willful blindness, which Plaintiff noted in its opening submission.  FOFs ¶ 184.

breaches as of the Closing Dates.  As UBS acknowledges (Dkt. 483 ¶ 367), in *BNY II*, the Second Circuit considered an MBS contract requiring repurchase of a loan upon "'discovery' of [a] breach," and held that "the law *charges a party with discovery* of breach only after it has had a reasonable opportunity to investigate and confirm its suspicions – in short, when it effectively becomes aware, rather than simply suspicious, of breach."  *Id.* ¶ 367 (emphasis added) (quoting *BNY II*, 821 F.3d at 310).

UBS's response to *BNY II* (Dkt. 483 ¶ 367)—that it "had no obligation to investigate" the Loans—is irrelevant.  The point is that UBS *did* investigate the Loans and found evidence of defects; thus, once UBS "had a reasonable opportunity to investigate and confirm its suspicions," the law charges UBS with discovery the breaches.  *BNY II*, 821 F.3d at 310.  UBS also argues that the contract in *BNY II* referred to a single commercial loan, and not thousands of residential loans, but it does not explain how this distinction bears on the construction of the "discovery" provision of the PSAs.[37]  In short, UBS does nothing to refute Plaintiff's authorities demonstrating that, in these circumstances, UBS is charged with discovery of breaches because facts placed it on notice of breaches and it had a reasonable time to investigate.

Plaintiff showed (FOFs ¶¶ 191-92) that specific facts put UBS on inquiry of the breaches at issue, and UBS presents no rebuttal.  UBS argues (Dkt. 483 ¶¶ 365-66) that discovering Loan defects in its diligence samples could not place it on inquiry notice of defects in other Loans.  But the purpose of UBS's diligence sampling was to "extrapolate" the sample results to the full loan pools, which contained the other Loans at issue.  FOFs ¶ 62 (quoting Mohiuddin NCUA Dep. Designation 68:5-20).  UBS also argues (Dkt. 483 ¶ 366) that it "either cleared so-called 'EV3s'

---

[37]  Plaintiff further showed (FOFs ¶ 190) that the contracts distinguish between the concepts "actual knowledge" and "discovery" to demonstrate that UBS's obligation to repurchase was triggered upon discovery and not only if it had actual knowledge.  But UBS's only response (Dkt. 483 ¶ 367 n.71) is to object to Plaintiff's use of established rules of contract interpretation that UBS itself cites elsewhere in its papers (Dkt. 483 ¶ 154).  Plaintiff further cited (FOFs ¶ 189) numerous precedents construing "discovery" to include constructive knowledge in the limitations context; UBS's only response (Dkt. 483 ¶ 367 n.71) is that these cases did not deal with contracts, but UBS does not rebut that they are persuasive authorities, especially because limitation provisions in cases like *Merck & Co. v. Reynolds*, 559 U.S. 633, 638 (2010) are derived from the common law of contractual rescission, as are the PSAs, *compare id. with Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 CIV. 8613 (SAS), 2002 WL 818082, at *4-5 (S.D.N.Y. Apr. 30, 2002).

when identified or removed those loans from the pools it acquired"—but the conceded fact that it found large numbers of defects in the sampled Loans created UBS's duty to investigate Loans *outside* the samples for similar defects.  Simply removing or "clearing" defects in Loans in the diligence sample did not suffice.[38]  Finally, UBS argues (Dkt. 483 ¶ 366) that there is no evidence it could have looked at Loans outside of its samples—but Plaintiff showed (FOFs ¶ 192) that UBS's own policies allowed it to "upsize" its samples and review additional Loans, (*id.* (citing PX 148 at 75, PX 19 at 19, Tr. (Twombly) 1317:17-1318:6)).[39]  In short, UBS had constructive knowledge of the breaches.

## C.    UBS Fails To Rebut The Evidence That It Breached The MLS Warranty

### 1.    The MLS Warranty Unambiguously Warrants That In Fact The MLS Information Was "True And Accurate"

Plaintiff has proven that the MLS Warranty unambiguously warrants that information on the MLS "was true and correct in all material respects," FOFs ¶¶ 193-202, and, consequently, UBS's request that (Dkt. 483 ¶¶ 159-65) the Court rewrite this warranty into a mere representation that the information was properly "transcribed" to the MLS must be rejected as a matter of law.  As multiple courts have found, the MLS Warranty is unambiguous.  *E.g.*, *Bank of N.Y. Mellon v. WMC Mortg., LLC*, 136 A.D.3d 1, 9 (1st Dep't 2015); *Home Equity Mortg. Tr., Series 2006-1 v. DLJ Mortg. Capital, Inc.*, Index 156016/2012, Dkt. 230 at 4 (N.Y. Sup. Ct. Nov. 8, 2013) (Ex. 1 to FOFs).  UBS has not been able to present any credible legal argument or testimony (Dkt. 483 ¶ 161 & n.38) to suggest otherwise.[40]

---

[38]    Moreover, the evidence shows that UBS did not always remove defective Loans (it securitized 104 Loans that received a final grade of EV3) and it often "cleared" defects that it should not have, FOFs ¶¶ 71-72.

[39]    Plaintiff also explained (FOFs ¶ 191) that charging UBS with constructive knowledge of breaches is appropriate because it "bought the loans, performed due diligence on them, selected them for inclusion in the Trusts, and made representations and warranties about them, and was therefore uniquely positioned to be aware of breaches." *Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 563 (S.D.N.Y. 2014).  UBS's only response (Dkt. 483 ¶ 366) is that it "did not originate any of the loans at issue"—which does not rebut the point that UBS *warranted* the credit quality of the Loans it bought from originators and then securitized, and it could have investigated the bases for it warranties before making them.

[40]    UBS should not be permitted to rely on the testimony of Grissom and Lantz to support its interpretation of the MLS Warranty.  Early in the trial, UBS represented to the Court that its position was that the contracts are not ambiguous.  *E.g.*, Tr. 353:15-354:14.  Based on that understanding, Plaintiff did not cross examine Grissom on her opinion as to custom and usage with respect to the MLS warranty, which she was totally unqualified to give.  *See* Tr.

UBS asks (Dkt. 483 ¶ 162) the Court to ignore the First Department's ruling in *Bank of New York Mellon v. WMC Mortg., LLC*, arguing it was dicta. In fact, the First Department held that a substantially identical warranty "warranted against the existence of any material misstatement during the warranty period" and that arguments to parse this "straightforward" warranty were meritless, 136 A.D.3d at 7—a legal ruling that is squarely on point here.[41]

UBS nevertheless persists in arguing (Dkt. 483 ¶ 161) that the MLS Warranty should be read to mean that information from the Loan File was transcribed accurately because the Warranty refers to "information 'furnished' to UBS RESI[.]" In fact, the Warranty speaks to "the date or dates respecting which such information is *furnished as specified in the Mortgage Loan Schedule*"—that is, to the operative dates in the MLS Definition as of which the specific information was warranted to be true and accurate, not to the process of transcription. PX 49 at 191 (emphasis added). It is irrelevant when UBS itself received the information that it then warranted was true. UBS also argues again (Dkt. 483 ¶ 163), that a plain reading of the MLS Warranty would turn it into a "no fraud" warranty. Contrary to UBS's assertion, however, the MLS Warranty does not "cover *all* instances of borrower fraud and misrepresentation;" rather, it warrants the truth and accuracy of the *specific* information listed on the MLS. That warranty is breached if that specific information is untrue, even if the breach was not caused by borrower fraud. FOFs ¶ 238 (citing PX 208 and Tr. Tr. 245:11-246:2). There is no basis in the contracts to *exempt* untrue MLS information from the protection of the MLS Warranty if the untruth was

---

350:18-357:18. UBS later tried to offer testimony from Mr. Lantz as to UBS's understanding of the MLS warranty, but the Court excluded it, Tr. 1537:4-1539:16, or stated that it was not probative, Tr. 1542:24-1551:21. That testimony also should be excluded on the ground that UBS asserted privilege on this subject during discovery. Dkts. 413-15. In any event, the testimony of a witness as to his subjective understanding of a contract is irrelevant. *See, e.g., Hotchkiss v. Nat'l City Bank of N.Y.,* 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.) ("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties.").

[41]   The only portion of a case that UBS cites in support of its interpretation  (Dkt. 483 ¶ 161) is (actual) dicta from the Delaware Court of Chancery, from a case that predates *WMC*, and was ultimately reversed.  *Cent. Mortg. Co. v. Morgan Stanley Mortgage Capital Holdings LLC,* No. CV-5140-VCS, 2010 WL 3258620, at *9 n.75 (Del. Ch. Aug. 19, 2010) (stating "I do not resolve" the parties' competing interpretations of an MLS representation), *rev'd sub nom. Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531 (Del. 2011).

caused by fraud or misrepresentation.[42]

Finally, UBS asserts (Dkt. 483 ¶¶ 164-65) that a plain reading of the MLS Warranty would be unreasonable, as it would make UBS responsible for the truth of characteristics of Loans that were disclosed as being "high risk." This argument misunderstands the fundamental purpose of the contracts, which allocated *disclosed* risks to the Trusts, but allocated *undisclosed* risks to UBS through UBS's warranties and the repurchase protocol—and the only Loans at issue in this case are those with risks that were not disclosed in contravention of UBS's warranties. The truly unreasonable result is the one offered by UBS—essentially to rewrite the MLS Warranty as offering the Loans for sale "as is," and void the parties' bargain that UBS would repurchase Loans for which MLS information in fact was not true and correct.

### 2. The MLS Misstated Loan Purpose, Property Type, And Documentation Type

Plaintiff showed that there are: (i) 98 Loans that breach the MLS Warranty regarding Loan Purpose, with current estimated damages of $30,220,342.88 (FOFs ¶¶ 204-07, App. 2); (ii) 88 Loans that breach the MLS Warranty regarding Property Type, with current estimated damages of $20,049,326.02 (FOFs ¶¶ 215-18, App. 3); and (iii) 38 Loans that breach the MLS Warranty regarding Documentation Type, with current estimated damages of $9,849,272.06 (FOFs ¶¶ 226-228, App. 4). UBS does not meaningfully respond to this evidence.

While UBS argues in its Appendix B (Dkt. 484-12 (App. B) at B-2) that Grissom believed some Loan Files were too incomplete to be re-underwritten, she made this assertion for only 21 of the Loans in these categories, and in none of those instances does she assert that the Files lacked the specific information necessary to show the relevant breaches.[43]

---

[42] The cases cited by UBS are not to the contrary. In *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*, 44 Misc. 3d 1206(A) (N.Y. Sup. Ct. July 3, 2014), the court did not address the meaning of the MLS warranty. In *MBIA Ins. Corp. v Credit Suisse Sec (USA) LLC*, Index No 603751-2009 (N.Y. Sup. Ct. May 24, 2012), Tr. 3:17-20 (Dkt. 238-2)—which was issued before *WMC*—the Court simply reacted with skepticism to the argument that there was "no difference between a no fraud warranty" and the MLS representation, which is not an argument that Plaintiff advances here. FOFs ¶ 200 (explaining difference between the two warranties).

[43] Specifically, Grissom found that 13 Loans breaching the MLS Warranty regarding loan purpose were too incomplete to be re-underwritten, App. 2, that 4 Loans breaching the MLS Warranty regarding property type were too

UBS also argues in its Appendix B (Dkt. 484-12 (App B.) at B-3) that an unspecified number of these Loans did not have MAEs because Grissom found they were processed based on the information listed on the MLS (even though that information was incorrect).  UBS cites only three Loans—which it does not dispute breached the MLS Warranty:  Loans ████████ (App. 2, FID 3189) and ████████ (App. 2, FID 15663), ████████████████████████ ████████████████████████ on the MLS; and Loan ████████ (App. 3, FID 12080), ████████ ████████████████████████████████████████ on the MLS. Dkt. 484-12 (App B.) at B-3-4.[44]  While UBS argues that these three Loans were *processed* by the originators as a cash-out refinance and a single-family detached property, respectively, it does not dispute that cash-out refinances are inherently riskier than rate-and-term refinances, FOFs ¶ 44, 208-12, or that certain property types are inherently riskier than others, *id.* ¶¶ 219-23.  Hence, UBS has not rebutted the evidence that the Loans carried a significantly increased risk of loss than was disclosed on the MLS.  This is sufficient to show MAEs.  *MARM*, 2015 WL 764665, at *15 (significantly increased risk of loss sufficient to show MAE).  Accordingly, the Court should find UBS liable and award Plaintiff its remedies with respect to the Loans in these three categories.

### 3.     The MLS Misstated Borrowers' Credit Scores

Plaintiff showed that there are 41 Loans that breach the MLS Warranty regarding Credit Score, with current estimated damages of $12,043,150.07 (FOFs ¶¶ 238-39, App. 5).  UBS offers no response to this evidence at all, even in its Appendix B (Dkt. 484-12 (App. B) at B-1-2), and does not dispute the evidence that it knowingly reported false credit scores for those Loans.  Dkt. 483 ¶ 196 n.44;  *see also* FOFs ¶¶ 238-39, Tr. 214:4-215:14, 221:10-14, 245:8-247:1 (Wu). Accordingly, the Court should find UBS liable and award Plaintiff its remedies for these 41 Loans.

### 4.     The MLS Misstated That Properties Were Owner Occupied

Plaintiff showed that there are 821 Loans that breach the MLS Warranty regarding Owner

---

incomplete to be re-underwritten, App. 3, and that 4 Loans breaching the MLS Warranty regarding document type were too incomplete to be re-underwritten, App. 4.

[44]   As a practical matter, UBS's argument applies to, at most 11 Loans breaching the MLS Warranty concerning loan purpose and 10 Loans breaching the MLS Warranty concerning property type.

Occupancy, with current estimated damages of $249,119,048.30 (FOFs ¶¶ 247-59, App. 6).  UBS offers a handful of arguments, all in its Appendix B.  First, UBS suggests (Dkt. 484-12 (App. B) at B-5) that the warranty speaks to "the borrower's *intent* to occupy the [subject] property" at origination (emphasis added), and the borrower could have changed his mind; in fact, the warranty speaks to "whether the Mortgaged Property *is* owner occupied, a second home or an investor property" as of the Closing Date.  *E.g.*, PX 49 at 45-46 (emphasis added).  Grissom's speculation about borrower intent does not rebut Holt's finding that in fact the properties securing the Loans in this category were not owner occupied.  *E.g.*, Dkt. 484-12 at B-5 (for Loan ████████, Grissom addressing borrower's intent to occupy).

Second, UBS asserts (Dkt. 484-12 (App. B) at B-6) there is no evidence of occupancy as of the Closing Dates.  In fact, in most cases Holt either found that the borrowers *never* occupied the subject properties, *e.g.*, App. 6, Loan ████████, FID 23446 (Holt finding ████████████████  ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████), or he reasonably inferred they did not, based on evidence the substance of which UBS does not dispute, *e.g.*, Loan ████████ (App. 6, FID 446) (████████ ████████████████████████████████████████).

Third, UBS argues (Dkt. 484-12 at B-6) that the Court should not apply the presumption of continuity in its analysis.  But that presumption is especially appropriate when applied over small periods of time, *United States v. Sliker*, 751 F.2d 477, 484-85 (2d Cir. 1984); FOFs ¶¶ 142-43, and UBS does not dispute that the vast majority of Loans were securitized only a few months after they were originated, FOFs ¶ 250 n.109.  UBS also states (Dkt. 484-12 at B-6 n.1) it would be "at odds with the reality of the housing crash and economic recession" to assert that "people are unlikely to move residences;" but the presumption here is not that the borrowers never moved anywhere at any time but rather that they did not occupy the specific properties at issue.

Fourth, UBS argues (Dkt. 484-12 at B-6) that Holt ignored evidence of actual occupancy for Loan 1████████████████████████████████████████

███████████████████████████████████████████.   In fact, Holt weighed that evidence against

other evidence—i███████████████████████████████████████████████

██████████(the substance of which Grissom does not dispute)—and found that, on balance, ██████

████████████████████████████████████ App. 6, FID 22567.

Fifth, UBS asserts (Dkt. 484-12 at B-6-7) the Trusts did not establish MAEs for the Loans

in this category.  But it does not dispute that Loans secured by non-owner occupied properties

have a significantly higher risk of loss—as admitted by Wu, UBS's former employee (FOFs ¶ 253

(citing Tr. 186:20-187:3) (Wu)), Grissom (Tr. 381:15-19 (Grissom)), and in UBS's own

guidelines (PX 17 at 3).  UBS also acknowledges (Dkt. 484-12 at B-7) that Chevy Chase's

Guidelines set stricter requirements for Loans secured by non-owner occupied properties (and

does not seriously dispute that Countrywide's and American Home Mortgage's did as well), and

while it suggests that the IndyMac Guidelines did not (*id.*), in fact, they did.  *E.g.*, PX U718 at 3

(IndyMac Guidelines explaining "[p]roperty occupancy status affects both pricing and Loan

eligibility").

Finally, UBS asserts (Dkt. 484-12 at B-7) there is no evidence that Loans in this category

are afflicted with fraud, but it cites only two examples, both of which contained evidence of fraud.

For Loan ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████.  App. 6, FID 15165.  For Loan ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.  App. 6, FID 25469.  These facts

indicate the respective properties were not owner occupied, and Grissom does not dispute them,

leaving UBS with no basis to rebut Holt's findings.  Accordingly, the Court should find UBS

liable and award Plaintiff its remedies for these 821 Loans.

### 5.    The MLS Misstated DTI Ratios

Plaintiff showed that there are 4,600 Loans that breach the MLS Warranty regarding DTI

Ratios, with current estimated damages of $1,507,058,897.59 (FOFs ¶¶ 260-314, App. 8).   UBS asks the Court to disregard this evidence by offering a strained misreading of the scope of the warranty and asking the Court not to accept the evidence of its breaches.   Based on the rationale set forth below, this Court should find UBS liable and award Plaintiff its remedies for these 4,600 Loans.

(a)      **The MLS Warranty Regarding DTI Ratios Warrants That The Reported DTI Ratios In Fact Are True And Accurate**

UBS argues (Dkt. 483 ¶ 171) that the term "debt-to-income ratio of the Mortgage Loan" in the MLS Definition does not refer to the DTI ratio of that Loan's borrower.   UBS does not identify what DTI ratio it believes the definition actually does refer to, however, which is reason enough to reject its construction.   *Cole v. Macklowe*, 99 A.D.3d 595, 596 (1st Dep't 2012) ("[A] contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties.").   Furthermore, contrary to UBS's assertion, the MLS Definition's use of the term "Mortgagor" in other contexts does not compel a different result.   A "Mortgage Loan" broadly includes all components of a Loan (including the DTI ratio of the Loan's borrower), PX 49 at 46, while a "Mortgagor" narrowly refers only to the "obligor on a Mortgage Note," *id.*   Thus, it is natural to refer to the "Mortgagor" for personal information about the borrower that exists regardless of whether he takes out a Loan (name and credit score), but to refer to the "Mortgage Loan" for information that exists only within the context of the Loan, including the DTI ratio, which is calculated only as part of the loan application process.

UBS also rehashes (Dkt. 483 ¶ 172) its argument that the MLS Warranty is a mere transcription representation, asserting it would be "absurd" to warrant that a DTI ratio based on a stated income was accurate.   UBS confuses Originators—which decided to issue stated income Loans to borrowers without verifying income—with UBS itself—which decided to warrant to investors that DTI ratios based on those stated incomes in fact were accurate.   UBS's argument that verifying the stated incomes would amount to "second-guessing" the originators' assessment of those incomes simply confirms that UBS made the MLS Warranty without regard to whether

36

the DTI ratio was in fact "true and correct."

        (b)      **The Undisputed Evidence That UBS Breached The MLS Warranty Regarding DTI Ratios Is Reliable**

UBS argues (Dkt. 483 ¶¶ 173-75) that Holt based his findings on hearsay statements, but it does not dispute that "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions," *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) (citation omitted), and the types of information that Holt relied on have been accepted in multiple RMBS cases. *See* Transcript of Trial, Tr. 345:15-346:20, *Assured Guar. Mun. Corp. v. Flagstar Bank*, *FSB*, 11 Civ. 2375 (JSR) (S.D.N.Y. Oct. 12, 2012) (Dkt. 113) (Ex. 6) (overruling hearsay objection to expert's reliance on databases to determine occupancy and a verification of employment form because experts "can testify as to hearsay"); *see also FHFA v. Nomura Holding Am., Inc*., 104 F. Supp. 3d 441, 528 (S.D.N.Y. 2015) (re-underwriting expert's "reliance on BLS data was entirely reasonable in the circumstances"); *cf. CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 740 n.7 (7th Cir. 2015) (expert could testify to the state of RMBS market based on SEC letters).[45]

UBS also asserts (Dkt. 483 ¶ 178-81) that the Court did not admit the Commercial Data[46] upon which Holt relies for its truth.  In fact, the Court did exactly that, admitting the Commercial Data under the hearsay exception of Federal Rule of Evidence 803(17), based on Holt's testimony that it was publically available, reliable, and commonly used by underwriters.  Tr. 1184:15-1186:10.  (THE COURT:  "I heard what [Holt] said, and that provides a basis for their admission

---

[45]   The cases cited by UBS on this point (Dkt. 483 ¶ 173) are inapposite, as they involved excluding from jury trials expert testimony that simply repeated the testimony of third-party witnesses without applying any expert analysis. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (district court did not abuse discretion in excluding from jury trial expert testimony that simply repeated statements of freelance artists' regarding comic book company's practices); *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (district court did not abuse discretion in excluding from jury trial expert testimony that simply repeated statements from gang members concerning their narcotics trafficking operations).[45]  Here, the Court is the factfinder (so there is no risk of jury confusion) and Holt did not simply repeat the statements he relied on, but rather considered them in combination with the Guidelines and Loan Files to opine that various Loans were materially defective.

[46]   The Commercial Data consists of data and information compiled by the United States Bureau of Labor Statistics ("BLS"), DataVerify, Data Tree, LexisNexis's Accurint service, Mortgage Electronic Registration Systems, Inc. ("MERS"), PACER, Salary.com, and Sitex Group, LLC ("Sitex").  Dkt. 434 at 1.

insofar as they contain data from the sources that Mr. Baldwin's question was directed to, and the witness confirmed were of the type used in the industry in the ordinary course of business."); *see also* FOFs ¶¶ 269, 288, 289, 292 (UBS's vendors relied on many Commercial Data sources).

UBS insists (Dkt. 483 ¶ 179) that Rule 803(17) applies only to "list-type documents," but the plain text of the Rule refers not only to "lists" but also to "[m]arket quotations, . . . directories, or other compilations," Fed. R. Evid. 803(17), and UBS's argument has been rejected by the Advisory Committee. Fed. R. Evid. 803(17) advisory committee's note (noting that "[w]hile Wigmore's text is narrowly oriented to lists, etc., prepared for the use of a trade or profession, authorities are cited which include other kinds of publications, for example, newspaper market reports"). Rule 803(17) does not turn on whether the information is presented as a list, but rather on "general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate," *id.*, and Holt's testimony regarding the Commercial Data—compiled by either federal agencies or for-profit companies with a strong interest in ensuring the accuracy of their reports—is unrebutted.[47]

UBS's attacks on specific Commercial Data sources also fail:

**Data Verify.** UBS asserts (Dkt. 483 ¶183) that Holt was "unfamiliar" with DataVerify; in fact Holt testified that "[w]e have used it, I have seen it in the past," Tr. 1013:18-22, that Data Verify was a source he "relied on in the course" of his "work as an underwriter," Tr. 1185:10-20, and that he used that data to identify breaches of the MLS Warranty regarding owner occupancy. Holt Direct (PX 1103) ¶ 166; *see also* Tr. 395:1-4 (Grissom testifying that Data Verify was available to underwriters during the relevant time period). In this context, Holt's statement that he

---

[47]  The cases UBS cites (Dkt. 483 ¶¶ 179, 181) are not to the contrary. *In re CR Bard Inc.*, 810 F.3d 913, 924 (4th Cir. 2016) held that a liability disclaimer was not admissible under Rule 803(17) because it was "not factual" but rather a company's statement of opinion, *id.*; while the court noted that such opinions were not "factual, list-type documents" it did *not* hold that documents must be of "list-type" to fall under the Rule, as UBS incorrectly asserts. *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 393 (Fed Cir. 1996), concerned oil purchase summaries prepared by the purchasers themselves; as such they were not prepared for "general use by an industry or members of the public," *id.*, unlike the Commercial Data, Tr. 1184:15-1186:10. And in both *Crane v. Crest Tankers, Inc.*, 47 F.3d 292, 296 (8th Cir. 1995) and *Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-cv-1499 (CSH), 2016 WL 1367725, at *17 (D. Conn. Apr. 5, 2016), the proponents offered *no* foundation for the evidence at issue; here, Holt provided that foundation based on years of underwriting experience.

was "not familiar" with Data Verify apparently meant only that he did not know how Data Verify gathered its data, Tr. 1013:18-22, but Rule 803(17) does not require that showing.

**Bureau Of Labor Statistics.**  UBS argues (Dkt. 483 ¶ 184) that Plaintiff did not show how BLS collects its employment and income data, but Rule 803(17) does not require that showing.  UBS suggests BLS data is not reliable, but it concedes that the data can be used to "show general income ranges and trends within a given market," *id.*  Grissom agreed the data was a "tool" available to underwriters, Tr. 392:17-393:4, UBS's own vendor relied on that data, FOFs ¶ 284 & n.139, and UBS does not dispute that Holt's use of BLS data was conservative, Holt Direct (PX 1103) ¶¶ 152-53; FOFs ¶ 285; *see also Jones-Reid v. Astrue*, 924 F. Supp. 2d 381, 407 (D. Conn. 2012) (describing BLS as a "reliable statistical source").

Moreover, UBS does not dispute that BLS data is admissible under Rule 803(8)(A)(ii), which provides a hearsay exception for records from a public office that constitute "a matter observed while under a legal duty to report."  Fed. R. Evid. 803(8)(A)(ii); *see also* FOFs ¶ 283; *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 551 (D. Md. 2007) ("[O]fficial publications posted on government agency websites should be admitted into evidence easily.").  The only cases UBS cites (Dkt. 484 ¶ 189) on this point are irrelevant, as they go only to Rule 803(8)(A)(iii), which is a separate hearsay exception for "authorized government investigations" with different requirements than Rule 803(8)(A)(ii).  *Cf. City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (interim, rather than final, report did not fall under Rule 803(A)(iii), previously 803(8)(C)); *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 637, 640 (S.D.N.Y. 2007) (report prepared by paid consultant for prosecutor did not fall under Rule 803(8)(C)).

**Salary.com.**  UBS does not address authorities admitting Salary.com data under Rule 803(17).  *Flitton v. Primary Residential Mortg., Inc.*, No. 2:03CV481DAK, 2008 WL 4911225, at *3 (D. Utah Nov. 13, 2008) (admitting Salary.com data under Rule 803(17) because of that website's "motivation to foster reliance by being accurate").  Instead, UBS argues (Dkt. 483 ¶ 185) that Plaintiff "never explained how Salary.com collects and calculates its salary data," but

Rule 803(17) does not require this showing.[48]

**Mortgage Electronic Registration System ("MERS").**  UBS argues (Dkt. 483 ¶ 187) that Holt did not personally record mortgages on MERS, but Rule 803(17) does not require that a witness establishing the reliability of a commercial data source personally compile the data.  Holt had first-hand experience *using* MERS, *e.g.*, PX 1103 (Holt Direct) ¶ 198, knew how the MERS recording process worked, Tr. 1020:14-20, and has first-hand knowledge using MERS to identify second mortgages, *e.g.*, PX 1103 (Holt Direct) ¶ 198, which is more than sufficient to satisfy Rule 803(17).  *See Blanche Road Corp. v. Bensalem Twp.*, No. CIV. A. 89-9040, 1996 WL 368347, at *2 (E.D. Pa. June 25, 1996) (expert established foundation for admission of real estate sales information under Rule 803(17) by testifying that he relied on it, even though he had not compiled the data himself), *aff'd*, No. 96-1648, 1997 WL 33483559 (3d Cir. Oct. 21, 1997); *see also* FOFs ¶ 269 (UBS's own vendors relied on MERS data).

**Accurint, SiteX, Data Tree.**  UBS's only critique of these sources (Dkt. 483 ¶¶ 186, 188) is that Holt did not explain in detail how they compiled their data, but Rule 803(17) does not require such a detailed discussion.  Holt explained what these sources were and that underwriters commonly relied on them.  Tr. 1184:15-1186:10.  Nothing more was required.  *E.g.*, *Blanche Road Corp.*, 1996 WL 368347, at *2; *Hutchinson v. Essence Commc'ns, Inc.*, 769 F. Supp. 541, 562 (S.D.N.Y. 1991) (witness "laid a foundation for the admission" of reports of sales data under Rule 803(17) by testifying that "he routinely relies on the reports in the course of his business").[49]

---

[48]   The only case UBS cites on this point (Dkt. 483 ¶ 185), *Personal Audio, LLC v. CBS Corp.*, No. 2:13-CV-270-JRG-RSP, 2014 WL 1202698, at *5 (E.D. Tex. Mar. 20, 2014), is not to the contrary.  *Id.* at *4.  That case involved the website "LinkedIn," which hosts professional profiles (akin to resumes) created by individuals, not by the website.  The court refused to admit an individual's LinkedIn profile under Rule 803(17) because (i) such profiles were not the type of information contemplated by the Rule; (ii) the defendant "could have easily" provided testimony from someone with actual knowledge of the individual's location; and (iii) allowing admission of the profile on the basis of a journalist's testimony that he regularly consulted LinkedIn when locating people would mean that "any online information is necessarily admissible if a journalist testifies that he or she uses that resource to gather information."  *Id.* at *4-5.  Those concerns are not present here:  (i) Salary.com contains objective reporting of salary amounts, not individuals' subjective description of their experience and skills; (ii) there is no easy alternative to a compendium of salary information; and (iii) there is no concern that admitting the data here would make "any online information" admissible.

[49]   The Commercial Data independently is admissible under Rule 807's "residual" hearsay exception. Dkt. 434. at 2 n.5.  UBS asserts (Dkt. 483 ¶ 190) there is insufficient foundation for this admission, but it does not dispute the

PACER.  UBS argues (Dkt. 483 ¶¶ 182, 192) that Holt "blindly relied" on borrower statements embedded within bankruptcy filings that are inadmissible hearsay.  To the extent that UBS suggests that Plaintiff sought to introduce those embedded statements for their truth, it is incorrect—Plaintiff does not seek to admit these statements for their truth, but rather submits that it was reasonable for Holt to rely on them because underwriting experts do so, FOFs ¶¶ 292-93; Tr. 1179:19-1180:3, 1180:20-1181:7, 1185:11-20 (Holt); PX 344 at 4 (UBS's instructions to its underwriters noting use of Lexis Nexis), and that the Court thus may admit those statements to evaluate the bases of Holt's opinions, FOFs ¶ 293.

Holt's reliance on these statements was reasonable.  He did not simply assume that everything a borrower said in a bankruptcy filing was true; rather he weighed those statements against information in the Loan File and other third-party sources and only relied upon them, for example, where his review led him to conclude that they "verified that the borrower's actual income differed from the stated income," *e.g.*, Holt Direct (PX 1103) ¶ 154.  It was reasonable for Holt to rely on those statements, as debtors in bankruptcy are often assisted by counsel and face civil and criminal penalties for false statements.  FOFs ¶ 293 (citing *Taylor v. Freeland & Kronz*, 503 U.S. 638, 644 (2010)).  Even Grissom did not dispute their accuracy.  *E.g.*, Tr. 479:18-480:2, 531:6-17 (Grissom).  While UBS cites an audit reporting misstatements in some filings, the audit did not disclose its criteria for identifying such misstatements, Dkt. 484-10 (Ex. J) at 6, providing no basis to doubt Holt's judgment in the specific instances identified in his report.  Moreover, even if UBS had provided evidence that any specific borrower had misrepresented his income in a bankruptcy filing, that evidence would support finding a breach of the MLS Warranty, as it would be much more likely than not that the borrower also misrepresented his income to the originator of

Commercial Data was compiled by entities hoping to foster reliance upon it, which establishes its trustworthiness. The case cited by UBS on this point, *Gupta v. Attorney General of the United States*, No. 12 Civ. 5637 (FM), 2014 WL 1116730, at *8 (S.D.N.Y. Mar. 20, 2014), is inapposite, as it excluded a defendant's self-serving statements to his father, not publically available commercial data that was widely relied upon by professional underwriters.

his loan, showing that the DTI ratio based on that income was inaccurate.[50]

### 6.    The MLS Misstated LTV Ratios

Plaintiff showed there are 3,550 Loans that breach the MLS Warranty regarding LTV Ratios, with current estimated damages of $1,243,861,625.51 (FOFs ¶¶ 315-332, App. 39),[51] based on the testimony of Cowan, a highly regarded expert in the field of AVMs and statistics whose qualifications UBS no longer seriously questions.  UBS did not offer any testimony in defense of the appraisals; instead, it insists all the appraisals were valid despite evidence that a substantial number exceeded the sales values of all ten comparable properties chosen based on the criteria used by appraisers and the upper bound proffered by UBS's own expert, as well as the losses on many liquidated Loans.  UBS's arguments are without merit.  Accordingly, this Court should find UBS liable and award Plaintiff its remedies for these 3,550 Loans.

UBS takes the position (Dkt. 483 ¶¶ 260-64) that because the contracts warrant that the LTV Ratios are based upon "an appraisal made at the time of origination," the appraisals supporting the Loans need not support a "correct" measure of market value, and that AVMs are not appropriate substitutes.  As Plaintiff has shown, however, FOFs ¶¶ 318-27, the warranty is violated if the appraisals could not have been honestly believed, and the AVM results demonstrate that the appraisals for loans where Holt found breaches could not have been.

UBS contends (Dkt. 483 ¶ 270) that Cowan never opined that the values attested to by the appraisers in question were not honestly believed, but he need not opine on that ultimate question—the Court may reasonably infer that result based on his testimony that many of the appraisals in question exceeded *all ten* of the comparable sales prices used by the AVM or were

---

[50]   UBS also discusses three Loans where it believes Holt should not have relied on bankruptcy filings (Dkt. 483 ¶¶ 194-96) but it presents no good reason to doubt Holt's findings.  For two Loans, Holt's findings were also based on other sources:  (i) ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████. FOFs ¶ 292.  For the final Loan, █████████████████████████
██████████████████████████████████████████████████████ FOFs ¶ 97 n.21.

[51]   Nearly all of these Loans are affected by other material breaches.  FOFs ¶ 332 n.178.

above the 68% upper bound advocated by its own expert, Barnett.  FOFs ¶¶ 324-26.  UBS takes the contrary position despite having failed to rebut Cowan's testimony that the AVM selected the ten most comparable properties based on the same criteria used by appraisers and that those factors account for well over 80% of the variation in residential mortgage properties—meaning that these ten comparable properties were highly similar to those a reasonable appraiser should have chosen, and that the factors on which they were chosen strongly predict a property's value.  FOFs ¶¶ 100, 102; Tr. 1677:3-12, 1710:20-21 21; PX 1108 ¶ 65.  Cowan testified that it was "more likely than not" that the mean value produced by the AVM was more accurate than the appraisal "even on the individual result,"[52] and the fact that so many appraisals were above the values of *all* ten comparable properties in his AVM means the differences were highly unlikely to be due to chance.  *E.g.*, Tr. 1608:22-1609:5.  Cowan testified further that a reasonable appraisal would fall somewhere in the range of his 10 comparables," Tr. 1703:6-10, and if the appraisals fell *outside* that range, then the appraisals did not accurately reflect fair market value, Tr. 1710:12-1711:8, Tr. 1703:6-1704:7, 1710:12-1711:8.[53]

Unable to defend its extreme positions, UBS is left to argue (Dkt. 483 ¶ 277-83) that AVMs are inherently unreliable.  But UBS used an AVM to check whether its appraisals were "reasonable" in just this way, and with a far less conservative tolerance for differences.  Tr. 1349:8-19.[54]  And Grissom testified that she believed AVMs were about as reliable as appraisals.

---

[52]   Tr. 1711:9-21 ("Q:  Are you expressing an opinion one way or the other about whether the individual Phoenix AVM results are an accurate reflection of fair market value?  A:  Yes, I am expressing an opinion.  Q:  What is that opinion?  A.  That is the way I get to these results is by doing individual comparisons, so I have to make a determination for each one, and there is a probability associated with each one, but as I add up across property-after-property 10,000 times, that probability kind of goes away for the overall result, but even on the individual results, I am making it a statement it is more likely than not an appraisal is inflated relative to its fair market value.").

[53]   UBS also points (Dkt. 483 ¶ 267) to the recalculated LTV ratio for a single Loan (████████), which Cowan conceded did not meet the 5% threshold and should be withdrawn (Tr. 1732:5-1734:2)—and has been.  FOFs App. 39 (LTV Holt) (no longer including Loan ████████).  This errant inclusion of a single recalculated LTV ratio has no bearing on the integrity of Cowan's analysis.

[54]   UBS attempts to evade this testimony by describing precisely how it used AVMs to check the reasonableness of appraisals.  Dkt. 483 ¶ 264 n.55.  That in doing so UBS compared appraised values to AVM results, instead of comparing an LTV using an appraised value to an LTV using an AVM result, makes no difference.  Those are two ways of doing the same thing.

Tr. 291:4-292:9, 1702:12-16.[55]

UBS also argues (Dkt. 483 ¶ 268) that one should never use an AVM to assess an LTV ratio for a purchase-money Loan, asserting that the definition of "Appraised Value" requires use of the "sales price" for such Loans.  This argument, which addresses only Cowan's opinions as to purchase-money Loans, is incorrect.  The definition requires, for such purchase-money Loans, the use of "*the lesser of*" the "value . . . based upon the appraisal . . . and . . . the sales price[.]  PX 49 at 23 (Definition of "Appraised Value") (emphasis added).  Thus, if the actual value of the property is lower than the sales price, the contracts require that the lower value be used, as in the four Loans UBS cites.  (Dkt. 483 ¶¶ 268-69, 285 (discussing Loans 1████████████ ███████████████████)).  Conversely, if the purchase price was too high, that is a classic example of a poorly underwritten loan.

UBS also fails to rebut (Dkt. 483 ¶ 270 n.56) Plaintiff's authorities (FOFs ¶ 317 & n.166) demonstrating that, in the context of a contractual breach of warranty claim, Plaintiff is not required to show appraisers' subjective disbelief.  UBS is mistaken that these cases "address whether reasonable reliance is an element of a breach of warranty claim … [but] do not address whether a breach of warranty based on an opinion is actionable," Dkt. 483 ¶ 270 n.56.  Restricting recovery for statements of opinion is a principle of *tort* law, which is derived from tort law's requirement of reasonable reliance—this restriction is not a principle of New York *contract* law, which has no similar reliance requirement.  *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 732 F.3d 755, 756 (7th Cir. 2013) ("Where reliance is an element of a tort claim (as in cases alleging fraud), representations of law are not actionable."); *id.* at 766 (holding that, if court

---

[55]  UBS's description (Dkt. 483 at 135 n. 54) of *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) omits that the Second Circuit interpreted a warranty regarding value based on an appraisal—"the fair market value of such real property as evidenced by an appraisal . . . was at least equal to 80% of the principal amount of the Mortgage Loan"—was a representation about the property's fair market value.  *Id.* at 207 ("We think, based on this reading of the warranty provisions, that the MLPSA means what it says: that each loan in the D5 Trust is secured by a mortgage on commercial or multifamily property the *fair market value* of which 'was at least equal to 80% of the principal amount of the Mortgage Loan' either on the date the mortgage was originated, or on the date the D5 Trust closed") (emphasis added).  The "Appraised Value" definition here has the same structure as the one in *LaSalle*—it refers to a "value . . . based upon" an appraised value, and should be interpreted the same way:  as a representation about the *value* of that property.

applies "contract-like (rather than tort-like) reliance, then" this statement of opinion "is a provision of the contract that, like any other, may be breached and give rise to an action for damages."). The lack of such a restriction in contract law makes sense, as parties are free to contractually warrant that statements of opinion are true. *CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 506 n.5 (1990) ("[R]eliance is established if, as here, the express warranties are bargained-for terms of the seller."); *cf. e.g.*, *Newby v. Bank of Am. Corp.*, No. 12 Civ. 614, 2013 WL 940943, at *4 (E.D.N.Y. Mar. 8, 2013) (confirming that limitation on recovery for statements of value under New York law stems from tort requirement, not applicable here, of reasonable reliance)." UBS likewise fails to rebut (Dkt. 483 ¶ 262 n.54) Plaintiff's showing that the Second Circuit in the breach of warranty context has treated the fair market "value" of a loan as a matter of "fact." FOFs ¶ 317 (quoting *LaSalle*, 424 F.3d at 210).

In addition, UBS argues (Dkt. 483 ¶¶ 292-99) that Phoenix was purportedly the expert, not Cowan; but in fact, all the analyses Cowan performed were his own. FOFs ¶ 109. UBS notes (Dkt. 484 ¶ 293) that Phoenix determined the number of comparable properties—in fact, Cowan assisted Phoenix with crafting the formulas it used to determine those comparables. Tr. 1619:6-9, 1675:24-1676:3. UBS also faults Cowan (Dkt. 483 ¶ 293-94) for not having set a maximum physical distance for the properties. But Cowan testified that choosing comparables from overly remote properties would be "fruitless" because the "distance would overwhelm all of the other characteristics," rendering the choice of maximum distance "a computer processing problem … not a statistics problem." Tr. 1679:5-1681:13, 1682:11-1683:1. He further testified that the only result of the distance limit would be the generation of fewer than 10 comparables, in which case he did not provide an AVM value, Tr. 1691:5-1693:14, 1712:8-14.

UBS also complains (Dkt. 483 ¶ 295-99; 306-08) that it did not receive certain underlying calculations and data (addresses of the comparable properties, adjustments to square footage and date of sale, and the underlying computer program). But UBS never requested this information prior to trial, from Cowan or Phoenix or otherwise, which belies any implication that UBS might have been prejudiced. *See Watanabe Realty Corp. v. City of New York*, No. 01 CIV. 10137

(LAK), 2004 WL 169751, *2 (S.D.N.Y. Jan. 28, 2004) (declining to preclude expert testimony in part because "plaintiff — in the 17 months since [the expert] rendered his report — never took his deposition nor, so far as the record discloses, sought any elaboration on the bases for the opinions expressed, a fact which tends to confirm the relative unimportance of the omitted material in that plaintiff did not even seek to elicit the basis for the opinions that were expressed.").[56]

Finally, UBS attacks Cowan's credibility (Dkt. 483 ¶¶ 300-05), but cites only trivia:  (i) a description of the scope of Lewtan results (the Lewtan AVM was run on a large portion of the loans, but the results were reported only on the samples), Dkt. 483 ¶ 301; (ii) a linguistic dispute about the meaning of the word "methodology" (Cowan's methodology, in the sense used in *Daubert*, did not change, though he provided a different analysis because Plaintiff was forced to change AVM providers),[57] Dkt. 483 ¶ 302; (iii) a disagreement with Barnett about whether one can calculate a reliable 68% upper bound when there are fewer than ten observations, Dkt. 483 ¶ 303; and (iv) Cowan's correct statement that Phoenix had not provided a forecast standard deviation when Phoenix had provided a standard forecast error to the mean—which, he explained, was *not* a forecast standard deviation, Dkt. 483 ¶ 304, Tr. 1617:2-8.  If errors at all, these are minor ones that do not call Cowan's credibility into question, and fall far short of intentionally false statements that courts have held render an expert's opinion unreliable, as UBS's failure to

---

[56]  UBS's cited cases (Dkt. 483 ¶¶ 292, 306) miss the mark because they deal with experts who uncritically adopted the work of others without directing or confirming it themselves—unlike Cowan, who is an expert in AVMs, directed Phoenix's work, and testified to its reliability based on his extensive experience.  FOFs ¶¶ 109, 323; *cf. Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614-15 (7th Cir. 2002) (hydrology expert could not rely on the output of models created entirely by his assistants, as he was not an expert in modeling and there was no independent evidence of the models' reliability); *Lava Trading Ins. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *16 (S.D.N.Y. Apr. 11, 2005) (Castel, J.) (striking expert report where expert made a series of assumptions and illogical inferences obviously aimed at reaching predetermined result for his client); *Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 145 (S.D.N.Y. 2006) (expert used "a proprietary software program whose methodology was not explained to the Court and may have been unknown to Carlson [the expert] himself" and had "no way of knowing whether all of" the relevant data "were properly considered.").

[57]  As Cowan testified, and UBS does not contradict, Lewtan withdrew its consent for the use of its data in litigation, and Quinn Emanuel commissioned an AVM from Phoenix whose methodology Cowan had dictated.  Tr. 1580:8-1581:23, 1584:6-7 ("Q:  So you did not choose Phoenix, correct? A. No. I was part of the discussions about who to pick, but I didn't choose Phoenix."), 1621:8-10 ("Q. Is it Phoenix, then, that created this Mahalanobis distance metric computer model?  A. At my direction, yes.").

cite a single case in support of its argument demonstrates.[58]

**D.     UBS Fails To Rebut The Evidence That It Breached The Maximum LTV Ratio Warranty**

Plaintiff showed that there are 1,461 Loans that breach the Maximum LTV Ratio Warranty, with current estimated damages of $467,213,195.39 (FOFs ¶¶ 333-38, App. 40). Apart from its general criticisms of Cowan, UBS's only response (Dkt. 483 ¶ 271) is that "Loan-to-Value Ratio" is defined for purposes of the Maximum LTV Representation Warranty as "the loan-to-value ratio calculated in accordance with applicable state laws regarding primary mortgage insurance" and that Cowan did not consult such laws in his work, *id.* (citing PX 49 at 42-43). But the Maximum LTV Representation Warranty itself warrants that only Loans with LTV Ratios "in excess of 80.00%" will be subject to a primary insurance policy, *e.g.*, PX 49 at 196—those are the only Loans to which laws "regarding primary mortgage insurance" would apply. The evidence that the Maximum LTV Representation Warranty was breached is that Loans with stated LTV Ratios *below* 80% actually had LTV Ratios above 80%. As these Loans were not to be subject to primary mortgage insurance, it is not necessary to apply PMI rules to those Loans to show that the Warranty was breached with respect to these Loans.[59] Accordingly, this Court should find UBS liable and award Plaintiff its remedies for these 1,461 Loans.

**E.     UBS Fails To Rebut The Evidence That It Breached The Mortgage File Warranty**

Plaintiff showed that there are 2,839 Loans that breach the Mortgage File Warranty, with current estimated damages of $875,619,825.58 (FOFs ¶¶ 340-51, App. 41). UBS does not dispute the substance of this evidence, but rather argues (Dkt. 483 ¶ 243) that the warranty's proviso—that UBS does not possess "documents which have been delivered to the Trustee or which have been

---

[58]   *See, e.g.*, *Lava Trading*, 2005 WL 4684238, at *21 (finding expert's opinion unreliable when it was based on plainly false assumptions); *see also In re Ephedra Products Liab. Litig.*, 494 F. Supp. 2d 256, 257 (S.D.N.Y. 2007) (finding expert's testimony unreliable because of the "magnitude" of the factual errors).

[59] As UBS concedes, moreover, this limiting definition of LTV ratio referring to primary mortgage insurance does not, by the language of the contracts, apply to the Maximum LTV Ratio Representation in the PSAs but rather to a different representation that does not refer to LTV. Dkt. 483 ¶ 271.

submitted for recording and not yet returned"—somehow required Plaintiff to show that the files were incomplete as of *origination*.  In fact, the Mortgage File Warranty was made as of the *Closing Date*, *e.g.*, PX 49 at 191, 196, and the evidence shows that UBS did not possess complete Mortgage Files at that time, FOFs ¶¶ 340-51; not only is UBS unable to produce the Mortgage Files now, but Twombly conceded that UBS *never obtained the Loan Files*—in which any Mortgage File documents would have been included—for the Loans it did not diligence, accounting for 75% of the Loans with breaches in this category.  FOFs ¶ 341.[60]  To take advantage of the proviso it references, UBS would have had to show that the missing documents—most of which it concededly never had—were in fact delivered to the Trustee or submitted for recording as of the Closing Date, but it did not.

UBS's argument (Dkt. 483 ¶ 244) that the documents in the Mortgage File "must have existed at some point in order for the loans at issue to close" is especially meritless in the case of title insurance, which accounts for 2,827 of the breaches in this category, and $874,824,571.24 in estimated damages.  As Grissom admitted, "[t]itle insurance . . . is issued *at or after closing* and would not have been a factor in the originator's decision whether to make the loan."  Grissom Direct (DX LI) ¶ 90 (emphasis added).  Thus, the fact that the Loans were made provides no reason to presume that title insurance documents were in the files at origination or thereafter.   In any event, again, the question is not whether title insurance *existed* but whether it was *in UBS's possession*.

UBS asserts (Dkt. 483 ¶ 246) it had no responsibility for the Mortgage Files as of the Closing Dates on the purported basis that Section 2.02 provided that it would deliver those files to the Custodian on behalf of the Trustee.  Under this reading, UBS could *never* breach the Mortgage File Warranty, impermissibly rendering that warranty a nullity.  *Macy's*, 127 A.D.3d at 54 ("[T]he

---

[60]  UBS's assertion (Dkt. 483 ¶ 247 n. 50) that its failure to obtain copies of Loan Files for most of the Loans does not mean it did not have copies of the Mortgage Files for those Loans is simply wrong.  The documents that make up the Mortgage File—the title insurance policy, mortgage note, and deed—are, assuming they exist, part of the Loan File. If UBS never obtained the Loan Files for these Loans, it necessarily never obtained the Mortgage Files either.

rules of construction of contracts require [the court] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect").[61]  The more natural reading is that the Trusts bargained for extra insurance—if the Custodian did not have a copy of a Mortgage File document, then the Trusts could obtain that document from UBS.

UBS speculates (Dkt. 483 ¶¶ 246) that the Custodian received the missing documents, citing the *lack* of any evidence about whether the Custodian did or not.  Such speculation cannot overcome Plaintiff's showing, FOFs ¶¶ 340-42, that the documents are not in the files today, or the inference UBS did not possess the documents as of the closing dates.  *E.g.*, *In re Balfour Maclaine Int'l Ltd.,* 873 F. Supp. 862, 869 n.9 (S.D.N.Y. 1995) (assumptions without evidentiary support insufficient to overcome *prima facie* case), *aff'd sub nom. In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68 (2d Cir. 1996).  UBS tries (Dkt. 483 ¶¶ 247) to blame its failure to "find" the missing documents on the timing of the Trustee's notice, but this argument makes no sense, as the Mortgage File Warranty required UBS to *possess* those documents, not to find them elsewhere.  If anything, UBS's arguments that it would have to "find" the missing documents and that it had no responsibility for them after closing tend to confirm that it did not actually possess those documents on the Closing Dates.  Accordingly, the Court should find UBS liable and award Plaintiff its remedies for these 2,839 Loans.

### F.    UBS Fails To Rebut The Evidence That It Breached The Hazard And Title Insurance Warranties

Plaintiff showed that there are 242 Loans that breach the Hazard Insurance Warranty, with current estimated damages of $77,265,129.85 (FOFs ¶¶ 357-64, App. 46), and 2,827 Loans that

---

[61]  Also relying on Section 2.02, UBS suggests that the Trustee somehow failed to provide timely notice of breaches of the Mortgage File Warranty, re-hashing its "prompt notice" argument.  This argument fails under Section 2.02 (as under Section 2.03) because Section 2.02 *does not require the Trustee to provide prompt notice of breaches of the Mortgage File Warranty*—it only requires that the Trustee "notify the Transferor . . . of any document defects . . ." (*e.g.*, PX 49 at 72) upon learning of such defects from the Custodian.  As UBS has presented no evidence that the Custodian notified the Trustee of any such defects, the Trustee was under no obligation to provide notice under Section 2.02, prompt or otherwise.  The case UBS cites on this point, *M & I Bank, FSB v. Coughlin*, No. CV 09-02282-PHX-NVM, 2012 WL 602365, at *5 (D. Ariz. Feb. 24, 2012), is inapplicable as the contract there, unlike the PSAs, contained an express "prompt notice" requirement.

breach the Title Insurance Warranty, with current estimated damages of $874,824,571.24 (FOFs ¶¶ 352-56, Apps. 41, 44, 45).  In response, UBS does nothing but speculate in its Appendix B (Dkt. 484-12 at B-29-31) that the necessary insurance documents existed when the Loans were made.  But UBS's conjecture that certain documents were present at origination does not apply to these two Warranties, which guarantee that certain types and levels of insurance existed as of the Closing Dates, *e.g.*, PX 49 at 193-94, and UBS has done nothing to rebut Plaintiff's showing that the required insurance was not present.  Accordingly, this Court should find UBS liable and award Plaintiff its remedies on the Loans in these two categories.

### G.     UBS Fails To Rebut The Evidence That It Breached The Guideline Warranty

#### 1.     The Guideline Warranty Unambiguously Warrants That Each Loan In Fact Was Originated In Accordance With Guidelines

Even though the Guideline Warranty unambiguously warrants that each Loan "was underwritten in accordance with" the underwriting guidelines, FOFs ¶ 365, and UBS does not dispute the substance of evidence showing that the Loans in fact did not comply with the Guidelines, *e.g.*, Dkt. 484-12 (App. B) at B-36 (Grissom "does not challenge that Holt correctly reported what BLS and salary.com state"), UBS argues (Dkt. 483 ¶¶ 197-211) that the Court should ignore that evidence unless Plaintiff can demonstrate that the original underwriter knew or should have known at the time of origination that a Loan contravened the applicable Guidelines (Dkt. 483 ¶ 206).  UBS's position is that the Guideline Warranty is essentially a representation that the underwriter did not commit fraud, hence the warranty would not be breached even if the underwriter failed to do her job (at the same time that UBS argues it did not warrant against fraud at all).  UBS's argument should be rejected:  the Guideline Warranty is a warranty that *in fact* the Loans complied with the Guidelines, regardless of the underwriter's knowledge.[62]  *FHFA v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 653 (S.D.N.Y. 2015) (guideline warranty meant that loans "did in fact meet the criteria set forth in their Originators' guidelines.  That is a

---

[62]   The Guideline Warranty is unambiguous, and UBS does not argue otherwise.  UBS's out-of-context citations of snippets of Holt's testimony (Dkt. 483 ¶¶ 199-202) are thus irrelevant to the Court's interpretation of that Warranty.

representation of fact.").

Because the Guideline Warranty is one of fact, post-origination evidence is relevant to show that in fact the Loans did not comply with the Guidelines, as multiple cases have held. *Id.*; *Flagstar*, 920 F. Supp. 2d at 505-06 (same); *accord Mass. Mut. Life Ins. Co. v. DB Structured Prods.*, Inc., 11 Civ. 30039 (MGM), 2015 WL 2130060, at *14 (D. Mass. May 7, 2015). UBS's attempt to distinguish these authorities fails:  While *FHFA* involved securities claims, the language of the relevant representation in that case was materially similar to the language of the Guideline Warranty here;[63] and while the *Flagstar* contract included a "no fraud" warranty, the court admitted post-origination evidence to show "the ways in which the loan file failed to meet Flagstar's guidelines," 920 F. Supp. 2d at 506, as that evidence is used here. *See* Holt Direct (PX 1103) ¶ 138 (explaining "it is appropriate—and often necessary—to consider information acquired after origination to determine whether the guidelines were in fact violated"); *see also id.* ¶¶ 152-56 (explaining how Holt used BLS data to show that a loan violated Guidelines).[64]

UBS also argues that reliance on post-origination evidence is categorically improper simply because it "was not available to the underwriter at the time of origination." Dkt. 483 ¶ 198. But it is well-established that later-in-time evidence may be used to prove an earlier fact or state of mind. *See United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) (stating that "[t]he fact that the evidence involved a subsequent rather than prior act is of no moment" and affirming admission of evidence regarding defendant's prior default to show intent). UBS's sole support for

---

[63]   The relevant representation in *FHFA* provided that "[t]he Mortgage Loans . . . were originated generally in accordance with the underwriting criteria described in this section."  74 F. Supp. 3d at 643.  Similarly, the Guideline Warranty provides that "[t]he Mortgage Loan was underwritten in accordance with the underwriting guidelines of the related Loan Seller in effect at the time of origination . . ."  *E.g.*, PX 49 at 196.

[64]   Even if the Guideline Warranty were limited to facts that were "known or knowable at origination" by the underwriter, as UBS argues (Dkt. 483 ¶ 205), post-origination evidence and evidence outside of the Loan Files would still be relevant.  For example, evidence from BLS or Salary.com that the highest comparable salary for the borrower's profession was well below the income stated by the borrower is strong circumstantial evidence that the underwriter failed to assess that the borrower's stated income is reasonable.  *E.g.*, *FHFA*, 74 F. Supp. 3d at 652-53 (post-origination evidence is relevant "if it help[s] to demonstrate that an Originator did or did not follow its own underwriting guidelines").  Similarly, while UBS criticizes "near year" evidence (Dkt. 483 ¶ 205 n.46), such material is strong circumstantial evidence that the borrower's income in the target year was misstated.

its argument to the contrary is a portion of the Court's Summary Judgment Order that addressed a different issue—the interpretation of the PSAs' cure-or-repurchase provision—and has no bearing on which evidence can show breaches of the Guideline warranty.[65]

UBS argues (Dkt. 483 ¶ 208) that Holt could not rely on any post-origination evidence that is hearsay because "re-underwriting experts" purportedly do not do so, but the rule against hearsay does not bar most of the post-origination evidence at issue here, which is part of the Commercial Data.  As shown above, the Commercial Data was admitted for its truth under an exception to the hearsay rule.  *See* Part II.C.5, *above*.  Moreover, experts may rely upon hearsay if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," Fed. R. Evid. 703, and UBS does not dispute that underwriters and re-underwriters rely on the types of materials that Holt considered, FOFs ¶ 288 (citing PX 67, PX U577, and PX U578).  These materials are thus the "*kinds* of facts" relied on by such experts in those fields, regardless of *when* those facts arose, and multiple courts have accepted the testimony of reunderwriting experts that rely on such post-origination evidence.  *FHFA*, 74 F. Supp. 3d at 652-653; *Mass. Mut.*, 2015 WL 2130060, at *14; *Flagstar*, 920 F. Supp. 2d at 506.

Finally, UBS's assertion (Dkt. 483 ¶ 210) that Holt "admitted" that he did not consider certain post-origination evidence "to confirm that there was *not* a material breach at the time of closing" (original emphasis) is incorrect.  UBS's assertion is not supported by the only evidence it cites—Holt's brief testimony that an *additional* source of post-origination evidence regarding a missing deed *could* have been checked to see if the deed had been recorded at the County Recorder's Office, *id.* (citing Tr. 828:12-20).  UBS's implication that additional post-origination sources, which UBS itself did not bother to consult, might show that certain breaches do not exist is pure speculation that does not rebut the evidence in the record.  *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 514 n.50 (S.D.N.Y. 2002) ("mere speculation" insufficient to

---

[65]  Moreover, once a breach is proved, post-origination evidence is relevant to show the materiality of the breach.  For example, where it otherwise is proved that an underwriter failed to assess the reasonableness of stated income, BLS and Salary.com information are admissible to show that this failure was material.  UBS does not dispute this point.

overcome plaintiff's proof of patent ownership).  Accordingly, this Court should find UBS liable and award Plaintiff its remedies on the Loans in these two categories.

### 2. Loans Were Made Without Critical Documents

Plaintiff showed that there are 1,276 Loans that breach the Guideline Warranty because critical documents were missing, with current estimated damages of $364,745,266.49 (FOFs ¶¶ 374-85, App. 47).  In response, UBS does not dispute that the relevant Loan Files do not presently contain those documents, but instead asserts (Dkt. 483 ¶¶ 216-30) that all of the documents must have existed at the time of origination and disappeared afterwards.[66]  Contrary to UBS's assertion (Dkt. 483 ¶ 218) that Holt did not determine if the documents were missing at origination, Holt did exactly that.  Tr. 778:13-15.  Starting with the fact that the documents are currently missing, Holt testified it was a "standard industry requirement" that underwriters digitize Loan Files at origination, making it highly unlikely that documents fell out of the digital files after the Loans were made.  Holt Direct (PX 1103) ¶ 175.[67]  Grissom could not contradict this testimony, as she never worked as an underwriter and had no contact with the U.S. mortgage market during the relevant time period, e.g., Tr. 660:14-661:5, 662:3-6, and UBS presented no evidence that the Originators of the Loans here did not follow this standard industry practice.

Contrary to UBS's assertion (Dkt. 483 ¶¶ 221-29), the evidence does not support its speculation that documents in the Loan Files went missing following origination.  UBS notes (id. ¶¶ 221) that there were multiple versions of some files, but UBS acknowledges that Holt reviewed the largest available file associated with each Loan, id. ¶ 221 n.49, and UBS presents no reason to believe that smaller versions of these files would contain the specific missing documents at issue.

---

[66]   For four of the 1,276 Loans in this category, UBS asserts (Dkt. 484-12 (App. B) at B-34-36) that while the documents are missing today, Grissom found other evidence that they existed at origination: Loans 1▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  Even if the Court credited Grissom's testimony (which it should not, for the reasons stated in Holt's rebuttals), she cites no such evidence that the documents were present in the other 1,272 Loans in this category.

[67]   UBS suggests (Dkt. 483 ¶ 219) that the Court should ignore that Holt's testimony on this point because it appeared "for the first time" in his trial declaration, but Holt's testimony was a permissible response to new arguments raised in Grissom's January 2016 expert report.  Second Rebuttal Report of Deborah Grissom ¶¶ 56-60.

UBS next argues (*id.* ¶¶ 222-26) that Grissom found a limited number of documents that Holt initially determined were missing, but does not identify any at-issue Loans for which this is true. Finally, UBS cites (Dkt. 483 ¶ 227) a letter from the servicer OneWest stating that Loan Files for Loans originated by IndyMac were in "disarray" (DX PC at 7), but this letter has not been admitted for its truth, Tr. 789:13-795:24, does not refer to documents *within* Loan Files being missing or in disarray (only that the files themselves are not organized), and concerns only approximately 346 Loan Files produced in this action.

UBS attempts (Dkt. 483 ¶ 230) to spin an email written by Twombly—that "Missing docs is going to be our saving grace here hopefully.  The exception we can all learn to live with."  (PX 88)—as stating that UBS could obtain missing documents and thereby eliminate the exceptions caused by those missing documents.  This argument is not credible, given that (i) Twombly testified that the Loan Files that UBS received from American Home, Countrywide, and IndyMac were routinely missing documents, Tr. 1379:25-1380:22, 1365:13-1366:19; (ii) Twombly wrote that UBS would "learn to live with" exceptions caused by missing documents rather than clearing them; and (iii) the documents are missing from the Loan Files today, indicating that missing document exceptions were not cleared.

UBS speculates (Dkt. 483 ¶¶ 231-40) that core documents were "lost or misplaced" after origination because loans were not supposed to have closed without them, but this ignores the unrebutted testimony of the frenzied nature of the mortgage market before 2008, in which underwriters had incentives to make loans without checking for core documents because they were compensated based on the number of loans they closed.  Holt Direct (PX 1103) ¶¶ 173, 176. Moreover, the Originators made the Loans at issue here solely to sell them (not to hold the risk of the Loans on their own books), and UBS's own documents recognized that such Loans were likely to be defective.  *E.g.*, PX 88; PX 710 at 2 (UBS internal email stating: "the stuff that [Countrywide] sells as whole loans usually don't perform anywhere near as good as the stuff that [Countrywide] securitizes themselves."); PX 707 at 2 (UBS internal Bloomberg message stating

"[Countrywide] kept the good stuff" and "sold the crap into deals[.]").[68]

UBS's speculation is especially implausible in the face of Holt's unrebutted testimony (based on his actual underwriting experience during the relevant time) that it was a standard industry practice to digitize loan files after closing.  Holt Direct (PX 1103) ¶ 175.  And, as Twombly acknowledged, while he would "expect to find everything in a loan file," "*[t]hat wasn't the case*" because "missing documents and trailing documents have always been an issue in the industry."  Tr. 1380:13-22 (emphasis added).  In total, this evidence makes it much more likely than not that the documents missing from the Loan Files today were missing at origination.

UBS argues (Dkt. 483 ¶ 239) that its failure to cure these breaches by producing the missing documents "does not give rise to a separate breach under the PSAs;" but Plaintiff does not argue that UBS's failure to cure caused a breach.  Rather, UBS's failure to produce the documents is additional circumstantial evidence from which the Court can infer that the documents did not exist at the time of origination or at the closing of the Trusts.  Moreover, UBS has conceded that the lack of core documents causes MAEs, as it conceded that "missing documents" are an "example of when" UBS's "cure obligation would be triggered."  Tr. 2132:14-2134:20.  Accordingly, the Court should find UBS liable and award Plaintiff its remedies for these 1,276 Loans.

### 3.    Loans Were Made Despite Unreasonable Stated Incomes

Plaintiff showed that there are 969 Loans that breach the Guideline Warranty because stated incomes were unreasonable and not assessed, with current estimated damages of $325,722,505.67 (FOFs ¶¶ 386-96, App. 58).  UBS's only response in its FOFs (Dkt. 483 ¶¶ 212-15) is that Holt found these breaches based on "rules of thumb" that were not in the Guidelines.

---

[68]    UBS asserts (Dkt. 483 ¶¶ 231-33, 235-37) that an "independent" settlement attorney would have ensured the required documents were present; but, as Holt explained, those attorneys were not truly independent, because they were selected or approved by the originators.  Tr. 1160:21-1162:10.  UBS cites (Dkt. 483 ¶ 237) Grissom's testimony that missing documents would have been caught by the originators' "QC" process, but this is non-expert conjecture, made in the face of her complete lack of any underwriting experience or familiarity with the U.S. mortgage market during the relevant time period.  *See also* Tr. 833:6-835:9 (Holt) (testifying that based on "decades of expertise and experience," the most reasonable inference from a document that is missing now is that the line underwriter, "QC person," and "post-QC person" simply did not do their job).

In fact, Holt did *not* create a rule that underwriters must document their assessments of stated income.  Rather, because it was standard industry practice for underwriters to provide that documentation (whether required by guidelines or not), it is reasonable to find that the lack of such documentation in a Loan File is evidence that an underwriter did not conduct the assessment, in combination with evidence that the borrower's stated income was higher than 90th percentile for the borrower's stated occupation as calculated using BLS data grossed up 125%.  FOFs ¶ 389; Holt Direct (PX 1103) ¶¶ 156-57.  Similarly, Holt did not opine that Guidelines required documentation of a Verbal Verification of Employment ("VVOE"); he testified that because underwriters generally document VVOEs, the lack of such documentation is evidence that the underwriter failed to verify the borrower's income.  Holt Direct (PX 1103) ¶ 69.  Holt's testimony on these points is effectively unrebutted, as Grissom never worked as an underwriter at all, was not involved with the U.S. mortgage market during the relevant time, and thus has no basis to opine on how underwriters document their work.  Tr. 263:22-265:25, 289:16-25.[69]

UBS makes additional, small-bore arguments in its Appendix B (Dkt. 484-12 (App. B) at B-36-39).  First, UBS asserts (*id.* at B-36) that, for some Loans, Grissom disputed Holt's findings of "the red flag[s] of patently unreasonable income"—in fact, Grissom did not dispute that these incomes were unreasonable on their face; rather, based on factors *other than income*, she speculated that the underwriters had assessed the incomes as reasonable.  Tr. 464:20-467:3 (Grissom) (for Loan ███████ opining that, based on factors in the loan file other than income, ████████████████████████████████████████████████████████████).[70]

Contrary to UBS's argument (Dkt. 484-12 (App. B) at B-39), however, these non-income factors

---

[69]   UBS also argues (Dkt. 483 ¶ 215) that the Court should dismiss 27 breaches of the Guideline Warranty based on missing documents that UBS asserts were not required by the Guidelines.  UBS does not identify which breaches these are, citing only examples from Grissom's trial declaration that are no longer at issue.

[70]   The same is true of the two Loans UBS cites.  Dkt. 484-12 (App. B) at B-36.  *See* App. 58, ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

do not indicate that the underwriter actually conducted the required income assessment, given that (i) it was standard industry practice to document those assessments, as Holt testified, Holt Direct (PX 1103) ¶ 147, and Grissom has no basis to dispute;[71] and (ii) the massive gaps between the amounts of the stated incomes and the unrebutted evidence of salaries for the borrowers' occupations, *e.g.*, App. 58, Loan ███████, FID 13100 ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████.

Next, UBS points out (Dkt. 484-12 (App. B) at B-36-37) that some Loans in Appendix 58 ("Guidelines – Stated Income Not Reasonable") lack "red flags"—but only 64 out of 969 Loans in Appendix 58 lack an explicit red flag, and for all but five of these Loans, Holt found that the underwriter failed to document the reasonableness of the borrower's income, which itself indicates that no such assessment was performed.[72]  The single Loan that UBS cites—Loan ███████ (Dkt. 484-12 (App. B) at B-36-37)—is one such example because the Loan File contained no indication that the underwriter assessed the borrower's stated income, which Holt then found ████████████ ███████████████████████████████████████████████████ according to BLS—facts Grissom did not dispute.[73]  UBS claims (Dkt. 484-12 (App. B) at B-37) that the borrower's re-calculated income would not have breached the applicable DTI requirements, but this confuses breaches of the Guideline Warranty based on unreasonable stated incomes with breaches of the Guideline Warranty based on DTI requirements.[74]  UBS suggests that Plaintiff did

---

[71]  UBS points (Dkt. 484-12 (App. B) at B-39) to Grissom's testimony that guidelines did not require documentation of income assessments, but Grissom—who never worked as an underwriter, Tr. 263:22-264:22, and did not work at all in the U.S. mortgage market during the relevant time, Tr. 289:16-25—has no basis to refute Holt's testimony that documenting these assessments was standard practice.

[72]  Loans ████████████████████████████████████████

[73]   UBS makes much of the fact that the "FID: Red Flags" field is blank (Dkt. 484-12 (App. B) at B-36) for approximately 71 Loans in Appendix 58, but this column refers to red flags aside from a facially unreasonable stated income, and so its absence for these Loans does not call into question Holt's methodology or the reliability of Appendix 58.

[74]  Similarly, UBS argues that some Loans in this category violated the Guidelines' DTI requirements by less than 2%, Dkt. 484-12 (App. B) at B-38, but, again, that threshold is irrelevant to the Loans in Appendix 58, which all violate the Guidelines based on unreasonable stated incomes, not necessarily for exceeding the Guidelines' DTI thresholds.  FOFs ¶¶ 387-93.

not prove fraud for this Loan, *id.*, but this goes to MAE, not breach, and UBS does not dispute that the borrower misstated their income, which itself is evidence of borrower fraud.[75]

Finally, UBS argues (Dkt. 484-12 (App. B) at B-38-39) that for some Loans there was evidence in the Loan File that the underwriter conducted the required assessment, pointing to a single Loan (Loan ███████) with a completed "checklist"—the only Loan in Appendix 58 for which Grissom made such a finding.[76]   But even if the Court accepted this as evidence that the underwriter actually conducted an assessment (instead of merely checking a box), UBS does not dispute that BLS data shows that the ████████████████████████████████████ ██████████████████████████████.  *See* App. 58, Loan ███████, FID 13269.  If the underwriter assessed the stated income as reasonable in the face of this information, that assessment itself would not have been a valid basis to approve the Loan, and thus would have violated the Guidelines.  *See* PX U12 at 1 (Countrywide Guidelines requiring that underwriters make "a judgment about the reasonableness of the income stated on the application in relation to the borrower's occupation and credit information."); PX U248 at 21 (IndyMac Guidelines providing that "[t]he Borrower's stated income must be reasonable for the Borrower's type of employment, line of work, and assets."); PX U578 at 31 (American Home Mortgage Guidelines providing that "[c]areful consideration must be provided relative to the income stated by the borrower and a reasonableness test is made by the AHM underwriter through various means such as 'Salary.com' or other providers of such information").  Accordingly, the Court should find UBS

---

[75]   In a footnote, UBS argues (Dkt. 484-12 (App. B) at B-37 n.17) that it was "circular" for Holt to find both a low credit limit and a high credit utilization rate to be red flags.  In fact, there is no tension, as the flags refer to different things:  (i) a low credit limit can indicate misstated income, because one would expect borrowers with higher incomes to have higher credit limits (FOFs ¶ 301, Holt Direct (PX 1103) ¶ 77 n.34); while (ii) a high credit utilization rate can indicate the borrower is living beyond her means by resorting to credit rather than cash, Holt Direct (PX 1103) ¶¶ 71, 77 n.34, Tr. 1024:21-1025:4 (Holt).  UBS also suggests (Dkt. 484-12 (App. B) at B-37 n.17) that failure to verify employment should not be a red flag; but conducting such verifications was standard industry practice, Holt Direct (PX 1103) ¶ 69; *see also, e.g.*, App 58, ██████████████████████████████████████████ ████████████████████████████████████████████████.

[76]   In addition, there are at most 51 Loans in Appendix 58 for which Grissom found that the underwriter completed a "Form 1008 with comments."

liable and award Plaintiff its remedies for these 969 Loans.

### 4. Loans Were Made That Violated Guidelines Based On Unreasonable Exceptions

Plaintiff showed that there are 565 Loans that breach the Guideline Warranty because they violated guidelines and unreasonable exceptions were granted, with current estimated damages of 230,044,030.88 (FOFs ¶¶ 397-404, App. 54). UBS responds to this evidence primarily in its Appendix B (Dkt. 484-12 (UBS App. B) at B-40) but it identifies only *two* Loans for which Grissom argues (incorrectly) that the compensating factors documented by the underwriters justified the Loan (*id.* at B-41).[77]

For some Loans, UBS asserts (Dkt. 484-12 (UBS App. B) at B-40) that the original underwriter "would have" looked at additional information that he or she did not document, including uncited factors on the exception form and "core documents." *Id.* at B-42 (describing Loan ███████); App. 54, Loan ███████, FID 18586 (█████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████). UBS's assertion is contrary to the Guidelines, which required underwriters to document the exceptions they granted, *e.g.*, PX U479 at 1 (Countrywide Guidelines providing that "[t]he Underwriter must also clearly describe any guideline exceptions and rationale for approval"); that requirement makes it much more likely than not that if an underwriter did not document a factor then he or she did not consider it. *See* Tr. 96:3-22 (Court explaining the Guideline Warranty speaks of "exceptions that were exercised").[78]

For the remaining Loans, Grissom either did not identify any compensating factors justifying the exception, *e.g.*, App. 54, Loan ███████, FID 3719 (███████████████

---

[77] Holt's testimony regarding these Loans is more credible than Grissom's. *See* App. 54, Loan ████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████.

[78] Moreover, UBS provides no support for this assertion, which must be rejected for simply assuming the truth of the matter to be proved. *Skidd v. JW Marriot Hotels & Resorts,* No. 06 Civ. 1554 (DAB), 2010 WL 2834890, at *6 (S.D.N.Y. July 8, 2010) (refusing to credit expert testimony that assumed the matter to be proved).



) or she

identified factors that she does not dispute were not relied upon by the original underwriter, *e.g.*,

*id.* Loan ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████).   Such additional

factors are irrelevant, however, because the Guideline Warranty speaks of exceptions that "*were*

*exercised*" and, as the Court explained, "if the underwriting guidelines were not, in fact, satisfied,

and an exception or compensating factor was not taken into account" at origination, it cannot be

taken into account now without "materially altering what the agreement provides."  Tr. 96:3-21

(Court discussing Guideline Warranty).[79]   Accordingly, the Court should find UBS liable and

award Plaintiff its remedies for these 565 Loans.

5.      **Loans Were Made That Violated Guidelines Without Any Exceptions**

Plaintiff showed that there are 2,976 Loans that breach the Guideline Warranty because

they violated guidelines and no exceptions were granted, with current estimated damages of

$909,885,038.71 (FOFs ¶¶ 405-10, App. 55).   UBS responds to this category in its Appendix B

(Dkt. 484-12 at B-42), in which it does not dispute that underwriters were generally required to

document exceptions and that, for the Loans in this category, "an exception is not currently in a

loan file[.]"   UBS asks the Court to find that exceptions were granted but that the forms

documenting the exceptions were lost, *id.*, based solely on Grissom's assertions that "Holt offered

no evidence to show that the purportedly missing document was not in fact properly transferred at

the time of origination."  *E.g.*, App. 55 (Loan ██████, FID 10460, Col. G; Loan ██████, FID

10631, Col. G; Loan ████████, FID 3529, Col. G).   But this is nothing beyond Grissom's

---

[79]   UBS argues (Dkt. 484-12 (App. B) at B-40) that it was appropriate for Grissom to look at factors not identified by the original underwriter because Holt did so as well, but the two experts did very different things.  Holt acted conservatively in making his findings—even if an exception was not justified by the factors that the underwriter considered, and thus the Loan breached the Guideline Warranty, Holt used his discretion not to make a finding if "the exception was appropriate taking into account *any* compensating factors and/or red flags in the loan file")  (original emphasis).  Holt Direct (PX 1103) ¶¶ 143, 192. Grissom, by contrast, asserted that the Loan did not breach the warranty in the first place based on factors that the underwriter never actually considered.  Grissom Direct (DX LI) ¶ 92-93.

assumption that an exception was granted in the first place, which assumes the truth of the proposition to be proved.  Grissom's testimony also cannot be credited as she never worked as an underwriter or issued an exception, Tr. 263:22-265:25, and the unrebutted evidence that, in the frenzied nature of the mortgage market before 2008, underwriters had incentives to make Loans in violation of guidelines as they were compensated based on the number of Loans they closed.  Holt Direct (PX 1103) ¶¶ 173, 176.

UBS also argues (Dkt. 484-12 (App. B) at B-43), based solely on Grissom's testimony, that exceptions were not required where a loan exceeded the Guidelines' DTI limits, but this ignores the plain requirements of the Guidelines that exceptions be documented in writing and contain no separate requirements for DTI-based exceptions.  *E.g.*, PX U479 at 1 (Countrywide Guidelines requiring that "[t]he Underwriter must also clearly describe *any* guideline exceptions and rationale for approval") (emphasis added); *see also* FOFs ¶ 405.  Finally, UBS asserts (Dkt. 484-12 (App. B) at B-43-44) that this category includes breach findings that are not "premised upon the underwriter's failure to obtain an exception," but UBS apparently misunderstands those findings, which refer to violations of the Guidelines *in addition* to the fact that no exception was documented.  This is true of the Loans UBS cites, which breached the Guidelines because of missing core documents, and for which no exceptions were granted.  *E.g.*, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.[80]  Accordingly, the Court should find UBS liable and award Plaintiff its remedies for these 2,976 Loans.

## III.   UBS FAILS TO SHOW THAT THE COURT SHOULD IGNORE THE EVIDENCE OF ITS LIABILITY

Unable to rebut the evidence of its liability, UBS tries to manufacture additional reasons

---

[80]   UBS also argues (Dkt. 484 (App. B) at B-44-45) that some Loans in this category were approved by an automated underwriting system (or "AUS") and therefore do not violate the Guidelines, but this argument affects only five Loans—Loans ██████████████████████████—and Plaintiff has removed the relevant findings from the revised appendices submitted herewith.

why the Court should strike that evidence.  None of UBS's arguments have merit.

### A.    Plaintiff's Experts Testified On Topics Discussed In Their Expert Reports And In Response To UBS's Experts On Those Topics

UBS asks (Dkt. 483 ¶¶ 376-88) the Court to exclude Plaintiff's experts' responses to the testimony of UBS's experts on the basis that Plaintiff's experts did not include those responsive opinions in their reports, including Holt's loan-by-loan replies to Grissom's responses to his findings.  *See* PX 552 App. 2 Col. S (Holt's report findings); DX JD App. B (Grissom's opposition report findings); PX 1103 App. 1, Col. O (Holt's reply findings, in his trial testimony).[81]  This argument makes no sense, as Plaintiff's experts submitted their reports and were deposed (if at all) *before* UBS's experts submitted their own reports—Plaintiff's experts' first opportunity to respond to UBS's experts was in their trial testimony.  Had Plaintiff's experts not responded to UBS's experts, UBS undoubtedly would be arguing that the testimony of UBS's experts was unrebutted.

In UBS's view, Holt could not respond to Grissom's opinions unless Plaintiff sought leave to file a supplemental report, but that is not the law.  Federal Rule of Civil Procedure 26 "does not limit an expert's testimony simply to reading his report . . . . The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."  *In re Methyl Tertiary Butyl Ether ("MBTE") Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006)); *see also Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160 (D.C. Cir. 2007) (Garland, J.) (same).  Likewise, "where an expert's affidavit provides evidentiary details for an opinion expressed in his expert report, those portions of his or her affidavit can be considered." *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (quoting *Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253, 2010 WL 2674584, at *7 n.4 (S.D.N.Y. July 6, 2010)).

---

[81]    *See* Responsive Appendix A for a response to UBS's Appendix A, setting forth where the respective Plaintiff's expert's opinion was disclosed in the original report and the critique to which each of Plaintiff's experts is responding.

The Holt testimony that UBS attacks as "new" (Dkt. 483 ¶ 383) dealt with topics that Holt addressed in his report.  His testimony merely responded to Grissom's opinions on those points:

- *First*, in his report, Holt found Loans to be Materially Defective if their true characteristics differed from that represented on the MLS, even if that discrepancy did not affect the pool-wide accuracy of the MLS, *see* PX 552 App. 2, *id.* ¶¶ 127-29; in her opposition report, Grissom stated the MLS Warranty was effectively a transcription warranty, and that investors "analyzed [the MLS] at the pool-wide, rather than the individual loan, level," DX JD ¶ 94; and, in his trial testimony, Holt stated that investors "were concerned whether data relating to individual loans was materially false," and reiterated his opinion that a misrepresentation on the MLS need not affect the pool as a whole to cause a Material and Adverse Defect, Holt Direct (PX 1103) ¶¶ 6, 133, 135-36.

- *Second*, in his report, Holt stated that the MAEs he found existed both at origination and thereafter, PX 552 ¶¶ 8, 46; in her opposition report, Grissom stated that Holt's determination of materiality was consistently mistaken, DX JD ¶¶ 80-87; and, in his trial testimony, Holt stated that the MAEs would not have dissipated, with one example being that where defects cast doubt on the integrity of the underwriting process, and no exception was granted but compensating factors arguably existed, those compensating factors did not render defects immaterial, since the Loan (and by extension the Trusts) would have received a higher interest rate if the Loan had been underwritten properly.  PX 1103 (Holt Direct) ¶¶ 9, 10.

- *Third*, in his report, Holt identified Loans as Materially Defective based on missing documentation, PX 552 App. 2, and opined that originators would "maintain a full and complete loan file," *id.* ¶ 155; in her opposition report, Grissom opined that documents went missing from loan files after origination and that loan files now missing documents likely had them at origination, DX JD ¶¶ 28, 48, 50, 53; and, in his trial testimony, Holt stated that loan files were digitized shortly after closing. PX 1103 (Holt Direct) ¶ 175.  He explained that for this reason individual documents existing at closing were unlikely to go missing. *Id.*  He further explained that for documents generally not existing at closing, if they were not in the loan file when he reviewed the file "it is likely that either the document was never actually obtained or finalized, or that the originator failed to add the document to the loan file," and that "[i]n either case, the originator's failure to perform this basic obligation raises doubts about the integrity of the entire loan origination process."  *Id.* ¶ 178.

The Cowan testimony that UBS claims is "new" (Dkt. 483 ¶ 384) also responded to UBS's experts on topics that he addressed in his report:

- *First*, in his report, Cowan stated that "AVMs are valuable tools to help assess the market value of a property" and that they are used to test the accuracy of appraisals, PX 544 ¶ 2; in his opposition report, Hedden

stated that AVMs are not appropriate substitutes for appraisals, (Hedden Report) ¶¶ 21-46; and, in his trial testimony, Cowan stated that a residence's square footage, age, and date of sale (all of which can be inputs to an AVM) account for 80% of the variability in home prices, explaining why an AVM can be reliably used to test the accuracy of appraisals. Cowan Direct (PX 1108) ¶¶ 43, 44, 45.

- *Second*, Cowan's report is replete with references to past uses of AVMs in litigation, evidencing that such use is common, *see* PX 544 ¶¶ 9, 10, *id.* Exs. 1, 2; in his opposition, Hedden stated it is improper to use AVMs to evaluate the reasonableness of appraisers' valuation opinions, Hedden Report ¶ 55; and, in his trial testimony, Cowan testified that AVMs are commonly used in litigation. Cowan Direct (PX 1108) ¶¶ 49-52.

- *Third*, in his report, Cowan stated that UBS used AVMs, and that he used the AVM in the denominator of his LTV calculations, PX 544 ¶¶ 2, 47; in his opposition, Dr. Barnett stated that placing the AVM in the denominator was flawed (Barnett Report) ¶¶ 71-72; and, in his trial declaration, Cowan explained in detail why his approach to valuation, rather than the alternatives used by UBS and espoused by Barnett, were proper, PX 1108 (Cowan Direct) ¶¶ 103-05.[82]

As a matter of law, it was entirely appropriate for Holt and Cowan to provide this responsive testimony. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, Nos. 08 Civ. 7611 (BSJ) (AJP), 09 Civ. 8824 (BSJ) (AJP), 2011 WL 4063297, at *2 (S.D.N.Y. 2011) ("There was nothing improper [under Rule 26] about [Plaintiff's] experts stating opinions . . . that respond directly to the 'same subject matter identified by' [Defendant's] experts in their rebuttal reports."); *Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.*, No. 99 Civ. 1725 (VM), 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11, 2003) (refusing to exclude testimony as outside the scope of the expert report where the testimony was "general facts and discussions related directly to the expert report [the expert] submitted"); *see also Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011) (affirming district court's admission of expert testimony that "was a reasonable elaboration of the opinion disclosed in the report").

---

[82]   The Court should also reject the claim that Cowan "provid[ed] for the first time [in his trial testimony] the additional details and explanations concerning the Phoenix AVM," Dkt. 483 ¶ 384 (referring to Cowan Direct (PX 1108) ¶¶ 62, 64-67), because "an expert's affidavit provid[ing] [additional] explanatory details . . . can be considered," *Cedar*, 769 F. Supp. 2d at 279; *see also* PX 544 ¶¶ 4-5 (information in original report concerning the Phoenix AVM). Further, the Court explored the Phoenix AVM in depth at the pre-trial conference, Dkt. 393 at 28:10-46:19.  UBS can hardly claim to be surprised or prejudiced by Cowan's testimony on this issue.

Even if the opinions were wholly "new" (they were not), contrary to UBS's assertion (Dkt. 483 ¶ 388), this evidence would not be "near automatic[ally]" excluded. *Lorme v. Delta Air Lines*, 251 F. App'x 691, 692 (2d Cir. 2007) (rejecting "the premise . . . that the exclusion sanction under Rule 37 is nearly automatic").[83]  Rather, the Second Circuit has held that "preclusion of evidence [under Rule 37] . . . [is a] harsh remed[y] and should be imposed only in rare situations," *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 70 (2d Cir. 1988), based on a four factor test:  (i) the importance of the testimony; (ii) the party's explanation for the failure to disclose; (iii) the prejudice as a result of having to prepare for the new testimony; and (iv) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006); *see also Cary Oil*, 2003 WL 1878246, at *4 (Rules 26(a) and 37(c)(1) "are not designed to prohibit a witness from testifying about anything not explicitly mentioned in his Rule 26 disclosure, but rather to protect one party from being blindsided by another party with new opinions never before discussed.")

First, there is no dispute that Holt's and Cowan's testimony is important.  Nor is there any dispute that the purportedly "new" testimony responds to the expert opinions proffered by UBS. Second, even though Holt and Cowan set forth their opinions and explicitly reserved their rights to respond to the opinions of UBS's experts, PX 552 ¶ 1 n.1; PX 544 ¶ 55, UBS opted *not* to depose them after it produced its expert reports to Plaintiff—UBS chose to depose Holt before Grissom issued her opposition report and chose not to depose Cowan at all.[84]  Third, UBS was not prejudiced by receiving Holt's and Cowan's trial testimony two weeks before trial began[85]—on a

---

[83]  While UBS cites (Dkt. 483 ¶ 388) the statement that exclusion is "near automatic" in *Lava Trading*, 2005 WL 4684238, at *8, that ruling preceded the Second Circuit's later statement to the contrary in *Delta Air Lines*.  Moreover, in *Lava Trading*, the expert was given an opportunity and "ample time" to make the disclosures required by Rule 26, but did not; this conduct "unquestionably prejudiced defendant."  *Id.* at *8.  Here, (i) Plaintiff's experts could not have provided responsive testimony in their initial reports, (ii) UBS did not depose them about their responses to UBS's experts, and (iii) UBS was not prejudiced in receiving that responsive testimony two weeks before trial.

[84]  While UBS cites (Dkt. 484 ¶ 379) *Design Strategy Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) for the proposition that the court need not find that the party offering expert testimony acted in bad faith to preclude the testimony, in that case the Second Circuit endorsed bad faith as a factor to be considered, *id.* at 294 (plaintiff failed to disclose it sought lost profits until shortly before trial, and then violated orders to compute those profits).  UBS does not and cannot allege that Plaintiff acted in bad faith in presenting the supplemental testimony.

[85]  Most of the cases that UBS cites (Dkt. 484 ¶¶ 376-78, 380, 388) are inapposite because they involved prejudice to the opposing party.  In *Horvath v. Deutsche Lufthansa, AG*, No. 02 Civ. 3269 (PKC), 2004 WL 486976, at *3-5

schedule that UBS agreed to, Dkt. 338—as its counsel thoroughly examined the experts about

their opinions at trial.[86]   Fourth, UBS did not seek a continuance.   Under these circumstances,

exclusion could not be warranted.   Fed. R. Civ. P. 26 advisory committee's note to 1993

amendment (exclusion is warranted only if disclosure is not "sufficiently in advance of trial [so]

that opposing parties have a reasonable opportunity to prepare for effective cross examination and

perhaps arrange for expert testimony from other witnesses"); *Metavante Corp. v. Emigrant Sav.

Bank*, 619 F.3d 748 (7th Cir. 2010) (cross examination demonstrated no harm of late disclosure).

This Court should not penalize Plaintiff for UBS's strategic choice not to depose Holt and Cowan

---

(S.D.N.Y. Mar. 12, 2004), the excluded new report concerned whether a drug caused damages, which the expert did not mention in his initial report even though plaintiff knew of that topic throughout the case—here, Plaintiff's experts discussed the topics in their initial reports and thereafter responded to the subsequent testimony of UBS's experts on those topics.  In *Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, 301 F.R.D. 31 (S.D.N.Y. 2014), the excluded report wholly incorporated a previous expert report that the court had struck twice—nothing like that happened here. In *Williams v. Blvd. Lines, Inc.*, No. 10 Civ. 2924 (DF), 2013 WL 5652589 (S.D.N.Y. Sept. 30, 2013), the excluded report, which discussed punitive damages, would have prejudiced the defendant insurance company, which had selected counsel on the basis that only the compensatory damages discussed in the timely report were at issue—there is no such prejudice here.  In *Wilkins v. Montgomery*, 751 F.3d 214, 219 (4th Cir. 2004), the party gave only the name and CV of its proposed expert on the day expert reports were due and did not serve its expert's report for another month—here, the Trustee complied with the Court's expert schedule.  In *Franconero v. UMG Recordings, Inc.*, 542 F. App'x 14, 16 (2d Cir. 2013), in which plaintiffs sought damages for the unauthorized sale of their music, the excluded report opined that the defendants' record sales had increased while the initial report did not—here, the experts did not offer such brand new testimony but rather responded to UBS's experts.  In *U.S. Bank, Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015), the excluded opinion was not mentioned anywhere in the expert's report or deposition—here, the all the topics at issue were mentioned in the experts' reports and UBS opted not to depose the experts about their responses to UBS's experts.  In *Morritt v. Stryker Corp.*, No. 07-CV-2919, 2011 WL 3876960 (E.D.N.Y. 2011), the excluded report dealt with alternative designs that the expert did not address in his initial report and refused to answer questions about during his deposition—here, the experts could not have offered their responsive testimony in their initial reports and UBS chose not to depose them about those opinions.  In *Sandata Techs., Inc. v. Infocrossing, Inc.*, No. 05 CIV. 09546, 2007 WL 4157163, at *8 (S.D.N.Y. Nov. 16, 2007), the court had denied the party leave to submit the report and found that the party had acted in bad faith, *id.* at *8—no such conduct is at issue here.

[86]   UBS's counsel cross-examined Holt and Cowan in detail about the opinions that UBS seeks to strike.  *See* Tr. 809:2-22; 810:23-811:7; 814:12-815:2; 828:5-11; 882:3-20 (Holt being questioned about Column O); 868:8-870:10 (Holt being questioned about his views on the MLS Warranty); 843:2-10; 843:11-18; 844:2-848:19 (Holt being questioned about MAEs not dissipating, especially exception pricing and the integrity of the underwriting process); 774:8-776:6; 777:6-785:6; 786:17-789:11; 796:4-805:9; 807:9-816:24; 818:8-836:18 (missing documents); 1556:15-1557:13; 1561:2-6; 1562:2-24; 1599:17-1601:6; 1627:7-1628:2; 1676:22-1679:4 (Cowan being questioned about the propriety of substituting AVMs for appraisals); 1561:7-16; 1562:25-1568:9; 1602:15-19; 1697:8-22 (Cowan being questioned about the use of AVMs in litigation); 1568:2-9; 1581:24-1585:1; 1588:16-1589:13; 1601:25-1602:8; 1602:20-1604:7; 1615:8-17; 1617:9-21; 1621:8-1622:8; 1622:22-1625:5; 1658:15-1659:7; 1673:24-1674:19; 1675:16-1676:3; 1676:11-21; 1689:4-1690:6 (Cowan being questioned about the Phoenix AVM).  Furthermore, UBS's experts testified regarding these opinions as well.  *See* Tr. 348:7-349:18; 593:10-594:12 (Grissom testifying about her views on the MLS Warranty); 649:21-704:15; 717:17-726:22; 652:16-21; 667:21-668:3; 719:8-720:2 (Grissom testifying about missing documents); 291:18-21 (Grissom testifying about the propriety of substituting AVMs for appraisals).

about their views of UBS's experts by precluding them from offering those views at all.[87]

UBS's arguments (Dkt. 483 ¶¶ 386-88) to strike a portion of Snow's testimony are also baseless.  First, in his report, Snow provided a methodology for calculating the Trusts' recoveries, PX 515 (Third Supplemental Expert Report of Karl N. Snow, Ph.D) ¶¶ 23-32; and Snow used that same methodology and calculations to provide an estimate of Plaintiff's recovery for certain Loans originated by IndyMac.  Snow Direct (PX 1110) ¶ 37.  UBS received these calculations at Snow's deposition, five months before trial; it deposed Snow at length about them, Snow Dep. 12:1-14:3 (Ex. 1); 56:2-13; 146:24-153:18; it "reserve[d] rights to redepose Dr. Snow" further about them, *id.* at 13:21-24, but it chose not to do so.  Tr. 1897:13-1898:5.  His trial testimony used the same methodology and thus presented no new opinion about the Marginal IndyMac Loans.[88]

UBS also accuses (Dkt. 483 ¶ 387) Snow of changing the repurchase dates from those in his report.  In his report, Snow used placeholder dates upon which UBS should have repurchased the Loans, PX 515 (Third Supplemental Expert Report of Karl N. Snow, Ph.D) ¶ 22, which he updated in his trial testimony, Snow Direct (PX 1110) ¶ 11, and which will need to be updated again in a post-trial submission to reflect the Court's final determinations of which Loans UBS should have repurchased and on which dates, Tr. 1879:15-21.  While updating these placeholder dates produces a different total dollar number than the number contained in Snow's report, this is not a reason to exclude his testimony, particularly because Snow made clear that the placeholder dates would change.  This Court should reject UBS's attempt to exclude Snow's expert opinion.

It is always possible to serve rebuttal, sur-rebuttal and sur-sur rebuttal reports, but at some point the process must come to an end.  UBS had ample notice of what Plaintiff's experts were

---

[87]   UBS cites (Dkt. 484 ¶¶ 378, 382) *In re Kreta Shipping, S.A.*, 181 F.R.D. 273 (S.D.N.Y. 1998) to support excluding the testimony of Plaintiff's experts—but in that case the court did *not* exclude the expert's testimony even though (unlike here), the expert offered new opinions after having responded to the opposing expert's report and after being deposed, *id.* at 275.  Instead, the court held that "a sanction lesser than exclusion of [the] testimony [was] appropriate," due to the "importance . . . of . . . [the] trial affidavit testimony" and "the lack of willfulness."  *Id.* at 277.

[88]   Even if Snow's IndyMac calculations were new, such opinions disclosed at a deposition are admissible.  *Lutes v. Kawasaki Motors Corp., USA*, No. 3:10-cv-1549, 2015 WL 1395898, at *3 (D. Conn. Mar. 25, 2015) (materials "outside of the bounds of [the] initial expert report" disclosed at expert's deposition were admissible if defendants suffered no "prejudice . . . in light of their having had the opportunity to depose [the expert] on these very topics.")

going to say—both through their reports and their written direct testimony, received well before trial—and were able to cross-examine them on the witness stand.  Plaintiff fully complied with the expert procedure that the Court established before trial, and UBS has failed to demonstrate that this procedure caused it to suffer any prejudice.

**B.      The Loan Files Are Admissible**

Even if the testimony of the Plaintiff's experts were struck, UBS would not be able to overcome the evidence of its liability that appears in the admitted documents, including the Loan Files.  UBS's arguments (Dkt. 483 ¶¶ 248-255) that the Court should exclude the Loan Files are meritless.  UBS asserts (*id.* ¶¶ 248-49) that Plaintiff failed to move the files into evidence before they rested.  In fact, when the subject first arose during trial, the parties were discussing the Loan Files generally, and the Court asked the parties to address the admission of the files through letter briefing, Tr. 1089:8-23; *see also* Tr. 2093:4-22 (Plaintiff's counsel stating understanding of the Court's requested procedure; Court responding "I don't think you misunderstood").   During Plaintiff's summation, a question arose whether the Loan Files had been offered in evidence, Tr. 2062:25-2063:6, so Plaintiff formally offered the documents.   Tr. 2097:12-14.   The parties discussed whether the Loan Files are admissible for purposes other than the truth, and Plaintiff later filed a letter brief on the subject.  Dkt. 434.  At no time did UBS argue it was prejudiced by this procedure.[89]

UBS has stipulated that the Loan Files are authentic.  Dkt. 339 ¶ 3.  While it attempted to backtrack on that stipulation by arguing (Dkt. 483 ¶ 251) that certain Loan Files might be incomplete, that goes to the weight of the evidence, not its authenticity or admissibility.   Tr. 1086:4-6 (Court noting that, otherwise, the authenticity stipulation would be "basically illusory").   Moreover, UBS's "significant evidence" that the Loan Files are incomplete boils down to a single

---

[89]   Courts often admit evidence after summation.  *E.g.*, *Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 674, 679 (2d Cir. 1998) (affirming district court's decision to admit affidavit after close of evidence); *see also Dibella v. Hopkins*, 403 F.3d 102, 119 (2d. Cir. 2005) (affirming district court's reopening of evidence during summation to allow introduction of attorney's time sheet).  Moreover, cases cited by UBS (Dkt. 483 ¶ 249) note the prejudice to those defendants by the admission of post-trial evidence, and UBS offers no such prejudice here—nor could it, as its own expert Grissom relied extensively on the Loan Files in reaching her conclusions.

self-serving hearsay statement that certain files held by a single servicer (most of which were not produced in this case) were in "disarray" and a vague, conclusory statement by Grissom that she "encountered examples of flawed loan files."  Dkt. 483 ¶ 251.  Such statements are certainly not "significant evidence" justifying exclusion of these authentic Loan Files from evidence.

UBS's follow-on argument (Dkt. 483 ¶ 250)—that if the Court admits the Loan Files, it would improperly have to consult them for the truth of the matters asserted therein to determine if the Loans qualified under the Guidelines—must too be rejected.  In fact, the Loan Files need not be admitted for their truth to show that statements in the Loan Files are *false*.  *Rentas v. Ruffin*, 816 F.3d 214, 222 (2d Cir. 2016) (reversing district court's decision to exclude police incident reports as hearsay when offered to prove that the reports were false).  Nor does the Court need to consider the Loan Files for the truth of their statements to conclude that those statements are inconsistent with the stated requirements of the Guidelines or for showing breaches of other warranties or the MAEs caused by the breaches.[90]  *Furr v. Brady*, 440 F.3d 43, 38 (1st Cir. 2006) (statement not hearsay "in that it was introduced solely to enable the jury to compare" two confessions); *Leon v. Fedex Ground Package System, Inc.*, --- F. Supp. 3d ---, 2016 WL 814639, *12 (D.N.M. Feb. 5, 2016) (statements were "not hearsay, because [the party] will introduce them to indicate that [the declarant] made inconsistent statements rather than to show that each statement was true.").  Furthermore, to the extent that Plaintiff's experts rely on certain hearsay statements in the files as *true*, they may do so if such statements are regularly relied on in their industry.  *See* Fed. R. Evid. 703.  Here, the experts on both sides agreed that Loan Files are relied upon by experts in the industry.  Tr. 269:14-270:6, 280:2-5 (Grissom); 1075:9-13 (Holt)—and the Court may review those materials in assessing the experts' opinions, *Williams v. Illinois*, 132 S. Ct. 2221, 2234-45 (2012) (plurality opinion) ("When the judge sits as the trier of fact, it is

---

[90]  UBS incorrectly asserts (Dkt. 483 ¶ 248 n.51) that if the Loan Files are admitted, Plaintiff could not use them for any purpose other than showing breaches of the Guideline Warranty.  This is incorrect because, for the same reason that they may show breaches of the Guideline Warranty, the Loan Files may also show that statements in the MLS concerning the Loans were not true, and that breaches were material.  In any event, Plaintiff never suggested that the files should be inadmissible for other purposes.

presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose.").

UBS argues (Dkt. 483 ¶¶ 252-53) that employer statements in W-2 forms and paystubs within the Loan Files are inadmissible for their truth under the "residual" hearsay exception of Federal Rule of Evidence 807, but UBS does not dispute that those statements would otherwise fall under Rule 803(6)'s business record exception to the hearsay rule, *see* Dkt. ¶ 253 & n.52, which is sufficient to satisfy Rule 807.  *United States v. West*, 574 F.2d 1131, 1136 (4th Cir. 1978) ("[T]he equivalent guarantee of trustworthiness requirement of [Rule 807] is met if there is equivalency of any one of the preceding [hearsay] exceptions") (examining predecessor Rule 804(b)(5)).  UBS also does not dispute other indicia of the statements' reliability, including the testimony of its own reunderwriting expert, Tr. 728:17-729:9 (Grissom calling W-2s "verified information" she "absolutely" would consider), its own underwriting guidelines, PX 67 at 35 (UBS Home Finance guidelines requiring W-2s and pay stubs), and the guidelines of the originators, *e.g.*, PX 67 at 225, 234 (IndyMac guidelines requiring W-2s and pay stubs); PX U004 at 19 (Countrywide guidelines requiring pay stubs).  Accordingly, the employer statements are admissible for their truth.[91]

UBS also disputes (Dkt. 483 ¶ 254) that statements of the Social Security Administration ("SSA"), are admissible for their truth, claiming that Plaintiff failed to lay an adequate foundation at trial.  But Plaintiff moved the SSA statements into evidence under the public records exception of Rule 803(8), Dkt. 434 at 5, UBS stipulated that the SSA statements are authentic public records, Dkt. 339 (stipulating to authenticity of all documents in the Loan Files), and "[Rule] 803(8) does not require any foundational testimony," *United States v. Doyle*, 130 F.3d 523, 546 (2d Cir. 1997).  Thus, the records would be inadmissible for their truth only if *UBS*, as the opponent of that

---

[91]    UBS argues (Dkt. 483 ¶ 253) that the trustworthiness of the employer statements is "undermined" by Holt's testimony that a single W-2, on which he did not rely, might have been fraudulent.  Tr. 882:3-20.  That testimony was not proffered to establish that employer statements are unreliable as a general matter.  Further, if anything, UBS's cross-examination on this W-2 undercuts UBS's current position that employer statements should not be admitted for their truth; at trial, UBS took the position that the statements in the W-2 *were true*, and sought to impeach Holt on that basis.  Tr.  900:15-901:3 (Holt).

admission, carried its burden to "show that the source of information or other circumstances indicate a lack of trustworthiness," Fed. R. Evid. 803(8)(B).  As UBS makes no attempt to do so, the SSA statements too are admissible for their truth.[92]

### C.    The Summary Evidence Is Admissible

In addition to seeking to exclude all of Plaintiff's experts and all of the Loan Files, UBS also continues to ask (Dkt. 483 ¶¶ 328-340) the Court to strike databases that summarize the complex expert and factual evidence regarding the thousands of Loans at issue.  Tr. 138:6-8 (admitting databases into evidence subject to UBS's motion to strike).  At trial, UBS moved to strike those databases based on a series of purported errors, Tr. 168:25-169:2.  In its FOFs, however, UBS no longer pursues most of those allegations and it does not dispute that the relevant information was accurately summarized in the databases—effectively conceding that its allegations do not provide a basis to exclude the databases.  *See* Dkt. 436 (Plaintiff's Opposition to UBS's Motion to Strike) at 3-5 (rebutting UBS's allegations).[93]

UBS falsely argues (Dkt. 483 ¶ 333) that Charles Cipione, who prepared the databases, "admitted" the databases "could not be trusted."  In fact, in the testimony that UBS cites, after UBS's counsel stated that he (UBS's counsel) did not understand what the column entitled "Holt Reviewed" represented, Tr. 161:6-24, Cipione referred the Court to his declaration and appendices for a full explanation.  *Id.* at 163:18-19.  It bears noting that UBS's counsel received those materials two weeks prior to Cipione's testimony but did not seek to meet and confer with Plaintiff's counsel about any such questions before conducting his examination.

---

[92]    *United States v. Suggs*, 531 F. App'x 609 (2d Cir. 2013), which UBS cites (Dkt. 483 ¶ 254), is inapposite, as it dealt with the authenticity of SSA records; here, the parties have stipulated to authenticity.

[93]    The only allegation that UBS made at trial which it repeats in its FOFs (Dkt. 483 ¶¶ 334-35) is that the Expert Report Information Database did not reflect that Grissom had changed her conclusions that six Loans were materially defective.  But UBS does not dispute that this information is accurately reflected in the Loan Summary Database (*see* Dkt. 436 at 4), providing no basis to strike all of the databases.  *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991) (affirming district court's decision to admit summary charts as the court "d[id] not find the charts to be substantially inconsistent with the evidence adduced at trial.") (superseded by statute on other grounds as stated in *United States v. Caseslorente*, 220 F.3d 727, 736 (6th Cir. 2000)); *In re Ear, Nose and Throat Surgeons of Worcester, Inc.*, 49 B.R. 316, 318-19 (Bankr. D. Mass. 1985) (admitting summary where "inaccuracies were few in number and involved" relatively little money, and discrepancies "[were] not so great as to render [the chart] misleading and without probative force").

UBS argues (Dkt. 483 ¶¶ 331-32, 337) that the databases could have been revised to reflect that certain Loans are no longer at issue—but UBS does not dispute that the databases' Loan-by-Loan summaries of the Loans remaining at issue are accurate.  This Loan-specific information is excerpted in the Appendices and Reports to Plaintiff's FOFs, which provide counts of the total numbers of Loans remaining at issue.  And while UBS speculates (Dkt. 483 ¶ 336) that the database might contain errors, "[t]he fact that [summaries] *might* be inaccurate is not a ground for excluding them without any determination of whether they are inaccurate."  *See Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 753 (7th Cir. 2005) (refusing to exclude evidence under Rule 1006) (emphasis in original).[94]  Accordingly, the databases should remain in evidence.[95]

## IV.   UBS FAILS TO SHOW THAT THE TRUSTS ARE NOT ENTITLED TO THEIR EQUITABLE REMEDIES

### A.   UBS Must Pay Equitable Damages For Liquidated Loans

Plaintiff showed (FOFs ¶ 419) that it is entitled to equitable damages for liquidated Loans, because the specific performance of repurchase is impossible, and Snow presented estimates of those damages, using as placeholders proposed dates on which the Court might find that UBS should have repurchased those Loans.  Snow Direct (PX 1110) ¶¶ 5, 11.  In response, UBS argues (Dkt. 483 ¶¶ 389-98) that Snow's use of placeholder "should have repurchased" dates was inappropriate because the contracts' definition of "Purchase Price" defines the repurchase amount "as of the date of purchase," which UBS argues can refer only to the date on which a Loan is

---

[94]   In arguing (Dkt. 483 ¶ 336) that the databases might contain errors, UBS cites only Cipione's testimony that he could not identify any such errors, Tr. 150:13-15.  A lack of errors does not indicate the existence of errors.

[95]   The cases that UBS cites on this topic (Dkt. 483 ¶ 329) are inapposite.  In *Weiss v. Allstate Ins. Co.*, 512 F. Supp. 2d 463 (E.D. La. 2007), the court excluded a list of insurance company representatives who dealt with the plaintiff because it did not accurately summarize the underlying material.  Here, the databases are accurate.  In *Emmel v. Coca-Cola Bottling Co. of Chicago, Inc.*, 904 F. Supp. 723, 742 (N.D. Ill. 1995), the court excluded a summary of applicant information because the defendant had not established the relevance or accuracy of the summary.  Here, the material is unquestionably relevant and Cipione established the accuracy of the databases in painstaking detail.  (Contrary to UBS's assertion, the *Emmel* court did not exclude the summary because the information was "duplicative.")  In *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 301 (3d Cir. 1961), which preceded the codification of the Federal Rules of Evidence by 14 years, the court excluded a bibliography because the plaintiff did not make all the summarized articles available to defendant.  Here, all of the summarized information was produced in discovery and almost all of it originated in UBS's own files.

actually repurchased, not the date on which it should have been repurchased.  On this basis, UBS asks (Dkt. 483 ¶ 398) that Snow's testimony regarding liquidated Loans be excluded, and Plaintiff should not receive any recovery for any liquidated Loan.[96]

UBS's position that Plaintiff should be left without a remedy for the very worst Loans is absurd.  As discussed at trial (Tr. 1861:22-1862:3), the repurchase dates that Snow used in his calculations were placeholders, which Snow will update based on the Court's holding on topics including the proper dates of repurchase.  Plaintiff submits that the most equitable solution is to calculate damages for liquidated Loans based on the dates that UBS should have repurchased those Loans, to put the parties in the positions they would have been in if UBS had complied with the contracts.  Specifically, Plaintiff will receive the amount of the Purchase Prices of liquidated Loans as of the repurchase dates plus prejudgment interest to compensate it for the lost value of those funds, while UBS will be credited with any principal or interest payments received on the Loans after the repurchase dates (as UBS would have received those payments if it had repurchased the Loans on the dates it should have).  But even if the Court determines that a different repurchase date is appropriate—and UBS does not propose any alternative—the solution would be for Snow to update his calculations based on the Court's findings, not to exclude Snow's testimony.

UBS seeks to confuse the issue with its discussion (UBS FOFs ¶¶ 395-96) of *Bank of New York Mellon v. WMC Mortgage, LLC*, ("*WMC*"), No. 12-CV-7096 (S.D.N.Y. Aug. 18, 2015), Dkt. 323, (UBS Ex. A.).  In that case, the court held that equitable damages for any liquidated Loan "starts at zero," because it held that the parties had agreed that this would be the repurchase price of such Loans by incorporating into its definition of Purchase Price a definition of "Stated Principal Balance" that provided, in relevant part: "as of any date of determination coinciding with or subsequent to the [date] on which the proceeds, if any, of a Liquidation Event with respect to

---

[96]  UBS's request does not extend to Snow's calculation of repurchase amounts for non-liquidated Loans, which will be repurchased on the dates ordered by the Court.

such Mortgage Loan would be distributed, zero." UBS Ex. A at 5-7, 16-17 (internal quotation marks omitted).

*WMC* is not applicable here. That case centered on the parties agreement as to the *amount* of equitable damages by incorporating "Stated Principal Balance" into the definition of the Purchase Price—it did *not* focus on the *date* of repurchase discussed in the Purchase Price definition itself, which is the sole basis of UBS's argument here. Contrary to UBS's assertion (Dkt. 483 ¶ 395), the *WMC*'s contract's definition of Purchase Price is *not* "materially identical" to that in the contracts here, because the contracts here do *not* incorporate a definition of "Stated Principal Balance" but rather use the separate and different definition of "Principal Balance."[97] If the parties had intended to expressly define the Purchase Price to include the Stated Principal Balance—which, like the definition in *WMC* refers to "the date of determination" and "liquidation proceeds" and states that "[t]he Stated Principal Balance of a Liquidated Loan is zero," (*E.g.*, PX 49 at 63)—they would have done so, but they did not.

Moreover, while the *WMC* PSA's definition of Stated Principal Balance allocated an amount of zero to a liquidated loan as of both "any date of determination" and any "subsequent" date on which the proceeds of a Liquidation Event would be distributed, the definition of Principal Balance at issue here does no such thing—as this Court correctly recognized in its summary judgment decision, the contracts here provide that the Principal Balance incorporated into the Purchase Price definition for a liquidated Loan is zero only "during the related Prepayment Period." *MARM*, 2015 WL 764665, at *14.[98] The Court rejected UBS's arguments that the incorporation of "Principal Balance" into "Purchase Price" results in a damages amount of zero, *id.*, and UBS never asked the Court to reconsider this decision. As the Court explained:

---

[97] This is true in the PSAs for MARM 2006-OA2 and 2007-3 PSAs; the definition of Purchase Price in the MARM 2007-1 PSA does not even define "principal balance."

[98] As the Court noted, "[t]he PSAs define the 'Prepayment Period' as either 'the period from and including the 16th day of the month preceding the month in which such Distribution Date occurs and to and including the 15th day of the month in which such Distribution Date occurs,' or 'the calendar month preceding the month in which such Distribution Date occurs.' The Distribution Date is defined as "the 25th day of each calendar month after the initial issuance of the Certificates, or if such 25th day is not a Business Day, the next succeeding Business Day." *MARM*, 2015 WL 764665, at *14 (citations omitted) (citing PSAs, § 1.01).

> The Prepayment Period and Distribution Date govern the Trusts' payments to the certificateholders. *They are not part of the PSAs' remedial scheme.* The entire definition of "Liquidated Mortgage Loan" is conditioned on the language, "With respect to any Distribution Date. . . ." . . . Under the PSAs, then, with respect to any Distribution Date, if a loan becomes a Liquidated Mortgage Loan during the relevant Prepayment Period, it has zero value for the purposes of calculating distribution to the shareholders. *For the purposes of the current dispute, these definitional sections do not alter the remedies available under section 2.03 of the PSAs.*

*Id.*, at *14 (citations omitted) (emphasis added). Thus, *WMC* is inapposite,[99] and UBS is simply wrong to claim that the PSAs allocate a zero Principal Balance to liquidated Loans at all times.

At bottom, UBS presents no barrier to the Court awarding equitable damages for liquidated Loans based on Snow's calculations.[100] Under First Department law, awarding damages is *especially* appropriate here, as providing no recovery for loans that have exited the Trusts would create a "perverse[] incentive for a sponsor to fill the trust with junk mortgages that would expeditiously default so that they could be released, charged off, or liquidated before a repurchase claim is made." *Nomura Home Equity Loan,* 133 A.D.3d at 106 (internal quotation marks omitted) (citing *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 40 Misc. 3d 562, 569 (Sup. Ct. N.Y. Cty. 2013), *rev'd on other grounds*, 112 A.D.3d 522 (1st Dep't 2013), *aff'd* 25 N.Y.3d 581 (2015)). The First Department's concern is reinforced by the trial evidence here—UBS discovered the defects prior to or shortly after securitization (FOFs ¶¶ 175-79), and it could and should have repurchased the defective Loans shortly thereafter, but it opted to shirk its obligations for nearly a decade while most of those Loans defaulted and then liquidated.

It would be highly inequitable to let UBS effectively avoid its liability for such Loans. *See generally Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Products, Inc.*, 5 F. Supp. 3d 543, 554 (S.D.N.Y. 2014) ("a number

---

[99] The other cases that UBS cites on this point (Dkt. 484 ¶ 395), *MASTR Asset Backed Sec. Trust 2006–HE3,* 2012 WL 4511065, at *5-6 & n.9, like *WMC*, dealt with a Purchase Price definition that was incorporated into a definition of "Stated Principal Balance"—unlike here.

[100] While UBS criticizes Snow for relying on the amount of losses realized on the loan, that is precisely the testimony offered by UBS's own expert, Carron. Carron Direct (DX PM) ¶ 36(b) ("I then determined the Repurchase Price for each charged-off loan. For purposes of this calculation, the Repurchase Price is equal to the sum of the realized losses of the loan.").

of courts have been willing—in the face of sole remedy provisions like the ones in the Agreements—to award money damages equivalent to what the defendant would pay were performance possible") (citing *Resolution Trust Corp.*, 280 F.3d at 18); *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, 2013 WL 4399210, at \*3-4 (S.D.N.Y. Aug. 15, 2013) (Judge Baer's earlier decision in this case); *Deutsche Alt-A Sec. Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc.*, 958 F. Supp. 2d 488, 500-01 (S.D.N.Y. 2013); and *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11 CIV. 2375 JSR, 2011 WL 5335566, at \*5-6 (S.D.N.Y. Oct. 31, 2011)).[101]

### B. Establishing Equitable Damages For Liquidated Loans Does Not Require Proving That UBS's Breaches Caused The Trusts' Losses

UBS next attempts (Dkt. 483 ¶ 399) to raise the pleadings bar for equitable damages. Notably, UBS does not dispute that specific performance is an equitable remedy,[102] or that, to obtain that remedy for non-liquidated Loans, Plaintiff need not prove the causation required to obtain expectation damages at law. *Cf. EMF Gen. Contracting Corp. v. Bisbee*, 6 A.D.3d 45, 51 (1st Dep't 2004) (to obtain specific performance, plaintiff must prove that (i) plaintiff substantially performed its contractual obligations and was willing and able to perform its remaining obligations; (ii) defendant is able to perform, and (iii) there was no adequate remedy at law); *Piga v. Rubin*, 300 A.D.2d 68, 69 (1st Dep't 2002) (same), *lv. denied*, 99 N.Y.2d 646 (2003).

Instead, UBS argues (Dkt. 483 ¶ 399) that where Plaintiff seeks equitable damages for liquidated Loans because the specific performance of repurchase is impossible, its action

---

[101] This result is also consistent with broader equitable and contractual principles. Courts sitting in equity may award compensatory damages. *See Dunkel v. McDonald*, 272 A.D. 267, 272 (1st Dep't 1947) (function of a court of equity goes not further than to award as incidental to other relief, or in lieu thereof, compensatory damages; it may not assess exemplary damages), *overruled in part on other grounds by I. H. P. Corp. v. 210 Cent. Park S. Corp.*, 16 A.D.2d 461, 228 N.Y.S.2d 883 (1st Dep't 1962). Compensatory contractual damages are intended "to place the wronged victim in the same position as it was prior to the wrongdoing, without providing the recovery of any windfall." *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 36 Misc. 3d 328, 342 (N.Y. Sup. Ct. 2012). Thus, given that equity may award damages in lieu of the desired equitable remedy here, the proper measure of those damages would be to place the Trusts in the same position as they would have been absent UBS's breach.

[102] *See Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12 Civ. 7096 (DLC), 2015 WL 4164691, at \*4 (S.D.N.Y. July 10, 2015) ("A claim relating to the breach of R&Ws is thus a claim for specific performance, and would have been enforced in a court of equity in the eighteenth century."); *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 106 (1st Dep't 2015) ("[S]pecific performance is an equitable remedy.").

76

somehow is converted back into one at law that requires traditional proof of causation—even though UBS elsewhere acknowledges these damages sought here are an equitable remedy (Dkt. 483 ¶ 413 n.84 ("Plaintiffs have conceded that this action is one for equitable relief"). In reality, "[t]he fact that equity permits damages to be awarded where the specific equitable relief described by the contract is not available—where the loans have been liquidated—does not convert the otherwise equitable action to an action at law." *WMC Mortg., LLC*, 2015 WL 4164691, at *5. Rather, "[d]amages in such circumstances are 'exactly the type of monetary relief that courts . . . envision as equitable relief; they are incidental to the grant of equitable relief, yet are necessary to afford complete relief.'" *Id.* (citation omitted). Thus, "[t]he need for a substituted remedy does not convert what would otherwise be an equitable claim into a legal one." *Id.* at *6. UBS cites no contrary authority—*none* of its cited cases deal with equitable damages where specific performance is unavailable, but rather with legal expectation damages.[103]

UBS's argument is also incompatible with the contracts, in which the parties agreed that the only causation Plaintiff must show to obtain repurchase is that UBS's breaches caused

---

[103]  None of the cases cited by UBS (Dkt. 483 ¶¶ 400-02) are applicable here because those cases all involved situations where it was *unclear* whether defendants should provide a remedy as a result of their breaches—here, in contrast, Section 2.03 of the PSAs explicitly provides an agreed-upon repurchase remedy.  *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 527 (2d Cir. 2004) (finding the lower court did not err in considering intervening cause as breaking causal link between breach and damages, plaintiff's expectation that its $800,000 in payroll checks would be honored); *In Touch Concepts, Inc. v. Cellco P'ship*, No. 13 CIV. 1419 PKC, 2013 WL 6182949, at *4-5 (S.D.N.Y. Nov. 18, 2013), *aff'd*, 788 F.3d 98 (2d Cir. 2015) (dismissing breach of contract claim because plaintiff did not allege how defendant's contractual failure to provide pre-suit notice caused plaintiff's damages, its expectation of not being sued); *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07 CIV. 9580 (HB), 2009 WL 2514033, at *12 (S.D.N.Y. Aug. 18, 2009), *aff'd in part, rev'd on other grounds*, 631 F.3d 42 (2d Cir. 2011) (dismissing breach of contract claim because of intervening cause of plaintiff's damages, its expectation of getting paid for products sold); *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 346-47 (S.D.N.Y. 2002) (dismissing breach of contract claim because unclear how defendant's breach of contract caused plaintiff's damages, its expectation of avoiding bankruptcy); *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 96 CIV. 7874 (RWS), 2002 WL 826956, at *6 (S.D.N.Y. May 1, 2002) (permitting evidence on damages in breach of contract claim because defendant's breach caused plaintiff's legal expectation damages, its ability to sell securities had they not been wrongfully liquidated by defendant); *Krofft Entm't, Inc. v. CBS Songs, a Div. of CBS, Inc.*, 653 F. Supp. 1530, 1534 (S.D.N.Y. 1987) (denying summary judgment since still issue whether defendant's breach caused plaintiff's damages, the expectation to put on a Broadway play); *Jorgensen v. Century 21 Real Estate Corp.*, 217 A.D.2d 533, 534 (2d Dep't 1995) (awarding summary judgment for defendants in breach of contract claim because criminal activity acted as intervening cause of plaintiff's damages, its expectation that its premises not be contaminated); *Drummer v. Valeron Corp.*, 154 A.D.2d 897, 897-98 (4th Dep't 1989) (dismissing breach of contract claim because plaintiff did not allege how defendant's breach proximately caused damages).

MAEs—in other words, that the breaches significantly increased the Loans' risk of loss, not that the breaches caused the Loans' or Trusts' losses.  *MARM*, 2015 WL 764665, at *15 (collecting cases).  As Judge Rakoff explained:

> If the sophisticated parties had intended that the plaintiff be required to show direct loss causation, they could have included that in the contract, but they did not do so, and the Court will not include that language under the guise of interpreting the writing. . . .  [T]he Court concludes that plaintiff must only show that the breaches materially increased its risk of loss.  Put another way, the causation that must here be shown is that the alleged breaches caused plaintiff to incur an increased risk of loss.

*Assured Guar. Mun. Corp. v. Flagstar Bank FSB*, 892 F. Supp. 2d 596, 602-03 (S.D.N.Y. 2012) (citations and internal quotation marks omitted); *accord LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, No. 0603339/2003, 2006 WL 6916430 (N.Y. Sup. Ct. Sept. 6, 2006) (granting motion *in limine* to exclude evidence of whether defendants' breaches caused the subject loans to default because plaintiff was not required to show a "causal link" between defendants' breaches and its losses to establish defendants' repurchase obligation), *aff'd as modified on other grounds*, 47 A.D.3d 103 (1st Dep't 2007).  Accordingly, equitable damages that require proof of traditional causation would not be "damages . . . commensurate with the sole remedy clause," *MASTR Adjustable Rate Mortgs. Trust 2006-OA2*, 2015 WL 764665, at *11 n.3, which does not require such proof.[104]

### C.    The Trusts Are Entitled To Prejudgment Interest For Liquidated Loans

UBS further tries to reduce the Trusts' equitable damages by arguing (Dkt. 483 ¶¶ 409-415) that Plaintiff is not entitled to prejudgment interest for liquidated Loans.  UBS does not dispute that N.Y. CPLR §§ 5001(a) and 5004 provide for a 9% rate of prejudgment interest in

---

[104]   Accepting UBS's argument also would further violate the First Department's caution against interpreting RMBS contracts to create perverse incentives for RMBS sponsors to securitize "junk mortgages."  *Nomura*, 133 A.D.3d at 106.  In essence, UBS argues that the Court should impose a *higher* standard of proof for Plaintiff to recover for the *worst* Loans—those which have liquidated.  This would both create an incentive for RMBS sponsors to securitize Loans that are likely to default and then attempt to avoid repurchase on the basis of an elevated standard of causation that is contrary to the terms of the parties' contracts, and also reward UBS for having done exactly that.  *Cf. id.* at 106-07 (also holding that the "sheer volume of defective loans" and "systemic nature of these defects" further supports award of equitable damages).

breach-of-contract actions.  Instead, it cites the contracts' definition of the Purchase Price, which is defined to include interest at the Loans' note rates, and argues that this definition was a waiver of Plaintiff's right to prejudgment interest if UBS failed to repurchase a defective Loan.

UBS's argument rests on a broad misinterpretation of *J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113 (2012), in which the court held that the parties had agreed to waive statutory interest based on two factors:  (i) a provision that the "sole remedy" for an event of default would be the return of the down payment; *and* (ii) a requirement "that the down payment be placed in an interest-bearing account, so that the party entitled to the down payment would receive compensation for the deprivation of its use of the money in the form of bank-accrued interest."  *Id.* at 118.  The court reasoned that the sole remedy provision "*together with* the provision for interest on the escrowed sum," *id.* (emphasis added) indicated that the parties intended the plaintiff should not receive statutory interest in addition to bank-accrued interest.

Here, by contrast, while the parties agreed the sole remedy for a defective Loan would be UBS's repurchase of that Loan at the Purchase Price, they did not agree on a rate of interest that would accrue if UBS did not repurchase the Loan—as UBS concedes, "[t]he Sole Remedy Provision . . . nowhere contemplates prejudgment interest," Dkt. 483 ¶ 410.  Thus, failing to award prejudgment interest for liquidated Loans that cannot be repurchased would not provide the Trusts with an alternative rate of agreed-upon interest and *J. D'Addario* does not apply.  *U.S. Bank v. Dexia*, No. 12-cv-9412 (SAS), 2014 WL 4290642, at *3 (S.D.N.Y. Aug. 28, 2014) (in RMBS repurchase case, holding that *J. D'Addario* is "easily distinguishable" because "the exclusive remedy . . . involves no built-in substitute for statutory interest"), *rev'd on other grounds*, 2016 WL 1042090 (Mar. 16, 2016); *Wells Fargo Bank N.A. v. Bank of Am. N.A.,* No. 10 Civ. 9584 (JPO), 2014 WL 476299, at *3 (S.D.N.Y. Feb. 6, 2014) (in RMBS repurchase case, holding that *J. D'Addario* does not apply because "[t]he parties did not supplant the statutory scheme by creating their own plan to compensate [the trusts] for the time value of the purchase price if Bank of America wrongfully refused to repurchase," and "[u]se of the words 'sole remedy' is not code for

79

'I waive prejudgment interest.'") *rev'd on other grounds*, 627 F. App'x 27 (2d Cir. 2015).[105]

Finally, UBS provides no support (Dkt. 483 ¶ 414) for its alternative solution of awarding prejudgment interest at the coupon rate of the Certificates. Contrary to UBS's assertion, Plaintiff did not bargain that the *Certificates'* coupon rate of interest would apply in any way to the *Loans* underlying those Certificates. Rather, the parties agreed that UBS would repurchase defective Loans at a defined Purchase Price that includes the mortgage rate of interest paid on the Loans, but that definition says nothing about the interest to be applied when UBS violates its repurchase obligation. The parties further bargained that their contracts would be governed by New York law, PX 49 at 168, PX 110 at 209, PX 182 at 207-08 (PSAs' choice of law provisions), which provides for prejudgment interest at 9%. Thus, awarding that rate of prejudgment interest to liquidated Loans would best accord with the expectations of the parties. *See generally J. D'Addario*, 20 N.Y.3d at 117 ("The principle behind prejudgment interest is that the breaching party should compensate the wronged party for the loss of use of the money.")[106] Accordingly, an

---

[105]   Contrary to UBS's assertion (Dkt. 483 ¶ 411-13), there is no basis for the Court to withhold prejudgment interest because Plaintiff seeks equitable damages. In the cases cited by UBS (*id.* ¶ 411), prejudgment interest (i) was not awarded because of the plaintiffs' conduct: *U.S. Bank Nat'l Ass'n v. Williams*, 121 A.D.3d 1098, 1100-01 (2d Dep't 2014) (misrepresentation to defendant) and *Zielinski v. Associated Mut. Ins. Co.*, 217 A.D.2d 938, 939 (4th Dep't 1995) (undue delay in asserting claim); (ii) was withheld because the parties had agreed on alternative mechanisms for the time-value of withheld funds: *Bank of N.Y. Trust Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 282 (2d Cir. 2013) (funds held "in an interest-bearing account"); or (iii) was awarded at a rate other than 9% because the case involved a partnership accounting, which is subject to special equitable rules under New York law: *Cohen v. Akabas & Cohen*, 71 A.D.3d 419, 420 (1st Dep't 2010) (citing *Shubert v Lawrence*, 27 A.D.2d 292, 297 (N.Y. 1967) (affirming award of 4.5% prejudgment interest) ("For many years in our law it has been recognized that in partnership accountings the allowance of interest was a matter for decision on equitable principles. … The exercise of that discretion is to be determined by the particular facts of each case."). Despite UBS's assertions otherwise, Courts regularly award 9% prejudgment interest in actions involving equitable relief. *E.g.*, *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508-09 (2d Cir. 1991) (imposing 9% prejudgment interest for claims involving case involving both legal and equitable claims); *DLJ Mortg. Capital, Inc. v. Right-Away Mortg., Inc.*, No. 07 Civ. 2791, 2008 WL 4078661, at *3 (S.D.N.Y. July 29, 2008) (imposing 9% prejudgment interest to run from time plaintiff was no longer receiving contractual interest); *In re Louis Frey Co., Inc.*, No. 03 Civ. 15297, 2006 WL 2090083, at *22 (Bankr. S.D.N.Y. July 28, 2006) (awarding 9% prejudgment interest for restitution claims); *Stillman v. InService Am. Inc.*, 738 F. Supp. 2d 480, 482-84 (S.D.N.Y. 2010), *aff'd*, 455 F. App'x 48 (2d Cir. 2012) (applying 9% prejudgment interest for *quantum meruit* claims); *Aniero Concrete Co. v. N.Y.C. Const. Auth.*, 308 F. Supp. 2d 164, 212 (S.D.N.Y. 2003) (same); *U.S. ex rel. Maris Equip. Co. v. Morganti, Inc.*, 163 F. Supp. 2d 174, 202 (E.D.N.Y. 2001), *aff'd sub nom. Morganti Inc. v. Liberty Bond Serv., Inc.*, 67 F. App'x 68 (2d Cir. 2003) (same).

[106]   The cases cited by UBS (Dkt. 483 ¶ 414) on this point are inapposite, as they were not putback actions in which plaintiffs' equitable recoveries were based on the contractually-defined repurchase prices of individual Loans, but rather Securities Act cases in which plaintiffs' statutory damages were based on the actual losses of their Certificates. *Nat'l Credit Union Admin. Bd. v. UBS Sec. LLC*, No. 13 CV 6731 (DLC), 2016 WL 1179203, at *7 (S.D.N.Y. Mar.

80

award of prejudgment interest of 9% for liquidated Loans is appropriate.[107]

**D.    UBS Has Not Shown That It Is Entitled To An Offset For Assured's Payments To Cover Losses On Certain Certificates, Which The Trusts Must Reimburse To Assured**

UBS asks (Dkt. 483 ¶¶ 404-08) the Court to give it a windfall by reducing the Trusts' recovery in the amounts that Assured paid to cover losses on certain Certificates.  New York law puts the burden of pleading and proving such an offset on UBS.  *Aristocrat Leisure Limited v. Deutsche Bank Tr. Co.*,  727 F. Supp. 2d 256, 289-90 (S.D.N.Y. 2010) ("New York state courts . . . require the party that would benefit from the offset . . . to prove its entitlement to a reduction of damages"); *Carcone v. Gordon Heating & Air Conditioning Co., Inc.*, 212 A.D.2d 1017 (4th Dep't 1995) (defendant must plead insurance offsets as an affirmative defense to contract damages); *Singer Co. v. Alka Knitting Mills, Inc.*, 41 A.D.2d 856, 857 (2d Dep't 1973) (same).

UBS bases its argument (Dkt. 483 ¶ 405) solely on the inapposite principle that a plaintiff in a breach-of-contract case may not obtain a "double recovery" where, because of insurance payouts, the plaintiff incurred no "out-of-pocket loss" as a result of the breach.  *Id.*  Here, not only has UBS presented no evidence as to any purported payments by Assured, but the unrebutted evidence shows that the Trusts would not "double recover" the amounts of any Assured payments, because they would be required to reimburse those amounts to Assured when distributions flow through the waterfall.  Snow Direct (PX 1110) ¶¶ 34, 35; Tr. 1900:20-1902:20.[108]

---

24, 2016) (awarding prejudgment interest on RMBS claims at each Certificate's coupon rate because "use of the coupon rate awards a plaintiff the same interest it expected to receive by virtue of purchasing the Certificate"); *FHFA*, 104 F. Supp. 3d at 584 (awarding prejudgment interest on RMBS claims at each Certificate's coupon rate because "[t]hat rate vindicates the [plaintiffs'] original expectations when purchasing the Certificates").

[107]    While UBS asserts (Dkt. 483 ¶ 415) that there is no justification for Snow's use of certain "placeholder" information in his damages calculations, Snow had to use those placeholders because the Court had not yet determined (i) which Loans should be repurchased, (ii) the dates upon which repurchase should have occurred, (iii) the rate of prejudgment interest, or (iv) the date of judgment.  Tr. 1879:15-1880:2, 1891:20-21, 1892:15-1893:16 (Snow).  UBS does not explain how Snow could have done otherwise without failing to recognize the Court's authority to make those findings.  And while UBS half-heartedly asserts that Plaintiff did not move to bifurcate liability from damages, it concedes that bifurcation is the exception and not the rule, and it does not explain why bifurcation would have been appropriate here.

[108]    The cases on which UBS relies are therefore inapplicable, because they stand only for the proposition that costs for which a plaintiff is fully and permanently insured may not be recovered as damages.  *See Consol. Edison Co. of New York v. Lexington Ins. Co.*, No. 14 Civ. 6547, 2015 WL 4611206, at *8 (S.D.N.Y. July 30, 2015) (precluding damages where plaintiff "not only has . . . not suffered, but . . . will not suffer" injury from "costs [that] have been

UBS argues (Dkt. 487 ¶ 407) that Plaintiff could avoid this problem by "exclud[ing] the Assured-insured tranches from any recovery," but that would constitute a breach of the contracts since Article IV of the PSAs *requires* distributions to Certificateholders in the order set forth in the waterfalls, including making insurance reimbursement payments, and Plaintiff cannot unilaterally violate these rules.  PX 49 at 105 (2006-OA2 PSA § 4.02(a)(3)); PX 110 at 135 (2007-1 PSA § 4.02(a)(5)); PX 182 at 128 (2007-3 PSA § 4.02(a)(2)(B)(b)).[109]

UBS's argument is not helped (Dkt. 483 ¶ 406) by the settlement in *In re U.S. Bank Nat'l. Ass'n*, 51 Misc. 3d 273, 279 (N.Y. Sup. Ct. 2015), in which the parties agreed that the subject settlement payment would be paid by JPMorgan to the Trusts according to a formula based on "net losses" without accounting for the amount of any payments by monoline certificate insurers. To start with, US Bank's agreement to the amount of a negotiated settlement in that case is simply not an admission as to the legal operation of the contracts here.  *Batavia Turf Farms, Inc. v. Cty. of Genesee*, 239 A.D.2d 903, 905 (4th Dep't 1997) ("a compromise or a settlement may not be regarded as evidence of . . . liability, or as an admission").[110]  Moreover, the cited portion of that settlement agreement (Dkt. 484-7 at 12) dealt with "net losses" of the trusts, while at issue here are the aggregate losses of the individual defective "*Loans*," PX 49 at 74, PX110 at 102, PX182 at 85 (emphasis added), and UBS does not explain how payments on Certificates could be netted out against losses on the underlying collateral.  Finally, the parties there did *not* agree that, in addition

---

[109]  reimbursed by . . . insurers"); *Garofalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp. 2d 343, 346-47 (S.D.N.Y. 1999) (precluding contract damages where "entire bill" that formed basis for claim "was subsequently reimbursed" and plaintiff therefore had not "suffered actual injury"); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995) (explaining that, under New York's "net loss" theory, contract damages are offset by the amount "plaintiff saved as a result of the breach").  Here, unlike in those cases, because the Trusts reimburse Assured when distributions flow through the waterfalls, it is not the case that the Trusts "will not suffer" losses on the insured certificates or that the Trusts "saved" money as a result of UBS's breaches.

[109]  UBS asserts (Dkt. 484 ¶ 407) that the offset is justified because "Assured has already been compensated through its settlement with UBS RESI," but UBS did not introduce its settlement with Assured into evidence, so the Court cannot evaluate the terms of that agreement.  For example, if the settlement required Assured to reimburse any settlement funds to UBS if Assured receives reimbursement payments from the Trusts, such terms would undermine UBS's assertion that Assured "has already been compensated" for its payments to the insured Certificates.

[110]  While UBS cites (Dkt. 487 ¶ 406) the report of Plaintiff's expert for the general proposition that New York law entitled Plaintiff to its full recovery minus insurance payments received, that report did not address reducing the recovery by the amount of *reimbursable* certificate insurance payments of the sort at issue here. Dkt. 484-7 at 28.

to excluding payments by monoline insurers from a calculation of certificates' net losses, the Trustee could fail to make required reimbursements to those insurers, as UBS urges here—nor could they, as the insurers were not parties to the settlement contract.  Simply put, there is no basis in law or fact for UBS to offload any portion of its obligations onto the Trusts or Assured.

**V.      UBS FAILS TO REBUT THE EVIDENCE OF ITS LIABILITY AND THE TRUSTS' REMEDIES FOR THE MARGINAL INDYMAC LOANS**

While arguing (Dkt. 483 ¶¶ 309-14, 317-18) that the contracts require Plaintiff to identify specific defective loans for repurchase, UBS fails to rebut the authorities that establish, as a matter of law, that the contracts allow Plaintiff to prove equitable damages *in lieu* of repurchase for the Marginal IndyMac Loans[111] through sampling and extrapolation evidence (FOFs ¶¶ 429-31). UBS's only response (Dkt. 483 ¶ 318 & n.60) is that these cases did not endorse specific sampling methodologies as a matter of evidence, but that point is irrelevant to whether Plaintiff may use sampling evidence to prove equitable damages for liquidated loans as a matter of law (Plaintiff can) or whether Plaintiff's unrebutted sampling evidence in this case is sufficient to do so (it is).[112]

As for the non-liquidated Marginal IndyMac Loans, UBS does not dispute that the relevant Loan Files are not available, or that Plaintiff in good faith entered into an agreement preventing it from obtaining those files from OneWest based on its understanding of Judge Baer's order regarding sampling.  Dkt. 254-7.  UBS's only argument (Dkt. 483 ¶¶ 320-21) is that Plaintiff should have *violated* its agreement with OneWest and subpoenaed the files anyway, but UBS does not explain how breaching that contract would have been reasonable or practical.  Accordingly

---

[111]   As explained in Plaintiff's Post-Trial Brief, the Marginal IndyMac Loans are 3,543 Loans originated by IndyMac for which no loan files are available and for which third-party sources did not reveal defects.  Plaintiff proved its claims for these Loans based on the extrapolated results from Holt's re-underwriting of a representative sample of 422 such Loans.  Br. at 41.

[112]   UBS's attempt to distinguish *Flagstar* on the basis that the case was "brought by a certificate insurer that was not limited to a sole remedy provision" (Dkt. 483 ¶ 318 n.60) is irrelevant, because *Nomura* holds that the sole remedy clause does not bar the Trustee from recovering equitable damages.  *Flagstar*'s reasoning that sampling is an admissible method to prove the amount of damages for an RMBS defendant's failure to repurchase applies with equal force regardless of the identity of the plaintiff.  UBS observes that the contracts in the *SACO* case did "not reflect the precise language" of the PSAs here, but fails to identify any material difference that would support a different result. Dkt. 483 ¶ 318 n.60.  UBS essentially urges this Court to "disagree[]" with Justice Bransten's ruling that the use of statistical sampling is consistent with such contract language, but does not provide any persuasive reason to do so.  *Id.*

83

Plaintiff may use sampling and extrapolation evidence to prove its equitable damages for the non-liquidated Marginal IndyMac Loans as well.  FOFs ¶¶ 432-34.

UBS provided no rebuttal sampling or extrapolation evidence of its own, and its criticisms of Plaintiff's evidence are not meaningful.  First, UBS criticizes (Dkt. 483 ¶ 323) Lipshutz for updating the extrapolated breach rate based on the IndyMac Sample after Holt updated his findings for that sample—but this updating does not suggest that the extrapolation methodology was incorrect because, as Lipshutz demonstrated in unrebutted testimony, all that changed was the underlying breach rate from Holt; his methodology was identical.  Tr. 1267:10-1268:8.  Next, UBS criticizes (Dkt. 483 ¶ 324) Lipshutz's extrapolation as to one Trust because two of 13 representativeness tests failed, but Lipshutz testified that these failures were not meaningful, FOFs ¶ 118, Tr. 1260:7-1261:17, and UBS's own sampling expert did not testify to the contrary—in fact, he conceded that he did not even mention Lipshutz's representativeness testing in his trial declaration.  Tr. 1785:8-13.  UBS also argues, again (Dkt. 483 ¶ 325), that Lipshutz's extrapolated breach rate for the full IndyMac Population is higher than a lower breach rate found by Holt for that same population—but UBS ignores, again, that Lipshutz extrapolated from Holt's *full* re-underwriting (with Loan Files) of the IndyMac Sample, while Holt conducted a *limited* review (without Loan Files) for the remaining IndyMac Loans; hence it is no surprise the rates were different.  FOFs ¶ 117.  Lastly, UBS suggests (Dkt. 483 ¶ 318) that Snow's damages calculations are not "tethered" to the contracts' Purchase Price—but Snow's calculations use the Purchase Prices for all Marginal IndyMac Loans to provide an estimate of aggregated equitable damages. Snow Direct (PX 1108) ¶ 38.

While UBS does not dispute that Plaintiff's evidence that UBS discovered breaches in all Loans (FOFs ¶¶ 173-92) applies to the Marginal IndyMac Loans, UBS argues (Dkt. 483 ¶ 315-17) that it did not receive "written notice" of defects in those Loans because Lipshutz did not identify specific Loans as defective.  But Lipshutz's report gave UBS written notice that, with a 95% degree of certainty, up to 100% of the IndyMac Loans were materially defective (PX 535), which was more than sufficient to notify UBS of breaches in all of those Loans.  Contrary to UBS's

assertion (Dkt. 483 ¶ 315) accepting this evidence of written notice is far different than the "pervasive breach" theory that the Court previously rejected.  Under that theory, UBS would have been notified of all defects in all of the 17,082 Loans in the Trusts based on notice of breaches in 4,462 specific Loans, without any statistical sampling or extrapolation.  Dkt. 280 at 6.  Lipshutz's report, by contrast, provided notice of breaches in *all* of the IndyMac Loans (not just a subset), based on scientifically rigorous sampling and extrapolation evidence.[113]  Accordingly, this Court should find UBS liable and award Plaintiff its remedies for the Marginal IndyMac Loans.

## CONCLUSION

For the reasons set forth above, and in Plaintiff's Post-Trial Brief and in Plaintiff's Proposed Findings of Fact and Conclusions of Law, judgment should be entered for Plaintiff.

---

[113]   Even should the Court deem such notice insufficient, Plaintiff's notice to UBS of Plaintiff's reasonable grounds to believe that breaches materially affected up to 100% of the IndyMac Loans constituted "substantial performance" sufficient for Plaintiff to obtain the equitable relief it seeks here.  *135 E. 57th St. LLC v. Daffy's Inc.*, 91 A.D.3d 1, 1 (1st Dep't 2011) (equitable "doctrine of substantial performance" allows a plaintiff to recover notwithstanding failure to comply with the precise language of the contract).

Dated:    July 26, 2016
New York, New York

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By:      /s/ Sean P. Baldwin
         David Elsberg
         (davidelsberg@quinnemanuel.com)
         Sean P. Baldwin
         (seanbaldwin@quinnemanuel.com)
         Andrew R. Dunlap
         (andrewdunlap@quinnemanuel.com)
         Steven M. Edwards
         (stevenedwards@quinnemanuel.com)
         Paul P. Hughes
         (paulhughes@quinnemanuel.com)
         Marlo A. Pecora
         (marlopecora@quinnemanuel.com)
         51 Madison Avenue, 22nd Floor
         New York, New York 10010
         Tel:  212-849-7000
         Facsimile:  212-849-7100

         *Attorneys for Plaintiff*