UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, solely in its capacity as Trustee of MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3, <br><br> Plaintiff, <br><br> -against- <br><br> UBS REAL ESTATE SECURITIES INC., <br><br> Defendant. | 12 Civ. 7322 (PKC) <br><br> **AMENDED COMPLAINT** |

Plaintiff U.S. Bank National Association ("U.S. Bank"), solely in its capacity as Trustee ("Trustee") of MASTR Adjustable Rate Mortgages Trust 2006-OA2 (the "2006-OA2 Transaction"); MASTR Adjustable Rate Mortgages Trust 2007-1 (the "2007-1 Transaction"); and MASTR Adjustable Rate Mortgages Trust 2007-3 (the "2007-3 Transaction") (collectively, the "Transactions" and the "Trusts," each being a "Trust"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint against UBS Real Estate Securities Inc. ("UBS Real Estate") alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is an action for breach of contract stemming from UBS Real Estate's failure to abide by its contractual obligations under the Pooling and Servicing Agreements ("PSAs") relating to the Transactions.  UBS Real Estate created the Transactions by transferring thousands of residential mortgage loans to the Trusts, and, as an inducement to investors and insurers, represented, among other things, that those mortgage loans met specified quality control standards and were underwritten according to applicable guidelines.  UBS Real Estate's representations

were false, and, as a result, investors in the Transactions and the financial guaranty insurer in the

Transactions, Assured Guaranty Municipal Corp. (f/k/a Financial Security Assurance Inc.)

("Assured"), have sustained and will continue to sustain substantial damages.

2.     In its role as sponsor of the transactions, UBS Real Estate acquired the underlying

mortgage loans, which it subsequently conveyed to three separate trusts.  Those trusts, in turn,

issued residential mortgage-backed securities ("RMBS" or "Certificates"), which were marketed

and sold to investors ("Certificateholders") in three offerings in 2006 and 2007.  To make the

Transactions more marketable, UBS Real Estate sought a financial guaranty insurer ("Certificate

Insurer") to guarantee certain of the trusts' payments to investors in certain classes of the senior

Certificates in the event that payments on the underlying mortgage loans were insufficient.

3.     To secure Assured's agreement to provide this insurance and to induce potential

investors to purchase the securities, UBS Real Estate made a comprehensive set of representations

and warranties in the PSAs governing these Transactions, vouching for the quality of the mortgage

loans (the "Mortgage Representations").  Among other things, UBS Real Estate represented and

warranted that:  (i) the information in the mortgage loan schedules was true and correct in all

material respects; (ii) the mortgage loans were underwritten in accordance with the underwriting

guidelines of the originators of the mortgage loans (the "Underwriting Guidelines"); and (iii) with

respect to certain of the mortgage loans in the 2006-OA2 and 2007-1 Transactions, the lender

made a reasonable determination that at the time of loan origination, the borrower had the ability to

make timely payments on each mortgage loan.  UBS Real Estate further agreed to cure,

repurchase, or replace mortgage loans that breached any of these representations and warranties

with mortgage loans that satisfied them.

4.     By making the Mortgage Representations, UBS Real Estate assumed the risk that the mortgage loans did not conform to those Mortgage Representations, whereas Assured and investors in the Transactions assumed only the risk that mortgage loans that did conform to those Mortgage Representations would not perform.  UBS Real Estate's actions enabled it to sell pools of mortgage loans to the Transactions that present a materially greater risk of delinquency and default, and in fact have become delinquent and defaulted, at higher rates than would have occurred had the mortgage loans met the criteria indicated in the Mortgage Representations.

5.     Between August 9, 2010 and September 27, 2012, Assured in its capacity as Certificate Insurer, pursuant to its rights under the PSAs, requested that UBS Real Estate cure or repurchase a total of 4,642 defective mortgage loans with an original unpaid principal balance of approximately $2,025,238,559.83 across all three Transactions:  1,416 defective mortgage loans with an original principal balance of $579,118,190 in the 2006-OA2 Transaction, 1,795 defective mortgage loans with an original principal balance of $755,689,228 in the 2007-1 Transaction, and 1,431 defective mortgage loans with an original principal balance of $690,404,141.23 in the 2007-3 Transaction.  Although UBS Real Estate represented that the mortgage loans underlying the Transactions were underwritten pursuant to the Underwriting Guidelines, designed to ensure that borrowers would repay the mortgage loans, in fact, as detailed in these repurchase demands, the mortgage loans did not have the characteristics represented on the mortgage loan schedules for the Transactions, were made to borrowers who could not afford to repay them, including by borrowers who did not satisfy the basic risk criteria for prudent and responsible lending.  UBS Real Estate has refused to repurchase all but a small fraction of these defective mortgage loans within the requisite 90-day cure or repurchase period, despite its contractual obligation to do so.

UBS Real Estate's refusal to repurchase these defective mortgage loans leaves the Certificateholders and Certificate Insurer uncompensated for their losses.

6.      UBS Real Estate's breaches of contract have inflicted and continue to inflict tremendous harm on Certificateholders and Assured.  Those mortgage loan pools have also suffered enormous losses.  As of September 25, 2012, the mortgage loans in the 2006-OA2 Transaction have suffered $472,120,624 in realized losses, 23.45 percent of the original collateral balance of $2,013,321,248.43; the mortgage loans in the 2007-1 Transaction have suffered $413,591,351 in realized losses, 19.7 percent of the original collateral balance of $2,099,439,579; and the mortgage loans in the 2007-3 Transaction have suffered realized losses of $645,962,130, 25.01 percent of the original collateral balance of $2,582,881,407.83.  The remaining loans in the Transactions are also performing extremely poorly.  As of September 25, 2012, large percentages of the current mortgage loan pools backing the certificates in the Transactions had been delinquent for at least sixty days:  46 percent in the 2006-OA2 Transaction, 34 percent in the 2007-1 Transaction, and 48 percent in the 2007-3 Transaction.  As a result, as of September 25, 2012, Assured has paid $146,379,233 in claims on the 2006-OA2 Transaction, $121,346,860 in claims on the 2007-1 Transaction, and $171,621,203 in claims on the 2007-3 Transaction.  Consequently, the Certificateholders' investments are at considerable risk, and the Certificate Insurer remains exposed to tens of millions of dollars in further claim payments under its financial guaranty insurance policies.

**PARTIES**

7.      U.S. Bank is, and was on September 28, 2012, a national banking association organized and existing under the laws of the United States of America.  U.S. Bank's registered main office is, and was on September 28, 2012, in Cincinnati, Ohio.  U.S. Bank's principal place of

business is, and was on September 28, 2012, in Minneapolis, Minnesota.  For diversity purposes, U.S. Bank is a citizen of Ohio.

8.      Defendant UBS Real Estate is, and was on September 28, 2012, incorporated in Delaware with its principal place of business at 1285 Avenue of the Americas, New York, NY 10019.  For diversity purposes, UBS Real Estate is a citizen of Delaware and New York.

## RELEVANT NON-PARTIES

9.      Assured Guaranty Municipal Corp. is incorporated in New York with its principal place of business at 31 West 52nd Street, New York, NY 10019.  Assured is a financial guaranty insurance company currently focused exclusively on the public finance market.  Assured is licensed in all 50 states, the District of Columbia, and Puerto Rico.  Prior to July 2009, Assured was known as Financial Security Assurance Inc.  As Certificate Insurer, Assured provides financial guaranty insurance on certain classes of the senior Certificates in each of the Transactions.

10.      UBS Securities LLC ("UBS Securities") is a limited liability company incorporated in Delaware with principal places of business at 677 Washington Boulevard, Stamford, CT 06901 and 299 Park Avenue, New York, NY 10171.  UBS Securities is one of the leading underwriters in mortgage and asset-backed securities in the United States.  UBS Securities served as underwriter of the securities issued in each of the Transactions.

11.      Mortgage Asset Securitization Transactions, Inc. ("MAST") is a Delaware corporation with its principal place of business at 1285 Avenue of the Americas, New York, NY 10019.  MAST is a wholly-owned limited purpose subsidiary of UBS Americas, Inc.  In its role as the depositor on each of the Transactions, MAST received the underlying mortgage loans from UBS Real Estate, and then transferred those mortgage loans to a trust created for each Transaction.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b).

13.     This Court also has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs, exceeds $75,000.  For diversity purposes, a national banking association's citizenship is determined solely by the state of its main office.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(b)(3). Defendant's principal place of business is in New York County.  Negotiations and other substantial activities relating to the transactions that give rise to the claims in this Complaint occurred within New York County.

## FACTUAL ALLEGATIONS

### A.     Residential Mortgage Backed Securities

15.     Asset-backed securities distribute risk and return to investors by pooling cash-producing financial assets, such as mortgage loans, and issuing securities backed by the pool of underlying assets.

16.     The most common form of securitization of residential mortgage loans involves a sponsor and the creation of a trust, to which the sponsor sells a portfolio of mortgage loans.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  SEC Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1,506, 1,511 (Jan. 7, 2005).

17.     After receiving the portfolio of residential mortgage loans, the trust will issue RMBS using the pool of residential mortgage loans as collateral.  By purchasing those securities,

known as Certificates, investors acquire rights to the cash flowing from the pool of residential mortgage loans owned by the trust. This cash is generated by borrowers' payments of principal and interest on the mortgage loans held by the trust.

18.    To decrease the risk to Certificateholders from a shortfall in mortgage loan payments to the trust, and thereby to make the securitizations more marketable, many securitizations include additional credit enhancement for all or some of the Certificates in the form of a financial guaranty insurance policy. Under the terms of such a policy, a financial guaranty insurer, in return for a premium, guarantees to all or some of the Certificateholders that, in the event cash flows from the mortgage loans are insufficient to make specified payments of interest and principal to the insured Certificates, the financial guaranty insurer will cover those shortfalls and, in some cases, other losses. In this way, the risk to the investors in insured Certificates of a shortfall in the anticipated cash flows from the pool of mortgage loans to the trust is mitigated.

19.    The presence of financial guaranty insurance increases the value and rating of a residential mortgage-backed security. To secure financial guaranty insurance, as well as to make the transactions more appealing to investors, sponsors of securitizations make extensive representations and warranties in the transaction documents concerning the quality of the underlying mortgage loans, to entice both investors and financial guaranty insurers. Sponsors also routinely covenant in the applicable contracts that, if mortgage loans fail to conform to the sponsor's representations and warranties in a manner that materially and adversely affects the interests of the Certificateholders or the financial guaranty insurer, the sponsor must replace the defective mortgage loans, cure the defects, or repurchase the defective mortgage loans within a specified time period (typically 90 days).

**B.    The Transactions at Issue in This Action**

20.    The Transactions at issue involve securitizations of pools of first-lien, adjustable-rate residential mortgage loans.

21.    The 2006-OA2 Transaction closed on November 15, 2006.  It consists of a pool of prime and Alt-A adjustable rate, first lien mortgage loans.  The Trust issued 21 classes of certificates with a total face amount of approximately $1,988,155,000 (the "2006-OA2 Certificates").  The total mortgage loan pool at closing was approximately 5,660 loans with an aggregate principal amount of approximately $2,013,321,248, divided into four groups.  Assured provided financial guaranty insurance on the Class 1-A-3, 2-A-3, and 4-A-2 Certificates, totaling $224 million in principal amount (the "Insured 2006-OA2 Certificates"), backed by three of those mortgage loan groups.

22.    The 2007-1 Transaction closed on January 16, 2007.  It consists of a pool of prime and Alt-A closed-end, adjustable-rate and hybrid-adjustable-rate, residential first-lien mortgage loans.  The Trust issued 40 classes of certificates with a total face amount of approximately $2,087,535,100 (the "2007-1 Certificates").  The total mortgage loan pool at closing was approximately 4,944 loans with an aggregate principal balance of approximately $645,192,475, divided into two groups.  Assured provided financial guaranty insurance on the Class 1-2A2 and 1-2A4 Certificates, totaling $458,926,000 in principal amount (the "Insured 2007-1 Certificates"), backed by one of those mortgage loan groups.

23.    The 2007-3 Transaction closed on May 15, 2007.  It consists of a pool of prime and Alt-A closed-end, adjustable-rate residential first-lien mortgage loans.  The Trust issued 28 classes of certificates with a total face amount of approximately $2,569,967,000 (the "2007-3 Certificates," and, together with the 2006-OA2 Certificates and the 2007-1 Certificates, the

8

"Certificates," and, the holders of such Certificates, the "Certificateholders").  The total mortgage loan pool at closing was approximately 6,478 loans with an aggregate principal balance of approximately $2,582,881,408, divided into four groups.  Assured provided financial guaranty insurance on the Class 1-1A2, 1-2A2, 2-1A2, 2-2A3 and 2-2A6 Certificates, totaling $809,188,000 in principal amount (the "Insured 2007-3 Certificates," and together with the Insured 2006-OA2 Certificates and the Insured 2007-1 Certificates, the "Insured Certificates"), backed by two of these mortgage loan groups.

24.     For each of the Transactions, UBS Real Estate conveyed the pool of mortgage loans to MAST in exchange for cash.  MAST in turn conveyed the pool of mortgage loans to the corresponding Trust, for the purpose of using the mortgage loans as collateral for the Certificates that would be sold to investors.  The Trust then worked with the underwriter, UBS Securities, to price and sell these Certificates.  The Trust issued the Certificates, and UBS Securities offered the Certificates for sale to investors.  For each of the Transactions, Assured provided financial guaranty insurance for the benefit of the Insured Certificates.

25.     For each of the Transactions, the cash flows from the mortgage loans, in the form of payments of principal and interest, are used to pay obligations on the Certificates.  The purchase of each Certificate is thus the purchase of a right to participate in the cash flows generated by the pool of underlying mortgage loans.  Because the mortgage loans were the primary collateral supporting the Certificates, their credit quality was, and continues to be, of critical importance to Certificateholders and Assured.

**C.     The Relevant Provisions of the Pooling and Servicing Agreements**

26.     The Transactions were entered into pursuant to the basic process described above in Section A, with UBS Real Estate serving as the sponsor for each Transaction.  Each Transaction

9

included:  (a) an Assignment, Assumption and Recognition Agreement that provided for the transfer of the mortgage loans by UBS Real Estate to its affiliated depositor, MAST; (b) a PSA that, among other things, transferred the mortgage loans to a single purpose trust, set forth UBS Real Estate's Mortgage Representations, established the rights of the Trustee, the Certificateholders, and Assured; and (c) a financial guaranty insurance policy covering certain payments on the Insured Certificates (the "Policy").

27.    The PSAs governing the Transactions are as follows:  (i) the PSA among MAST, UBS Real Estate, Wells Fargo Bank, N.A. ("Wells Fargo"), the Trustee, and Clayton Fixed Income Services Inc. dated October 1, 2006, for the 2006-OA2 Transaction; (ii) the PSA among MAST, UBS Real Estate, Wells Fargo, and the Trustee, dated December 1, 2006, for the 2007-1 Transaction; and (iii) the PSA among MAST, UBS Real Estate, Wells Fargo, and the Trustee, dated April 1, 2007, for the 2007-3 Transaction.

28.    In Schedule II of each PSA, UBS Real Estate made the Mortgage Representations, including concerning:  (1) the key characteristics of the mortgage loans that backed the Certificates issued in the Transaction; and (2) adherence to the Underwriting Guidelines pursuant to which the mortgage loans were originated.  UBS Real Estate was in a position to make the Mortgage Representations because, unlike Assured and the Certificateholders, it had access to the loan files and selected the mortgage loans for inclusion in the Transactions.  UBS Real Estate – not the Certificateholders or Assured – thus bore the risk that its Mortgage Representations were untrue.

29.    In the each of the PSAs, UBS Real Estate made the Mortgage Representations, including the following:

- **Accuracy of Mortgage Loan Schedule.**  The "information set forth in the Mortgage Loan Schedule was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the Mortgage Loan Schedule."  2006-OA2 PSA Schedule II(i); 2007-1 PSA Schedule II(i);

2007-3 PSA Schedule II(1).  Items included on the Mortgage Loan Schedule include the debt-to-income ("DTI") ratio, intended occupancy, and loan-to-value ("LTV") ratio.

- **Underwriting**.  The Mortgage Loans were "underwritten in accordance with the underwriting guidelines" of the related loan originator "in effect at the time of origination with exceptions thereto exercised in a reasonable manner."  2006-OA2 PSA Schedule II(xxx); 2007-1 PSA Schedule II(xxx); 2007-3 PSA Schedule II(28).

- **Borrower Ability to Pay**:  With respect to the Group I mortgage loans in the 2006-OA2 Transaction and the Subgroup I-I mortgage loans in the 2007-1 Transaction, "the Mortgage Loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Mortgage Loan."  2006-OA2 PSA Schedule II(xlv); 2007-1 PSA Schedule II(xlvi).

30.    In Section 2.03 of each of the PSAs, UBS Real Estate represented that each of the Mortgage Representations in such PSA was true as of the date the Transaction to which it is related closed.  Section 2.03 of each of the PSAs provides that Assured may notify UBS Real Estate if it determines that any mortgage loan fails to conform to the Mortgage Representations in a manner that "materially and adversely affects the interests of the Certificateholders or the Certificate Insurer [Assured] in any Mortgage Loan."  Under that same provision, within 90 days of such notice or of the Transferor's [UBS Real Estate's] knowledge of the breach (whichever is earlier), UBS Real Estate must cure the breach, substitute a mortgage loan that conforms with the Mortgage Representations, or repurchase the defective mortgage loan.  (UBS Real Estate had the second option only for the first two years after the Transaction closed.)  UBS Real Estate must make such a substitution or repurchase "notwithstanding the Transferor's [UBS Real Estate's] lack of knowledge with respect to the substance of such representation or warranty," per Section 2.03 of each PSA.

31.    Under Section 2.03 of each PSA, if UBS Real Estate fails to cure or repurchase the defective mortgage loan within 90 days of notice or its own discovery (whichever is earlier), the Trustee, "shall enforce the Transferor's [UBS Real Estate's] obligations hereunder to (i) purchase

such Mortgage Loan at the Purchase Price or (ii) substitute for the related Mortgage Loan an

Eligible Substitute Mortgage Loan."  In addition, also under Section 2.03 of each of the PSAs,

UBS Real Estate must "promptly reimburse" Assured and the Trustee, "for any expenses

reasonably incurred by" them "in respect of enforcing the remedies for such breach by" UBS Real

Estate relating to its failure to comply with its obligations to cure the breach, repurchase the

defective mortgage loan, or substitute a mortgage loan that conforms to the Mortgage

Representations.

### D.    Assured and the Trustee Provide Notices Of Defective Loans

32.    There have been a large number of delinquencies among the mortgage loans

underlying each Transaction.  As of September 25, 2012, there was $849,573,029.93 in

outstanding principal balance of the remaining mortgage loans collateralizing the Certificates in

the 2006-OA2 Transaction; of these remaining mortgage loans, $398,105,868.51—46 percent—

have been delinquent for at least sixty days.  As of September 25, 2012, there was $900,800,269.12

in outstanding principal balance of the remaining mortgage loans collateralizing the Certificates in

the 2007-1 Transaction; of these remaining mortgage loans, $308,719,365.06—34 percent—have

been delinquent for at least sixty days.  As of September 25, 2012, there was $1,035,971,746.46 in

outstanding principal balance of the remaining mortgage loans collateralizing the Certificates in

the 2007-3 Transaction; of these remaining mortgage loans, $503,484,432—48 percent—have

been delinquent for at least sixty days.

33.    In light of the unusually high delinquency and default rates, Assured performed a

review of certain mortgage loans in each Transaction in order to determine whether they complied

with the Mortgage Representations made by UBS Real Estate.  Assured and the Trustee provided

written notice to UBS Real Estate of the specific breaches of the Mortgage Representations based

on the results of the review.  These notices included detailed descriptions of each specific breach,

such as unreasonableness of stated income, misrepresentations of income, employment,

occupancy, and debt obligations; inaccurate and false loan-level information provided by

borrowers and later given to Assured, Certificateholders, and the rating agencies; DTI ratios that

exceeded the limits set forth in the Underwriting Guidelines; LTV ratios and combined

loan-to-value ratios that exceeded the limits set forth in the Underwriting Guidelines; and relevant

documents that are either defective or missing from the loan files.

34.     These notices demonstrate that UBS Real Estate breached the Mortgage

Representations.  Moreover, these breaches materially and adversely affect the interests of the

Certificateholders and Assured in the mortgage loans.  The following categories illustrate the types

of breaches of the Mortgage Representations that pervade the Transactions.  Examples of each

type follow in the Appendix, annexed hereto.

35.     These notices demonstrate that, in each Transaction, loan originators breached the

Underwriting Guidelines and, therefore, the Mortgage Representation guaranteeing adherence to

the applicable Underwriting Guidelines.  For example:

- **Unreasonable Stated Income.**  The Underwriting Guidelines for reduced documentation loans required that a borrower's stated income be consistent with the borrower's occupation and credit and asset profile.  But loan originators routinely failed to determine whether stated incomes were reasonable.

- **Use of Improper Loan Qualification Program.**  According to the applicable Underwriting Guidelines, if a loan application under a reduced-documentation program displayed factual inconsistencies—for example, if a borrower made a statement that was contradicted by a document in the loan application—then the loan could be extended only if the borrower underwent a more stringent loan program application, one with more robust documentation requirements.  But loan originators routinely processed loans under the reduced documentation loan programs despite numerous application inconsistencies.

- **Failure to Verify That Borrower's Assets Were Sufficient.**  According to the applicable Underwriting Guidelines, the loan originators were generally required to obtain satisfactory verification of assets for each borrower in an amount generally

equal to at least three to six months of the new housing payments, plus verification that the borrower had all the funds needed to close the subject transaction.  But loan originators routinely failed to verify the borrowers' assets.

36.      The Mortgage Loan Schedule for each PSA contained, for each loan, among other things:  (a) the DTI ratio; (b) the borrower's intended occupancy with respect to the mortgaged property; and (c) the LTV ratio.  The repurchase notices from Assured and the Trustee revealed that much of this information was incorrect, including due to falsification of borrowers' income and debt, inflated property values, intent to occupy, and other misrepresentations of key characteristics of the mortgage loans, all of which constitute breaches of the Mortgage Representation guaranteeing the accuracy of the information in the Mortgage Loan Schedule.  For example:

- **False DTI Ratios.**  A key measure of ability to repay a mortgage loan is the DTI ratio, or the borrower's monthly debt obligations compared to his or her monthly income.  The higher the DTI ratio (*i.e.*, the greater the percentage of monthly income a borrower must devote to debt payments), the greater the risk of default.  But the Mortgage Loan Schedules contained numerous understated DTI ratios.

- **False Occupancy Disclosures.**  An accurate representation of the occupancy status (*i.e.*, whether the property securing a mortgage loan is to be the borrower's primary residence, a second home, or an investment property) is critical in assessing the risk that a borrower will not repay a mortgage loan and determines what guidelines apply to the underwriting of such mortgage loan.  Borrowers who reside in mortgaged properties generally are less likely to default than borrowers who purchase properties as second homes or investment properties and live elsewhere, and borrowers generally are more likely to maintain the condition of their primary residence.  But the Mortgage Loan Schedules contained numerous occupancy misrepresentations.

- **False LTV Ratios.**  The LTV ratio reflects the percentage of a property's appraised value covered by the mortgage loan.  The higher the LTV ratio, the greater the risk that, if the mortgaged property were liquidated, the resulting funds would be insufficient to repay the mortgage loan.  But the Mortgage Loan Schedules contained numerous false LTV ratios.

37.      The aforementioned breaches of the Mortgage Representations materially and adversely affect the interests of the Certificateholders and Assured in the related mortgage loans.

14

These breaches, which represent only a few of many in the mortgage loans collateralizing the

Transactions, constitute breaches of the underlying PSAs.

 **E.** **UBS Real Estate's Refusal to Meet Its Repurchase Obligations**

 38. Pursuant to Section 2.03 of each of the PSAs, Assured and the Trustee sent UBS

Real Estate a series of written notices identifying defective mortgage loans in each Transaction

and demanding that UBS Real Estate either cure the defects or repurchase those mortgage loans

within 90 days of the notice.  Specifically:

- By a letter dated August 9, 2010, Assured requested that UBS Real Estate cure or repurchase 270 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $140,348,606.

- By a letter dated August 13, 2010, Assured requested that UBS Real Estate cure or repurchase 325 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $129,403,675.

- By a letter dated August 13, 2010, Assured requested that UBS Real Estate cure or repurchase 112 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $55,219,616.

- By letter dated August 13, 2010, Assured requested that UBS Real Estate cure or repurchase 55 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $19,644,848.

- By letter dated June 17, 2011, Assured requested that UBS Real Estate cure or repurchase 412 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $184,153,505.

- By letter dated June 30, 2011, Assured requested that UBS Real Estate cure or repurchase 329 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $164,780,597.

- By letter dated June 30, 2011, Assured requested that UBS Real Estate cure or repurchase 289 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $72,081,142.

- By letter dated July 5, 2011, Assured requested that UBS Real Estate cure or repurchase 236 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $83,524,093.

- By letter dated July 7, 2011, Assured requested that UBS Real Estate cure or repurchase 87 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $30,816,660.

- By letter dated December 14, 2011, Assured requested that UBS Real Estate cure or repurchase 167 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $61,295,315.

- By letter dated December 15, 2011, Assured requested that UBS Real Estate cure or repurchase 80 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $31,172,576.

- By letter dated December 15, 2011, Assured requested that UBS Real Estate cure or repurchase 78 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $25,402,002.

- By a letter dated March 28, 2012, Assured requested that UBS Real Estate cure or repurchase 361 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $238,335,720.  On April 27, 2012, the Trustee reiterated the repurchase requests in Assured's March 28, 2012 letter to UBS Real Estate.

- By a letter dated May 7, 2012, Assured requested that UBS Real Estate cure or repurchase 179 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $79,628,709.  On May 30, 2012, the Trustee reiterated the repurchase requests in Assured's May 7, 2012 letter to UBS Real Estate.

- By a letter dated May 31, 2012, Assured requested that UBS Real Estate cure or repurchase 261 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $98,863,185.  On June 19, 2012, the Trustee reiterated the repurchase requests in Assured's May 31, 2012 letter to UBS Real Estate.

- By a letter dated June 27, 2012, Assured requested that UBS Real Estate cure or repurchase 183 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $54,941,581.  On July 19, 2012, the Trustee reiterated the repurchase requests in Assured's June 27, 2012 letter to UBS Real Estate.

- By a letter dated June 28, 2012, Assured requested that UBS Real Estate cure or repurchase 192 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $172,706,965.  On July 19, 2012, the Trustee reiterated the repurchase requests in Assured's June 28, 2012 letter to UBS Real Estate.

(collectively, the "Breach Notices").  The Breach Notices demanded that UBS Real Estate cure or

repurchase a total of 3,616 mortgage loans with an original unpaid principal balance of

approximately $1,642,318,795, and UBS Real Estate has failed to repurchase all but a small fraction of those defective mortgage loans.

39.   Subsequently further repurchase demands were issued to UBS Real Estate, in accordance with the PSAs, for which the 90-day cure period has yet to expire. Specifically:

- By a letter dated August 17, 2012, Assured requested that UBS Real Estate cure or repurchase 264 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $89,465,828.  On September 14, 2012, the Trustee reiterated the repurchase requests in Assured's August 17, 2012 letter to UBS Real Estate.

- By a letter dated August 17, 2012, Assured requested that UBS Real Estate cure or repurchase 354 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $179,395,420.99.  On September 14, 2012, the Trustee reiterated the repurchase requests in Assured's August 17, 2012 letter to UBS Real Estate.

- By a letter dated August 30, 2012, Assured requested that UBS Real Estate cure or repurchase 180 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $36,216,561.

- By a letter dated September 27, 2012, Assured requested that UBS Real Estate cure or repurchase 228 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $77,841,954.84.

(collectively, the "Additional Breach Notices").  Thus, there are currently outstanding four Additional Breach Notices, delivered in accordance with the PSAs, pursuant to which UBS Real Estate was required to cure or repurchase an additional 1,026 mortgage loans with an original unpaid principal balance of approximately $382,919,764.83.  Together, the Breach Notices and Additional Breach notices demanded that UBS Real Estate cure or repurchase a total of 4,642 mortgage loans with an original unpaid principal balance of approximately $2,025,238,559.83.

40.   In each Breach Notice and Additional Breach Notice, details were given of the violations of the Mortgage Representations that materially and adversely affect the interests of the Certificateholders and Assured in the related mortgage loans, in particular the Mortgage Representation that all mortgage loans were underwritten pursuant to the applicable Underwriting

Guidelines, with all exceptions exercised on a reasonable basis, and the Mortgage Representation that the data in the Mortgage Loan Schedule was accurate. The Breach Notices and Additional Breach Notices are incorporated by reference into this Complaint.

41.     The 90-day cure period for the Breach Notices has expired, but UBS Real Estate has failed to repurchase or substitute all but a small percentage of the defective mortgage loans.

**F.     Resulting Damage to the Certificateholders and Assured**

42.     UBS Real Estate's breaches of the Mortgage Representations, through the inclusion of defective mortgage loans in the Transactions, as well as its breaches of its repurchase obligations, go to the very core of the bargain between the parties. Contrary to the Mortgage Representations, the Transactions were assembled from toxic mortgage loans, which present a materially greater risk of delinquency and default and have become delinquent and defaulted at much higher rates than they would have had they conformed to the Mortgage Representations. As of September 25, 2012, the mortgage loans in the 2006-OA2 Transaction have suffered $472,120,624.00 in realized losses, 23.45 percent of the original collateral balance of $2,013,321,248.43; the mortgage loans in the 2007-1 Transaction have suffered $413,591,351.13 in realized losses, 19.70 percent of the original collateral balance of $2,099,439,579; and the mortgage loans in the 2007-3 Transaction have suffered realized losses of $645,962,130, 25.01 percent of the original collateral balance of $2,582,881,407.83. As a direct consequence of the breaches of the Mortgage Representations, the Certificateholders' and Assured's risk of loss is far greater than would have been the case had the mortgage loans conformed to the Mortgage Representations. Furthermore, UBS Real Estate, contrary to its contractual commitment, has refused to cure or repurchase all but a small fraction of the defective mortgage loans that it included in the Transactions.

43.     Assured is exposed to additional claims under each of the Policies because additional mortgage loans in each Transaction continue to become delinquent and eventually will be liquidated, which will lead to further shortfalls in the mortgage loan cash flows necessary for the related Trusts to pay required principal and interest on the Insured Certificates, as well as to principal write-downs, for which Assured will have to pay claims under its Policies.  Similarly, Certificateholders face far greater risk that they will not be paid interest and principal.

## FIRST CAUSE OF ACTION
### (Breach of Repurchase Obligations)

44.     Plaintiff repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

45.     This is a claim for breach of contract against UBS Real Estate with respect to its repurchase obligations under each PSA.

46.     In Section 2.03 of each PSA, UBS Real Estate covenanted that, within 90 days of the earlier of its discovery or its receipt of written notice from any eligible party of a breach of any representation or warranty which materially and adversely affected the interests of the Certificateholders or the Certificate Insurer in any mortgage loans, it would cure such breach or repurchase the affected mortgage loan or mortgage loans from the trust at the purchase price set forth in the PSA.

47.     In the Breach Notices for each Transaction, UBS Real Estate was provided with notice of breaches of Mortgage Representations that materially and adversely affected the interests of the Certificateholders and Assured in the mortgage loans underlying each Transaction.  The Breach Notices identified the specific mortgage loans that contained one or more breaches of the Mortgage Representations and described in detail the facts evidencing those breaches.

48.     The 90-day period in which UBS Real Estate was required to cure the breaches identified in the Breach Notices, or repurchase the defective mortgage loans identified therein, has expired.  UBS Real Estate has materially breached the PSAs by failing to repurchase the vast majority of those defective mortgage loans.

49.     Plaintiff has fully complied with its obligations under each PSA.

50.     As a direct result of UBS Real Estate's breaches of its repurchase obligations, Certificateholders and Assured have incurred and will continue to incur damages, including without limitation interest and reasonable attorneys' and accountants' fees and expenses, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE PLAINTIFF requests the Court enter judgment:

      a.     For an award of damages against Defendant, in an amount to be proven at trial, but including at a minimum:

          i.     Certificateholders' and Assured's compensatory and consequential losses, including lost profits and business opportunities;

          ii.     Trustee's attorneys' fees, costs, and expenses associated with enforcing its legal rights under each PSA; and

          iii.     Pre-judgment interest at the maximum legal rate.

      b.     Such other and further relief as the Court may deem just and proper.

Dated:    August 2, 2016                    Respectfully submitted,
New York, New York


                                           QUINN EMANUEL URQUHART
                                           & SULLIVAN, LLP

                                           By:    ___/s/ Sean P. Baldwin_____
                                                  David L. Elsberg
                                                  (davidelsberg@quinnemanuel.com)
                                                  Sean P. Baldwin
                                                  (seanbaldwin@quinnemanuel.com)
                                                  Andrew R. Dunlap
                                                  (andrewdunlap@quinnemanuel.com)
                                                  Steven M. Edwards
                                                  (stevenedwards@quinnemanuel.com)
                                                  Paul P. Hughes
                                                  (paulhughes@quinnemanuel.com)
                                                  Marlo A. Pecora
                                                  (marlopecora@quinnemanuel.com)
                                                  51 Madison Avenue, 22nd Floor
                                                  New York, New York 10010
                                                  Tel:  212-849-7000
                                                  Facsimile:  212-849-7100

                                                  *Attorneys for Plaintiff*

**Appendix**

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| Unreasonable Stated Income | $244,000 | 2006-OA2 | The borrower stated a monthly income of $7,400 as a business manager for a department store and $4,300 per month from employment as an office manager for a doctor.  The lender should have questioned the borrower's claim to have what appeared to be two full-time jobs.  The co-borrower stated income of $6,600 per month as a medical coordinator for an insurance company and $2,800 per month as an instructor for a school.  Moreover, in the initial loan application, the borrower stated income from secondary employment of $2,300 per month, which was later marked through and increased to $4,300 per month.  The borrowers' asset and credit profiles did not support their stated earnings.  The borrowers stated liquid assets of $29,940, which would be less than two months' stated income, and was not indicative of individuals with $253,200 annual income.  The credit report reflected that the borrowers had revolving debt of $42,500, indicating that the borrowers were obligated on revolving debts that were twice their stated monthly incomes.  Given these facts relating to the borrowers' employment, assets, and credit, it was not reasonable for the lender to approve the mortgage loan using the stated income. |
| Unreasonable Stated Income | $187,500 | 2007-1 | The borrower claimed income of $174,996 per year as a field supervisor for local government, and the co-borrower claimed income of $95,000 per year as a teller for a credit union.  The lender failed to question whether the borrowers' incomes were reasonable in light of their employment and credit profiles.  According to the local government's salary chart, which was publicly available at the time, a field supervisor can earn a maximum of $37,776 per year, which is barely one-fourth of the salary the borrower claimed.  According to Salary.com, a head teller in the borrowers' city can make $36,036 per year, which is barely one-third of the salary the co-borrower claimed.  Moreover, the borrowers' credit profiles did not support the income stated.  The borrowers had a total of $84,514 in revolving credit card debt and had used at least 86 percent of the available credit |

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| | | | on six credit cards.  This excess use of credit is not representative of the credit profile of borrowers who earn nearly $270,000 per year.  Given these facts relating to the borrowers' income and credit, it was not reasonable for the lender to approve the mortgage loan using the stated income. |
| Unreasonable Stated Income | $650,000 | 2007-1 | The borrower claimed income of $114,000 per year as a medical consultant for a law office and $75,000 per year as a registered nurse for a regional hospital.  The lender failed to question whether the borrower's income was reasonable in light of her employment (for each job individually and both jobs collectively), credit profile and asset profile.  The loan file did not contain a verification of employment for either job, as required by the Underwriting Guidelines, and the underwriter should have questioned the borrower's claim to have what appeared to have been two full-time jobs.  A letter dated October 19, 2010 from the law office at which the borrower claimed to work stated that the borrower never worked there.  Additionally, the borrower's credit and asset profiles did not support her stated income.  The borrower had over $96,000 in revolving credit card debt on over six credit cards.  Furthermore, the borrower's checking account statements showed beginning and ending balances of $1,190 and $2,935 respectively.  The revolving debt and checking account balances were not representative of a person earning nearly $190,000 per year.  Given these facts relating to the borrower's income, assets, and credit, it was not reasonable for the lender to approve the mortgage loan using the stated income. |
| Use of Improper Loan Qualification Program | $213,500 | 2007-3 | The borrower's initial loan application stated that the borrower owned four properties.  However, the borrower's credit report in the loan file indicated that borrower owned an undisclosed fifth property.  The borrower's final loan application stated that borrower only owned two properties.  In addition to these discrepancies, the loan file contains multiple inconsistencies with respect to the borrower's income and employment.  In the borrower's loan application, the borrower first claimed salaried and commission income from three employers, but later claimed a different salaried and commission income from two |

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| | | | employers.  Moreover, the borrower's credit report indicated that he had only one employer.  The lender did not question these discrepancies, and the loan closed as a reduced documentation loan. |
| Use of Improper Loan Qualification Program | $280,000 | 2007-3 | The borrower claimed income of $90,000 per year on his initial loan application dated February 1, 2007.  However, less than ten days later, the borrower claimed additional income of $59,940 per year on an updated loan application.  The lender did not question these discrepancies, and the loan closed as a reduced documentation loan. |
| Failure to Verify That Borrower's Assets Were Sufficient | $133,730 | 2007-1 | Underwriting Guidelines required the lender to obtain verification of a minimum of $22,924.18 in assets for the borrower to qualify for the loan.  However, the loan file contained only $808.58 in verified assets, and therefore did not meet the minimum requirement in the Underwriting Guidelines. |
| Failure to Verify That Borrower's Assets Were Sufficient | $800,000 | 2007-1 | Underwriting Guidelines required the lender to obtain verification of a minimum of $111,204.56 in assets for the borrower to qualify for the loan.  However, the loan file did not contain any verification of assets. |
| False DTI Ratio | $420,000 | 2006-OA2 | The borrower claimed that she was employed as a Men's Department Manager in a department store, with a stated income of $8,650 per month.  The Work Number revealed that the borrower's employment ended three months prior to the closing of the subject loan.  Considering that the borrower was unemployed at the time of the subject loan, the qualifying income would have been $0.  If the borrower were assumed to have $100 in monthly income instead of $0, that would result in a DTI ratio of 3,487.87 percent, which is many times greater than what was represented in the Mortgage Loan Schedule, and grossly exceeds the maximum DTI ratio of 38 percent allowed by the Underwriting Guidelines. |
| False DTI Ratio | $217,200 | 2007-1 | The borrower failed to disclose all of his owned real estate and all of his mortgages in his loan application.  A Fraudguard report (a website that provides |

| Breach | Loan Amount | Transaction | Description |
|--------|-------------|-------------|-------------|
| | | | access to public record information relating to the borrower, including real estate owned) subsequently obtained by Assured revealed that the borrower failed to disclose two other mortgage loans in the borrower's name as of the date of the subject transaction. Factoring in the undisclosed mortgage payments, the loan's DTI ratio was 191.51 percent, which is more than several times greater than what was represented in the Mortgage Loan Schedule, and grossly exceeds the maximum DTI ratio of 45 percent in the Underwriting Guidelines. |
| False DTI Ratio | $272,000 | 2007-1 | The borrower failed to disclose all of his owned real estate and all of his mortgages in his loan application. A Fraudguard report subsequently obtained by Assured revealed that the borrower failed to disclose one other mortgage loan in the borrower's name as of the date of the subject transaction. Furthermore, the borrower's loan application misrepresented his income. Factoring in the undisclosed mortgage payments and the borrower's actual income, the loan's DTI ratio was 169.34 percent, which is several times greater than what was represented in the Mortgage Loan Schedule, and grossly exceed the maximum DTI ratio of 45 percent in the Underwriting Guidelines. |
| False DTI Ratio | $147,512 | 2007-1 | The borrower failed to disclose all of her owned real estate and all of her mortgages in her loan application. A Fraudguard report subsequently obtained by Assured revealed that the borrower failed to disclose an additional mortgage loan that was in the borrower's name as of the date of the subject transaction. Furthermore, the borrower's loan application misrepresented her income. Factoring in the undisclosed mortgage payments and the borrower's actual income, the loan's DTI ratio was 149.28 percent, which is several times greater than what was represented in the Mortgage Loan Schedule, and grossly exceeds the maximum DTI ratio of 45 percent in the Underwriting Guidelines. |
| False Occupancy Disclosure | $200,700 | 2006-OA2 | The loan was submitted and approved as an owner-occupied transaction. However, a quality control review completed on November 3, 2009 by the private mortgage insurance company revealed that the borrower had informed the original loan officer at the time of application that she was purchasing the home |

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| | | | as an investment.  In particular, the borrower indicated she was purchasing the property as a "straw buyer."  Thus, the information in the Mortgage Loan Schedule stating that the subject property was owner-occupied was not correct. |
| False Occupancy Disclosure | $540,000 | 2007-1 | The borrowers refinanced their home on September 28, 2006.  In their loan application, the borrowers represented the home as their primary residence, and the Mortgage Loan Schedule stated that the property was owner-occupied.  However, a Fraudguard report obtained by Assured revealed that the borrowers occupied another property from September 21, 2000 until December 24, 2009.  Furthermore, a 411.com (a publicly available data base of telephone number listings) search did not list the borrowers as residing at the property.  Finally, the appraisal associated with the subject transaction contains pictures showing that the subject property was vacant at the time of the refinancing.  Thus, the information in the Mortgage Loan Schedule stating that the subject property was owner-occupied was not correct. |
| False Occupancy Disclosure | $1,320,000 | 2007-1 | The subject loan closed on September 7, 2006.  The borrower indicated that he occupied the property as his primary residence, and the Mortgage Loan Schedule stated that the property was owner-occupied.  However, a Fraudguard report subsequently obtained by Assured revealed that the borrower's primary residence was in another state from November 10, 2005 until February 25, 2008.  Thus, the information in the Mortgage Loan Schedule stating that the subject property was owner-occupied was not correct. |
| False Occupancy Disclosure | $356,000 | 2007-3 | The borrower represented in his mortgage loan application that the subject property was his primary residence, and the Mortgage Loan Schedule stated that the property was owner-occupied.  However, the appraisal for the subject property indicated that it was vacant.  Additionally, the verification of mortgage sent from the broker to the mortgage company indicated that the borrower resided in a different city.  Thus, the information in the Mortgage Loan Schedule stating that subject property was owner-occupied was not correct. |
| False LTV | $285,000 | 2007-1 | The borrower had purchased the property only four months prior to the date of |

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| Ratio | | | the loan for $260,000.  If the appraised value of a property is higher than a recent sales price, the Underwriting Guidelines dictate that the increase in value must be reasonable.  The appraisal contains no explanation supporting the rapid increase in the subject property's value.  The LTV ratio using the very recent sales price of the subject property was 109.62 percent, which is substantially higher than the LTV ratio stated in the Mortgage Loan Schedule, and grossly exceeds the maximum LTV ratio of 80 percent in the Underwriting Guidelines. |
| False LTV Ratio | $2,990,000 | 2007-1 | To determine the subject property's value, the appraiser used properties that did not reflect the subject property's location, age, size, design and appeal, inflating the subject property's appraised value and lowering the subject transaction's LTV ratio.  Using an appraised value of the subject property derived from transactions that were more representative of the subject property results in a LTV ratio of 92.41 percent, which is substantially higher than the LTV ratio stated in the Mortgage Loan Schedule, and grossly exceeds the maximum LTV ratio of 80 percent in the Underwriting Guidelines. |