UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, Solely in its capacity as Trustee of MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3, | : : : : : : : : |
| Plaintiff, | : : |
| - against - | : : |
| UBS REAL ESTATE SECURITIES INC., | : : |
| Defendant. | : : |

12-cv-7322 (PKC)

**ECF Case**

**Electronically Filed**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**DEFENDANT'S POST-TRIAL SUR-REPLY**</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Scott D. Musoff
Robert A. Fumerton
Robert L. Dunn
Alexander C. Drylewski
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

Thomas J. Nolan
Allison B. Holcombe
Abraham A. Tabaie
300 South Grand Avenue
Los Angeles, California 90071
Phone:  (213) 687-5000

Charles F. Smith
Lara A. Flath
155 N. Wacker Drive
Chicago, Illinois 60606
Phone:  (312) 407-0700

*Attorneys for Defendant UBS Real
  Estate Securities Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

DISCUSSION .......................................................................................................................2

I.     PLAINTIFFS' RE-UNDERWRITING EXPERT SHOULD BE DISREGARDED..........2

     A.    Plaintiffs Cannot Justify Holt's Lack of Credibility ................................2

     B.    Holt's Analyses Lack Reliability ........................................................4

II.    PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING MAE ......................7

     A.    MAE Must Be Assessed at the Time of Notice or Discovery ................................7

     B.    Holt Did Not Perform Any MAE Analysis.........................................................10

     C.    Plaintiffs' Attempts to Prove MAE Without Holt Fail ..........................................12

III.   PLAINTIFFS HAVE NOT PROVEN R&W BREACHES .........................................14

     A.    Plaintiffs Have Not Proven Breaches of the MLS Rep.........................................14

     B.    Plaintiffs Have Not Proven Breaches of the Guideline Rep ................................17

     C.    Plaintiffs Have Not Proven Breaches of the Mortgage File Warranty ................19

IV.   PLAINTIFFS CANNOT SAVE COWAN'S ANALYSIS.............................................20

V.    PLAINTIFFS HAVE NOT PROVEN THEIR ENTITLEMENT TO DAMAGES ..........23

     A.    Plaintiffs Ignored the PSAs' Damages Formula....................................................23

     B.    Plaintiffs Have Not Proven Proximate Causation.................................................26

CONCLUSION....................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

### CASES

*ACE Secs. Corp. v. DB Structured Prods.*,
   965 N.Y.S. 2d 844 (Sup. Ct. N.Y. Cnty 2013), *rev'd on other grounds*, 977
   N.Y.S. 2d 229 (App. Div. 2013) ....................................................................................8

*Assured Guaranty Municipal Corp. v. DLJ Mortgage Capital, Inc.*,
   44 Misc. 3d 1206(A), 2014 N.Y. Slip Op 51044(U) (Sup. Ct. N.Y. Cnty July 3,
   2014) ...........................................................................................................................14

*Bogdan & Faist P.C. v. CAI Wireless Systems Inc.*,
   745 N.Y.S.2d 92 (1st Dep't 2002) ...............................................................................27

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*,
   No. 13 Civ. 1582(PAE), 2015 WL 4191419 (S.D.N.Y. July 10, 2015) .........................24

*Harkabi v. SanDisk Corp.*,
   891 F. Supp. 2d 527 (S.D.N.Y. 2012) .............................................................................2

*Hotchkiss v. National City Bank of N.Y.*,
   200 F. 287 (S.D.N.Y. 1911), *aff'd sub nom. Ernst v. Mechanics' & Metals
   National Bank*, 201 F. 664 (2d Cir. 1912) ....................................................................8

*Maggio v. Zeitz (In re Luma Camera Service, Inc.)*,
   333 U.S. 56 (1948) .......................................................................................................12

*Marine Carriers Corp. v. Fowler*,
   429 F.2d 702 (2d Cir. 1970) .........................................................................................11

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013) .........................................................................................16

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc.*,
   No. 12 Civ. 7322 (HB), 2013 WL 4399210 (S.D.N.Y. Aug. 15, 2013) ...................23, 25

*MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*,
   Index No. 603751/2009 (Sup. Ct. N.Y. Cnty May 24, 2012) ...........................................14

*McClellan v. I-Flow Corp.*,
   710 F. Supp. 2d 1092 (D. Or. 2010) ...............................................................................6

*Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*,
   559 N.Y.S.2d 883 (1st Dep't 1990) ...............................................................................24

*National Market Share, Inc. v. Sterling National Bank*,
   392 F.3d 520 (2d Cir. 2004) .........................................................................................27

*Nicholson v. 300 Broadway Realty Corp.*,
    7 N.Y.2d 240 (1959) ........................................................................................27

*Tucker v. American International Group, Inc.*,
    No. 3:09-CV-1499 (CSH), 2016 WL 1367725 (D. Conn. Apr. 5, 2016) ........................17

*U.S. Airways, Inc. v. McCutchen*,
    133 S. Ct. 1537 (2013) .......................................................................................24

*United States Equal Employment Opportunity Commission v. Rockwell International
    Corp.*, 60 F. Supp. 2d 791 (N.D. Ill. 1999), *aff'd sub nom. Equal Employment
    Opportunity Commission v. Rockwell International Corp.*, 243 F.3d 1012 (7th Cir.
    2001) ..............................................................................................................6

*United States v. Ochs*,
    548 F. Supp. 502 (S.D.N.Y. 1982), *aff'd*, 742 F.2d 1444 (2d Cir. 1983) ........................5

*United States v. Patterson*,
    219 F.2d 659 (2d Cir. 1955) ...............................................................................12

*Wantanabe Realty Corp. v. City of New York*,
    No. 01 Civ. 10137 (LAK), 2004 WL 169751 (S.D.N.Y. Jan. 28, 2004) ........................21

*Wills v. Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004) .................................................................................11

**RULES**

Fed. R. Civ. P. 26(a)(2)(B) ........................................................................................22

Fed. R. Evid. 803(17) ...............................................................................................16

**OTHER AUTHORITIES**

Anand, Priya, *5 big-shots who lied on their resumes*
    Marketwatch (Sept. 20, 2014), http://www.marketwatch.com/story/5-big-shots-
    who-lied-on-their-resumes-2014-09-18 ..................................................................3

Restatement (Third) of Restitution & Unjust Enrichment § 2 ........................................24

Defendant UBS RESI[1] respectfully submits this sur-reply to Plaintiffs' Reply Post-Trial Brief dated July 26, 2016 ("Reply Brief") (ECF No. 491).

## PRELIMINARY STATEMENT

In its Proposed Findings of Fact and Conclusions of Law, UBS RESI demonstrated the many ways in which Plaintiffs have failed to prove the elements of their claims.  (*See* ECF No. 483.)  Plaintiffs thereafter sought leave to reply in order "to identify the areas as to which there is no material dispute between the parties, to correct certain misstatements of controlling law and facts by UBS, and to address the new legal theories that were raised for the first time in UBS's submissions."  (ECF No. 487.)  But the Reply Brief filed by Plaintiffs not only fails to achieve any of these goals, but continues Plaintiffs' never-ending shell game by introducing yet another set of "revised" loan-level appendices that once again change their defect allegations for hundreds of loans.  And rather than "correct" purported misstatements of law or fact by UBS RESI, the Reply Brief merely advances the same incorrect assertions from Plaintiffs' opening submission and repeatedly attacks "strawman" arguments that UBS RESI never even made.  Finally, far from "address[ing] the new legal theories" in UBS RESI's submission, the Reply Brief skirts critical issues and attempts to distract the Court from the plain language of the governing PSAs.  UBS RESI does not endeavor to comprehensively address here all of arguments contained in the Reply Brief (much of which is merely a repetition of arguments already addressed in UBS RESI's Proposed Findings of Fact and Conclusions of Law), but respectfully submits this sur-reply to address certain mischaracterizations of the facts and applicable law and those arguments raised for the first time in Plaintiffs' latest submission.

---

[1] All capitalized terms shall have the same meanings ascribed to them in UBS RESI's Proposed Findings of Fact and Conclusions of Law, dated July 1, 2016 ("UBS FOF").  Unless otherwise indicated, all emphasis is added.

1

## DISCUSSION

### I.  PLAINTIFFS' RE-UNDERWRITING EXPERT SHOULD BE DISREGARDED

#### A.  Plaintiffs Cannot Justify Holt's Lack of Credibility

UBS RESI has shown definitively that the testimony of Plaintiffs' sole re-underwriting expert, Holt, lacks the requisite credibility, reliability and relevance to support Plaintiffs' claims. (UBS FOF ¶¶ 65-94.)  Ironically, the Reply Brief touts "Holt's extensive underwriting qualifications" (Reply Br. 4) even as Plaintiffs are now forced to admit that Holt "mis-described" the very educational credentials that he claims form the basis of his opinions.  (*Id.* at 9; *see also* UBS FOF ¶¶ 86-88.)  Plaintiffs attempt to downplay Holt's "mis-description" by asserting that it "does not undermine [his] undisputed underwriting qualifications, which are derived not from this single course but from 25 years of practical experience."  (Reply Br. 9.)  Tellingly, Plaintiffs' characterization of this credential as "a single course" puts the lie to Holt's own description in his resume, expert report and trial declaration (as well as his testimony in another trial in this Court) of a three-year "graduate degree from the University of Virginia."  (UBS FOF ¶ 86.)  Plaintiffs also ignore Holt's unequivocal admission on the stand that the characterization of his education was "a false statement."  (Tr. 752:17-20; UBS FOF ¶ 87.)  Given the particular importance of an expert's credentials to the opinions he or she renders at trial, it is no surprise that numerous courts have held that an expert's false testimony in this regard is sufficient grounds to exclude – or, at the very least, heavily discount – that expert's testimony in its entirety.  *See, e.g.*, *Harkabi v. SanDisk Corp.*, 891 F. Supp. 2d 527, 539 (S.D.N.Y. 2012) (discounting testimony of expert who mis-described herself as a "professor" when in fact she

was a "lecturer"); (UBS FOF ¶ 88 (citing cases)).[2]  Plaintiffs half-heartedly attempt to

distinguish this case law in a footnote on the ground that it "involved experts who fundamentally

misrepresented highly relevant qualifications" (Reply Br. 9 n.11), but that same description

applies squarely to Holt's admittedly false statements here.

Plaintiffs similarly cannot dispute that Holt made false statements under oath about his

ability to detect "W-2 fraud" through the presence of commas (or lack thereof) in such forms.

(UBS FOF ¶ 89.)  Plaintiffs brush this aside by claiming that Holt simply "failed to remember,

off the cuff, the exact IRS requirements for including or excluding commas in W-2 forms,"

arguing that this does not "undermine[] his overall credibility, particularly where his findings

with respect to the Loan at issue were not determined solely by that W-2."  (Reply Br. 10.)  This

is a mischaracterization of the record.  Holt was never subjected to an "off the cuff" memory test

and was never asked to recall IRS requirements for W-2 forms on cross-examination – instead, it

was *Holt*, in an attempt to support his strained views after being confronted with evidence to the

contrary, who affirmatively raised the issue on the stand in the first place and testified, without

qualification, that he had "gone through training of red flags to look and see if a W-2 or pay stub

is fraudulent."  (UBS FOF ¶ 89 (citing Tr. 882:10-884:10).)  As Holt opined in his trial

declaration, false statements by an individual borrower "call into question the borrower's

character" as well as "the integrity" of all of the other information in that borrower's loan file.

(PX 1103 ¶ 54.)  The same standards that Holt demanded of borrowers should apply *a fortiori* to

Holt himself, who made multiple false statements under oath that undermine the integrity of his

testimony in its entirety.

---

[2] One does not need to look far to find numerous examples of business executives and other individuals who faced
serious consequences as a result of similar misstatements about their educational qualifications.  *See, e.g.*, Priya
Anand, *5 big-shots who lied on their resumes*, Marketwatch (Sept. 20, 2014), *available at*
http://www.marketwatch.com/story/5-big-shots-who-lied-on-their-resumes-2014-09-18.

### B.     Holt's Analyses Lack Reliability

Putting aside Holt's false statements under oath, UBS RESI has established that Holt committed thousands of errors in his re-underwriting analysis, which has proven to be fundamentally unreliable.  (UBS FOF ¶¶ 68-84.)  Although Plaintiffs now attempt to paint these errors as "minor" and "small-bore" (Reply Br. 5), they cannot deny that at each step of this litigation, Plaintiffs have been forced to withdraw significant numbers of Holt's defect allegations, putting the unreliability of his analyses beyond doubt.  (UBS FOF ¶¶ 81-83.) Indeed, following Holt's August 2015 expert report (*i.e.*, the fourth expert report he submitted in this case), Plaintiffs not only withdrew thousands of defect allegations as to hundreds of loans up to and through trial, but then withdrew another **3,000** alleged defects following the end of trial affecting over **2,300** loans.  (*Id.* ¶ 82.)  Even now – a year after Holt's report – Plaintiffs continue to withdraw *hundreds* of additional defects in the 13 "corrected" loan-level appendices submitted in connection with their Reply Brief, through which they dropped another **915** of Holt's defect allegations affecting **600** loans.[3]

Plaintiffs characterize Holt's mistakes as "programming errors" or "*de minimis*," but *thousands* of errors, whatever their nature, necessarily render Holt's results unreliable.  Most recently, in connection with its Proposed Findings of Fact and Conclusions of Law, UBS RESI noted that Appendix 36 included over 200 loans with different values in the "DTI (Actual)" and "Holt allegation" columns.  (*See* UBS RESI App'x B.)  Plaintiffs respond in their Reply Brief that UBS RESI did not identify any loan where the "alleged inconsistencies call Holt's findings into doubt" (Pl. Reply to App'x B at p.14, n.4) but this is no response at all.  These repeated mistakes reveal that even basic transcriptions performed by Holt were flawed and inaccurate,

---

[3]  As a result of these revisions, 134 loans are no longer alleged to be defective based on any of Holt's findings. Plaintiffs, however, appear to assert that most of these 134 loans are defective as a result of Cowan's analysis.

*hundreds of times*, calling into question the reliability of all of Holt's offered evidence, particularly given that much of his analysis rests on calculations, such as DTI, that require accuracy.[4]  Indeed, it appears that every single time Plaintiffs review the results of Holt's work (or, at least, UBS RESI's criticisms of those results), they withdraw hundreds of defect allegations.  The end result is a continually shifting case with ever-changing allegations that lack all indicia of reliability.  *United States v. Ochs*, 548 F. Supp. 502, 513 (S.D.N.Y. 1982) (discounting witness's "entire testimony" where "[t]he inconsistencies . . . succumb so disfavorably to the indicia of reliability"), *aff'd*, 742 F.2d 1444 (2d Cir. 1983).

The seemingly endless withdrawals of Holt's defect findings aside, Holt's analysis also lacks reliability because of the significant changes he made to his opinions and methodologies, which were driven by Plaintiffs' counsel and resulted in increased alleged defect rates in the loans reviewed.  (UBS FOF ¶¶ 74-79.)  Plaintiffs now argue that Holt's changes "resulted primarily from his review of additional materials, including additional guidelines, loan files, and third-party commercial data" (Reply Br. 7), but this is beside the point.  Holt does not dispute that he reviewed these "additional materials" only at the request of Plaintiffs' counsel and, in many instances, did so for the very first time in his last report even though these same materials were equally available at the time of his earlier reports.  (*See, e.g.*, UBS FOF ¶ 76.)

Plaintiffs counter by asserting that "[l]awyers are allowed to ask experts to consider various materials in reaching their opinions" (Reply Br. 8), but lawyers are not allowed to direct the methodology that forms the basis of the expert's opinions.  Here, Plaintiffs' counsel directed Holt to conduct analyses in a manner that was fundamentally different from his prior work.  For

---

[4]  Plaintiffs' other replies to UBS's Appendix B also fail to make Holt's findings any more credible and demonstrate that the sweeping relief that Plaintiffs seek through their proposed findings of fact cannot be supported by the record evidence in this case.

example, Holt testified that when he and his team "reunderwrote a loan to determine whether it had been originated in guidelines, it was [his] policy never to look at servicing records, such as collection notices and foreclosure documents." (UBS FOF ¶¶ 199-201.)  The reason is plain: in Holt's own words, "one of the goals of reunderwriting is to step into the shoes of the original underwriter who made the loan," and to "go back and look at the loan files [as] if you were taking the application right from the borrower across the desk and reviewing the file." (*Id.* ¶ 199.)  Nevertheless, at the direction of counsel, Holt substantially relied on post-origination documentation in his 2015 report – including the same servicing records, collection notices and foreclosure documents that he previously set aside as irrelevant – in order to manufacture significantly more violations of the Guideline Rep.  (*Id.* ¶ 201.)  Holt was not merely considering materials suggested by counsel – it was a lawyer-driven, fundamental change to his opinions and methodologies.  *See McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1118 (D. Or. 2010) (excluding "ever-changing" expert testimony as tainted by "litigation bias" and holding that "expert reports may be discredited if they 'merely express the opinions of the lawyers who hired them'" (citation omitted)); *U.S. Equal Emp't Opportunity Comm'n v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) (excluding testimony of expert who "was directed to employ principles that contradicted his normal methodology" and "performed analyses he would not normally perform"), *aff'd sub nom. Equal Emp't Opportunity Comm'n v. Rockwell Int'l Corp.*, 243 F.3d 1012 (7th Cir. 2001).  Plaintiffs do not even address, let alone attempt to distinguish, *McClellan* or *Rockwell* in their Reply Brief.[5]

---

[5]  Nor have Plaintiffs ever explained why defect allegations were withdrawn by Plaintiffs' counsel before trial without Holt's knowledge or what the basis was for the withdrawals.  (*See* UBS FOF ¶ 83.)  This further undermines the integrity of Holt's testimony, as he was unable to explain why allegations were dropped from his own trial declaration.  (*Id.*)  Holt's allegations also represent a material departure from the breach allegations originally asserted by Assured, further highlighting the inherently unreliable nature of the re-underwriting work itself.  (UBS FOF ¶ 76 n.16.)

## II.   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING MAE

### A.   MAE Must Be Assessed at the Time of Notice or Discovery

Plaintiffs failed to offer any evidence to establish that each breach "materially and adversely affected" the interests of the Certificateholders in the loan at the time UBS RESI's repurchase obligations were triggered.  (*See* UBS FOF ¶¶ 95-158.)  Plaintiffs instead attempt to characterize the MAE standards set by the Court as "preliminary statements," and argue that MAE should be determined at the time the R&Ws were made.  (Reply Br. 11.)  In its summary judgment decision, however, the Court stated that "the determination of whether the breach 'materially and adversely affect the interests of the Certificateholders . . .' *is assessed as of the cure-repurchase period*" (SJ Order at 18 (emphasis added)), and the case was tried accordingly. This holding accords with the plain language of the PSAs, which uses the term "affects" in referring to the cure-repurchase period.  (*See* UBS FOF ¶ 102.)

Plaintiffs resist this logical conclusion by arguing that "the MAE clause speaks in the present tense because the contract speaks in the present tense."  (Reply Br. 12.)  This generality ignores that the word "affects" is used in a provision of the PSAs that is specific as to time, and speaks to the time period "within ninety (90) days of the earlier of [UBS RESI's] discovery or its receipt of notice from any party of a breach of any representation or warranty made pursuant to this Section 2.03," not the time that the R&Ws were made.  (PX 49 at 74.)[6]  Thus, a natural reading of this provision makes clear that MAE must be assessed as of that later point in time. (UBS FOF ¶¶ 102-3.)

---

[6]  (*See also* SJ Order at 18 n.2 ("The Trustee shall enforce the obligations of the Transferor in accordance with Section 2.03 to correct or cure any such breach of a representation or warranty made herein, and if the Transferor fails to correct or cure the defect within such period, *and such defect materially and adversely affects* the interests of the Certificateholders and the Certificate Insurer in the related Mortgage Loan, the Trustee shall enforce the Transferor's obligations hereunder . . . .") (citing PSA § 2.03) (emphasis in original).)

Plaintiffs' cases discussing *materiality* (Reply Br. 12 n.15) are inapposite and reflect Plaintiffs' continued attempt to conflate materiality and MAE, which, as the Court recognized, are separate requirements under the PSAs. (Tr. 1003:13-20.)[7]  Moreover, Plaintiffs' reliance on cases involving monoline insurers is likewise inapposite. (Reply Br. 15.)  Contrary to Plaintiffs' assertion, UBS RESI did not distinguish these cases simply on the basis that "Plaintiff is not an insurer" (Reply Br. 15), but because they involve statutory rules governing causation and effect that are unique to insurance providers. (*See* UBS FOF ¶ 109.)

Plaintiffs also assert that "requiring an investigation into individual borrowers' circumstances as of points in time after the Trusts closed would undermine the intended simplicity of the repurchase mechanism." (Reply Br. 15.)  Setting aside that Plaintiffs never advanced this argument before filing the Reply Brief, they fail to provide any evidence that the parties intended "simplicity," and Plaintiffs' unilateral view of the repurchase remedy as "simple" cannot trump the clear and unambiguous words of the provision.  Indeed, "[t]he degree to which bargained for remedies are simple or convoluted is a matter for sophisticated commercial actors to address before the execution of a contract.  It is not something to complain about in subsequent litigation." *ACE Secs. Corp. v. DB Structured Prods.*, 965 N.Y.S.2d 844, 851 (Sup. Ct. N.Y. Cnty May 13, 2013) (rejecting contractual interpretation based on party's "frustration that being bound by the strict terms of the contract is laborious and inconvenient"), *rev'd on other grounds*, 977 N.Y.S.2d 229 (1st Dep't 2013).  As Judge Hand held – in a decision upon which Plaintiffs themselves rely (Reply Br. 30 n.40) – "[a] contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties." *Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911), *aff'd sub nom. Ernst v. Mechanics' & Metals Nat'l*

---

[7]  For the same reasons, Plaintiffs' argument that the R&Ws themselves speak only "as of a specific moment in time" (Reply Br. 14) says nothing about the separate MAE requirement.

*Bank*, 201 F. 664 (2d Cir. 1912).[8]

For the same reasons, Plaintiffs' argument that UBS RESI's reading of the MAE requirement is "commercially unreasonable" because it "would not allow the Trusts to recover *anything* for Loans that liquidated before the point of discovery or notice" is also without merit. Plaintiffs ignore that the timing of "notice" is within the control of the parties to the PSAs – such as a certificateholder or certificate insurer – who may choose to pursue the repurchase remedy through the Trustee and the sole remedy provision.  Read in conjunction with the "Purchase Price" formula in the PSAs (*see infra* § V.A), this presupposes that these parties will monitor performance and promptly make decisions about whether to pursue a remedy *before* a loan liquidates.  (*See* UBS FOF Ex. A (*Bank of New York Mellon v. WMC Mortgage*) at 18 ("[T]he parties structured their relationship in a way that requires ongoing disclosure of the performance of the Trust's loans, and limits the time given to the seller to cure any defect or repurchase a defective loan," and, in any event, such arguments do not "provide a sufficient basis in this litigation to ignore" the contractual language at issue); *see also* Reconsid. Order at 7 ("When it comes to written, integrated contracts among sophisticated parties, predictable outcomes in accordance with the expressed intentions of the contracting parties is justice and fairness.").)[9]

In fact, it makes eminent sense that the parties intended for MAE to be assessed at the time of UBS RESI's notice or discovery given that repurchase of a loan out of the Trusts could well be contrary to the interests of the Certificateholders if no MAE exists at that time.  (*See*

---

[8]  Plaintiffs citation to other actions where plaintiffs were denied post-closing discovery from borrowers' employers (Reply Br. 15-16) has no bearing on this action or the unambiguous contractual language to which the parties agreed.  Plaintiffs have not even attempted to obtain such discovery in this litigation.

[9]  Plaintiffs' assertion that a liquidated loan is "quite different" than a loan that has paid in full because the latter "has paid the Trusts all funds owed while a liquidated Loan has not" (Reply Br. 16 n.19) is inaccurate.  A loan that pays in full before maturity will not pay into the Trusts the full amount of interest payments due over the course of the loan's original term.  (*See* DX KJ, Lantz Trial Dec. ¶ 44.)

UBS FOF ¶ 110 n.25.)  If a R&W breach no longer has an MAE, then a fully-performing loan should remain in the Trust so that Certificateholders are not deprived of future interest payments on the loan by having it paid down in full through repurchase.  (DX KJ ¶ 44.)  Thus, while the parties contemplated the possibility of breaching loans in the pools, they also agreed to a limited remedy allowing for repurchase only where an MAE is shown at the time the remedy is sought.[10]

### B.    Holt Did Not Perform Any MAE Analysis

In any event, as proven at trial and as set forth in UBS RESI's Proposed Findings of Fact and Conclusions of Law, Holt repeatedly admitted on the stand that he "did not do any analysis" of MAE at any time, regardless of the standard that applies.  (Tr. 928:11-20; 1192:5-18; *see also* UBS FOF ¶¶ 112-120.)  This is illustrated not only by Holt's clear admissions, but also by the plainly immaterial nature of many of the defects that pervade his expert report, trial declaration and the appendices accompanying Plaintiffs' post-trial submissions.  (UBS FOF ¶¶ 114-16.)  Indeed, in his expert report, Holt simply rejected outright the Court's holding in its decision denying reconsideration that an MAE at origination could be eliminated or offset by later events.  (*Id.* ¶ 119 (chart).)  Unable to reconcile Holt's views with the Court's holding (of which Holt testified he was unaware), Plaintiffs counter only that "[t]he Court made clear that this ruling was not addressed to evidentiary issues."  (Reply Br. 18.)  But this was not an evidentiary ruling, it was a legal interpretation of the plain language of the contract.  Moreover, in light of Holt's admissions, Plaintiffs have not put forth *any* evidence of MAE, under the Court's articulated

---

[10]  Plaintiffs also continue to press their "willful blindness" theory of discovery, which is merely a rebranded version of their "pervasive breach" theory already rejected by the Court.  (UBS FOF ¶¶ 349-350.)  Plaintiffs attempt to differentiate their new theory by arguing that pervasive breach is based on the notice element of Section 2.03 while willful blindness is based on the discovery element of that section.  (Reply Br. 26.)  This is a distinction without a difference – both theories are based on the allegation that UBS RESI was *constructively* aware of breaches based on the large number of breaches of which it is alleged to have been actually aware.  Regardless, Plaintiffs have not satisfied the elements of the willful blindness doctrine in this case.  (*See* UBS FOF ¶¶ 354-364.)

legal standard or any other.  (Reconsid. Order at 6; UBS FOF ¶¶ 101-102.)

Left with no competent expert evidence regarding materiality or MAE, Plaintiffs – who chose to hinge the success of their claims on the testimony of a single re-underwriting expert – cannot establish these essential requirements as to any of the loans at issue.  (UBS FOF ¶ 64); *see, e.g.*, *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (expert testimony required to prove complex, technical issues, such as "the nexus between the injury and the alleged cause").  Plaintiffs erroneously argue that "New York courts do not require expert testimony to establish contractual material or adverse effects" (Reply Br. 11), but the cases they cite concern a general standard of materiality.  Here, by contrast, the MAE analysis requires an expert's assessment of a loan's "layered risks" and potential compensating factors in order to determine whether an alleged defect "significantly increases the risk of loss on the loan."  This determination necessarily requires the expertise of loan re-underwriters – not laypersons.  *See Wills*, 379 F.3d at 46 (requiring expert testimony where causation issue "would not [have been] obvious to the lay juror"); *Marine Carriers Corp. v. Fowler*, 429 F.2d 702, 710 (2d Cir. 1970) (court could not make technical determinations "[w]ithout the benefit of expert testimony").

Finally, Plaintiffs' argument that "UBS has done nothing to rebut Plaintiffs' showing that Holt appropriately considered the cumulative impact of multiple breaches' MAEs" (Reply Br. 22) is flatly wrong.  Throughout the trial and as reflected in its Proposed Findings of Fact and Conclusions of Law, UBS RESI laid out the numerous problems with Holt's so-called "layered risk" approach, including that Plaintiffs have provided no guidance for the Court to assess whether, and by how much, the removal of an alleged defect impacts the MAE for a given loan.  (UBS FOF ¶¶ 121-25.)  Plaintiffs' response that "the fact that multiple breaches cause the MAE to be greater does not mean that the MAE disappears if a breach is eliminated" (Reply Br. 22

n.28) only proves UBS RESI's point.  If, as Plaintiffs posit, a defect can *increase* the MAE, then

by definition its removal can *lessen* the MAE, and the Court is left with no way to know when

the MAE is lessened to the point of being eliminated.  This hole in Plaintiffs' evidence is fatal to

their efforts to prove their case for any of the at-issue loans with multiple alleged defects.

### C.       Plaintiffs' Attempts to Prove MAE Without Holt Fail

Faced with a re-underwriting expert who admittedly performed no relevant materiality or

MAE analysis, Plaintiffs have conjured up alternative theories for establishing MAE.  None of

these theories has merit for the reasons already set forth in UBS RESI's previous submission.

(*See* UBS FOF ¶¶ 132-158.)  Plaintiffs nevertheless continue to argue that "the presumptions of

continuity and backward relation" support the inference that MAEs would persist for over a

decade, asserting that "UBS presents no reason to suspect that the passage of time would mend

underwriting defects."  (Reply Br. 18.)  Putting aside that it is Plaintiffs' burden to show the

existence of MAEs at the relevant time period, the Supreme Court has cautioned that the very

presumptions Plaintiffs seek to invoke "are not rules of law to be applied to all cases, with or

without reason," because "the inference from yesterday's possession is one thing, that

permissible from possession twenty months ago quite another."  *Maggio v. Zeitz*, 333 U.S. 56,

65-66 (1948) (vacating order relying on presumption of continuation where last evidence of

possession was over a year before order).  If ever there were a case where such presumptions

should not apply it is this one, where loans were originated over a decade ago and the underlying

circumstances concern the lives and livelihoods of borrowers scattered across the country, which

can safely be presumed to change – rather than remain static – over a long period of time.  *See*

*United States v. Patterson*, 219 F.2d 659, 661 (2d Cir. 1955) (rejecting presumption as only "as

strong or as weak as the nature of the surrounding circumstances permits" where evidence

showed the records in question changed hands repeatedly and may have been destroyed).

Plaintiffs' arguments regarding instances of so-called "borrower fraud" (Reply Br. 19) fare no better.  (*See* UBS FOF ¶¶ 144-48.)  Plaintiffs, through Holt, have not met even the minimal standards of proving that borrowers engaged in fraud, instead relying solely on hearsay and conjecture (and simply ignoring evidence that does not support their theories).  (*Id.* ¶ 145.) Plaintiffs' argument that "UBS misses the point" when it states that the PSAs do not contain a no-fraud representation because "a breach of warranty revealing fraud causes an MAE" (Reply Br. 19) ignores that Plaintiffs must still show in the first instance that the alleged borrower fraud caused a breach of R&W and Plaintiffs nowhere explain why such breaches cannot be offset by compensating factors just like any other alleged breach.[11]

Plaintiffs' argument that so-called "altered loan terms" can satisfy the MAE requirement (Reply Br. 19) is pure speculation unsupported by any record evidence.  (UBS FOF ¶¶ 149-157.) Plaintiffs readily concede that they have not offered any pricing matrices or testimony from experts or originators regarding how these supposed "altered loan terms" affect the loans' prices (Reply Br. 20), leaving the Court to divine the answer itself.  Their argument that "securitization pricing is not required for the Loan-by-Loan MAE analysis required by the PSAs" (*id.*) glosses over the fact that they have not provided *any* evidence – from a securitization pricing expert, a loan pricing expert, or anyone else – showing how any of the at-issue loans' prices or interest rates would have been "altered," if at all, by the alleged R&W breaches.  Plaintiffs also have no answer to the undisputed fact that, in many of these hypothetical instances (such as the conversion of a stated income loan into a full documentation loan), the "altered terms" on the

---

[11]   While Plaintiffs continue to insist that UBS RESI's vendor, JCIII, provided admissions regarding its view of "fraud as being material" (Reply Br. 19), they do not (because they cannot) point to any record evidence that JCIII ever performed any analysis regarding MAE.  (UBS FOF ¶ 146.)

loan would have resulted in *lower* pricing.[12]

## III. PLAINTIFFS HAVE NOT PROVEN R&W BREACHES

In its proposed findings of fact and related appendices, UBS RESI comprehensively

addressed the reasons why Plaintiffs have not met their burden to prove R&W breaches (*see*

UBS FOF §§ IV-VI.)  Plaintiffs do not offer any meaningful rebuttal to these arguments.

### A. Plaintiffs Have Not Proven Breaches of the MLS Rep

#### 1. Plaintiffs ignore the PSAs' definitions

First, UBS RESI demonstrated that Plaintiffs' interpretation of the MLS Rep as a strict-

liability, overarching no-fraud representation is not supported by the language of the PSAs and

would lead to commercially absurd results, contrary to well-settled New York contract law.

(UBS FOF ¶¶ 161-65.)  If Plaintiffs' reading of the MLS Rep were true, then parties to RMBS

securitizations would never bother bargaining for a no-fraud representation.  *See Assured Guar.*

*Mun. Corp. v. DLJ Mortg. Capital, Inc.*, 44 Misc. 3d 1206(A), 2014 N.Y. Slip Op 51044(U), at

*4 (Sup. Ct. N.Y. Cnty July 3, 2014).[13]

Regarding alleged MLS Rep breaches based on reported Debt-To-Income ratios,

Plaintiffs do not dispute that the definition of Mortgage Loan Schedule refers pointedly to the

---

[12]  Plaintiffs also incorrectly state that "UBS has no response" to their argument that missing documents constitute MAEs.  (Reply Br. 21.)  In fact, UBS RESI has argued throughout this litigation that Plaintiffs have not provided any proof that the allegedly missing documents were missing at origination – the only relevant time period. Moreover, like all R&W breaches, Plaintiffs cannot dispute that the risks associated with missing documents may be offset by compensating factors existing at the time of UBS RESI's notice or discovery.  (UBS FOF ¶¶ 134-36.) Further, UBS RESI did *not* represent that all of the loan file documents would be kept in one place – quite the contrary.  (*See infra* § III.C.)

[13]  Plaintiffs assert that *Assured* "did not address the meaning of the MLS warranty" but do not otherwise address the point for which UBS RESI cited it – *i.e.*, that RMBS industry participants pay more for the added risk protection of no-fraud representations, which would make no sense if the MLS Rep could simply be stretched to cover all of the same alleged conduct.  *See MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, Index No. 603751/2009 (Sup. Ct. N.Y. Cnty May 24, 2012), Tr. 3:17-20 (NYSCEF No. 238-2) (plaintiff's assertion that "there's no difference between a no fraud warranty" and other standard reps "makes no sense because why would anybody get a no fraud warranty if there is no difference").

14

"debt-to-income ratio *of the Mortgage Loan*" – as opposed to the "Mortgagor," as used in other definitions.  (UBS FOF ¶ 171.)  Contrary to Plaintiffs' claim that "UBS does not identify what DTI ratio it believes the definition actually does refer to" (Reply Br. 36), UBS RESI explained that "Mortgage Loans" are in turn defined in the PSAs as those loans "being identified in the Mortgage Loan Schedule."  (*Id.*; PX 49 at 46.)  The definition thus indisputably does *not* refer to the DTI of the borrower and instead points the reader to the DTI of the "loans," *i.e.*, the DTI information identified on the face of the mortgage loan files themselves.  Because Holt admitted that he only attempted to recalculate the DTIs of the "Mortgagors" in assessing MLS Rep violations, his analysis is contrary to the terms of the PSAs and therefore irrelevant.  (UBS FOF ¶ 171.)

Regarding alleged MLS Rep breaches based on Loan-To-Value Ratios, Plaintiffs similarly ignore the relevant PSA definitions.  (UBS FOF ¶ 167.)  Indeed, these definitions make clear that the Loan-to-Value Ratios listed on the MLS are based on the actual appraised value or sales price of the underlying properties.  (*Id.*)  Plaintiffs nevertheless argue that the MLS Rep is violated whenever they can show that "the appraisals could not have been honestly believed, and the AVM results demonstrate that the appraisals for loans where Holt found breaches could not have been."  (Reply Br. 42.)  This position finds no support in the language of the PSAs or anywhere else.

### 2. Plaintiffs blindly relied on inadmissible hearsay

Regardless of the above, Plaintiffs' attempts to prove MLS Rep violations are fundamentally flawed because they rely largely and blindly on inadmissible hearsay sources. (UBS FOF ¶¶ 192-96.)  Plaintiffs cannot dispute that Holt simply took the data found through the Hearsay Sources (without doing any independent analysis of their reliability) and performed simple, straightforward comparisons to the data in the loan files – tasks that do not involve any

15

expertise.  (UBS FOF ¶ 174); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (experts cannot serve "simply as a conduit for introducing hearsay").[14]  Plaintiffs attempt to defend Holt's reliance on statements made by borrowers in bankruptcy records by arguing that Holt "weighed those statements against information in the Loan File and other third-party sources and only relied upon them, for example, where his review led him to conclude that they 'verified the borrower's actual income differed from the stated income."  (Reply Br. 41-42.) This is belied by Holt's own sworn testimony on the stand, where he admitted that he did nothing more than a straightforward comparison of bankruptcy records to the MLS "[j]ust to verify the information" (and in some cases performing "long division"), and simply accepted the accuracy of the bankruptcy materials even where they were contradicted by compelling evidence in the loan files themselves.  (UBS FOF ¶¶ 174, 192-96; Tr. 906:24-907:10 ("THE COURT.  If the bankruptcy filing had a statement by the borrower which indicated a lower income, you would credit that statement over the W-2 in the underwriting file; is that your testimony?  [HOLT]. Yes, sir.  THE COURT.  Okay.  And that would be the practice and the protocol in every case? . . . [HOLT].  *That was our protocol, yes, sir.*") (emphasis added); Tr. 907:24-908:11.) Thus, Plaintiffs' arguments are undermined by the testimony of their own expert.

Moreover, Plaintiffs incorrectly assert that the data Holt found through the Hearsay Sources was admitted for the truth of the matter at trial under the hearsay exception for "commercial records" set forth in Federal Rule of Evidence 803(17).  (Reply Br. 37-38.)  In fact, nowhere in the testimony that Plaintiffs cite is Rule 803(17) even mentioned or the truth of the

---

[14]  Plaintiffs fail to distinguish *Marvel Characters* and the other cases UBS RESI cited for this point, arguing only that they involved "jury trials."  (Reply Br. 37 n.45.)  Nothing in these decisions suggests that their holdings depended on this distinction or indicates that they would have been decided differently had they involved bench trials.

sources discussed.  (*See* Tr. 1185:11-20.)[15]  Further, Plaintiffs mispresent their burden by

claiming that Rule 803(17) does not require a showing that data be collected through a reliable

methodology.  (Reply Br. 38-41.)  As courts have held, such a showing is required to invoke

Rule 803(17).  *See, e.g.*, *Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-CV-1499 (CSH), 2016 WL

1367725, at *17 (D. Conn. Apr. 5, 2016) (holding that court "cannot determine" whether

evidence met the Rule 803(17) exception because "[i]nsufficient background information has

been presented (e.g., as to methods of fact gathering, credentials of the authors) to so qualify this

list" and the plaintiff "offers no proof as to how the list was compiled and no examples of

when/how the list is allegedly used").  Holt offered no testimony as to the collection methods

used to produce the Hearsay Sources, much less testimony sufficient to demonstrate the

reliability of such methods.

### B.  Plaintiffs Have Not Proven Breaches of the Guideline Rep

Second, Plaintiffs have not established that the at-issue loans breach the Guideline Rep.

(UBS FOF § V.)  Plaintiffs' theory of breach is premised on a fundamental misinterpretation of

the Guideline Rep as a guarantee that "*in fact* the Loans complied with the Guidelines,

*regardless of the underwriter's knowledge*."  (Reply Br. 50 (emphasis added).)  But the

Guideline Rep states that the loans were "*underwritten* in accordance with the underwriting

guidelines of the related Loan Seller in effect *at the time of origination* with exceptions thereto

exercised in a reasonable manner."  (UBS FOF ¶¶ 197-98.)  This is a representation that speaks

---

[15]  Plaintiffs responded to UBS's hearsay objection by asking Holt whether he or other underwriters and re-underwriters generally used the Hearsay Sources in the course of their work.  (*Id.*)  Reliance by other experts in the field is the test for whether hearsay may be relied on by experts under Rule 703, not whether statements are an exception to the hearsay rules under Rule 803(17).  As to Rule 703, Holt admitted that he was merely a conduit for this hearsay material (upon which he did not rely in the past), and did not do any expert analysis to determine MLS Rep breaches, definitively undermining Plaintiffs' argument.  As to Rule 803(17), it requires "a sufficient foundation to show that the hearsay to be admitted is a factual, list-type document, created for public consumption using a reliable methodology" – a standard that Plaintiffs made no attempt to meet at trial.  (*See* UBS FOF ¶ 179.)

to a particular moment in time.  Yet, rather than "step into the shoes of the original underwriter who made the loan," which Holt testified was "one of the goals of reunderwriting" (*id.* ¶ 199), or even attempt to call any of the originators to testify at trial, Holt and Plaintiffs simply deem the underwriting of thousands of loans defective based on hindsight and post-origination information of which the originators could not possibly have been aware.  (*Id.* ¶ 201-10.)  At the same time, Holt *ignored* post-origination information where it contradicted his findings of breach, further highlighting his "say anything" approach to this case.  (*Id.* ¶ 202.)

Plaintiffs' only response is to attack strawmen arguments – for example, that it is UBS RESI's position "that the Guideline Warranty is essentially a representation that the underwriter did not commit fraud, hence the warranty would not be breached even if the underwriter failed to do her job." (Reply Br. 50.)  UBS RESI has argued no such thing.  Rather, UBS RESI's position is that whether the underwriter "failed to do her job" necessarily must be assessed using the information and materials that were available at the time of origination – a position that comports not only with the plain language of the Guideline Rep and the requirements of the guidelines, but with common sense.

Finally, Plaintiffs' allegations that thousands of loans are in breach of R&Ws based on missing documents suffer from the flawed assumption that where a document is missing from the version of the loan file that Plaintiffs obtained through discovery from various third parties years after the fact, it must have never been included in the loan file at origination.  (UBS FOF ¶¶ 216-240.)  Holt repeatedly admitted that multiple versions of these loan files may exist and Plaintiffs' counsel conceded that they simply chose to review the "larger" file.  (*Id.* ¶ 221 & n.49; *see also* Reply Br. 53.)  Remarkably, Plaintiffs argue that "UBS presents no reason to believe that smaller versions of these files would contain the specific missing documents at issue." (Reply Br. 53.)

In fact, UBS RESI presented at trial numerous instances where Holt alleged defects based on documents missing from his purportedly "larger" version of the loan file, only to have Grissom find those allegedly missing documents in the files she reviewed.  (UBS FOF ¶¶ 222-24.)[16] Moreover, while Plaintiffs attempt to support their conspiracy theory that hundreds of originators, supervisors, closing agents, borrowers and sellers across the country were working together to close thousands of loans without critical and necessary documents (*id.* ¶¶ 234-36), the most they can offer is the supposed "unrebutted testimony of the frenzied nature of the mortgage market before 2008."  (Reply Br. 54.)  This generalized, *ipse dixit* assertion – which did not appear in any of Plaintiffs' expert reports – is wholly insufficient to carry their burden to prove breaches based on missing documents.

### C.      Plaintiffs Have Not Proven Breaches of the Mortgage File Warranty

Plaintiffs largely ignore that the "Mortgage File" is an expressly defined term consisting of certain enumerated items (UBS FOF ¶ 241), and instead continue to insist that "UBS RESI never obtained the *Loan Files*."  (Reply Br. 48.)  Not only is the "Mortgage File" different than a "Loan File," but Plaintiffs also disregard the text of the Mortgage File Warranty itself, which states that UBS RESI "is in possession of a complete Mortgage File *except for* documents which have been *delivered to the Trustee* or which have been *submitted for recording and not yet returned.*"  (*Id.* ¶ 243; PX 49 at 196 (emphasis added).)  This is a qualified representation manifestly stating that UBS RESI does *not* have all the contents of the Mortgage File, much less the complete loan files.  Plaintiffs offered no meaningful response to this in their Reply Brief.

---

[16]  Plaintiffs continue to double down on Holt's incredible testimony that underwriters immediately "digitized" complete versions of loan files at origination such that it would be "highly unlikely that documents fell out of the digital files after the Loans were made."  (Reply Br. 53.)  This theory is directly contradicted by Holt's own admissions that several different versions of the loan files existed in many instances, and the undisputed fact that Grissom repeatedly found documents in the files she reviewed that Holt deemed "missing."  (UBS FOF ¶¶ 220-24.)

Moreover, Plaintiffs do not dispute that Section 2.02 of the PSAs required "the Custodian, *on behalf of the Trustee*," to take possession of the Mortgage Files at closing and certify their completeness to the Trustee, who, in turn, was required to notify UBS RESI of any missing documents.  (UBS FOF ¶ 246.)  Plaintiffs offered no evidence that the Custodian, acting on behalf of U.S. Bank, ever certified to any document defects in any of the Mortgage Files at issue or that U.S. Bank ever notified UBS RESI of such defects.  Plaintiffs attempt to turn the tables by arguing that "UBS has presented no evidence that the Custodian notified the Trustee of any such defects" and therefore "the Trustee was under no obligation to provide notice under Section 2.02, prompt or otherwise."  (Reply Br. 49 n.61.)  But Plaintiffs have never produced any evidence that document deficiencies were ever communicated to or from the Trustee either.  In any event, either the Custodian never identified any document deficiencies to the Trustee (U.S. Bank) or the Custodian *did* identify document deficiencies and U.S. Bank failed to notify UBS RESI as required under the PSAs.  In neither case can Plaintiffs recover for any of the loans at issue based on an alleged breach of this representation.[17]

## IV.   PLAINTIFFS CANNOT SAVE COWAN'S ANALYSIS

Plaintiffs also provide no meaningful response to UBS RESI's showing that Cowan – who owns the expert firm that employs Holt – gave trial testimony that is inadmissible, unreliable and insufficient to establish any breaches of R&Ws.  (UBS FOF ¶¶ 256-308.)  First, Cowan's analyses are insufficient to prove breaches of the Guideline Rep.  In their Reply Brief, Plaintiffs do not even respond to UBS RESI's showing that the use of AVMs was not permissible under the Guidelines, as Holt admitted, and therefore Cowan's testimony does not

---

[17]  Plaintiffs' position also ignores the testimony of U.S. Bank's own witness, Ms. Reynolds, who testified that legal ownership of the loans was assigned to the Trusts at closing.  (*See* UBS FOF ¶ 20.)

and cannot show any Guideline Rep breaches.  (*See* UBS FOF ¶¶ 275-76.)

Second, Cowan's analyses similarly are insufficient to prove breaches of the MLS Rep. The PSAs' definitions make clear that the "Loan-to-Value Ratio" information included on the Mortgage Loan Schedule was based on the *actual* appraised values or *sales prices* of the underlying properties *at the time of origination* – not a retrospective AVM employed a decade later to second-guess those measures.  (UBS FOF ¶ 167.)  In the face of these unambiguous definitions, Plaintiffs characteristically shift the target by claiming that UBS RESI did not "offer any testimony in defense of the appraisals" underlying the loans alleged to be in breach.  (Reply Br. 42.)  Plaintiffs ignore that it is their burden to prove how and whether any individual appraisal gave rise to a breach of R&Ws under the plain language of the PSAs, which conclusively forecloses their ability to do so through Cowan.

Plaintiffs also try to amend their allegations yet again for purposes of the MLS Rep by asserting that they have proven breaches where the "appraisals in question exceeded *all ten* of the comparable sales prices used by the AVM or were above the 68% upper bound" because such appraisals were unreasonable.  (Reply Br. 41-42.)[18]  However, even if Plaintiffs' theory were correct (and it is not, *see* UBS FOF ¶¶ 256-76), Cowan readily admitted on the stand that AVMs are subject to significant variability and cannot be used to accurately value individual properties.  (*See id.* ¶¶ 263-270.)  At trial, Cowan tried to walk back his admission that he did not know whether an individual AVM mean is more accurate than an appraisal (Reply Br. 43), but this change in testimony does not make Plaintiffs' claims any more viable and serves only to undermine Cowan's credibility.

---

[18]  Plaintiffs claim that the 68% upper bound was "advocated by [UBS RESI's] own expert, Barnett."  (Reply Br. 42-43.)  This is not true.  Dr. Barnett merely explained that Cowan's professed reason for changing his methodology from using the 68% upper bound in 2014 to the AVM mean in 2015 was demonstrably false, and that the result of this change was to dramatically drive up the breach rate.  (DX OX, Barnett Trial Dec. ¶¶ 45-53.)

Third, for purposes of the so-called "Maximum LTV Ratio Warranty," the definition of Loan-to-Value Ratio states that the loans' LTVs must be calculated "in accordance with applicable state laws regarding primary mortgage insurance" – an analysis that Cowan utterly failed to even consider, let alone perform. (*See* UBS FOF ¶¶ 271-73.) Plaintiffs quibble with this definition, arguing for the first time in their Reply Brief that loans with LTVs under 80% need not be calculated in such a manner. (Reply Br. 47.) But, by its plain terms, the definition of Loan-to-Value Ratio applies to *all loans* for purposes of determining violations of the Maximum LTV Ratio Warranty and, in any event, Plaintiffs cannot dispute that Cowan never complied with the only alternative calculation set forth in the definition of Loan-to-Value Ratio – *i.e.*, the actual appraised value or sales price of the underlying property at origination. (UBS FOF ¶ 271.) Thus, Cowan's analysis based on a retrospective AVM is equally irrelevant to whether the Maximum LTV Ration was breached.

Fourth, in their Reply Brief, Plaintiffs unsuccessfully try to explain away Cowan's significant credibility problems – for instance, by claiming that Cowan's blatant about-face regarding whether he changed his methodology was merely a "linguistic dispute." (Reply Br. 46.) In reality, Cowan swore under oath in response to UBS RESI's pre-trial motion in limine: "*[m]y methodology did not change*." (DX XK ¶ 18 (emphasis added).) During cross-examination, however, Cowan readily admitted that Phoenix's and Lewtan's AVMs were entirely different and that his analysis of their respective outputs used a "*completely different methodology*." (UBS FOF ¶ 302 (emphasis added).) Try as Plaintiffs might, this blatant inconsistency cannot be reconciled or simply brushed aside.

Finally, Plaintiffs attempt to justify their own Rule 26(a)(2)(B) failures by blaming UBS RESI for not affirmatively requesting that Cowan or Phoenix provide the information they failed

to disclose.  (Reply Br. 45-46.)  Of course, this argument turns Federal Rule of Civil Procedure 26(a)(2)(B) on its head.  It is *Plaintiffs'* obligation, without being asked, to disclose "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B).[19]  To the extent Plaintiffs continue to claim that UBS RESI should have attempted to obtain discovery from Phoenix, Federal Rule of Civil Procedure 26(b)(4) provides only for discovery from experts *who will be testifying at trial*, and Plaintiffs did not identify a single individual from Phoenix as a testifying expert.  Rather, Cowan merely disclosed that he was relying upon Phoenix's work, while at the same time shielding its methods behind claims that Phoenix's work was "proprietary" and/or that he was not aware of Phoenix's methodology. (UBS FOF ¶¶ 292-99, 306-08.)  Cowan's testimony should be excluded on this ground alone.

## V.   PLAINTIFFS HAVE NOT PROVEN THEIR ENTITLEMENT TO DAMAGES

### A.   Plaintiffs Ignored the PSAs' Damages Formula

Plaintiffs have not proven their entitlement to damages for the simple reason that their damages expert failed to follow the unambiguous Purchase Price formula set forth in the PSAs, which constitutes the parties' agreed-upon "sole remedy" for breaches of R&Ws.  (UBS FOF ¶¶ 389-98); *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 7322 (HB), 2013 WL 4399210, at *4 (S.D.N.Y. Aug. 15, 2013) ("No matter now the breach is characterized, Plaintiffs' repurchase remedy is limited to 'the Purchase Price' under the PSAs.").  That contractual limit is enforceable.  *See, e.g.*, *Mom's Bagels of N.Y., Inc. v. Sig*

---

[19]  Plaintiffs' citation to *Wantanabe Realty Corp. v. City of New York*, No. 01 civ. 10137 (LAK), 2004 WL 169751 (S.D.N.Y. Jan. 28, 2004), is misplaced.  There, the court found that "the material omitted played no more than a minor role in [the expert's] analysis," *id.* at *2, whereas here Cowan omitted foundational aspects of his opinion until trial, including variables used in identifying purported comparable properties until trial and never disclosed Phoenix's methodology, which prevented UBS RESI from being able to replicate Cowan's and Phoenix's work and, therefore, severely prejudiced UBS RESI's ability to analyze their findings.  (*See* UBS FOF ¶ 306.)

*Greenebaum, Inc.*, 559 N.Y.S.2d 883, 885 (1st Dep't 1990) ("We have long held that parties to a commercial contract, absent any question of unconscionability, may agree to limit the seller's liability for damages.").

Plaintiffs cannot dispute that the Purchase Price formula, by its terms, refers to the outstanding principal balance of the loan as of the date of repurchase – *i.e.*, the date of UBS RESI's actual repurchase "pursuant to Section 2.02 or 2.03." (UBS FOF ¶¶ 392-93.) Nevertheless, they argue that the Court should deviate from this agreed-upon definition based on general principles of fairness, arguing that "the most equitable solution is to calculate damages for liquidated loans based on the dates that UBS *should have* repurchased those Loans." (Reply Br. 73.) This position flouts the parties' agreement and finds no basis in the law. *See U.S. Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1547-48 (2013) ("[H]ewing to the parties' exchange yields . . . 'equitable relief' [because the] agreement itself becomes the measure of the parties' equities" (citation omitted)); Restatement (Third) of Restitution & Unjust Enrichment § 2 reporter's notes cmt. c (2011) ("'[T]here is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation.'" (citation omitted)); *see also Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, No. 13 Civ. 1582 (PAE), 2015 WL 4191419, at *9 (S.D.N.Y. July 10, 2015) (notion that in undertaking equitable analysis, "the law favors contractual guideposts" as to the measure of recovery "because a contract makes the parties the masters of their destiny").

The decision in *Bank of N.Y. Mellon v. WMC Mortgage, LLC* is directly on point. (UBS FOF ¶¶ 395-397; Ex. A.) There, the court rejected the very same arguments advanced by Plaintiffs here, concluding that the plaintiff trustee was bound by a materially identical purchase price formula and holding that "the merits of the parties' arguments rest upon the text of the

contract they signed, and whether the equitable remedies requested are sufficiently tethered to that contract."  (UBS FOF Ex. A at 20.)  The court also dismissed Plaintiffs' argument here that following the parties' damages calculation would "create a perverse[] incentive for a sponsor to fill the trust with junk mortgages that would expeditiously default" (Reply Br. 75), concluding that "it is not so clear that the [purchase price] formula here necessarily creates any perverse incentive to delay repurchase of a concededly defective loan" and emphasizing that "even if such incentives may have arisen here, [the trustee] has not shown that they provide a sufficient basis in this litigation to ignore the parties' agreed upon formula for measuring the value of a liquidated loan."  (UBS FOF Ex. A at 18); *see also MARM 2006-OA2*, 2013 WL 4399210, at *3-4 (rejecting Plaintiffs' argument that equitable principles may allow them to seek "damages that are greater than those that are commensurate with the sole remedy clause").

Plaintiffs argue that *WMC* is "not applicable here" based on their manufactured distinction between the definitions of "Stated Principal Balance" there and "Principal Balance" here.  (Reply Br. 74.)  But there is no material difference between the two defined terms, which contemplate the outstanding "principal balance of such Mortgage Loan," plus accrued interest and certain other costs, and assign a principal balance of "zero" to liquidated loans.  (*Compare* UBS FOF Ex. A at 6 *with* PX 49 at 56.)  Indeed, the relevant contractual provisions in both cases are nearly identical in all material respects.  Plaintiffs argue that the "Principal Balance incorporated into the Purchase Price definition for a liquidated Loan is zero only 'during the related Prepayment Period.'"  (Reply Br. 74.)  This is a distinction without a difference, as the "Prepayment Period" is defined simply as "the calendar month preceding the month in which [a] Distribution Date occurs."  (PX 49 at 55-56.)  Thus, the "related Prepayment Period" merely refers to the time period in which to determine whether a loan is a Liquidated Loan, and

25

Plaintiffs do not explain how this reference can alter the party's unambiguous agreement that the Purchase Price must be based on the "outstanding Principal Balance of such Mortgage Loan as of the date of purchase" for any given loan.  (*Id.* at 57; UBS FOF ¶¶ 392-93.)

Finally, even if the Court were to agree with Plaintiffs that it should "calculate damages for liquidated Loans based on the dates that UBS should have repurchase those Loans" (Reply Br. 73), this would still not save Snow's analysis for the large number of loans that liquidated prior to the date on which UBS RESI allegedly "should have" repurchased them.  For those loans, Snow calculated a purchase price using the outstanding principal balance *just prior to the date of liquidation* – a result that has nothing to do with any supposed repurchase obligation of UBS RESI and finds no support in the PSAs.  (UBS FOF ¶ 394; Ex. A at 10 (rejecting plaintiff's damages expert's use of "purchase price" formula that used "the outstanding principal balance on the loan just prior to liquidation").  Plaintiffs' improvised damages formula, which is untethered to the actual language of the PSAs, should thus be rejected.[20]

### B.    Plaintiffs Have Not Proven Proximate Causation

Even if Plaintiffs could recover broader damages than those allowed under the agreed-upon Purchase Price formula (and they cannot), they would be required to prove that such damages were directly and proximately caused by UBS RESI's alleged breaches.  (*See* UBS FOF ¶¶ 399-403 (citing cases).)  Absent an agreed-upon contractual remedy, "[c]ausation is an essential element of damages in a breach of contract action" and Plaintiffs have the burden to prove that the "defendant's breach directly and proximately caused his or her damages."  *Nat'l*

---

[20]  Snow also erred in failing to exclude from his damages calculation payments made to insured Certificateholders, who have not suffered any losses on account of that insurance.  (UBS FOF ¶¶ 404-408.)  Plaintiffs' principal response is that "UBS presented no evidence as to any purported payments by Assured" (Reply Br. 81), but Snow himself expressly calculated "Assured Adjusted" damages in his expert report to account for such payments – calculations that he removed from his trial declaration.  (UBS FOF ¶ 404.)

*Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).   Plaintiffs respond

that causation is not an element of the equitable damages remedy they seek in this case.  (Reply

Br. 76.)  That is wrong under New York law.  Courts require causation even where they award

money damages in equity because a contractually-specified equitable remedy "appears to be

impossible or impracticable."  *See Bogdan & Faist P.C. v. CAI Wireless Sys. Inc.*, 745 N.Y.S.2d

92, 96 (3d Dep't 2002) ("[U]pon a proper showing a court in equity may award" the "*actual or

direct damages . . . as a consequence of*" the breach "in lieu of the desired – but impossible to

confer – equitable remedy" (emphasis added)); *Nicholson v. 300 Broadway Realty Corp.*, 7

N.Y.2d 240, 242 (1959) (although sale of property "renders impossible a decree of specific

performance, . . . there still remains the possibility of damages *stemming from breach of the

agreement*." (emphasis added)).

　　　　Plaintiffs' argument that requiring them to prove an essential element of any breach of

contract claim is "incompatible with the contracts" because the PSAs do not require causation

(Reply Br. 77-78) seeks to have it both ways.  Plaintiffs cannot pick and choose which parts of

the PSAs they will comply with and which they will not.  They are bound to follow the

contractual requirements of the PSAs (including the Purchase Price formula, which Snow

ignored), and they certainly cannot go beyond the remedial structures of the PSAs to recover

general breach-of-contract damages without proving that such damages were proximately caused

by the breach (which they have not even attempted to do).[21]  Plaintiffs' position – based on

abstract notions of "equity" – would have this Court allow them to not only disregard the parties'

agreed-upon damages calculation, but also to avoid having to prove essential elements of a

---

[21]  Plaintiffs do not cite any cases for the proposition that they are relieved of proving an element of their claim
simply because it is equitable in nature.

breach of contract claim.  It is hard to imagine a result more inequitable.[22]

## CONCLUSION

For the reasons stated herein and those contained in UBS RESI's Proposed

Findings of Fact and Conclusions of Law, UBS RESI respectfully requests that the Court enter

judgment in its favor.

Dated: August 23, 2016
       New York, New York

Respectfully submitted,

/s/ Scott D. Musoff

Scott D. Musoff
Robert A. Fumerton
Robert L. Dunn
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

Thomas J. Nolan
Allison B. Holcombe
Abraham A. Tabaie
300 South Grand Avenue
Los Angeles, California 90071
Phone:  (213) 687-5000

Charles F. Smith
Lara A. Flath
155 N. Wacker Drive
Chicago, Illinois 60606
Phone:  (312) 407-0700

*Attorneys for Defendant UBS Real
Estate Securities Inc.*

---

[22]  What is more, Plaintiffs also claim that principles of "equity" allow them to recover prejudgment interest at a rate exceeding the coupon rate of the certificates (Reply Br. 79-80), even though the PSAs set forth a "sole remedy" provision that omits such relief.  (UBS FOF ¶¶ 409-415.)