UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3, | : : : : : : | 12-cv-7322 (PKC) **ECF Case** |
| Plaintiffs, | : : | **Electronically Filed** |
| - against - | : : | |
| UBS REAL ESTATE SECURITIES INC., | : : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DEBORAH GRISSOM

I, Deborah Grissom, under penalty of perjury pursuant to 28 U.S.C. § 1746 declare as follows:

1. I have been retained by Skadden, Arps, Slate, Meagher & Flom LLP, counsel for defendant UBS Real Estate Securities Inc. ("UBS RESI"), as a testifying expert in connection with the above-captioned litigation. I submit this declaration at the request of UBS RESI's counsel in connection with the Court's Memorandum and Order dated September 6, 2016 (Dkt. 505) ("Order") and the Affidavit of Sean P. Baldwin dated September 20, 2016 (Dkt. 507) ("Baldwin Affidavit").

2. I am a Senior Director at Treliant Risk Advisors in the residential mortgage practice. I offered testimony at trial in this matter based on the contents of my expert rebuttal report that evaluated the April 25, 2014 Supplemental Expert Report of Ira H. Holt, Jr. In part, my opinions and analysis are based upon the knowledge, training, experience, professional judgment, and expertise that I have developed during my 29 years working in the residential

mortgage industry.  The facts set forth in this declaration are based on my personal knowledge and/or information obtained in consultation with others at Treliant and FTI Consulting, Inc.  If called upon as a witness, I could and would testify to such facts under oath.

3. In response to the Order, counsel for UBS RESI requested an analysis of the documents submitted by Plaintiff into evidence as the "loan files" (the "PX L Exhibits"). Specifically, counsel asked we survey the PX L Exhibits for any indication of materials that (1) do not relate to the subject loan or (2) are inconsistent with the purported digitization of the loan file shortly after origination and/or during underwriting.  Following the entry of the Order, FTI surveyed 300,766 documents relating to 3,666 loans within the PX L Exhibits.[1]  With respect to these 3,666 loans, we reviewed 643 files produced by JCIII, 2,765 files produced by Assured, 2,117 files produced by U.S. Bank (from Wells Fargo, American Home Liquidating Trust, and Bank of America for Countrywide), and 357 files produced from other entities.

4. Counsel for UBS RESI also asked that I respond to certain factual assertions in the Baldwin Affidavit.

## I. The PX L Exhibits Contain Documents Unrelated to the Subject Loan, Partial and Incomplete Documents, And Are Generally Disorganized.

5. Plaintiff acknowledges that there are documents within the loan files completely unrelated to the underwriting of the loan but attempts to limit these "documents relating to another loan or borrower" to the JCIII-produced files.  (Baldwin Affidavit ¶ 4(1); see also ¶ 22 ("Plaintiff has been able to locate alternative versions of the loan files for all loans referenced in the JCIII production from other sources, including Assured's production.  The loan files produced from these alternative sources appear to be in the form in which they would have been

---

[1] FTI has only been able to review a total of 5,882 loan files relating to 3,666 unique loans since the Court's Order but stands ready and able to continue its review.

maintained by the originators or servicers from which they were originally sourced, and do not appear to contain any documents other than the Origination Documents, Mortgage File Documents, and/or Servicing documents, *nor any documents that do not relate to the loan or borrower at issue*." (emphasis added).) Similarly, Plaintiff asserts that, beyond the JCIII-produced loan files, each loan file is "properly-organized" and in good condition (Id. ¶¶ 4(1), 24, 25, and 28.) Plaintiff also seems to suggest that even if the JCIII-produced documents are disorganized, the documents themselves are intact as Holt purportedly only used those files to find "missing" documents. (Id. ¶ 21.)

6. My review of the PX L Exhibits reveals this is not true. Instead, my review indicates that the loan files produced from all entities contain documents that (i) are missing pages within discrete documents, (ii) contain pages of documents that are in the wrong order; and/or (iii) contain documents that had no relation to the subject property or borrower. Out of the 3,666 loans that we reviewed following the Court's order, 1,603 loans (or 44%) had these issues. Even excluding the files produced by JCIII, 1,465 of the remaining 3,600 loans (or 41%) still presented these issues.

7. For example, PX L10012, which is an Assured-produced loan file, relates to Loan 1393367. Yet, PX L10012 contains a 2009 rejection letter relating to an individual unassociated with the borrower. This file also contains a 2009 credit approval for a different individual than the borrower. Likewise, PX L4934, a US Bank-produced loan file relating to Loan 158899791, contains post-closing documentation for an entirely different borrower and property at pages 5-8 of the loan file.

8. Similarly, Plaintiff introduced two separate PX L Exhibits for Loan 1340222, a JCIII-produced loan file and an Assured-produced loan file (PX L15 and PX L10114,

3

respectively). Yet, each separately-produced copy of this file contains a credit report that does not relate to either the subject borrower or property. The Assured-produced loan file (PX L10114) also includes a cover letter that does not relate to either the borrower or the property at issue in Loan 1340222.

9. PX L2186, which was produced by JCIII, is a prime example of a loan with flawed documents. Within this exhibit, several documents, including critical origination-related documents, are significantly flawed: (1) the loan application starts on page 12 of the application itself and is missing page 4; (2) pages 6 and 7 of the credit report are missing; (3) pages 2-4 of the borrower's W-9 are missing; (4) the title commitment is out of order; (5) the final title policy order is out of order; (6) only page 3 of the deed of trust is present; and (6) page 2 of the flood certification is partially cut off.

10. Although these examples are not exhaustive, they are consistent with the Court's own identification of anomalies within the PX L Exhibits that are at odds with the Plaintiff's description of these documents as "properly-organized" loan files. They also contradict Plaintiff's express assertion that documents relating to another loan or borrower were limited to the JCIII-produced files.

11. These results are also consistent across originator:

| Originator | Loans Reviewed | % of Loans With At Least One Document Missing Pages, With Pages Out of Order, Or With No Relation to the Subject Property or Borrower |
|---|---|---|
| Countrywide | 2,247 | 49% |
| AHM | 1,002 | 33% |
| IndyMac | 79 | 37% |
| MortgageIT | 259 | 33% |
| RFC | 67 | 64% |

4

**II.     Mr. Holt Relied Upon JCIII-Produced Documents To Allege Material Breaches**

12.     Plaintiff asserts that Mr. Holt did not rely on the JCIII-produced loan files "except to confirm they did not contain any core documents that were missing from the other seven sets of loan files." (Baldwin Affidavit ¶ 4(1).)  Plaintiff's own Appendices summarizing Mr. Holt's findings submitted in connection with Plaintiff's post-trial proposed findings of fact and conclusions of law contradict this assertion.  For 326 loans in Plaintiff's post-trial Appendices, Mr. Holt relied upon at least one JCIII-produced document to support his allegation of a material breach.

13.     For example, Appendix 8 ("DTI Ratio") includes Loan 1471432 and the allegation that the borrower's 2006 joint tax returns verified the borrower' true joint annual income.  Appendix 8, Column J ("FID Cites") expressly identifies these tax returns as JCIII-produced documents.  ("Tax Return (L1396 at JCIII0000474606) Tax Return (L1396 at JCIII0000474608).")  See also Loan 1082669 ("Tax Return (L3 at JCIII00000853000, JCIII0000853001) Pay Stub (L2 at JCIII0000852993)"); Loan 1356042 ("Other (L22 at JCIII0000855673) Other (L22 at JCIII0001115755, JCIII0001115756, JCIII0001115757, JCIII0001115769)"); Loan 1370019 ("Tax Return (L41 at JCIII0003505691)"); Loan 1370137 ("Work Number (L42 at JCIII0003874244) Pay Stub (L42 at JCIII0003874373, JCIII0003874460, JCIII0003874464) W-2 (L42 at JCIII0003874460, JCIII0003874461) Tax Return (L42 at JCIII0003874464)"). In each of these examples, Mr. Holt relied upon a JCIII-produced document to support an alleged breach of representation and warranty, contrary to Plaintiff's assertion that "Holt did not rely on [JCIII files] to find material breaches" and that "he only referred to them to *eliminate* possible breaches." (Baldwin Affidavit ¶ 21 (italics in original).)

5

14.     Moreover, at trial, Mr. Holt testified that he used the "larger" file as the purportedly extant version from origination.  In 201 instances, the JC-III produced file contained more pages than any other version.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 27, 2016.

_____

Deborah Grissom