## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3. | ) ) ) ) ) ) |
| Plaintiff, | ) 12-Civ-7322 (PKC) ) ) |
| vs. | ) ) ) |
| UBS REAL ESTATE SECURITIES, INC., | ) ) ) |
| Defendant | ) |

### NOTICE OF MOTION
### OF CERTIFICATEHOLDERS DAVID AND SANDRA VISHER
### TO INTERVENE AS PLAINTIFFS

PLEASE TAKE NOTICE THAT, upon the annexed Memorandum of Law and

Declaration of David Visher, sworn to February 5, 2018 and all prior pleadings and

proceedings had herein, Plaintiffs DAVID AND SANDRA VISHER will move this court

before the Honorable P. Kevin Castel, United States District Judge for the United States

District Court, Southern District of New York, located at 500 Pearl Street, New York,

New York, at a date and time to be determined by the Court, for an Order permitting

Plaintiffs to Intervene pursuant to Federal Rule of Civil Procedure Rules 24(a)(2) and

24(b)(l)(B) in the above-captioned action.

Dated: February 6, 2012

David Visher
28808 Cliffside Drive
Malibu Ca 90265
Telephone: 310-457-7880
Pro Se

Sandra Visher
28808 Cliffside Drive
Malibu Ca 90265
Telephone: 310-457-7880
Pro Se

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3. <br><br> Plaintiff, <br><br> vs. <br><br> UBS REAL ESTATE SECURITIES, INC., <br><br> Defendant. | Civil Civ. Action No. 12-cv-7322 (PKC) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CERTIFICATEHOLDERS DAVID AND SANDRA VISHER FOR LEAVE TO INTERVENE AS PLAINTIFFS**

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   FACTS .................................................................................................................... 1

A.   US Bank Litigation Against UBSREI and Original Interpleader Motion ................... 1

B.   On May 6, 2013 Assured and UBSREI Settled Their Outstanding Claims................. 2

C.   During Discovery US Bank Failed to Get At Least 5,337 IndyMac Loan Files ......... 2

D.   On October 11, 2017 US Bank Distributed Proposed Settlement Agreement ............ 3

E.   On January 2, 2018 US Bank Distributed an Update on Master Process ................... 3

III.  ARGUMENT ........................................................................................................... 4

A.   Intervention is  Timely .......................................................................................... 5

B.   Intervention Plaintiffs Have a Substantial Interest in the Outcome of this Case......... 7

C.   By US Bank's Acts, US Bank Has Shown Collusion, Adversity of Interest, Nonfeasance, or
Incompetence ............................................................................................................... 7

  1.   US Bank's Failure to get 5,337 IndyMac Loan Files During Discovery was Grossly
  Incompetent ............................................................................................................. 7

  2.   US Banks Failure to Immediately Reject the Proposed Settlement was Incompetent........... 11

  3.   US Banks' Failure to Recognize NCUA as a Shill and Axonic as Likely a Shill as well was
  Incompetent ............................................................................................................. 12

  4.   US Banks' Failure to recognize that Keller Rohrback LLP Fee was Grossly Excessive was
  Incompetent ............................................................................................................. 14

  5.   The Trusts May Have Already Been Hijacked or Could be Hijacked in the Future.............. 14

    a)   UBSREI Settlement with Assured in 2013 Could Have Given UBSREI Substantial
    Control over the Trusts ............................................................................................. 14

    b)   Regardless of Legal and Ethical Limitations on Trading with Non-public Information,
    UBSREI may be purchasing Certificates in the Secondary Market ......................................... 16

    c)   UBSREI Could Acquire or has Acquired Control of the Trusts for less than $85 Million 16

  6.   There is Circumstantial Evidence that Collusion Has Already Taken Place in this Litigation
  ......................................................................................................................... 18

D.   Intervenor Plaintiffs Purpose in Intervening is Limited ........................................... 19

IV.   CONCLUSION ........................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Basciani Foods, Inc. v. Mid Island Wholesale Fruit & Produce, Inc.,* 09-CV-4585(JS)(WDW), 2011 U.S. Dist. LEXIS 368, *7 (E.D.N.Y. Jan. 3, 2011) ................................................ 5

*Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179-180 (2d Cir. 2001).......................... 1

*Diversified Group, Inc. v. Daugerdas,* 217 F.R.D. 152, 157 (S.D.N.Y. 2003) ................................ 5

*HL. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 797 F.2d 85, 89 (2d Cir. 1986) ............... 5

*Master Card Int'! Inc. v. Visa Int'! Serv. Ass'n, Inc*., 471 F.3d 377,390 (2d Cir. 2006) .................. 6

*NAACP* v. *New York,* 413 U. S. 345, 366 ........................................................................ 6

*Spangler v. Pasadena City Board of Education*, 552 F.2d 1326, 1329 (9th Cir.1977) ................... 20

*The Pension Committee of the University of Montreal Pension Plan, et al., v. Banc of America Securites, LLC et al*, 685 F.Supp.2d 456 (2010). U.S.D.C.S.D. New York. January 15, 2010 .................. 10

*U.S. Bank Nat'l Ass'n v. UBS Real Estate Secs. Inc.*, 205 F. Supp. 3d 386, 451-55 (S.D.N.Y. 2006) ........ 2, 8

*U.S. Postal Service v. Brennan*, 579 F.2d 188, 192 (2d Cir. 1978) .......................................... 5

*United States v. Peoples Benefit Life Ins. Co.,* 271 F.3d 411, 415 (2d Cir. 2001) ....................... 5

*United Airlines, Inc. v. McDonald* 432 U.S. 385 (1977): ...................................................... 6

*Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.,* 922 F.2d 92, 97 (2d Cir. 1990).. 5

**Statutes**

Federal Rule of Civil Procedure 24(a)(2) and 24(b)(l)(B)........................................... 1, 4, 5

Federal Rule of Civil Procedure Rule 26............................................................ 7

## I.       INTRODUCTION

Intervention Plaintiffs, David Visher and Sandra Visher ("Intervention Plaintiffs"), hereby move this Honorable Court for the entry of an Order permitting Intervention Plaintiffs to Intervene pursuant to Federal Rule of Civil Procedure 24(a)(2) and 24(b)(l)(B) in the above-captioned action. Intervention Plaintiffs' proposed Complaint-in-Intervention is attached as Ex. A to Declaration of David Visher Dated February X, 2018 (hereinafter referred to as "Visher Dec. Ex. A"). Intervention Plaintiffs' interests are related to one of the transactions that is the subject of this action. Intervention Plaintiffs' interests are not adequately protected in this litigation. As explained in greater detail below, the current Plaintiff has exhibited clear "collusion, adversity of interest, nonfeasance, or incompetence" *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179-180 (2d Cir. 2001) at 180, in its prosecution of the Trusts claims against UBSRESI. Intervention Plaintiffs must be permitted to pursue litigation against UBSRESI directly to adequately protect our rights in this matter.

## II.      FACTS

### A.       US Bank Litigation Against UBSREI and Original Interpleader Motion

On September 28, 2012, Trustee/Assured filed a lawsuit against UBSREI to enforce the trusts' right to put back to UBSREI any loan that breached their representations and warranties. On October 15, 2013, Intervention Plaintiffs, along with Alex Bakal and ESM filed a motion to intervene based in part on our belief that our interests were not adequately protected in this litigation. This Court ruled against us in part by stating "Where there is an identity of interest, as here, the movant to intervene must rebut the presumption of adequate

1

representation by the party already in the action.' *Butler*, 250 F.3d at 179-80" (Intervenor

Ruling January 13, 2013 p.4) and that we had failed to show that our representative, US Bank

and its counsel, showed "'collusion, adversity of interest, nonfeasance, or incompetence.' Id.

at 180." (Intervenor Ruling January 13, 2013 p.4)

### B.    On May 6, 2013 Assured and UBSREI Settled Their Outstanding Claims

On May 6, 2013 Assured and UBSREI entered into a settlement agreement with

UBSREI paying Assured $358.5 million and 85% of future losses (Assured 8K May 6, 2013

– Ex. B). $358.5 million was approximately 66% of the losses experienced by Assured to that

date (Visher Dec. ¶ 11)

### C.    During Discovery US Bank Failed to Get At Least 5,337[1] IndyMac Loan Files

*U.S. Bank Nat'l Ass'n v. UBS Real Estate Secs. Inc.*, 205 F. Supp. 3d 386, 475-76

(S.D.N.Y. 2006):

> "As of the Closing Date of the Trusts, there were 5,982[1] IndyMac files among
> the three Trusts. (Barnett Dec. ¶ 18.) IndyMac filed for Chapter 7 bankruptcy protection
> in 2008.
> "According to the Trusts, the loan files are in the hands of OneWest, FSB
> ("OneWest"), the entity that assumed the loan servicing obligations of IndyMac. During
> the initial discovery period in this action (Tr. 1240-41), the lawyers for the Trusts and
> the lawyers for OneWest agreed that OneWest would produce to the Trusts a requested
> sample of loans – 422[1] loan files, or about 7% of all IndyMac loans; the Trusts and
> OneWest further agreed that the Trusts would not seek additional loan files from
> OneWest. (Tr. 1236.)
> "No court precluded the Trusts from demanding more loan files. The Trusts
> never sought relief from any court concerning its private agreement and, indeed, the
> agreement has not been produced to the Court for inspection. There is no claim that the

---

[1] As discussed in Visher Dec ¶ 15, our numbers will differ from the court's numbers in some cases because a complete record of the relevant numbers was not publicly available leading to our need to estimate a full set of numbers. For the sake of consistency, we use our estimates throughout our analysis. This difference does not materially impact our argument.

IndyMac files have been destroyed or impaired. Presumably, they remain securely in the hands of OneWest."

There are approximately 5,805[1] IndyMac loans in the three trusts (Visher Dec. ¶ 15), US Bank received a total of 468 IndyMac loan files from various sources (Baldwin Dec. dated September 20, 2016 ¶ 8), excluding JCIII & Associate produced loan files which have been stricken (Order Dated April 20, 2017) which means, at a minimum US Bank fail to receive 5,337[1] loan files ("Missing IndyMac Loan Files"). This assumes none of the 468 IndyMac loan files received were duplicative, in which case that number would be higher.

### D.    On October 11, 2017 US Bank Distributed Proposed Settlement Agreement

On October 11, 2017, US Bank distributed a Proposed Settlement Agreement with a cover letter from Keller Rohrback LLP which stated that the Proposed Settlement Agreement was a result of "extensive arms-length negotiations" and that it was a "fair and reasonable resolution" (KR Letter dated October 11, 2017 page 2 - Visher Dec. Ex. C). The Proposed Settlement Agreement would involve UBSREI paying the Trusts $543 million (Proposed Settlement Agreement Page 6 - Visher Dec. Ex. D). While US Bank indicated that the two certificate holders which agreed to the Proposed Settlement, NCUA and Axonic, owned certificates in MARM 2007-1 and MARM 2007-3 respectively, US Bank did not reveal which certificates they owned. Keller Rohrback LLP would receive a fee of $12,586,000 plus addition money under certain circumstances. (Proposed Settlement Agreement Page 11 - Visher Dec. Ex. D).

### E.    On January 2, 2018 US Bank Distributed an Update on Master Process

On January 2, 2018 US Bank distributed a notice in which they updated the certificate

holders on the litigation progress. In this notice they indicated that there were approximately 6,757 loans at issue (MARM 2006-OA2 January 2, 2018 Notice p. 3 – Visher Dec. Ex. E) and that 1,295 loans had been resolved (973 liquidated loans and 322 active loans - Visher Dec. ¶ 13). US Bank estimated what the damages would be on the liquidated loans, including the prejudgment interest and legal fees. Using those estimates and the assumption that the benefits of putting an active loan back to UBSREI is approximately 50% that of a liquidated loan, the estimated value of the lawsuit is $538 million if we prevail on none of the 6,757 loans still at issue (Visher Dec. ¶ 13). If we prevail on 50% of those loans, the value of the suit goes to $1.56 billion. (Visher Dec. ¶ 13). To date we have prevailed on 99% of the loans submitted to the master. (Visher Dec. Ex. E - MARM 2006-OA2 Notice dated January 2, 2018 page 3).

## III.    ARGUMENT

Rule 24 (Intervention) provides that a non-party may intervene in the following circumstances:

(a)    Intervention of Right. On timely motion, the court must permit anyone to intervene who:

(2) claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

(b)    Permissive Intervention.

(1) *In General.* On timely motion, the court may permit anyone to intervene who:

(B) has a claim or defense that shares with the main action a common question of law or fact.

**

** 

(3) *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

"For a party to intervene in a case as of right under Rule 24(a)(2), that party must have an interest in the case that is '"direct, substantial, and legally protectable. '" *United States v. Peoples Benefit Life Ins. Co.,* 271 F.3d 411, 415 (2d Cir. 2001) (quoting *Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.,* 922 F.2d 92, 97 (2d Cir. 1990)).

Here, Intervention Plaintiffs have interests that are "direct, substantial, and legally protectable."

In the alternative, permissive intervention under 24(b)(l)(B) would also be appropriate. Permissive intervention is within the court's broad discretion. *Diversified Group, Inc. v. Daugerdas,* 217 F.R.D. 152, 157 (S.D.N.Y. 2003); *see U.S. Postal Service v. Brennan,* 579 F.2d 188, 192 (2d Cir. 1978). In exercising that discretion, courts consider factors that include "'the nature and extent of the intervenors' interests,' the degree to which those interests are 'adequately represented by other parties,' and 'whether parties seeking intervention will significantly contribute to [the] full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" *Id.* (quoting *HL. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 797 F.2d 85, 89 (2d Cir. 1986)). "The test is flexible and courts generally look at all of the factors rather than focusing narrowly on any one of the criteria, [and] district courts have considerable discretion in making this evaluation." *Basciani Foods, Inc. v. Mid Island Wholesale Fruit & Produce, Inc.,* 09-CV-4585(JS)(WDW), 2011 U.S. Dist. LEXIS 368, *7 (E.D.N.Y. Jan. 3, 2011) (citations omitted).

## A.    Intervention is Timely

For either subpart, the court must first consider whether the motion is timely. "Factors

5

to consider in determining timeliness include: (a) the length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness." *Master Card Int'! Inc. v. Visa Int'! Serv. Ass'n, Inc.*, 471 F.3d 377,390 (2d Cir. 2006)).

While intervention more than 5 years after the initiation of a lawsuit may not seem to be timely, the unusual circumstances surrounding this motion completely mitigate that fact. First, we did intervene 17 days after the suit was initiated. Second, we did it on the basis that we knew we would not be properly represented. Third, our initial intervention motion was denied because we did not have concrete evidence that our representation was incompetent. Fourth, evidence of such incompetence or worse, as fully outlined below, took time to reveal itself as litigation progressed. Therefore, for us to be bound by the past and future incompetent actions of our representative in these circumstances is manifestly unjust.

Courts have consistently found that the timeliness requirement is not a purely chronological one and have allowed intervention even post judgement given appropriate facts. For instance, in *United Airlines, Inc. v. McDonald* 432 U.S. 385 (1977):

"Our conclusion is consistent with several decisions of the federal courts permitting post-judgment intervention for the purpose of appeal.(citation) The critical inquiry in every such case is whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment. Cf. *NAACP v. New York*, 413 U. S. 345, 366. Here, the respondent filed her motion within the time period in which the named plaintiffs could have taken an appeal. We therefore conclude that the Court of Appeals was correct in ruling that the respondent's motion to intervene was timely filed

and should have been granted." (p. 396)

Therefore, intervention is timely.

## B.     Intervention Plaintiffs Have a Substantial Interest in the Outcome of this Case

If US Bank prevails on just 50% of the loans still at issue, which we view as a very conservative estimate, the value of the suit to the trust would be approximately $1.56 billion. (Visher Dec. ¶ 13). Given the waterfall provisions of MARM 2006-OA2 and the certificates that Intervenor Plaintiffs own, this would result in an additional $8.8 million payment being made to Intervenor Plaintiff as compared to what would have resulted had the Proposed Settlement been accepted (Visher Dec. ¶ 18). We have an interest.

## C.     By US Bank's Acts, US Bank Has Shown Collusion, Adversity of Interest, Nonfeasance, or Incompetence

### 1.     US Bank's Failure to get 5,337 IndyMac Loan Files During Discovery was Grossly Incompetent

Federal Rule of Civil Procedure Rule 26 provides the following with regards to the scope and limits of discovery –

(b) Discovery Scope and Limits.

(1) Scope in General. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

It is indisputable that the loan files were relevant to discover whether a loan was breached. US Bank was fully aware of this fact. Holt, US Bank's expert, testified:

The loan files are the originator's proof that the loans were originated in accordance with guidelines, industry standards, and all applicable representations and warranties. By reviewing the

7

documentation in the loan file supporting approval in conjunction with the applicable underwriting guidelines, a re-underwriter can determine, among other things, whether the originator's guidelines were correctly applied, and if not, whether the deviation from the guidelines was supported by legitimate compensating factors. (Holt Direct Para. 57)

There were 17,082 loans in the three trusts (*U.S. Bank Nat'l Ass'n v. UBS Real Estate Secs. Inc.*, 205 F. Supp. 3d 386, 399 (S.D.N.Y. 2006) ) of which only 14,402 loan files were provisionally received into evidence (id. p. 451) (This seems to be contradicted by table below). Subsequently, the loan files produced by JCIII & Associate were stricken (Order Dated April 20, 2017). In Sean Baldwin's Declaration dated September 20, 2016, he included, paragraph 8, the following table showing the source of all the loan files that US Bank received in discovery:

| Producing Entity | Originator [No. of Loan Files] | Bates Prefix |
|---|---|---|
| **Assured** | American Home Mortgage [2104]<br>Countrywide Home Loans [3137]<br>IndyMac [84]<br>MortgageIT [151]<br>Residential Funding Corp [115] | AGM |
| **UBS** | American Home Mortgage [77]<br>Countrywide Home Loans [156]<br>IndyMac [24]<br>MortgageIT [1] | LF<br>UBS-USBANK |
| **UBS on Behalf of JCIII** | American Home Mortgage [1767]<br>Countrywide Home Loans [413]<br>IndyMac [70]<br>MortgageIT [135]<br>Residential Funding Corp [99] | JCIII |
| **U.S. Bank (from Wells Fargo)** | Chevy Chase [13]<br>MortgageIT [5] | USBANK-UBS |
| **U.S. Bank (from American Home Liquidating Trust)** | American Home Mortgage [5] | USBANK-UBS |
| **U.S. Bank (from Bank of America, for Countrywide)** | Countrywide Home Loans [3781] | USBANK-UBS<br>USBANK-UBS-LF |

| OneWest | IndyMac [360] | OWB |
|---|---|---|
| **MortgageIT** | MortgageIT [538] | LW-ASSURED LW-MASTR |

Excluding the JCIII loan file, this table list in aggregate totals 10,551 loans, of which 468 loans are IndyMac loans. But this includes approximately 1,020 duplicative Countrywide loan files so the total number of loan files produced was 9,531 (Visher Dec. ¶ 15). Assuming none of the other loan files are duplicative, the Missing IndyMac Loans Files, numbering 5,337 in total, equal 55% of the total loans produced. If IndyMac loans suffered a similar breach rate as the other loans in the trust this would mean damages would be 55% higher if these loans were included. Using our conservative estimate of damages of $1.56 billion for 9,531 loan files, (Visher Dec. ¶ 13), this would lead to an estimate of damages of $2.43 billion, or $873 million more. ($1.56 billion/9,531 x 5,337)

But the IndyMac loan files are not the only missing loan files. Ignoring the stricken JCIII loan files, 1,406 of the American Home files are missing, or 39% of American Home total, and 809 of the Other Originators files or 49% of the Other Originators total. (Visher Dec. ¶ 15). Using the same damages assumptions as above, this is a loss of an additional $362 million ($1.56 billion/9,531 x 2,215) that the trusts could expect to recover in this lawsuit.

In any case Paragraph 6, of Sean Baldwin's Declaration dated September 20, 2016 is patently false or at a minimum directly contradicted by the rest of his Declaration. Paragraph 6 states –

> As explained at trial, with the exception of the "missing" IndyMac loan files, see Order at 139, Plaintiff has obtained every extant version of the loan files for each of the Loans at issue from every source known to it. Tr. 74:17-23 ("We have obtained every version of these loan files from every source that we are aware of

9

where they might exist. We've gone to the originators, servicers, UBS, Assured. There is no one who could possibly have had these files that we haven't asked for them. So we have versions of those loan files from every source we could have gotten them from.").

By his own calculation, US Bank is missing 2,215 non-IndyMac loan files, certainly not "every extant version" but more importantly if the missing loan files are worth $1 billion you don't just "ask[] for them". You demand them, and if they are not delivered you bring the matter to the court to enforce your legal right. Sooner or later you have the full power of the state behind you, and you would get the loan files or the right to shift the liability for the loan files being "lost" to either UBSREI or the servicer. If you "ask[] for them" and they are not delivered, the next step is not "oh well we tried". There is absolutely no way US Bank would have acted this way had that $1 billion been owed US Bank.

While we believe this is clearly incompetence and likely negligence and maybe gross negligence[2], we include the following analysis on negligence in the discovery context from *The Pension Committee of the University of Montreal Pension Plan, et al., v. Banc of America Securites, LLC et al*, 685 F.Supp.2d 456 (2010). U.S.D.C.S.D. New York. January 15, 2010:

> It is useful to begin with standard definitions of each term and then to explore the conduct, in the discovery context, that causes certain conduct to fall in one category or another.
>
> [Negligence] is conduct "which falls below the standard established by law for the protection of others against unreasonable risk of harm." [Negligence] is caused by heedlessness or inadvertence, by which the negligent party is unaware of the results which may follow from [its] act. But it may also arise where the negligent party has considered the possible consequences carefully, and has exercised [its] own best judgment.(citation)

---

[2] If US Bank's incompetence cannot be mitigated by granting the motion to intervene and reopening discovery, we will pursue damages in Bakal v. U.S. Bank National Association, Case No. 15-cv-6976. As such, any finding of non-negligence is requested to be deferred until the issue can be fully briefed and argued in that case.

The standard of acceptable conduct is determined through experience. In the discovery context, the standards have been set by years of judicial decisions analyzing allegations of misconduct and reaching a determination as to what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding. A failure to conform to this standard is negligent even if it results from a pure heart and an empty head.

"Gross negligence has been described as a failure to exercise even that care which a careless person would use." (citation) According to a leading treatise — *Prosser & Keeton on Torts* — most courts find that gross negligence is something more than negligence "and differs from ordinary negligence only in degree, and not in kind." (citation)

The same treatise groups willful, wanton, and reckless into one category that requires "that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." (citation)

....

The next step in the discovery process is collection and review. Once again, depending on the extent of the failure to collect evidence, or the sloppiness of the review, the resulting loss or destruction of evidence is surely negligent, and, depending on the circumstances may be grossly negligent or willful. **For example, the failure to collect records — either paper or electronic — from key players constitutes gross negligence or willfulness** as does the destruction of email or certain backup tapes after the duty to preserve has attached.

With respect to discovery, acquiring the loan files was known from day one as the most important if not the only discovery obligation. The fact that our case would be harmed in direct proportion to the percentage of loan files not collected was a mathematical certainty. That US Bank failed to receive 44% of the relevant loan files was incompetence at the very least and likely something far worse.

### 2.    US Banks Failure to Immediately Reject the Proposed Settlement was Incompetent

This case began on September 28, 2012, more than 5 years ago. US Bank has spent $73.5 million of the certificate holders' money to litigate this case. (Trustee January 2, 2018

11

Notice p. 6 – Visher Dec. Ex.s D, E and F). Any prudent person would constantly be monitoring the expected return of the litigation, the Intervention Plaintiffs certainly have. Using purely publicly released information prior to US Bank distributing the January 2, 2018 notices, Intervention Plaintiffs estimated that expected return of the litigation was more than $1.5 Billion (Visher Declaration ¶ 12). Proposed Settlement was barely one third of that. US Bank's failure to immediately reject the settlement makes the trusts representatives look incompetent and stupid as it is clear to UBSREI that US Bank has no idea what the value of the lawsuit is and that it therefore is easily manipulatable. To the extent that this lawsuit is settled, this weakness and incompetence will be very costly to the certificate holders. US Bank has spent the last 3 months analyzing the Proposed Settlement Offer and hired addition counsel to help them do it, presumably at the certificate holders' expense. If someone offers you $100K for your house when you know it is worth $300K, you don't go out a hire an appraiser. You say some version of "no" depending on your mood. This is not rocket science, literally most five-year old's know this.

### 3.     US Banks' Failure to Recognize NCUA as a Shill and Axonic as Likely a Shill as well was Incompetent

In the Proposed Settlement that US Bank distributed to the certificate holders, NCUA and Axonic were presented as having represented the trusts' interest in negotiation the Proposed Settlement. This was certainly not the case. While US Bank did not disclose and refused to disclose which certificates NCUA and Axonic owned, it is a matter of public record that NCUA is involved as guarantor of NCUA Guaranteed Notes Trusts 2010-R3 and 2011-R2 which per public Offering Memorandums both hold MARM 2007-1 I2A1 certificates ($31,704,400 and $13,587,600 original face, respectively) and no other certificates from the other trusts. Which

12

certificates NCUA owns is relevant because it impacts its exposure to the level of settlement. These are super senior certificates - meaning they are the last certificates to realize loses and the first to receive recoveries. Over the lifetime, this class of certificate has suffered $17 million is losses. Given NCUA holdings, NCUA has suffered a loss of $1.26 million or .056% of the $2.181 billion suffered by the three trusts (Visher Dec. ¶16). Clearly negligible in the overall picture. In addition, the settlement calls for $103.8 million to be paid to Group I-2 which will complete repay the MARM 2007-1 I2A1 certificates losses of $17 million which gets paid first in Group I-2. What this means is that so long as the settlement amount going to Group I-2 exceeds $17 million, NCUA is indifferent to the settlement level. NCUA's indifference exposes Keller Rohrback LLP representation that the Proposed Settlement Agreement was a result of "extensive arms-length negotiations" and that it was a "fair and reasonable resolution" as the fraud that it is.

Likewise, with MARM 2007-3, 78% of the outstanding bonds are indifferent to the settlement level so long as it is greater than approximately $200 million across all three trusts, less than 40% of the Proposed Settlement (Visher Dec. ¶16). Given that Axonic's ownership is not public, nor has US Bank disclosed which bonds Axonic holds with the exception that they own approximately $12.4 million current principal in MARM 2007-3 per January 2, 2018 notice, it is impossible to ascertain whether Axonic, like NCUA, was essentially indifferent to the settlement level. But given the relative percentages, it is quite likely it is.

A prudent person, when presented with a "negotiated" settlement that is so far from reasonable, would ask why and how this would come about. When a cursory examination of the motivations of the parties' reveals that the two parties that were represented as having opposing

interest to UBSREI, don't, and US Bank just naively distributes the Proposed Settlement, it reveals that US Bank is incompetent. Again, this incompetence will materially adversely impact our eventual settlement.

### 4.    US Banks' Failure to recognize that Keller Rohrback LLP Fee was Grossly Excessive was Incompetent

The Proposed Settlement requires a fee of $12,586,000 to be paid to Keller Rohrback LLP. As mentioned above, one of Keller Rohrback LLP's clients, NCUA, was going to receive $1.26 million as a result of the settlement and that the other client, Axonic, owned a similar amount of certificates. (NCUA owned approximately $15.2 million current face in MARM 2007-1 while Axonic owned approximately $12.4 million current face in MARM 2007-2) (Ex. F and G – MARM 2007-1 and MARM 2007-3 US Bank Notice January 2, 2008 p 2). While contingent fees where the client and their counsel split the take have been found to be acceptable, taking a multiple of what your client takes is fraudulent. Maybe there was a side deal whereby Keller Rohrback LLP would funnel some of this fee back to their clients. I don't know which is worse or more unethical. Or maybe UBSREI paid a premium for the drafting of a deceptive and fraudulent cover letter to the Proposed Settlement Agreement. In any case, US Banks' failure to recognize the absurdity of the entire matter was incompetent.

### 5.    The Trusts May Have Already Been Hijacked or Could be Hijacked in the Future

   *a)    UBSREI Settlement with Assured in 2013 Could Have Given UBSREI Substantial Control over the Trusts*

The MARM 2006-OA2 PSA defines Voting Rights as follows:

The portion of the voting rights of all of the Certificates which is allocated to any Certificate. With respect to any date of determination, 98% of all Voting Rights will be allocated among the holders of the Senior Certificates, the Mezzanine Certificates and the Class C Certificates in proportion to the then outstanding

14

Certificate Principal Balances of their respective Certificates, 1% of all Voting Rights will be allocated among the holders of the Class P Certificates and 1% of all Voting Rights will be allocated among the holders of the Residual Certificates. The Voting Rights allocated to each Class of Certificate shall be allocated among Holders of each such Class in accordance with their respective Percentage Interests as of the most recent Record Date.

And Certificate Principal Balance as follows:

With respect to any Certificate (other than the Interest Only Certificates and Class C Certificates) at any date, the maximum dollar amount of principal to which the Holder thereof is then entitled under this Agreement, such amount being equal to the Denomination of that Certificate (A) plus any increase to the Certificate Principal Balance of such Certificate pursuant to Section 4.02 due to the receipt of Subsequent Recoveries and (B) minus the sum of (i) all distributions of principal previously made with respect to that Certificate; provided, however, that solely for purposes of determining the Premium Distribution Amount payable to the Certificate Insurer and the Certificate Insurer's rights as subrogee to the Holders of the Insured Certificates, the Certificate Principal Balance of any Insured Certificate shall be deemed not to be reduced by any principal amounts paid to the Holder thereof from payments made by the Certificate Insurer under the Certificate Insurance Policy .. (emphasis added)

And under Section 12.01:

Exercise of Voting Rights of Holder of the Insured Certificates.
For so long as there is no continuing default by the Certificate Insurer in respect of its
obligations under the Certificate Insurance Policy (a "Certificate Insurer Default"), each of the Depositor, the Master Servicer, the Trust Administrator and the Trustee, and, by accepting its Insured Certificate, each Holder of an Insured Certificate, agrees that the Certificate Insurer shall have the right to exercise all Voting
Rights of the Holders of the Insured Certificates under this Agreement without any further consent of the Holders of the Insured Certificates. (emphasis added)

Using these definitions and similar definitions from the other trusts, Assured currently controls 37% ($860 million/$2.323 billion) of the outstanding votes (Visher Dec ¶ 17), and this percentage will go up in the future as the other certificate holders are paid down and Assured is not repaid by the trusts. While the UBSREI and Assured settlement terms are not public, it is

quite possible and even quite likely that one of the terms of the settlement was that UBSREI received the right to vote Assured's votes in the trusts.[3]

> b)      *Regardless of Legal and Ethical Limitations on Trading with Non-public Information, UBSREI may be purchasing Certificates in the Secondary Market*

UBS, Bank of America and Countrywide, as well as US Bank, possess a vast quantity of non-public information regarding the quality of the loans in the trust as well as the law underlying this case. While outsiders could analyse the law of the case, the quality of the underlying loans would only be known if one had access to the loan files and re-underwrote each one of them. Only UBSREI and US Bank have those loan files and have done that re-underwriting. That information will have a huge impact on the value of the outstanding certificates. Currently the bonds trade very infrequently with some being marked below par and some over par (Visher Dec. ¶ 19). Assuming par as current value, the outstanding value of all the certificates of the three trusts is $1.46 billion. (Visher Dec. ¶ 17). If the true value of the suit is $1.56 Billion, the aggregate value of the outstanding securities would double overnight. It is possible that UBSREI and Countrywide, added and abetted by US Bank, distributed the deceptive Proposed Settlement Agreement for the sole purpose of driving down certificate holders' expectations, thereby allowing UBSREI and Countrywide to acquire bonds on the cheap. This would minimize the costs of UBSREI acquiring control of the Trusts.

> c)      *UBSREI Could Acquire or has Acquired Control of the Trusts for less than $85 Million*

---

[3] One interesting additional consequence of UBSREI's settlement with Assured is that any damages paid to the trust will be distributed to the certificate holders based on the waterfall provisions and approximately $200 million of the UBSREI's Proposed Settlement Amount of $543 million would be distributed to Assured with 85% presumably distributed back to UBS.

The maximum any certificate could receive due to this litigation is the current par amount of the certificate plus the cumulative losses experienced by that certificate to date. The current outstanding amount of the mortgages in these trusts is equal to the current par amount of the certificates in aggregate, so, ignoring future losses on the mortgages, the maximum value to a certificate holder of this suit is approximately the cumulative losses experienced to date by that certificate.

UBS, Countrywide, or Bank of America could purchase or have purchased the certificates that have experienced the least cumulative losses to date relative to the current par amount to acquire votes cost effectively. Assuming the settlement with Assured gave UBSREI the right to vote the Insured Certificates and with it 37% of the votes of the Trusts, UBSREI could purchase $83 million current face ("CF") MARM 2006-OA2 1A1, $18 million CF MARM 2007-1 I-2A1, $23 million CF MARM 2007-1 I-2A3 and $29 million CF MARM 2007-3 I-2A1, to acquire enough votes to reach 51% votes in all three trusts (Visher Dec. ¶ 17). This will require paying at most $84 million above current face to give certificate holders' 100% of their maximum potential payout. To the extent that this litigation settles at something above zero, this $84 million cost will be reduced. For instance, if the settlement amount is $543 million, as deceptively suggested by UBSREI, the majority of that $84 million cost will be returned to UBSREI in settlement.

As clearly expressed in Section 8.07 of the MARM 2006-OA2 PSA "The Holders of Certificates entitled to at least 51% of the Voting Rights or the NIMS Insurer may at any time remove the Trustee and appoint a successor trustee acceptable to the NIMS Insurer and the Certificate Insurer". This is control. Merely the threat of control is control and will influence the

actions of the Trustee at a minimum.

### 6.    There is Circumstantial Evidence that Collusion Has Already Taken Place in this Litigation

While admittedly it is difficult distinguishing collusion from incompetence there are some bizarre coincidences in this case that collusion would explain. First, the errors, while only two, are catastrophic in affect if uncorrected. A conservative estimate of the value of this litigation, as mentioned above, is $2.8 billion inclusive of the value of the all missing loan files. US Bank voluntarily signing away US Bank's legal right to get 93% of the IndyMac loan files in exchange for OneWest performing 7% of something that is both OneWest's job as well as OneWest's legal obligation is just bizarre.

But the source of the missing loan files is truly peculiar. As shown by the settlement agreement, Countrywide has an interest in the outcome in the case because presumably the loans that UBSREI purchased from Countrywide for the MARM trusts were purchased with similar representations and warranties from Countrywide as those the trust received from UBS. Therefore, if Countrywide loans get put back to UBSREI, UBSREI will put those loans back to Countrywide and UBSREI is indifferent to losses on those loans. However, as IndyMac no longer exists, any loss arising from the IndyMac Loans will be absorbed by UBSREI. Likewise, American Home is also bankrupt, so American Home loan losses will be absorbed by UBSREI. Originators other that Countrywide, IndyMac, or American Home originated 1,632 loans of which 809 loan files are missing (Visher Dec. ¶ 15), or 50%. Of the 823 files received from these other originators, 695 came from MortgageIT, or 85%, which is not bankrupt and was purchased by Deutsche Bank in January 2007 (Visher Dec. Ex. 9).  Therefore, of the 7,551

missing loan files, 70% came from IndyMac, bankrupt, and 19% came from American Home, bankrupt (Visher Dev ¶ 15). The fact that nearly 90% and maybe 100% of the missing loan files are from originators who are bankrupt when 40% of all of the originator in the trusts are not bankrupt (35.5% Countrywide and 4% MortgageIT) is highly likely not result from a coincidence.[4]

More likely, either UBSREI colluded with the servicers of the IndyMac loans and American Home loans to ensure that they did not deliver the loan files to the trusts, or UBSREI colluded with US Bank to ensure those loan files were not delivered to the trusts. Without mitigation, the results of this litigation will be irreparable tainted.

Likewise, US Bank's bizarre response to the Proposed Settlement Agreement was highly detrimental to the certificate holders as discussed above and highly beneficial to UBSREI. The easiest answer that fully explains US Bank's actions is that US Bank was colluding with or controlled by UBSREI.

### D.    Intervenor Plaintiffs Purpose in Intervening is Limited

As indicated in the proposed Complaint in Intervention, Intervenor Plaintiffs seek no new causes of action, no new legal theories, and no new damage theories. Our purpose is as follows –

- Re-open discovery and trial for the sole purpose of obtaining the 7,551 missing loan files resulting from US Banks incompetence and/or collusion, re-underwriting those loans and submitting those loans that have breached

---

[4] Conversely Countrywide and MortgageIT started this litigation with 40% of the liability ((6,054+695)/17082) and are ending with 71% of the liability ((6,054+695)/9,531) (Visher Dec. ¶ 15)

representations and warranties into the existing master process. Presumably any agreement between US Bank and OneWest regarding production of loan files does not apply to the Intervenor Plaintiffs.

- Force UBS, Countrywide, and Bank of America to disclose if they have the right to Assured's votes, and the date, amount, and price of all purchases of any certificate of these three trusts to determine when UBSREI acquired control or how close to acquiring control in the trusts it is. The integrity of this process depends on it.

- Protect our rights against additional "collusion, adversity of interest, nonfeasance, or incompetence" of US Bank in the future.

## IV.    CONCLUSION

Without Intervention Plaintiffs' Motion to Intervene being granted for the reasons set forth herein, there will be no "full development of the underlying factual issues in the suit and [no] just and equitable adjudication of the legal questions presented" *Spangler v. Pasadena City Board of Education*, 552 F.2d 1326, 1329 (9th Cir.1977).

Dated: February 6, 2018

David Visher
28808 Cliffside Drive
Malibu Ca 90265
Telephone: 310-457-7880
Pro Se

Sandra Visher
28808 Cliffside Drive
Malibu Ca 90265
Telephone: 310-457-7880
Pro Se

21

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3.<br><br>Plaintiff,<br><br>vs.<br><br>UBS REAL ESTATE SECURITIES, INC.,<br><br>Defendant. | Civil Civ. Action No. 12-cv-7322 (PKC) |

## DECLARATION OF DAVID VISHER IN SUPPORT OF MOTION OF CERTIFICATE HOLDERS, DAVID AND SANDRA VISHER TO INTERVENE AS PLAINTIFFS

David Visher declares, under penalty of perjury:

1.  I submit this declaration in support of Plaintiffs' Motion to Intervene pursuant to Fed.R.Civ.P. 24(a)(2) and 24(b)(l)(B).

2.  Attached hereto as Exhibit A is an unsigned and unverified version of Plaintiffs' proposed Complaint in Intervention.

3.  Attached hereto as Exhibit B is a true and accurate copy of Assured 8K dated May 6, 2013.

4.  Attached hereto as Exhibit C is a true and accurate copy of Keller Rohrback LLP Letter dated October 11, 2017.

5.  Attached hereto as Exhibit D is a true and accurate copy of Proposed Settlement Agreement.

6.  Attached hereto as Exhibit E is a true and accurate copy of MARM 2006-OA2 Notice dated January 2, 2018.

i

7.      Attached hereto as Exhibit F is a true and accurate copy of MARM 2007-1 Notice dated January 2, 2018.

8.      Attached hereto as Exhibit G is a true and accurate copy of MARM 2007-3 Notice dated January 2, 2018.

9.      Attached hereto as Exhibit H is a true and accurate copy of Opinion noting acquisition of MortgageIT by subsidiary of Deutsche Bank in January 2007.

10.     Attached hereto as Exhibit I is a true and accurate copy of Reuters article announcing American Home Mortgage Bankruptcy dated August 6, 2007.

11.     Attached hereto as Exhibit J are a true and accurate copies of the pages of the April 2013 remits of MARM 2006-OA2, MARM 2007-1, and MARM 2007-3, documenting payments by Assured to trusts. Across these three trusts, Assured's total payment was $538,617,358.16. UBS's settlement payment of $358.5 million is 66% of that.

12.     When the Proposed Settlement Agreement was released, I estimated the value of the litigation should be around $1.5 billion to the Trusts.

13.     Using the information and estimates of the three January 2, 2008 Notices

| | Resolved Per Stipulation | | Resolved By Court | | Uncontested By UBS | | Currently Resolved | |
|---|---|---|---|---|---|---|---|---|
| | Liquidated | Active | Liquidated | Active | Liquidated | Active | Liquidated | Active |
| # of Loans | 336 | 111 | 511 | 169 | 126 | 42 | 973 | 322 |
| Estimated Damages | 97,600,000 | 16,219,639 | 144,000,000 | 23,997,778 | 37,400,000 | 6,203,755 | 279,000,000 | 46,421,172 |
| Estimated Prejudgment Interest | 41,417,274 | 6,924,031 | 61,129,124 | 10,309,356 | 15,868,375 | 2,637,863 | 118,414,773 | 19,871,250 |
| Estimated Damages Per Loan | 290,476 | 146,123 | 281,800 | 141,999 | 296,825 | 147,708 | 286,742 | 144,165 |

| | | |
|---|---|---|
| Legal Fees | 73,500,000 |
| Total | 538,501,952 |

These are the loans to date which have been determined to have been breached by stipulation, master process, or are uncontested with the estimated damage for liquidated loans, estimated prejudgment interest, and legal fees being calculated by US Bank. This includes my best estimate that the benefit of putting an active breached loan back to UBS would be approximately 50% of that of a liquidated loan.

Assuming 50% of the unresolved loans are resolved in our favor going forward yield the following results -

| | Unresolved Fraud | | Unresolved Nonfraud | | Totals |
|---|---|---|---|---|---|
| | Liquidated | Active | Liquidated | Active | |
| # of Loans | 1,718 | 545 | 2,436 | 1,204 | 5,903 |
| Estimated Damages | 246,443,217 | 39,288,903 | 348,741,343 | 86,610,361 | 721,083,825 |
| Estimated Prejudgment Interest | 105,209,501 | 16,809,513 | 148,110,781 | 36,802,428 | 306,932,222 |

| | |
|---|---|
| Legal Fees | 73,500,000 |
| Projected Unresolved Damages | 1,028,016,047 |
| Resolved Damages | 538,501,952 |
| Total Damages | 1,566,517,999 |
| Cumulative Loan Loss | 2,188,378,735 |
| Payment as % of Cum Loss | 72% |

14.     From MARM 2006-OA2 Notice dated January 2, 2018 page 3 we find the trusts have prevailed on 692 loans out of the 698 loans that the master has resolved, or 99%.

15.     Using data from the three Trusts Prospectus Supplement and the data from Sean Baldwin's Declaration dated September 20, 2016, paragraph 8, I have created the following table –

| | Total Loans | Countrywide | IndyMac | American Home | Other |
|---|---|---|---|---|---|
| MARM 2006-OA2 | 5660 | 47.51% | 37.47% | 0.00% | 15.02% |
| MARM 2007-1 Group 1 | 4589 | 0.00% | 16.16% | 78.27% | 5.57% |
| MARM 2007-1 Group 2 | 355 | 0.00% | 100.00% | 0.00% | 0.00% |
| MARM 2007-3 | 6478 | 51.94% | 39.94% | 0.00% | 8.12% |
| | | | | | |
| Total | 17082 | 6,054 | 5,805 | 3,592 | 1,632 |
| Percentages | | 35.44% | 33.98% | 21.03% | 9.55% |
| Loan Files Produced Except JCIII | 9,531 | 7,074 | 468 | 2,186 | 823 |
| Missing Files # | 7,551 | 0 | 5,337 | 1,406 | 809 |
| Missing Files % | 44.2% | 0.0% | 91.9% | 39.1% | 49.6% |
| Composition of Missing Files | | 0.0% | 70.7% | 18.6% | 10.7% |

While the number of total loans is precise, the percentages originated by each originator is relative to the stated principal balance of the loan, so the number of loans originated by each originator is only accurate to the extent that all originators originate the same size loan. This is certainly approximately true but definitely not precisely true. The Loan Files Produced line is just a summation for each originator from Baldwin Dec. The total of that line though assumes that some of the Countrywide loans files are duplicates as the files produced exceeds the total number of loan. This may not be entirely true for the reason stated above.

16.     I have reviewed the PSAs for MARM 2007-1 and MARM 2007-3 and the current remittance reports for those trust and concluded the following. The MARM 2007-1

I2A1 Certificates will receive 100% of all their cumulative losses to date so long as the MARM 2007-1 Trust receives in excess of 5% of the cumulative losses that the trust has experienced to date. Given NCUA's holdings this results in a maximum payment of $1.26 million. 78% of the certificates currently outstanding for MARM 2007-3 will receive 100% of all of their cumulative losses to date so long as the MARM 2007-3 Trust receives in excess of 10% of the cumulative losses that the trust has experienced to date. The Proposed Settlement is approximately 24% of cumulative losses of the Trusts.

17.   I have reviewed the PSAs and most recent remittance reports for MARM 2006-OA2, MARM 2007-1, and MARM 2007-3 with regards to voting rights and have produced the following table summarizing my conclusions.

|  | MARM 2006-OA2 | MARM 2007-1 | MARM 2007-3 | Total |
|---|---|---|---|---|
| Assured Payments To Date | 211,512,523 | 246,514,976 | 401,934,575 | 859,962,074 |
| Current Outstanding Principal | 366,090,871 | 654,266,171 | 443,552,444 | 1,463,909,486 |
| Total Votes In Terms of Principal | 577,603,395 | 900,781,147 | 845,487,018 | 2,323,871,560 |
| Votes Needed for 51% Control | 83,065,208 | 212,883,409 | 29,263,805 | 325,212,421 |
| Cheapest Votes in Terms of Cum Loss | 45,733,439 | 36,190,271 | 2,537,552 | 84,461,262 |

18.   I have reviewed the MARM 2006-OA2 PSA and have concluded that our certificates would receive $8.8 million more if the litigation is settled at $1.56 billion rather than $543 million. For the sake of full disclosure, this analysis also showed that our certificates are fully compensated for any settlement above approximately $1.2 billion.

19.   Of the certificates that I and Sandra Visher own some are being marked below par and some over par.

20.   David Visher and Sandra Visher are citizens of California.

DATED: February 6, 2018

David Visher

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3. ) ) ) ) ) | Civil Civ. Action No. 12-cv-7322 |
| Plaintiff, ) ) | |
| vs. ) ) | |
| UBS REAL ESTATE SECURITIES, INC., ) ) | |
| Defendant. ) ) | |
| DAVID and SANDRA VISHER, Individually ) ) | PROPOSED COMPLAINT IN INTERVENTION |
| Intervenor Plaintiffs. ) ) ) | |

1.       Intervention Plaintiffs are holders of the MASTR Adjustable Rate Mortgage Trust 2006-OA2 ("MARM-OA2" or the "Trust") Super Senior Certificates, and bring this intervention action on their own behalf, against UBS Real Estate Securities Inc., ("UBSRESI"), for of breaches of contract arising from the UBSRESI's failure to promptly repurchase loans as obligated as a result of breaches of the representations and warranties arising from the underlying mortgage loans originated by IndyMac Bank FSB, Countrywide Home Loans, Inc., and other originators, which did not meet specified quality control standards, were not underwritten according to applicable guidelines, and have therefore experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines.

2.        Because of the Trustee's "collusion, adversity of interest, nonfeasance, or incompetence" *Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171,* 179-180 (2d Cir. 2001) at 180 in execution of their obligations as Trustee in prosecuting the claims in this case, which if uncorrected will result in the certificate holders in the three trusts losing well in excess of $500 million,  Plaintiff Intervenors are forced to bring this intervenor action against UBSRESI to protect our interests and to require UBSRESI to cure or repurchase ALL the loans that have breached the representations and warranties from the Trust or pay damages for those which have been liquidated.

## **PARTIES**

### *Intervention Plaintiffs*

1.        Intervention Plaintiffs David and Sandra Visher, ("Visher"), are the beneficial owners of the following certificates issued by the Trust and are in the California with respect to diversity for jurisdiction:

| VISHER FACE AMOUNT | |
|---|---|
| *Certificate Class* | *Visher* |
| 1-A-1 | $11,740,000 |
| 1-A-2 | $11,632,000 |
| 4-A-1-A | $2,160,000 |
| 4-A-1-B | $8,507,309 |
| total | $34,039,309 |

## **JURUSDICTION**

2.        This Court will continue to have diversity jurisdiction as Intervention Plaintiffs are citizens of California, Trustee is a citizen solely of Ohio and UBS is a citizen of both Delaware and New York and the jurisdictional threshold is exceeded.

## REMAINDER OF COMPLAINT

3.     The entirety of the controlling complaint is unchanged, except for the

addition of the Intervention Plaintiffs, and is incorporated wherein by reference.

Dated: February 6, 2018

_____
David Visher
28808 Cliffside Drive
Malibu Ca 90265
Telephone: 310-457-7880
Pro Se

_____
Sandra Visher
28808 Cliffside Drive
Malibu Ca 90265
Telephone: 310-457-7880
Pro Se

# EXHIBIT B

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K
## Current Report
*Pursuant to Section 13 or 15 (d) of the*
Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported) — May 6, 2013**

# ASSURED GUARANTY LTD.
**(Exact name of registrant as specified in its charter)**

| **Bermuda** | **001-32141** | **98-0429991** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**Assured Guaranty Ltd.**
**30 Woodbourne Avenue**
**Hamilton HM 08 Bermuda**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(441) 279-5700**

**Not applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01**       **Regulation FD Disclosure.**

On May 6, 2013, Assured Guaranty Ltd. issued a press release announcing that it and its subsidiaries Assured Guaranty Municipal Corp. ("AGM") and Assured Guaranty Corp. ("AGC" and, together with AGM and Assured Guaranty Ltd., "Assured Guaranty") have entered into an agreement with UBS Real Estate Securities Inc. and certain other affiliates ("UBS") and a third party that resolves Assured Guaranty's claims related to specified residential mortgage-backed securities ("RMBS") transactions that were issued, underwritten or sponsored by UBS and insured by AGM or AGC under financial guaranty insurance policies.

AGM will receive an initial cash payment of approximately $358.5 million within one business day of signing the agreement, which partially reimburses AGM for past losses on the MASTR Adjustable Rate Mortgages Trust 2006-OA2, MASTR Adjustable Rate Mortgages Trust 2007-1 and MASTR Adjustable Rate Mortgages Trust 2007-3 first lien RMBS transactions. Additionally, under the agreement, UBS has agreed to reimburse AGM for 85% of all future losses on these transactions, through a collateralized loss-sharing reinsurance arrangement that is expected to be in place by the third quarter of 2013. AGM had filed a lawsuit against UBS in New York Federal court in respect of these transactions, alleging breaches of representations and warranties in respect of the underlying loans in the transactions. The agreement resolves all RMBS claims that Assured Guaranty has asserted against UBS in connection with these transactions, and also resolves the lawsuit AGM filed against UBS Securities LLC, as underwriter of the IndyMac IMSC Mortgage Loan Trust, Series 2007-HOA-1a first lien transaction, as well as potential Assured Guaranty claims on three other RMBS transactions.

The press release is attached as Exhibit 99.1 hereto and incorporated herein by reference.

Cautionary Statement Regarding Forward-Looking Statements:
Any forward-looking statements made herein reflect the current views of Assured Guaranty with respect to future events and are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Such statements involve risks and uncertainties that may cause actual results to differ materially from those set forth in these statements. These risks and uncertainties include, but are not limited to, the failure of UBS to make payments or establish the reinsurance arrangements in accordance with the terms of the agreement and other risks and uncertainties that have not been identified at this time, management's response to these factors, and other risk factors identified in Assured Guaranty's filings with the Securities and Exchange Commission. Readers are cautioned not to place undue reliance on these forward-looking statements, which are made as of May 6, 2013. Assured Guaranty undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

**Item 9.01**       **Financial Statements and Exhibits.**

**(d) Exhibits**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated May 6, 2013 |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

ASSURED GUARANTY LTD.

By:   /s/ James M. Michener

Name: James M. Michener

Title: General Counsel

DATE: May 6, 2013

2

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release dated May 6, 2013 |

3

EXHIBIT C

# KELLER ROHRBACK L.L.P.

LAURIE B. ASHTON ①③
IAN S. BIRK ❶
KENNETH A. BLOCH ❸
JAMES A. BLOOM ①
KAREN E. BOXX ❶
GRETCHEN FREEMAN CAPPIO ❸
ALISON CHASE ❸
T. DAVID COPLEY ①③❸
ROB J. CRICHTON ❸
MAUREEN M. FALECKI ②❸
JULI FARRIS ②❸❶
RAYMOND J. FARROW❶
ERIC J. FIERRO ①
ALISON S. GAFFNEY ❶
GLEN P. GARRISON ❸❸
LAURA R. GERBER ❸
MATTHEW M. GERGND ❸
GARY A. GOTTO ①
BENJAMIN GOULD ②❸
CHRISTOPHER GRAVER ①

MEREDITH L. GRAY ❸❸
GARY D. GREENWALD ③❶
MARK A. GRIFFIN ❸
AMY N.L. HANSON ❶
IRENE M. HECHT ❶
SCOTT C. HENDERSON ❸
MICHAEL G. HOWARD ❸
KHESRAW KARMAND ②❸❹
DEAN N. KAWAMOTO ②❸❹
RON KILGARD ①❸❶
KATHRYN M. KNUDSEN ❶
DAVID J. KO ❸
ERIC R. LALIBERTE ❸
BENJAMIN J. LANTZ ❸
LUKE M. LARIVIERE ❸
CARI CAMPEN LAUFENBERG ❸
ELIZABETH A. LELAND ❸
JEFFREY LEWIS ❸
TANA LIN ❸⑦❸❹
DEREK W. LOESER ❸

HOLLY E. LYNCH ❸
RYAN MCDEVITT ❸
DANIEL MENSHER ❸❸
IAN J. MENSHER ❶
MICHAEL W. MEREDITH ❸
GRETCHEN S. OBRIST ❸
ROBERT S. OVER ❶
DUDLEY B. PANCHOT ❸
DAVID S. PREMINGER ❶
MATTHEW J. PREUSCH ②❸
JACOB RICHARDS ②
ERIN M. RILEY ❸❸
STEVEN N. ROSS ❸
ISAAC RUIZ ❸
DAVID J. RUSSELL ❸
MARK D. SAMSON ③❹
LYNN LINCOLN SARKO ❸❹❸
WILLIAM C. SMART ❸
THOMAS A. STERKEN ❸
BETH M. STROSKY ❸

KARIN B. SWOPE ❸
PAUL A. TONELLA ❸
HAVILA C. UNREIN ②❸❸
GABE E. VERDUGO ❸
AMY WILLIAMS-DERRY ❸❸
MICHAEL WOERNER ❸
BENSON D. WONG ❸
EDWIN G. WOODWARD ❸

① ADMITTED IN ARIZONA
② ADMITTED IN CALIFORNIA
③ ADMITTED IN COLORADO
④ ADMITTED IN IDAHO
⑤ ADMITTED IN ILLINOIS
⑥ ADMITTED IN MASSACHUSETTS
⑦ ADMITTED IN MICHIGAN
⑧ ADMITTED IN MINNESOTA
⑨ ADMITTED IN MONTANA
⑩ ADMITTED IN NEW YORK
⑪ ADMITTED IN OHIO
⑫ ADMITTED IN OREGON
⑬ ADMITTED IN WASHINGTON
⑭ ADMITTED IN WASHINGTON, D.C.
⑮ ADMITTED IN WISCONSIN

October 11, 2017

U.S. Bank National Association
(as Trustee for the MASTR Adjustable Rate
Mortgages Trust 2006-OA2, the MASTR
Adjustable Rate Mortgages Trust 2007-1, and
the MASTR Adjustable Rate Mortgages Trust
2007-3)
Attn: Nick Valaperta, Trust Department
425 Walnut Street
Cincinnati, OH 45202-3923

_Via Federal Express (Overnight Delivery) and E-mail_

Re:  MASTR Adjustable Rate Mortgages Trust 2006-OA2; MASTR Adjustable Rate
Mortgages Trust 2007-1; and MASTR Adjustable Rate Mortgages Trust 2007-3

Dear Mr. Valaperta:

We write on behalf of: (1) the National Credit Union Administration Board, as an
Agency of the Executive Branch of the United States and as Guarantor of NCUA Guaranteed
Notes Trust 2010-R3 and NCUA Guaranteed Notes Trust 2011-R2 ("NCUA"), (2) Axonic
Credit Opportunities Master Fund, LP ("Axonic"), and (3) OC 523 Master Fund, Ltd. ("OC
523").  We are contacting US Bank in its capacity as the Trustee for the MASTR Adjustable
Rate Mortgages Trust 2006-OA2 ("MARM 2006-OA2"), the MASTR Adjustable Rate
Mortgages Trust 2007-1 ("MARM 2007-1"), and the MASTR Adjustable Rate Mortgages Trust
2007-3 ("MARM 2007-3," together with MARM 2006-OA2 and MARM 2007-1, the "Trusts").
Capitalized terms used but not defined herein shall have the meanings set forth in the attached
settlement agreement (the "Settlement Agreement").

Re. MARM 2006-OA2; MARM 2007-1; and          **KELLER ROHRBACK L.L.P.**
MARM 2007-3
October 11, 2017
Page 2

On September 29, 2017, we informed you that NCUA and certain other certificateholders, identified herein as Axonic and OC 523 (together with NCUA, the "Initiating Parties"), after extensive arms-length negotiations with UBS Real Estate Securities Inc. ("UBS RESI"), and Countrywide Home Loans, Inc. ("Countrywide," and collectively with the Initiating Parties and UBS RESI, the "Parties"), entered into a term sheet (the "Term Sheet") regarding the Trusts. We now write to inform you that the Parties have finalized a settlement agreement that, as contemplated by the Term Sheet and if accepted by the Trustee, would resolve outstanding liability regarding the origination, transfer, sale, servicing or delivery of the mortgage loans to the Trusts in return for a one-time payment to the Trusts from UBS RESI:

- UBS RESI would pay to the Trusts for distribution to certificateholders by the Trustee the sum of $543,456,000.00 (the "Payment"). This sum is equal to 24% of the estimated lifetime losses in the Trusts.

- In exchange for the Payment, the Trustee, on behalf of all Certificateholders, would voluntarily dismiss with prejudice the pending action regarding the repurchase of mortgages in the Trusts, and release, *inter alia*, any and all claims brought, or that could have been brought, in the pending action, as well as any and all claims relating to or arising out of the origination, transfer, sale, servicing or delivery of the mortgage loans to the Trusts and any and all obligations of any kind relating thereto.

A copy of the Settlement Agreement signed by the Parties is attached as Exhibit A to this letter. Attached as Exhibit B to this letter are certificates of beneficial ownership evidencing the Initiating Parties' interest in the Trusts.

The Initiating Parties believe this settlement is a fair and reasonable resolution of any claims the Trusts may have against UBS RESI and Countrywide and is in the best interests of the Trusts and their certificateholders, among other reasons because it will result in prompt recovery for certificateholders without the expense and delay of further proceedings.

The Initiating Parties renew their request that the Trustee work with UBS RESI and Countrywide to immediately seek a stay of all proceedings in the pending action and to continue such a stay during the settlement process.

The Initiating Parties strongly urge the Trustee to expeditiously submit the Settlement Agreement to all certificateholders, inform them of the Initiating Parties' support for the settlement, and promptly conduct a vote of all eligible certificateholders with respect to the approval or rejection of the settlement. The Initiating Parties commit to voting all of the certificates they own or otherwise control in favor of the settlement.

Re. MARM 2006-OA2; MARM 2007-1; and                    **KELLER ROHRBACK L.L.P.**
MARM 2007-3
October 11, 2017
Page 3

   In connection with that process, the Initiating Parties urge the Trustee to make a prompt
disclosure of the Settlement Agreement to the certificateholders and to the public.  The Initiating
Parties recognize that the Settlement Agreement may constitute or contain material non-public
information; therefore, in order to avoid having the possession of such information unduly limit
the Initiating Parties' ability to act in the public financial markets, they reserve the right to make
the Settlement Agreement publicly available (in whole or in part) on the website of Keller
Rohrback L.L.P. at the close of business (5:00 pm prevailing Eastern Time) on October 18, 2017.

         Sincerely,

         Derek Loeser

Cc:  David Hagens, Esq.
   Danielle Rose, Esq.
   Talcott Franklin, Esq.
   Elaine Golin, Esq.
   Scott Musoff, Esq.

# EXHIBIT D

EXECUTION COPY

## SETTLEMENT AGREEMENT
## (MARM 2006-OA2, MARM 2007-1, MARM 2007-3 TRUSTS)

This Settlement Agreement (the "Agreement"), dated as of October 11, 2017 (the "Execution Date"), is made by and among (i) UBS Real Estate Securities Inc. ("UBS RESI"); (ii) Countrywide Home Loans, Inc. ("Countrywide"); (iii) the National Credit Union Administration Board, as an Agency of the Executive Branch of the United States and as Guarantor of NCUA Guaranteed Notes Trust 2010-R3 and NCUA Guaranteed Notes Trust 2011-R2 ("NCUA"); (iv) The Bank of New York Mellon, solely in its capacity as the indenture trustee of NCUA Guaranteed Notes Trust 2010-R3 and NCUA Guaranteed Notes Trust 2011-R2; (v) Axonic Credit Opportunities Master Fund, LP and OC 523 Master Fund, Ltd. ("Axonic") (collectively NCUA, The Bank of New York Mellon, and Axonic are referred to as the "Initiating Parties"); and (vi) U.S. Bank National Association (the "Trustee"), solely in its capacity as trustee of MASTR Adjustable Rate Mortgages Trust 2006-OA2 ("MARM 2006-OA2"); MASTR Adjustable Rate Mortgages Trust 2007-1 ("MARM 2007-1"); and MASTR Adjustable Rate Mortgages Trust 2007-3 ("MARM 2007-3" and, together with MARM 2006-OA2 and MARM 2007-1, the "Trusts"). Each of UBS RESI, Countrywide, the Initiating Parties, and, upon acceptance as described below, the Trustee, individually is a "Party" hereto, and together they constitute the "Parties." Certain capitalized terms used herein are defined in Section 1 of this Agreement. Other capitalized terms used but not defined herein shall have the meaning assigned to them in the PSAs (as defined below).

## RECITALS

A.     The Trusts, by and through the Trustee, have asserted certain claims against UBS RESI in the United States District Court for the Southern District of New York in an action captioned U.S. BANK, NATIONAL ASSOCIATION, solely in its capacity as Trustee of MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3 v. UBS REAL ESTATE SECURITIES INC., No. 12-cv-7322 (PKC) (S.D.N.Y.) (the "Action");

B.     Between April 18, 2016 and May 13, 2016, the Action was tried before the Hon. P. Kevin Castel, and thereafter was referred for post-trial proceedings before the Hon. Barbara S. Jones (ret.), acting as Special Master;

C.     Since the trial, certain Initiating Parties, UBS RESI and Countrywide participated in mediation sessions in August and September 2017 with Robert A. Meyer, Esq., of Loeb & Loeb, Los Angeles, California, serving as mediator (the "Mediator");

D.     On September 29, 2017, certain Initiating Parties, UBS RESI and Countrywide executed a Term Sheet reflecting an agreement on the economic terms for resolving the Action;

E.     The Initiating Parties, UBS RESI and Countrywide negotiated the terms of this Agreement and, as of the date hereof, have reached agreement, as described herein, concerning a proposed settlement that, upon acceptance of the terms hereof by the Trustee, would resolve the Action and release certain potential claims under the Transaction Documents;

F.     This Agreement is being presented to the Trustee for approval and acceptance as described herein.

**AGREEMENT**

The Parties, intending to be legally bound, agree as follows:

**1.     Defined Terms.**  As used in this Agreement, in addition to the terms otherwise defined herein, the following terms have the meanings set forth below:

"Acceptance Deadline" means January 9, 2018.

"Action" is defined in Recital A.

"Agreement" is defined in the Preamble.

"Allocable Share" means, for any Trust, the share of the Payment allocable to that Trust, as set forth herein.

"Certificateholder" means each Certificateholder (as defined in the PSAs) from time to time, and each Certificateholder's successors in interest, assigns, pledgees and/or transferees.

"Certificate Insurer" shall mean, with respect to each Trust, the financial guaranty insurer that insured certain classes of certificates of such Trust, together with its successors and assigns.

"Countrywide" is defined in the Preamble.

"Depositor" means Mortgage Asset Securitization Transactions, Inc.

"Disclosure Claims" is defined in Section 6(d).

"Execution Date" is defined in the Preamble.

"Initiating Parties" is defined in the Preamble.

"Initiating Parties' Attorney's Fees Payment" is defined in Section 12(a).

"Judicial Proceeding" is defined in Section 12(c).

"Losses" means any and all losses, costs, payments, fines, penalties, assessments, demands, charges, fees, judgments, damages, awards, disbursements and amounts paid in settlement, punitive damages, foreseeable and unforeseeable damages, incidental or consequential damages, in each case of whatever kind or nature.

"MARM 2006-OA2," "MARM 2007-1" and "MARM 2007-3" are defined in the Preamble.

"Mortgage Loan" means each of the Mortgage Loans (as defined in the PSAs) in which any of the Trusts have held, hold or will hold an interest at any time, whether past, present or future.

"Net Losses" means, with respect to each Trust, the amount of losses with respect to the Mortgage Loans held by such Trust (net, without duplication, of any insurance proceeds, condemnation proceeds, net liquidation proceeds, and subsequent recoveries with respect

thereto) that have been incurred and are estimated to be incurred from such Trust's inception to its expected termination date.

"PSA" and "PSAs" means, individually and collectively, (i) that certain Pooling and Servicing Agreement, dated as of October 1, 2006, for MARM 2006-OA2; (ii) that certain Pooling and Servicing Agreement, dated as of December 1, 2006, for MARM 2007-1; and (iii) that certain Pooling and Servicing Agreement, dated as of April 1, 2007, for MARM 2007-3.

"Party" and "Parties" are defined in the Preamble.

"Payment" is defined in Section 4.

"Person" means any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a governmental authority.

"Precluded Persons" is defined in Section 6(a).

"Reimbursable Costs" is defined in Section 12(b).

"Related Persons" means, with respect to a Person, (i) any other Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) each of their respective predecessors, successors and assigns, and (iii) each of the principals, administrators, members, parents, subsidiaries, employees, officers, managers, directors, partners, limited partners, investment bankers, representatives, estates, divisions, financial advisors, estate managers, agents, attorneys, advisors, investment advisors, auditors, accountants, trustees, underwriters, insurers and reinsurers, family members, executors, administrators as well as anyone acting or appearing to act on behalf of any of them, and the legal representatives, heirs, executors, administrators, predecessors, successors and assigns of any of the foregoing.

"Released Claims" means, with respect to the Trusts and the Trustee, all alleged or actual claims, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, Losses, debts, expenses (including attorney's fees), obligations, demands, claims for accountings or audits, alleged Events of Default (as defined in the PSAs), rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct, indirect, derivative, by subrogation or brought in any other capacity, including claims that previously existed, currently exist, or exist in the future, and arising out of, connected to, or relating to:

      (i)     any claim that was asserted in the Action, or would have been subject to the doctrine of res judicata had the Action been fully litigated to final judgment with respect to any claim that was asserted therein;

      (ii)     the origination, transfer, sale, or delivery of Mortgage Loans to the Trusts or any other Person and any and all obligations of any kind relating thereto under the Transaction Documents, including, but not limited to (A) any alleged or actual breach of any covenants, representations and warranties in any of the Transaction Documents or any alleged or actual failure to notify the Trustee of such a breach, and (B) any alleged or actual obligation to repurchase Mortgage Loans, make payments of any kind, or

-3-

otherwise compensate the Trusts or any other Person under any of the Transaction Documents for any Mortgage Loan on the basis of any such covenants, representations or warranties in any of the Transaction Documents or otherwise or failure to cure any alleged breaches of such covenants, representations and warranties;

(iii)     the custody or documentation of Mortgage Loans as such custody or documentation exists as of, or existed prior to, the Settlement Date, including with respect to alleged defective, incomplete or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment or any other matter relating to legal enforceability of Mortgage Loans, whether pursuant to the PSAs or other Transaction Document; *provided, however*, that the Released Claims shall not include claims relating to a custodian's obligation under the Transaction Documents to maintain the Mortgage Files (as defined in the PSAs) received by the custodian;

(iv)     any obligation of any Person to take any enforcement or other action or provide any notice towards, or with respect to, any matter that is a Released Claim pursuant to clause (i), (ii), (iii), (v), (vi) or (vii) of this definition;

(v)     the servicing and master servicing of Mortgage Loans (including the timing or sufficiency of a servicer's collection, foreclosure and loss mitigation efforts) and any alleged Events of Default (as defined in the PSAs) through the Settlement Date; *provided* that claims based solely on a servicer's aggregation and remittance of Mortgage Loan payments, accounting for principal and interest, and preparation of tax-related information in connection with Mortgage Loans and ministerial operation and administration of Mortgage Loans for which a servicer receives servicing fees are not released;

(vi)     the distribution of the Payment to, or within, the Trusts, and any tax consequences to the Trusts or the Certificateholders relating to such distribution, it being understood and agreed that the matters described in this clause (vi) shall not be a Released Claim with respect to any current servicer; or

(vii)     any claim for indemnification or contribution with respect to any of the foregoing.

"Released Persons" means (a) the Depositor, UBS RESI and Countrywide, as well as each other Person (other than the Trustee), including but not limited to any originator, seller or servicer, obligated under any of the Transaction Documents or any Mortgage Loans, and (b) each Related Person (other than the Trustee) of a Person specified in clause (a) (solely in its respective capacity as such).

"Request Letter" is defined in Section 2(b).

"Settlement" means the negotiated settlement set forth in this Agreement, including all terms and conditions thereof.

"Settlement Date" means the date on which the Trusts have received the Payment in accordance with this Agreement.

-4-

"Termination Date" is defined in Section 2(c)(i).

"Transaction Documents" means the PSAs and all other assignment agreements, custodial agreements, indemnity agreements, sale and servicing agreements, insurance and indemnity agreements, mortgage loan purchase agreements, indentures, trust agreements, and/or other similar agreements or documents relating to the Trusts and any Mortgage Loans, including prospectuses and prospectus supplements and any amendments thereto or similar disclosure documents disseminated or other disclosures made in relation to the Trusts or Mortgage Loans.

"Trusts" is defined in the Preamble.

"Trustee" is defined in the Preamble.

"Trustee's Acceptance" is defined in Section 2(c)(i).

**2.      Settlement Process.**

(a)      This Agreement shall be binding and effective upon UBS RESI, Countrywide and the Initiating Parties as of the Execution Date and shall continue to be binding and irrevocable until the Termination Date.

(b)      Within five (5) business days after the Execution Date, this Agreement shall be presented to the Trustee for its review and acceptance as follows:  the Initiating Parties will submit a letter to the Trustee (the "Request Letter") (i) expressing their support for the Settlement, (ii) indicating that they intend to vote all of the certificates in the Trusts owned or otherwise controlled by the Initiating Parties in favor of the acceptance by the Trustee of the Settlement, (iii) requesting that the Trustee submit the Agreement and the Request Letter to the Certificateholders for the purpose of (x) notifying such Certificateholders of the existence, terms and conditions of the Settlement and of the Initiating Parties' support thereof, (y) conducting a vote of the Certificateholders entitled to vote thereon as of the date of such notice with respect to the approval or rejection of the Settlement with respect to the Trusts, and (z) cooperating with UBS RESI and Countrywide in requesting the Trustee to consent to stay the Action during the pendency of the settlement process.  Following the issuance of the Request Letter, each Initiating Party shall provide reasonable support in furtherance of effectuating the Settlement by causing all voting rights on the Trust certificates held or otherwise controlled by such Initiating Party to be voted in favor of acceptance of the Settlement for the Trusts (and against any other proposal that would have the effect of disapproving, frustrating, delaying or changing the terms of approval of the Settlement), and by refraining from transferring or disposing of any such certificates held or otherwise controlled by such Initiating Party (other than to a Person who agrees to vote all such transferred certificates in the same manner as required of such Initiating Party under this Agreement) until the earlier of (A) the Acceptance Deadline, if the Trustee does not sign and deliver this Agreement prior to the Acceptance Deadline or (B) the Settlement Date, if the Trustee does sign and deliver this Agreement prior to the Acceptance Deadline; *provided, however* that continued holding is not required if prohibited by law or regulation. The Initiating Parties' obligations under this Section 2(b) shall also terminate in the event of a material breach of this Agreement by UBS RESI or Countrywide that is not cured within ten (10) business days of notice of such breach having been provided by any Party.  For the avoidance of doubt, the Request Letter shall not constitute, and the Initiating Parties shall not be obligated to provide, a direction or instruction under any Transaction Document to the Trustee (other than by voting its

certificates as agreed herein), and the Initiating Parties shall not be required to indemnify, or pay or reimburse the costs or expenses of, any Person or to otherwise pay any out-of-pocket costs in connection with this Agreement.

      (c)   Acceptance by Trustee.

      (i)   On or prior to the Acceptance Deadline, the Trustee may provide written notice of its acceptance to UBS RESI, Countrywide and the Initiating Parties accepting the Settlement for the Trusts. The Trustee shall accept the Settlement for the Trusts by executing the applicable signature page of this Agreement attached hereto and delivering an original or copy thereof to each of UBS RESI, Countrywide and the Initiating Parties prior to the Acceptance Deadline (the "Trustee's Acceptance"). The Agreement will become binding upon the Trustee with respect to the Trusts upon the Trustee's Acceptance. If the Trustee's Acceptance is not delivered on or prior to the Acceptance Deadline, unless the Parties otherwise agree, this Agreement shall be deemed to be terminated on the business day following the Acceptance Deadline (the "Termination Date"), and all obligations under this Agreement will terminate on the Termination Date, except for the obligations in Sections 7, 9, 21, 22 and 23 (and any relevant definitions in Section 1).

      (ii)   The Acceptance Deadline may be extended at the option of UBS RESI and Countrywide (following consultation with the Initiating Parties) until the latter of (x) sixty (60) days after the initial Acceptance Deadline and (y) in the event the Trustee institutes a Judicial Proceeding as defined in Section 12(c), ten (10) business days following the conclusion of such proceeding.

      **3.**    **The Action.**  Not later than three (3) business days following the Settlement Date, the Trustee shall cause to be filed a stipulation of voluntary dismissal with prejudice of the Action in the form attached hereto as <u>Exhibit A</u>. The Trustee shall take all other steps as necessary to effect dismissal with prejudice of the Action, including but not limited to filing, if requested by the court in the Action, a proposed order of dismissal with prejudice in a form reasonably acceptable to UBS RESI.

      **4.**    **Payment.**

      (a)   Within fifteen (15) business days following receipt of the Trustee's Acceptance, UBS RESI shall pay to the Trustee the sum of USD $543,456,000.00 (the "Payment"), which shall be further allocated in accordance with Section 5. The Payment shall be made by wire transfer to an account specified by the Trustee in writing.

      (b)   The date of the Trustee's receipt of the Payment under Section 4(a) shall be deemed the Settlement Date.

      **5.**    **Distribution of Payment.**

      (a)   <u>Allocation Formula</u>. The Trustee shall allocate the Payment among the Trusts and among the mortgage loan groups and subgroups within each Trust in accordance with the amounts set forth in Appendix 1. Each Trust's Allocable Share of the Payment and the share allocated to each group within a Trust and each subgroup within a group was calculated based

-6-

upon the net losses suffered by such Trust, group or subgroup, as applicable. The calculations set forth in Appendix 1 reflect such adjustments as were necessary to ensure that the effects of rounding did not cause the sum of the Allocable Shares for all Trusts to exceed the amount of the Payment. For avoidance of doubt, none of UBS RESI, Countrywide or the Trustee shall bear any responsibility for making any determination or calculation set forth in this Section 5(a) or in Appendix 1.

      (b)   <u>Subsequent Recovery/Repayment of Principal</u>.

      (i)   Each Trust's Allocable Share of the Payment shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the PSAs, for further distribution to Certificateholders in accordance with the distribution provisions of the PSAs (taking into account the determination and the division of each Trust's Allocable Share to mortgage loan groups and subgroups within the Trust as contemplated by Section 5(a)(ii)). The party responsible for making distributions to Certificateholders under each Trust's PSA shall distribute each Trust's Allocable Share within that Trust as though such Allocable Share was a Subsequent Recovery relating to principal proceeds available for distribution on the related Distribution Date (*provided* that in the case of the Group II Mortgage Loans in MARM 2007-1, the Allocable Share of such Trust shall be distributed as though it was a Recovery as defined in the PSA for such Trust).

      (ii)   After the distribution of the Allocable Share to each of the Trusts pursuant to Section 5(b)(i), to the extent permitted under each Trust's PSA, the party responsible for calculating certificate balances pursuant to such Trust's PSA will apply the amount of the Allocable Share for that Trust to increase the certificate balance of certificates within that Trust (other than any class of REMIC residual interests) in the reverse order of previously allocated Realized Losses (as defined in the PSAs), as though such Allocable Share was a Subsequent Recovery (as defined in the PSAs) relating to principal proceeds pursuant to the terms of the related PSA (*provided* that in the case of the Group II Mortgage Loans in MARM 2007-1, the Allocable Share of such Trust shall be distributed as though it was a Recovery (as defined in the PSA for such Trust)). For the avoidance of doubt, this Section 5(b)(ii) is intended only to increase the balances of the related classes of securities, as provided for herein, and shall not affect the distribution of the Payment provided for in Section 5(b)(i).

      (iii)   Consistent with the subrogation provisions of Section 12.05 of the PSA for MARM 2006-OA2, Section 13.05 of the PSA for MARM 2007-1 and Section 12.05 of the PSA for MARM 2007-3, any increase in the certificate balances in respect of the receipt of Subsequent Recoveries (whether or not attributable to receipt of the Payment) that are allocable to any class of certificates insured by the Certificate Insurer shall be credited to the Certificate Insurer and its assigns to the extent that the Certificate Insurer has made payments on such insured class of certificates.

      (iv)   In no event shall the deposit or distribution of any amount hereunder into any Trust be deemed to reduce the Net Losses experienced by such Trust.

      (v)   In the case of MARM 2007-3, distributions of the Allocable Share of such Trust shall respect each point in the priority of payment at which the Certificate Insurer is entitled to payment of the certificate insurer reimbursement amount.

(c)     For the avoidance of doubt, apart from paying the Payment in accordance with Section 4, UBS RESI and Countrywide shall have no obligation with respect to the distribution of the Payment to, or within, the Trusts; and the Trustee shall not be required to transfer any mortgage loans, or any mortgage files relating thereto, to UBS RESI or Countrywide.

**6.     Release.**

(a)     From and after the Settlement Date, the Trustee, on behalf of itself, the Trusts, and the Certificateholders, and any Persons claiming by, through or on behalf of any of the Trustee, the Certificateholders or the Trusts or under any of the Transaction Documents (collectively, the Trustee, the Certificateholders, the Trusts and such Persons being defined together as the "Precluded Persons"), irrevocably and unconditionally grants to the Released Persons a full, final and complete release, waiver and discharge of all Released Claims that the Precluded Persons may now or may hereafter have, directly or indirectly, against or involving any or all of the Released Persons.

(b)     With respect to any and all Released Claims, each of the Precluded Persons expressly waives the provisions, rights, and benefits of California Civil Code § 1542 and any provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Precluded Persons may after the Settlement Date discover facts in addition to or different from those that any of them now knows or knows as of the Settlement Date or believes to be true with respect to the subject matter of the claims released hereunder; however, as of the Settlement Date, each of the Precluded Persons fully, finally, and forever settles and releases any and all claims released hereunder, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which may exist on the Settlement Date or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  Each of the Precluded Persons acknowledges that the foregoing waiver was separately bargained for and a key element of this Agreement of which this release is a part.

(c)     The Parties do not release or waive any rights or claims against each other to enforce the terms of this Agreement.

(d)     The releases and waivers in this Section 6 do not include any direct individual claims for securities fraud or other alleged disclosure violations in connection with the sale of certificates in the Trust ("Disclosure Claims") that an Investor may seek to assert based upon such Investor's purchase or sale of securities (except insofar as such claims arise from any Transaction Document with respect to the sale or servicing of any Mortgage Loans and the

claims can be extinguished by this Agreement); *provided, however*, that the question of the extent to which any payment made or benefit conferred pursuant to this Agreement may constitute an offset or credit against, or a reduction in the gross amount of, any such claim shall be determined in the action in which such claim is raised, and, notwithstanding any other provision in this Agreement, the Parties reserve all rights with respect to the position they may take on that question in those actions and acknowledge that all other Persons similarly reserve such rights.

7.     **No Admissions.**  This Agreement effectuates the settlement of the Released Claims, and the contents hereof shall not be construed as an admission by any Person of any liability or any factual contention of any kind to any other Person, whether or not the Person is a Party.  This Agreement is without prejudice or value as precedent and shall not be used or referred to in any way in the Action, or any other action, proceeding or hearing, other than to enforce or effectuate the terms of this Agreement.  This Agreement and all discussions between the Parties and their representatives regarding the subject matter of this Agreement are communications in the nature of compromise and settlement such that all protections of Rule 408 of the Federal Rules of Evidence, as well as similar protections provided by any and all analogous evidentiary rules and/or privileges of laws of any state or other jurisdiction, shall apply.

8.     **Repurchase Claims.**  From and after the Execution Date (until the Termination Date), no Initiating Party may initiate or pursue against any Released Person any action that would constitute a Released Claim. From and after the Settlement Date, the Trustee shall not take any action that is intended or reasonably could be expected to be adverse to or inconsistent with the intent, terms, and conditions of this Agreement, and the Trustee will not initiate, pursue or assist in the pursuit against any Released Person, any new or existing repurchase claims or other claims that would be Released Claims hereunder. At the Settlement Date, each notice or demand the Trustee has given regarding any repurchase claim or other claim that would be a Released Claim, and all such notices and demands, shall be deemed null and void, rendered inoperative, as if never sent, and shall be deemed for all purposes to be withdrawn with prejudice.

9.     **Confidentiality.**  All matters relating to the negotiation of this Agreement, including confidential information exchanged between any Parties in connection with such negotiation, other than this Agreement itself, shall be and remain confidential and no Party to this Agreement shall disclose such information to a Released Person or any third party without the prior written consent of each other Party; *provided* that a Party may disclose such information to its own attorneys, accountants and advisors to the extent such attorneys, accountants and advisors need to know such information for the purpose of assisting such Party with the transactions contemplated by this Agreement, if the disclosing Party (a) directs such attorneys, accountants or advisors to keep the information confidential, (b) is responsible for any disclosure by its attorneys, accountants or other advisors of such information and (c) takes at its sole expense all reasonable measures to restrain such attorneys, accountants and advisors from disclosing such information. The confidentiality obligations of the Parties hereunder shall not pertain to (i) requisite disclosure in the necessary course of business for such purposes as audits, reinsurance, investor reports, rating agency examinations, accounting, taxation, and banking, or (ii) where otherwise required by law or regulation but only to the extent so required and after giving each other Party reasonable advance notice of any such disclosure that could reasonably be expected to be made public and the opportunity to seek a protective order or other limitation

-9-

on the scope of such disclosure, consistent with the applicable requirements of law and regulation.

**10.      Representations and Warranties.**

(a)      UBS RESI represents and warrants, as of the date hereof, that (i) it is duly authorized to execute and deliver this Agreement; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to it or its property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the person signing this Agreement on its behalf is duly authorized to do so; and (v) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b)      Countrywide represents and warrants, as of the date hereof, that (i) it is duly authorized to execute and deliver this Agreement; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to it or its property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the person signing this Agreement on its behalf is duly authorized to do so; and (v) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)      Each Initiating Party represents and warrants, as of the date hereof, that (i) it is duly authorized to execute and deliver this Agreement; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to it or its property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the person signing this Agreement on its behalf is duly authorized to do so; and (v) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(d)      The Trustee represents and warrants, solely in its capacity as trustee of the Trusts, as of the date it becomes Party hereto, that (i) it serves as the trustee of the Trusts; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to the Trustee (in such capacity) or the

-10-

Trusts' property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the Trustee has neither assigned nor delegated to another the Trustee's authority to enter into or perform under this Agreement; (v) the person signing this Agreement on its behalf is duly authorized to do so; and (vi) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

11. **Final Agreement.** This Agreement contains the entire agreement between the Parties relating to the settlement contemplated herein, and supersedes any and all prior agreements, understandings, representations, and statements between the Parties, whether oral or written, and whether by such Party or such Party's legal counsel. The Parties are entering into this Agreement based solely on the representations and warranties and other terms contained herein, and not based on any promises, representations, and/or warranties not found herein.

12. **Attorney's Fees.**

(a)    Solely upon the occurrence of the Trustee's Acceptance, and within fifteen (15) business days following receipt of the Trustee's Acceptance, UBS RESI shall pay the sum of USD $12,586,000.00 to the Initiating Parties' counsel as attorney's fees and out of pocket costs ("Initiating Parties' Attorney's Fees Payment"). The Initiating Parties' Attorney's Fees Payment is to be allocated among counsel for the Initiating Parties in their sole discretion. Under no circumstances shall any Released Person have any liability to the Initiating Parties, their attorneys, or any other Person in connection with the determination of the amount of the Initiating Parties' Attorney's Fees Payment or the allocation of the Initiating Parties' Attorney's Fees Payment among counsel for the Initiating Parties. Except for payment of the Initiating Parties' Attorney's Fees Payment and any payment pursuant to Section 12(b) below, no Released Person shall have any obligation to pay any amounts in connection with any and all past, present and future attorney's fees, costs, and expenses that any Person incurred or may incur in connection with this Agreement. The Initiating Parties' Attorney's Fees Payment shall be made by wire transfer to an account specified by counsel for the Initiating Parties in writing.

(b)    In addition to the Initiating Parties' Attorney's Fees Payment, UBS RESI shall also reimburse the Initiating Parties for reasonable costs, fees and expenses for experts or local counsel incurred by the Initiating Parties (the "Reimbursable Costs") on an ongoing basis, up to but not to exceed USD $1,000,000.00; *provided, however* that UBS RESI shall have no obligation to make any payments under this Section 12(b) unless the Initiating Parties provide invoices to UBS RESI and its counsel for all Reimbursable Costs and proof of the Initiating Parties' payment of such invoices. Within sixty (60) days of receiving an invoice for Reimbursable Costs and proof of payment and upon UBS RESI's good faith determination that such Reimbursable Costs were reasonable, UBS RESI shall pay to the Initiating Parties the amount of such Reimbursable Costs. If all Reimbursable Costs total USD $500,000.00 or less as of the Trustee's Acceptance, then the Initiating Parties shall not be entitled to any further payments from UBS RESI under this Section 12(b). If the Reimbursable Costs total more than USD $500,000.00 as of the Trustee's Acceptance, then UBS RESI shall pay to the Initiating Parties a sum equal to USD $1,000,000.00 less the amount of Reimbursable Costs that have

already been reimbursed by UBS RESI under this Section 12(b).  For the avoidance of doubt, in no event shall UBS RESI be obligated to pay the Initiating Parties more than USD $1,000,000.00 pursuant to this Section 12(b).

        (c)     In the event that a judicial approval proceeding under New York CPLR Article 77, or a similar type of proceeding under other state or federal law ("Judicial Proceeding") is instituted by the Trustee with respect to this Settlement, UBS RESI and Countrywide agree not to object to any request by the Initiating Parties' counsel to seek additional reasonable attorneys' fees, not to exceed one half of one percent (0.5%) of the Payment, from the Trust, and/or to seek reasonable costs incurred in connection with the Judicial Proceeding from the Trust.

**13.**    **No Oral Modification.**  No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is in writing and executed by each of the Parties.

**14.**    **Interpretation.**  The terms of this Agreement were negotiated in good faith and at arm's length by the Parties. The provisions contained herein shall not be construed in favor of or against any Party because that Party or its counsel drafted this Agreement, but shall be construed as if all Parties prepared this Agreement, and any rules of construction to the contrary are hereby expressly waived.

**15.**    **Legal Advice.**  The Parties have each received independent legal advice from attorneys of their choice as to the advisability of making the settlement and the releases provided for herein and as to the advisability of executing this Agreement.

**16.**    **No Amendments to Transaction Documents.**  The Parties agree that this Agreement reflects a compromise of disputed claims and is not intended to, and shall not be argued or deemed to constitute, an amendment of any term of any Transaction Document.

**17.**    **Concerning the Trustee.**  Nothing in this Agreement shall be construed to imply that the Trustee owes any greater duties under the Transaction Documents than it would otherwise owe under those agreements.

**18.**    **Severability.**  If any term or provision of this Agreement or the application thereof, other than the Payment terms contained in Sections 4 or 5, the agreements with respect to the Action in Section 3, the release and waiver contained in Section 6 or the agreement with respect to repurchase claims in Section 8, is found to be illegal, unenforceable, or invalid in whole or in part for any reason, such illegal, unenforceable, or invalid term or provision or part thereof shall be deemed stricken from this Agreement, and such term or provision shall not affect the legality, enforceability, or validity of any other term or provision of this Agreement.

**19.**    **Successors in Interest.**  The terms, conditions, and provisions of this Agreement are binding upon and shall inure to the benefit of the Parties and each of their assigns, successors in interest, personal representatives, estates, administrators, heirs, devisees, insurers, and legatees.

**20.    No Waiver.**  The waiver by any Party of any breach of this Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of this Agreement.

**21.    Governing Law.**  This Agreement shall be interpreted in accordance with and governed in all respects by the substantive and procedural law of the State of New York, without regard to the conflicts of law provisions thereof (other than Section 5-1401 of the New York General Obligations Law).

**22.    Dispute Resolution.**  In the event of any controversy or claim arising out of or relating to this Agreement, or a breach thereof, the Parties shall first attempt to settle the dispute by confidential mediation with the Mediator.  If settlement is not reached within sixty (60) days after service of a written demand for mediation, or some longer period mutually agreed to by the Parties, any unresolved controversy or claim shall be brought in New York State Supreme Court, New York County, or the United States District Court for the Southern District of New York.

**23.    Specific Performance.**  Each Party acknowledges and agrees that each other Party would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any such breach could not be adequately compensated in all cases by monetary damages alone.  Accordingly, each Party agrees that, in addition to any other right or remedy to which any other Party may be entitled at law or in equity, each Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to obtain temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of this Agreement; *provided, however*, that no Party will be entitled to any remedy under this Agreement by virtue of its termination if the Trustee does not deliver the Trustee's Acceptance prior to the Acceptance Deadline in accordance with Section 2(c)(i).

**25.    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original.  The counterparts shall constitute one and the same Agreement. Facsimile and PDF signatures shall have the same force and effect as original signatures.

**26.    Third-Party Beneficiaries.**  Each Released Person shall be a third-party beneficiary of this Agreement, with the right to sue under and directly enforce this Agreement. No other Person that is not a Released Person or a signatory to this Agreement shall have any third-party beneficiary or other rights under this Agreement, or have any right to sue under or directly enforce this Agreement.

[REMAINDER OF PAGE BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

NATIONAL CREDIT UNION
ADMINISTRATION BOARD, AS AN AGENCY
OF THE EXECUTIVE BRANCH OF THE
UNITED STATES AND AS GUARANTOR OF
NCUA GUARANTEED NOTES TRUST 2010-R3
AND NCUA GUARANTEED NOTES TRUST
2011-R2

By: _____

Name: _____

Title: _____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

THE BANK OF NEW YORK MELLON, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS THE INDENTURE TRUSTEE OF NCUA GUARANTEED NOTES TRUST 2010-R3 AND NCUA GUARANTEED NOTES TRUST 2011-R2

By: _____

Name: __Alison Kowalski_____

Title: __Vice President_____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

AXONIC CREDIT OPPORTUNITIES MASTER FUND, LP,

AXONIC PG STRUCTURED CREDIT FUND, LP,

AXONIC HIGH CONVICTION SERIES A,
a segregated series of AXONIC IDF LLC,

AND

EP AXONIC YIELD LTD.,

BY AXONIC CAPITAL LLC, the investment adviser / investment manager for the above entities,

By: _____
Name: _____ *CLAYTON DEGIACINTO* _____
Title: _____ *AUTHORIZED SIGNATORY* _____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

UBS REAL ESTATE SECURITIES INC.

By: _____
Name: ~~John Lantz~~
Title: ~~Executive Director~~

By: _____
Name: William W Chandler
Title: Managing Director


COUNTRYWIDE HOME LOANS, INC.

By: _____
Name: _____
Title: _____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

UBS REAL ESTATE SECURITIES INC.

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


COUNTRYWIDE HOME LOANS, INC.

By: _____
Name:   Elizabeth Chen
Title:   Senior Vice President

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

ACCEPTED AND AGREED for the Trusts.

U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as Trustee

By: _____
Name: _____
Title: _____

Date: _____

# APPENDIX 1

Allocations for Purposes of Section 5 of Settlement Agreement

Appendix 1

**MARM 2006-OA2**

Group 1
Loss Share Percentage: 12.673625%
**Allocable Share of Payment:** **$68,875,577.99**

Group 2
Loss Share Percentage: 7.542307%
**Allocable Share of Payment:** **$40,989,121.65**

Group 3
Loss Share Percentage: 1.938160%
**Allocable Share of Payment:** **$10,533,047.75**

Group 4
Loss Share Percentage: 9.155446%
**Allocable Share of Payment:** **$49,755,822.36**

**MARM 2007-1**

Group I-1
Loss Share Percentage: 6.741528%
**Allocable Share of Payment:** **$36,637,237.23**

Group I-2
Loss Share Percentage: 19.09617%
**Allocable Share of Payment:** **$103,779,291.56**

Group II
Loss Share Percentage: 1.055761%
**Allocable Share of Payment:** **$5,737,594.76**

**MARM 2007-3**

Group 1-1
Loss Share Percentage: 10.047237%
**Allocable Share of Payment:** **$54,602,310.36**

Group 1-2
Loss Share Percentage: 19.630381%
**Allocable Share of Payment:** **$106,682,482.41**

Group 2-1
Loss Share Percentage: 3.306243%
**Allocable Share of Payment:** $17,967,977.73

Group 2-2
Loss Share Percentage: 8.813140%
**Allocable Share of Payment:** **$47,895,535.97**

EXHIBIT A

Form of Stipulation of Voluntary Dismissal of the Action

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
U.S. BANK, NATIONAL ASSOCIATION,  :
solely in its capacity as Trustee of MASTR  :
ADJUSTABLE RATE MORTGAGES TRUST  :
2006-OA2, MASTR ADJUSTABLE RATE  :
MORTGAGES TRUST 2007-1, AND MASTR  :   12-cv-7322 (PKC)
ADJUSTABLE RATE MORTGAGES TRUST  :
2007-3,  :
    :
                              Plaintiff,  :
    :
         - against -  :
    :
UBS REAL ESTATE SECURITIES INC.,  :
    :
                              Defendant.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STIPULATION OF VOLUNTARY DISMISSAL WITH PREJUDICE

WHEREAS Plaintiff U.S. Bank, National Association, as Trustee of MASTR Adjustable

Rate Mortgages Trust 2006-OA2, MASTR Adjustable Rate Mortgages Trust 2007-1, and

MASTR Adjustable Rate Mortgages Trust 2007-3, and Defendant UBS Real Estate Securities

Inc. have reached a settlement disposing of all claims asserted in the above-captioned action;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between

the parties, through their undersigned counsel, that, pursuant to Federal Rule of Civil Procedure

41(a)(1), this action shall be, and hereby is, dismissed with prejudice, with each party to bear its

own costs.

DATED: _____, 2017
       New York, New York


QUINN EMANUEL URQUHART &amp;
   SULLIVAN, LLP

_____
Sean P. Baldwin
David L. Elsberg
Andrew R. Dunlap
Steven M. Edwards
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone:  (212) 849-7000


*Attorneys for U.S. Bank, National
Association*


SKADDEN, ARPS, SLATE,
   MEAGHER &amp; FLOM LLP

_____
Scott D. Musoff
Robert A. Fumerton
Alexander C. Drylewski
Four Times Square
New York, NY 10036
Phone:  (212) 735-3000

Charles F. Smith
Lara A. Flath
155 N. Wacker Drive
Chicago, IL 60606
Phone: (312) 407-0700


*Attorneys for UBS Real Estate Inc.*


SO ORDERED this ___ day of _____, 2017:


_____
     U.S.D.J.

# EXHIBIT E



Global Corporate Trust Services
190 S. LaSalle St | | MK-IL-SLTM
Chicago, IL 60603

**NOTICE TO HOLDERS OF MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2,**

**MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2006-OA2**

**Please forward this notice to beneficial holders of the certificates and notice parties under the MARM 2006-OA2 PSA. The classes of certificates and their corresponding CUSIPs are listed on Exhibit A.**

Reference is hereby made to the Pooling and Servicing Agreement, dated as of October 1, 2006 (the "MARM 2006-OA2 PSA"), among Mortgage Asset Securitization Transactions, Inc. (the "Depositor"), UBS Real Estate Securities Inc. ("UBS"), Wells Fargo Bank, N.A. ("Wells Fargo"), U.S. Bank National Association as trustee, and Clayton Fixed Income Services Inc. Reference is also made to (i) the Pooling and Servicing Agreement, dated as of December 1, 2006 (the "MARM 2007-1 PSA"), among the Depositor, UBS, Wells Fargo, and U.S. Bank as trustee; and (ii) the Pooling and Servicing Agreement, dated as of April 1, 2007 (the "MARM 2007-3 PSA" and together with the MARM 2006-OA2 PSA and the MARM 2007-1 PSA, the "PSAs") among the Depositor, UBS, Wells Fargo, and U.S. Bank. This notice refers to U.S. Bank in its capacities as trustee under the PSAs, including as the plaintiff in the Lawsuit (as defined below), as the "Trustee" or "Plaintiff".

Reference is also made to prior notices in which the Trustee informed you of the status of Plaintiff's pending lawsuit against UBS in the United States District Court for the Southern District of New York (the "Court"), Case No. 12-cv-7322 (PKC) (the "Lawsuit") related to the MASTR Adjustable Rate Mortgages Trust 2006-OA2 (the "MARM 2006-OA2 Trust"), the MASTR Adjustable Rate Mortgages Trust 2007-1, and the MASTR Adjustable Rate Mortgages Trust 2007-3 (each a "Trust" and together, the "Trusts"). Certificateholders should carefully review all materials filed on, and continue to monitor, the Lawsuit's public docket, available at https://ecf.nysd.uscourts.gov/cgi-bin/login.pl or https://www.pacer.gov. Any discrepancy between the Court's records and this notice should be resolved in favor of the Court's records. References to docket numbers herein correspond to the Lawsuit's public docket. Headings used herein are for convenience only.

Reference is also made to the Trustee's October 18, 2017 notice (the "October 18 Notice"), informing you that the Trustee had received a letter from the law firm Keller Rohrback L.L.P. on behalf of certain "Initiating Parties," attaching a proposed settlement agreement negotiated with UBS and Countrywide Home Loans, Inc. ("Countrywide"). Keller Rohrback has provided the Trustee with a corrected proposed settlement agreement (the "Proposed Settlement Agreement"), in which the definition of "Initiating Parties" has been revised. It is annexed hereto as **Exhibit B**.

By its terms, the Trustee would not become a party to, or be bound by, the Proposed Settlement Agreement unless the Trustee accepts it on behalf of the Trusts prior to the "Acceptance Deadline," as defined therein.  **You are hereby notified that, on December 21, 2017, UBS and Countrywide extended the Acceptance Deadline from January 9, 2018 to February 8, 2018.  Certificateholders that wish to share their views of the Proposed Settlement Agreement should contact the Trustee (nicolas.valaperta@usbank.com) in writing by January 26, 2018.**

**Since the publication of the October 18 Notice, the Trustee has received questions from certificateholders relating to the Proposed Settlement Agreement and the Lawsuit.  The Trustee is sending this notice to provide additional information, including information that is intended to respond to those questions.**

As set forth in the October 18 Notice, the Hon. P. Kevin Castel, who presided over the trial of the case, has appointed the Hon. Barbara S. Jones (a retired judge from the United States District Court for the Southern District of New York) to serve as the Sole Master (the "Master") with respect to loans and legal issues that the Court did not resolve in its September 6, 2016 Memorandum and Order ("Trial Order") (Docket No. 505).  See Docket Nos. 515, 539, 545 and 549.  Orders issued and Reports and Recommendations filed by the Master are "subject to review by the Court pursuant to Federal Rule of Civil Procedure 53(f)."  Docket No. 539; see also Docket Nos. 545 and 549.

Per the October 18 Notice, Keller Rohrback, on behalf of the Initiating Parties, asked the Trustee to seek a stay of all proceedings in the Lawsuit.  UBS, Countrywide, and one of the Initiating Parties (the National Credit Union Administration Board) separately asked the Master to stay the Master proceedings.  After carefully considering relevant facts and circumstances, the Trustee informed the Master that it opposed staying the Master process.  The Master has declined to stay the Master process, and the process is ongoing.

Update on the Master Process

Following her appointment, the Master directed the parties to identify all loans that the parties believed could be resolved in one party's favor based on the Trial Order.  Docket No. 527.  In April 2017, the parties entered into a stipulation, which was so-ordered by the Master and the Court, in which 454 loans were resolved in Plaintiff's favor (including ~147 from the MARM 2006-OA2 Trust) and 1,637 loans were resolved in UBS's favor (including ~485 from the MARM 2006-OA2 Trust), in each case subject to full preservation of appellate rights (the "April 2017 Stipulation").[1]  Docket No. 541.

---

[1] In certain cases, this notice uses "~" to denote approximate numbers and values, but certificateholders are cautioned that all numbers and values contained in this notice are approximate and are based on the Trustee's current estimates, which may change.

UBS asked the Master to resolve in UBS's favor, and to exclude from the Master process, certain other categories of loans under the Trial Order, including loans for which Plaintiff did not allege a breach of warranty based on borrower fraud.   On April 21, 2017, the Master issued a Report and Recommendation in which the Master, among other things, held that Plaintiff could continue to pursue recovery on loans in the Master process where the breach allegation was not based on borrower fraud. Docket No. 542.  The Court adopted the Master's April 21 Report and Recommendation by Order dated June 5, 2017.  Docket No. 549.

Following the Trial Order and the April 2017 Stipulation, per Plaintiff's calculation, there were ~6,757 loans at issue in the Master process (excluding paid-in-full loans), of which ~2,229 loans were from the MARM 2006-OA2 Trust.

On May 1, 2017, the Master issued a Report and Recommendation stating that she would "conduct a loan-by-loan review of each outstanding loan, ordered by category."  Docket No. 545.  Plaintiff's litigation counsel had requested to submit, as the first category, breaches of the Mortgage Loan Schedule warranty involving borrower fraud due to undisclosed debts (the "Undisclosed Debt Loans").  Plaintiff's litigation counsel explained to the Master that they viewed these loans as having the strongest claims under the Trial Order.  The Master granted Plaintiff's request.  Docket No. 545.  The Master also ordered Plaintiff to provide submissions for no fewer than 400 loans per month, followed by response submissions by UBS, and reply submissions by Plaintiff.  Id.   The Court adopted the Master's Report and Recommendation by Order dated June 5, 2017.  Docket No. 549.

The Master has now issued rulings on 698 of the 806 Undisclosed Debt Loans submitted as part of the first two batches.  As to all three Trusts, the Master resolved 692 Undisclosed Debt Loans in Plaintiff's favor and resolved six Undisclosed Debt Loans in UBS's favor.[2]  The Master informed the parties that she is continuing to review the remaining 108 loans, and those loans have not yet been resolved.[3]  With respect to the MARM 2006-OA2 Trust specifically, excluding paid-in-full loans, the Master resolved 230 Undisclosed Debt Loans in Plaintiff's favor, resolved one Undisclosed Debt Loan in UBS's favor, and is still reviewing 19 loans.

---

[2] Twelve of the 692 loans resolved by the Master have been paid in full and were inadvertently submitted to the Master. Plaintiff will not be seeking rulings from the Master on any other paid-in-full loans.

[3] Three of the 108 loans have been paid in full and Plaintiff is no longer pursuing relief on these loans.

The above loan-level Master results relate exclusively to Undisclosed Debt Loans. The Master has not issued any rulings on loans where the alleged breach of warranty is based on (i) evidence of borrower fraud other than failure to disclose debts (such as based on allegations of borrower misrepresentations of income or occupancy), or (ii) evidence of breach where Plaintiff has not alleged borrower fraud (such as breaches based on the originator's failure to adhere to the underwriting guidelines).

If the Trustee were to accept the Proposed Settlement Agreement in accordance with its terms, ~$170.2 million of the ~$543.5 million settlement "Payment" would be allocated to the MARM 2006-OA2 Trust. See Exhibit B, Appendix 1.

The following charts (Charts A and B) summarize the MARM 2006-OA2 loans resolved in Plaintiff's favor to date, excluding paid-in-full loans. The estimated values provided below are based on calculations performed by Plaintiff's expert, applying its methodology submitted at trial. UBS continues to contest Plaintiff's damages methodology and, in particular, seeks a ruling, per below, that damages on liquidated loans are negligible under the MARM 2006-OA2 PSA. Further, the loans resolved by the Master remain subject to Court review, and all loan rulings in the Lawsuit remain subject to appellate review.

| Chart A: Liquidated Loans | Number of Loans | Estimated Damages |
|---|---|---|
| Resolved Per April 2017 Stipulation in Plaintiff's Favor | ~112 | ~$33.3 million |
| Undisclosed Debt Loans Resolved by Master in Plaintiff's Favor | ~183 | ~$48.8 million |

| Chart B: Active Loans | Number of Loans |
|---|---|
| Resolved Per April 2017 Stipulation in Plaintiff's Favor | ~33 |
| Undisclosed Debt Loans Resolved by Master in Plaintiff's Favor | ~47 |

As to the active loans, Plaintiff is seeking an order from the Court that UBS must repurchase active loans on which Plaintiff proves breaches of warranty with a material and adverse effect on the certificateholders' interests. For purposes of considering the Proposed Settlement Agreement, however, Plaintiff's expert is calculating the net cash value associated with UBS's repurchase of active MARM 2006-OA2 loans resolved in Plaintiff's favor to date.

4

Additional Undisclosed Debt Loans from all three Trusts have been submitted to, but not yet resolved by, the Master. As to those loans, UBS has not contested that ~44 liquidated loans from the MARM 2006-OA2 Trust and ~14 active loans from the MARM 2006-OA2 Trust contain breaches of warranties with a material and adverse effect on certificateholders' interests, but, as to certain such loans, it contests the reliability of the underlying loan files. Plaintiff's expert has calculated the estimated damages associated with the ~44 such liquidated loans to be ~$12.8 million.

With respect to MARM 2006-OA2 loans that have not yet been resolved in the Master process, there are ~751 loans for which Plaintiff's breach of warranty claims are based on borrower fraud (including the ~58 Undisclosed Debt Loans referenced immediately above). Of these 751 loans, ~576 are liquidated loans and ~175 are active loans. There are ~1,247 unresolved MARM 2006-OA2 loans for which Plaintiff's breach of warranty claims are not based on borrower fraud. Of these 1,247 loans, ~837 are liquidated loans and ~410 are active loans.

Given certain rulings in the Trial Order and while preserving all appellate rights, Plaintiff's litigation counsel has informed the Master that Plaintiff expects to not pursue relief in the current Master process on a significant number of loans where Plaintiff's breach of warranty claim is not based on borrower fraud. Plaintiff has not yet determined how many such loans it will not pursue in the current Master process.[4]

Next Steps in the Master Review Process

In mid-November 2017, Plaintiff asked the Master to adjust the review process to permit Plaintiff to submit next statistically significant, random samples of 100 loans from each Trust, which would be prioritized for resolution after the sample loans are fully submitted.[5] Plaintiff's litigation counsel explained to the Master that, based on certain rulings in the Trial Order, Plaintiff expects to prevail on significantly fewer loans where the alleged breach of warranty is not based on borrower fraud compared to claims based on alleged borrower fraud. Accordingly, Plaintiff's litigation counsel told the Master that rulings on samples of loans could assist Plaintiff in developing a better understanding as to overall expected results through the Master process.

On November 30, 2017, the Master informed the parties that she would permit Plaintiff to submit next loans from the samples selected by Plaintiff's expert. UBS will be bound by rulings on individual loans but not by any extrapolation based on the sample results. The additional loans that comprise the samples are currently expected to be fully submitted by April or May 2018.

---

[4] If, in preparing submissions to the Master, Plaintiff concludes that, based on the Trial Order, it cannot prevail on a loan for which it has alleged breach of warranty based on borrower fraud, Plaintiff would also cease pursuing such a claim in the current Master process, again while preserving its full appellate rights.

[5] Plaintiff's expert randomly selected the sample for each Trust from ~6,753 total loans that remained to be decided following the April Stipulation, excluding loans that have been paid in full.

The Master is also considering, and has not yet ruled on, various submissions made by UBS and Plaintiff regarding certain unresolved legal issues that may meaningfully affect Plaintiff's recovery in the Lawsuit.

For example, on damages, UBS seeks a ruling that Plaintiff can recover only negligible damages on liquidated loans under the PSAs. See also Docket No. 483. UBS also seeks a ruling that any damages award in the Lawsuit should be reduced to account for insurance payments that the Certificate Insurer made to the Trusts. Id.

Plaintiff seeks rulings, among other things, awarding it (i) pre-judgment interest at the New York statutory rate of 9% as to liquidated loans on which it prevails; and (ii) expenses reasonably incurred in enforcing Plaintiff's remedies, including attorneys' fees, as set forth in the PSAs' repurchase protocol (see, e.g., MARM 2006-OA2 PSA § 2.03). See also Docket Nos. 477; 495 (Am. Compl.), at 21. UBS contests this relief. See, e.g., Docket No. 483. The estimated damages calculations above do not include any award of prejudgment interest or any recovery of legal expenses. According to the calculation of Plaintiff's expert, if pre-judgment interest at a rate of 9% were imposed on the MARM 2006-OA2 liquidated loans on which Plaintiff has prevailed through the April 2017 Stipulation and the Master Process to date (shown in Chart A), the interest would total ~$31.3 million, assuming interest starts running 90 days after the dates on which UBS discovered or received notice of breaches per the Trial Order.

To date, the MARM 2006-OA2 Trust has been charged ~$16.7 million in attorneys' fees and ~$7.4 million in other expenses, including expert fees. The MARM 2007-1 Trust and the MARM 2007-3 Trust have each separately been charged fees and expenses. The Trustee's expenses and fees related to the Lawsuit continue to be charged to the Trusts in accordance with the PSAs.

Certificateholders are cautioned that other developments, including, without limitation, appellate rulings in other litigations, could also affect the outcome of the Lawsuit.

* * * * *

The Trustee is continuing to evaluate the Proposed Settlement Agreement, given various relevant factors, including, without limitation, the terms of the Proposed Settlement Agreement, results achieved to date and potential results, litigation risks, expenses, and views that it receives from certificateholders. **Per above, certificateholders that wish to share their views of the Proposed Settlement Agreement should contact the Trustee (nicolas.valaperta@usbank.com) in writing by January 26, 2018.**

Certificateholders are cautioned that their responses do not bind the Trustee to any particular course of action. Certificateholders may be asked to complete a certificate of beneficial ownership in connection with submitting their views. In addressing inquiries that may be directed to it, the Trustee may conclude that a specific response to a particular inquiry from an individual certificateholder is not

consistent with equal and full dissemination of information to all certificateholders. To protect the interests of all certificateholders, the Trustee may condition any response to inquiries by certificateholders upon the execution and delivery of a confidentiality agreement and may determine not to disclose certain information. Recipients of this notice are cautioned that receipt of this notice does not indicate that the Trustee will recognize the recipient as a certificateholder.

This notice is intended to summarize certain developments in the Lawsuit and with respect to the Proposed Settlement Agreement. It is not a complete summary or statement of the same. Certificateholders should carefully review the Court docket, Exhibit B and prior notices and should consult with their own legal and financial advisors regarding the matters set forth therein and in this notice. Certificateholders are also cautioned that this notice is based on, among other things, Plaintiff's current understanding of various developments as well as calculations performed by its experts, and these estimates could be subject to modification. Please note that this notice is not intended, and should not be construed, as investment, accounting, financial, legal, tax, or other advice by or on behalf of the Trustee, or its directors, officers, employees, affiliates, agents, attorneys, or advisors. Certificateholders and other persons interested in the Trusts should not rely on the summary or description of any matter contained in this notice. The Trustee makes no representation and accepts no responsibility or liability as to the completeness or accuracy of the information provided herein.

The Trustee expressly reserves all rights under the PSAs, including, without limitation, its right to payment in full of all fees and costs as provided in and subject to the applicable terms of the PSAs, and its right, prior to exercising any rights or powers vested in it by the PSAs at the request or direction of any of the certificateholders, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities that may be incurred in compliance therewith; and all rights that may be available to it under applicable law or otherwise. No delay or forbearance by the Trustee under the terms of the PSAs, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein. Please note that, prior to any distribution to certificateholders, to the extent permitted under the PSAs, funds held by the Trustee may be used first for payment of the fees and costs incurred or to be incurred by the Trustee in performing its duties, as well as for any indemnities owed or to become owed to the Trustee. This includes, but is not limited to, compensation for the Trustee's time spent, and the fees and costs of counsel and other agents it employs, to pursue remedies or other actions, including the resolution of the issues described in this notice.


**U.S. BANK NATIONAL ASSOCIATION,**                              January 2, 2018
**solely in its capacity as Trustee of the MARM 2006-OA2 Trust**

7

## EXHIBIT A

| MARM 2006-OA2 Class | MARM 2006-OA2 CUSIP[1] |
|---|---|
| 1-A-1 | 55275NAA9 |
| 1-A-2 | 55275NAB7 |
| 1-A-3 | 55275NAC5 |
| 2-A-1 | 55275NAE1 |
| 2-A-2 | 55275NAF8 |
| 2-A-3 | 55275NAG6 |
| 3-A-1 | 55275NAK7 |
| 3-A-2 | 55275NAL5 |
| 4-A-1A | 55275NAM3 |
| 4-A-1B | 55275NAN1 |
| 4-A-2 | 55275NAP6 |
| X-1 | 55275NAD3 |
| X-2 | 55275NAH4 |
| XW | 55275NAJ0 |
| M-1 | 55275NAR2 |
| M-2 | 55275NAS0 |
| M-3 | 55275NBA8 |
| M-4 | 55275NBB6 |
| M-5 | 55275NBC4 |
| M-6 | 55275NBD2 |
| M-7 | 55275NBE0 |
| M-8 | 55275NAT8 |
| C | 55275NAU5 |
| 1-P | 55275NAV3 |
| 2-P | 55275NAW1 |
| 3-P | 55275NAX9 |
| 4-P | 55275NAY7 |
| R | 55275NAZ4 |

---

[1] The CUSIP numbers appearing herein are included solely for the convenience of the Certificateholders. The Trustee is not responsible for the selection or use of CUSIP numbers, or for the accuracy or correctness of CUSIP numbers printed on any Certificates or as indicated in this notice.

**EXHIBIT B**

CORRECTED EXECUTION COPY

## SETTLEMENT AGREEMENT
## (MARM 2006-OA2, MARM 2007-1, MARM 2007-3 TRUSTS)

This Settlement Agreement (the "Agreement"), dated as of October 11, 2017 (the "Execution Date"), is made by and among (i) UBS Real Estate Securities Inc. ("UBS RESI"); (ii) Countrywide Home Loans, Inc. ("Countrywide"); (iii) the National Credit Union Administration Board, as an Agency of the Executive Branch of the United States and as Guarantor of NCUA Guaranteed Notes Trust 2010-R3 and NCUA Guaranteed Notes Trust 2011-R2 ("NCUA"); (iv) The Bank of New York Mellon, solely in its capacity as the indenture trustee of NCUA Guaranteed Notes Trust 2010-R3 and NCUA Guaranteed Notes Trust 2011-R2; (v) Axonic Credit Opportunities Master Fund, LP, Axonic PG Structured Credit Fund, LP, Axonic High Conviction Series A and EP Axonic Yield LTD. ("Axonic") (collectively NCUA, The Bank of New York Mellon, and Axonic are referred to as the "Initiating Parties"); and (vi) U.S. Bank National Association (the "Trustee"), solely in its capacity as trustee of MASTR Adjustable Rate Mortgages Trust 2006-OA2 ("MARM 2006-OA2"); MASTR Adjustable Rate Mortgages Trust 2007-1 ("MARM 2007-1"); and MASTR Adjustable Rate Mortgages Trust 2007-3 ("MARM 2007-3" and, together with MARM 2006-OA2 and MARM 2007-1, the "Trusts"). Each of UBS RESI, Countrywide, the Initiating Parties, and, upon acceptance as described below, the Trustee, individually is a "Party" hereto, and together they constitute the "Parties." Certain capitalized terms used herein are defined in Section 1 of this Agreement. Other capitalized terms used but not defined herein shall have the meaning assigned to them in the PSAs (as defined below).

## RECITALS

A.      The Trusts, by and through the Trustee, have asserted certain claims against UBS RESI in the United States District Court for the Southern District of New York in an action captioned U.S. BANK, NATIONAL ASSOCIATION, solely in its capacity as Trustee of MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA2, MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, AND MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3 v. UBS REAL ESTATE SECURITIES INC., No. 12-cv-7322 (PKC) (S.D.N.Y.) (the "Action");

B.      Between April 18, 2016 and May 13, 2016, the Action was tried before the Hon. P. Kevin Castel, and thereafter was referred for post-trial proceedings before the Hon. Barbara S. Jones (ret.), acting as Special Master;

C.      Since the trial, certain Initiating Parties, UBS RESI and Countrywide participated in mediation sessions in August and September 2017 with Robert A. Meyer, Esq., of Loeb & Loeb, Los Angeles, California, serving as mediator (the "Mediator");

D.      On September 29, 2017, certain Initiating Parties, UBS RESI and Countrywide executed a Term Sheet reflecting an agreement on the economic terms for resolving the Action;

E.      The Initiating Parties, UBS RESI and Countrywide negotiated the terms of this Agreement and, as of the date hereof, have reached agreement, as described herein, concerning a proposed settlement that, upon acceptance of the terms hereof by the Trustee, would resolve the Action and release certain potential claims under the Transaction Documents;

F.      This Agreement is being presented to the Trustee for approval and acceptance as described herein.

## **AGREEMENT**

The Parties, intending to be legally bound, agree as follows:

**1.      Defined Terms.** As used in this Agreement, in addition to the terms otherwise defined herein, the following terms have the meanings set forth below:

"Acceptance Deadline" means January 9, 2018.

"Action" is defined in Recital A.

"Agreement" is defined in the Preamble.

"Allocable Share" means, for any Trust, the share of the Payment allocable to that Trust, as set forth herein.

"Certificateholder" means each Certificateholder (as defined in the PSAs) from time to time, and each Certificateholder's successors in interest, assigns, pledgees and/or transferees.

"Certificate Insurer" shall mean, with respect to each Trust, the financial guaranty insurer that insured certain classes of certificates of such Trust, together with its successors and assigns.

"Countrywide" is defined in the Preamble.

"Depositor" means Mortgage Asset Securitization Transactions, Inc.

"Disclosure Claims" is defined in Section 6(d).

"Execution Date" is defined in the Preamble.

"Initiating Parties" is defined in the Preamble.

"Initiating Parties' Attorney's Fees Payment" is defined in Section 12(a).

"Judicial Proceeding" is defined in Section 12(c).

"Losses" means any and all losses, costs, payments, fines, penalties, assessments, demands, charges, fees, judgments, damages, awards, disbursements and amounts paid in settlement, punitive damages, foreseeable and unforeseeable damages, incidental or consequential damages, in each case of whatever kind or nature.

"MARM 2006-OA2," "MARM 2007-1" and "MARM 2007-3" are defined in the Preamble.

"Mortgage Loan" means each of the Mortgage Loans (as defined in the PSAs) in which any of the Trusts have held, hold or will hold an interest at any time, whether past, present or future.

-2-

"Net Losses" means, with respect to each Trust, the amount of losses with respect to the Mortgage Loans held by such Trust (net, without duplication, of any insurance proceeds, condemnation proceeds, net liquidation proceeds, and subsequent recoveries with respect thereto) that have been incurred and are estimated to be incurred from such Trust's inception to its expected termination date.

"PSA" and "PSAs" means, individually and collectively, (i) that certain Pooling and Servicing Agreement, dated as of October 1, 2006, for MARM 2006-OA2; (ii) that certain Pooling and Servicing Agreement, dated as of December 1, 2006, for MARM 2007-1; and (iii) that certain Pooling and Servicing Agreement, dated as of April 1, 2007, for MARM 2007-3.

"Party" and "Parties" are defined in the Preamble.

"Payment" is defined in Section 4.

"Person" means any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a governmental authority.

"Precluded Persons" is defined in Section 6(a).

"Reimbursable Costs" is defined in Section 12(b).

"Related Persons" means, with respect to a Person, (i) any other Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) each of their respective predecessors, successors and assigns, and (iii) each of the principals, administrators, members, parents, subsidiaries, employees, officers, managers, directors, partners, limited partners, investment bankers, representatives, estates, divisions, financial advisors, estate managers, agents, attorneys, advisors, investment advisors, auditors, accountants, trustees, underwriters, insurers and reinsurers, family members, executors, administrators as well as anyone acting or appearing to act on behalf of any of them, and the legal representatives, heirs, executors, administrators, predecessors, successors and assigns of any of the foregoing.

"Released Claims" means, with respect to the Trusts and the Trustee, all alleged or actual claims, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, Losses, debts, expenses (including attorney's fees), obligations, demands, claims for accountings or audits, alleged Events of Default (as defined in the PSAs), rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct, indirect, derivative, by subrogation or brought in any other capacity, including claims that previously existed, currently exist, or exist in the future, and arising out of, connected to, or relating to:

   (i) any claim that was asserted in the Action, or would have been subject to the doctrine of res judicata had the Action been fully litigated to final judgment with respect to any claim that was asserted therein;

   (ii) the origination, transfer, sale, or delivery of Mortgage Loans to the Trusts or any other Person and any and all obligations of any kind relating thereto under the Transaction Documents, including, but not limited to (A) any alleged or actual breach of

any covenants, representations and warranties in any of the Transaction Documents or any alleged or actual failure to notify the Trustee of such a breach, and (B) any alleged or actual obligation to repurchase Mortgage Loans, make payments of any kind, or otherwise compensate the Trusts or any other Person under any of the Transaction Documents for any Mortgage Loan on the basis of any such covenants, representations or warranties in any of the Transaction Documents or otherwise or failure to cure any alleged breaches of such covenants, representations and warranties;

(iii)     the custody or documentation of Mortgage Loans as such custody or documentation exists as of, or existed prior to, the Settlement Date, including with respect to alleged defective, incomplete or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment or any other matter relating to legal enforceability of Mortgage Loans, whether pursuant to the PSAs or other Transaction Document; *provided, however*, that the Released Claims shall not include claims relating to a custodian's obligation under the Transaction Documents to maintain the Mortgage Files (as defined in the PSAs) received by the custodian;

(iv)     any obligation of any Person to take any enforcement or other action or provide any notice towards, or with respect to, any matter that is a Released Claim pursuant to clause (i), (ii), (iii), (v), (vi) or (vii) of this definition;

(v)     the servicing and master servicing of Mortgage Loans (including the timing or sufficiency of a servicer's collection, foreclosure and loss mitigation efforts) and any alleged Events of Default (as defined in the PSAs) through the Settlement Date; *provided* that claims based solely on a servicer's aggregation and remittance of Mortgage Loan payments, accounting for principal and interest, and preparation of tax-related information in connection with Mortgage Loans and ministerial operation and administration of Mortgage Loans for which a servicer receives servicing fees are not released;

(vi)     the distribution of the Payment to, or within, the Trusts, and any tax consequences to the Trusts or the Certificateholders relating to such distribution, it being understood and agreed that the matters described in this clause (vi) shall not be a Released Claim with respect to any current servicer; or

(vii)     any claim for indemnification or contribution with respect to any of the foregoing.

"Released Persons" means (a) the Depositor, UBS RESI and Countrywide, as well as each other Person (other than the Trustee), including but not limited to any originator, seller or servicer, obligated under any of the Transaction Documents or any Mortgage Loans, and (b) each Related Person (other than the Trustee) of a Person specified in clause (a) (solely in its respective capacity as such).

"Request Letter" is defined in Section 2(b).

"Settlement" means the negotiated settlement set forth in this Agreement, including all terms and conditions thereof.

-4-

"Settlement Date" means the date on which the Trusts have received the Payment in accordance with this Agreement.

"Termination Date" is defined in Section 2(c)(i).

"Transaction Documents" means the PSAs and all other assignment agreements, custodial agreements, indemnity agreements, sale and servicing agreements, insurance and indemnity agreements, mortgage loan purchase agreements, indentures, trust agreements, and/or other similar agreements or documents relating to the Trusts and any Mortgage Loans, including prospectuses and prospectus supplements and any amendments thereto or similar disclosure documents disseminated or other disclosures made in relation to the Trusts or Mortgage Loans.

"Trusts" is defined in the Preamble.

"Trustee" is defined in the Preamble.

"Trustee's Acceptance" is defined in Section 2(c)(i).

2.    **Settlement Process.**

(a)    This Agreement shall be binding and effective upon UBS RESI, Countrywide and the Initiating Parties as of the Execution Date and shall continue to be binding and irrevocable until the Termination Date.

(b)    Within five (5) business days after the Execution Date, this Agreement shall be presented to the Trustee for its review and acceptance as follows:  the Initiating Parties will submit a letter to the Trustee (the "Request Letter") (i) expressing their support for the Settlement, (ii) indicating that they intend to vote all of the certificates in the Trusts owned or otherwise controlled by the Initiating Parties in favor of the acceptance by the Trustee of the Settlement, (iii) requesting that the Trustee submit the Agreement and the Request Letter to the Certificateholders for the purpose of (x) notifying such Certificateholders of the existence, terms and conditions of the Settlement and of the Initiating Parties' support thereof, (y) conducting a vote of the Certificateholders entitled to vote thereon as of the date of such notice with respect to the approval or rejection of the Settlement with respect to the Trusts, and (z) cooperating with UBS RESI and Countrywide in requesting the Trustee to consent to stay the Action during the pendency of the settlement process.  Following the issuance of the Request Letter, each Initiating Party shall provide reasonable support in furtherance of effectuating the Settlement by causing all voting rights on the Trust certificates held or otherwise controlled by such Initiating Party to be voted in favor of acceptance of the Settlement for the Trusts (and against any other proposal that would have the effect of disapproving, frustrating, delaying or changing the terms of approval of the Settlement), and by refraining from transferring or disposing of any such certificates held or otherwise controlled by such Initiating Party (other than to a Person who agrees to vote all such transferred certificates in the same manner as required of such Initiating Party under this Agreement) until the earlier of (A) the Acceptance Deadline, if the Trustee does not sign and deliver this Agreement prior to the Acceptance Deadline or (B) the Settlement Date, if the Trustee does sign and deliver this Agreement prior to the Acceptance Deadline; *provided, however* that continued holding is not required if prohibited by law or regulation. The Initiating Parties' obligations under this Section 2(b) shall also terminate in the event of a material breach of this Agreement by UBS RESI or Countrywide that is not cured within ten (10) business days of notice

-5-

of such breach having been provided by any Party.  For the avoidance of doubt, the Request Letter shall not constitute, and the Initiating Parties shall not be obligated to provide, a direction or instruction under any Transaction Document to the Trustee (other than by voting its certificates as agreed herein), and the Initiating Parties shall not be required to indemnify, or pay or reimburse the costs or expenses of, any Person or to otherwise pay any out-of-pocket costs in connection with this Agreement.

        (c)    <u>Acceptance by Trustee</u>.

        (i)    On or prior to the Acceptance Deadline, the Trustee may provide written notice of its acceptance to UBS RESI, Countrywide and the Initiating Parties accepting the Settlement for the Trusts.  The Trustee shall accept the Settlement for the Trusts by executing the applicable signature page of this Agreement attached hereto and delivering an original or copy thereof to each of UBS RESI, Countrywide and the Initiating Parties prior to the Acceptance Deadline (the "<u>Trustee's Acceptance</u>").  The Agreement will become binding upon the Trustee with respect to the Trusts upon the Trustee's Acceptance.  If the Trustee's Acceptance is not delivered on or prior to the Acceptance Deadline, unless the Parties otherwise agree, this Agreement shall be deemed to be terminated on the business day following the Acceptance Deadline (the "<u>Termination Date</u>"), and all obligations under this Agreement will terminate on the Termination Date, except for the obligations in Sections 7, 9, 21, 22 and 23 (and any relevant definitions in Section 1).

        (ii)    The Acceptance Deadline may be extended at the option of UBS RESI and Countrywide (following consultation with the Initiating Parties) until the latter of (x) sixty (60) days after the initial Acceptance Deadline and (y) in the event the Trustee institutes a Judicial Proceeding as defined in Section 12(c), ten (10) business days following the conclusion of such proceeding.

    **3.**    **The Action.**  Not later than three (3) business days following the Settlement Date, the Trustee shall cause to be filed a stipulation of voluntary dismissal with prejudice of the Action in the form attached hereto as <u>Exhibit A</u>.  The Trustee shall take all other steps as necessary to effect dismissal with prejudice of the Action, including but not limited to filing, if requested by the court in the Action, a proposed order of dismissal with prejudice in a form reasonably acceptable to UBS RESI.

    **4.**    **Payment.**

        (a)    Within fifteen (15) business days following receipt of the Trustee's Acceptance, UBS RESI shall pay to the Trustee the sum of USD $543,456,000.00 (the "<u>Payment</u>"), which shall be further allocated in accordance with Section 5.  The Payment shall be made by wire transfer to an account specified by the Trustee in writing.

        (b)    The date of the Trustee's receipt of the Payment under Section 4(a) shall be deemed the Settlement Date.

### 5.   Distribution of Payment.

(a)   <u>Allocation Formula</u>.  The Trustee shall allocate the Payment among the Trusts and among the mortgage loan groups and subgroups within each Trust in accordance with the amounts set forth in Appendix 1.  Each Trust's Allocable Share of the Payment and the share allocated to each group within a Trust and each subgroup within a group was calculated based upon the net losses suffered by such Trust, group or subgroup, as applicable.  The calculations set forth in Appendix 1 reflect such adjustments as were necessary to ensure that the effects of rounding did not cause the sum of the Allocable Shares for all Trusts to exceed the amount of the Payment.  For avoidance of doubt, none of UBS RESI, Countrywide or the Trustee shall bear any responsibility for making any determination or calculation set forth in this Section 5(a) or in Appendix 1.

(b)   <u>Subsequent Recovery/Repayment of Principal</u>.

(i)   Each Trust's Allocable Share of the Payment shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the PSAs, for further distribution to Certificateholders in accordance with the distribution provisions of the PSAs (taking into account the determination and the division of each Trust's Allocable Share to mortgage loan groups and subgroups within the Trust as contemplated by Section 5(a)(ii)).  The party responsible for making distributions to Certificateholders under each Trust's PSA shall distribute each Trust's Allocable Share within that Trust as though such Allocable Share was a Subsequent Recovery relating to principal proceeds available for distribution on the related Distribution Date (*provided* that in the case of the Group II Mortgage Loans in MARM 2007-1, the Allocable Share of such Trust shall be distributed as though it was a Recovery as defined in the PSA for such Trust).

(ii)   After the distribution of the Allocable Share to each of the Trusts pursuant to Section 5(b)(i), to the extent permitted under each Trust's PSA, the party responsible for calculating certificate balances pursuant to such Trust's PSA will apply the amount of the Allocable Share for that Trust to increase the certificate balance of certificates within that Trust (other than any class of REMIC residual interests) in the reverse order of previously allocated Realized Losses (as defined in the PSAs), as though such Allocable Share was a Subsequent Recovery (as defined in the PSAs) relating to principal proceeds pursuant to the terms of the related PSA (*provided* that in the case of the Group II Mortgage Loans in MARM 2007-1, the Allocable Share of such Trust shall be distributed as though it was a Recovery (as defined in the PSA for such Trust)).  For the avoidance of doubt, this Section 5(b)(ii) is intended only to increase the balances of the related classes of securities, as provided for herein, and shall not affect the distribution of the Payment provided for in Section 5(b)(i).

(iii)   Consistent with the subrogation provisions of Section 12.05 of the PSA for MARM 2006-OA2, Section 13.05 of the PSA for MARM 2007-1 and Section 12.05 of the PSA for MARM 2007-3, any increase in the certificate balances in respect of the receipt of Subsequent Recoveries (whether or not attributable to receipt of the Payment) that are allocable to any class of certificates insured by the Certificate Insurer shall be credited to the Certificate Insurer and its assigns to the extent that the Certificate Insurer has made payments on such insured class of certificates.

(iv)     In no event shall the deposit or distribution of any amount hereunder into any Trust be deemed to reduce the Net Losses experienced by such Trust.

(v)     In the case of MARM 2007-3, distributions of the Allocable Share of such Trust shall respect each point in the priority of payment at which the Certificate Insurer is entitled to payment of the certificate insurer reimbursement amount.

(c)     For the avoidance of doubt, apart from paying the Payment in accordance with Section 4, UBS RESI and Countrywide shall have no obligation with respect to the distribution of the Payment to, or within, the Trusts; and the Trustee shall not be required to transfer any mortgage loans, or any mortgage files relating thereto, to UBS RESI or Countrywide.

**6.     Release.**

(a)     From and after the Settlement Date, the Trustee, on behalf of itself, the Trusts, and the Certificateholders, and any Persons claiming by, through or on behalf of any of the Trustee, the Certificateholders or the Trusts or under any of the Transaction Documents (collectively, the Trustee, the Certificateholders, the Trusts and such Persons being defined together as the "Precluded Persons"), irrevocably and unconditionally grants to the Released Persons a full, final and complete release, waiver and discharge of all Released Claims that the Precluded Persons may now or may hereafter have, directly or indirectly, against or involving any or all of the Released Persons.

(b)     With respect to any and all Released Claims, each of the Precluded Persons expressly waives the provisions, rights, and benefits of California Civil Code § 1542 and any provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Precluded Persons may after the Settlement Date discover facts in addition to or different from those that any of them now knows or knows as of the Settlement Date or believes to be true with respect to the subject matter of the claims released hereunder; however, as of the Settlement Date, each of the Precluded Persons fully, finally, and forever settles and releases any and all claims released hereunder, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which may exist on the Settlement Date or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  Each of the Precluded Persons acknowledges that the foregoing waiver was separately bargained for and a key element of this Agreement of which this release is a part.

-8-

(c)     The Parties do not release or waive any rights or claims against each other to enforce the terms of this Agreement.

(d)     The releases and waivers in this Section 6 do not include any direct individual claims for securities fraud or other alleged disclosure violations in connection with the sale of certificates in the Trust ("Disclosure Claims") that an Investor may seek to assert based upon such Investor's purchase or sale of securities (except insofar as such claims arise from any Transaction Document with respect to the sale or servicing of any Mortgage Loans and the claims can be extinguished by this Agreement); *provided, however*, that the question of the extent to which any payment made or benefit conferred pursuant to this Agreement may constitute an offset or credit against, or a reduction in the gross amount of, any such claim shall be determined in the action in which such claim is raised, and, notwithstanding any other provision in this Agreement, the Parties reserve all rights with respect to the position they may take on that question in those actions and acknowledge that all other Persons similarly reserve such rights.

7.     **No Admissions.**  This Agreement effectuates the settlement of the Released Claims, and the contents hereof shall not be construed as an admission by any Person of any liability or any factual contention of any kind to any other Person, whether or not the Person is a Party.  This Agreement is without prejudice or value as precedent and shall not be used or referred to in any way in the Action, or any other action, proceeding or hearing, other than to enforce or effectuate the terms of this Agreement.  This Agreement and all discussions between the Parties and their representatives regarding the subject matter of this Agreement are communications in the nature of compromise and settlement such that all protections of Rule 408 of the Federal Rules of Evidence, as well as similar protections provided by any and all analogous evidentiary rules and/or privileges of laws of any state or other jurisdiction, shall apply.

8.     **Repurchase Claims.**  From and after the Execution Date (until the Termination Date), no Initiating Party may initiate or pursue against any Released Person any action that would constitute a Released Claim. From and after the Settlement Date, the Trustee shall not take any action that is intended or reasonably could be expected to be adverse to or inconsistent with the intent, terms, and conditions of this Agreement, and the Trustee will not initiate, pursue or assist in the pursuit against any Released Person, any new or existing repurchase claims or other claims that would be Released Claims hereunder. At the Settlement Date, each notice or demand the Trustee has given regarding any repurchase claim or other claim that would be a Released Claim, and all such notices and demands, shall be deemed null and void, rendered inoperative, as if never sent, and shall be deemed for all purposes to be withdrawn with prejudice.

9.     **Confidentiality.**  All matters relating to the negotiation of this Agreement, including confidential information exchanged between any Parties in connection with such negotiation, other than this Agreement itself, shall be and remain confidential and no Party to this Agreement shall disclose such information to a Released Person or any third party without the prior written consent of each other Party; *provided* that a Party may disclose such information to its own attorneys, accountants and advisors to the extent such attorneys, accountants and advisors need to know such information for the purpose of assisting such Party with the transactions contemplated by this Agreement, if the disclosing Party (a) directs such attorneys, accountants or advisors to keep the information confidential, (b) is responsible for any

disclosure by its attorneys, accountants or other advisors of such information and (c) takes at its sole expense all reasonable measures to restrain such attorneys, accountants and advisors from disclosing such information. The confidentiality obligations of the Parties hereunder shall not pertain to (i) requisite disclosure in the necessary course of business for such purposes as audits, reinsurance, investor reports, rating agency examinations, accounting, taxation, and banking, or (ii) where otherwise required by law or regulation but only to the extent so required and after giving each other Party reasonable advance notice of any such disclosure that could reasonably be expected to be made public and the opportunity to seek a protective order or other limitation on the scope of such disclosure, consistent with the applicable requirements of law and regulation.

10.  **Representations and Warranties.**

(a)     UBS RESI represents and warrants, as of the date hereof, that (i) it is duly authorized to execute and deliver this Agreement; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to it or its property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the person signing this Agreement on its behalf is duly authorized to do so; and (v) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b)     Countrywide represents and warrants, as of the date hereof, that (i) it is duly authorized to execute and deliver this Agreement; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to it or its property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the person signing this Agreement on its behalf is duly authorized to do so; and (v) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)     Each Initiating Party represents and warrants, as of the date hereof, that (i) it is duly authorized to execute and deliver this Agreement; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to it or its property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the person signing this Agreement on its behalf is duly authorized to do so; and (v) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited

by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(d)    The Trustee represents and warrants, solely in its capacity as trustee of the Trusts, as of the date it becomes Party hereto, that (i) it serves as the trustee of the Trusts; (ii) it has taken all necessary action to authorize the execution and delivery of this Agreement; (iii) the execution and delivery of this Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw, or rule applicable to the Trustee (in such capacity) or the Trusts' property or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (iv) the Trustee has neither assigned nor delegated to another the Trustee's authority to enter into or perform under this Agreement; (v) the person signing this Agreement on its behalf is duly authorized to do so; and (vi) this Agreement constitutes its valid, binding and enforceable obligation, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

**11.    Final Agreement.**  This Agreement contains the entire agreement between the Parties relating to the settlement contemplated herein, and supersedes any and all prior agreements, understandings, representations, and statements between the Parties, whether oral or written, and whether by such Party or such Party's legal counsel.  The Parties are entering into this Agreement based solely on the representations and warranties and other terms contained herein, and not based on any promises, representations, and/or warranties not found herein.

**12.    Attorney's Fees.**

(a)    Solely upon the occurrence of the Trustee's Acceptance, and within fifteen (15) business days following receipt of the Trustee's Acceptance, UBS RESI shall pay the sum of USD $12,586,000.00 to the Initiating Parties' counsel as attorney's fees and out of pocket costs ("Initiating Parties' Attorney's Fees Payment").  The Initiating Parties' Attorney's Fees Payment is to be allocated among counsel for the Initiating Parties in their sole discretion.  Under no circumstances shall any Released Person have any liability to the Initiating Parties, their attorneys, or any other Person in connection with the determination of the amount of the Initiating Parties' Attorney's Fees Payment or the allocation of the Initiating Parties' Attorney's Fees Payment among counsel for the Initiating Parties.  Except for payment of the Initiating Parties' Attorney's Fees Payment and any payment pursuant to Section 12(b) below, no Released Person shall have any obligation to pay any amounts in connection with any and all past, present and future attorney's fees, costs, and expenses that any Person incurred or may incur in connection with this Agreement.  The Initiating Parties' Attorney's Fees Payment shall be made by wire transfer to an account specified by counsel for the Initiating Parties in writing.

(b)    In addition to the Initiating Parties' Attorney's Fees Payment, UBS RESI shall also reimburse the Initiating Parties for reasonable costs, fees and expenses for experts or local counsel incurred by the Initiating Parties (the "Reimbursable Costs") on an ongoing basis, up to but not to exceed USD $1,000,000.00; *provided, however* that UBS RESI shall have no obligation to make any payments under this Section 12(b) unless the Initiating Parties provide invoices to UBS RESI and its counsel for all Reimbursable Costs and proof of the Initiating

Parties' payment of such invoices. Within sixty (60) days of receiving an invoice for Reimbursable Costs and proof of payment and upon UBS RESI's good faith determination that such Reimbursable Costs were reasonable, UBS RESI shall pay to the Initiating Parties the amount of such Reimbursable Costs. If all Reimbursable Costs total USD $500,000.00 or less as of the Trustee's Acceptance, then the Initiating Parties shall not be entitled to any further payments from UBS RESI under this Section 12(b). If the Reimbursable Costs total more than USD $500,000.00 as of the Trustee's Acceptance, then UBS RESI shall pay to the Initiating Parties a sum equal to USD $1,000,000.00 less the amount of Reimbursable Costs that have already been reimbursed by UBS RESI under this Section 12(b). For the avoidance of doubt, in no event shall UBS RESI be obligated to pay the Initiating Parties more than USD $1,000,000.00 pursuant to this Section 12(b).

(c)     In the event that a judicial approval proceeding under New York CPLR Article 77, or a similar type of proceeding under other state or federal law ("Judicial Proceeding") is instituted by the Trustee with respect to this Settlement, UBS RESI and Countrywide agree not to object to any request by the Initiating Parties' counsel to seek additional reasonable attorneys' fees, not to exceed one half of one percent (0.5%) of the Payment, from the Trust, and/or to seek reasonable costs incurred in connection with the Judicial Proceeding from the Trust.

**13.     No Oral Modification.** No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is in writing and executed by each of the Parties.

**14.     Interpretation.** The terms of this Agreement were negotiated in good faith and at arm's length by the Parties. The provisions contained herein shall not be construed in favor of or against any Party because that Party or its counsel drafted this Agreement, but shall be construed as if all Parties prepared this Agreement, and any rules of construction to the contrary are hereby expressly waived.

**15.     Legal Advice.** The Parties have each received independent legal advice from attorneys of their choice as to the advisability of making the settlement and the releases provided for herein and as to the advisability of executing this Agreement.

**16.     No Amendments to Transaction Documents.** The Parties agree that this Agreement reflects a compromise of disputed claims and is not intended to, and shall not be argued or deemed to constitute, an amendment of any term of any Transaction Document.

**17.     Concerning the Trustee.** Nothing in this Agreement shall be construed to imply that the Trustee owes any greater duties under the Transaction Documents than it would otherwise owe under those agreements.

**18.     Severability.** If any term or provision of this Agreement or the application thereof, other than the Payment terms contained in Sections 4 or 5, the agreements with respect to the Action in Section 3, the release and waiver contained in Section 6 or the agreement with respect to repurchase claims in Section 8, is found to be illegal, unenforceable, or invalid in whole or in part for any reason, such illegal, unenforceable, or invalid term or provision or part thereof shall be deemed stricken from this Agreement, and such term or provision shall not affect the legality, enforceability, or validity of any other term or provision of this Agreement.

-12-

19.     **Successors in Interest.**  The terms, conditions, and provisions of this Agreement are binding upon and shall inure to the benefit of the Parties and each of their assigns, successors in interest, personal representatives, estates, administrators, heirs, devisees, insurers, and legatees.

20.     **No Waiver.**  The waiver by any Party of any breach of this Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of this Agreement.

21.     **Governing Law.**  This Agreement shall be interpreted in accordance with and governed in all respects by the substantive and procedural law of the State of New York, without regard to the conflicts of law provisions thereof (other than Section 5-1401 of the New York General Obligations Law).

22.     **Dispute Resolution.**  In the event of any controversy or claim arising out of or relating to this Agreement, or a breach thereof, the Parties shall first attempt to settle the dispute by confidential mediation with the Mediator.  If settlement is not reached within sixty (60) days after service of a written demand for mediation, or some longer period mutually agreed to by the Parties, any unresolved controversy or claim shall be brought in New York State Supreme Court, New York County, or the United States District Court for the Southern District of New York.

23.     **Specific Performance.**  Each Party acknowledges and agrees that each other Party would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any such breach could not be adequately compensated in all cases by monetary damages alone.  Accordingly, each Party agrees that, in addition to any other right or remedy to which any other Party may be entitled at law or in equity, each Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to obtain temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of this Agreement; *provided, however,* that no Party will be entitled to any remedy under this Agreement by virtue of its termination if the Trustee does not deliver the Trustee's Acceptance prior to the Acceptance Deadline in accordance with Section 2(c)(i).

25.     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original.  The counterparts shall constitute one and the same Agreement. Facsimile and PDF signatures shall have the same force and effect as original signatures.

26.     **Third-Party Beneficiaries.**  Each Released Person shall be a third-party beneficiary of this Agreement, with the right to sue under and directly enforce this Agreement. No other Person that is not a Released Person or a signatory to this Agreement shall have any third-party beneficiary or other rights under this Agreement, or have any right to sue under or directly enforce this Agreement.

[REMAINDER OF PAGE BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

NATIONAL CREDIT UNION
ADMINISTRATION BOARD, AS AN AGENCY
OF THE EXECUTIVE BRANCH OF THE
UNITED STATES AND AS GUARANTOR OF
NCUA GUARANTEED NOTES TRUST 2010-R3
AND NCUA GUARANTEED NOTES TRUST
2011-R2

By: _____

Name: _____

Title: _____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

THE BANK OF NEW YORK MELLON, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS THE INDENTURE TRUSTEE OF NCUA GUARANTEED NOTES TRUST 2010-R3 AND NCUA GUARANTEED NOTES TRUST 2011-R2

By: _Alison Kwalski_____

Name: __Alison Kowalski_____

Title: ___Vice President_____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

AXONIC CREDIT OPPORTUNITIES MASTER FUND, LP,

AXONIC PG STRUCTURED CREDIT FUND, LP,

AXONIC HIGH CONVICTION SERIES A,
a segregated series of AXONIC IDF LLC,

    AND

EP AXONIC YIELD LTD.,

BY AXONIC CAPITAL LLC, the investment adviser / investment manager for the above entities,

By: _____
Name: _____ CLAYTON DEGIACINTO _____
Title: _____ AUTHORIZED SIGNATORY _____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

UBS REAL ESTATE SECURITIES INC.

By: _____
Name: John Lantz
Title: Executive Director

By: _____
Name: William W Chandler
Title: Managing Director


COUNTRYWIDE HOME LOANS, INC.

By: _____
Name: _____
Title: _____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

IN WITNESS WHEREOF, the Parties or their authorized representatives have executed this Agreement as of the Execution Date.

UBS REAL ESTATE SECURITIES INC.

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


COUNTRYWIDE HOME LOANS, INC.

By: _____
Name:  Elizabeth Chen
Title:   Senior Vice President

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

ACCEPTED AND AGREED for the Trusts.

U.S. BANK NATIONAL ASSOCIATION, solely
in its capacity as Trustee

By: _____

Name: _____

Title: _____

Date: _____

*Signature Page for MARM 2006-OA2, 2007-1 and 2007-3 Settlement Agreement*

APPENDIX 1

Allocations for Purposes of Section 5 of Settlement Agreement

Appendix 1

**MARM 2006-OA2**

Group 1
Loss Share Percentage: 12.673625%
**Allocable Share of Payment:      $68,875,577.99**

Group 2
Loss Share Percentage:  7.542307%
**Allocable Share of Payment:      $40,989,121.65**

Group 3
Loss Share Percentage:   1.938160%
**Allocable Share of Payment:      $10,533,047.75**

Group 4
Loss Share Percentage: 9.155446%
**Allocable Share of Payment:      $49,755,822.36**

**MARM 2007-1**

Group I-1
Loss Share Percentage: 6.741528%
**Allocable Share of Payment:      $36,637,237.23**

Group I-2
Loss Share Percentage: 19.09617%
**Allocable Share of Payment:      $103,779,291.56**

Group II
Loss Share Percentage: 1.055761%
**Allocable Share of Payment:      $5,737,594.76**

**MARM 2007-3**

Group 1-1
Loss Share Percentage: 10.047237%
**Allocable Share of Payment:      $54,602,310.36**

Group 1-2
Loss Share Percentage: 19.630381%
**Allocable Share of Payment:      $106,682,482.41**

Group 2-1
Loss Share Percentage: 3.306243%
**Allocable Share of Payment:      $17,967,977.73**

Group 2-2
Loss Share Percentage: 8.813140%
**Allocable Share of Payment:      $47,895,535.97**

EXHIBIT A

Form of Stipulation of Voluntary Dismissal of the Action

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S. BANK, NATIONAL ASSOCIATION,      :
solely in its capacity as Trustee of MASTR   :
ADJUSTABLE RATE MORTGAGES TRUST   :
2006-OA2, MASTR ADJUSTABLE RATE   :
MORTGAGES TRUST 2007-1, AND MASTR   :   12-cv-7322 (PKC)
ADJUSTABLE RATE MORTGAGES TRUST   :
2007-3,                                :
                                       :
                        Plaintiff,     :
                                       :
          - against -                  :
                                       :
UBS REAL ESTATE SECURITIES INC.,       :
                                       :
                        Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STIPULATION OF VOLUNTARY DISMISSAL WITH PREJUDICE

WHEREAS Plaintiff U.S. Bank, National Association, as Trustee of MASTR Adjustable

Rate Mortgages Trust 2006-OA2, MASTR Adjustable Rate Mortgages Trust 2007-1, and

MASTR Adjustable Rate Mortgages Trust 2007-3, and Defendant UBS Real Estate Securities

Inc. have reached a settlement disposing of all claims asserted in the above-captioned action;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between

the parties, through their undersigned counsel, that, pursuant to Federal Rule of Civil Procedure

41(a)(1), this action shall be, and hereby is, dismissed with prejudice, with each party to bear its

own costs.

DATED: _____, 2017
       New York, New York


QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

_____

Sean P. Baldwin
David L. Elsberg
Andrew R. Dunlap
Steven M. Edwards
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone:  (212) 849-7000

*Attorneys for U.S. Bank, National
Association*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

_____

Scott D. Musoff
Robert A. Fumerton
Alexander C. Drylewski
Four Times Square
New York, NY 10036
Phone:  (212) 735-3000

Charles F. Smith
Lara A. Flath
155 N. Wacker Drive
Chicago, IL 60606
Phone: (312) 407-0700

*Attorneys for UBS Real Estate Inc.*


SO ORDERED this \_\_\_ day of _____, 2017:


_____
      U.S.D.J.

EXHIBIT F



Global Corporate Trust Services
190 S. LaSalle St | | MK-IL-SLTM
Chicago, IL 60603

**NOTICE TO HOLDERS OF MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1,**

**MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2007-1**

**Please forward this notice to beneficial holders of the certificates and notice parties under the MARM 2007-1 PSA. The classes of certificates and their corresponding CUSIPs are listed on Exhibit A.**

Reference is hereby made to the Pooling and Servicing Agreement, dated as of December 1, 2006 (the "MARM 2007-1 PSA"), among Mortgage Asset Securitization Transactions, Inc. (the "Depositor"), UBS Real Estate Securities Inc. ("UBS"), Wells Fargo Bank, N.A. ("Wells Fargo"), and U.S. Bank National Association as trustee. Reference is also made to (i) the Pooling and Servicing Agreement, dated as of October 1, 2006 (the "MARM 2006-OA2 PSA"), among the Depositor, UBS, Wells Fargo, U.S. Bank as trustee, and Clayton Fixed Income Services Inc.; and (ii) the Pooling and Servicing Agreement, dated as of April 1, 2007 (the "MARM 2007-3 PSA" and together with the MARM 2006-OA2 PSA and the MARM 2007-1 PSA, the "PSAs") among the Depositor, UBS, Wells Fargo, and U.S. Bank. This notice refers to U.S. Bank in its capacities as trustee under the PSAs, including as the plaintiff in the Lawsuit (as defined below), as the "Trustee" or "Plaintiff".

Reference is also made to prior notices in which the Trustee informed you of the status of Plaintiff's pending lawsuit against UBS in the United States District Court for the Southern District of New York (the "Court"), Case No. 12-cv-7322 (PKC) (the "Lawsuit") related to the MASTR Adjustable Rate Mortgages Trust 2007-1 (the "MARM 2007-1 Trust"), the MASTR Adjustable Rate Mortgages Trust 2006-OA2, and the MASTR Adjustable Rate Mortgages Trust 2007-3 (each a "Trust" and together, the "Trusts"). Certificateholders should carefully review all materials filed on, and continue to monitor, the Lawsuit's public docket, available at https://ecf.nysd.uscourts.gov/cgi-bin/login.pl or https://www.pacer.gov. Any discrepancy between the Court's records and this notice should be resolved in favor of the Court's records. References to docket numbers herein correspond to the Lawsuit's public docket. Headings used herein are for convenience only.

Reference is also made to the Trustee's October 18, 2017 notice (the "October 18 Notice"), informing you that the Trustee had received a letter from the law firm Keller Rohrback L.L.P. on behalf of certain "Initiating Parties," attaching a proposed settlement agreement negotiated with UBS and Countrywide Home Loans, Inc. ("Countrywide"). Keller Rohrback has provided the Trustee with a corrected proposed settlement agreement (the "Proposed Settlement Agreement"), in which the definition of "Initiating Parties" has been revised. It is annexed hereto as **Exhibit B**.

By its terms, the Trustee would not become a party to, or be bound by, the Proposed Settlement Agreement unless the Trustee accepts it on behalf of the Trusts prior to the "Acceptance Deadline," as defined therein. **You are hereby notified that, on December 21, 2017, UBS and Countrywide extended the Acceptance Deadline from January 9, 2018 to <u>February 8, 2018</u>. Certificateholders that wish to share their views of the Proposed Settlement Agreement should contact the Trustee (<u>nicolas.valaperta@usbank.com</u>) in writing by <u>January 26, 2018</u>.**

**Since the publication of the October 18 Notice, the Trustee has received questions from certificateholders relating to the Proposed Settlement Agreement and the Lawsuit. The Trustee is sending this notice to provide additional information, including information that is intended to respond to those questions.**

Keller Rohrback previously sent a certificate of beneficial ownership to the Trustee completed by The Bank of New York Mellon, one of the "Initiating Parties." In that certificate, The Bank of New York Mellon certified that it owned certificates with a current principal amount of ~$15.2 million in the MARM 2007-1 Trust.[1]

As set forth in the October 18 Notice, the Hon. P. Kevin Castel, who presided over the trial of the case, has appointed the Hon. Barbara S. Jones (a retired judge from the United States District Court for the Southern District of New York) to serve as the Sole Master (the "<u>Master</u>") with respect to loans and legal issues that the Court did not resolve in its September 6, 2016 Memorandum and Order ("<u>Trial Order</u>") (Docket No. 505).  <u>See</u> Docket Nos. 515, 539, 545 and 549.  Orders issued and Reports and Recommendations filed by the Master are "subject to review by the Court pursuant to Federal Rule of Civil Procedure 53(f)." Docket No. 539; <u>see also</u> Docket Nos. 545 and 549.

Per the October 18 Notice, Keller Rohrback, on behalf of the Initiating Parties, asked the Trustee to seek a stay of all proceedings in the Lawsuit. UBS, Countrywide, and one of the Initiating Parties (the National Credit Union Administration Board) separately asked the Master to stay the Master proceedings. After carefully considering relevant facts and circumstances, the Trustee informed the Master that it opposed staying the Master process. The Master has declined to stay the Master process, and the process is ongoing.

<u>Update on the Master Process</u>

Following her appointment, the Master directed the parties to identify all loans that the parties believed could be resolved in one party's favor based on the Trial Order. Docket No. 527. In April 2017, the parties entered into a stipulation, which was so-ordered by the Master and the Court, in which 454 loans were resolved in Plaintiff's favor (including ~121 from the MARM 2007-1 Trust) and 1,637 loans

---

[1] In certain cases, this notice uses "~" to denote approximate numbers and values, but certificateholders are cautioned that all numbers and values contained in this notice are approximate and are based on the Trustee's current estimates, which may change.

were resolved in UBS's favor (including ~331 from the MARM 2007-1 Trust), in each case subject to full preservation of appellate rights (the "April 2017 Stipulation").  Docket No. 541.

UBS asked the Master to resolve in UBS's favor, and to exclude from the Master process, certain other categories of loans under the Trial Order, including loans for which Plaintiff did not allege a breach of warranty based on borrower fraud.  On April 21, 2017, the Master issued a Report and Recommendation in which the Master, among other things, held that Plaintiff could continue to pursue recovery on loans in the Master process where the breach allegation was not based on borrower fraud. Docket No. 542.  The Court adopted the Master's April 21 Report and Recommendation by Order dated June 5, 2017.  Docket No. 549.

Following the Trial Order and the April 2017 Stipulation, per Plaintiff's calculation, there were ~6,757 loans at issue in the Master process (excluding paid-in-full loans), of which ~1,981 loans were from the MARM 2007-1 Trust.

On May 1, 2017, the Master issued a Report and Recommendation stating that she would "conduct a loan-by-loan review of each outstanding loan, ordered by category."  Docket No. 545.  Plaintiff's litigation counsel had requested to submit, as the first category, breaches of the Mortgage Loan Schedule warranty involving borrower fraud due to undisclosed debts (the "Undisclosed Debt Loans").  Plaintiff's litigation counsel explained to the Master that they viewed these loans as having the strongest claims under the Trial Order.  The Master granted Plaintiff's request.  Docket No. 545.  The Master also ordered Plaintiff to provide submissions for no fewer than 400 loans per month, followed by response submissions by UBS, and reply submissions by Plaintiff.  Id.  The Court adopted the Master's Report and Recommendation by Order dated June 5, 2017.  Docket No. 549.

The Master has now issued rulings on 698 of the 806 Undisclosed Debt Loans submitted as part of the first two batches.  As to all three Trusts, the Master resolved 692 Undisclosed Debt Loans in Plaintiff's favor and resolved six Undisclosed Debt Loans in UBS's favor.[2]  The Master informed the parties that she is continuing to review the remaining 108 loans, and those loans have not yet been resolved.[3]  With respect to the MARM 2007-1 Trust specifically, excluding paid-in-full loans, the Master resolved 206 Undisclosed Debt Loans in Plaintiff's favor, resolved five Undisclosed Debt Loans in UBS's favor, and is still reviewing 67 loans.

The above loan-level Master results relate exclusively to Undisclosed Debt Loans.  The Master has not issued any rulings on loans where the alleged breach of warranty is based on (i) evidence of borrower fraud other than failure to disclose debts (such as based on allegations of borrower misrepresentations of income or occupancy), or (ii) evidence of breach where Plaintiff has not alleged

---

[2] Twelve of the 692 loans resolved by the Master have been paid in full and were inadvertently submitted to the Master. Plaintiff will not be seeking rulings from the Master on any other paid-in-full loans.

[3] Three of the 108 loans have been paid in full and Plaintiff is no longer pursuing relief on these loans.

borrower fraud (such as breaches based on the originator's failure to adhere to the underwriting guidelines).

If the Trustee were to accept the Proposed Settlement Agreement in accordance with its terms, ~$146.2 million of the ~$543.5 million settlement "Payment" would be allocated to the MARM 2007-1 Trust. See Exhibit B, Appendix 1.

The following charts (Charts A and B) summarize the MARM 2007-1 loans resolved in Plaintiff's favor to date, excluding paid-in-full loans. The estimated values provided below are based on calculations performed by Plaintiff's expert, applying its methodology submitted at trial. UBS continues to contest Plaintiff's damages methodology and, in particular, seeks a ruling, per below, that damages on liquidated loans are negligible under the MARM 2007-1 PSA. Further, the loans resolved by the Master remain subject to Court review, and all loan rulings in the Lawsuit remain subject to appellate review.

| *Chart A: Liquidated Loans* | Number of Loans | Estimated Damages |
|---|---|---|
| Resolved Per April 2017 Stipulation in Plaintiff's Favor | ~82 | ~$25 million |
| Undisclosed Debt Loans Resolved by Master in Plaintiff's Favor | ~148 | ~$44.4 million |

| *Chart B: Active Loans* | Number of Loans |
|---|---|
| Resolved Per April 2017 Stipulation in Plaintiff's Favor | ~37 |
| Undisclosed Debt Loans Resolved by Master in Plaintiff's Favor | ~58 |

As to the active loans, Plaintiff is seeking an order from the Court that UBS must repurchase active loans on which Plaintiff proves breaches of warranty with a material and adverse effect on the certificateholders' interests. For purposes of considering the Proposed Settlement Agreement, however, Plaintiff's expert is calculating the net cash value associated with UBS's repurchase of active MARM 2007-1 loans resolved in Plaintiff's favor to date.

Additional Undisclosed Debt Loans from all three Trusts have been submitted to, but not yet resolved by, the Master. As to those loans, UBS has not contested that ~46 liquidated loans from the MARM 2007-1 Trust and ~19 active loans from the MARM 2007-1 Trust contain breaches of warranties with a material and adverse effect on certificateholders' interests, but, as to certain such loans, it contests the reliability of the underlying loan files. Plaintiff's expert has calculated the estimated damages associated with the ~46 such liquidated loans to be ~$13.4 million.

4

With respect to MARM 2007-1 loans that have not yet been resolved in the Master process, there are ~750 loans for which Plaintiff's breach of warranty claims are based on borrower fraud (including the ~65 Undisclosed Debt Loans referenced immediately above). Of these 750 loans, ~537 are liquidated loans and ~213 are active loans. There are ~1,020 unresolved MARM 2007-1 loans for which Plaintiff's breach of warranty claims are not based on borrower fraud. Of these 1,020 loans, ~629 are liquidated loans and ~391 are active loans.

Given certain rulings in the Trial Order and while preserving all appellate rights, Plaintiff's litigation counsel has informed the Master that Plaintiff expects to not pursue relief in the current Master process on a significant number of loans where Plaintiff's breach of warranty claim is not based on borrower fraud. Plaintiff has not yet determined how many such loans it will not pursue in the current Master process.[4]

Next Steps in the Master Review Process

In mid-November 2017, Plaintiff asked the Master to adjust the review process to permit Plaintiff to submit next statistically significant, random samples of 100 loans from each Trust, which would be prioritized for resolution after the sample loans are fully submitted.[5] Plaintiff's litigation counsel explained to the Master that, based on certain rulings in the Trial Order, Plaintiff expects to prevail on significantly fewer loans where the alleged breach of warranty is not based on borrower fraud compared to claims based on alleged borrower fraud. Accordingly, Plaintiff's litigation counsel told the Master that rulings on samples of loans could assist Plaintiff in developing a better understanding as to overall expected results through the Master process.

On November 30, 2017, the Master informed the parties that she would permit Plaintiff to submit next loans from the samples selected by Plaintiff's expert. UBS will be bound by rulings on individual loans but not by any extrapolation based on the sample results. The additional loans that comprise the samples are currently expected to be fully submitted by April or May 2018.

The Master is also considering, and has not yet ruled on, various submissions made by UBS and Plaintiff regarding certain unresolved legal issues that may meaningfully affect Plaintiff's recovery in the Lawsuit.

For example, on damages, UBS seeks a ruling that Plaintiff can recover only negligible damages on liquidated loans under the PSAs. See also Docket No. 483. UBS also seeks a ruling that any damages award in the Lawsuit should be reduced to account for insurance payments that the Certificate Insurer made to the Trusts. Id.

---

[4] If, in preparing submissions to the Master, Plaintiff concludes that, based on the Trial Order, it cannot prevail on a loan for which it has alleged breach of warranty based on borrower fraud, Plaintiff would also cease pursuing such a claim in the current Master process, again while preserving its full appellate rights.

[5] Plaintiff's expert randomly selected the sample for each Trust from ~6,753 total loans that remained to be decided following the April Stipulation, excluding loans that have been paid in full.

Plaintiff seeks rulings, among other things, awarding it (i) pre-judgment interest at the New York statutory rate of 9% as to liquidated loans on which it prevails; and (ii) expenses reasonably incurred in enforcing Plaintiff's remedies, including attorneys' fees, as set forth in the PSAs' repurchase protocol (see, e.g., MARM 2007-1 PSA § 2.03). See also Docket Nos. 477; 495 (Am. Compl.), at 21.  UBS contests this relief.  See, e.g., Docket No. 483.  The estimated damages calculations above do not include any award of prejudgment interest or any recovery of legal expenses.  According to the calculation of Plaintiff's expert, if pre-judgment interest at a rate of 9% were imposed on the MARM 2007-1 liquidated loans on which Plaintiff has prevailed through the April 2017 Stipulation and the Master Process to date (shown in Chart A), the interest would total ~$31 million, assuming interest starts running 90 days after the dates on which UBS discovered or received notice of breaches per the Trial Order.

To date, the MARM 2007-1 Trust has been charged ~$17.3 million in attorneys' fees and ~$7.4 million in other expenses, including expert fees.  The MARM 2006-OA2 Trust and the MARM 2007-3 Trust have each separately been charged fees and expenses.  The Trustee's expenses and fees related to the Lawsuit continue to be charged to the Trusts in accordance with the PSAs.

Certificateholders are cautioned that other developments, including, without limitation, appellate rulings in other litigations, could also affect the outcome of the Lawsuit.

* * * * *

The Trustee is continuing to evaluate the Proposed Settlement Agreement, given various relevant factors, including, without limitation, the terms of the Proposed Settlement Agreement, results achieved to date and potential results, litigation risks, expenses, and views that it receives from certificateholders. **Per above, certificateholders that wish to share their views of the Proposed Settlement Agreement should contact the Trustee (nicolas.valaperta@usbank.com) in writing by January 26, 2018.**

Certificateholders are cautioned that their responses do not bind the Trustee to any particular course of action.  Certificateholders may be asked to complete a certificate of beneficial ownership in connection with submitting their views.  In addressing inquiries that may be directed to it, the Trustee may conclude that a specific response to a particular inquiry from an individual certificateholder is not consistent with equal and full dissemination of information to all certificateholders.  To protect the interests of all certificateholders, the Trustee may condition any response to inquiries by certificateholders upon the execution and delivery of a confidentiality agreement and may determine not to disclose certain information.  Recipients of this notice are cautioned that receipt of this notice does not indicate that the Trustee will recognize the recipient as a certificateholder.

This notice is intended to summarize certain developments in the Lawsuit and with respect to the Proposed Settlement Agreement.   It is not a complete summary or statement of the same. Certificateholders should carefully review the Court docket, Exhibit B and prior notices and should

6

consult with their own legal and financial advisors regarding the matters set forth therein and in this notice. Certificateholders are also cautioned that this notice is based on, among other things, Plaintiff's current understanding of various developments as well as calculations performed by its experts, and these estimates could be subject to modification. Please note that this notice is not intended, and should not be construed, as investment, accounting, financial, legal, tax, or other advice by or on behalf of the Trustee, or its directors, officers, employees, affiliates, agents, attorneys, or advisors. Certificateholders and other persons interested in the Trusts should not rely on the summary or description of any matter contained in this notice. The Trustee makes no representation and accepts no responsibility or liability as to the completeness or accuracy of the information provided herein.

The Trustee expressly reserves all rights under the PSAs, including, without limitation, its right to payment in full of all fees and costs as provided in and subject to the applicable terms of the PSAs, and its right, prior to exercising any rights or powers vested in it by the PSAs at the request or direction of any of the certificateholders, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities that may be incurred in compliance therewith; and all rights that may be available to it under applicable law or otherwise. No delay or forbearance by the Trustee under the terms of the PSAs, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein. Please note that, prior to any distribution to certificateholders, to the extent permitted under the PSAs, funds held by the Trustee may be used first for payment of the fees and costs incurred or to be incurred by the Trustee in performing its duties, as well as for any indemnities owed or to become owed to the Trustee. This includes, but is not limited to, compensation for the Trustee's time spent, and the fees and costs of counsel and other agents it employs, to pursue remedies or other actions, including the resolution of the issues described in this notice.

**U.S. BANK NATIONAL ASSOCIATION,**                              **January 2, 2018**
**solely in its capacity as Trustee of the MARM 2007-1 Trust**

7

# EXHIBIT A

| MARM 2007-1 Class | MARM 2007-1 CUSIP[1] |
|---|---|
| I-1A | 576431AA8 |
| I-2A1 | 576431AB6 |
| I-2A2 | 576431AC4 |
| I-2A3 | 576431AD2 |
| I-2A4 | 576431AE0 |
| I-X-1 | 576431AF7 |
| I-X-2 | 576431AG5 |
| I-X-3 | 576431AH3 |
| I-M1 | 576431BG4 |
| I-M2 | 576431BH2 |
| I-M3 | 576431BJ8 |
| I-M4 | 576431BK5 |
| I-M5 | 576431BL3 |
| I-M6 | 576431BM1 |
| I-M7 | 576431BN9 |
| I-C | 576431BS8 |
| I-P | 576431BT6 |
| I-R | 576431BU3 |
| II-A-1 | 576431AJ9 |
| II-A-2 | 576431AK6 |
| II-A-3 | 576431AL4 |
| II-A-3X | 576431AM2 |
| II-A-4 | 576431AN0 |
| II-A-4X | 576431AP5 |
| II-A-5 | 576431AQ3 |
| II-A-5X | 576431AR1 |
| II-A-6 | 576431AS9 |
| II-A-6X | 576431AT7 |
| II-A-7 | 576431AU4 |
| II-A-7X | 576431AV2 |
| II-A-8 | 576431AW0 |
| II-A-9 | 576431AX8 |
| II-A-10 | 576431AY6 |
| II-A-11 | 576431AZ3 |
| II-A-12 | 576431BA7 |
| II-A-13 | 576431BB5 |
| II-A-14 | 576431BC3 |
| II-A-15 | 576431BD1 |
| II-A-LR | 576431BE9 |
| II-A-UR | 576431BF6 |
| II-B-1 | 576431BP4 |
| II-B-2 | 576431BQ2 |
| II-B-3 | 576431BR0 |
| II-B-4 | 576431BV1 |
| II-B-5 | 576431BW9 |
| II-B-6 | 576431BX7 |
| II-P | 576431BY5 |
| R-X | NA |

[1] The CUSIP numbers appearing herein are included solely for the convenience of the Certificateholders. The Trustee is not responsible for the selection or use of CUSIP numbers, or for the accuracy or correctness of CUSIP numbers printed on any Certificates or as indicated in this notice.

# EXHIBIT G



Global Corporate Trust Services
190 S. LaSalle St | | MK-IL-SLTM
Chicago, IL 60603

**NOTICE TO HOLDERS OF MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-3,**

**MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2007-3**

**Please forward this notice to beneficial holders of the certificates and notice parties under the MARM 2007-3 PSA. The classes of certificates and their corresponding CUSIPs are listed on Exhibit A.**

Reference is hereby made to the Pooling and Servicing Agreement, dated as of April 1, 2007 (the "MARM 2007-3 PSA"), among Mortgage Asset Securitization Transactions, Inc. (the "Depositor"), UBS Real Estate Securities Inc. ("UBS"), Wells Fargo Bank, N.A. ("Wells Fargo"), and U.S. Bank National Association as trustee. Reference is also made to (i) the Pooling and Servicing Agreement, dated as of October 1, 2006 (the "MARM 2006-OA2 PSA"), among the Depositor, UBS, Wells Fargo, U.S. Bank as trustee, and Clayton Fixed Income Services Inc.; and (ii) the Pooling and Servicing Agreement, dated as of December 1, 2006 (the "MARM 2007-1 PSA" and together with the MARM 2006-OA2 PSA and the MARM 2007-3 PSA, the "PSAs") among the Depositor, UBS, Wells Fargo, and U.S. Bank. This notice refers to U.S. Bank in its capacities as trustee under the PSAs, including as the plaintiff in the Lawsuit (as defined below), as the "Trustee" or "Plaintiff".

Reference is also made to prior notices in which the Trustee informed you of the status of Plaintiff's pending lawsuit against UBS in the United States District Court for the Southern District of New York (the "Court"), Case No. 12-cv-7322 (PKC) (the "Lawsuit") related to the MASTR Adjustable Rate Mortgages Trust 2007-3 (the "MARM 2007-3 Trust"), the MASTR Adjustable Rate Mortgages Trust 2006-OA2, and the MASTR Adjustable Rate Mortgages Trust 2007-1 (each a "Trust" and together, the "Trusts"). Certificateholders should carefully review all materials filed on, and continue to monitor, the Lawsuit's public docket, available at https://ecf.nysd.uscourts.gov/cgi-bin/login.pl or https://www.pacer.gov. Any discrepancy between the Court's records and this notice should be resolved in favor of the Court's records. References to docket numbers herein correspond to the Lawsuit's public docket. Headings used herein are for convenience only.

Reference is also made to the Trustee's October 18, 2017 notice (the "October 18 Notice"), informing you that the Trustee had received a letter from the law firm Keller Rohrback L.L.P. on behalf of certain "Initiating Parties," attaching a proposed settlement agreement negotiated with UBS and Countrywide Home Loans, Inc. ("Countrywide"). Keller Rohrback has provided the Trustee with a corrected proposed settlement agreement (the "Proposed Settlement Agreement"), in which the definition of "Initiating Parties" has been revised. It is annexed hereto as **Exhibit B**.

By its terms, the Trustee would not become a party to, or be bound by, the Proposed Settlement Agreement unless the Trustee accepts it on behalf of the Trusts prior to the "Acceptance Deadline," as defined therein. **You are hereby notified that, on December 21, 2017, UBS and Countrywide extended the Acceptance Deadline from January 9, 2018 to <u>February 8, 2018</u>. Certificateholders that wish to share their views of the Proposed Settlement Agreement should contact the Trustee (<u>nicolas.valaperta@usbank.com</u>) in writing by <u>January 26, 2018</u>.**

**Since the publication of the October 18 Notice, the Trustee has received questions from certificateholders relating to the Proposed Settlement Agreement and the Lawsuit. The Trustee is sending this notice to provide additional information, including information that is intended to respond to those questions.**

Keller Rohrback previously sent certificates of beneficial ownership to the Trustee completed by Axonic Credit Opportunities Master Fund, LP and various affiliates (together, "<u>Axonic</u>"), one of the "Initiating Parties." In those certificates, Axonic certified that it owned certificates with a current principal amount of ~$12.4 million in the MARM 2007-3 Trust.[1]

As set forth in the October 18 Notice, the Hon. P. Kevin Castel, who presided over the trial of the case, has appointed the Hon. Barbara S. Jones (a retired judge from the United States District Court for the Southern District of New York) to serve as the Sole Master (the "<u>Master</u>") with respect to loans and legal issues that the Court did not resolve in its September 6, 2016 Memorandum and Order ("<u>Trial Order</u>") (Docket No. 505). <u>See</u> Docket Nos. 515, 539, 545 and 549. Orders issued and Reports and Recommendations filed by the Master are "subject to review by the Court pursuant to Federal Rule of Civil Procedure 53(f)." Docket No. 539; <u>see also</u> Docket Nos. 545 and 549.

Per the October 18 Notice, Keller Rohrback, on behalf of the Initiating Parties, asked the Trustee to seek a stay of all proceedings in the Lawsuit. UBS, Countrywide, and one of the Initiating Parties (the National Credit Union Administration Board) separately asked the Master to stay the Master proceedings. After carefully considering relevant facts and circumstances, the Trustee informed the Master that it opposed staying the Master process. The Master has declined to stay the Master process, and the process is ongoing.

<u>Update on the Master Process</u>

Following her appointment, the Master directed the parties to identify all loans that the parties believed could be resolved in one party's favor based on the Trial Order. Docket No. 527. In April 2017, the parties entered into a stipulation, which was so-ordered by the Master and the Court, in which 454

---

[1] In certain cases, this notice uses "~" to denote approximate numbers and values, but certificateholders are cautioned that all numbers and values contained in this notice are approximate and are based on the Trustee's current estimates, which may change.

loans were resolved in Plaintiff's favor (including ~186 from the MARM 2007-3 Trust) and 1,637 loans were resolved in UBS's favor (including ~821 from the MARM 2007-3 Trust), in each case subject to full preservation of appellate rights (the "April 2017 Stipulation"). Docket No. 541.

UBS asked the Master to resolve in UBS's favor, and to exclude from the Master process, certain other categories of loans under the Trial Order, including loans for which Plaintiff did not allege a breach of warranty based on borrower fraud. On April 21, 2017, the Master issued a Report and Recommendation in which the Master, among other things, held that Plaintiff could continue to pursue recovery on loans in the Master process where the breach allegation was not based on borrower fraud. Docket No. 542. The Court adopted the Master's April 21 Report and Recommendation by Order dated June 5, 2017. Docket No. 549.

Following the Trial Order and the April 2017 Stipulation, per Plaintiff's calculation, there were ~6,757 loans at issue in the Master process (excluding paid-in-full loans), of which ~2,547 loans were from the MARM 2007-3 Trust.

On May 1, 2017, the Master issued a Report and Recommendation stating that she would "conduct a loan-by-loan review of each outstanding loan, ordered by category." Docket No. 545. Plaintiff's litigation counsel had requested to submit, as the first category, breaches of the Mortgage Loan Schedule warranty involving borrower fraud due to undisclosed debts (the "Undisclosed Debt Loans"). Plaintiff's litigation counsel explained to the Master that they viewed these loans as having the strongest claims under the Trial Order. The Master granted Plaintiff's request. Docket No. 545. The Master also ordered Plaintiff to provide submissions for no fewer than 400 loans per month, followed by response submissions by UBS, and reply submissions by Plaintiff. Id. The Court adopted the Master's Report and Recommendation by Order dated June 5, 2017. Docket No. 549.

The Master has now issued rulings on 698 of the 806 Undisclosed Debt Loans submitted as part of the first two batches. As to all three Trusts, the Master resolved 692 Undisclosed Debt Loans in Plaintiff's favor and resolved six Undisclosed Debt Loans in UBS's favor.[2] The Master informed the parties that she is continuing to review the remaining 108 loans, and those loans have not yet been resolved.[3] With respect to the MARM 2007-3 Trust specifically, excluding paid-in-full loans, the Master resolved 244 Undisclosed Debt Loans in Plaintiff's favor, resolved zero Undisclosed Debt Loans in UBS's favor, and is still reviewing 19 loans.

The above loan-level Master results relate exclusively to Undisclosed Debt Loans. The Master has not issued any rulings on loans where the alleged breach of warranty is based on (i) evidence of borrower fraud other than failure to disclose debts (such as based on allegations of borrower

---

[2] Twelve of the 692 loans resolved by the Master have been paid in full and were inadvertently submitted to the Master. Plaintiff will not be seeking rulings from the Master on any other paid-in-full loans.

[3] Three of the 108 loans have been paid in full and Plaintiff is no longer pursuing relief on these loans.

misrepresentations of income or occupancy), or (ii) evidence of breach where Plaintiff has not alleged borrower fraud (such as breaches based on the originator's failure to adhere to the underwriting guidelines).

If the Trustee were to accept the Proposed Settlement Agreement in accordance with its terms, ~$227.2 million of the ~$543.5 million settlement "Payment" would be allocated to the MARM 2007-3 Trust. See Exhibit B, Appendix 1.

The following charts (Charts A and B) summarize the MARM 2007-3 loans resolved in Plaintiff's favor to date, excluding paid-in-full loans. The estimated values provided below are based on calculations performed by Plaintiff's expert, applying its methodology submitted at trial. UBS continues to contest Plaintiff's damages methodology and, in particular, seeks a ruling, per below, that damages on liquidated loans are negligible under the MARM 2007-3 PSA. Further, the loans resolved by the Master remain subject to Court review, and all loan rulings in the Lawsuit remain subject to appellate review.

| *Chart A:  Liquidated Loans* | Number of Loans | Estimated Damages |
|---|---|---|
| Resolved Per April 2017 Stipulation in Plaintiff's Favor | ~142 | ~$39.3 million |
| Undisclosed Debt Loans Resolved by Master in Plaintiff's Favor | ~180 | ~$50.8 million |

| *Chart B:  Active Loans* | Number of Loans |
|---|---|
| Resolved Per April 2017 Stipulation in Plaintiff's Favor | ~41 |
| Undisclosed Debt Loans Resolved by Master in Plaintiff's Favor | ~64 |

As to the active loans, Plaintiff is seeking an order from the Court that UBS must repurchase active loans on which Plaintiff proves breaches of warranty with a material and adverse effect on the certificateholders' interests. For purposes of considering the Proposed Settlement Agreement, however, Plaintiff's expert is calculating the net cash value associated with UBS's repurchase of active MARM 2007-3 loans resolved in Plaintiff's favor to date.

Additional Undisclosed Debt Loans from all three Trusts have been submitted to, but not yet resolved by, the Master. As to those loans, UBS has not contested that ~36 liquidated loans from the MARM 2007-3 Trust and ~9 active loans from the MARM 2007-3 Trust contain breaches of warranties with a material and adverse effect on certificateholders' interests, but, as to certain such loans, it contests

the reliability of the underlying loan files. Plaintiff's expert has calculated the estimated damages associated with the ~36 such liquidated loans to be ~$11.2 million.

With respect to MARM 2007-3 loans that have not yet been resolved in the Master process, there are ~930 loans for which Plaintiff's breach of warranty claims are based on borrower fraud (including the ~45 Undisclosed Debt Loans referenced immediately above). Of these 930 loans, ~731 are liquidated loans and ~199 are active loans. There are ~1,373 unresolved MARM 2007-3 loans for which Plaintiff's breach of warranty claims are not based on borrower fraud. Of these 1,373 loans, ~970 are liquidated loans and ~403 are active loans.

Given certain rulings in the Trial Order and while preserving all appellate rights, Plaintiff's litigation counsel has informed the Master that Plaintiff expects to not pursue relief in the current Master process on a significant number of loans where Plaintiff's breach of warranty claim is not based on borrower fraud. Plaintiff has not yet determined how many such loans it will not pursue in the current Master process.[4]

<u>Next Steps in the Master Review Process</u>

In mid-November 2017, Plaintiff asked the Master to adjust the review process to permit Plaintiff to submit next statistically significant, random samples of 100 loans from each Trust, which would be prioritized for resolution after the sample loans are fully submitted.[5] Plaintiff's litigation counsel explained to the Master that, based on certain rulings in the Trial Order, Plaintiff expects to prevail on significantly fewer loans where the alleged breach of warranty is not based on borrower fraud compared to claims based on alleged borrower fraud. Accordingly, Plaintiff's litigation counsel told the Master that rulings on samples of loans could assist Plaintiff in developing a better understanding as to overall expected results through the Master process.

On November 30, 2017, the Master informed the parties that she would permit Plaintiff to submit next loans from the samples selected by Plaintiff's expert. UBS will be bound by rulings on individual loans but not by any extrapolation based on the sample results. The additional loans that comprise the samples are currently expected to be fully submitted by April or May 2018.

The Master is also considering, and has not yet ruled on, various submissions made by UBS and Plaintiff regarding certain unresolved legal issues that may meaningfully affect Plaintiff's recovery in the Lawsuit.

---

[4] If, in preparing submissions to the Master, Plaintiff concludes that, based on the Trial Order, it cannot prevail on a loan for which it has alleged breach of warranty based on borrower fraud, Plaintiff would also cease pursuing such a claim in the current Master process, again while preserving its full appellate rights.

[5] Plaintiff's expert randomly selected the sample for each Trust from ~6,753 total loans that remained to be decided following the April Stipulation, excluding loans that have been paid in full.

For example, on damages, UBS seeks a ruling that Plaintiff can recover only negligible damages on liquidated loans under the PSAs.  See also Docket No. 483.  UBS also seeks a ruling that any damages award in the Lawsuit should be reduced to account for insurance payments that the Certificate Insurer made to the Trusts.  Id.

Plaintiff seeks rulings, among other things, awarding it (i) pre-judgment interest at the New York statutory rate of 9% as to liquidated loans on which it prevails; and (ii) expenses reasonably incurred in enforcing Plaintiff's remedies, including attorneys' fees, as set forth in the PSAs' repurchase protocol (see, e.g., MARM 2007-3 PSA § 2.03).  See also Docket Nos. 477; 495 (Am. Compl.), at 21.  UBS contests this relief.  See, e.g., Docket No. 483.  The estimated damages calculations above do not include any award of prejudgment interest or any recovery of legal expenses.  According to the calculation of Plaintiff's expert, if pre-judgment interest at a rate of 9% were imposed on the MARM 2007-3 liquidated loans on which Plaintiff has prevailed through the April 2017 Stipulation and the Master Process to date (shown in Chart A), the interest would total ~$35.3 million, assuming interest starts running 90 days after the dates on which UBS discovered or received notice of breaches per the Trial Order.

To date, the MARM 2007-3 Trust has been charged ~$17.3 million in attorneys' fees and ~$7.4 million in other expenses, including expert fees.  The MARM 2006-OA2 Trust and the MARM 2007-1 Trust have each separately been charged fees and expenses.  The Trustee's expenses and fees related to the Lawsuit continue to be charged to the Trusts in accordance with the PSAs.

Certificateholders are cautioned that other developments, including, without limitation, appellate rulings in other litigations, could also affect the outcome of the Lawsuit.

* * * * *

The Trustee is continuing to evaluate the Proposed Settlement Agreement, given various relevant factors, including, without limitation, the terms of the Proposed Settlement Agreement, results achieved to date and potential results, litigation risks, expenses, and views that it receives from certificateholders.  **Per above, certificateholders that wish to share their views of the Proposed Settlement Agreement should contact the Trustee (nicolas.valaperta@usbank.com) in writing by January 26, 2018.**

Certificateholders are cautioned that their responses do not bind the Trustee to any particular course of action.  Certificateholders may be asked to complete a certificate of beneficial ownership in connection with submitting their views.  In addressing inquiries that may be directed to it, the Trustee may conclude that a specific response to a particular inquiry from an individual certificateholder is not consistent with equal and full dissemination of information to all certificateholders.  To protect the interests of all certificateholders, the Trustee may condition any response to inquiries by certificateholders upon the execution and delivery of a confidentiality agreement and may determine not to disclose certain information.  Recipients of this notice are cautioned that receipt of this notice does not indicate that the Trustee will recognize the recipient as a certificateholder.

This notice is intended to summarize certain developments in the Lawsuit and with respect to the Proposed Settlement Agreement. It is not a complete summary or statement of the same. Certificateholders should carefully review the Court docket, Exhibit B and prior notices and should consult with their own legal and financial advisors regarding the matters set forth therein and in this notice. Certificateholders are also cautioned that this notice is based on, among other things, Plaintiff's current understanding of various developments as well as calculations performed by its experts, and these estimates could be subject to modification. Please note that this notice is not intended, and should not be construed, as investment, accounting, financial, legal, tax, or other advice by or on behalf of the Trustee, or its directors, officers, employees, affiliates, agents, attorneys, or advisors. Certificateholders and other persons interested in the Trusts should not rely on the summary or description of any matter contained in this notice. The Trustee makes no representation and accepts no responsibility or liability as to the completeness or accuracy of the information provided herein.

The Trustee expressly reserves all rights under the PSAs, including, without limitation, its right to payment in full of all fees and costs as provided in and subject to the applicable terms of the PSAs, and its right, prior to exercising any rights or powers vested in it by the PSAs at the request or direction of any of the certificateholders, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities that may be incurred in compliance therewith; and all rights that may be available to it under applicable law or otherwise. No delay or forbearance by the Trustee under the terms of the PSAs, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein. Please note that, prior to any distribution to certificateholders, to the extent permitted under the PSAs, funds held by the Trustee may be used first for payment of the fees and costs incurred or to be incurred by the Trustee in performing its duties, as well as for any indemnities owed or to become owed to the Trustee. This includes, but is not limited to, compensation for the Trustee's time spent, and the fees and costs of counsel and other agents it employs, to pursue remedies or other actions, including the resolution of the issues described in this notice.

**U.S. BANK NATIONAL ASSOCIATION,**               **January 2, 2018**
**solely in its capacity as Trustee of the MARM 2007-3 Trust**

# EXHIBIT A

| MARM 2007-3 Class | MARM 2007-3 CUSIP[1] |
|---|---|
| 1-1A1 | 57645NAA8 |
| 1-1A2 | 57645NAB6 |
| 1-2A1 | 57645NAC4 |
| 1-2A2 | 57645NAD2 |
| 1-AIO | 57645NAE0 |
| 1-A3 | 57645NAL4 |
| 1-M1 | 57645NAF7 |
| 1-M2 | 57645NAG5 |
| 1-M3 | 57645NAH3 |
| 1-M4 | 57645NAJ9 |
| 1-M5 | 57645NAK6 |
| 2-1A1 | 57645NAM2 |
| 2-1A2 | 57645NAN0 |
| 2-2A1 | 57645NAP5 |
| 2-2A2 | 57645NAQ3 |
| 2-2A3 | 57645NAR1 |
| 2-2A4 | 57645NAS9 |
| 2-2A5 | 57645NAT7 |
| 2-2A6 | 57645NAU4 |
| 2-AIO | 57645NAV2 |
| 2-M1 | 57645NAW0 |
| 2-M2 | 57645NAX8 |
| 2-M3 | 57645NAY6 |
| 2-M4 | 57645NAZ3 |
| 2-M5 | 57645NBA7 |
| 2-M6 | 57645NBB5 |
| 2-M7 | 57645NBC3 |
| 2-M8 | 57645NBD1 |
| I-C | 57645NBE9 |
| 1-1P | 57645NBF6 |
| 1-2P | 57645NBG4 |
| 1-R | 57645NBH2 |
| 1-RX | 57645NBJ8 |
| 2-C | 57645NBK5 |
| 2-1P | 57645NBL3 |
| 2-2P | 57645NBM1 |
| 2-R | 57645NBN9 |
| 2-RX | 57645NBP4 |

[1] The CUSIP numbers appearing herein are included solely for the convenience of the Certificateholders. The Trustee is not responsible for the selection or use of CUSIP numbers, or for the accuracy or correctness of CUSIP numbers printed on any Certificates or as indicated in this notice.

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 11 Civ. 2976 (LAK) |
| Plaintiff, | |
| -against- | STIPULATION AND ORDER OF SETTLEMENT AND DISMISSAL |
| DEUTSCHE BANK AG, DB STRUCTURED PRODUCTS, INC., DEUTSCHE BANK SECURITIES INC., and MORTGAGEIT, INC., | |
| Defendants. | |

WHEREAS, this Stipulation and Order of Settlement and Dismissal (the "Stipulation") is entered into by and among the United States of America, by its attorney Preet Bharara, United States Attorney for the Southern District of New York, and on behalf of the U.S. Department of Housing and Urban Development ("HUD") and the Federal Housing Administration ("FHA") (collectively, the "United States" or "Government"); defendants Deutsche Bank AG ("DBAG"), DB Structured Products, Inc. ("DBSP"), and Deutsche Bank Securities Inc. ("DBSI") (together, the "DB Defendants"), along with MortgageIT, Inc. ("MortgageIT") (collectively, "Defendants") by their authorized representatives;

WHEREAS, MortgageIT is a New York business corporation with its principal place of business in Manhattan, and became a wholly-owned, indirect subsidiary of DBSP in January 2007, when its corporate parent, MortgageIT Holdings, Inc., was merged into a wholly-owned, indirect subsidiary of DBSP;

WHEREAS, DBSI and DBSP are wholly-owned subsidiaries of DBAG with their principal places of business in Manhattan; and DBAG is a German business corporation with a branch office in Manhattan;

# EXHIBIT I

Discover Thomson Reuters



**REUTERS**    World    Business    Markets    Politics    TV



Ad

With QuickBooks, get paid 2x faster. Free 30-day trial. Sign up today.

**Intuit QuickBooks**

Visit Site

**#FUNDS NEWS**    AUGUST 6, 2007 / 5:29 AM / 10 YEARS AGO

# American Home Mortgage files for bankruptcy

Reuters Staff                                    3 MIN READ     

(Adds detail, background)

NEW YORK, Aug 6 (Reuters) - American Home Mortgage Investment Corp. AHM.N, a large home lender catering to people considered good credit risks, completed its rapid descent on Monday when it filed for Chapter 11 bankruptcy protection.

The Melville, New York-based real estate investment trust, one of the largest independent U.S. home loan providers, filed for protection from creditors with the U.S. Bankruptcy Court in Delaware.

The filing came after American Home closed most operations on Friday, laying off all but about 750 workers. The company said it had started the year with more than 7,400 employees.

American Home's bankruptcy reflects how worries about loan defaults fueled by slumping U.S. housing prices have spread beyond subprime lenders, which lend to people with weaker credit, to companies that make higher-quality loans.

Ad                                                               



**Revolutionary Calculator to Find the Best Reverse Mortgages. 100% Free. No SS. NMLS#13999**

Revolutionary Calculator to Find the Best Reverse Mortgages. 100% Free. No SS. NMLS#13999

ALL REVERSE MORTGAGE®

Learn More

American Home invested in home loans and mortgage securities, serviced mortgage accounts and originated loans from a network of branches.

EXHIBIT J

MASTR Adjustable Rate Mortgages Trust
Mortgage Pass-Through Certificates
Distribution Date:     25-Apr-2013

**MASTR Adjustable Rate Mortgages Trust**
**Mortgage Pass-Through Certificates**
**Series 2006-OA2**

Contact:   Customer Service - CTSLink
           Wells Fargo Bank, N.A.
           Securities Administration Services
           8480 Stagecoach Circle
           Frederick, MD 21701-4747
           www.ctslink.com
           Telephone:     1-866-846-4526
           Fax:           240-586-8675

22-Apr-2013        4:15:01PM

| Reserve and Guaranty Funds | | | | |
|---|---|---|---|---|
| Account Name | Beginning Balance | Current Withdrawals | Current Deposits | Ending Balance |
| 1-A-3 Guarantee - Assured Guaranty | 52,986,476.12 | 0.00 | 0.00 | 53,226,019.15 |
| 2-A-3 Guarantee - Assured Guaranty | 34,673,694.82 | 0.00 | 0.00 | 34,830,448.82 |
| 4-A-2 Guarantee - Assured Guaranty | 73,987,510.46 | 0.00 | 0.00 | 74,321,995.66 |
| Cap Account | 1,000.00 | 0.00 | 0.00 | 1,000.00 |
| Carryover Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Mezzanine Cap Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Class P Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |

| Hedge Funds | | |
|---|---|---|
| Account Name | Funds In (A) | Funds Out (B) | Net Amount (A - B) |
| Cap Contract - Wachovia | 0.00 | 0.00 | 0.00 |
| Mezzanine Cap Contract - Wachovia | 0.00 | 0.00 | 0.00 |

MASTR Adjustable Rate Mortgages Trust
Mortgage Pass-Through Certificates
Distribution Date:      25-Apr-2013

**MASTR Adjustable Rate Mortgages Trust**
**Mortgage Pass-Through Certificates**
**Series 2007-1**

Contact:   Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
wwww.ctslink.com
Telephone:      1-866-846-4526
Fax:               240-586-8675

19-Apr-2013      1:33:09PM

| Reserve and Guaranty Funds | | | | |
|---|---|---|---|---|
| Account Name | Beginning Balance | Current Withdrawals | Current Deposits | Ending Balance |
| I-2A2 & I-2A4 Interest Coverage-Assured Guaranty | 0.00 | 0.00 | 0.00 | 0.00 |
| I-2A2 Principal Coverage - Assured Guaranty | 39,101,548.16 | 766,241.62 | 461,542.41 | 39,583,018.96 |
| I-2A4 Principal Coverage - Assured Guaranty | 107,982,473.77 | 0.00 | 488,170.77 | 107,982,473.77 |
| Group I Cap 1 Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Group I Cap 2 Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Carryover Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Class I-P Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Group I Swap Account | 1,000.00 | 0.00 | 0.00 | 1,000.00 |

| Hedge Funds | | | |
|---|---|---|---|
| Account Name | Funds In (A) | Funds Out (B) | Net Amount (A - B) |
| Group I Cap 1 - UBS AG, London Branch | 0.00 | 0.00 | 0.00 |
| Group I Cap 2 - UBS AG, London Branch | 0.00 | 0.00 | 0.00 |
| Group I Swap - UBS AG, London Branch | 26,655.42 | 378,975.00 | (352,319.58) |

MASTR Adjustable Rate Mortgages Trust
Mortgage Pass-Through Certificates
Distribution Date:    25-Apr-2013

**MASTR Adjustable Rate Mortgages Trust**
**Mortgage Pass-Through Certificates**
**Series 2007-3**

Contact:  Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:     1-866-846-4526
Fax:           240-586-8675

18-Apr-2013      8:29:27PM

| Reserve and Guaranty Funds | | | | |
|---|---|---|---|---|
| Account Name | Beginning Balance | Current Withdrawals | Current Deposits | Ending Balance |
| 1-1A2 Interest Coverage - Assured Guaranty | 0.00 | 0.00 | 0.00 | 0.00 |
| 1-1A2 Principal Coverage - Assured Guaranty | 63,372,011.63 | 2,155,511.61 | 557,901.07 | 65,256,116.48 |
| 1-2A2 Interest Coverage - Assured Guaranty | 0.00 | 0.00 | 0.00 | 0.00 |
| 1-2A2 Principal Coverage - Assured Guaranty | 100,380,555.59 | 4,659,299.67 | 877,431.89 | 104,616,227.14 |
| 2-1A2 Interest Coverage - Assured Guaranty | 0.00 | 0.00 | 0.00 | 0.00 |
| 2-1A2 Principal Coverage - Assured Guaranty | 22,660,294.15 | 324,041.38 | 182,991.38 | 22,903,787.56 |
| 2-2A3 Interest Coverage - Assured Guaranty | 0.00 | 0.00 | 0.00 | 0.00 |
| 2-2A3 Principal Coverage - Assured Guaranty | 1,631,799.56 | 355,299.85 | 13,175.60 | 1,981,300.90 |
| 2-2A6 Interest Coverage - Assured Guaranty | 0.00 | 0.00 | 0.00 | 0.00 |
| 2-2A6 Principal Coverage - Assured Guaranty | 34,036,917.88 | 0.00 | 274,823.39 | 33,915,969.72 |
| Class 1-1P Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 1-2P Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 2-1P Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 2-2P Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 2-2A3 Basis Risk Cap Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Group 1 Basis Risk Cap Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Group 1 Certificate Cap Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Group 1 Carryover Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Group 2 Basis Risk Cap Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Group 2 Certificate Cap Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Group 2 Carryover Reserve Fund | 0.00 | 0.00 | 0.00 | 0.00 |
| Group 2 Credit Enhancement Reserve Fund | 1,000.00 | 0.00 | 0.00 | 1,000.00 |

| Hedge Funds | | | |
|---|---|---|---|
| Account Name | Funds In (A) | Funds Out (B) | Net Amount (A - B) |
| Class 2-2A3 Basis Risk Cap - Swiss Re | 0.00 | 0.00 | 0.00 |
| Group 1 Basis Risk Cap - Swiss Re | 0.00 | 0.00 | 0.00 |
| Group 2 Basis Risk Cap - Swiss Re | 0.00 | 0.00 | 0.00 |
| Group 1 Certificate Cap - Swiss Re | 0.00 | 0.00 | 0.00 |
| Group 2 Certificate Cap - Swiss Re | 0.00 | 0.00 | 0.00 |

David Visher
Sandra Visher
28808 Cliffside Drive
Malibu California 90265
310-795-2188
visher@orionpartnersllc.com

February 6, 2018

Hon. P. Kevin Castel
United States District Court
Southern District of New York
500 Pearl Street, Room 1020
New York, New York 10007

Re:   *MASTR Adjustable Rate Mortgages Trust 2006-OA2, et al.* ("Trusts") *v. UBS Real Estate Sec. Inc.* ("UBS"), 12 Civ. 7322 (PKC)

Dear Judge Castel:

    We would like to submit the attached Notice of Motion to Intervene in the above-mentioned case with the attached supporting documents for the reasons contained therein.

Respectfully Submitted,

David Visher
Pro Se

Sandra Visher
Pro Se

cc: All Counsel (by ECF)

PRIORITY ★ MAIL ★ EXPRESS™

UR FASTEST SERVICE IN THE U.S.

USPS USM P3

P S 1 0 0 0 1 0 0 0 0 0 6

PT3 July 2013  OD: 12.5 x 9.5

WHEN USED INTERNATIONALLY, A CUSTOMS DECLARATION LABEL MAY BE REQUIRED.

Civil DKT
MG

WRITE FIRMLY WITH BALL POINT PEN ON HARD SURFACE TO MAKE ALL COPIES LEGIBLE.

CUSTOMER USE ONLY

FROM: (PLEASE PRINT)   PHONE ( 310 ) 7615-2144

David Usher
2820 83rd side Dr
Malibu CA 90265

PAYMENT BY ACCOUNT (if applicable)

DELIVERY OPTIONS (Customer Use Only)

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE ( 212 ) 805-0173

USPDCSDNY
Pro Se Intake Unit
US Courthouse
500 Pearl Street rm 200
NY NY

ZIP + 4® (U.S. ADDRESSES ONLY)
1 0 0 0 7

For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
$100.00 insurance included.

UNITED STATES POSTAL SERVICE®

PRIORITY ★ MAIL ★ EXPRESS™

1007

10007

AMOUNT
$24.70
R2305H127204-09

ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code     Scheduled Delivery Date (MM/DD/YY)    ☐ Military   ☐ DPO

Date Accepted (MM/DD/YY)   Scheduled Delivery Time   ☐ 12 NOON   ☐ 3:00 PM   Postage  $

Time Accepted   ☐ AM   ☐ PM   10:30 AM Delivery Fee   Insurance Fee  $   COD Fee  $

Special Handling/Fragile  $   Sunday/Holiday Premium Fee  $   Return Receipt Fee  $

Weight   ☐ Flat Rate   Acceptance Employee Initials   Total Postage & Fees  $ 24.70   Live Animal Transportation Fee  $

DELIVERY (POSTAL SERVICE USE ONLY)

Delivery Attempt (MM/DD/YY)   Time   ☐ AM   ☐ PM   Employee Signature

Delivery Attempt (MM/DD/YY)   Time   ☐ AM   ☐ PM   Employee Signature

3-ADDRESSEE COPY

LABEL 11-B, OCTOBER 2016   PSN 7690-02-000-9996